## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

RENATA SINGLETON,
MARC MITCHELL,
LAZONIA BAHAM,
JANE DOE,
TIFFANY LACROIX,
FAYONA BAILEY,
JOHN ROE, and
SILENCE IS VIOLENCE;

     *Plaintiffs*,

       v.

LEON CANNIZZARO, in his official
capacity as District Attorney of Orleans
Parish and in his individual capacity;

GRAYMOND MARTIN,
DAVID PIPES,
IAIN DOVER,
JASON NAPOLI,
ARTHUR MITCHELL,
TIFFANY TUCKER,
MICHAEL TRUMMEL,
MATTHEW HAMILTON,
INGA PETROVICH,
LAURA RODRIGUE,
SARAH DAWKINS, and
JOHN DOE,
in their individual capacities;

     *Defendants*.

**Case No. 17-10721**

## SECOND AMENDED COMPLAINT
## AND JURY DEMAND

## PRELIMINARY STATEMENT

This civil rights action challenges the Orleans Parish District Attorney's Office's unconstitutional policy of using extrajudicial and unlawful means to coerce, arrest, and imprison crime victims and witnesses. The plaintiffs in this action are victims and witnesses of crime and a non-profit organization that advocates for victims in Orleans Parish. Each has been harmed by Defendants' unconstitutional acts.

Pursuant to official policies, practices, and customs of Defendant Orleans Parish District Attorney Leon Cannizzaro, prosecutors routinely issue their own fabricated subpoenas directly from the District Attorney's Office—without any judicial approval or oversight—in order to coerce victims and witnesses into submitting to interrogations by prosecutors outside of court. These fraudulent documents create the false impression that meeting with the District Attorney is required by law, and they threaten crime victims and witnesses with fines, arrest, and imprisonment if they do not obey. If that unlawful coercion does not succeed, Defendants routinely obtain arrest warrants to put crime victims and witnesses in jail.

In the past five years alone, Defendants have sought "material witness" warrants at least 150 times. In a significant number of applications for these warrants, Defendants make false statements, omit material facts, and rely on plainly insufficient allegations no reasonable prosecutor would believe could justify the arrest of a witness or a victim of crime. If prosecutors told the whole story, these warrants would never be issued.

In addition, Defendants ensure crime victims and witnesses languish in jail. Defendants habitually seek and obtain extraordinarily high secured money bonds for victims and witnesses, ranging up to $500,000, and sometimes no bond at all. These amounts often dwarf the bond

amounts set for criminal defendants themselves—and they ensure these victims and witnesses are trapped in jail, even when the defendant in the criminal case may be released.

Defendants then deny victims a prompt court appearance, where the victim could challenge her detention or the conditions of her release. As a result, victims and witnesses routinely wait weeks or even months in jail before they are brought before a judge. One rape victim spent 12 days in jail before her first court appearance. A victim of child sex trafficking was jailed for 89 days—including Christmas and New Year's Day—before she had an opportunity to challenge her confinement.

Defendants' policies are designed to create a culture of fear and intimidation that chills crime victims and witnesses from asserting their constitutional rights. As a result of these policies, crime victims and witnesses in Orleans Parish know that if they exercise their right not to speak with an investigating prosecutor, they will face harassment, threats, arrest, and jail.

For instance, when Plaintiff Renata Singleton, at the time an accountant for a charter school system and the victim in a domestic violence case, declined to speak to Defendants, they arrested and jailed her for five days on a $100,000 bond. Upon being booked into jail, Ms. Singleton's clothes were taken, and she was given an orange jumpsuit. When she appeared in court, she was shackled at her hands and feet. Metal chains tethered her to the other prisoners. The defendant, her former boyfriend and alleged abuser, had paid his $3,500 secured bond at arraignment and was released. He came to court from home in his own clothes. He pled guilty to two misdemeanors and was sentenced to probation, avoiding a jail sentence altogether.

Ms. Singleton's experience is but one example of the practices challenged in this action. Other crime victims have been threatened and arrested in front of their friends and family. Their names now appear online in publicly accessible arrest databases. They have had to expend

limited incomes on lawyers to protect themselves against Defendants' unlawful practices. They have had to bear the toll of Defendants' threats when they are often already dealing with trauma connected to the underlying crime.

Defendants' actions violate the United States Constitution and Louisiana law. Plaintiffs seek declaratory and injunctive relief requiring Defendant Cannizzaro to permanently end these unconstitutional and illegal policies, and monetary damages against all individual Defendants who violated their rights.

## JURISDICTION AND VENUE

1.  Plaintiffs bring this action under the First, Fourth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Louisiana law.

2.  The Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). The Court has jurisdiction over Plaintiffs' Louisiana law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

3.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## JURY DEMAND

4.  Plaintiffs demand a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

### A. Plaintiffs

5.  Plaintiff Renata Singleton is a 37-year-old black woman, and a victim in a domestic violence case. The prosecutor attempted to coerce Ms. Singleton into a private meeting

4

at the District Attorney's Office by sending her two fraudulent subpoenas. After Ms. Singleton declined to attend the private meeting, the prosecutor applied for a warrant to jail Ms. Singleton, relying on false, misleading, and plainly insufficient factual assertions in the warrant application. Ms. Singleton was jailed for five days because she could not pay the $100,000 bond the prosecutor recommended based on his factual allegations. The defendant in the case pled guilty to two misdemeanors and was sentenced to inactive probation with no jail time.

6.     Plaintiff Marc Mitchell, a 41-year-old black man with a high school education, was shot multiple times while playing basketball with his nephews. After several negative experiences with the District Attorney's Office, including a meeting at which Mr. Mitchell felt pressured by prosecutors to testify in a way that was inconsistent with his recollection of events, Mr. Mitchell told prosecutors that he no longer wished to meet with them outside of court. Two days later, Assistant District Attorney Michael Trummel applied for an arrest warrant to jail Mr. Mitchell as a material witness, relying on false and misleading factual assertions. Mr. Mitchell was arrested and jailed unless he paid the $50,000 bond sought by the prosecutor based on his factual allegations.

7.     Plaintiff Lazonia Baham, a 49-year-old black woman who has an eighth-grade education and was in special education classes, received a fraudulent subpoena from the District Attorney's Office after her daughter's boyfriend was murdered. When Ms. Baham declined to meet privately with prosecutors as the fraudulent subpoena demanded, Assistant District Attorney Jason Napoli made an application for an arrest warrant to jail her as a material witness. The application relied solely on the allegation that Ms. Baham would not communicate with prosecutors. Ms. Baham was jailed for eight days because she could not pay the $100,000 bond that Defendant Napoli had requested, based on his factual allegations.

5

8.     Plaintiff Jane Doe is the victim of molestation and pornography involving a juvenile. When Ms. Doe was 17 years old, Assistant District Attorney Iain Dover threatened to jail her if she refused to comply with two fraudulent subpoenas demanding that she meet with him privately at the District Attorney's Office. As a result of these threats, Ms. Doe reluctantly attended a meeting with Defendant Dover. The criminal case involving Ms. Doe remains pending, and Ms. Doe faces an imminent risk of future harm.

9.     Plaintiff Fayona Bailey, a 34-year-old black woman, received a fraudulent subpoena to appear at a private meeting at the District Attorney's Office in connection with a murder case. Assistant District Attorney Inga Petrovich and other representatives of the District Attorney's Office threatened Ms. Bailey with a criminal fine or jail time if she did not attend the private meeting. Ms. Bailey was forced to retain and pay for a private attorney to fight the fraudulent subpoena.

10.     Plaintiff Tiffany LaCroix, a 30-year-old black woman, received a fraudulent subpoena issued by Defendant Laura Rodrigue. In the document, Defendant Rodrigue demanded that Ms. LaCroix meet her privately at the District Attorney's Office before trial to discuss a case in which Ms. LaCroix was a witness. The document threatened a fine and jail time if she did not comply. Ms. LaCroix retained and paid for a private attorney to fight the fraudulent subpoena.

11.     Plaintiff John Roe is a 36-year-old black man. Mr. Roe is the victim of an aggravated assault and has cooperated fully with police. After Defendant Sarah Dawkins secured a material witness warrant for Mr. Roe that contained several false statements and material omissions, he was arrested and jailed for three days. After his release, Defendant Dawkins has continued to threaten to jail Mr. Roe and his fiancée unless Mr. Roe agreed to meet with

Defendant Dawkins outside of court. The criminal case involving Mr. Roe is still pending, and Mr. Roe faces an imminent risk of future harm.

12.      Plaintiff Silence Is Violence is a non-profit organization based in Orleans Parish. Silence Is Violence advocates for, represents, and provides services to victims of violent crime in the New Orleans community. The organization was founded to conduct public advocacy to protect New Orleans residents from violent crime. Under Defendant Cannizzaro's administration, it has been forced to focus instead on protecting crime victims from the coercive tactics of the District Attorney's Office.

**B.  Defendants**

13.      Defendant Leon Cannizzaro is the Orleans Parish District Attorney. Defendant Cannizzaro is, and at all relevant times has been, the final policymaker with respect to criminal prosecutions and the treatment of victims and witnesses by the District Attorney's Office in Orleans Parish. Since being sworn into office on January 11, 2009, Defendant Cannizzaro has been responsible for the supervision, administration, policies, practices, and customs of the Orleans Parish District Attorney's Office. Defendant Cannizzaro has been responsible for the hiring, training, discipline, supervision, and control of the Assistant District Attorneys identified in this lawsuit, including the Defendants below. Defendant Cannizzaro is sued in his individual capacity and in his official capacity as Orleans Parish District Attorney.

14.      Defendant Graymond Martin is First Assistant District Attorney in the Orleans Parish District Attorney's Office. In his position as First Assistant District Attorney, Defendant Martin is second-in-command to Defendant Cannizzaro and is responsible for key office policies, including in connection with compliance with ethical rules and the Office's witness contact policies. Defendant Martin is sued in his individual capacity.

15.     Defendant David Pipes is an Assistant District Attorney and Chief of Trials in the Orleans Parish District Attorney's Office. In his position as Chief of Trials, Defendant Pipes evaluates the performance of each Assistant District Attorney under his supervision, recommending raises, promotions, and disciplinary actions, including dismissal. Defendant Pipes is sued in his individual capacity.

16.     Defendant Iain Dover is an Assistant District Attorney in the Orleans Parish District Attorney's Office. Defendant Dover is sued in his individual capacity.

17.     Defendant Jason Napoli is an Assistant District Attorney in the Orleans Parish District Attorney's Office. Defendant Napoli is sued in his individual capacity.

18.     Defendant Arthur Mitchell is an Assistant District Attorney in the Orleans Parish District Attorney's Office. Defendant Mitchell is sued in his individual capacity.

19.     Defendant Tiffany Tucker is an Assistant District Attorney in the Orleans Parish District Attorney's Office. Defendant Tucker is sued in her individual capacity.

20.     Defendant Michael Trummel is an Assistant District Attorney in the Orleans Parish District Attorney's Office. Defendant Trummel is sued in his individual capacity.

21.     Defendant Matthew Hamilton is an Assistant District Attorney in the Orleans Parish District Attorney's Office. Defendant Hamilton is sued in his individual capacity.

22.     Defendant Inga Petrovich is an Assistant District Attorney in the Orleans Parish District Attorney's Office. Defendant Petrovich is sued in her individual capacity.

23.     Defendant Laura Rodrigue is an Assistant District Attorney in the Orleans Parish District Attorney's Office. Defendant Rodrigue is sued in her individual capacity.

24.     Defendant Sarah Dawkins is an Assistant District Attorney in the Orleans Parish District Attorney's Office. Defendant Dawkins is sued in her individual capacity.

25.     Defendant John Doe, an Assistant District Attorney in the Orleans Parish District Attorney's Office, is an individual presently unknown to Plaintiffs despite diligent search and inquiry. Defendant Doe participated in the meeting with Plaintiff Singleton at the Orleans Parish District Attorney's Office, further described herein. Defendant Doe is sued in his individual capacity.

## STATEMENT OF FACTS

I.      **The Unlawful Policies, Practices, and Customs of the Orleans Parish District Attorney's Office**

26.     Government officials investigating and prosecuting crime possess investigatory powers that are immense but not limitless, and they are constrained in at least three critical respects. First, if a prosecutor seeks to compel a victim or witness to submit to an interrogation under the threat of depriving that person of bodily liberty, the prosecutor must first apply to a neutral judge who will decide whether or not a subpoena should be issued pursuant to constitutional and other legal standards.

27.     The Constitution also places additional substantive constraints on a prosecutor or police officer's ability to compel out-of-court interrogations, in addition to the procedural requirement of obtaining a valid court order. For example, prosecutors cannot exploit this power as a pre-trial preparation tool in a manner that corrupts the adversarial system. As a result, the situations in which such a private interview can be compelled are narrow and governed by appropriate legal and constitutional standards, none of which can be applied if a judge is not even informed of the prosecutor's extrajudicial issuance of a subpoena.

28.     Second, if the government officials want to cause the arrest or imprisonment of a crime victim or witness, they generally must apply to a judge to get an arrest warrant. In the

9

warrant application, the official must accurately present all material facts so that the judge can determine whether or not the government has provided sufficient grounds to issue the warrant.

29.     Third, if an arrest warrant is issued and a crime victim or witness is jailed on that warrant, she must be brought before a neutral judicial officer in an expeditious manner for a post-deprivation hearing and opportunity to be heard to ensure that the ongoing detention is necessary to serve the government's compelling interests and that any conditions for release, like posting bail, are constitutional and lawful.

30.     For years, Defendants have been routinely flouting these well-established constitutional and legal requirements, pursuant to an official policy, practice, and custom enforced by Defendant Cannizzaro: prosecutors demand that witnesses meet with them privately and outside of court, and then enforce these demands by seeking material witness warrants for those who do not comply.

31.     Defendants routinely fabricate and then issue their own subpoenas directly from the District Attorney's Office, without any judicial or clerk approval. These documents threaten individuals with arrest and imprisonment in order to coerce victims and witnesses to submit to a private interrogation that they have a constitutional right to decline.

32.     When that unlawful coercion does not work, Defendants routinely obtain "material witness" arrest warrants by relying on false and misleading facts, by omitting material facts from their warrant applications, and by relying on plainly insufficient factual assertions.

33.     Finally, after individuals have been unlawfully jailed pursuant to these warrants, Defendants seek and obtain extraordinarily high monetary bond amounts and leave victims and witnesses to languish in jail without timely access to a judge or an attorney until the Office decides to alert the court to the arrest and schedule a hearing.

**A. Fraudulent and legally invalid "subpoenas"**

34.     The District Attorney's Office under Defendant Cannizzaro has a policy, practice, and custom of coercing private meetings between prosecutors and witnesses by creating the false impression that the meetings are required by law.

35.     To carry out this practice, the Office has systematically created and manipulated documents, styled as "subpoenas," that command witnesses to appear at the District Attorney's Office for private interrogations. The documents take at least three forms: standardized pre-printed "subpoena" forms, unauthorized forms from the electronic "CourtNotify" system, and individualized "subpoena" forms.

36.     These documents are not lawful subpoenas.

37.     First, the District Attorney's Office created its own pre-printed forms that demand the witness appear in person at the Office at a certain time and date to be questioned by prosecutors and other law enforcement officers.

38.     This pre-printed document, which bears the official seal of the District Attorney's Office, is labeled "**SUBPOENA**." It warns: "**A FINE AND IMPRISONMENT MAY BE IMPOSED FOR FAILURE TO OBEY THIS NOTICE.**"



39.     The office-wide template document includes blank spaces for the witness's name, the case name, and the time and date the witness is commanded to appear at the District Attorney's Office.

40.     There is no space on the template for a signature from the judge or clerk of court.

41.     This template allowed prosecutors to adapt the fraudulent form for use in multiple cases over multiple years.

42.     On at least one occasion, First Assistant District Attorney Graymond Martin distributed this template to attorneys, investigators, and victim-witness coordinators at the District Attorney's Office, instructing them to use it exclusively. *See* Appendix A (email from Defendant Martin with attachment).

