## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RENATA SINGLETON,<br>MARC MITCHELL,<br>LAZONIA BAHAM,<br>JANE DOE,<br>TIFFANY LACROIX,<br>FAYONA BAILEY,<br>JOHN ROE, and<br>SILENCE IS VIOLENCE,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>LEON CANNIZZARO, in his official<br>capacity as District Attorney of Orleans<br>Parish and in his individual capacity;<br><br>GRAYMOND MARTIN,<br>DAVID PIPES,<br>IAIN DOVER,<br>JASON NAPOLI,<br>ARTHUR MITCHELL,<br>TIFFANY TUCKER,<br>MICHAEL TRUMMEL,<br>MATTHEW HAMILTON,<br>INGA PETROVICH,<br>LAURA RODRIGUE,<br>SARAH DAWKINS, and<br>JOHN DOE,<br>in their individual capacities;<br><br>     *Defendants*. | CIVIL ACTION NO. 2:17-cv-10721<br><br><br>JUDGE: JANE TRICHE MILAZZO<br><br><br>MAGISTRATE: JANIS VAN MEERVELD |

## PLAINTIFFS' CONSOLIDATED OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION…………………………………...……….……….………..1

STATEMENT OF THE CASE…………………………………………………...2

STANDARD OF REVIEW…………………………...……….……………5

SUMMARY OF THE ARGUMENT………………….……………….………5

ARGUMENT…………………………….…………………..………...……6

    I.    DEFENDANTS' NEW FACTUAL ALLEGATIONS……..……..……6

    II.    PRESCRIPTION……………………………..………......……6

    III.    IMMUNITY …………………………………..…………..……12

        A.  The Individual Defendants Are Not Absolutely Immune
           Because Their Conduct Was Investigative and Administrative,
           Not Prosecutorial…………………………..………..…..…13

        B.  The Individual Defendants Are Not Entitled to Qualified
           Immunity Because Their Acts Were Clearly Unlawful…………..…20

    IV.    FOURTH AMENDMENT CLAIMS BASED ON DEFECTIVE
          MATERIAL WITNESS WARRANT APPLICATIONS……………..........21

        A.  Plaintiffs Singleton, Baham, Mitchell, and Roe's Fourth
           Amendment Claims Under *Franks v. Delaware*………..……..………22

        B.  Plaintiff Silence Is Violence's Claims……………..………..……31

        C.  Defendants Are Not Shielded by Qualified Immunity……..………33

    V.    FOURTH AMENDMENT CLAIMS BASED ON
          FRAUDLENT SUBPOENAS……………………….……..………34

    VI.    FIRST AMENDMENT CLAIMS…………………..……..………38

        A.  Plaintiffs Were Unlawfully Compelled to
           Speak with Prosecutors………………………..……………..39

i

B.  Defendants Retaliated Against Plaintiffs for Constitutionally
Protected Activity…………………………………...……………….……42

C.  Defendants Are Not Entitled to Qualified Immunity……………..………44

VII.   FOURTEENTH AMENDMENT PROLONGED
DETENTION CLAIMS………………………………….……….……..45

VIII.  FOURTEENTH AMENDMENT SUBSTANTIVE
DUE PROCESS CLAIMS…………………………………...….…………46

IX.    CLAIMS FOR FAILURE TO SUPERVISE, TRAIN,
OR DISCIPLINE, AND FAILURE TO INTERVENE…....……...…………47

X.     LOUISIANA ABUSE OF PROCESS CLAIMS…………...……………47

XI.    LOUISIANA FRAUD CLAIMS…………………………..…...………..50

**CONCLUSION** ……………………………………………...…………………50

# INTRODUCTION

Plaintiffs—crime victims, witnesses, and a non-profit victim advocacy organization—challenge the Orleans Parish District Attorney's Office's ("Office") use of unlawful means to coerce, arrest, and imprison crime victims and witnesses. They bring claims against District Attorney Leon Cannizzaro, in his individual and official capacities, for the policies, practices, and customs that caused their injuries. Plaintiffs also bring claims against the individual Assistant District Attorneys who injured them.

Plaintiffs' Second Amended Complaint ("Complaint") describes four related policies that the Office has routinely used to intimidate victims and witnesses. First, the Office has used fraudulent subpoenas to coerce victims into meeting privately with prosecutors. Second, prosecutors have routinely misled courts to obtain material witness arrest warrants for crime victims and witnesses. Third, prosecutors have unlawfully compelled victims and witnesses to speak to them in private and retaliated against them when the witness declines to do so—or when the prosecutor dislikes a witness's story. Fourth, prosecutors have orchestrated the prolonged detention of these witnesses to secure private conversations with prosecutors or to pressure witnesses to change their testimony. As outlined in detail in the Complaint, these actions have violated Plaintiffs' rights.

In their Motion to Dismiss, Defendants raise a host of procedural defenses that are inapplicable to most of Plaintiffs' claims. Where Defendants address the merits, their arguments do not meet the high bar for dismissal under Fed. R. Civ. P. 12(b)(6). Contrary to Defendants' contentions, Plaintiffs' allegations are supported by ample facts and by the governing case law. Defendants' Motion to Dismiss should be denied.

## STATEMENT OF THE CASE

On April 26, 2017, an investigative journalist at *The Lens* published a news story reporting that prosecutors at the Orleans Parish District Attorney's Office routinely used fraudulent subpoenas to gain private access to witnesses outside of court proceedings. Doc. 52 ¶ 67.

The documents described in the story were each adapted from a standard template form. The documents were labeled, "SUBPOENA," and warned, "A FINE AND IMPRISONMENT MAY BE IMPOSED FOR FAILURE TO OBEY THIS NOTICE." Doc. 52 ¶ 38. Marked with the official seal of the Office, they directed witnesses to report to the Office for a private meeting with a prosecutor to "testify" before him. Doc. 52 ¶¶ 35-40.

Before *The Lens* published its story, this practice was not widely known among the public. Doc. 52 ¶ 67. No one who received one of the fraudulent subpoenas had reason to question its legitimacy. In response to the public outcry when the story broke, the Office made a series of public statements about the fraudulent subpoenas.

A spokesman for the Office defended the policy and explained that these documents were intentionally designed to mislead: "Maybe in some places if you send a letter on the DA's letterhead that says, 'You need to come in and talk to us' … that is sufficient. It isn't here. *That is why it looks as formal as it does*." Doc. 52 ¶ 68 (emphasis added).

The fraudulent subpoenas were part of a longstanding policy to coerce witnesses into out-of-court meetings with prosecutors using fabricated documents masquerading as valid legal process. Doc. 52 ¶¶ 61-66. A preliminary investigation identified fraudulent subpoenas signed by at least 14 prosecutors in cases from second-degree murder to disturbing the peace. Doc. 52 ¶ 63.

This policy came directly from Office leadership. On May 13, 2014, Defendant First Assistant District Attorney Graymond Martin sent an email directing all staff, "Please see the

attached/revised DA Subpoena to be used from this date forward. Please disregard any older forms of subpoenas. **<u>Do not use any of the older subpoenas.</u>**" Doc. 52 ¶ 45; *see* Doc. 52, App. A.

In the face of public criticism following *The Lens* article, Defendant Cannizzaro repeatedly asserted that no one had been jailed for failing to comply with a fraudulent subpoena. Doc. 52 ¶¶ 84-85. Plaintiffs' preliminary investigation, however, has identified at least 10 material witness arrest warrant applications that explicitly rely on fraudulent subpoenas. Doc. 52 ¶ 86. Six of these witnesses were jailed. Doc. 52 ¶ 87; *see* Doc. 52 ¶¶ 86-113 (describing these cases).

The use of fraudulent subpoenas is part of a broader policy and practice: basing material witness arrest warrant applications on material misrepresentations and omissions, including false allegations that: (1) the witness was properly served with a subpoena; (2) the witness refused to testify; and (3) the Office could not find the witness. Doc. 52 ¶ 131; *see* Doc. 52 ¶¶ 130-135 (describing this policy). Prosecutors also routinely submit material witness warrant applications that offer no reasonable basis to arrest a witness or crime victim—such as the witness or victim's preference not to meet with prosecutors outside of court. *See* Doc. 52 ¶¶ 114-129.

Once a person is jailed on a material witness arrest warrant, prosecutors routinely leave her to languish in jail without access to a judge or counsel. *See* Doc. 52 ¶¶ 144-162. At times, the results are extreme: P.M., a victim of child sex trafficking, was detained as a material witness for 109 days. Doc. 52 ¶¶ 154-156. Prosecutors exploit this prolonged detention to pressure the witness to agree to private meetings or to alter her testimony to support the State's theory of the case. Doc. 52 ¶ 159. Frequently, prosecutors seek to interview the person after court appearances when she is still shackled and wearing an orange jumpsuit. Doc. 52 ¶¶ 159-162.

The individual Plaintiffs in this case are victims and witnesses harmed by these practices. Prosecutors sent Plaintiff Renata Singleton, a domestic violence victim, at least two fraudulent

subpoenas, pressured her to speak with them privately on threat of imprisonment, and subsequently arrested her during a meeting at the Office pursuant to a material witness warrant predicated on the two fraudulent subpoenas, as well as other misrepresentations. *See* Doc. 52 ¶¶ 193-228.

Plaintiff Marc Mitchell was shot while playing basketball. Despite assisting prosecutors extensively, he was pressured to change his testimony and was ultimately jailed pursuant to a material witness warrant predicated on false and misleading statements. *See* Doc. 52 ¶¶ 229-260.

Plaintiff Lazonia Baham's daughter's boyfriend was murdered. She, too, received fraudulent subpoenas; she, too, was pressured to change her story; and she, too, was jailed—for eight days—based on misleading representations. *See* Doc. 52 ¶¶ 261-286.

Plaintiff Jane Doe is a teenage victim of molestation and child pornography. Similarly, she was served with a fraudulent subpoena, threatened with jail time, and harassed and humiliated by prosecutors even when she did submit to an interview. *See* Doc. 52 ¶¶ 287-303.

Plaintiffs Fayona Bailey and Tiffany LaCroix each were witnesses in murder cases. Both were sent fraudulent subpoenas and threatened with imprisonment. Each hired an attorney at her personal expense to "quash" the fake subpoenas. *See* Doc. 52 ¶¶ 304-325.

Plaintiff John Roe was attacked by a man wielding an AK-47. After the assault, he cooperated with police. He was later arrested on a material witness warrant secured based on false and misleading statements. *See* Doc. 52 ¶¶ 326-388.

Plaintiff Silence Is Violence is a non-profit victim advocacy organization. Resources once directed at Silence Is Violence's core mission—public advocacy against violent crime—must instead be devoted to ensuring that victims of crime are not victimized again by the District Attorney's Office. *See* Doc. 52 ¶¶ 389-413.

## STANDARD OF REVIEW

Defendants' motions to dismiss are governed by Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss under 12(b)(6) "is viewed with disfavor and is rarely granted." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (quotations and citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). At the motion-to-dismiss stage, the complaint must be liberally construed in favor of the plaintiff, and facts pled in the complaint must be taken as true. *See, e.g.*, *Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002).

## SUMMARY OF THE ARGUMENT

Defendants raise four main objections to Plaintiffs' claims. First, Defendants attempt to dispute the factual allegations in Plaintiffs' Complaint. This is premature, as a court considering a motion to dismiss must assume the Plaintiffs' allegations are true and draw all reasonable inferences in the Plaintiffs' favor.

Second, Defendants argue that prescription has run for certain Plaintiffs. However, claims are not time-barred where, as here, Defendants have concealed their unlawful conduct, and Plaintiffs could not reasonably have been expected to know about it.

Third, Defendants argue that they are entitled to either absolute or qualified immunity. These defenses are inapplicable to the bulk of Plaintiffs' claims, which are brought against Defendant Cannizzaro in his official capacity. Nor do these defenses apply to Plaintiffs' claims for prospective relief. As for the Individual Defendants, absolute immunity does not shield conduct that is investigative or administrative in nature, which is the conduct at issue in this case. Nor is qualified immunity available since Defendants' conduct violated clearly established law.

5

Fourth, Defendants contest the merits of certain claims, often in brief or conclusory terms. Defendants' arguments are unsupported or mischaracterize the law.

## ARGUMENT

## I.   DEFENDANTS' NEW FACTUAL ALLEGATIONS

In response to Plaintiffs' allegations, Defendants proffer a slew of factual allegations of their own.[1] As noted, this is not the appropriate stage of litigation for factual disputes, where factual allegations must be taken as true, and all reasonable inferences drawn in Plaintiffs' favor. *See Oliver*, 276 F.3d at 740. The Court should thus disregard them.

