# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

RENATA SINGLETON, MARC MITCHELL,
LAZONIA BAHAM, JANE DOE, TIFFANY
LACROIX, FAYONA BAILEY, JOHN ROE, and
SILENCE IS VIOLENCE;

                Plaintiffs,

   vs.

LEON CANNIZZARO, in his official capacity as
District Attorney of Orleans Parish and in his
individual capacity;

GRAYMOND MARTIN, DAVID PIPES, IAIN
DOVER, JASON NAPOLI, ARTHUR MITHCELL,
TIFFANY TUCKER, MICHAEL TRUMMEL,
MATTHEW HAMILTON, INGA PETROVICH,
LAURA RODRIGUE, SARAH DAWKINS, and
JANE DOE, in their individual capacities;

                Defendants.

**CIVIL ACTION NO.  17-10721**

**JUDGE: JANE TRICHE MILAZZO**

**MAGISTRATE: JANIS VAN
MEERVERLD**

**BRIEF OF AMICI CURIAE LOUISIANA FOUNDATION AGAINST SEXUAL
ASSAULT, DV LEAP, AND THE NATIONAL ALLIANCE TO END SEXUAL
VIOLENCE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION AND INTEREST OF THE AMICI ................................................... 1

ARGUMENT .................................................................................................................. 4

I.    THE FIRST AMENDMENT RIGHT NOT TO SPEAK IS WELL ESTABLISHED. .......... 4

II.    THE CHALLENGED POLICIES AND PRACTICES ARE SELF-DEFEATING AND THUS DO NOT ADVANCE A COMPELLING GOVERNMENT INTEREST .................. 8

CONCLUSION ............................................................................................................. 13

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Alexander v. City of Round Rock*,
   854 F.3d 298 (5th Cir. 2017) ...................................................7

*Cressman v. Thompson*,
   798 F.3d 938 (10th Cir. 2015) ..................................................5

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
   515 U.S. 557 (1995)...................................................4, 5, 6, 7

*Jackler v. Byrne*,
   658 F.3d 225 (2d Cir. 2011)......................................................6

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
   487 U.S. 781 (1988)...................................................4, 5, 6, 7

*Turner Broad. Sys. Inc. v. F.C.C.*,
   512 U.S. 622 (1994)...........................................................4, 6

*West Virginia State Bd. of Education v. Barnette*,
   319 U.S. 624 (1943)...........................................................4, 5

*Wooley v. Maynard*,
   430 U.S. 705 (1977)...............................................................4

**Statutes**

U.S. Const. amend. I ...................................................... *passim*

**Other Authorities**

American Civil Liberties Union, *Responses from the Field: Sexual Assault, Domestic Violence, and Policing* (Oct. 2015).............................................10, 11

Denise Gamache & Rhonda Martinson, *Ending Gender Bias in the Law Enforcement Response to Sexual Assault and Domestic Violence*, Report on the OVW Roundtable (Aug. 2016)..9, 10

Judith Lewis Herman, *Justice From the Victim's Perspective*, VIOLENCE AGAINST WOMEN, Vol. 11, No. 5 (May 2005).............................................8, 11

U.S. Department of Justice, *Identifying and Preventing Gender Bias in Law Enforcement Response to Sexual Assault and Domestic Violence* ...............................................10

## INTRODUCTION AND INTEREST OF THE AMICI

This is a case about alleged government use of deception to coerce an especially vulnerable group of people—crime victims and witnesses—to speak to prosecutors against their will, in some cases pressed to do so falsely, about traumatic experiences.  As alleged in the Second Amended Complaint (the "Complaint"), the individual Plaintiffs have, in effect, been re-victimized by Defendants' misuse of their investigatory authority and punished for the exercise of their constitutional right not to submit to off-the-record interviews in the absence of a valid subpoena or properly obtained material witness warrant.  Amici, organizations dedicated to advocating for victims of sexual assault and domestic violence, write to emphasize the merit and gravity of the asserted First Amendment violations and to urge the Court to allow Plaintiffs to build a record in support of their detailed factual allegations.