43.     On May 13, 2014, Defendant Martin's assistant sent an email addressed to the entire staff at the District Attorney's Office, including Defendants Cannizzaro, Pipes, Dover, Petrovich, Napoli, Rodrigue, Tucker, and Dawkins.

44.     The subject line of the email was "OPDA Subpoena Template for Your Use."

45.     The email read: "TO ALL OPDA STAFF: Please see the attached/revised DA Subpoena to be used from this date forward. Please disregard any old forms of subpoenas. **Do not use any of the older subpoenas.** As per the First Assistant D.A. Graymond Martin, please save the attached in a folder on your computer. Thank you."

Date: 5/13/2014 10:50 AM

TO ALL OPDA STAFF:

Please see the attached/revised DA Subpoena to be used from this date forward.  Please disregard any older forms of subpoenas.  Do not use any of the older subpoenas.  As per the First Assistant D.A. Graymond Martin, please save the attached in a folder on your computer.  Thank you.

46.     The template for the fraudulent subpoena, an example of which is seen above in paragraph 38, was attached to the email.

47.     The prosecutors and investigators employed by the District Attorney's Office who deliver these documents regularly made verbal threats that witnesses who do not "obey" fraudulent subpoenas will be arrested and jailed. These threats were often reiterated both in person and over the phone.  The District Attorney's Office has explicitly conceded that the use of these subpoenas is an office "policy."[1]

48.     In addition to the pre-printed form, the District Attorney's Office also has a policy and practice of using a government-run computer program called CourtNotify to generate altered and unlawful subpoenas.

49.     CourtNotify is a computer program that prosecutors and public defenders use to request subpoenas for witnesses to appear for formal judicial proceedings in court.

50.     The District Attorney's Office, however, has altered the subpoenas generated by CourtNotify so that, instead of ordering the witness to testify in court, the subpoenas demand that the witness submit to questioning at the District Attorney's Office.

51.     An example helps to illustrate how this unconstitutional policy is implemented in practice. On February 24, 2017, a representative of the District Attorney's Office delivered a fraudulent CourtNotify "subpoena" to K.M., a 60-year-old homeless man who was the victim of a battery.

---

[1] Charles Maldonado, *Orleans Parish Prosecutors Are Using Fake Subpoenas To Pressure Witnesses To Talk To Them*, The Lens, http://thelensnola.org/2017/04/26/orleans-parish-prosecutors-are-using-fake-subpoenas-to-pressure-witnesses-to-talk-to-them (Apr. 26, 2017) (quoting Assistant District Attorney Chris Bowman, acting as spokesman for the District Attorney's Office, as stating, "The district attorney sees no legal issues *with this policy*.") (emphasis added).

52.     The document demanded that K.M. appear at the District Attorney's Office—not in court—for questioning on March 3, 2017.

53.     This document was not a lawful subpoena.

54.     Based on CourtNotify records, Assistant District Attorney Tucker was the last person to access the March 6th subpoena before the forged document was delivered to K.M. by investigators from the District Attorney's Office.

| Witness Notification History for K____M____ | | | | | |
|---|---|---|---|---|---|
| **CDC Case No :** | | 523972 | | | |
| **Defendant :** | | JOHNQUELL BIBBINS | | | |
| **Event Date:** | | 03/06/2017 09:00 | | | |
| **Item No :** | | A0313815 | | | |
| **Request** | **Status** | **Description** | **Responsible Party** | **Notification Date** | **Logged By** |
| APPEAR | Printed | COURT SERVICE PRINT | Tiffany Tucker | 02/22/2017 02:39 | Tiffany Tucker |
| APPEAR | Printed | COURT SERVICE PRINT | Tiffany Tucker | 02/22/2017 02:39 | Tiffany Tucker |
| APPEAR | Printed | COURT SERVICE PRINT | Tiffany Tucker | 02/22/2017 02:37 | Tiffany Tucker |
| APPEAR | Printed | COURT SERVICE PRINT | Tiffany Tucker | 02/22/2017 02:37 | Tiffany Tucker |
| APPEAR | Printed | COURT SERVICE PRINT | Tiffany Tucker | 02/22/2017 02:36 | Tiffany Tucker |
| APPEAR | Printed | COURT SERVICE PRINT | Tiffany Tucker | 02/22/2017 02:36 | Tiffany Tucker |
| APPEAR | Incomplete Address | need an address to serve | Keith Hoffman | 12/08/2016 07:43 | Keith Hoffman |
| APPEAR | Incomplete Address | need an address to serve | Keith Hoffman | 12/07/2016 08:40 | Keith Hoffman |

55.     To fabricate the document, Defendant Tucker or another representative of the District Attorney's Office under her direction took a CourtNotify subpoena that had previously ordered K.M. to appear in court on March 6, 2017, and altered it so that it instructed him to appear at the *District Attorney's Office* on March 3rd instead.

56.     This forgery is apparent because the individual who altered the document neglected to change the text at the bottom of the subpoena marking the appearance date: on the March 3rd document, the appearance date is still listed as March 6th.



57.     This individual also neglected to remove each of the multiple references to the "court" and replace them with references to the District Attorney's Office.



58.     In addition to the pre-printed forms and the altered CourtNotify subpoenas described above, Defendant has shown reporters a third type of fraudulent subpoena.[2]

---

[2] Paul Murphy, *Practice of fake subpoenas to be stopped by Orleans DA*, WWLTV (Apr. 27, 2017), http://www.wwltv.com/news/local/orleans/practice-of-fake-subpoenas-to-be-stopped-by-orleans-da/434702306.



59.     Like a lawful subpoena, the document includes the trappings of an official

summons, stating that the witness is "hereby notified to appear" at the District Attorney's Office

to discuss "such matters as may be required of you," and including a "return on service" so that a

court could track whether the document was received.

60.     Like the other types of unlawful subpoenas discussed above, however, this

subpoena was never reviewed or approved by a court.

61.     The full scope of these practices has yet to be uncovered, in part because, unlike

lawful subpoenas, the fraudulent documents usually are not intentionally introduced by

prosecutors in public court records.

62.     But the evidence demonstrates that this policy is entrenched and its harms are

widespread. A preliminary investigation based on publicly available information has unearthed

the use of fraudulent subpoenas in a wide variety of criminal cases, with charges ranging from

second-degree murder to disturbing the peace.

63.     They have been signed by at least 14 different prosecutors, 11 of whom are

currently still employed at the District Attorney's Office: (1) Laura Rodrigue, (2) Jason Napoli,

(3) William Dieters, (4) Tiffany Tucker, (5) Mike Trummel, (6) Arthur Mitchell, (7) Sarah

Dawkins, (8) Zachary Popovich, (9) Iain Dover, (10) Robert Moore, (11) Michael Heier, (12)

Inga Petrovich, (13) Louis Russo, and (14) Payal Patel.

64.     At least four of these prosecutors—Defendants Iain Dover, Jason Napoli, Arthur

Mitchell, and Michael Trummel—have held or currently hold a supervisory position.

65.     The number of prosecutors involved and the wide variety of cases in which

fraudulent subpoenas were employed evidence a persistent pattern of violations carried out by

experienced and inexperienced prosecutors alike.

66.     Members of the criminal defense bar in Orleans Parish and former Assistant

District Attorneys who worked under Defendant Cannizzaro confirm what this initial

investigation suggests: the use of these fraudulent subpoenas has been widespread and systemic.

67.     On April 26, 2017, an investigative journalist at *The Lens* published an article

about prosecutors' use of fraudulent subpoenas. Before that date, the use of fraudulent subpoenas

was not widely known among the public.

68.     Defendant Cannizzaro initially defended the practice. Chris Bowman, the official

spokesman for the District Attorney's Office told *The Lens*, "The district attorney does not see

any legal issues with respect to this policy."[3]

69.     Bowman further explained that misleading reluctant witnesses into meeting with

prosecutors was precisely the reason that the Office had created the documents to look as they

do: "Maybe in some places if you send a letter on the DA's letterhead that says, 'You need to

come in and talk to us' … that is sufficient. It isn't here. *That is why it looks as formal as it does*"

(emphasis added).[4]

---

[3] Charles Maldonado, *Orleans Parish prosecutors are using fake subpoenas to pressure witnesses to go talk to them*, The Lens (Apr. 26, 2017), http://thelensnola.org/2017/04/26/orleans-parish-prosecutors-are-using-fake-subpoenas-to-pressure-witnesses-to-talk-to-them.
[4] *Id.*

70.     After facing public criticism from legal and ethical experts and the general public, Defendant Cannizzaro promised to remove the word "subpoena" from documents that were not subpoenas. The "subpoena" title would be replaced with "Notice to Appear."

71.     At 12:50 pm on April 26, 2017, the same day that article about fraudulent subpoenas appeared in *The Lens*, Defendant Martin sent an email to be distributed to all Assistant District Attorneys at the Office.

72.     In the email, Defendant Martin stated, "It has been brought to my attention that some ADA's may be using forms to be delivered to witnesses in cases that may not have been approved by me as appropriate."

73.     Attached to the email was a revised "Notice to Appear" form. Defendant Martin instructed prosecutors to use this new form in lieu of other "self created or modified notice[s] that may be floating around the office," unless approved by him.

74.     The newly-titled "Notice to Appear" documents inform witnesses they are "hereby notified" to report to the DA's Office to speak privately with prosecutors about "such matters *as may be required of you*" (emphasis added).

```
                        NOTICE TO APPEAR
St. v.                                          Case #

                DISTRICT ATTORNEY FOR THE PARISH OF ORLEANS
                        THE STATE OF LOUISIANA

TO: _____

        YOU ARE HEREBY NOTIFIED to appear at the Office of the District
Attorney, for the Parish of Orleans, 619 South White Street, New Orleans,
Louisiana, on the _____ day of _____ at __:__ _.m., Instanter,
to discuss to the truth according to your knowledge in such matters as may
be required of you.

BY LEON A.CANNIZZARO, JR.
District Attorney
619 South White Street                    _____
New Orleans, Louisiana 70119              Assistant District Attorney
```

75.     The format of the newly proposed "notices" resembles official court documents, and like lawful subpoenas, they include a "return on service." The documents misleadingly refer to themselves as "process of Court."



76.     Thus, although they do not include the word "subpoena," the "notice" documents continue to create the false impression that the witness is "required" by law to meet privately with prosecutors.

77.     On April 28, 2017, two days after the *Lens* article, Defendant Martin issued a memorandum to staff at the District Attorney's Office.

78.     This time, Defendant Martin instructed them not to use the "Notice to Appear" form he had recently circulated. He wrote, "At this time I expressly revoke the use of any 'Notice to Appear' or any other self created or modified notice that may be floating around the office in your computer or on some network."

79.     On May 4, 2017, Defendant Martin directed his assistant to circulate to ADAs a template of a letter to send to witnesses.

80.     The letter does not include overt threats of jail or fines and does not resemble an official court order.

81.     However, prosecutors at the District Attorney's Office have made such threats verbally when delivering the letter.

82.     For example, in summer 2017, a prosecutor from the District Attorney's Office threatened a witness with a material witness warrant over the phone when the witness told the prosecutor that she wished to consult with counsel before agreeing to speak with the prosecutor outside of court.

83.     Shortly after the prosecutor made these threats, two investigators from the District Attorney's Office arrived at the witness's door and hand-delivered a letter matching the template Defendant Martin had advised prosecutors to use.

### B.   The unlawful jailing of victims and witnesses

#### 1.   Material witness warrants based on fraudulent subpoenas

84.     After facing public criticism for using fraudulent subpoenas, Defendant Cannizzaro claimed, "There are no consequences, there are no legal consequences for the person who is the subject of that notice if they do not show up … No case has been presented to me where someone was arrested because they failed to honor a District Attorney's notice."[5]

85.     At a City Council hearing on September 20, 2017, Defendant Cannizzaro repeated this claim, and he challenged councilmembers to "show me one person who was ever arrested and convicted with one of those DA notices!"[6]

86.     In fact, based on an initial investigation, in the past three years, Orleans Parish prosecutors applied for arrest warrants for at least ten witnesses explicitly relying on an assertion that the witness did not "obey" a fraudulent subpoena—without informing the court the subpoena was fraudulent.

---

[5] Paul Murphy, *Practice of fake subpoenas to be stopped by Orleans DA*, WWLTV, (Apr. 27, 2017), http://www.wwltv.com/news/local/orleans/practice-of-fake-subpoenas-to-be-stopped-by-orleans-da/434702306.

[6] Remarks of Leon Cannizzaro, Hearing on the Budget of the District Attorney's Office, New Orleans City Council (Sept. 20, 2017).

87.     All ten warrants were issued. Six of these witnesses were jailed—including Plaintiff Singleton.[7]

88.     In their applications for these warrants, prosecutors represented to the court that witnesses had been served valid subpoenas, when, in fact, they had been served fraudulent subpoenas demanding private, out-of-court meetings with prosecutors.

89.     Prosecutors relied on allegations that witnesses did not do as these "subpoenas" demanded, even though the allegation that a witness exercised her constitutional right to decline to meet privately with a prosecutor at the District Attorney's Office is an objectively unreasonable basis to arrest and imprison a witness to or victim of crime.

90.     It is a policy of the District Attorney's Office that the material witness warrant applications must be approved by a supervisor before being submitted to the court.

91.     And consistent with their broader policy and practice when seeking material witness arrest warrants, prosecutors routinely omitted critical facts in these applications in order to obtain a warrant—for example, prosecutors omit that the witness had agreed to appear in court pursuant to a subpoena and had only declined to communicate with them in private.

92.     **_J.B. and I.E._**  In December 2015, two alleged victims of aggravated assault with a firearm approached public defender Thomas Frampton and informed him that they wanted to provide favorable exculpatory statements for the defendant charged in the assault case. Both victims gave Frampton signed statements exculpating the defendant. Frampton emailed the statements to Assistant District Attorney Sarah Dawkins.

---

[7] Ms. Singleton's experience is detailed in Part II of this Complaint.

93.     Soon afterwards, Frampton and Dawkins discussed the signed statements. As Frampton recalls, Dawkins told him, "You know how it goes in our office. Recantations mean someone goes to jail: the defendant or the victim."

94.     Dawkins then sent fraudulent subpoenas to both victims demanding that they appear at her office for a private meeting and threatening them with fines or jailing if they did not "obey."

95.     When the two women declined to attend the private meetings with prosecutors, Dawkins made an application for a material witness warrant for each of the women. Dawkins asked the court to jail each victim unless she paid a $250,000 secured money bond. The sole factual allegation in both warrant applications was that the women had not obeyed subpoenas demanding private, out-of-court meetings at the District Attorney's Office. Dawkins did not inform the court that the "subpoenas" she referenced in her applications were fraudulent and had never been issued by a judge.

> II.
>
> The State has reason to fear ███████████ will not appear in Court pursuant to a subpoena. She received personal service to appear at the Office of the District Attorney on December 17, 2015 and she failed to appear.

96.     The judge granted Dawkins's request based on her factual assertions, and J.B. spent six days in jail.

97.     **K.M.**  In March 2017, Assistant District Attorney Tiffany Tucker made an application for a material witness warrant to arrest K.M., the victim of a battery. The warrant application relied in part on a fraudulent subpoena, which Defendant Tucker attached as an exhibit. Defendant Tucker falsely represented to the court that the document was a "subpoena,"

as that term is defined under Louisiana law. Based on these representations, the court issued the warrant to jail the victim.

> The State has reason to fear ▮▮▮▮ will not appear in Court pursuant to a subpoena as he has failed to at the District Attorney's Office pursuant to subpoena on Friday, March 03, 2017. (See State's Exhibit 1, a copy of the subpoena).

98.     K.M. was arrested that afternoon. He remained in the Orleans Parish Prison for eight days because he could not pay the $100,000 bond that Tucker requested based on her factual assertions.

99.     ***B.B.***  B.B., an alleged witness to a murder, received a fraudulent subpoena demanding that he appear at a private meeting at the District Attorney's Office on February 20, 2014.