Moreover, a number of these new allegations are false. For example, Defendants dispute Plaintiff Mitchell's allegation that Defendant Trummel relied on a false statement—that Mitchell had bought a bus ticket to leave town—when he asked the court to jail Mitchell as a material witness. Defendants explain, "Mr. Trummel notes that the statement that Mr. Mitchell had a bus ticket to leave town was based on information provided by Mr. Mitchell's mother." Doc. 63-1 at 13 n.16.[2] This cannot be true: at the time Defendant Trummel made this statement to the court, Mr. Mitchell's mother had been dead for nearly three years.[3]

## II.   PRESCRIPTION

Defendants allege that Plaintiffs Singleton, Mitchell, Baham, and Doe's claims for damages are time-barred. But until recently—due to Defendants' efforts to conceal the unlawful

---

[1] Plaintiffs do not object to Defendants' reference to court documents, such as the arrest warrant applications at issue in this case. Doc. 63-1 at 2 n.2. Nor do Plaintiffs take issue with the inclusion of entries from court dockets or files, which may be considered matters of public record. However, Plaintiffs do object to the factual allegations in Defendants' arrest warrant applications being taken as true, since the warrant applications are the very documents Plaintiffs allege to be replete with false and misleading statements.

[2] When referencing documents filed in this case, Plaintiffs refer to the page number listed on the ECF header.

[3] *See Obituary for Patricia Lewis*, New Orleans Advoc. (Oct. 23, 2013), *available at* http://www.legacy.com/obituaries/theneworleansadvocate/obituary.aspx?page=lifestory&pid=167671868.

6

nature of their conduct—these plaintiffs were not aware of the facts necessary to plead their claims. Therefore, under governing precedent, their claims are not prescribed.

The statute of limitations for section 1983 claims is borrowed from the state in which the cause of action arose. *See Owens v. Okure*, 488 U.S. 235, 240 (1989). Specifically, courts apply the prescriptive period that the State provides for personal injury torts. *Id.* at 240-41. Here, that prescriptive period is one year. *See* La. Civ. Code. Ann. art. 3492 (1992).

Although state law supplies the limitations period, federal law determines when the statute of limitations accrues, or begins to run. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007). State tolling rules also apply to section 1983 claims. *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 764 (5th Cir. 2015). These tolling rules create exceptions to the statute of limitations, and where they apply, they prevent the running of prescription. *See Marin v. Exxon Mobil Corp.*, 48 So.3d 234, 245 (La. 2010). Based on each of these principles—the law of federal accrual and state tolling rules—Plaintiffs' claims have not prescribed.

**Accrual.** Under federal law, the limitations period begins to run "'when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.'" *Aly v. City of Lake Jackson*, 453 F. App'x 538, 539 (5th Cir. 2011) (quoting *Wallace*, 549 U.S. at 388). "A plaintiff need not know that she has a legal cause of action; she need know only the facts that would ultimately support a claim." *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). Specifically, the plaintiff must know (1) that she has been injured, and (2) "the connection between the injury and the defendant's actions." *Id.* (quotations omitted).

Here, Plaintiffs did not know facts necessary to their claims until more than a year after their injuries. Plaintiffs Singleton, Baham, and Doe did not know that the "subpoenas" directing them to report to the District Attorney's Office were fraudulent. Doc. 52 ¶¶ 228, 286, 303. Indeed,

7

Defendants' scheme was *designed* to mislead Plaintiffs into believing that these documents were valid; the fraudulent documents were labeled "subpoenas," bore the official seal of the District Attorney's Office, and threatened fines and imprisonment for failure to comply. Doc. 52 ¶¶ 38-40.

Each of the claims for which Defendants assert prescription is premised upon these Plaintiffs' receipt of fraudulent subpoenas.[4] Accordingly, under federal accrual rules, the statute of limitations did not begin to run until the first time that Plaintiffs knew or reasonably could have known the factual basis for their claims: when *The Lens* exposed the use of fraudulent subpoenas on April 26, 2017. Doc. 52 ¶¶ 67, 228, 286, 303.

For Baham's Fourteenth Amendment prolonged detention claim against Defendant Napoli to accrue, Baham had to know not only that she was injured, but who has caused her injury. *See Piotrowski*, 237 F.3d at 576. Baham had no reason to suspect that Defendant Napoli, and not the court or the jail, was responsible for her detention until she learned he was seeking out-of-court contact with her to which he was not legally entitled. It was not until April 2017, when the use of fraudulent subpoenas was made public, that Baham had reason to investigate whether Defendant Napoli had orchestrated aspects of her detention to secure a private interrogation. Doc. 52 ¶ 286.[5]

Plaintiff Mitchell's claims are also not prescribed. The warrant application for Mitchell's arrest was not included in the clerk's file, and no discussions about it took place on the record. Doc. 52 ¶¶ 259-260. Instead, the warrant application was available only in the prosecutor's file. Doc. 52 ¶ 260. Under Louisiana law, a prosecutor's file is exempt from disclosure as a public

---

[4] In Count I, Singleton challenges her arrest pursuant to a material witness warrant that explicitly relied on fraudulent subpoenas left at Singleton's home. In Count II, the fraudulent subpoena that Plaintiff Doe received is the central factual basis for her claim. Fraudulent subpoenas also provide the factual underpinnings of Plaintiffs Singleton, Baham, and Doe's claims under the First Amendment (Count III) and Fourteenth Amendment (Count V), as well as their claims for failure to supervise, train, and discipline (Count VI), failure to intervene (Count VII), abuse of process (Count VIII), and fraud (Count IX).

[5] *See Piotrowski*, 237 F.3d at 576 (explaining that accrual begins when "circumstances would lead a reasonable person to investigate further") (quotations omitted).

record until the criminal conviction becomes final. In the case involving Mitchell, this happened on September 29, 2017. Doc. 52 ¶ 260 n.14. Before this, Mitchell could not have learned the basis given for his arrest. Accordingly, the limitations period for Mitchell began on that date.

**Tolling.** Two Louisiana tolling principles apply to Plaintiffs' claims: (1) the "discovery rule," and (2) tolling based on fraudulent concealment.[6]

The "discovery rule" applies when a plaintiff's cause of action is not known or reasonably knowable to the plaintiff. *Wimberly v. Gatch*, 635 So. 2d 206, 212-13 (La. 1994). A plaintiff's "mere apprehension that something may be wrong is insufficient to commence the running of prescription." *Campo v. Correa*, 828 So.2d 502, 511 (La. 2002). Instead, "the ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." *Marin*, 48 So. 3d at 246. This reasonableness inquiry "depends almost entirely on the particular circumstances, requiring a case-by-case analysis." *Terrebonne Par. Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F. 3d 303, 322 (5th Cir. 2002).

Defendants' conduct here was to coerce certain speech and behavior from victims and witnesses by creating the false impression that it was required by law. The objective of this practice was to convince victims and witnesses that prosecutors' authority was real and their methods judicially sanctioned. As described above, Defendants' scheme was successful: Plaintiffs did not know and had no reason to know that the documents they received—labeled "subpoenas"—were not, in fact, subpoenas. Doc. 52 ¶¶ 228, 286, 303.[7]

---

[6] These principles are part of Louisiana's doctrine of *contra non valentem*, which is "a judicially created exception to the general rule of prescription." *Rajnowski v. St. Patrick's Hosp.*, 564 So. 2d 671, 674 (La. 1990).

[7] Plaintiff Mitchell does not allege that he received a fraudulent subpoena. However, as described above, Defendants' written application for a material witness warrant was submitted *ex parte*, and the application was not filed into the

Plaintiffs' inaction prior to this discovery was reasonable, particularly in light of Plaintiffs' education and intelligence. Plaintiff Singleton was an accountant. Doc. 52 ¶ 226. Plaintiff Mitchell had a high-school education and worked at a hotel. Doc. 52 ¶¶ 6, 247. Plaintiff Baham was in special education classes in school and did not advance beyond the eighth grade. Doc. 52 ¶ 7. Plaintiff Doe was a teenager in high school. Doc. 52 ¶ 8. These Plaintiffs, none of whom had experience in law, were ill-equipped to perceive Defendants' misconduct, which was cloaked in legal process.[8]

The discovery rule suspends prescription for Plaintiffs' official capacity claims against Defendant Cannizzaro for an additional reason. Even where a plaintiff is aware of her injury, "prescription d[oes] not begin to run until [the plaintiff] ha[s] a reasonable basis to pursue a claim *against a specific defendant.*" *Jordan v. Employee Transfer Corp.*, 509 So. 2d 420, 424 (La. 1987) (emphasis added).[9] Here, in order to know that the District Attorney's Office—and not merely certain individuals within it—caused their injuries, Plaintiffs would have needed some indication that the conduct that harmed them was undertaken pursuant to the Office's policies or customs. The Plaintiffs who received fraudulent subpoenas did not know that they were fraudulent—much less that their use amounted to an official policy. Doc. 52 ¶¶ 61-62, 228, 286, 303. Likewise, until Plaintiffs Singleton, Baham, and Mitchell understood that their detentions as material witnesses

---

[8] Relevant to the reasonableness inquiry is whether the plaintiff had education and experience in the subject matter that gave rise to the cause of action. *See, e.g.*, *Bayou Fleet, Inc. v. Bollinger Shipyards, Inc.*, 197 So. 3d 797, 807 (La. App. 4th Cir. 2016) (holding that Plaintiffs' inaction in dispute involving a shipyard was unreasonable where the plaintiffs were "well educated, sophisticated businessmen with nearly 40 years of experience each in managing and owning marine businesses").

record. Mitchell's first opportunity to learn the reasons offered in that application was on September 29, 2017, when the District Attorney's file, which contained the application, became available. Doc. 52 ¶ 259.

[9] *See Jack B. Harper Contractor, Inc v. United Fiberglass of Am., Inc.*, No CIV.A. 11-20, 2012 WL 2087394, at *2 (E.D. La. June 8, 2012) (quoting this language from *Jordan* with approval).

were secured based on false statements and material omissions, these Plaintiffs had no reason to investigate whether their injuries occurred as part of an official policy.

Louisiana law also suspends prescription when defendants have concealed the fact of the offense or have prevented the plaintiff from asserting her cause of action, as long as the plaintiff's delay is not willful or caused by her own negligence. *See Marin*, 48 So.3d at 251-252. Tolling based on concealment requires three elements to be satisfied. *Prevo v. Louisiana ex rel. Dep't of Pub. Safety & Corr. Div. of Prob. & Parole*, 187 So.3d 395, 399 (La. 2015).

First, the defendant must have engaged in conduct that rises to the level of concealment, misrepresentation, fraud, or ill practice. *Id*. As explained above, Defendants concealed the fraudulent nature of their conduct by fabricating templates to mimic court-approved forms. Doc. 52 ¶¶ 37-40. And with respect to Mitchell, Defendants failed to file the material witness warrant application in the record and conducted all discussion of the warrant *ex parte*. Doc. 52 ¶¶ 259-260.

Second, the plaintiff must show that the defendants' actions effectively prevented the plaintiff from pursuing her case. *Prevo*, 187 So.3d at 398. Defendants' concealment of their misdeeds and threats against Plaintiffs satisfy this prong.[10] In particular, Defendants actively discouraged Singleton from protecting her legal rights by jailing her when she refused to speak to prosecutors without the presence of counsel.[11]

Third, the plaintiff's inaction must have been reasonable in light of her education, intelligence, and the nature of the defendant's conduct. *Prevo*, 187 So.3d at 398. As described

---

[10] *See, e.g.*, *Lomont v. Bennett*, 172 So. 3d 620, 637 (La. 2015) (holding, in a legal practice case in which the attorney had acted to conceal the malpractice, that prescription did not apply because "[the plaintiff's] delay in bringing th[e] action was a direct result of the fraud committed by [the defendant], rather than her own willfulness or negligence").

[11] *Nathan v. Carter*, 372 So.2d 560, 563 (La. 1979) (holding that prescription did not apply due to fraud and misrepresentation where the defendant threatened to withhold money from plaintiff "if she ever contacted an attorney").

above, Plaintiffs' inaction was entirely reasonable, particularly given Defendants' efforts to mislead them. The statute of limitations should therefore be tolled until the fraud was revealed.

## III.    IMMUNITY

With respect to each of Plaintiffs' claims, the Individual Defendants assert that they are entitled to absolute immunity from money damages for their unlawful acts because they committed these acts while employed as prosecutors. The Individual Defendants argue that even if they are not entitled to absolute immunity, they are protected by qualified immunity.