Plaintiffs allege that Defendants have engaged in the systematic use of fake subpoenas, issued without judicial oversight, the obtaining of material witness warrants on false pretenses, and the prolonged detention of witnesses in order to induce their cooperation.  Amici recognize and respect the importance of thorough, properly conducted investigations into acts of sexual violence and domestic abuse and do not argue for a right to refuse to participate in the prosecution of such crimes with appropriate judicial oversight.  The conduct alleged here, however, falls outside the bounds of legitimate operation of the criminal justice system and has resulted in serious constitutional violations.

Courts have long recognized that the right not to speak, no less than the right to speak, implicates First Amendment limits on government conduct.  This fundamental aspect of personal autonomy is as entitled to recognition in the context of coerced cooperation with prosecutors as it is in the context of forced recitation of a loyalty pledge or forced endorsement or renunciation of

1

particular ideological beliefs.  Being pressed to subscribe to someone else's version of events

one has experienced, as alleged here, fits comfortably within the constitutional proscription

against being coerced to adopt a particular government-sanctioned viewpoint or message.

If, as the Supreme Court has held, one may not be compelled to make factual statements

against one's will, at least in a noncommercial setting, one cannot, *a fortiori*, be compelled to

make *false* factual statements.  Even unaccompanied by pressure to lie, however—the most

egregious of the compelled speech violations alleged here—coercion to speak to law

enforcement under false pretenses represents an intolerable incursion on Plaintiffs' liberty

interests.  The First Amendment—not just the Fifth—protects the right to remain silent.  The

reluctance of many sexual assault and domestic violence victims to voluntarily assist prosecutors

stems from their well-founded fear of retribution (physical, emotional, financial) by the

perpetrator as well as, in some cases, fear of the consequences of such cooperation for the

perpetrator, on whom the victim/witness may be dependent.

Amici, described below, have first-hand knowledge of the devastating impact on crime

victims and witnesses of being punished for resisting (or purportedly resisting) prosecutors'

efforts to extract testimony to support their theories, as well as an understanding of the powerful

reasons for such resistance—reasons rooted in the vulnerable circumstances in which the

victims/witnesses find themselves and the severe risks to which they often reasonably believe

acceding to out-of-court interviews will expose them.

In addition to offending settled First Amendment principles, giving prosecutors free reign

to trample the free-speech rights of crime victims and witnesses in the manner alleged will (as

Plaintiffs also allege) have the self-defeating effect of discouraging victims and witnesses from

reporting crimes in the first place.  It is no stretch to conclude that the abusive subpoena and

material witness procedures and retaliatory punishments, should they be proven, will chill the voluntary witness cooperation on which the successful prosecution of sexual assault and domestic violence cases so heavily depends.  Far from serving a compelling government interest, the claimed constitutional violations will do precisely the opposite—dissuading victims who might otherwise seek the protection of law enforcement authorities from coming forward, thereby hindering the successful prosecution of sex crimes and domestic abuse.

Plaintiffs have sufficiently alleged violation of their First Amendment rights to survive dismissal of those claims.  The Court should hold that that the right not to be compelled to speak is not as narrow as Defendants urge.  It should allow Plaintiffs to make the case that their right not to participate in coercive, out-of-court interrogations—particularly when it is part of an effort to build a false record—is actionable.

The **Louisiana Foundation Against Sexual Assault (LaFASA)** is a coalition agency that serves statewide sexual assault crisis centers through education, professional training, technical assistance, and community engagement resulting in safer, healthier, stronger, and better-informed communities throughout Louisiana.  LaFASA believes that meaning and impactful service to survivors can only be accomplished by educating advocates and communities in all aspects of the survivor's often complicated and nuanced journey.  LaFASA's initiatives are specifically tailored to deliver this type of information and guidance to ensure that survival is a reality, and eventually, to eradicate the public-health epidemic of sexual assault entirely.