100.     When B.B. did not go to the District Attorney's Office on February 20th, Assistant District Attorney Robert Moore sent a text message to a member of B.B.'s family. Moore threatened the family member that he would seek a warrant to arrest B.B if he did not meet with prosecutors outside of court.



101.     Moore applied for a material witness warrant for B.B. Moore asserted in the warrant application that B.B. should be jailed because he would not appear "pursuant to a

subpoena issued by a District Attorney investigator." Moore asked the court to jail B.B. unless he paid a $500,000 bond. The court granted Moore's motion. B.B. was arrested and kept in jail for five days.

102.    **S.B**.  On January 25, 2017, Assistant District Attorney Michael Trummel made an application for a material witness warrant for S.B., the alleged victim of an aggravated battery. Defendant Trummel alleged that a "subpoena" was left in S.B.'s door instructing her to "report to the DA's Office on the day of trial."

103.    This document was not a lawful subpoena. Like each of the other "subpoenas" described here, it had never been presented to or issued by a judge. Nonetheless, based on Trummel's misrepresentation, the court issued a warrant for S.B.'s arrest. Six days later, the defendant in the underlying criminal case pled guilty, and the court vacated the material witness warrant. The District Attorney never called S.B. to testify.

104.    **C.R**.  In March 2015, Assistant District Attorney Michael Heier made an application for the court to jail C.R. on a material witness warrant because C.R. had "failed to appear at the District Attorney's Office subject to subpoena." Heier did not inform the court that the document he called a "subpoena" was not a valid subpoena. The warrant application also asserted that C.R. had missed scheduled appointments with the District Attorney's Office. Heier requested that the court set bond for C.R. at $250,000.

105.    C.R. appeared in court, and the court agreed to release him on a $5,000 bond. Prosecutors objected to releasing C.R. instead of jailing him or placing him on ankle monitoring.

106.    The defendant in the case was charged with simple criminal damage to property and disturbing the peace. She ultimately pled guilty and was given a suspended sentence and six months of inactive probation.

107.    ***S.S.***  In February 2014, S.S.—the victim of an attempted murder—was jailed as a material witness because Assistant District Attorney Jason Napoli asserted in an application for an arrest warrant that S.S. did not "obey" a fraudulent subpoena ordering him to appear at a private meeting at the District Attorney's Office.

108.    Defendant Napoli attached an affidavit to his application for a material witness warrant. The affidavit asserted that his Office's investigator "would leave an Orleans Parish District Attorney Office Subpoena along with his card in the hands of [S.S.'s] Mother or Grandmother after each visit but to no avail, [S.S.] never appeared in the District Attorney['s] Office on the dates listed on his subpoenas." Defendant Napoli did not inform the court that these documents were not lawful subpoenas.

109.    S.S. was arrested and kept in jail for 14 days. At Defendant Napoli's request, and based on his representations, S.S. was held without bail.

110.    ***T.J.***  On January 27, 2017, Assistant District Attorney Williams Dieters requested a material witness warrant for an alleged domestic violence victim because she did not obey a fraudulent subpoena. As a factual basis for the request, Dieters alleged, "[W]hat I did serve her with was, in fact, a DA subpoena … and that is a subpoena." Dieters did not inform the court that the subpoena was not lawful. No judge had been presented with the subpoena as required by law before issuing such a document. The court granted Dieters' motion and a warrant was issued for T.J.'s arrest.

111.    Chief Judge White, who presided over the case, later learned of Dieters' misrepresentations; she stated the she did not know the subpoena was fraudulent when she issued the warrant and would not have issued the warrant had she known.

112.    **Q.J.**  On August 12, 2014, Assistant District Attorney Sarah Dawkins submitted a warrant application for Q.J. Dawkins alleged in the application that Q.J. had not complied with a "subpoena" and that he did not answer prosecutors' phone calls. Dawkins recommended that Q.J. be kept in jail unless he paid a bond of $250,000. Her application was approved by the Chief of Trials, Defendant David Pipes. Dawkins did not inform the court that the subpoena was fraudulent. The court then granted the application on the same day it was filed.

113.    In June 2015, the defendant in the criminal case pled guilty to the illegal carrying of a weapon and misdemeanor marijuana possession-first offense. He received a six month suspended sentence and six months of inactive probation.

### 2.  Material witness warrant applications that provide no reasonable basis for the arrest of a witness or victim of crime

114.    The District Attorney's Office relies on fraudulent subpoenas in its warrant applications as part of a larger policy and practice: submitting material witness warrant applications based on a witnesses' perceived or actual refusal to speak privately with prosecutors.

115.    No reasonable prosecutor would believe that a witness or crime victim can be arrested and jailed because she declines to meet with prosecutors outside of court or to submit voluntarily to interrogation at the District Attorney's Office.

116.    But in the last three years, Orleans Parish prosecutors have sought and secured dozens of material witness warrants on this basis.

117.    For example, in one representative material witness warrant application, which resulted in the issuance of an arrest warrant, the prosecutor alleged that the witness "ha[d] failed to respond to letters, telephone calls, voicemails, emails, and Facebook messages" from prosecutors.

118.    In another warrant application, the prosecutor asked the court to jail a victim of an armed robbery who "informed the District Attorney's Office that she would not speak to representatives of the District Attorney's Office without a lawyer present."

119.    One such allegation—that "[t]he State has reason to fear that [the witness] will not appear in Court pursuant to a subpoena as he has failed to appear pursuant to previous appointments with the undersigned"—appears to be part of an Office-wide template for material witness warrant applications.

120.    In December 2014, Assistant District Attorney Corey Moll relied on this allegation when he applied for a material witness warrant for the victim, J.C. The defendant in the case was charged with "unauthorized use of a motor vehicle."

> The State has reason to fear ▮▮▮▮▮▮▮▮ will not appear in Court pursuant to a subpoena as he has failed to appear pursuant to previous appointments with the undersigned and is avoiding service at the address he provided to the State.

121.    J.C. was jailed for eight days based on Moll's factual assertions because J.C. could not pay the $100,000 money bond that Moll requested.

122.     In June 2015, Assistant District Attorney Mark Lopez used this same phrase as the sole allegation in a warrant application for the arrest of D.B., the victim of aggravated criminal damage to property. The defendant in the case was accused of damaging D.B's Pontiac Firebird.

> The State has reason to fear that the witness will not appear in Court pursuant to a subpoena as he/she has failed to appear pursuant to previous appointments with the undersigned

123.    Based on his factual assertions, Lopez asked that D.B. be jailed unless he paid a $300,000 money bond.

124.     The defendant in the case had been released on a $5,000 money bond. He pled guilty and was sentenced to a one-year suspended sentence and active probation.

125.     In June 2016, the same factual basis appeared again in a warrant application for M.C., the victim of a sexual battery.

> The State has reason to fear **M.C.** will not appear in Court pursuant to a subpoena as she has failed to appear pursuant to previous appointments with the undersigned. Additionally, this witness has routinely changed residences, and does not have a stable address or shelter.

126.     Prosecutors also routinely base material witness warrants on allegations that are entirely irrelevant to whether the witness will appear in court pursuant to a valid subpoena. These allegations regularly target crime victims who are poor.

127.     For example, in the material witness warrant application for M.C., the prosecutor recommended that M.C. be jailed because she had "no place to live" and "no means of support."

128.     Assistant District Attorney Matthew Payne applied for a warrant to jail H.J., the victim of an aggravated battery, because she "does not have a current address."

129.     Assistant District Attorney Louis Russo sought and secured a material witness warrant for D.E., the victim of armed robbery with a firearm, before the defendant in the case had even been arraigned. In support of his application, Russo asserted to the court that D.E. likely had no stable place to live because she was an exotic dancer.

**3.  Material witness warrants based on false allegations and material omissions**

130.     Prosecutors in the District Attorney's Office routinely base material witness warrant applications on material misrepresentations and material omissions.

131.     Upon information and belief, prosecutors in Defendant Cannizzaro's administration have based dozens of warrant applications on false allegations, including: (1) that

the witness was properly served with a subpoena; (2) that the witness refused to testify; and (3) that the Office did not know how to find the witness.

132.     These misrepresentations frequently supplement allegations that the witness has simply exercised her right to decline to speak voluntarily with prosecutors. For example, the material witness warrant for Plaintiff Marc Mitchell came on the heels of his decision not to speak privately with prosecutors anymore. The prosecutor's motion explicitly and inappropriately relied on Mitchell's decision to exercise his First Amendment rights, and alleged in support of Mr. Mitchell's arrest that he "indicated this would be the last meeting he would have with the District Attorney's Office and did not want to move forward with the case."

133.     Prosecutors also told the court that Mr. Mitchell had refused to sign a "subpoena" for court and had bought a bus ticket to leave down. Neither of these allegations was true. The prosecutors omitted the fact that Mr. Mitchell had actually signed a subpoena to testify at trial. Based on the prosecutors' representations in the warrant application, Mitchell was arrested and jailed because he could not pay the $50,000 money bond.

134.     Critical information is also routinely omitted from material witness warrant applications. For example, prosecutors know that many witnesses' refusals to speak to them are the predictable result of prosecutors' strong-arm tactics to secure favorable testimony. But they omit accounts of the coercive tactics that have alienated the witness and led the witness to exercise her right to decline to meet privately with prosecutors outside formal court supervision or testimony, or without their own lawyer present.

135.     Conversely, prosecutors frequently make lackluster attempts to contact the witnesses—if they fail, the witness can be arrested and put in jail, which gives prosecutors an opportunity to influence their testimony in a coercive environment. But prosecutors frequently

do not accurately represent the efforts that they have made when they describe them to judges, creating a false impression that an arrest warrant is the only reasonable way to find and ensure the appearance of a victim or witness.

### 4. Defendant Cannizzaro's role in the unconstitutional abuse of material witness warrant applications at the District Attorney's Office

136.     At a City Council hearing on September 20, 2017, Defendant Cannizzaro made clear that his policy is to use material witness warrants when initial outreach by the District Attorney's Office does not satisfy prosecutors that the person will communicate sufficiently with them outside of court.

137.     When a councilmember criticized Defendant Cannizzaro for jailing rape victims, Defendant Cannizzaro warned that if the Council cut his budget, prosecutors would "not [be] able to work [with victims] as closely." He threatened that the Office would *increase* their use of material witness warrants instead if cuts were made to his budget: "I don't want any of you to be surprised should further cuts be made," Defendant Cannizzaro said.

138.     Not surprisingly, under Defendant Cannizzaro's direction, the unlawful use of material witness warrants has proliferated in the District Attorney's Office.

139.     A pre-discovery review of publicly availably documents has identified more than 30 prosecutors working under Defendant Cannizzaro who have personally signed or approved material witness warrant applications based on materially false allegations, material omissions, or insufficient and irrelevant allegations.

140.     Defendant Cannizzaro's involvement has been personal. At times, Defendant Cannizzaro makes decisions about whether to jail the victim or witness in particular cases.

141.     Recounting a case in which he decided to jail two witnesses, Defendant Cannizzaro said, "I instructed my ADAs to obtain an indictment and, if necessary, secure the

testimony of the witnesses through the use of material witness warrants, which we were ultimately required to do."[8]

142.    This behavior is consistent with Defendant Cannizzaro's reputation in the New Orleans legal community as a micromanager, often weighing in on even the smallest decisions in his assistants' cases.

143.    Defendant Cannizzaro also publicly defended an Assistant District Attorney who engaged in the unlawful conduct that is the subject of this lawsuit: after Assistant District Attorney William Dieters obtained an arrest warrant for a domestic violence victim based on a fraudulent subpoena, Defendant Cannizzaro told the press those actions were justified because the victim had stopped cooperating with prosecutors.[9]

**C.  Violation of the due process rights of incarcerated witnesses**

144.    Once a victim or witness is imprisoned pursuant to a material witness warrant, prosecutors routinely leave that person to languish in jail—without access to judge or counsel—until the prosecutor decides to alert the court of the arrest and requests that a hearing be scheduled. Because prosecutors are able to control the length of a person's post-arrest detention, they are able to create and manipulate that detention as a tool to credibly threaten witnesses and to coerce meetings and interviews while the person is in custody or afterwards.

145.    In addition to the constraints on prolonged post-arrest detention of material witnesses that the federal Constitution imposes under these specific circumstances, prosecutors also routinely violate state law protections. Under Louisiana law, an arrested person must be

---

[8] *Don't let reluctant witnesses derail justice: DA Leon Cannizzaro*, NOLA.com (June 7, 2017), http://www.nola.com/opinions/index.ssf/2017/06/material_witness_warrants.html.

[9] Charles Maldonado, *Prosecutor tried to jail victim of alleged domestic violence after she didn't obey fake subpoena*, The Lens (June 14, 2017), http://thelensnola.org/2017/06/14/new-orleans-prosecutor-used-fake-subpoena-to-seek-arrest-warrant-for-victim-of-alleged-domestic-violence.

brought before a judge within 72 hours of arrest, excluding Saturdays, Sundays, and holidays. *See* Art. 230.1, La. C. Crim. P; *see State v. Chaney*, 384 So. 2d 442, 444 (La. 1980).

146.     Yet people jailed as material witnesses in Orleans Parish regularly remain in jail without seeing a judge for days or weeks beyond this 72-hour period.

147.     After obtaining a material witness warrant from the court, prosecutors must arrange for its entry into NCIC with the Orleans Parish Sheriff's Office. Prosecutors will then direct the Sheriff's Office when to execute the warrant, if it does not issue on its own due to an unrelated arrest or traffic stop.

148.     In general, prosecutors are responsible for decisions about when a material witness or victim is called to court. In Orleans Parish, prosecutors participate in setting matters on the docket. This is done by submitting to the clerk a form called a "set sheet," requesting that a case be set for a hearing on a particular date and at a particular time.

149.     The "set sheet" process is not normally used for criminal arrestees, who are automatically scheduled to go through the magistrate process by the clerk. However, an incarcerated witness or victim is usually brought before a judge only when the prosecutor asks the court to set a hearing for the witness.

150.     The District Attorney's Office knows when a witness is incarcerated; the Office requests the arrest warrant and bond amount and is informed when the arrest is made. Therefore, prosecutors in the District Attorney's Office know when a witness has been kept in jail for more than 72 hours without access to a neutral magistrate.

151.     However, on information and belief, the District Attorney's Office has no procedure to prevent the unlawful and unconstitutional over-incarceration of material witnesses.

152.    The District Attorney's Office lacks such a procedure even though the Office has been held liable for the prolonged incarceration of material witnesses before. *See Mairena v. Foti*, 816 F.2d 1061 (5th Cir. 1987).

153.    Based on a limited review of publicly available records, within the last five years, at least 50 victims and witnesses were confined in jail for more than 72 hours before seeing a judge after being arrested pursuant to material witness warrants that Defendant Cannizzaro's Office sought.

154.    For example, P.M., a victim of child sex trafficking, was arrested pursuant to a material witness warrant obtained based on the prosecutor's factual representations. She was confined in the Orleans Parish Prison for 89 days before she was brought to a neutral judicial officer.

155.    She was arrested on Thanksgiving Day and spent Christmas and New Year's Day in a jail cell away from her infant daughter.

156.    P.M. ultimately remained in the jail for 109 days before she was released. When P.M. left the jail, she had lost her housing and began living on the street. Shortly thereafter, P.M. lost custody of her child.

157.    As another example, E.B., the victim of first-degree rape, was jailed for 12 days before she was brought to a neutral judicial officer.

158.    Yet another example is K.C., a witness in a murder case who was jailed for 18 days before she was brought to a neutral judicial officer. In total, K.C. spent 32 days in jail, including New Year's Day and Christmas.

159.    Prosecutors exploit these prolonged detentions for investigative purposes, interrogating witnesses still in detention or shortly after release, and at times pressuring these

witnesses to change or supplement their statements to better support the prosecution's theory of the case.

160.    Prosecutors regularly make their decisions about when to bring material witnesses to court for a hearing on considerations relating to the underlying prosecution, without regard to the constitutional rights of the witness or crime victim.