These defenses are inapplicable to Plaintiffs' official capacity claims against Defendant Cannizzaro, as these claims are, in effect, levied against the District Attorney's Office itself.[12] "Unlike government officials sued in their individual capacities, municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under § 1983." *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999).

Immunity is also inapplicable to claims for prospective relief.[13] Thus, Plaintiffs Roe and Silence Is Violence's injunctive claims against Defendants Dawkins, Pipes, Martin, and Cannizzaro (in his individual capacity) do not hinge on this analysis.[14] Nor does immunity apply to Plaintiffs' injunctive claims against Defendant Cannizzaro in his official capacity.

Immunity is therefore solely at issue with respect to Plaintiffs' damages claims against the Individual Defendants. For the reasons explained below, these arguments fail.

---

[12] *See Burge v. Par. of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) ("Official capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent.").

[13] *See Valley v Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 n.1 (5th Cir. 1997) ("[T]he defenses of qualified and absolute immunity do not extend to suits for injunctive relief under 42 U.S.C. § 1983.").

[14] Plaintiffs Baham and Doe also raised claims for injunctive relief. Doc. 52 ¶¶ 415, 416, 419, 420, 423, 425, 426, 429, 430, 432, 443, 450. However, since the criminal cases involving those Plaintiffs have concluded, their claims for prospective relief are withdrawn. In Count II, Plaintiffs' claims against Defendant Mitchell are also withdrawn.

12

### A.   The Individual Defendants Are Not Absolutely Immune Because Their Conduct Was Investigative and Administrative, Not Prosecutorial

"'[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.'" *Loupe v. O'Bannon*, 824 F.3d 534, 538-39 (5th Cir. 2016) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). Rather, a prosecutor is absolutely immune only for actions undertaken in her "'role as [an] advocate for the State,'" and not for acts performed in her role as an 'administrator or investigative officer.'" *Burns v. Reed*, 500 U.S. 478, 491 (1991) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430-31 & n.33 (1976)).

For this reason, the Supreme Court employs a "functional approach," in which absolute immunity turns on "the specific activities that g[a]ve rise to the cause of action." *Loughlin v. Tweed*, No. CIV.A. 15-649, 2015 WL 3646777, at *5 (E.D. La. June 10, 2015) (Feldman, J.). Importantly, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed,* 500 U.S. 478, 486 (1991).

Here, there were five categories of "activities that g[a]ve rise to" Plaintiffs' claims, *Loughlin*, No. CIV.A. 15-649, 2015 WL 3646777, at *5: (1) the creation and use of fraudulent subpoenas to gain access to witnesses outside of court for private meetings at the Office; (2) the use of verbal and written threats to gain access to witnesses outside of court and to influence witnesses' testimony; (3) the misuse of the material witness arrest warrants for investigative ends; (4) the prolonged detention of material witnesses; and (5) the failure to supervise or intervene. None of this conduct is entitled to absolute immunity.

#### 1.   Fraudulent Subpoenas

Plaintiffs allege that Defendants Napoli, Petrovich, Rodrigue, and Dover each "issued" fraudulent subpoenas threatening Plaintiffs Singleton, Baham, Doe, LaCroix, and Bailey with fines and jail if they refused to meet privately with prosecutors. Doc. 52 ¶¶ 195-197, 270-271, 288, 305-

13

308, 317-318; *see* Doc. 52 ¶¶ 37-40 (describing these documents). Prosecutors did so using an Office-wide template subpoena distributed by Defendant Martin. Doc. 52 ¶¶ 43-46.   When Defendant Martin distributed the template, he instructed all prosecutors in the Office to use the fraudulent template document exclusively. Doc. 52 ¶ 45. These allegations form the basis for Plaintiffs' First, Fourth, and Fourteenth Amendment claims, their claims for failure to supervise, train, and discipline, their claims for failure to intervene, and the state law torts of abuse of process and fraud.

Absolute immunity does not apply and Defendants are liable for each of these claims for at least two reasons. First, the Plaintiffs allege that Defendants used the fraudulent subpoenas in an investigative capacity. The purpose of prosecutors' so-called subpoenas was not to prepare for court appearances, but to mine for information. That is quintessential investigative conduct.[15]

Second, in "issuing" fraudulent subpoenas, Defendants were acting outside of their authority as prosecutors. When a prosecutor "sidesteps" the judicial process, she is not entitled to absolute immunity. For example, in *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012), a prosecutor issued investigative subpoenas without first consulting a judge or grand jury, in contravention of state law. *Id.* at 909-10. The Ninth Circuit Court of Appeals denied absolute immunity because, in part, he had "avoid[ed] the scrutiny of the . . . court and [thereby] forfeited the protections the law offers to those who work within the process." *Id.* at 914; *see also Loupe*, 824 F.3d at 540 (citing *Lacey* in holding that prosecutors were not entitled to immunity when they intentionally avoided or contravened court processes).

---

[15] *See Simon v. City of New York*, 727 F. 3d 167, 172-74 (2d Cir. 2013) (holding that investigative interviews by prosecutors are not entitled to absolute immunity); *see also Hoog-Watson v. Guadaloupe Cty.*, 591 F.3d 431, 438 (5th Cir. 2009) (holding that prosecutor's participation in a search and seizure was investigative and hence not absolutely immune).

Defendants acted outside of the legal boundaries of the prosecutorial function when they "issued" fake subpoenas because Louisiana law *does not allow* prosecutors to "issue" their own subpoenas without judicial oversight. *See* LSA-C.Cr.P. art. 66. Defendants do not contend otherwise. As a result, Defendants have failed to show that absolute immunity applies to this extrajudicial conduct. *See Simon v. City of New York*, 727 F.3d 167, 173-74 (2d Cir. 2013).

### 2.   *Verbal and Written Threats*

The fraudulent subpoenas distributed by Defendant Martin and "issued" by Defendants Mitchell, Napoli, Petrovich, Rodrigue, and Dover included written threats: "A fine and imprisonment may be imposed for failure to obey this notice." Doc. 52 ¶ 38. Defendants Napoli and Petrovich also directed their investigators to verbally threaten Plaintiffs. Doc. 52 ¶¶ 265-268, 308-309. Defendant Dover verbally threatened Doe with jail on several occasions. Doc. 52 ¶¶ 295, 297. These threats are part of the factual basis for Plaintiffs' claims under the First, Fourth, and Fourteenth Amendments, their claims for failure to supervise, train, and discipline, their claims for failure to intervene, and the state law torts of abuse of process and fraud.

Making threats to strengthen the force of their fraudulent subpoenas is not a prosecutorial function that entitles the Individual Defendants to immunity. As described in detail above, the fraudulent subpoenas were "issued" for an investigative purpose, and the threats were made to that same end. And like the use of fraudulent subpoenas, threatening witnesses that Defendants would enforce fraudulent subpoenas with criminal fines and jail is plainly outside the scope of a prosecutor's authority.

Separately, Defendant Dawkins and Defendant Cannizzaro each made unlawful verbal threats that form the basis of Plaintiffs Roe and Silence Is Violence's claims under the First and Fourteenth Amendments. Defendant Dawkins verbally threatened Plaintiff Roe and his fiancée

with jail if Roe refused to meet privately. These out-of-court threats demanding out-of-court meetings were not prosecutorial functions. As was the case with the fraudulent subpoenas, the purpose of these meetings was investigative: when Defendant Dawkins threatened Plaintiff Roe and his fiancée, she demanded private meetings with her, not in-court testimony. Doc. 52 ¶ 380-387. And indeed, Dawkins has no reason to threaten Plaintiff Roe simply to secure his testimony, since Plaintiff Roe had willingly cooperated with police and has never contended he would refuse to testify if validly subpoenaed to court. Doc. 52 ¶¶ 333-34, 348.

Moreover, Defendant Dawkins sought to compel Plaintiff Roe to meet privately with her months before trial. Defendant Dawkins's objective was to gain an investigative advantage, not to advocate in court. Because this conduct was investigative, and because Defendant Dawkins has no lawful authority to compel Plaintiff Roe to meet with her or imprison him if he refused, she is not absolutely immune from liability for making these threats. *See Loupe*, 824 F.3d at 540.

Defendant Cannizzaro twice threatened Tamara Jackson, the Executive Director of Silence Is Violence, with criminal prosecution in order to silence her political speech. In the first instance, Jackson was threatened after filing a complaint with the National District Attorneys' Association about the Office's failure to protect victims. Jackson "understood that the threat was made as a direct and proximate result of her advocacy for victims and complaint to the National District Attorneys' Association." Doc. 52 ¶ 174. In the second, Defendant Cannizzaro threatened Jackson after she publicly criticized the Office for its failure to protect crime victims. Once again, Jackson "understood this threat to be retaliation for her comments to the press and a warning not to make further statements to reporters." Doc. 52 ¶ 175. Absolute immunity does not shield these out-of-court threats, which were made without connection to any judicial proceeding. Accordingly, Defendant Cannizzaro cannot meet his burden to establish absolute immunity.

### 3.        *The Misuse of Material Witness Warrants*

Plaintiffs allege that Defendants Mitchell, Napoli, Trummel, Hamilton, and Dawkins used material witness arrest warrants to secure the detention of Singleton, Mitchell, Baham, and Roe based on false and misleading statements. Defendant Pipes approved the decision to seek arrest warrants for Plaintiffs. This conduct is the basis for Plaintiffs' claim that these Defendants violated their rights under the Fourth and Fourteenth Amendments, and for their claims for failure to supervise, train, and discipline and for failure to intervene.

To be sure, prosecutors may receive absolute immunity for in-court advocacy as well as written motions made to detain a material witness to secure a witness's attendance at trial. *See, e.g.*, *Burns*, 500 U.S. at 491 (holding that a prosecutor's advocacy at a probable cause hearing for a search warrant was entitled to immunity).

However, Plaintiffs' Fourth Amendment claim does not turn on the act of *advocating for* a material witness warrant. Rather, Plaintiffs allege that (1) the prosecutors, just like any police officer swearing to a warrant application under oath, acted as complaining *witnesses* when they made factual representations to the court; and (2) that the warrants were used primarily to make witnesses available for unlawful *investigative* interviews. Neither the function of giving such testimony nor the function of investigation are protected by absolute immunity.

First, the factual representations made to the Court by prosecutors in their arrest warrant applications were more akin to a complaining witness's affidavit than lawyerly advocacy relying on the testimony of others. In *Kalina v. Fletcher*, the U.S. Supreme Court unanimously held that, when a prosecutor swears to facts in an affidavit accompanying a warrant application, her

17

testimony is not subject to absolute immunity. 522 U.S. 118, 130-31 (1997). The Court explained that "[t]estifying about facts is the function of the witness, not of the lawyer." *Id.*[16]

As alleged in the Complaint, Defendants offered facts to the Louisiana courts based on their own purported experiences with the witnesses, testifying to the underlying facts just as a police officer would in any warrant application. *See* Doc. 52 ¶¶ 201, 243, 245-246, 273 (Defendants Mitchell, Trummel, Hamilton, and Napoli attesting to facts about certain Plaintiffs). Therefore, under *Kalina*, the Defendants are not entitled to absolute immunity.

Second, the Complaint alleges that the material witness warrants at issue in this case were employed to pressure witnesses to submit to out-of-court investigative interviews with prosecutors—not strictly to obtain in-court testimony. Doc. 52 ¶¶ 243-48, 178-81, 223. In similar circumstances, the Second Circuit has held that the unlawful use of material witness warrants was investigative rather than prosecutorial. In *Simon v. City of New York*, the prosecutor obtained a material witness arrest warrant and subsequently subjected the witness to interrogation in the District Attorney's Office. The Court found that, although *filing* the warrant application was protected by absolute immunity, the prosecutors' investigative conduct was not. 727 F.3d at 172-74. It explained:

> A material witness warrant serves the purpose of securing a witness's presence at a trial or grand jury proceeding. It does not authorize a person's arrest and prolonged detention for purposes of investigative interrogation by the police or a prosecutor.

*Id.* at 174. Hence, "[o]nce defendants decided that Simon should be detained for questioning by [the prosecutor] and compelled her attendance at the Queens DA for two days of intermittent questioning," their actions fell outside the protection of absolute immunity. *Id.* at 173. Here,

---

[16] *See also Loughlin*, No. CIV.A. 15-649, 2015 WL 3646777, at *7 (citing *Kalina* for the principle that a prosecutor is not entitled to absolute immunity when he "personally vouch[es] for the truth of facts set forth in a certification supporting the issuance of an arrest warrant").