**DV LEAP**, a national leader in domestic violence litigation at all levels, including the Supreme Court, assists with appeals of unjust rulings in domestic violence and child abuse cases.  DV LEAP also provides training and in-depth consultation to lawyers, judges, mental health

professionals, litigants, and shares resources with key stakeholders.  In the policy arena, DV LEAP partners with advocacy organizations at the local and national level to improve policy and laws to protect the victims of domestic violence.

**The National Alliance to End Sexual Violence (NAESV)** is the voice in Washington for the 56 state and territorial sexual assault coalitions and 1300 rape crisis centers working to end sexual violence and support survivors.  NAESV advocates for the rights of survivors engaged with the criminal justice system and encourages the use of responsible practices and policies for those working with victims.

<u>**ARGUMENT**</u>

## I.     THE FIRST AMENDMENT RIGHT NOT TO SPEAK IS WELL ESTABLISHED

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 641 (1994).  The freedom of thought protected by the First Amendment against state action "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988) (freedom of speech "necessarily compris[es] the decision of both what to say and what *not* to say").  The right to speak and the right to refrain from speaking are "complementary components of the broader concept of 'individual freedom of mind.'" *Id.*

The First Amendment protects the right of the speaker "not to propound a particular point of view." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 575 (1995).  "[E]ven with the purest of motives," the government "may not substitute its judgment as to how best to speak for that of speakers and listeners."  *Riley*, 487 U.S. at 791.  Government

action that "requires the utterance of a particular message favored by the government" contravenes the "essential right" to "decide for himself or herself the ideas and beliefs deserving of expression." *Turner*, 512 U.S. at 641. Thus, in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), the Court invalidated a compulsory flag salute in public school on the ground that the pledge required "affirmation of a belief and an attitude of mind." *Id.* at 633.

The Supreme Court has never limited the proscription against compelled speech to ideological or religious messages. The principle that the government "may not compel affirmance of a belief with which the speaker disagrees" extends to "statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech," *Riley*, 487 U.S. at 795, and that is true whether the speech constitutes a statement of opinion or a statement of "fact." *Id.* at 797-98; *see also Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) ("This constraint on state compulsion is not limited to ideological messages; compelled statements of fact are equally proscribed by the First Amendment.").

The First Amendment requires a tight fit between (i) content-based government action that either restricts or compels private speech and (ii) the advancement of an important governmental objective. *See Riley*, 487 U.S. at 800 ("government [may] not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored").

A constitutional violation does not arise, of course, every time factual speech is compelled by government. In applying for a passport or a driver's license, for example, one is required to supply factual information in exchange for a government certification (a tangible benefit). One is also required to respond to the census and to file income tax returns. And, of

course, one can be ordered to sit for a deposition or testify at trial.  These are among the many

contexts in which government has the right to collect information from private citizens in order

to perform its core functions.  *See Barnette*, 319 U.S. at 645 (Murphy, J., concurring) (noting that

the right to refrain from speech can be subordinated when "essential operations of government

may require it for the preservation of an orderly society—as is the case of compulsion to give

evidence in court").  The compelled provision of accurate factual information for a purpose that

does not involve government promotion of particular ideas and does not implicate the expressive

autonomy interests of private citizens raises no constitutional concerns.

The extrajudicial, fraudulently coerced witness interviews alleged in this case are quite

different.  They *do not* rely on valid legal authority, and they allegedly have been used to force

crime victims and witnesses to provide either false reports of what they saw (consistent with the

prosecution's preferred theory of the case) or simply cooperation the witness is justifiably

unwilling, under the circumstances, to give.

The scenario in which a witness is pressured to subscribe to the prosecutor's preferred

view of the facts is surely no less offensive a form of compelled speech than being forced to

salute the flag, to take a loyalty oath that conflicts with one's beliefs, or otherwise to "promot[e]

an approved message."  *Hurley*, 515 U.S. at 579; *see, e.g.*, Sec. Am. Compl. ¶¶ 161, 262-69, 410.

Coerced endorsement of falsehoods, especially when freighted with severe legal consequences

for an intimate of the witness, is plainly repugnant to the established First Amendment right to

say, or not say, what one believes.  *See Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011) ("a

citizen has a First Amendment right to decide what to say and what not to say, and, accordingly,

the right to reject government efforts to require him to make statements he believes are false").