161.    Plaintiff Baham, for example, was brought to court for the first time at Defendant Napoli's request after spending eight days in jail as a material witness. Once Baham arrived in court in shackles and an orange jumpsuit, Defendant Napoli exploited this opportunity to interrogate her in a room behind the courtroom and pressure her to change her account of events.

162.    In many cases, the material witness does not receive a hearing at all. The prosecutor simply requests the witness's presence on the date of trial. Prosecutors have used the custodial status of the witness to force the shackled witness to speak privately about her testimony.  The witness is released if the prosecutor decides to no longer use her testimony.

**D.  The chilling effect of Defendants' unlawful practices**

163.    Unless a prosecutor complies with the requirements above and secures a subpoena or warrant through a valid, court-approved legal process, an individual is under no legal obligation to speak with a prosecutor conducting an investigation. The right to freely decline voluntary questioning from a government official is a basic constitutional right.

164.    Defendants' unlawful practices, however, have been effective in widely chilling the exercise of the constitutional right to decline private questioning from prosecutors outside of a formal legal proceeding.

165.    Plaintiffs Renata Singleton, Lazonia Baham, and Jane Doe each had exercised their right to decline to speak voluntarily with the District Attorney's Office after receiving

fraudulent subpoenas insisting that they do so. But prosecutors ultimately secured private interrogations with each of these Plaintiffs by using or threatening to use a material witness warrant, overcoming Plaintiffs' attempts to exercise their legal rights not to speak with prosecutors outside of court.

166.    Plaintiff Marc Mitchell, the victim of an attempted murder, told Assistant District Attorney Michael Trummel that he wanted no further out-of-court contact with prosecutors about the case.

167.    Two days later, Defendant Trummel asked the court to jail Mr. Mitchell as a material witness, alleging that Mr. Mitchell refused to meet with prosecutors. After Mr. Mitchell was released, Mr. Mitchell met with Defendant Trummel twice to discuss his testimony because he feared being jailed again if he did not agree to the private meetings.

168.    The chilling impact of prosecutors' unlawful practices extends beyond the victims and witnesses who have personally been jailed or threatened. The practice is so commonplace that the possibility that a witness or victim could be jailed colors local attorneys' strategic judgments and affects how they counsel their clients.

169.    When a client is a victim or witness in a criminal case, many defense lawyers advise the client to comply with prosecutors' requests for out-of-court meetings, even if the client is adamantly against it and wishes to exercise her First Amendment rights. Any other approach risks arrest and retaliation.

170.    One attorney whose client had been jailed for several months as a material witness considered challenging the legality of her client's detention, but instead arranged a meeting for her to speak with prosecutors because it was the faster way to get her out of jail.

171.     Plaintiff Silence Is Violence has suffered a similar and even more acute chilling effect; the organization never advises victims to decline meetings with prosecutors—even if the victim wishes to do so—for fear that prosecutors will jail the victim on a material witness warrant. In this manner, the unlawful practices challenged in this case determine how the organization itself chooses to exercise its core right to communicate in private with its members and clients, the people that it exists to serve.

172.     The District Attorney's Office has compounded these effects by threatening attorneys and other professionals with criminal charges for complaining about these practices.

173.     Defendant Cannizzaro twice threatened Tamara Jackson, the Executive Director of Silence Is Violence. In 2016, Ms. Jackson submitted a formal complaint to the National District Attorneys Association. The complaint expressed concerns about the inadequate protections the District Attorney's Office provides to crime victims. After filing the complaint, Ms. Jackson sent a copy of it to Defendant Cannizzaro.

174.     Shortly after the complaint was filed, Defendant Cannizzaro called Ms. Jackson and told her to be careful: if it appeared that she was encouraging victims not to communicate with his office, he could prosecute her for witness coercion. Ms. Jackson understood that the threat was made as a direct and proximate result of her advocacy for victims and complaint to the National District Attorneys Association.

175.     This was not the first time Defendant Cannizzaro had made these threats. Three years earlier, Defendant Cannizzaro called Ms. Jackson after she stated in the press that the District Attorney's Office failed to protect victims from violent retaliation. Defendant Cannizzaro told Ms. Jackson that if she dissuaded victims from assisting prosecutors, she could

be charged with obstruction. Again, Ms. Jackson understood this threat to be retaliation for her comments to the press and a warning not to make further statements to reporters.

176.    In December 2014, the District Attorney's Office brought felony charges against an investigator for the Public Defender's Office based on her interaction with a witness. In the same time period, prosecutors at the District Attorney's Office had also threatened two public defenders with prosecution. As a result, although public defenders know that witnesses do not have to meet with prosecutors, they often will not tell witnesses about their constitutional right not to communicate with prosecutors because they fear retaliatory prosecution.

**E.   Supervision and training at the District Attorney's Office**

177.    The supervision and training methods at the District Attorney's Office have encouraged and exacerbated the unconstitutional practices described in this lawsuit.

178.    In some instances, supervisors have directly instructed prosecutors to engage in unconstitutional practices.

179.    For example, as alleged above,[10] on May 13, 2014, First Assistant District Attorney Graymond Martin distributed a template fraudulent subpoena form to the entire staff at the District Attorney's Office and instructed the staff to use it exclusively.

180.    In the April 26, 2017, email to all Assistant District Attorneys, Defendant Martin also explicitly instructed them to use the threat of arrest from a material witness warrant to make contact with a witness: "after the warrant is obtained one last effort to contact the witness prior to the execution of the warrant should be made where the witness is informed of the legal peril…."

---

[10] *See supra* ¶¶ 42-46.

181.    In another instance, in a training on witness recantations, Chief of Trials David Pipes suggested that prosecutors seek material witness arrest warrants with secured money bonds for recanting witnesses. *See* Appendix B (excerpt from training materials).

182.    On the cover page of the materials distributed for the presentation, Defendant Pipes promises: "From impeachment to imprisonment, this session will cover what to do when your witnesses suddenly become their witnesses."

183.    In the same materials, Defendant Pipes describes certain witnesses as "traitors" and "cold-blooded liar[s]."

184.    Defendant Pipes includes witnesses who "change [their] mind[s]" or "[do] not remember" as ways in which "your witness [will] betray you."

185.    Defendant Pipes instructs prosecutors that identifying "the traitors in your midst" prior to trial "will go a long way to making sure you get the last laugh."

186.    The presentation includes slides that appear to mock certain witnesses and victims who Defendant Pipes warns prosecutors might "betray you."

187.    More broadly, Defendant Cannizzaro's administration has adopted supervision policies that promote a "win at all costs" approach to prosecution.

188.    Prosecutors are promoted and demoted based on, among other things, the number of convictions the prosecutor has won at trial. Prosecutors who win jury trials may be rewarded with pay raises, senior attorney positions, or positions in Major Offense Trials unit, which is both prestigious and well-paid. Prosecutors who lose jury trials may be demoted to juvenile court and other less desirable and less well-paid divisions.[11]

---

[11] Publicly available salary documents dated July 15, 2014, listed seven attorneys in the Major Offense Trials unit, including Defendants Rodrigue, Napoli, Petrovich, and Pipes. Defendant Pipes, who was listed as Chief of Major Offense Trials, received a salary of $115,000 per year. The remaining six prosecutors in the Major Offense Trials

189. On information and belief, each prosecutor's win-loss record is tracked in a statistics book that Defendant Cannizzaro keeps in his desk. On information and belief, the Office does not track each prosecutor's record of misconduct violations, including misconduct identified by a court.

190. One former prosecutor explained, "[I]f you lose a case, you are potentially going to be shifted off to juvenile court or child support.… [E]veryone is terrified that they will be moved and chased out of the Office."[12]

191. When a prosecutor in Defendant Cannizzaro's administration loses a jury trial, she must report to Defendant Cannizzaro himself to explain why she lost. Defendant Cannizzaro routinely yells and berates the attorney for losing during these meetings. On information and belief, in contrast, prosecutors are rarely—if ever—demoted or otherwise disciplined for ethical violations.

192. As a result of these policies, one former prosecutor explained, "[Prosecutors] will aim to seek the most convictions possible, even if this means committing misconduct. They know they will not be punished for winning so there is little incentive to comply with the law."[13]

## II. Individual Plaintiffs' Experiences

### A. Renata Singleton

193. On November 2, 2014, Renata Singleton had an argument with her boyfriend, Vernon Crossley. According to the Police Incident Report, the two "tussled over [the] phone."

---

unit made salaries ranging from $78,000 to $92,000. Prosecutors in juvenile court had salaries ranging from $46,632 to $64,400. The Chief of the juvenile division received a salary of $80,000.

[12] Ellen Yaroshefsky, *New Orleans Prosecutorial Disclosure in Practice After Connick v. Thompson*, Geo. J. Legal Ethics 913, 934 (2012), *available at* http://scholarlycommons.law.hofstra.edu/faculty_scholarship/1024 934 (quoting interview with prosecutor).

[13] *Id.* at 935 (quoting interview with prosecutor).

Mr. Crossley grabbed Ms. Singleton's cell phone out of her hand and shattered it. Ms. Singleton's daughter called 911 on their landline and put her mother on the phone. Mr. Crossley was arrested and released the next day.

194.    Shortly after the incident, Ms. Singleton was contacted by a victim-witness advocate from the District Attorney's Office. Ms. Singleton told her that she had three children and that her job paid by the hour; she did not want to miss work or time with her children to pursue the charges. Ms. Singleton had ended her relationship with Mr. Crossley and considered the situation resolved. She told the advocate that she just wanted to move on.

195.    On Tuesday, April 21, 2015, an investigator from the District Attorney's Office came to Ms. Singleton's home to deliver two documents, styled as "subpoenas" that demanded she appear for questioning at the District Attorney's Office on April 24th. The documents were left at Ms. Singleton's door.

196.    On information and belief, the investigator took this action at the direction of Assistant District Attorney Arthur Mitchell.

197.    The "subpoenas" were fraudulent. They had never been presented to or approved by a court.

198.    Ms. Singleton asked a friend in law enforcement about these documents. Like Ms. Singleton, her friend assumed the "subpoenas" were lawful. But she told Ms. Singleton that, since the documents were left in the door, she had not been validly served and did not have to submit to questioning at the District Attorney's Office.

199.    On April 24, Singleton did not go to the District Attorney's Office to speak privately with prosecutors.

200.    On the same day, Defendant Mitchell applied for a material witness warrant asking the court to put Ms. Singleton in jail. As a factual basis for his request, Defendant Mitchell relied on Ms. Singleton's failure to appear at the District Attorney's Office pursuant to the two documents, which Defendant Mitchell told the court were "subpoenas."

201.    Defendant Mitchell attached a notarized affidavit to the warrant application, stating that, "after being duly sworn," he "did depose and say … [t]hat he has reviewed the foregoing motion thereto and that the allegations contained therein are truthful."

202.    Defendant David Pipes, an Assistant District Attorney and Chief of Trials, reviewed and approved Defendant Mitchell's application for the arrest warrant.

203.    Based on Defendant Mitchell's factual assertions, Judge Robin Pittman issued the arrest warrant for Ms. Singleton's arrest. At Defendant Mitchell's request, and based on his misrepresentations, Judge Pittman set a monetary bond of $100,000.

204.    On the evening of Thursday, May 28, 2015, and unaware of the outstanding arrest warrant, Singleton returned home to find that a new subpoena, requiring her appearance in court the following day, had been delivered. Ms. Singleton's teenage son had accepted and signed it. Ms. Singleton planned to comply with the subpoena because it told her to go to the courthouse and had been served on her son.

205.    Later that night, police officers knocked on Ms. Singleton's front door. The officers said they had a warrant for her arrest. Ms. Singleton pulled the subpoena her son had signed out of her purse and showed it to the officers, explaining to them that she had just been served to appear in court and intended to comply.

206.    One of the officers said that he had to arrest Ms. Singleton anyway because the District Attorney's Office really wanted her.

207.    Ms. Singleton's police officer friend came to her house. The friend promised the officers that she would accompany Ms. Singleton to the District Attorney's Office the following morning. One of the officers made a phone call to the District Attorney's Office for approval. After the call, the officers agreed to leave without arresting Ms. Singleton, notwithstanding the warrant authorizing her arrest.

208.    The next morning, accompanied by her friend from the police department, Ms. Singleton went to the District Attorney's Office. She was greeted by Defendant Mitchell, who told Ms. Singleton's friend to wait in the lobby.

209.    Defendant Mitchell guided Ms. Singleton to a room to be questioned. Assistant District Attorney Tiffany Tucker and another attorney who introduced himself as a supervisor, Defendant Doe, joined the meeting.

210.    Defendant Mitchell began to ask Ms. Singleton about the incident with Mr. Crossley. Ms. Singleton told him that she was more concerned about why she had almost been arrested. She told Defendant Mitchell that she did not want to answer questions without a lawyer present. Defendant Mitchell told her she did not need a lawyer because she was not the criminal.

211.    Frightened, Ms. Singleton still refused to answer any questions without an attorney present.

212.    Ms. Singleton heard Defendant Doe give an instruction to call a unit, and a police officer came and arrested her on the spot.

213.    Although both had observed that Ms. Singleton's arrest was prompted by her decision not to provide information to prosecutors without counsel present, neither Mr. Mitchell nor Ms. Tucker took any action to prevent Ms. Singleton's arrest.

214.    As the officer walked Ms. Singleton out of the building in handcuffs, still accompanied by the people who had been in the meeting, Ms. Singleton passed by her friend, the police officer who had accompanied her to the meeting. Defendant Doe turned to Ms. Singleton's friend and warned her that she might want to stay out of this before she lost her job.

215.    The arresting officer brought Ms. Singleton to the Orleans Parish Prison.

216.    Ms. Singleton had never been arrested before. She began to sob.

217.    Ms. Singleton contacted her sister to let her know that she needed her to take care of her three children. Officers at the jail took Ms. Singleton's clothes and gave her an orange jumpsuit.

218.    Ms. Singleton was worried about her children. She asked her sister to tell them she was away for business. Ms. Singleton had just started work as a payroll accountant at KIPP New Orleans Schools. She was terrified that she would lose her job.

219.    Ms. Singleton could not afford the $100,000 bond that prosecutors had requested and spent the next five nights at the Orleans Parish Prison away from her children and her job.

220.    On June 2, 2015, Ms. Singleton was brought to court from the jail for the first court appearance since her arrest. She wore an orange jumpsuit and was shackled at her hands and feet. Metal chains tied her to all of the other prisoners who had court dates that day.

221.    In contrast, Mr. Crossley, the alleged perpetrator, had been released months earlier on a $3,500 secured bond. He paid it on the day of his arraignment and came to court appearances from home, wearing his own clothes.

222.    Ms. Singleton's mother hired a lawyer for her. The lawyer argued for a bond reduction, which was granted, and Ms. Singleton's mother posted $5,000 for bond.

43

223.    Ms. Singleton was released with an 8:00 p.m. curfew and an ankle monitor. Ms. Singleton wore bell-bottom jeans to hide the ankle monitor from her younger children. During her time in jail, Ms. Singleton had lost eight pounds.

224.    Mr. Crossley pled guilty to two misdemeanors and was sentenced to one year of inactive probation with no jail time. Once Ms. Singleton had been jailed, the District Attorney's office never asked her to testify.

225.    Ms. Singleton's arrest as a material witness has been a persistent source of humiliation and shame. Ms. Singleton's mugshot can be found online. There is an entry for Ms. Singleton at policearrests.com, listing Ms. Singleton as a "suspect" and stating that she was "charged with an offense by police."



226.    Ms. Singleton, who has a master's degree in Business Administration, is currently looking for a new job as an accountant. She is anxious that her arrest will prevent her from being hired.

227.    Her arrest has left another mark as well: Ms. Singleton is afraid to ever call the police again.

228.     Until *The Lens* broke its story about the District Attorney's Office's use of fraudulent subpoenas on April 26, 2017, Ms. Singleton did not know that her subpoena was fraudulent. Nor was she aware of the factual basis given for her material witness warrant.