Defendants used material witness warrants for investigative ends. *See, e.g.*, Doc. 52 ¶¶ 243-48, 178-181. Thus, as in *Simon*, they are not absolutely immune for this conduct.

For similar reasons, Defendant Doe is not absolutely immune for his conduct in ordering Singleton's arrest on a pending arrest warrant because she refused to speak with prosecutors without counsel present. "The *execution* of a material witness warrant is a police function, not a prosecutorial function" and is not entitled to absolute immunity. *Simon*, 727 F.3d. at 172 (emphasis in original). Accordingly, Defendant Doe cannot meet his burden to justify absolute immunity.

Defendant Pipes is also not entitled to absolute immunity for approving material witness arrest warrants in his role as Chief of Trials. Doc. 52 ¶¶ 202, 350. Pipes's immunity turns on whether the conduct he supervised is itself immune, which it was not. *Van de Kamp v. Goldstein*, 555 U.S. 335, 341-45 (2009) (immunity of supervisor is derived in part from whether the conduct of the prosecutor supervised was absolutely immune).

### 4.    *The Prolonged Detention of Material Witnesses*

Plaintiffs allege that Defendant Napoli intentionally left Plaintiff Baham in jail for eight days without a court appearance, Doc. 52 ¶¶ 276-277, even though State law requires that arrestees be brought to court within 72 hours, Doc. 52 ¶ 145; *see* La. Code Crim. P. Ann. 230.1 (2006). This conduct is the basis for both of Plaintiff Baham's Fourteenth Amendment claims against Defendant Napoli, and it is a component of Plaintiff Baham's First Amendment claims. It is also a basis for Baham's claims for failure to supervise and failure to intervene.

Defendant Napoli is not entitled to absolute immunity for this conduct. A prosecutor does not receive absolute immunity for administrative acts.[17] And when a prosecutor fails to follow

---

[17] *See Loupe*, 824 F.3d at 539 ("[A] prosecutor is afforded only qualified immunity for acts performed in the course of 'administrative duties'"); *Simon*, 727 F.3d at 172-74 (same).

statutory rules, court orders, or local custom in detaining witnesses, courts view that failure as administrative, even when the detention is connected to the prosecution of a criminal case.[18] Defendant Napoli facilitated Baham's prolonged detention in violation of state law and as a matter of administration. He is therefore not protected by absolute immunity.

### 5.     Failure to Supervise, Train, or Discipline

Plaintiffs allege that Defendants Cannizzaro, Martin, and Pipes each failed to supervise, train, or discipline prosecutors to prevent the unlawful conduct at issue in this case. Plaintiffs further allege that, in certain instances, these Defendants specifically instructed prosecutors to commit this misconduct. These allegations form the factual basis for Plaintiffs' claims against these Individual Defendants for failure to supervise, train, or discipline.

None of this conduct is shielded by absolute immunity. Because the prosecutors being supervised were not engaged in conduct that warrants immunity, these supervisors are not entitled to derivative immunity. *See Van de Kamp*, 555 U.S. at 341-45.

### B.     The Individual Defendants Are Not Entitled to Qualified Immunity Because Their Acts Were Clearly Unlawful

The doctrine of qualified immunity shields state actors from civil liability if their conduct was not objectively unreasonable in light of clearly established law at the time of that conduct. *Kinney v. Weaver*, 367 F.3d 337, 367 (5th Cir. 2004). Immunity should be denied if "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quotations omitted).

---

[18] *See, e.g., Simon,* 727 F.3d at 172-174; *Odd v. Malone*, 538 F.3d 202, 212-14 (3d Cir. 2008) (denying a prosecutor absolute immunity when he failed to notify the court that a case was delayed and the material witness therefore remained incarcerated).

"[T]he Supreme Court has rejected any requirement that the facts of prior cases be 'fundamentally' or 'materially' similar." *Gerhart v. McLendon*, No. 17-60331, 2017 WL 4838405, at *4 (5th Cir. Oct. 25, 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Instead, qualified immunity turns on whether the law gave Defendants "fair warning that [their unlawful conduct] was unconstitutional." *Hope*, 536 U.S. at 741. Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.*

Here, each of Plaintiffs' claims for relief involves a clearly established right, which Defendants plainly violated. Because qualified immunity is tied to the merits of their claims, Plaintiffs address this issue in the respective merits sections below.

## IV.    FOURTH AMENDMENT CLAIMS BASED ON DEFECTIVE MATERIAL WITNESS WARRANT APPLICATIONS

In Count I of the Complaint, Plaintiffs Singleton, Baham, Mitchell, and Roe allege that Defendants violated their Fourth Amendment rights to be free from unreasonable seizures. Specifically, they contend that Defendants relied on misrepresentations and material omissions in their applications for material witness arrest warrants to arrest Plaintiffs, in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). These Plaintiffs seek relief against Defendant Cannizzaro, in his official capacity, for the policies, practices, and customs that gave rise to their injuries, as well as against the Individual Defendants that harmed them. Plaintiff Silence Is Violence seeks relief against Defendant Cannizzaro, in his official capacity, for the injuries that the Office's unlawful policies have caused to the organization. In addition to *Franks* violations, Silence Is Violence challenges the Office's official practice of routinely relying on facts plainly insufficient to justify a material witness warrant, in violation of *Malley v. Briggs*, 475 U.S. 335 (1986).

21

## A.    Plaintiffs Singleton, Baham, Mitchell, and Roe's Fourth Amendment Claims Under *Franks v. Delaware*

In *Franks v. Delaware*, 438 U.S. 154 (1978), the U.S. Supreme Court held that a state agent violates the Fourth Amendment where (1) she includes material false statements in support of a warrant (2) that were made deliberately or with "reckless disregard for the truth" and (3) which are "necessary to the finding of probable cause." *Id.* at 155-56. Although *Franks* itself involved false statements, the "holding in *Franks* applies to omissions as well." *Hale v. Fish,* 899 F.2d 390, 400, n.3 (5th Cir. 1990).[19]

To assess whether the false statements and omissions were necessary to the finding of probable cause, a court must "consider the faulty affidavit as if those errors and omissions were removed." *Winfrey v. Rogers*, 882 F.3d 187, 199 (5th Cir. 2018). The court must then "examine the 'corrected affidavit' and determine whether probable cause for the issuance of the warrant survives the deleted false statements and material omissions." *Id.*

As a preliminary matter, Defendants question whether probable cause is the appropriate standard for material witness warrants. Doc. 63-1 at 25-26. The Second, Sixth, and Ninth Circuits have held that it is.[20] These courts have interpreted probable cause in this context to mean probable cause that the legal standard set forth in the applicable material witness statute has been met.[21]

---

[19] Defendants suggest (without authority) that *Franks* may not apply to material witness warrant applications. Doc. 63-1 at 26. Although *Franks* itself involved a criminal search warrant, the Fifth Circuit has applied it to arrest warrants. *See, e.g.*, *Winfrey v. Rogers*, 882 F.3d 187, 198-99 (5th Cir. 2018). Federal courts have also repeatedly applied the *Franks* analysis to material witness warrant applications. *See, e.g.*, *United States v. Awadallah*, 349 F.3d 42, 64–65 (2d Cir. 2003); *Al-Kidd v. Gonzales*, No. 1:05-cv-093-EJL-MHW, 2012 WL 4470776, at *4, *7 (D. Idaho Sept. 27, 2012); *United States v. Padilla*, No. 04-60001-CR, 2007 WL 188146 (S.D. Fla. Jan. 22, 2007); *Mayfield v. Gonzales*, No. CIV. 04-1427-AA, 2005 WL 1801679, at *7-9 (D. Or. July 28, 2005).

[20] *See United States v. Munguia*, 273 F. App'x 517, 522 (6th Cir. 2008); *Awadallah*, 349 F.3d at 64–65; *Bacon v. United States*, 449 F.2d 933, 942 (9th Cir. 1971).

[21] *See id.*

However, in his concurring opinion in *Ashcroft v. al-Kidd*, Justice Kennedy, joined by Justices Ginsburg, Breyer, and Sotomayor, questioned whether probable cause was the appropriate standard for material witness warrants. *See* 563 U.S. 731, 744-45 (2011). Two months later, in *Schneyder v. Smith*, the Third Circuit, citing Justice Kennedy's concurrence in *al-Kidd*, held that material witness warrants should be assessed under the Fourth Amendment's objective reasonableness standard. 653 F.3d 313, 325-26 (3d Cir. 2011).

Under that standard, the court explained, the dispositive question is whether the seizure was justified under the totality of the circumstances. *Id.* To answer this question, courts must "'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Commentators have praised the reasonableness standard adopted in *Schneyder* for being more protective of witnesses' civil liberties than the probable cause standard, since it requires the court to consider the specific burdens imposed on the witness and weigh these burdens against the government's interest in arresting the witness.[22]

This Court, however, need not decide which standard applies; as described below, under either test, Defendants violated Plaintiffs' Fourth Amendment rights.

**<u>Renata Singleton.</u>** In the material witness warrant application for Plaintiff Singleton, Defendant Mitchell included a number of false and misleading allegations and omissions.

First, Defendant Mitchell asserted that Singleton failed to appear in court for trial settings on March 20 and April 24, 2015. Doc. 63-3 at 1-2. However, Defendant Mitchell only

---

[22] *See, e.g.*, Hallie T. Damon, *A Reasonable Detention? Rethinking the Material Witness Statute's Probable Cause Standard After* al-Kidd, 44 Colum. Hum. Rts. L. Rev. 537, 563 (2013) (praising the reasonableness framework adopted in *Schneyder* because it "both restored constitutional protection to those detained under the state material witness statute and offered a solution for courts to apply to the federal material witness statute in order to accommodate the balance between law enforcement and the preservation of civil liberties.").

acknowledged that Singleton had not received personal service for the March 20 date. Thus, although Defendant Mitchell did not explicitly state that Singleton was validly served for the April 24 date, he created the misleading impression that she was. *See also* Doc. 63-3 at 2 (alleging that Singleton failed to appear "even after the numerous subpoenas that she received at her primary residence").

Second, Defendant Mitchell alleged in the warrant application that an investigator from the Office "left two subpoenas at the residence for SINGLETON to appear at the District Attorney's Office on April 24, 2015." Doc. 63-3 at 2. But these documents were not "subpoenas." They were fraudulent documents created to resemble authentic subpoenas. Relatedly, Defendant Mitchell alleged in the warrant application that Singleton "failed to appear pursuant to an appointment with [Defendant Mitchell]." Doc. 63-3 at 1. He did not explain that this "appointment" was set only by the fraudulent subpoenas left at Singleton's door.

Third, certain allegations in the warrant application falsely imply that Singleton was avoiding service or that she was impossible to serve. For example, Defendant Mitchell alleged that the Sheriff's Office made three attempts to serve Singleton at her home and left subpoenas in her door "due to no one accepting service at the residence on her behalf." Doc. 63-3 at 1. But Singleton was not home when these attempts were made. The phrasing of these allegations creates the false impression that someone was home and refusing to answer.[23]

Similarly, Defendant Mitchell alleged that a victim-witness coordinator at the Office told him that Singleton "had never been cooperative." Doc. 63-3 at 1. He does not explain the content

---

[23] Defendant Mitchell also alleged in the application that his investigator "observed a Toyota Camry, associated with SINGLETON, parked in the driveway of the residence. Investigator Porter knocked on the door of the residence and waited for a response from someone present inside the residence, to no avail." Doc. 63-3 at 2. Again, this creates the false impression that Singleton was home but would not answer the door.

of the conversations between Singleton and this coordinator, in which Singleton explained that she preferred not to pursue the charges because she did not want to lose time at work or with her children. Instead, Defendant Mitchell invites the court to infer from this comment that Singleton would not appear in court if validly served.

Plaintiffs have alleged that these false statements and omissions were intentional and reckless. Doc. 52 ¶ 417.[24] More broadly, Plaintiffs' allegations make clear that Defendant Mitchell's primary concern was to secure an out-of-court interview with Singleton, and not merely to secure her truthful testimony in court: when *Singleton appeared at the Office* but refused to answer questions without counsel, she was arrested on the spot. Doc. 52 ¶¶ 208-215. Ultimately, Singleton was never called to testify in the case.