It is content-based regulation of speech devoid of legally cognizable justification.

Pressuring a witness to recite a "particular message favored by the government," *Turner*, 512 U.S. at 641, when that message conflicts with what the speaker believes to be true contravenes the fundamental rule that the government "may not compel affirmation of a belief with which the speaker disagrees." *Hurley*, 515 U.S. at 573.  Forcing a speaker to "propound a particular point of view" lies "beyond the government's power to control." *Id.* at 575.  Such conduct is constitutionally invalid "even [if done] with the purest of motives," *Riley*, 487 U.S. at 791, and it is beyond the constitutional pale where, as alleged here, the alleged motives are not pure.

Even in the absence of pressure to testify *falsely*, the use of fake subpoenas to coerce informal, unrecorded interviews with prosecutors violates the right not to make "statements of fact the speaker would rather avoid, " *Hurley*, 515 U.S. at 573, i.e., the right to decide "what *not* to say." *Riley*, 487 U.S. at 797.  As Plaintiffs allege, "The right to freely decline voluntary questioning from a government official is a basic constitutional right."  Sec. Am. Compl. ¶ 163.  This right turns not on whether the statement in question is true or false but rather on whether it is one *the plaintiff wishes to make*.  In this case, Plaintiffs have good reason to fear describing to prosecutors the traumas they have suffered at the hands of close acquaintances or intimate partners; they are understandably reluctant to tell their stories out of court in a setting in which they are unprotected against high-pressure manipulation and threats, and the law does not require them to jeopardize their well-being by doing so.[1]  *See, e.g.*, Sec. Am. Compl. 3-4.

---

[1] *Alexander v. City of Round Rock*, 854 F.3d 298 (5th Cir. 2017), is distinguishable.  First, it involved the right of a suspect (not a victim or witness) to refuse to answer an officer's questions during a *Terry* stop.  *Id.* at 308.  Second, the court did not decide whether—in that factually distinct context—a First Amendment right exists or not; rather, it held that the defendants were entitled to qualified immunity because the asserted First Amendment rights were not clearly established.  *Id.* at 309.

## II.   THE CHALLENGED POLICIES AND PRACTICES ARE SELF-DEFEATING AND THUS DO NOT ADVANCE A COMPELLING GOVERNMENT INTEREST

The government's asserted interest in obtaining convictions in sexual assault and domestic violence cases is not advanced by the tactics alleged in the Complaint.  To the contrary, the challenged policies and practices are at odds with the government's stated objectives.  In a particular case the use of chicanery to obtain truthful testimony that leads to a conviction may serve the government's interest in the appropriate meting out of criminal punishment—a detective making a false statement in an interrogation in order to prompt a confession, for example.  But the long-term impact of the kind of systematic deception alleged here is, as Plaintiffs allege, to erode trust in and respect for law enforcement, especially after the practices, and their devastating impact on victims and witnesses, have been publicly exposed.  *See* Sec. Am. Compl. ¶¶ 67ff.  This, in turn, will reduce voluntary participation by vulnerable individuals in what they rightly believe to be a tainted process.  The alleged abridgement of Plaintiffs' well-established First Amendment rights thus does not advance a compelling state interest.

From their close work with victims of sexual assault and domestic violence, Amici are familiar with the trepidation experienced by individuals (usually women) who are assaulted by romantic partners or other acquaintances yet remain dependent (financially, physically, and/or emotionally) on them.  They are differently situated than other crime victims, and, consequently, approach interaction with the criminal justice system differently.  They often have reasons relating to their personal security to resist the entreaties of aggressive prosecutors.  *See* Judith Lewis Herman, *Justice From the Victim's Perspective*, Violence against women, Vol. 11, No. 5 (May 2005) 571, 574, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi= 10.1.1.853.4843&rep=rep1&type=pdf ("Victims who participate in the justice system may . . .