**B.  Marc Mitchell**

229.     In July 2014, Marc Mitchell and his cousin, Christopher Chambers, took their nephews to a neighborhood court to play basketball.

230.     A man approached Mr. Mitchell, wanting to use the court. When Mr. Mitchell told the man that his team was going to play the next game, the man argued with him. A few moments later, another man fired 28 bullets at Mr. Mitchell and his cousin. Both men were shot multiple times. Mr. Mitchell spent two months in the hospital with life-threatening injuries.

231.     The District Attorney's Office charged both men at the court, Jonterry Bernard and Gerard Gray, with attempted murder of Mr. Mitchell and his cousin. Mr. Bernard was tried first. The prosecution's theory was that Bernard was the triggerman, but that Gray had directed the shooting.

232.     Mr. Mitchell assisted the District Attorney's Office in the prosecution against Mr. Bernard.

233.     He signed a medical release form authorizing prosecutors to obtain his medical records. He met with prosecutors at their offices. In October 2015, he testified in the prosecution's case against Bernard, identifying Bernard as the man who shot him. Mr. Bernard was convicted and sentenced to 100 years in prison.

234.     As Gray's trial approached, Mr. Mitchell met with Defendant Michael Trummel and Defendant Matthew Hamilton on several occasions to prepare. During these meetings,

45

Defendant Trummel and/or Defendant Hamilton told Mr. Mitchell that Gray was in a gang, and that Gray had ordered Bernard to shoot him.

235.    Mr. Mitchell repeatedly responded that, based on what he witnessed, he did not know whether Gray was in a gang, and he did not know whether Gray had ordered Bernard to shoot him. Mitchell recalls repeatedly telling the prosecutors that he got into an argument with one man, and then another man shot him.

236.    Defendant Trummel and/or Defendant Hamilton continued to ask Mr. Mitchell if he had seen Gray gesture to Bernard to order him to shoot. Mr. Mitchell repeatedly told the prosecutors that he had not.

237.    Mr. Mitchell was uncomfortable with how this meeting had gone. Defendant Trummel, in particular, seemed more intent on telling him what had happened than actually listening to Mr. Mitchell's account of the shooting.

238.    Mr. Mitchell was under the impression that Defendant Trummel wanted him to testify using specific words that did not match Mr. Mitchell's recollection of events.

239.    Mr. Mitchell also did not believe the District Attorney's Office was taking concerns about his safety seriously.

240.    For example, after Bernard's trial, a man made a gesture of a gun and pantomimed shooting Mr. Mitchell on the steps of the courthouse. Frightened, Mr. Mitchell told prosecutors what had happened, but they did not investigate the threat, and they never followed up with Mr. Mitchell about his safety.

241.    On April 4, 2016, Mr. Mitchell met with Defendant Trummel and Defendant Hamilton, to inform them that he wanted no further private contact with the District Attorney's Office.

242.     During that meeting, and in the presence of Defendant Trummel, Defendant Hamilton gave Mr. Mitchell a subpoena ordering him to appear to testify at Gray's trial on April 11, 2016. Mr. Mitchell signed the subpoena.

243.     On April 6, 2016—five days before Mr. Mitchell had the opportunity to appear at the April 11th court date—Defendant Trummel submitted a warrant application asking the court to jail Mr. Mitchell as a material witness. The warrant application specifically relied on Mr. Mitchell's statement during the April 4th meeting that he no longer wished to meet with prosecutors outside of court.

244.     On information and belief, Defendant Trummel took this action with the knowledge of Defendant Hamilton.

245.     Defendant Trummel and/or Hamilton also told the court that Mr. Mitchell had a bus ticket to leave town.  Mr. Mitchell had not bought a bus ticket.

246.     The warrant application did not explain that, after telling prosecutors he no longer wished to speak with them in private, Mr. Mitchell had signed a subpoena to appear in court for Gray's trial, among other material omissions. Relying on Defendant Trummel and Defendant Hamilton's representations, the court issued the arrest warrant.

247.     The following day, two police officers came in a marked police car to the high-end hotel where Mr. Mitchell worked. Mr. Mitchell was wearing his uniform: a white dinner-jacket, black tuxedo pants, and a black bowtie.

248.     The police officers arrested Mr. Mitchell in the ornate hotel lobby, and placed him in handcuffs, in full view of his coworkers and the guests checking in.

249.     When Mr. Mitchell asked why he was being arrested, one of the officers said that he did not know, but the prosecutor had told them to come and pick him up.

250.     Mr. Mitchell was not given a copy of the warrant signed by the judge or the warrant application signed by Defendant Trummel.

251.     Mr. Mitchell was jailed at the Orleans Parish Prison on a $50,000 bond, set by the court at Defendant Trummel's request.

252.     While Mr. Mitchell was confined in jail, his family sought assistance from Silence Is Violence. Its Executive Director, Tamara Jackson, immediately advocated for Mr. Mitchell's release. The following morning, the court released Mitchell on his own recognizance.

253.     The day before Gray's trial, Mr. Mitchell was again called to meet privately with prosecutors. This time, fearful of being arrested again, Mr. Mitchell came reluctantly to the private meeting, accompanied by Ms. Jackson. Again, Defendant Trummel and/or Defendant Hamilton told Mr. Mitchell about Mr. Gray's gang affiliation and suggested that Mr. Gray had ordered Mr. Mitchell's shooting.

254.     Mr. Mitchell once again told Defendant Trummel and/or Defendant Hamilton that he knew only one thing: he got into an argument with Mr. Gray, and another man had shot him.

255.     Mr. Mitchell testified truthfully at trial that he never heard Mr. Gray order Bernard to shoot him. Mr. Gray was convicted.

256.     Shortly after the trial, Mr. Mitchell was called in to meet with Chief Judge White in her chambers. Ms. Jackson accompanied Mr. Mitchell to the meeting on behalf of Silence Is Violence.

257.     Chief Judge White told Mr. Mitchell that she wanted to apologize for what had happened to him, and said that prosecutors in the case had misled her.

258.     After his experiences with the District Attorney's Office, Mr. Mitchell repeatedly woke up panicking and soaked in sweat. He eventually sought treatment for his trauma

symptoms. Mr. Mitchell's therapy, which was arranged by Plaintiff Silence Is Violence,

addressed his arrest as a material witness.

259.    Neither the material witness warrant application nor the warrant for Mr.

Mitchell's arrest were included in the clerk's file, and no discussions of the material witness

warrant took place on the record.

260.    Therefore, until undersigned counsel obtained the District Attorney's file through

a public records request,[14] Mr. Mitchell did not know the factual basis given for his material

witness warrant.

**C.  Lazonia Baham**

261.    Lazonia Baham's daughter's boyfriend was murdered in February 2013. The

District Attorney's Office charged a man named Isaac Jones with committing the murder.

262.    Two investigators from the District Attorney's Office came to Ms. Baham's home

to interview her about the case. Ms. Baham told the investigators that she had seen Mr. Jones

around the corner on the day of the murder. By "around the corner," Ms. Baham meant around

the corner from her house.

263.    After this conversation at her home, Ms. Baham spoke several times to

investigator Michael Kitchens of the District Attorney's Office. Repeatedly, Kitchens asked Ms.

Baham questions about seeing Jones on the day of the murder. Each time Ms. Baham said that

she did not see Jones near the scene of the murders; she saw him around the corner from her

house.

---

[14] Under Louisiana law, the District Attorney's file is exempt from disclosure as a public record until the criminal conviction becomes final. Mr. Gray's conviction became final on September 29, 2017. Undersigned counsel obtained the District Attorney's file in the Gray case on October 3, 2017.

264.    Ms. Baham told Kitchens that this was all she knew about the case.

265.    On one call, Kitchens told Ms. Baham that if she refused to tell prosecutors what she knew, she could be arrested.

266.    After this threat, Ms. Baham stopped taking calls from Kitchens.

267.    Ms. Baham understood that Kitchens wanted her to provide specific testimony using specific words that did not match her recollection of events.

268.    On information and belief, Kitchens took these actions at the request of Assistant District Attorney Jason Napoli.

269.    Ms. Baham told the District Attorney's Office that she would come to court if subpoenaed, but she was adamant that she would not change her story.

270.    In the months that followed, Ms. Baham received several unlawful subpoenas demanding that she appear at the District Attorney's Office.

271.    On information and belief, these unlawful subpoenas were issued at the direction of Defendant Napoli.

272.    Ms. Baham did not go to the private meetings at the District Attorney's Office.

273.    On October 13, 2015,  Defendant Napoli made an application for a warrant asking the court to jail Ms. Baham as a material witness. In setting forth the factual basis for the warrant application, Defendant Napoli alleged that Ms. Baham "refused to meet with ADA Jason Napoli and cut off all communication with the District Attorney's Office."

274.    The application did not allege that Ms. Baham had ever missed any court appearances nor told the District Attorney's Office she would not come to court. Defendant Napoli withheld from the court that Ms. Baham had talked with him on multiple occasions, and

he omitted that she had told him that she planned to attend court. Based on Defendant Napoli's representations, a warrant for her arrest was issued.

275. On December 29, 2015, officers from the New Orleans Police Department arrested Ms. Baham at her home. Ms. Baham was sick with the flu, and she was dressed in a bathrobe and slippers.

276. Ms. Baham spent the next eight days in jail. At Defendant Napoli's request, and based on his representations, she was held without bond. Ms. Baham, who has a ninth-grade education and was in special education classes in school, did not understand why she had been arrested. She did not know whom to ask about why she was in jail or how to secure her release.

277. On January 6th, Ms. Baham was brought to court for the first time since she was arrested. Ms. Baham wore an orange jumpsuit and was shackled at her hands and feet.

278. On information and belief, Ms. Baham's prolonged detention was the result of Defendant Napoli's conduct. Defendant Napoli brought Ms. Baham to a small room behind the Section A courtroom to speak privately with him.

279. Once Ms. Baham and Defendant Napoli were alone, Defendant Napoli repeatedly asked Ms. Baham about seeing Jones near the scene of the murder. Ms. Baham repeated that she had not seen Jones near the scene of the murder; she had seen him near her home.

280. Ms. Baham told Defendant Napoli that she was willing to testify, but the only thing she knew was that she had seen Jones near her home on the day that her daughter's boyfriend was killed.

281. Defendant Napoli seemed to want her to testify to something that she knew was not true.

282. Defendant Napoli then asked Ms. Baham if she knew what perjury was.

283. Ms. Baham was released on the evening of January 6, 2015.

284. Ms. Baham has since testified twice in pretrial proceedings in the Jones case. In her testimony, Ms. Baham stated that she had seen Jones near her home at the time of the murder, and not near the murder scene.

285. The Isaac Jones case has not yet gone to trial. Ms. Baham has appeared in court pursuant to several lawful subpoenas.

286. Until the news broke in April 2017, Ms. Baham did not know and had no reason to know that her subpoena was fraudulent. Nor was she aware of the factual basis given for the material witness warrant.

**D. Jane Doe**

287. Jane Doe is the victim of molestation of a juvenile and child pornography involving a juvenile.

288. In September 2016, Assistant District Attorney Iain Dover and an investigator delivered a fraudulent subpoena to her home, where Ms. Doe lives with her mother. The document demanded that she appear at the District Attorney's Office for questioning.

289. As a result of Defendant Dover's persistent attempts to speak privately with her, Ms. Doe and her mother retained private counsel.

290. After Defendant Dover came to Ms. Doe's home, an attorney for Ms. Doe faxed him a letter: "Please honor their right to privacy, their right to be left alone. They do not want to be badgered, bothered or harassed by anyone from law enforcement in any way." The letter directed Defendant Dover to direct his questions to Ms. Doe's attorney.

291. Defendant Dover did not leave Ms. Doe alone. Instead, even though Defendant Dover knew that the teenage victim was represented by counsel, an investigator from the District

Attorney's Office working for Defendant Dover and accompanied by a uniformed police officer, appeared at the Ms. Doe's high school, brandishing another document[15] that demanded she appear for questioning at the District Attorney's Office the next morning.

292.    On information and belief, the investigator and uniformed police officer took these actions at the direction of Defendant Dover.

293.    Ms. Doe was called out of class to accept the document in the principal's office. Her fellow students were at lunch, and they stared as the uniformed police officer approached her. Ms. Doe tried not to cry in front of the other teenagers.

294.    Embarrassed and exhausted, Ms. Doe asked her mother to pick her up early from school. Ms. Doe stayed home for the rest of the day.

295.    When Ms. Doe did not come to the District Attorney's Office on the following morning, Defendant Dover called her attorney and left a voicemail threatening that, if the victim did not arrive by 11 a.m., he would seek her arrest on a material witness warrant.

296.    A hearing in the case was held that same day. Defendant Dover arrived at the hearing with a completed material witness warrant application asking the court to jail Ms. Doe.

297.    Defendant Dover told the court that the Louisiana Crime Victim's Bill of Rights required that he speak privately and outside of court with Ms. Doe. Ms. Doe's attorney, David Anderson, feared that if his client did not attend the meeting, Defendant Dover would follow through on his repeated threats to secure a warrant for Ms. Doe's arrest. As a result of Dover's intimidation tactics, Anderson did not object. Anderson decided that the best strategy to avoid Ms. Doe's arrest would be for Anderson to arrange a meeting with prosecutors at a more

---

15  Defendant Dover contends this document was a valid subpoena. No formal request for the subpoena—a requirement under Louisiana law—is included in the clerk's record in the case. The record also does not include a signed order from the judge granting the subpoena.

convenient time. Ms. Doe did not want to meet with Defendant Dover, but on Anderson's advice, she agreed to meet with him because she believed that she would be jailed if she did not.

298.     Anderson informed the court that Ms. Doe would be willing to comply with the meeting. The court ordered Anderson to arrange a meeting for Ms. Doe to meet with prosecutors.

299.     Ms. Doe met with Defendant Dover with counsel at the District Attorney's Office. At the meeting, Defendant Dover humiliated and mocked her. Defendant Dover interrogated her about the offenses that victimized her, including a number of intimate questions. Ms. Doe cried during Defendant Dover's questioning.

300.     Despite the difficult and personal nature of the inquiry, Defendant Dover mocked Ms. Doe when she did not answer his questions. He mimicked what she said in a whiny-sounding voice. Ms. Doe was shaken and upset by the questioning and experience.

301.     The defendant in the child pornography and child molestation case entered a guilty plea in Orleans Parish Criminal District Court in December 2017. His sentencing is set for February 23, 2018. Ms. Doe still does not wish to meet privately with prosecutors again unless lawfully compelled to do so.

302.     As a result of her experiences with Defendant Dover, Ms. Doe is terrified to speak to law enforcement for any reason. She becomes anxious when she sees a police car or police uniform. When Ms. Doe hears an unexpected knock at her door, she runs into her mother's room to hide.

303.     Until the news broke in April 2017, Ms. Doe had no reason to know and did not know that the initial subpoena issued by the District Attorney's Office was fraudulent, and that the second subpoena was unlawfully obtained and/or fraudulent.

### E.  Fayona Bailey and Tiffany LaCroix

304.    Fayona Bailey and Tiffany LaCroix were potential witnesses in two different murder cases.

305.    Each received a fraudulent subpoena demanding a private meeting at the District Attorney's Office prior to trial.

306.    Defendant Inga Petrovich issued a fraudulent subpoena demanding Ms. Bailey appear at the District Attorney's Office on March 16, 2017 for private interrogation in connection with a murder case.

307.    Two investigators from the District Attorney's Office came to Ms. Bailey's home to deliver the document. The document that the investigators handed to Ms. Bailey was titled "**SUBPOENA**," and it ordered her to come to the District Attorney's Office on March 16, 2017 for a private meeting. The document threatened jail and fines for "failure to obey."

308.    One of the investigators told Ms. Bailey that if she did not come to the private meeting at the District Attorney's Office, she could be sent to jail.

309.    On information and belief, the investigators took these actions at the direction of Defendant Petrovich.

310.    Ms. Bailey was terrified. She had never been to jail before.

311.    The investigators asked Ms. Bailey to sign the document to acknowledge that she had received it. Ms. Bailey told them that she did not want to sign anything without consulting her attorney.