Without these false allegations and omissions, the arrest warrant application for Singleton could not satisfy probable cause. The fact that Singleton, a crime victim, did not appear in court when *she was never validly subpoenaed* does not furnish probable cause to believe that she would not appear in court if a subpoena were validly served. Nor could probable cause be established because she did not obey a fraudulent subpoena demanding she meet with Defendant Mitchell in private when she has no legal obligation to do so. The corrected warrant application fares even worse under the Fourth Amendment's reasonable test: these circumstances are not a reasonable basis to jail a domestic violence victim for five days on a $100,000 secured bond. [25]

---

[24] Defendants do not dispute that Defendant Mitchell's conduct was intentional. However, with respect to Defendant Pipes, they argue, "Ms. Singleton does not allege that Mr. Pipes knew the statements in the application were false, and the facts as alleged do not plausibly raise such an inference." Doc. ¶¶ 63-1, at 27 n.31. First, Singleton alleges that Pipes, along with all of the Defendants named in Count I, acted intentionally or with reckless disregard for the truth. Doc. 52 ¶ 417. Second, the Complaint alleges that Pipes "reviewed and approved Mitchell's application for the arrest warrant," Doc. 52 ¶ 202. These allegations, along with others about his conduct as a supervisor, satisfy the element of intent for Defendant Pipes. Doc. 52 ¶¶ 15, 181-186, App. B.

[25] The fact-intensive nature of the *Franks* analysis also weighs against granting Defendants' motion to dismiss. *See, e.g.*, *Crosby v. Cox Commc'ns, Inc.*, No. CV 16-6700, 2016 WL 6403348, at *3 (E.D. La. Oct. 28, 2016) (denying motion to dismiss in light of "the fact-intensive nature" of the analysis, "as well as the requirement that the Court credit plaintiffs' plausible allegations").

**Marc Mitchell.** Plaintiff Mitchell was arrested based on prosecutors' off-the-record statements to the judge, as well as a written application signed by Defendant Trummel. In these statements and written application, Defendants Trummel and Hamilton did not inform the court that: (1) On April 4, 2016, Mitchell had signed a subpoena to testify in court on April 11, 2016 (the warrant for Mitchell was secured on April 6, 2016); (2) Mitchell had cooperated with prosecutors and had met with them several times to prepare the case for trial; (3) Mitchell had previously testified at trial against the co-defendant in the case; and (4) Defendant Trummel had pressured Mitchell to alter his account of events to better support the State's theory of the case at the second trial for the co-defendant. *See* Doc. 52 ¶¶ 232-236, 241-243.

Prosecutors also relied on false statements to secure the arrest warrant for Mitchell. They asserted, for example, that Mitchell had bought a bus ticket to leave town. Doc. 52 ¶¶ 245. Mitchell had not bought a bus ticket. Doc. 52 ¶¶ 245.[26] Defendant Trummel also alleged that, on April 4, 2016, Mitchell told prosecutors that he "did not want to move forward with the case" and that "the only way in which he would testify is if he was arrested." Doc. 63-11 at 1. This first allegation is misleading. The second is false. Mitchell had told prosecutors that he no longer *wanted* to testify. Mitchell also told prosecutors that he would no longer meet with them outside of court. Doc. 52 ¶¶ 166, 241. He did not tell prosecutors that he would not testify if validly subpoenaed. Instead, Mitchell signed a subpoena for the next court appearance.[27]

The U.S. District Court for Idaho found a *Franks* violation in a case that involved similar false statements and omissions. *Al-Kidd v. Gonzales*, No. 1:05-CV-093-EJL-MHW, 2012 WL

---

[26] As noted above, Defendants contend that "the statement that Mr. Mitchell had a bus ticket to leave town was based on information provided [to Defendant Trummel] by Mr. Mitchell's mother." Doc. 63-1 at 13 n.16. But this could not be true because at that time, Mr. Mitchell's mother had been dead for nearly three years.

[27] These omissions and misrepresentations were intentional. Doc. 63-3 at 27-28. Defendants Trummel and Hamilton were aware of the facts they omitted and the false statements that they made. Doc. 52 ¶¶ 234-246, 417.

4470776 (D. Idaho Sept. 27, 2012). In that case, an FBI agent alleged in a material witness warrant application that the plaintiff had purchased a one-way ticket out of the country, when in fact, he had purchased a round-trip ticket. *Id.* at *2. The agent also omitted that the plaintiff had previously cooperated with the FBI.[28] The court found that absent the agent's misrepresentations and omissions, there was no probable cause to arrest the plaintiff as a material witness. In particular, the court emphasized that the fact that the plaintiff had previously assisted the FBI in the investigation was "necessary to the [court's] probable cause determination." *Id.* at *3.

The court also observed that the overall effect of the warrant affidavit was to create the false impression that the plaintiff's presence could not be secured by subpoena. It explained:

> [T]he warrant affidavit is drafted such that it misrepresents the facts and circumstances surrounding the Plaintiff and the impracticability of securing his presence by subpoena at the trial …. The problem in this case is that the failure to include the omitted incorporation cast an incomplete picture of the individual and the surrounding circumstances such that the affidavit misrepresented the true nature of the situation and the Plaintiff himself.

*Id.*

Here, like in *al-Kidd*, prosecutors' misrepresentations and omissions created a misleading impression that Mitchell would not come to court under any circumstances. In reality, Mitchell had voluntarily assisted prosecutors on multiple occasions, both in the case at issue and in the trial of the co-defendant who shot Mitchell, and he had willingly and effectively testified in that case. Though Mitchell had told prosecutors he no longer *wanted* to participate, the critical context for these statements was that prosecutors had pressured Mitchell to change his truthful account to better support their case and that he had signed a subpoena to appear for trial.

---

[28] The agent also omitted that the plaintiff was a U.S. citizen with a wife, son, and other family in the United States, that he was not informed his testimony would be needed or that he should not travel, that he was not asked to inform the FBI if he left the country, and that he had not been contacted by the FBI in over eight months. *Id.* at *2.

Absent prosecutors' misrepresentations and omissions, prosecutors did not establish probable cause that Mitchell's presence in court could not be secured with a subpoena. Nor was Mitchell's arrest at his workplace and subsequent jailing on a $50,000 secured bond reasonable under the Fourth Amendment under the totality of the circumstances.

**<u>Lazonia Baham.</u>** The application for Plaintiff Baham, completed by Defendant Napoli, relies solely on allegations that she refused (1) to meet with Defendant Napoli and "cut off all communication" with the Office; (2) to speak with the Office's Investigator Kitchens "[d]espite multiple visits to her home"; and (3) to return Kitchens's phone calls. Doc. 63-8 at 1.

These allegations omit several material facts. First, Defendant Napoli did not disclose that Baham had voluntarily spoken several times with investigators from the Office, including Kitchens. Doc. 52 ¶¶ 262-264. Second, he omitted that, during these conversations, at Defendant Napoli's direction, Investigator Kitchens pressured Baham to change her account of events to support the State's theory of the case, and that Kitchens threatened her with jail if she did not. Doc. 52 ¶¶ 262-268. Third, Defendant Napoli did not disclose that he sent Baham fraudulent subpoenas, demanding she meet with him in private. Doc. 52 ¶¶ 270-271. Fourth, he did not disclose that Baham stated that she would come to court if subpoenaed, but would not alter her honest account of events. Doc. 52 ¶ 269.

Defendants do not dispute that these omissions were intentional. Doc. 63-1 at 28-29. Defendant Napoli was aware of the facts excluded from the application, but omitted them to falsely suggest that Baham was "intentionally avoiding service." Doc. 63-8 at 1; Doc. 52 ¶¶ 263-74, 417.

When these omissions are corrected, the warrant application provides no valid basis for Baham's arrest. The application did not allege Baham had ever missed a court date. Doc. 52 ¶ 274. And Baham never told prosecutors that she would not come to court; in fact, she affirmatively told

them that she would. Doc. 52 ¶ 269. Baham was not avoiding service; she was declining to interact in private with the prosecutors and their representatives who had pressured her to lie and threatened her with jail. These circumstances do not constitute probable cause to believe that her presence in court could not be secured by subpoena. Nor was it reasonable under these circumstances to jail a witness for eight days without bond.

Defendants argue that, even if the warrant application were corrected, this "would not have critically undermined the showing necessary for issuance of a material-witness warrant." Doc. 63-1 at 29. Defendants contend this is true because Baham "fail[ed] to appear for trial on October 13, 2015," and that this event prompted the issuance of the material witness warrant. Doc. 63-1 at 29. But Baham was never served for that or any other trial date.[29] Moreover, this allegation does not actually appear in the warrant application as a basis for Baham's arrest. It is unclear on what basis Defendants contend that this "prompted the filing of the warrant application." Doc. 63-1 at 29.

Defendants also contend that Baham exhibited "extreme reluctance to assist in the prosecution of Mr. Jones," and state that "Plaintiffs do not challenge [this] as false." Doc. 63-1 at 29. That statement to this Court is misleading in the extreme. Plaintiffs alleged that Baham initially voluntarily assisted with the case, but later chose not to communicate with prosecutors or their representatives *outside of court*. Doc. 52 ¶¶ 262-272. Plaintiffs have never suggested that Baham refused or in any other way exhibited "extreme reluctance" *to testify*. Material witness arrest warrants are authorized to secure in-court testimony, not to enable out-of-court communication with prosecutors. Accordingly, Defendants' arguments must fail.

**John Roe.** In Defendant Assistant District Attorney Sarah Dawkins's warrant application for Plaintiff Roe, the sole allegation was as follows: "Attempts to reach [John Roe] at his home

---

[29] The clerk's minutes, which Defendants cite for this allegation, make no mention of any witness's failure to appear on that day. *See* Doc. 63-9.

and by phone by members of the Orleans Parish District Attorney's Office have been unsuccessful. Messages left for [John Roe] have gone unanswered." Doc. 63-11 at 1.

Defendant Dawkins omitted that: (1) Roe assisted and answered questions from police near the time of the incidents, and had furnished his own contact information as well as his fiancée's; (2) despite having notice that Roe had moved, prosecutors sent every subpoena that was issued to his *old* address, and they had no reason to believe that he had received any of the subpoenas delivered there; (3) prosecutors had not made certain basic efforts to locate Roe, despite knowing that he had moved; (4) before the attempts to contact Roe in May 2017, neither prosecutors nor police had contacted Roe for nearly 22 months since he had first assisted them. Doc. 52 ¶¶ 333-348.

Defendant Dawkins's statement that she or others at the Office had attempted to call Roe and left messages for him was also false. Neither Dawkins or anyone else at the Office left any phone messages for Roe. Doc. 52 ¶ 354. Nor did Roe receive messages on his Facebook account, which was publicly available. Doc. 52 ¶¶ 346-347. Defendant Dawkins's statement that attempts were made to contact Roe "at his home" were misleading at best; in attempting to serve Roe, the Sheriff's Department had noted in returns that it filed into the record that Roe's address was "incomplete" and he had "moved." Doc. 52 ¶ 339.

Defendants argue that these statements were not, in fact, misleading because the warrant application did not specify that "messages" meant "phone messages" or that "phone calls were made to only one number or attempts to locate him were confined to a single address." Doc. 63-1 at 30. These arguments miss the point. The allegations in the material witness warrant created the unmistakable impression that Roe was impossible to contact or even avoiding service. However, as the facts omitted by Defendant Dawkins make clear, neither was the case.

30

Defendants also argue that Defendant Dawkins's misrepresentations and omissions were not intentional or recklessly false. Doc. 63-1 at 30. But Plaintiffs alleged that Dawkins made the false statements and omissions knowingly and intentionally, or with reckless disregard for the truth, and the facts support that inference. Doc. 52 ¶¶ 354-356, 417. At the pleading stage, these allegations must be taken as true.

When the misrepresentations and omissions in the material witness warrant application are corrected, there is no basis for an arrest warrant for Roe under the probable cause or reasonableness standard. That prosecutors had not attempted to reach him for nearly 22 months and therefore lost touch with Roe cannot constitute probable cause to believe that his presence in court could not be secured by a valid subpoena, particularly when he had voluntarily assisted police in the case. This is especially true when prosecutors repeatedly issued subpoenas to a known incorrect address, and did not make reasonable attempts to locate Roe.[30] Nor do these facts provide a reasonable basis for jailing a crime victim for three days on a $250,000 secured bond.

### B.    Plaintiff Silence Is Violence's Claims

Unlike the individual plaintiffs, Silence Is Violence does not challenge the contents of any one warrant application. Instead, it alleges that the Office's unlawful policy, practice, and custom of relying on false allegations, material omissions, and plainly insufficient factual allegations in applications for material witness arrest warrants has forced Silence Is Violence to redirect its resources to protect its clients from prosecutors, and that this unconstitutional conduct has frustrated its mission. Doc. 52 ¶¶ 389-414.