8

fear for their safety because of the threat of retaliation by the perpetrator. . . . [T]his fear is often well founded.  Perpetrators of sexual and domestic violence have intimate knowledge that makes it very easy for them to threaten or discredit their victims.").  This reluctance to participate in the prosecution of an intimate partner—even (or especially) an abusive one—has undoubtedly been exacerbated by the publicly reported practices described in this lawsuit: the use of fraudulent subpoenas and fraudulently obtained material witness orders to extort witness cooperation and impose severe punishment in retaliation for the supposed failure to accede.

The wishes and needs of the victims of sexual assault and domestic violence "are often diametrically opposed to the requirements of legal proceedings."  Herman, *supra*, at 574.  They represent a class of crime victims whose plight calls for special sensitivity on the part of police and prosecutors.  The conduct alleged in the Complaint shows precisely the opposite: a propensity to distrust and blame the victim and to bully them into assisting the prosecution.  In the absence of a properly obtained court order, this conduct drives a wedge between prosecutors and the public.  It sows seeds of doubt in the minds of those contemplating reporting domestic crime and chills the flow of information on which successful prosecutions depend.

Studies of the interaction of domestic or sexual assault crime victims with law enforcement, the results of which are consistent with Amici's experience, suggest the self-defeating nature of Defendants' alleged conduct.  According to an August 2016 report by the Battered Women's Justice Project, for example, surveys showed that female victims of domestic violence "shared a strong reluctance to turning to law enforcement for help."  Rhonda Martinson, J.D. *et al*., *Ending Gender Bias in the Law Enforcement Response to Sexual Assault and Domestic Violence*, Report on the OVW Roundtable (Aug. 2016) at 7, *available at* http://www.bwjp.org/assets/documents/pdfs/ovw-gender-bias-roundtable-report.pdf.  Seventy

9

percent of respondents feared that calling the police would make things worse, including because calling the police would have negative consequences for them, and the offender would only get a slap on the wrist.  *Id.*  Twenty-four percent of respondents who had contacted the police reported that they had been arrested or threatened with arrest during a partner-abuse incident or while reporting a sexual assault incident to the police.  *Id.*  Of those who had not contacted the police, seventeen percent feared the police would be violent or would threaten to arrest or arrest them. *Id.*  Respondents reported fear of the collateral consequences of police involvement, including the involvement of child protective services; criminal charges that could trigger immigration or deportation proceedings; and loss of housing, employment, or welfare benefits of the victim or the abuser.  *Id.* at 8.

The U.S. Department of Justice has identified the following commonsense principle relating to the interaction of police with victims: "A victim who is treated with respect is more likely to continue participating in an investigation and prosecution than one who feels judged or blamed for a sexual assault or domestic violence incident."  U.S. Department of Justice, *Identifying and Preventing Gender Bias in Law Enforcement Response to Sexual Assault and Domestic Violence*, at 12, *available at* https://www.justice.gov/opa/file/799366/download.  "By taking affirmative steps to respect the dignity of all complainants, law enforcement officers may be able to increase the quality and quantity of the information they receive."  *Id.*  The DOJ report states that law enforcement agencies "should review and revise their policies and procedures, as necessary, and provide training to assist officers in being cognizant of the emotional impact that participating in interviews and evidence-gathering may have on a victim who has undergone a traumatic event, such as a rape or sexual assault." *Id.* at 13.  "Arresting the wrong party or both parties . . . discourages the victim from reporting future incidents."  *Id.* at 20.