312.    Ms. Bailey then retained and paid for a private attorney, Anthony J. Ibert, to challenge the fraudulent subpoena.

313.     Shortly after Ms. Bailey retained Mr. Ibert, a representative from Defendant Cannizzaro's Office called Ms. Bailey and again threatened her with jail time if she did not comply with the subpoena.

314.     Ms. Bailey told the representative on the phone that she was represented by a lawyer, and that her lawyer had informed her that the subpoena was not legal.

315.     The representative continued speaking to her even though she was represented by counsel.  The representative told her that her lawyer was wrong, and that the only way she could avoid the appearance required by the subpoena was with a valid medical excuse, supported by documentation.

316.     Because Ms. Bailey was apprehensive, given the language used in the subpoenas and the threats from prosecutors, she did not feel at liberty to travel or to leave the state until the purported subpoena was quashed.

317.     Plaintiff Tiffany LaCroix received a fraudulent subpoena in November 2016.

318.     The document was identical to the one that Ms. Bailey received, including the threat of fines or imprisonment for "failure to obey." The fraudulent subpoena that Ms. LaCroix received was issued by Defendant Laura Rodrigue.

319.     Ms. LaCroix did not want to report to the District Attorney's Office for a private interrogation. The defendant in the criminal case was the father of Ms. LaCroix's child. She did not want to be pressured to reveal private information about him unless she was compelled by law to do so.

320.     Ms. Lacroix was scared at the possibility of going to jail. She had never been jailed in her life.

321. The designated time that the fraudulent subpoena directed Ms. Lacroix to appear at the District Attorney's Office was also a problem. She works as a schoolteacher, and she was one of the few teachers certified to administer statewide standardized testing to students with special needs. The appointment demanded by the fraudulent subpoena would have required her to miss one of the testing days.

322. Like Ms. Bailey, Ms. LaCroix retained Anthony J. Ibert to challenge the fraudulent subpoena.

323. Because Ms. LaCroix was apprehensive, given the language used in the subpoenas and the threats from prosecutors, she did not feel at liberty to travel or to leave the state until the purported subpoena was quashed.

324. In both cases, Mr. Ibert filed motions to "quash" the fraudulent subpoenas. Because the documents were not legal documents, however, there was nothing to quash. In response to Mr. Ibert's motions, which described the fraudulent nature of the documents, prosecutors withdrew them.

325. The defendants in both cases were ultimately convicted at trial. Prosecutors never called Ms. Bailey or Ms. LaCroix to testify.

**F. John Roe**

326. In the early morning hours of January 30, 2016, John Roe was attacked with an AK-47 rifle.

327. The assailant threatened Mr. Roe, pointing the gun at him, and struck him several times.

328. Mr. Roe escaped and fled on foot.

329. He then called the police and reported the assault.

330.   When the police arrived, Mr. Roe provided details of the assault.

331.   Michael Young was eventually arrested on this charge.

332.   In the early morning hours of the day following Mr. Roe's assault, his friend Gregory Young was murdered. Police soon focused the murder investigation on Michael Young, the same defendant charged with the assault of Mr. Roe.

333.   Mr. Roe assisted and answered questions from police with respect to both the assault and murder investigations.

334.   Mr. Roe provided his address, his phone number, and the name and phone number of his fiancée to the police.

335.   No one suggested Mr. Roe may eventually have to testify in court.

336.   After these interactions with police, Mr. Roe did not hear from anyone from the Police Department or the District Attorney's Office for nearly 22 months.

337.   Unbeknownst to Mr. Roe, starting in May 2017, the District Attorney's Office attempted to serve a number of subpoenas for him to testify in court.[16]

338.   None of those subpoenas were served.

339.   Instead, at least four subpoena returns were filed by deputies from the Sheriff's Department who attempted to serve them. Each was marked "incomplete address" or "subject moved."

340.   But according to court records, despite the deputies' notes on the returns, prosecutors never attempted to have Mr. Roe served at a different address.

341.   As of the present date, prosecutors or their agents have sent at least ten subpoenas to the defunct address.

---

[16] The criminal case involving the murder of Gregory Young and the criminal case in which Mr. Roe is the victim are being tried together under the same case number.

342.     Mr. Roe—who had no idea that prosecutors were attempting to serve him process—had moved into the home of his fiancée.

343.     Both Mr. Roe and his fiancée had changed their phone numbers when they had switched carriers since his initial communications with police.

344.     Nevertheless, Mr. Roe was not difficult to find, nor did he intend to be.

345.     For example, Mr. Roe had provided his fiancée's full name to the police, along with her phone number at the time.

346.     Mr. Roe also maintains a Facebook account under his own name, as does his fiancée.

347.     Neither Mr. Roe nor his fiancée received messages from anyone at the District Attorney's Office or the police department on their Facebook accounts.

348.     Mr. Roe never stated to the police or anyone at the District Attorney's Office that he would not appear in court pursuant to a subpoena.

349.     Nevertheless, on August 28, 2017, Assistant District Attorney Sarah Dawkins submitted an application for a material witness warrant to jail Mr. Roe.

350.     Defendant David Pipes authorized Defendant Dawkins to pursue the warrant.

351.     In the warrant application, the sole justification Defendant Dawkins provided was that prosecutors had been unable to reach Mr. Roe.

352.     Defendant Dawkins's application stated, "Attempts to reach [John Roe] at his home and by phone by members of the Orleans Parish District Attorney's Office have been unsuccessful. Messages left for [John Roe] have gone unanswered."

353.     This short statement was false and misleading in several respects.

354. First, neither Defendant Dawkins nor anyone else at the District Attorney's Office left any phone message for Mr. Roe, and on information and belief, they could not have left messages, as the number the police had on file had been disconnected at that point. Defendant Dawkins knew or should have known this when she asked the court to jail Mr. Roe.

355. Second, Defendant Dawkins alleged that members of the District Attorney's Office had attempted to reach Mr. Roe "at his home." But as Defendant Dawkins knew or should have known, the address where service was attempted was not in fact Mr. Roe's home because, as noted in case records dated as early as June 2017, he had moved.

356. Third, Defendant Dawkins intentionally omitted from the material witness warrant application that Mr. Roe had fully and voluntarily assisted police in their investigation.

357. At Defendant Dawkins's request, and based on her representations, the court issued the warrant and set bond at $250,000.

358. On the evening of December 3, 2017, with no knowledge of the warrant or the unserved subpoenas that preceded it, Mr. Roe was pulled over in his car by police for a supposed traffic violation.

359. The police officers brought Mr. Roe to central lockup. An officer informed Mr. Roe that there was a warrant for his arrest and that he would stay in jail unless he paid a "sky high" secured money bond: $250,000.

360. Mr. Roe was stunned. He could not imagine why he had this warrant, especially with such a high money bond.

361. Mr. Roe was told to strip and put on an orange jumpsuit.

362. Mr. Roe still did not understand why he was being jailed. He called his fiancée and asked her to find out for him.

363.    Mr. Roe's fiancée looked up Mr. Roe's case on a public database operated by the Orleans Parish Sheriff's Office. She saw that he was jailed as a material witness, but she did not know what this meant.

364.    When Mr. Roe's fiancée saw that bond was set at $250,000, she began to weep.

365.    The following morning, his fiancée was given contact information for a victim/witness counselor at the District Attorney's Office.

366.    Mr. Roe's fiancée called the victim/witness counselor and asked why Mr. Roe was in jail and how she could help him get out.

367.    The victim/witness counselor explained that she worked for Defendant Dawkins. Then, communicating on Defendant Dawkins's behalf, she informed his fiancée that Mr. Roe had to "cooperate" in their case or he would have to stay in jail until the case went to trial.

368.    When Mr. Roe's fiancée begged for a solution, the victim/witness counselor stated that she would have to ask Defendant Dawkins. She reiterated that Mr. Roe had to "cooperate" or he would not be released. The victim/witness counselor did not explain what "cooperation" would entail.

369.    On December 5, 2017, Mr. Roe was brought to court from the jail.

370.    Mr. Roe was wearing the orange jumpsuit. He was shackled at his hands and feet, and metal chains were wrapped around his waist. He was humiliated and terrified.

371.    Defendant Dawkins approached Mr. Roe. "I've got you now," she said.

372.    Defendant Dawkins told Mr. Roe that he would have to submit to electronic monitoring or she would not consent to his release from jail.

373.    Mr. Roe agreed, and the court ordered him to submit to electronic monitoring.

374.    On December 6th, Mr. Roe was released.

375.   By this time, Mr. Roe had spent three days in jail.

376.   Because he had missed work, Mr. Roe was fired from his job as a laborer with a cement company.

377.   On or around December 6th, Mr. Roe met another hurdle when he attempted to set up his electronic monitoring. Electronic monitoring cost $300 a month, plus fees to set up the monitoring.

378.   Mr. Roe could not afford this amount, especially after missing work and being fired from his job.

379.   Mr. Roe returned to court and told Defendant Dawkins that he could not afford to pay for the ankle monitor.

380.   Defendant Dawkins told Mr. Roe that since he could not afford the ankle monitor, he would have to report to court once a week until Michael Young's trial to check in with her.

381.   After a brief hearing, Defendant Dawkins guided Mr. Roe and his fiancée out and spoke with them in the hallway outside of the courtroom.

382.   Defendant Dawkins told Mr. Roe that if he failed to come to any check-in, he would go to jail.

383.   Mr. Roe has reported to four of these required court appearances so far.

384.   Each time, Mr. Roe has waited several hours for the check-in.

385.   After these appearances, Defendant Dawkins regularly has held Mr. Roe outside of the courtroom to discuss the murder case.

386.   During one of these meetings, Defendant Dawkins told Mr. Roe's fiancée that she, too, was responsible for ensuring that he arrived at the check-in meetings, and that if she failed in this endeavor, she, too, would be jailed.

387.   Defendant Dawkins has also told Mr. Roe that apart from the courthouse meetings, he must also meet with her at her office to discuss the case.

388.   Mr. Roe does not want to speak with Defendant Dawkins in these private settings, but he does so because he is afraid of being jailed.

**G. Silence Is Violence**

389.   Silence Is Violence was founded in January 2007 with a mission to advocate for crime victims and safer communities. As its inaugural act, Silence Is Violence organized a march to New Orleans City Hall demanding better policy and leadership on the issue of violent crime.

390.   In the two years that followed, Silence Is Violence offered programming focused on local policy advocacy and community engagement. The organization sponsored letter-writing campaigns, held forums for candidates for office to discuss criminal justice issues, and offered music classes for youth to create a peaceful, non-violent activity for children and their families to share.

391.   Silence Is Violence hosted regular walks through New Orleans neighborhoods to build support against violent crime, and it hosted programs for awareness events, like the National Crime Victims' Rights week.

392.   Since Defendant Cannizzaro took office in 2009, Silence Is Violence leaders repeatedly received reports from victims and families that the prosecutors, investigators, and victim-witness advocates working for Defendant Cannizzaro use strong-arm tactics to pressure victims to speak outside of court with the prosecution and to corroborate the prosecution's theory of the case—including threats to put crime victims in jail.

393.   The new Cannizzaro administration's practices dramatically reduced the number of victims who were willing to meet with prosecutors in private out-of-court settings. When

numerous Silence Is Violence clients and community members explained to its staff how the District Attorney's Office had damaged their trust, common themes emerged.

394.    Victims who feared violent retaliation for assisting prosecutors frequently felt that their concerns fell on deaf ears when they shared them at the District Attorney's Office.

395.    The office was reckless with witnesses' names and identities, and its promises to provide physical protection and assistance frequently fell through.

396.    Victims felt menaced and harassed by prosecutors, investigators, and victim-witness advocates from the District Attorney's Office. The prosecutors, investigators, and advocates had shown up at their homes, jobs, and schools, raising questions about sensitive issues with their peers, their children, and their employers.

397.    Plaintiff Marc Mitchell, a client of Silence Is Violence, received a call from a victim-witness advocate asking for the location of his uncle's funeral. Mr. Mitchell's cousin had also been a victim of the attempted murder, and the advocate wanted to find him at the funeral to ask him questions. Mr. Mitchell learned for the first time on the call with the advocate that his uncle had died.

398.    As victims' willingness to assist prosecutors outside of court decreased, dozens of Silence Is Violence clients were jailed or threatened with jail for declining to meet with prosecutors outside formal legal proceedings.

399.    When that happens, Silence Is Violence responds by securing legal protection for the client and, if the client is jailed, advocating for and securing her release.

400.    For example, Plaintiff Marc Mitchell's family contacted Silence is Violence when Mr. Mitchell was arrested and jailed as a material witness. Silence Is Violence advocated for Mitchell's release with the judge.

401.    After Mr. Mitchell was released, the Executive Director of Silence Is Violence accompanied Mitchell to a meeting with the judge. Silence Is Violence staff advised Mr. Mitchell about his future dealings with the District Attorney's Office to protect him from further harm, communicated with the District Attorney's Office on Mr. Mitchell's behalf, and accompanied him to two further meetings with prosecutors.

402.    After Mr. Mitchell's case had concluded, Silence Is Violence helped him secure treatment for the trauma that he experienced. The treatment addressed Mr. Mitchell's experiences with the District Attorney's Office.

403.    In another case, a homicide witness approached Silence Is Violence after prosecutors had obtained a warrant for her arrest. A Silence Is Violence staff member contacted the District Attorney's Office. The organization was assured that the warrant would be recalled as soon as the witness gave prosecutors a statement.

404.    As a result of that assurance, the victim agreed to make a statement. The victim was afraid to stay in her own neighborhood in case of violent retaliation against her as a witness to a serious crime; Silence Is Violence rented a hotel room for her and informed the victim-witness advocate from the District Attorney's Office where the victim was staying so that they could obtain the statement.

405.    Shortly after disclosing the victim's location to the District Attorney's Office, police arrived at the hotel room and arrested the victim, who was pregnant at the time. Silence Is Violence spent the next several days advocating for the victim's release.

406.    Silence Is Violence recently assisted the alleged victim of a robbery and battery. The victim, who was an immigrant, identified a suspect in a police line-up. She later told the Assistant District Attorney on the case that she was not sure she had identified the right person.

65

The prosecutor told the victim that if she recanted the identification, she could be deported. Shortly after this conversation, two people from the District Attorney's Office came to the victim's home to reiterate this threat.

407.    The victim approached Silence Is Violence for help. Silence Is Violence secured pro bono counsel to protect her from the deportation threats. Silence Is Violence also hired an interpreter so that the victim could communicate with counsel.

408.    As a result of these experiences, the possibility that prosecutors may seek a material witness warrant through fraudulent means and engage in other forms of retaliation for the exercise of a victim's First Amendment rights is now a major concern that has forced Silence Is Violence to change the way it structures its operations, allocates its resources, and manages victims' relationships with the District Attorney's Office.

409.    For instance, Silence Is Violence does not recommend that victims or their family members appear at the District Attorney's Office without a Silence Is Violence representative present. This representative's role is not only to advocate for the victim, but to serve as a witness if the victim is threatened, including with perjury, obstruction, or a material witness warrant for engaging in constitutionally protected activity.

410.    Silence Is Violence recommends to victims that before they meet with prosecutors, they ensure that they have no open criminal charges—including unpaid traffic tickets. Silence Is Violence makes this recommendation because, based on its observations, Defendant Cannizzaro's administration routinely uses unrelated cases as leverage to coerce out-of-court meetings with prosecutors and testimony favorable to the prosecution's theory of the case.

411.    When clients do have criminal records, Silence Is Violence takes the lead in communicating with the District Attorney's Office to insulate the victim or witness from potential threats.

412.    This individual advocacy—particularly aimed at protecting crime victims against abuses of the subpoena and material witness warrant process by the District Attorney's Office— has become a significant and outsized portion of Silence Is Violence's work during the administration of Defendant Cannizzaro.