---

[30] *See al-Kidd*, 2012 WL 4470776, at *2-3, discussed *supra* p. 27; *cf. State v. Peterson*, 619 So. 2d 786, 790 (La. Ct. App. 1993) (rejecting defendant's argument that his right to compulsory process was violated where Sheriff was unable to locate a witness because the defendant himself had supplied the wrong address).

In addition to challenging the Office's persistent *Franks* violations, Silence Is Violence has also alleged that the Office has a policy, practice, and custom of filing material witness warrant applications based on facially insufficient factual allegations, and that this violates the Fourth Amendment under *Malley v. Briggs*, 475 U.S. 335 (1986).

In *Malley*, the U.S. Supreme Court held that an officer violates the Fourth Amendment when he presents an affidavit to a magistrate that is "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Id.* at 345. Plaintiffs allege that prosecutors routinely submit applications that violate *Malley*, and that this practice is so pervasive it amounts to an official policy. Doc. 52 ¶¶ 114-129. For example, Plaintiffs allege that prosecutors regularly request material witness arrest warrants based on irrelevant allegations that target crime victims who are poor; including allegations that the crime victim has "no place to live," "no means of support," and "does not have a current address." Doc. 52 ¶¶ 126-128.

Defendants do not address the merits of Silence Is Violence's *Franks* and *Malley* claims. And while they discuss the Individual Plaintiffs' material witness warrants, Defendants do not dispute that the Office has a policy of seeking material witness warrants based on false statements, material omissions, and plainly insufficient facts. *See* Doc. 63-1 at 25-31, 46-48.

Defendants' sole argument as to these claims is to suggest (without citation or argument) that Silence Is Violence lacks standing. Defendants "[a]ssume for the sake of argument that SIV would have standing to seek redress for alleged harm to its client," and in a footnote, state, "The Defendants do not concede that SIV has standing." Doc. 63-1 at 46, n.45.

Defendants' cursory suggestion is unavailing. An organization has Article III standing if it "meets the same standing test that applies to individuals." *OCA-Greater Houston v. Texas*, 867 F.3d 610, 619 (5th Cir. 2017) (quotations omitted). Therefore, to establish organizational standing,

Silence Is Violence must show that (1) it has suffered an "injury in fact"; (2) there is "a causal connection between the injury and the conduct complained of"; and (3) it is likely that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). To satisfy these requirements, the organization must show that (1) the challenged policy frustrates the goals and/or purposes of the organization; (2) the plaintiff organization devoted resources to counteract the defendant's allegedly unlawful policies, and (3) the injury must be concrete and demonstrable. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).[31]

Silence Is Violence has alleged in detail the resources it has devoted to combating the illegal policies at issue in this case, the ways in which these policies have frustrated its mission, and the injuries these policies have caused it. Doc. 52 ¶¶ 12, 389-414. Accordingly, Silence Is Violence has alleged sufficient facts to establish organizational standing.[32] As Defendants do not otherwise dispute these claims, their motion to dismiss them must be denied.

### C.   Defendants Are Not Shielded by Qualified Immunity

As noted above, immunity does not apply to official capacity claims. *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466–67 (5th Cir. 1999). Nor is immunity applicable to claims for prospective relief. *See Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 n.1 (5th Cir. 1997).

Accordingly, qualified immunity is at issue only as to Plaintiffs' claims for damages against Defendants Mitchell, Pipes, Napoli, Trummel, Hamilton, and Dawkins. The right at issue is clear: the U.S. Supreme Court established over three decades ago that it is unlawful to provide

---

[31] *See also Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) ("[A]n organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices.") (quotations omitted); *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) ("[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct[.]").

[32] Defendants also argue that "SIV has failed to adequately allege facts showing that the rights of any specific clients were violated." Doc. 63-1 at 46. But this argument is inapposite because that is not a requirement for organizational standing.

false or misleading information in a warrant application. *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978). However, relying on *Ashcroft v. al-Kidd*, these Defendants contend that they are entitled to qualified immunity because it is unclear whether a material witness arrest warrant application must satisfy probable cause or instead must pass a "reasonableness" test. Doc. 63-1 at 22-23. Defendants' warrant applications failed to satisfy either standard. Therefore, Defendants violated Plaintiffs' clearly established Fourth Amendment right not to be detained based on false information absent probable cause and without any reasonable basis for the detention.

## V.   FOURTH AMENDMENT CLAIMS BASED ON FRAUDULENT SUBPOENAS

Count II alleges that Defendant Cannizzaro, in his official capacity, and Defendants Napoli, Petrovich, Rodrigue, Dover, and Martin, in their individual capacities, violated the Fourth Amendment by coercing witnesses to attend private meetings using unlawful "subpoenas" and threats of criminal fine and imprisonment. Defendants do not dispute that Plaintiffs' seizures were unreasonable under the Fourth Amendment; instead, they contend that Plaintiffs Bailey, LaCroix, and Doe were not seized at all. Doc. 63-1 at 32-34.

A seizure occurs within the meaning of the Fourth Amendment when a government agent, "by means of physical force or show of authority," restrains or prevents an individual's freedom of movement. *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). To meet this definition, the plaintiff's belief that she was restrained must be reasonable "in view of all of the circumstances surrounding the incident," and she must also actually submit to this show authority. *Brendlin*, 551 U.S. at 255, 262 (quotations omitted).

The Fifth Circuit Court of Appeals has explained that the question whether an individual has "submitted" is context-specific. *Brendlin*, 551 U.S. at 262 ("But what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until

he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away."). Accordingly, to determine whether a seizure has occurred, this court must consider how the Defendants' conduct compelled Plaintiffs to restrain their movement or behavior.

**Fayona Bailey and Tiffany LaCroix.** Defendants argue that Plaintiffs Bailey, LaCroix, and Doe were not seized because they did not comply with the fraudulent subpoenas sent to them. Doc. 63-3 at 29-30. But Bailey and LaCroix did submit to Defendants' show of authority. Both believed the fraudulent subpoenas (and the threats that accompanied them) were real. As such, they reasonably believed that they were confined to two choices: (1) they could attend the out-of-court interview with a prosecutor; or (2) they could fight the "subpoenas" in court.

Both Bailey and LaCroix chose the second option. They each hired an attorney at personal expense, and they participated in a legal challenge against wholly fraudulent documents. *See id.* ¶¶ 312, 322, 324. In light of prosecutors' threats, neither felt free to go to work, attend to personal responsibilities, and otherwise "disregard the [subpoena] and go about [her] business" unburdened by an unwanted interrogation with prosecutors, on the one hand, or court proceedings to avoid that interrogation, on the other. *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

These facts are far afield from those in the cases cited by the Defendants. For example, in *California v. Hodari D.*, the U.S. Supreme Court held that a seizure had not occurred during a police chase when the defendant did not yield because there was no "*submission* to the assertion of authority." *Id.* at 626. The analogous behavior here would be to simply ignore the fraudulent subpoena and evade the threats and punishments that may follow. But here, Plaintiffs submitted to the fraudulent subpoenas by treating them as they would real ones and undertaking the time,

expense, and travel necessary to hire an attorney to challenge them. That time, money, and movement constitutes a submission to Defendants' show of authority.[33]

**Jane Doe.** Doe's claim involves two "subpoenas." The first was delivered to her door at her home. Doc. 52 ¶¶ 288. In the Complaint, Doe alleged that this was a fraudulent subpoena. Doc. 52 ¶¶ 288, 303. Defendants do not address this first fraudulent subpoena. Doc. 63-1 at 15-16, 34-35.

The second was delivered to Doe at school. Doc. 52 ¶ 291. Doe alleged this document was "unlawfully obtained and/or fraudulent." Doc. 52 ¶ 303. Doe also explained: "Defendant Dover contends this document was a valid subpoena. No formal request for the subpoena—a requirement under Louisiana law—is included in the clerk's record in the case. The record also does not include a signed order from the judge granting the subpoena." Doc. 52 ¶ 291 n.15.

Defendants have now produced a motion and signed order. Docs. 63-5, 63-6. On that basis, they contend that the second document was "a proper Article 66 subpoena." Doc. 63-1 at 16.[34] But the motion and order, on their own, do not contradict Doe's allegation that the second document was "unlawfully obtained." Doc. 52 ¶ 303. The motion, for example, does not disclose that Defendant Dover gave Doe a fraudulent subpoena threatening jail unless she met privately with him. Doc. 63-6; *see Franks v. Delaware*, 438 U.S. 154, 155-156 (1978). To the extent Defendants raise a factual dispute about this document, it should be reserved for discovery.[35]

---

[33] The policy concerns described by the Court in *Hodari D.* are also inapplicable here. In that case, the Court noted that its decision made practical sense because "compliance with police orders to stop should … be encouraged" because "[s]treet pursuits always place the public at some risk." *Id.* at 627. Here, Bailey and Lacroix hired an attorney to challenge what they believed to be lawful subpoenas in the appropriate and lawful manner.

[34] Defendants also describe Plaintiffs' portrayal of this document as "false or misleading." Doc. 63-1 at 7. However, as described above, Plaintiffs were precise as to what they knew, even disclosing Defendant Dover's public protestations that the document was valid. *See* Doc. 52 ¶ 291 n.15, 303.

[35] *See Laird v. State Farm Fire & Cas. Co.*, No. CV 16-707-JWD-RLB, 2017 WL 2239578, at *10 (M.D. La. May 22, 2017) (noting that discovery, not a motion to dismiss, was the appropriate stage for the defendant to challenge plaintiff's evidence).

36

Even if the second document were lawfully obtained, Doe's claim must prevail. Doe alleged that she submitted to a private interview with Defendant Dover because both she and her attorney believed she would be jailed if she did not. Doc. 52 ¶¶ 297-298. They believed this because Defendant Dover had repeatedly intimidated and threatened Doe—including by delivering a fraudulent subpoena to her door. Doc. 52 ¶¶ 288-295. A Fourth Amendment violation is not cured simply because some aspect of the state actor's conduct is legitimate.[36] Instead, the relevant question is whether the seizure was reasonable under the totality of the circumstances. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Here, it was not.

Finally, Defendants argue that Doe's submission was "voluntary." Doc. 63-3 at 34.[37] As detailed above, it was not. *See United States v. Jaras*, 86 F. 3d 383, 390 (5th Cir. 1996) ("It is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent."). But even if it were, this would not dispose of Doe's claim; "[s]ubstantial authority from both the Supreme Court and [the Fifth Circuit Court of Appeals] establishes that *voluntary* submissions to a show of state authority can constitute seizures for Fourth Amendment purposes." *McLin v. Ard*, 866 F.3d 682, 691 (5th Cir. 2017).

**Silence Is Violence.** Defendants do not address the merits of Silence Is Violence's official capacity claim, which does not hinge on whether any one person was seized, but instead on whether

---

[36] *See, e.g.*, *United States v. Hernandez*, 279 F.3d 302, 308-09 (5th Cir. 2002) (holding that a second, voluntary consent to search did not cure Fourth Amendment violation caused by the officer's initial illegal search where the consent was not "a sufficient break in the causal connection between the initial [illegal] search … and the later search to which [the defendant] consented").

[37] Defendants also contend that Doe met with Defendant Dover pursuant to a "direct court order." Doc. 63-1 at 34. But as Doe has explained, she and her attorney *did not object* to a meeting with Defendant Dover because her attorney "decided that the best strategy to avoid Ms. Doe's arrest would be for [her attorney] to arrange a meeting with prosecutors at a more convenient time." Doc. 52 ¶ 297. Once her attorney "informed the court that Ms. Doe would be willing to comply with the meeting," the court ordered Doe's attorney to arrange it. Doc. 52 ¶ 298. Thus, it was Doe, and not the court, who ultimately decided that the meeting would take place, and this decision was based on Defendant Dover's unlawful conduct. *See* Doc. 52 ¶ 297 ("As a result of Dover's intimidation tactics, [Doe's attorney] did not object [to the private interview with Dover].").

the Office's policy of using fraudulent subpoenas violated the organization's rights. Defendants also do not dispute that Plaintiffs have adequately pled that the use of fraudulent subpoenas was an official policy. Doc. 63-1 at 31-35, 46-48. Accordingly, these arguments are waived.[38]

**Qualified Immunity.** Defendants Napoli, Petrovich, Rodrigue, Dover, and Martin claim they are entitled to qualified immunity for using fraudulent subpoenas. Their sole argument is that Plaintiffs were not seized, and therefore, their Fourth Amendment rights were not violated. Doc. 63-1 at 32-35. As described above, this argument fails.