A significant underlying issue is that, as noted above, the goals of victims often are not aligned with those of the criminal justice system.  *See* Herman, *supra*, at 575 ("for many victims . . . . their goals are not congruent with the sanctions the system imposes").  A 2015 ACLU report, *Responses from the Field: Sexual Assault, Domestic Violence, and Policing* (Oct. 2015) ("ACLU Report"), *available at* https://www.aclu.org/sites/default/files/field_document/2015.10.20_highlights_-_responses_from_the_field.pdf, explains that survivors were "looking for options other than punishment for the abuser, options that were not necessarily focused on separation from the abuser"; that survivors "feared that once they were involved in the criminal justice system, they would lose control of the process"; and that survivors "were reluctant to engage the system because they believed that it was complicated, lengthy, and would cause them to suffer more trauma."  *Id.* at 2; *see also id.* ("In response to a request to name the most often-reported reasons survivors do not call the police or cooperate with the criminal justice system, respondents pointed to survivors' beliefs that their interests and goals are at odds with those of the criminal justice system or that the process would have deleterious effects on their wellbeing."); Herman, *supra*, at 574 ("To a victim who has already been terrorized and humiliated, the routine procedures of the legal system do not offer much assurance.").  Some victims "don't have the energy to deal with the day-to-day or life, plus having experienced sexual or domestic violence, plus push through legal proceedings, even if those proceedings would help them." ACLU Report at 29.  The criminal justice system "is not trauma informed and can re-traumatize a survivor of violence," and many survivors who worked with the criminal justice system "wish[ed] they had not after the fact because it negatively impacted their ability to heal from trauma."  *Id.* at 31.  The allegations in the Complaint echo these findings.

According to the ACLU Report, Congress heard testimony, in connection with consideration of the Violence Against Women Act, that "the main reason survivors of sexual assault refused to report their attackers to the police was because of their lack of confidence in the criminal justice system." *Id.* at 5. According to National Crime Victimization Survey data, thirty-eight percent of those who chose not to report victimization to the police "feared reprisal or did not want to get the offender in trouble." *Id.* at 8. Reporting "may have collateral consequences for survivors in addition to concerns about retaliation from the abusers or their friends and family," including fear of deportation or loss of child custody. *Id.* at 9, 25-26.

When the criminal justice process is infected with pressure to lie and/or threats of imprisonment—thus treating victim as perpetrator—as alleged here, it stands to reason that, as the studies cited above suggest, victims will be dissuaded from providing evidence voluntarily. Fear of mistreatment and lack of trust in the criminal justice system will reinforce the reluctance of domestic crime victims to step forward. Public revelation of prosecutorial misconduct reinforces the hesitancy of crime victims such as Plaintiffs to report to authorities information that, when used by prosecutors, is likely to further destabilize their lives. The coercion and retaliatory punishment Plaintiffs allege compounds that destabilization, thereby turning on its head the role the criminal justice system should play for crime victims and witnesses.

The suggestion that Plaintiffs' constitutional rights must yield to the imperatives of law enforcement in this context rests on a false dichotomy. Studies such as those cited above document the adverse impact that abusive or insensitive behavior by law enforcement toward crime victims has on the willingness of such victims to work with the authorities to identify and bring perpetrators to justice. The conduct alleged in this case, if proven, is likely to further buttress hostility toward and suspicion of law enforcement and, as a result, lead more victims of

12

sexual assault and domestic violence to conclude that the personal cost of seeking justice is too high.  Allowing this well-pleaded case to go forward would help avert that unfortunate outcome.

## **CONCLUSION**

For the foregoing reasons and those set forth in Plaintiffs' opposition brief, Defendants' motion to dismiss the Complaint should be denied.

Respectfully submitted,

By**:** /s/ R. Bruce Rich_____
R. Bruce Rich
Jonathan Bloom
Victor S. Leung
Admitted *pro hac vice*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel. (212) 310-8000
bruce.rich@weil.com
jonathan.bloom@weil.com
victor.leung@weil.com

Catherine E. Lasky (La. Bar No. 28652)
Kerry A. Murphy (La. Bar No. 31382)
LASKY MURPHY LLC
715 Girod Street, Suite 250
New Orleans, LA 70130
Tel. (504) 603-1501
klasky@laskymurphy.com
kmurphy@laskymurphy.com

Dated:  April 12, 2018                    *Counsel for Amici Curiae*

13

## CERTIFICATE OF SERVICE

I hereby certify that in accordance with the Eastern District of Louisiana's electronic filing procedures, this Proposed Brief of *Amici Curiae* was electronically filed on the 12th day of April, 2018. A Notice of Electronic Filing will be sent by the Court to all counsel of record who have consented to email notification and electronic service. This document is available for viewing and downloading from the Court's ECF system.

  /s/ Victor S. Leung

14