413.    Resources once directed at Silence Is Violence's core mission—public advocacy to protect victims and combat violent crime—must instead be devoted to ensuring that victims of crime are not victimized again by the District Attorney's Office.

414.    At all times relevant to this Complaint, the above Defendants were acting under color of state law.

## CLAIMS FOR RELIEF

### COUNT I:
**Reliance on False Statements, Material Omissions, and Plainly Insufficient Facts in Applications for Material Witness Warrants in Violation of the Fourth Amendment 42 U.S.C. § 1983**

*Against Defendant Cannizzaro in his official capacity, and*
*against Defendants Mitchell, Pipes, Napoli, Trummel, Hamilton, and Dawkins*
*in their individual capacities*

415.    Defendant Cannizzaro's official policy, practice, and custom of relying on false allegations, material omissions, and plainly insufficient factual allegations in applications for material witness warrants violated the Fourth Amendment rights of Plaintiffs Singleton, Baham, Mitchell, Roe, and the rights of Plaintiff Silence Is Violence's clients. It poses an ongoing risk of violating the Fourth Amendment rights of Plaintiffs Baham, Doe, and Roe, and the rights of Silence Is Violence and its clients.

416.    Acting pursuant to this policy, practice, and custom, Defendants Mitchell and Pipes violated the clearly established Fourth Amendment rights of Plaintiff Singleton; Defendant Napoli violated the clearly established Fourth Amendment rights of Plaintiff Baham; Defendant Trummel violated the clearly established Fourth Amendment rights of Plaintiff Mitchell; and Defendant Dawkins violated the clearly established rights of Plaintiff Roe. Plaintiff Baham faces an ongoing risk that Defendant Napoli will violate her rights in this way again. Plaintiff Roe faces an ongoing risk that Defendant Dawkins will violate his rights in this way again.

417.    The Defendants included these false statements, material omissions, and plainly insufficient factual allegations in warrant applications knowingly and intentionally, or with reckless disregard for the truth. The warrants for Plaintiffs' arrests would not have issued but for Defendants' false statements and material omissions. Moreover, no reasonable prosecutor would

believe that the clearly insufficient grounds stated in arrest warrant applications could justify the arrest and detention of a witness or a victim of crime.

418.    Defendants' unconstitutional acts directly and proximately caused compensable injury to these Plaintiffs.

## COUNT II:
### Unlawful Subpoenas Used to Seize Plaintiffs in Violation of the Fourth Amendment
### 42 U.S.C. § 1983

*Against Defendant Cannizzaro in his official capacity, and*
*against Defendants Mitchell, Napoli, Petrovich, Rodrigue, Dover, and Martin*
*in their individual capacities*

419.    Defendant Cannizzaro's official policy, practice, and custom of compelling witnesses to attend private meetings at the District Attorney's Office by using unlawful subpoenas, accompanied by threats of arrest and imprisonment, violated the Fourth Amendment rights of Plaintiffs Bailey, Lacroix, and Doe, and the rights of Plaintiff Silence Is Violence and its clients. It poses an ongoing risk of violating the Fourth Amendment rights of Plaintiff Doe and Plaintiff Baham, and the rights of Plaintiff Silence Is Violence and its clients.

420.    Acting pursuant to this official policy, practice, or custom, Defendant Petrovich acted with deliberate indifference when violating the clearly established Fourth Amendment rights of Plaintiff Bailey; Defendant Rodrigue acted with deliberate indifference when violating the clearly established Fourth Amendment rights of Plaintiff Lacroix; and Defendant Dover acted with deliberate indifference when violating the clearly established Fourth Amendment rights of Plaintiff Doe. Defendant Martin, acting with deliberate indifference, violated the clearly established rights of each of these plaintiffs by directly instructing prosecutors to engage in unlawful conduct. Plaintiff Doe and Plaintiff Baham face an ongoing risk that Defendants will violate their rights in this way again.

421. Defendants' unconstitutional acts directly and proximately caused compensable injury to these Plaintiffs.

### COUNT III:
### Compelled Speech and Retaliation for Constitutionally Protected Speech
### in Violation of First Amendment
### 42 U.S.C. § 1983

*Against Defendant Cannizzaro in his official capacity, and*
*against Defendants Cannizzaro, Mitchell, Pipes, Doe, Napoli, Dover, Trummel,*
*Hamilton, Petrovich, Rodrigue, Martin, and Dawkins in their individual capacities*

422. Defendant Cannizzaro, acting in his official capacity as Orleans Parish District Attorney and an official policymaker for the District Attorney's Office, maintains a policy, practice, and custom of foregoing legal court process and instead compelling witnesses to speak with prosecutors outside of court by issuing fraudulent subpoenas, threatening witnesses with fines and jail, seeking to jail witnesses who do not meet voluntarily with prosecutors, and leaving witnesses in jail for excessive periods of time.

423. As a direct consequence of Defendant Cannizzaro's policy, practice, and custom, Plaintiffs Baham, Mitchell, Singleton, Doe, and Roe were each unconstitutionally compelled to speak to prosecutors. Plaintiffs Lacroix, Bailey, and Plaintiff Silence Is Violence and its clients were also injured by Defendant Cannizzaro's policy, practice, and custom of compelling witnesses and victims to speak to prosecutors. Plaintiffs Baham, Doe, Roe, and Silence Is Violence face an ongoing risk that the District Attorney's Office will violate their rights in this way again.

424. Defendant Cannizzaro also maintains an official policy, practice, and custom of retaliating against crime victims and witnesses who engage in certain constitutionally protected activity: (1) choosing not to speak voluntarily with prosecutors absent a lawful court order; and (2) resisting efforts by prosecutors to coerce false testimony that supports the prosecution's

theory of the case. This retaliation includes threatening witnesses with jail, seeking to jail these witnesses, and leaving these witnesses in jail for excessive periods of time. This policy, practice, and custom would chill a person of ordinary firmness from exercise of her constitutionally protected rights.

425.    Plaintiffs Singleton, Mitchell, Baham, Bailey, LaCroix, Doe, Roe, and Silence Is Violence each suffered injury as a direct consequence of Defendant Cannizzaro's policy, practice, and custom of unlawful retaliation. Plaintiffs Baham, Doe, Roe, and Silence Is Violence face an ongoing risk that the District Attorney's Office will violate their rights in this way again.

426.    Acting pursuant to these policies, practices, and customs, Defendants Mitchell, Pipes, and Doe violated the First Amendment rights of Plaintiff Singleton; Defendant Napoli violated the First Amendment rights of Plaintiff Baham, and she faces an ongoing risk that he or others at the District Attorney's Office will do so again; Defendant Dover violated the First Amendment rights of Plaintiff Doe, and she faces an ongoing risk that he or others at the District Attorney's Office will do so again; Defendants Trummel and Hamilton violated the First Amendment rights of Plaintiff Mitchell; Defendant Petrovich violated the First Amendment rights of Plaintiff Bailey; Defendant Rodrigue violated the First Amendment rights of Plaintiff Lacroix; and Defendant Dawkins violated the First Amendment rights of Plaintiff Roe, and he faces and ongoing risk that she or others at the District Attorney's Office will do so again. Defendant Martin violated the First Amendment rights of each of these plaintiffs by directly instructing prosecutors to engage in unlawful conduct.

427.    Defendant Cannizzaro, in his individual capacity, violated the rights of Silence Is Violence by threatening its Executive Director with prosecution for her public statements on behalf of the organization, thus chilling the organization's expression of core political speech and

burdening its decisions about how to advise its individual clients about communications with prosecutors. Plaintiff Silence Is Violence faces an ongoing risk that Defendant Cannizzaro will violate its rights in this way again.

428.    Defendants' unconstitutional acts directly and proximately caused compensable injury to these Plaintiffs.

## COUNT IV:
## Prolonged Detention in Violation of the Fourteenth Amendment
## 42 U.S.C. § 1983

*Against Defendant Cannizzaro in his official capacity*
*and Defendant Napoli in his individual capacity*

429.    Defendant Cannizzaro's official policy, practice and custom of causing individuals to be jailed without a prompt court appearance after an arrest on a material witness warrant violated the Fourteenth Amendment due process rights of Plaintiff Baham and the rights of Silence is Violence and its clients, and poses and ongoing risk of violating the Fourteenth Amendment rights of Plaintiffs Baham, Doe, and Roe, and the rights of Silence Is Violence and its clients.

430.    Acting pursuant to policy, practice, and custom, Defendant Napoli acted with deliberate indifference when violating Plaintiff Baham's clearly established Fourteenth Amendment rights. Plaintiff Baham faces a risk that Defendants will violate her rights in this way again.

431.    Defendants' unconstitutional acts directly and proximately caused Plaintiff Baham's injuries and the injuries to Silence is Violence and its clients.

## COUNT V:
## Violation of Fourteenth Amendment Substantive Due Process
## 42 U.S.C. § 1983

*Against Defendant Cannizzaro in his official capacity, and*
*against Defendants Cannizzaro, Mitchell, Pipes, Doe, Napoli, Dover, Trummel,*
*Hamilton, Petrovich, Rodrigue, Dawkins, and Martin in their individual capacities*

432.    Each of Defendant Cannizzaro's official policies, practices and customs described

above, separately and in combination, shocks the conscience and violated the Fourteenth

Amendment rights of all Plaintiffs and poses an ongoing risk of violating the Fourteenth

Amendment rights of Plaintiff Baham, Plaintiff Doe, Plaintiff Roe, and the rights of Plaintiff

Silence Is Violence and its clients.

433.    Defendants' unconstitutional acts directly and proximately caused compensable

injury to Plaintiffs.

## COUNT VI:
## Failure to Supervise, Train, or Discipline
## 42 U.S.C. § 1983

*Against Defendant Cannizzaro in his official capacity, and*
*against Defendants Cannizzaro, Martin, and Pipes*
*in their individual capacities*

434.    Defendants Cannizzaro, Martin, and Pipes failed to adequately train, supervise,

and/or discipline Assistant District Attorneys and other agents at the District Attorney's Office

under their supervision, including all other individual Defendants, as to the unlawful conduct

described in Counts I-V.

435.    Defendant Cannizzaro acted and failed to act with gross negligence, recklessness,

and deliberate indifference to Plaintiffs' clearly established constitutional rights.

436.     Defendant Cannizzaro's conduct directly and proximately caused the deprivations of Plaintiffs' clearly established constitutional rights, and also directly and proximately caused the Defendants and others to deprive Plaintiffs of those rights.

## COUNT VII:
## Failure to Intervene
## 42 U.S.C. § 1983

*Against all Defendants in their individual capacities*

437.     Defendants, acting under color of state law and within the scope of their employment, knew or should have known that they and others within the District Attorney's Office were violating Plaintiffs' constitutional rights as described in Counts I-V.

438.     Defendants each had opportunities to intervene and prevent these violations but, acting with deliberate indifference, declined to do so.

439.     Defendants' failure to intervene violated Plaintiffs' clearly established constitutional rights.

440.     Through their failure to intervene, Defendants directly and proximately caused Plaintiffs' injuries.

## COUNT VIII:
## Abuse of Process under Louisiana Law

*Against Defendant Cannizzaro in his official capacity, and*
*against Defendants Dover, Mitchell, Petrovich, Pipes, Napoli, Trummel, Hamilton, Rodrigue,*
*Doe, Dawkins, and Martin in their individual capacities*

441.     Pursuant to Defendant Cannizzaro's official policies, practices, and customs, as described in Counts I-V, prosecutors and other agents in the District Attorney's Office willfully and maliciously abused the material witness statute for a purpose for which it was not designed:

to coerce private, out-of-court meetings with prosecutors and to coerce testimony consistent with the prosecution's theory of the case.

442.     Pursuant to these same policies, prosecutors and other agents in the District Attorney's Office willfully and maliciously abused the process for investigative subpoenas set forth in Article 66 of the Louisiana Rules of Criminal Procedure. By circumventing the requirements of Article 66, Defendants avoided court oversight of investigative subpoenas, and they used them not to investigate crimes pre-indictment, but to intimidate, coerce, and threaten witnesses after criminal proceedings have already been initiated.

443.     Plaintiffs Singleton, Mitchell, Baham, Doe, Bailey, Lacroix, and Roe were injured by Defendants' unlawful actions, as a direct consequence of Defendant Cannizzaro's official policies, practices, and customs. Plaintiffs Baham, Doe, and Roe face a risk that Defendants will harm them in this way again.

444.     Plaintiff Silence Is Violence was injured because it had to redirect its resources to remedy and prevent harms to its clients caused by the unlawful acts of the District Attorney's Office. Plaintiff Silence Is Violence faces a risk that Defendants will harm it in this way again.

445.     Defendants' acts and omissions directly and proximately caused Plaintiffs' injuries. These injuries were the reasonably foreseeable consequences of the abuse of process described herein.

446.     Defendants engaged in these wrongful acts and omissions in the scope of their employment with the District Attorney's Office.

## COUNT IX:
## Fraud under Louisiana Law

*Against Defendant Cannizzaro in his official capacity, and*
*against Defendants Mitchell, Napoli, Petrovich, Rodrigue, Dover, Doe, and Martin*
*in their individual capacities*

447.     As pled with specificity above, by creating, serving, and/or approving official-seeming "subpoenas," Defendants conveyed the material misrepresentation that the "subpoenas" were real, had been obtained legitimately, and had to be honored by certain Plaintiffs under threat of fines and incarceration.

448.     The Defendants made these misrepresentations with the intent to deceive Plaintiffs.

449.     Plaintiffs reasonably and justifiably relied on the authenticity, truthfulness, and lawfulness of the fraudulent subpoenas.

450.     Plaintiffs Singleton, Baham, Doe, Bailey, LaCroix, and Silence Is Violence and its clients were injured by Defendants' unlawful actions. Plaintiffs Baham, Doe, and Silence Is Violence face a risk that Defendants will harm them in this way in the future.

451.     Defendants' acts and omissions directly and proximately caused Plaintiffs' injuries. These injuries were the reasonably foreseeable consequences of the fraudulent acts described herein.

452.     Defendants engaged in these wrongful acts and omissions in the scope of their employment with the District Attorney's Office.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

A.     Award compensatory damages to Plaintiffs and against all Defendants, jointly and

        severally, in an amount to be determined at trial;

B.     Award punitive damages to Plaintiffs, and against all individual Defendants in

        their individual capacities, in an amount to be determined at trial, that will deter

        such conduct by defendants in the future;

C.     Enter injunctive relief requiring Defendants to end the ongoing constitutional

        violations and violations of Louisiana law, equitable relief in the court's

        discretion that ensures that the violations do not recur;

D.     Award pre-judgment and post-judgment interest and recovery of Plaintiffs' costs,

        including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42

        U.S.C. §1983 claims;

E.     Order expungement of all records of the material witness warrants for Plaintiffs

        Singleton, Doe, Mitchell, Baham, and Roe; and

F.     For any and all other relief to which Plaintiffs may be entitled and that the Court

        deems just and proper in its discretion.

Respectfully submitted this 24th day of January, 2018,


/s/Anna Arceneaux

Anna Arceneaux
Admitted *pro hac vice*
American Civil Liberties Union Foundation
201 West Main Street, Suite 402
Durham, NC 27701
Tel. (919) 682-5159
aarceneaux@aclu.org


/s/Somil Trivedi

Admitted *pro hac vice*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 715-0802
strivedi@aclu.org

/s/Katherine Chamblee-Ryan

Katherine Chamblee-Ryan*
Alec Karakatsanis
Admitted *pro hac vice*
Civil Rights Corps
910 17th Street NW
Washington, D.C. 20006
Tel. (202) 656-5198
katie@civilrightscorps.org
alec@civilrightscorps.org


/s/Bruce Hamilton

Bruce Hamilton
La. Bar No. 33170
 ACLU Foundation of Louisiana
New Orleans, LA 70156
Tel. (504) 522-0628
bhamilton@laaclu.org


COUNSEL FOR PLAINTIFFS

*Not licensed in the District of Columbia,
practice subject to D.C. App. R. 49(c)(8),
with supervision by Alec Karakatsanis, a
member of the D.C. Bar.