Defendants do not dispute that using fraudulent subpoenas was unreasonable under clearly established law. Doc. 63-1 at 32-35. Nor could they. "'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.'" *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quotations omitted). Plaintiffs have alleged that Defendants circumvented the law to compel investigative interviews to which Defendants were not entitled. *See* La. Cr. P. art. 66; *see also* La. Op. Att'y Gen. No. 92-366, at 2 (June 23, 1992) ("[A] district attorney has no authority to issue any type of subpoena, regardless of the method of service used."). Qualified immunity does not apply.

## VI. FIRST AMENDMENT CLAIMS

Count III alleges that Defendant Cannizzaro, in his official capacity, and Defendants Cannizzaro, Mitchell, Pipes, Doe, Napoli, Dover, Trummel, Hamilton, Petrovich, Rodrigue, Martin, and Dawkins, in their individual capacities, unlawfully compelled Plaintiffs to speak and retaliated against Plaintiffs for engaging in speech protected by the First Amendment. Doc. 52 ¶¶

---

[38] *See Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 372 (5th Cir. 1998) ("Failure to provide any legal or factual analysis of an issue results in waiver"); *Mr. Mudbug, Inc. v. Bloomin Brands, Inc,*, No. 15-5265, 2018 WL 560467, at *2 n. 22 (E.D. La. Jan. 25, 2018) ("[T]he Court will not consider arguments raised for the first time in a reply.").

422-28. Defendants briefly argue that Plaintiffs fail to state a claim because Plaintiffs' First Amendment rights are not "clearly established." Defendants are wrong.

## A.    Plaintiffs Were Unlawfully Compelled to Speak with Prosecutors

It is well-settled that the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see Riley v. Nat'l Fed'n of the Blind of North Carolina*, 487 U.S. 781, 797 (1988) (reiterating that the First Amendment includes the freedom to choose "both what to say and what *not* to say").

Like most constitutional rights, this First Amendment right is not absolute—it can be overcome when the government's countervailing interest is sufficiently weighty. As a result, it has long been recognized that "the right to refrain from speaking at all" can be subordinated when "essential operations of government may require it for the preservation of an orderly society—as in the case of compulsion to give evidence in court." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring).

Thus, testifying in open court is an exception to the general First Amendment rule: the government can compel people who possess evidence relevant to a legal controversy to provide that information and to swear an oath that it is true. However, the government's ability to coerce speech in such proceedings has always been limited by formal judicial supervision to ensure that the government's need for information outweighs the individual's First Amendment rights.[39] This judicial supervision ensures that the government does not abuse its power.[40]

---

[39] *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 709 (1972) (explaining that subpoenas to testify for a grand jury are always "subject, of course, to the supervision of the presiding judge as to the propriety, purposes, and scope of the grand jury inquiry and the pertinence of the probable testimony") (quoting *In re Pappas*, 358 Mass. 604, 614 (1971)).

[40] In accordance with these principles, the commentary to Article 66, which provides a lawful avenue for a prosecutor to obtain an investigative subpoena, states that "the requirement of court approval before the subpoena is actually issued" prevents the "possible abuse of it by the district attorney." La. Cr. P. art. 66(a) cmt.

This case does not fall under the exception to the well-established general rule that an individual cannot be compelled to speak absent compelling governmental interest. There simply is *no* legitimate interest advanced by the Defendants' circumvention of available lawful means to obtain information from crime victims and witnesses. Nor does the government have a legitimate interest in compelling false testimony or retaliating against those who exercise their rights.[41]

Of course, speech is compelled when a person unwillingly succumbs to government compulsion. However, the First Amendment is also violated when a person resists the compulsion to speak and is punished for it. In *Wooley v. Maynard*, for instance, the government sought to compel speech from a husband and wife who asserted a First Amendment right to not express a motto on their license plates. The husband was issued three criminal citations, fined $50, and sentenced to 15 days in jail. *Wooley*, 430 U.S. at 708. The Court held this punishment violated the First Amendment's prohibition against compelled speech (even though the couple had not succumbed to the government's demands).

Each of the Plaintiffs in this case suffered First Amendment violations under the compelled speech doctrine, either because they succumbed to prosecutors' demands or because they were harmed when they refused to do so. Plaintiff Singleton was arrested *at the District Attorney's Office* when she refused to speak without the presence of counsel. Doc. 52 ¶¶ 211-212. Plaintiffs Bailey and LaCroix retained counsel at personal expense to fight fraudulent subpoenas that sought to compel them to speak. Doc. 52 ¶¶ 312, 322. Plaintiffs Mitchell, Baham, and Roe submitted to private meetings with prosecutors after they were unlawfully jailed as material witnesses. Doc. 52 ¶¶ 253, 278-280, 380-388. Plaintiff Doe submitted to a private interview with Defendant Dover

---

[41] Defendants do not dispute that prosecutors' use of fraudulent subpoenas, prolonged detention, and threats constituted compulsion. Doc. 63-1 at 36-37. *See Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950) (finding that threats of punishment, such as "imprisonment[ and] fines" constitute government compulsion).

because she was afraid she would be jailed if she did not. Finally, Plaintiff Silence Is Violence changed its policies in response to Defendants' conduct; now, "the organization never advises victims to decline meetings with prosecutors—even if the victim wishes to do so—for fear that prosecutors will jail the victim on a material witness warrant." Doc. 52 ¶171.[42]

Defendants argue that Plaintiffs have no First Amendment right to decline to speak to prosecutors, relying on the Fifth Circuit's decision in *Alexander v. City of Round Rock*, 854 F.3d 298, 308-09 (5th Cir. 2017). Doc. 63-1 at 36-37. Defendants misunderstand this case. The court in *Alexander* held that that there is no clearly established right to refrain from speaking during a *Terry* stop when an officer has reasonable suspicion of a crime. *Id. Alexander* simply reiterates the tightly limited exception to the First Amendment's prohibition on compelled speech: that it is permitted in certain judicially monitored or legally sanctioned settings.

But here, Defendants operated outside of the law. Prosecutors here had *legal* avenues for gaining access to Plaintiffs: they could have asked the court for an Article 66 subpoena and met the appropriate legal standard. Defendants chose to threaten, jail, and defraud them instead.

Defendants also argue, relying on *Alexander*, that the First Amendment only bars compelled *political* speech. But the compelled speech doctrine is not limited to ideological messages.[43] And again, Defendants' reliance on *Alexander* is misplaced. *Alexander* concerns a valid *Terry* stop; in those exigent circumstances, the government's interests might outweigh the right not to speak. *Id.* This reasoning is inapplicable to this case.

---

[42] *See also* Doc. 52 ¶¶ 408-410 (describing ways in which Silence Is Violence has changed its policies as a result of Defendants' practice of using threats and imprisonment to compel speech).

[43] *See Riley*, 487 U.S. at 797-98 (holding that there was no difference between "compelled statements of opinion" and "compelled statements of 'fact'" because "either form of compulsion burdens protected speech"); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004) ("[The] proscription of compelled speech does not turn on the ideological content of the message that the speaker is being forced to carry."); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 188 (3d Cir. 2005) ("[T]he law does not hold that a compelled speech violation occurs only in the context of compulsion to embrace a certain viewpoint ….").

**B.      Defendants Retaliated Against Plaintiffs for Constitutionally Protected Activity**

To state a First Amendment retaliation claim, a plaintiff must allege that (1) she was engaged in constitutionally protected activity; (2) the defendant's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse actions were substantially motivated by the plaintiff's exercise of constitutionally protected conduct. *Keenan v. Tejada*, 290 F.3d 252, 258 (5th Cir. 2002).

Defendants argue that Plaintiffs have not met the first element of this test because there is no constitutional right to refuse to speak to prosecutors.  Doc. 63-1 at 36-37.  But as described above, Plaintiffs possess a constitutional right to not speak to prosecutors absent proper court process, which each plaintiff exercised (or attempted to exercise) here. *See Wooley,* 430 U.S. at 714 (1977); *see also Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say.") (quotations omitted).

Additionally, several Plaintiffs resisted Defendants' efforts to compel *specific* speech. A "citizen has a First Amendment right … to reject governmental efforts to require him to make statements that he believes are false." *See Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011). As alleged, members of Cannizzaro's office pressured victims and witnesses to give specific, false testimony. For example, Plaintiff Baham states that Defendant Napoli attempted to pressure her into giving false testimony at trial regarding where she saw Isaac Jones. Doc. 52 ¶¶ 279-82. Plaintiff Mitchell was also pressured to change his testimony. Doc. 52 ¶ 238.

In the case of Silence Is Violence, retaliation followed Executive Director Tamara Jackson's expression of core political speech.[44] Defendant Cannizzaro twice threatened her: once after she expressed her opinion in the press that the Office "failed to protect victims from violent retaliation," Doc. 52 ¶ 175, and once again after she submitted a formal complaint to the National District Attorney's Association "about the inadequate protections the District Attorney's Office provides to crime victims," Doc. 52 ¶ 173. It is difficult to imagine a clearer case of constitutionally protected speech than this one, where a citizen who criticized a public official was subsequently threatened by that same official. *See Rolf v. City of San Antonio*, 77 F.3d 823, 827-28 (5th Cir. 1996) ("[S]peaking out in opposition to government policy is protected activity.").

Defendants do not dispute that the individual Plaintiffs have pled the second element— injury. An injury predicated on retaliation need only be slight.[45] The threats and imprisonment through material witness arrest warrants (which explicitly stated the refusal to speak privately with prosecutors as a *reason* for the arrest warrant application) experienced by Plaintiffs meet that bar.[46]

Defendants do, however, attempt to downplay Plaintiff Silence Is Violence's injury by suggesting the retaliatory threats were mere "warnings." Doc. 63-1 at 47-48. But Plaintiffs have alleged that Silence is Violence was threatened—twice—with prosecution by a sitting District Attorney. Doc. 52. ¶¶ 173, 175. Under Fifth Circuit precedent, such threats satisfy the injury

---

[44] Defendants claim that Silence Is Violence's rights were not violated because Jackson's speech "would at least arguably constitute obstruction of justice." Doc. 63-3 at 47. No law, cited by Defendants or otherwise, supports this.

[45] *See Izen*, 398 F.3d at 368 n.5 ("Any form of official retaliation … including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement …") (quoting *Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001)); *Keenan*, 290 F.3d at 259 (finding injury sufficient even where the "effect on freedom of speech may be small").

[46] Defendants contend, without legal support, that these threats do not give rise to a retaliation claim "as a matter of law." Doc. 63-3 at 47-48. Fifth Circuit precedent states otherwise. *See Izen*, 398 F.3d at 368 n.5 (holding that threatened prosecution "constitutes an infringement").

element of a First Amendment retaliation claim. *See Izen v. Catalina*, 398 F.3d 363, 367 n.5 (5th Cir. 2004) (offering threatened prosecution as an example of unlawful retaliation).

As for the third element, Defendants do not dispute that their adverse actions against the individual Plaintiffs were substantially motivated by Plaintiffs' exercise of constitutionally protected conduct. Defendants do, however, suggest that Silence Is Violence cannot satisfy this element. However, the timing and nature of Cannizzaro's threats confirm that they were motivated by Silence Is Violence's constitutionally protected public statements.[47]

### C.    Defendants Are Not Entitled to Qualified Immunity

The Individual Defendants contend they are entitled to qualified immunity for violating Plaintiffs' First Amendment rights. These Defendants are wrong. First, it is clearly established that the First Amendment protects both "the right to speak freely and the right to refrain from speaking at all," particularly where the government wishes to compel a speaker to convey a particular message. *Wooley*, 430 U.S. at 714. In addition, the Fifth Circuit has refused to extend qualified immunity to acts of retaliation against constitutionally protected speech where—as here—there is no probable cause to charge the plaintiff with a crime. *See Keenan*, 230 F.3d at 261.

Nor is Defendant Cannizzaro shielded by qualified immunity for threatening the Executive Director of Silence Is Violence. The ability to criticize the government without risk of retaliatory arrest is not only clearly established, it is one of the core underpinnings of the First Amendment.[48]

---

[47] *See Mooney v. Lafayette Cty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013) ("The causal connection prong … may also be satisfied when the plaintiff relies upon a chronology of events from which retaliation may plausibly be inferred.").