# Appendix A

# OPDA Subpoena Template for Your Use

From: Debbie Barra <dbarra@orleansda.com>

To:  Rhonda Goode_Douglas <Rgoodedouglas@orleansda.com>, Armando Asaro <aasaro@orleansda.com>, Alicia bennette <abennette@orleansda.com>, Audrey Blackwood <ablackwood@orleansda.com>, Alex Calenda <acalenda@orleansda.com>, Autumn Cheramie <acheramie@orleansda.com>, Andrew Decoste <adecoste@orleansda.com>, Ashleye Dunbar <adunbar@orleansda.com>, Andre Gaudin <agaudin@orleansda.com>, Angad Ghai <aghai@orleansda.com>, Alfreda Gordon <agordon@orleansda.com>, Andrea Iovino <aiovino@orleansda.com>, Amy Jackson <ajackson@orleansda.com>, Andrew Joyner <ajoyner@orleansda.com>, Anne Kiefer <akiefer@orleansda.com>, Abigail MacDonald <amacdonald@orleansda.com>, Andree Mattix <amattix@orleansda.com>, Alison Morgado <amorgado@orleansda.com>, Avis Morton <amorton@orleansda.com>, Ambrosia Mote <amote@orleansda.com>, Andrew Pickett <apickett@orleansda.com>, Brian Ebarb <bcebarb@orleansda.com>, Bobby Freeman <bfreeman@orleansda.com>, Beverly Hines <bhines@orleansda.com>, Bill Carragan <billcarragan@orleansda.com>, Betina James <bjames@orleansda.com>, Brian Lapeyrolerie <blapeyrolerie@orleansda.com>, Blake Peters <bpeters@orleansda.com>, Brittany Reed <breed@orleansda.com>, Bonycle Thornton <bthornton@orleansda.com>, Brittany Weber <bweber@orleansda.com>, Caroline Barkerding <c.bark@orleansda.com>, Cathy Gleason <c.gleason@orleansda.com>, Cobyon Bazley <cbazley@orleansda.com>, Christopher Bowman <cbowman@orleansda.com>, Cindi Cavalier-Burns <cburns@orleansda.com>, Carolyn Dandridge <cdandridge@orleansda.com>, Clithia Dibble (C.J.) <cdibble@orleansda.com>, Casey Dieck <cdieck@orleansda.com>, Candice Djilo <cdjilo@orleansda.com>, Craig Famularo <cfamularo@orleansda.com>, Christine Fiudo <cfiudo@orleansda.com>, Camellia Green <cgreen@orleansda.com>, Cherie Huffman <chuffman@orleansda.com>, Carol Johnson <cjohnson@orleansda.com>, Cheryl Legaux <clegaux@orleansda.com>, Crystal McCullum <cmccullum@orleansda.com>, Corey Moll <cmoll@orleansda.com>, Christopher Bowman <communications@orleansda.com>, Carole Taylor <ctaylor@orleansda.com>, Cherrilynne Thomas <cwthomas@orleansda.com>, Leon Cannizzaro <dacannizzaro@orleansda.com>, Debbie Barra <dbarra@orleansda.com>, David Benelli <dbenelli@orleansda.com>, Donata Boutte <dboutte@orleansda.com>, Darren Brazley <dbrazley@orleansda.com>, Denise Cannizzaro <dcannizzaro@orleansda.com>, DeJonique Carter <dcarter@orleansda.com>, Donald Cassels <dcassels@orleansda.com>, Denise Favorite <dfavorite@orleansda.com>, Don Hancock <dhancock@orleansda.com>, Donald Harris <dharris@orleansda.com>, Debra Henry <dhenry@orleansda.com>, Dianne Johnson <djohnson@orleansda.com>, Debra Lebeauf <dlebeauf@orleansda.com>, Donna Andrieu <donna.andrieu@orleansda.com>, David Pipes <dpipes@orleansda.com>, Dianne Puig <dpuig@orleansda.com>, David Roberts <droberts@orleansda.com>, Denise Thornton <dthornton@orleansda.com>, Daisha Washington <dwashington@orleansda.com>, Elizabeth Garren <egarren@orleansda.com>, Elizabeth Kilian <ekilian@orleansda.com>, Erica Lotz <elotz@orleansda.com>, Edward McAuliffe <emcauliffe@orleansda.com>, Erin Murphy <emurphy@orleansda.com>, Fran Bridges <fbridges@orleansda.com>, Finnan Connick <fconnick@orleansda.com>, Frank Denton <fdenton@orleansda.com>, Fred Herman <fherman@orleansda.com>, Glen Burmaster <gburmaster@orleansda.com>, Gary Dewey <gdewey@orleansda.com>, Garold Fayard <gfayard@orleansda.com>, Glenn Green <ggreen@orleansda.com>, George S. Hesni <ghesni@orleansda.com>, Gloria Holmes <gholmes@orleansda.com>, Gordon Kuehl <gkuehl@orleansda.com>, Graymond Martin <graymar@orleansda.com>, Heather M. Holland <hmholland@orleansda.com>, Iain Dover <idover@orleansda.com>, Iris Johnson <ijohnson@orleansda.com>, Inga Petrovich <ipetrovich@orleansda.com>, Irena Zajickova <izajickova@orleansda.com>, Bryant Clark <jbryantclark@orleansda.com>, Jack Cardarella <jcardarella@orleansda.com>, Jennifer Comarda <jcomarda@orleansda.com>, Jay Main <jmain@orleansda.com>, Jason Napoli <jnapoli@orleansda.com>, Jonathan Parker <jparker@orleansda.com>, Jessica Patton <jpatton@orleansda.com>, John Rohr <jrohr@orleansda.com>, Karen Avery <kavery@orleansda.com>, Kathleen Murphy <kcmurphy@orleansda.com>, Kyle Daly <kdaly@orleansda.com>, Kenneth Davis <kdavis@orleansda.com>, Karen Duffy <kduffy@orleansda.com>, Kevin Guillory <kguillory@orleansda.com>, Kelly Hebron <khebron@orleansda.com>, Karen Lansden <klansden@orleansda.com>, Kathryn LeSage <klesage@orleansda.com>, Kathy Murphy <kmurphy@orleansda.com>, La-Tasha Atkins <latkins@orleansda.com>, L'Toya Brumfield <lbrumfield@orleansda.com>, Lyndia B. Sholes <lbsholes@orleansda.com>, Laura Cannizzaro <lcannizzaro@orleansda.com>, Lynell Desdunes <ldesdunes@orleansda.com>, Leon A. Cannizzaro Jr. <leon.cannizzaro@orleansda.com>, Lauren Favret <lfavret@orleansda.com>, Lorie Forte <lforte@orleansda.com>, Loretta M. Brown <lmbrown@orleansda.com>, Mel Ryan <lmryan@orleansda.com>, Linda Nguyen <lnguyen@orleansda.com>, Lauren Robertson <lrobertson@orleansda.com>, Louis Russo <lrusso@orleansda.com>, Lido Schaubhut <lschaubhut@orleansda.com>, Lynn Schiffman <lschiffman@orleansda.com>, Lisa Schneider <lschneider@orleansda.com>, Lindsay Truhe <ltruhe@orleansda.com>, M. J. Audibert <maudibert@orleansda.com>, Molyssa Robinson Barnes <mbarnes@orleansda.com>, Mark Burton <mburton@orleansda.com>, Mike Danon <mdanon@orleansda.com>, Michael

Dewey <mdewey@orleansda.com>, Michelle Dupre <mdupre@orleansda.com>, Myra Gary <mgary@orleansda.com>, Marla Gianini <mgianini@orleansda.com>, Mary Glass <mglass@orleansda.com>, Michael Heier <mheier@orleansda.com>, Michael Henn <mhenn@orleansda.com>, Michael Jurina <mjurina@orleansda.com>, Matthew Kirkham <mkirkham@orleansda.com>, Mike Kitchens <mkitchens@orleansda.com>, Margaret Parker <mparker@orleansda.com>, Morgan Preston <mpreston@orleansda.com>, Michael Redmann <mredmann@orleansda.com>, Mason Spong <mspong@orleansda.com>, Mason Spong Jr <mspongjr@orleansda.com>, Michael Stamps <mstamps@orleansda.com>, Mandy Stearns <mstearns@orleansda.com>, Nickey Chaney <nchaney@orleansda.com>, Nick Geraci <ngeraci@orleansda.com>, Natasha L. Jack <njack@orleansda.com>, Nelle Noble <nnoble@orleansda.com>, Nikisha Roberts <nroberts@orleansda.com>, Napoleon Williams <nwilliams@orleansda.com>, Odelean Ball <oball@orleansda.com>, Pamela Butler <pbutler@orleansda.com>, Paige Cline <pcline@orleansda.com>, Phil Costa <pcosta@orleansda.com>, Pamela Hartman <phartman@orleansda.com>, Payal Patel <ppatel@orleansda.com>, Ralph Brandt <rbrandt@orleansda.com>, Russell Cortazzo <rcortazzo@orleansda.com>, Robert Ferrier <rferrier@orleansda.com>, Raynieca Johnson <rjohnson@orleansda.com>, Ronald McKeever <rmckeever@orleansda.com>, Robert Moore <rmoore@orleansda.com>, Reed Poole <rpoole@orleansda.com>, Ronnie Puigh <rpuigh@orleansda.com>, Rich Spinelli <rspinelli@orleansda.com>, Robert Waterwall <rwaterwall@orleansda.com>, Skip Cade <scade@orleansda.com>, Sidney H. Cates V <scates@orleansda.com>, Sarah Dawkins <sdawkins@orleansda.com>, Sharon Dupree <sdupree@orleansda.com>, Shelbi Gatlin <sgatlin@orleansda.com>, Sara Merlo <smerlo@orleansda.com>, Sharif Nadir <snadir@orleansda.com>, Sloan Richard <srichard@orleansda.com>, Sequetha Simmons <ssimmons@orleansda.com>, Suzanne Taylor <staylor@orleansda.com>, Sandy Gavin <stgavin@orleansda.com>, Scott Vincent <svincent@orleansda.com>, Shanda Williams <swilliams@orleansda.com>, Taylor Anthony <tanthony@orleansda.com>, Troy Banks <tbanks@orleansda.com>, Taryn Carter <tcarter@orleansda.com>, Trinette Cockerham <tcockerham@orleansda.com>, Tammy Crumpton <tcrumpton@orleansda.com>, Tiphani Dansby <tdansby@orleansda.com>, Troy Dumas <tdumas@orleansda.com>, Tanya Evans <tevans@orleansda.com>, Tuyl Fletchinger <tfletchinger@orleansda.com>, Taylor Gray <tgray@orleansda.com>, Troylyn Jefferson <tjefferson@orleansda.com>, Tangela Johnson <tjohnson@orleansda.com>, Todd Juluke <tjuluke@orleansda.com>, Tandra McMurray <tmcmurray@orleansda.com>, Tanja Nicholas <tnicholas@orleansda.com>, Trishawn Payne-Palmer <tpaynepalmer@orleansda.com>, Tommy Ripp <tripp@orleansda.com>, Tony Tran <ttran@orleansda.com>, Tenisha Stevens <ttstevens@orleansda.com>, Tiffany Tucker <ttucker@orleansda.com>, Tammy Warren <twarren@orleansda.com>, Verna Archie <varchie@orleansda.com>, Vickie Barley <vbarley@orleansda.com>, Vickie Landry <vlandry@orleansda.com>, Val Solino <vsolino@orleansda.com>, Warren Fitzgerald <wfitzgerald@orleansda.com>, William M. Hagood II <whagood@orleansda.com>, William Macke <wmacke@orleansda.com>, Wayne Rumore <wrumore@orleansda.com>

Date: 5/13/2014 10:50 AM

---

TO ALL OPDA STAFF:

Please see the attached/revised DA Subpoena to be used from this date forward.  Please disregard any older forms of subpoenas.  **Do not use any of the older subpoenas**.  As per the First Assistant D.A. Graymond Martin, please save the attached in a folder on your computer.  Thank you.

ORLEANS PARISH DISTRICT ATTORNEY NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged and/or confidential and/or part of an attorney work product. It is not to be transmitted to or received by anyone other than the named addressee (or a person authorized to deliver it to the named addressee). It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it and notify the sender of the error by replying via e-mail or by calling the Orleans Parish District Attorney's Office at 504-822-2414 so that our address record can be corrected. Communications to and from this e-mail address may be subject to provisions of the State of Louisiana Public Records Act. Thank you.

Debbie E.(Barra)Ford
Executive Assistant to the

First Assistant District Attorney
Orleans Parish District Attorney's Office
619 South White Street
New Orleans, LA 70119
(504) 571-2901 office
(504) 234-1653 cell

**Attachments:**

- CourtSubpoena.pdf



# SUBPOENA
## A FINE AND IMPRISONMENT MAY BE IMPOSED FOR FAILURE TO OBEY THIS NOTICE.

### Office of the Orleans Parish District Attorney

### CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS

To:

You Are Hereby Notified pursuant to LSA-CCRP art. 66 to appear before the District Attorney for the Parish of Orleans, to testify to the truth according to your knowledge in such matters as may be required of you.

on _____

at _____

to Assistant District Attorney:

_____

phone #:_____

at 619 South White Street

In the case of:

State of LA vs. _____

Item # _____

Case # _____

Charge(s): _____

_____

Instructions:

Contact the above named Assistant District Attorney upon receipt of this subpoena.

Bring this subpoena with you to the District Attorney's Office when you appear to testify.

## RETURN OF PERSONAL SERVICE

THIS IS TO CERTIFY that on

I received the process of Court of which this is a duplicate.

*Recipient of Service*

THIS IS TO CERTIFY that on

I made due Personal Service thereof by leaving same in the hands of the aforesigned Recipient

*(please write Recipient's name),*

the person to whom the process is directed.

*Server of Process*

## RETURN OF DOMICILIARY SERVICE

THIS IS TO CERTIFY that on

I received the process of Court of which this is a duplicate.

*Recipient of Service*

THIS IS TO CERTIFY that on

I made due Personal Service thereof by leaving same in the hands of the aforesigned Recipient

*(please write Recipient's name),*

a person of suitable age and discretion, residing at the domicile of the person to whom the said process of Court was issued, who was absent at the time, which fact I learned by interrogating the person in whose hands the said process was left.

*Server of Process*

# Appendix B

# *That's Not What Happened!*
# Witness Recantation Issues

### Mr. David Pipes, Assistant District Attorney
### Orleans Parish, New Orleans, LA

Witnesses are the vehicle by which you bring your case. What do you do when that vehicle takes a sudden left turn? From impeachment to imprisonment, this session will cover what to do when your witnesses suddenly become their witnesses.

---

## Part I - Which Of Your Witnesses Will Turn?

How do you identify the traitors in your midst? Knowing a witness is going to recant prior to his taking the stand at trial will go a long way to making sure you get the last laugh.

## Part II - How Will Your Witness Betray You?

Your witness will not show up. Your witness will change his mind. Your witness will not remember. Your witness will lie. Now ... what are you going to do about it?

## Part III – Protecting the Innocent and Punishing the Guilty

Has your victim fallen prey to fear, intimidation, and apathy, or were they just a cold-blooded liar from the word go?

## Part IV – MATERIALS and HAND OUTS

Material Witness Bonds
Prior Inconsistent Statements as an Impeachment Tool
Crimes and Sanctions

# *That's not what happened!*
## Witness Recantation Issues

David Pipes
Assistant District Attorney
Parish of Orleans

# RECANT

1. to withdraw or repudiate (a statement or belief) formally and publicly.

2. revoke

3. to make an open confession of error.

-Merriam-Webster Dictionary

# WHICH OF YOUR WITNESSES WILL TURN ON YOU?



# FAMILY



# FAMILY

# ADDICTS



# FAMILY

# ADDICTS

# "SNITCHES"

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of January, 2018, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, and that service will be provided through the CM/ECF system.


<u>/s/ Katherine Chamblee-Ryan</u>
Katherine Chamblee-Ryan