[48] *See, e.g.*, *City of Houston, Tex. v. Hill*, 482 U.S. 451, 463 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").

## VII.    FOURTEENTH AMENDMENT PROLONGED DETENTION CLAIMS

In Count IV, Plaintiffs Baham and Silence Is Violence allege that Defendant Cannizzaro, in his official capacity, maintains a policy and custom of detaining material witnesses for prolonged periods without access to court, in violation of the Fourteenth Amendment. Doc. 52 ¶¶ 144-162. Baham also brings this claim against Defendant Napoli. Doc. 52 ¶¶ 276-278, 148-152. Plaintiffs Roe and Silence Is Violence also seek injunctive relief on this claim. Defendants do not acknowledge Silence Is Violence's damages claim or the claims for injunctive relief. *See* Doc. 63-1 at 43-45, 46-48. These issues are therefore waived. *See Bailey*, 133 F.3d at 372.

Defendants' sole argument is that Baham has not adequately pled that Defendant Napoli was responsible for her prolonged detention.[49] Doc. 63-1 at 44. To the contrary, Plaintiffs alleged that "prosecutors are responsible for decisions about when a material witness or victim is called to court," and explained how this occurs. Doc. 52 ¶¶ 148-149. They alleged that the Office has "no procedure to prevent the unlawful and unconstitutional over-incarceration of material witnesses," even though it "has been held liable for the prolonged incarceration of material witnesses before. *See Mairena v. Foti*, 816 F.2d 1061 (5th Cir. 1987)." Doc. 52 ¶¶ 150-152. And they alleged that "[o]n information and belief, Ms. Baham's prolonged detention was the result of Defendant Napoli's conduct." Doc. 52 ¶ 278. These allegations suffice at the pleading stage.

Defendant Napoli also contends that he is entitled to qualified immunity.[50] He is not; the Fifth Circuit has stated that a person's right to avoid prolonged detention without a prompt court appearance is clearly established. *Jones v. City of Jackson*, 203 F.3d 875, 881 (5th Cir. 2000).

---

[49] As Defendants have failed to otherwise address Baham's claims on the merits, they have waived their opportunity to do so. *See Bailey*, 133 F.3d at 372.

[50] Defendant Napoli's only argument is that courts have not settled on the appropriate standard for assessing Fourth Amendment claims based on material witness warrants. But as described above, qualified immunity hinges on whether the *right* is clearly established, not the standard for that right. *See supra* p. 34.

45

## VIII.   FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAIMS

In Count V, Plaintiffs allege violation of their due process rights by Cannizzaro in his official capacity and by Cannizzaro, Mitchell, Pipes, Doe, Napoli, Dover, Trummel, Hamilton, Petrovich, Rodrigue, Dawkins, and Martin in their individual capacities.

A state actor violates substantive due process when her conduct is "so egregious" that it "shock[s] the contemporary conscience." *Reyes v. North Texas Tollway Auth.*, 861 F.3d 558, 562 (5th Cir. 2017).[51] Defendants' behavior—which involves fraudulent court documents, the unlawful jailing of crime victims, and attempts to coerce false testimony—meets that standard.

Defendants may be held liable for this conduct when it reflects "deliberate indifference." *Brown v. Nationsbank Corp.*, 188 F.3d 579, 592 (5th Cir. 1999). Conduct that occurs over time, with "ample opportunity for cool reflection" reflects "deliberate indifference." *Id.* Here, Defendants had the opportunity to correct these unlawful practices, but did not. To the contrary, Office supervisors *required* that these tactics continue and defended them publicly after they were discovered. Doc. 52 ¶¶ 43-46, 68-69.

Individual Defendants contend they are shielded by qualified immunity. But Defendants violated a clearly established right against subjecting witnesses and victims to conduct so horrific that it shocks the conscience. *Rochin v. California*, 342 U.S. 165 (1952). Only an unreasonable prosecutor would not understand that the conduct at issue in this case violates Plaintiffs' legal rights.

---

[51] *See also Rochin v. California*, 342 U.S. 165 (1952) (introducing the "shocks the conscience" standard).

46

IX.    **CLAIMS FOR FAILURE TO SUPERVISE, TRAIN, OR DISCIPLINE, AND FAILURE TO INTERVENE**

Counts VI alleges a failure to train, supervise, or discipline against Defendant Cannizzaro in his official and individual capacities,[52] and against Defendants Pipes and Martin in their individual capacities. Count VII alleges failure to intervene against all Defendants in their individual capacities. Defendants allege that these claims fail because Plaintiffs did not state a predicate constitutional violation.[53] For the reasons described above, Plaintiffs have stated claims, and Defendants' argument must fail. *See supra* pp. 21-46.

As for failure to intervene, Defendants argue (in conclusory fashion) that Plaintiffs have not plausibly alleged any of them "acted with deliberate indifference with respect to alleged wrongdoing by others within the DA's office." Doc. 63-1 at 47. Such threadbare arguments should be rejected. In any event, the Complaint alleges sufficient facts to show that Defendants' unlawful conduct was pervasive and well-known throughout the Office, such that a failure to intervene could stem only from deliberate indifference. *See, e.g.*, Doc. 52 ¶¶ 26-192.

X.    **LOUISIANA ABUSE OF PROCESS CLAIMS**

Count VIII alleges that Defendant Cannizzaro, in his official capacity, and Defendants Dover, Mitchell, Petrovich, Pipes, Napoli, Trummel, Hamilton, Rodrigue, Doe, Dawkins, and Martin, in their individual capacities, committed the state law tort of abuse of process.

Abuse of process involves the "malicious perversion of a legally issued process whereby a result not lawfully or properly obtainable under it is attempted to be secured." *Succession of Cutrer*

---

[52] The failure to supervise, train, and discipline is frequently pled as a means of establishing municipal liability. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985).  Here, however, these are free-standing claims against Defendants in their individual capacities.

[53] As this is Defendants' sole argument, they have waived the opportunity to substantively address the merits of this claim. *See Bailey*, 133 F.3d at 372.

*v. Curtis*, 341 So. 2d 1209, 1214 (La. App. 1976) (quotations omitted). To state an abuse of process claim, a complaint must allege "(1) the existence of an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular prosecution of the proceeding." *Mills v. City of Bogalusa*, No. CV 13-5477, 2016 WL 2992502, at *14 (E.D. La. May 24, 2016) (citing *Waguespack, Seago & Carmichael (A PLC) v. Lincoln*, 768 So. 2d 287, 290-91 (La. App. 2000)).

Defendants' abuse of material witness warrants is a textbook example of the conduct this tort was designed to address. Defendants do not dispute that Plaintiffs have pled ulterior motive. Doc. 63-1 at 40-42, 44. They note, however, that abuse of process "involves the malicious use of a legal process *after* the process has been instituted." Doc. 63-1 at 41 (quoting *Duboue v. City of New Orleans*, 909 F. 2d 129 (5th Cir. 1990)). Thus, Defendants argue, Plaintiffs' allegations that Defendants "acted wrongfully in ***obtaining*** material-witness warrants does not state a valid cause of action." Doc. 63-1 at 41.

Defendants misunderstand Plaintiffs' claims. Plaintiffs allege that Defendants used material witness warrants to secure private investigative interviews. Doc. 52 ¶¶ 164-171. Plaintiffs Singleton, Baham, Mitchell, and Roe were each interrogated by prosecutors after arrest warrants were issued. Doc. 52 ¶¶ 208-212, 253, 277-279, 380-386. Thus, Defendants coopted the material witness statute—which exists solely to secure in-court testimony—and used it to "obtain a result not proper under the law." *Ioppolo v. Rumana*, 581 Fed. App'x 321, 325 (5th Cir. 2014).

Defendants' use of fraudulent subpoenas also amounts to abuse of process. Again, Defendants do not dispute the ulterior motive element. But they contend that abuse of process requires "malicious perversion of a ***legally issued process***," and that "[b]ecause the Plaintiffs allege that the material-witness warrants and subpoenas were issued ***illegally***, they have not stated a valid cause of action." Doc. 63-1 at 41-42 (quoting *Curtis*, 341 So. 2d at 1214).

48

However, "legally issued," in this context, means that the process is one normally associated with legal proceedings or the courts. For example, in *Almerico v. Dale*, 927 So. 2d 586 (5th Cir. 2006), the Fifth Circuit Court of Appeals rejected an abuse-of-process claim involving an internal police department disciplinary proceeding. The court explained that "the 'process' part of the cause of action" must refer to "legal process, or court process;" this case fell outside that definition because it instead involved "a civil service disciplinary matter." *Id.* at 594.

Courts have never limited this tort to process that was *validly* issued. In fact, the Louisiana Court of Appeals has specified that abuse of process occurs when a government officer "fail[s] to comply with the proper procedures or rules set out by law for conducting official actions." *Taylor v. State*, 617 So. 2d 1198, 1205-06 (La. Ct. App. 1993).

The conduct at issue in this claim is not the *creation* of fraudulent subpoenas, but rather the use of these documents to gain private interrogations free of judicial oversight in which they could, among other things, improperly coerce witnesses to change their testimony. Doc. 52 ¶ 442.

Defendants also argue that Silence Is Violence "cannot satisfy the basic tort-law requirement of causation" because it has not "connect[ed] specific, concrete actions by specific Defendants with specific injuries it allegedly suffered." Doc. 63-1 at 48. But Silence Is Violence has alleged in detail how the Office's policies of misusing material witness warrants and fraudulent subpoenas have "forced Silence Is Violence to change the way it structures its operations, allocates its resources, and manages victims' relationships with the Office."[54] These allegations are more than adequate to establish causation at the pleading stage.

---

[54] *See, e.g.*, Doc. 52 ¶¶ 171-175, 252, 389-413 (describing the effects of Defendant Cannizzaro's policies on Silence Is Violence).

## XI.     LOUISIANA FRAUD CLAIMS

Count IX alleges that Defendants committed fraud under Louisiana law by creating and delivering documents that purported to be "subpoenas," but which were not, in fact, subpoenas. Under Louisiana law, the tort of fraud requires (1) a misrepresentation of material fact; (2) made with the intent to deceive; (3) reasonable or justifiable reliance by the plaintiff; and (4) resulting injury. *Schaumburg v. State Farm Mut. Auto. Ins. Co.*, 421 F. App'x 434, 442 (5th Cir. 2011).

Defendants do not dispute that Plaintiffs have pled the first two elements. Instead, Defendants contend that Plaintiffs were not injured because they did not appear at the Office as the documents demanded. Doc. 63-1 at 43. But Plaintiffs were injured. Plaintiffs Bailey and LaCroix—believing the documents were real subpoenas—each retained counsel to "quash" them. *See supra* at pp. 35, 40. Doe both retained counsel and ultimately submitted to an unwanted interrogation with Defendant Dover because she believed, based in part on the threats in the fraudulent subpoena she received, that she would be jailed if she did not. *See supra* pp. 37, 40-41. When Singleton was jailed, she did not know that a fraudulent subpoena was a basis for her arrest; as such, she could not challenge the validity of the warrants, and spent five days in jail. Doc. 52 ¶ 219-228.

Defendants do not specifically address Silence Is Violence's official capacity fraud claim, which does not hinge on whether any particular witness submitted to the demands in a fraudulent subpoena. Doc. 52 ¶ 450; Doc. 63-1 at 46-48. These arguments are therefore waived, *see Bailey*, 133 F.3d at 372, and this claim should proceed.

### CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Respectfully submitted this 4th day of April, 2018,

/s/ Bruce Hamilton

Anna Arceneaux
Admitted *pro hac vice*
American Civil Liberties Union Foundation
201 West Main Street, Suite 402
Durham, NC
Tel. (919) 682-5159
aarceneaux@aclu.org

Somil Trivedi
Admitted *pro hac vice*
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
Tel. (202) 715-0802
strivedi@aclu.org

Bruce Hamilton
La. Bar No. 33170
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, LA 70156
Tel. (504) 522-0628
bhamilton@laaclu.org

Katherine Chamblee-Ryan*
Alec Karakatsanis
Admitted *pro hac vice*
Civil Rights Corps
910 17th Street NW
Washington, D.C. 20006
Tel. (202) 656-5198
katie@civilrightscorps.org
alec@civilrightscorps.org

COUNSEL FOR PLAINTIFFS

*Not licensed in the District of Columbia,
practice subject to D.C. App. R. 49(c)(8),
with supervision by Alec Karakatsanis, a
member of the D.C. Bar.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 4th day of April, 2018, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, and that service will be provided through the CM/ECF system.

/s/ Bruce Hamilton