# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RENATA SINGLETON ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 17-10721** |
| **LEON CANNIZZARO ET AL.** | **SECTION: "H"** |

## ORDER AND REASONS

Before the Court is Defendants' Joint Motion to Dismiss (Doc. 63). For the following reasons, the Motion is **GRANTED IN PART**.

## BACKGROUND

At its core, this lawsuit alleges that the Orleans Parish District Attorney's Office unlawfully compelled victims and witnesses of crimes to cooperate with prosecutors. Those who failed to comply with prosecutors' requests were allegedly threatened, harassed, and, in some cases, jailed. Plaintiffs in this case include eight people—victims of and witnesses to crimes—and an organization that advocates on behalf of crime victims.

The primary tool that prosecutors allegedly used to compel cooperation was a document manufactured by the District Attorney's Office ("DA's Office") to look like a court-ordered subpoena that was, in fact, nothing more than an invitation by prosecutors to meet with them outside of court. Prosecutors often threatened witnesses with jail time for failure to comply with these

"subpoenas."[1] Because the "subpoenas" were not actually approved by a judge, but instead were engineered by prosecutors, the documents did not give anyone the authority to fine or jail witnesses who failed to appear. Nevertheless, prosecutors often followed up on their threats by asking judges to jail witnesses on material witness warrants.[2]

The Plaintiffs allege that the DA's Office operated this system for years, and it was not until *The Lens* published an exposé about the issue in the spring of 2017 that the practice became widely known.[3] Orleans Parish District Attorney Leon Cannizzaro and his office faced intense public criticism after the practice was publicly exposed.[4] Armed with knowledge of the alleged scheme, Plaintiffs filed their initial Complaint in this Court on October 17, 2017.[5] A few months later, on January 25, 2018, Plaintiffs filed an Amended Complaint.[6] Plaintiffs seek monetary and injunctive relief for alleged violations of federal and state law by the Defendants. The federal claims include violations of the First, Fourth, and Fourteenth Amendments under 42 U.S.C. § 1983. The Louisiana state law claims include allegations of abuse of process and fraud.

The Plaintiffs in this suit include Renata Singleton, Marc Mitchell, Lazonia Baham, Jane Doe, Tiffany LaCroix, Fayona Bailey, John Roe, and Silence is Violence ("SIV"), a non-profit victim advocacy group based in Orleans

---

[1] The "fake subpoenas" described in the pleadings and briefs in this matter are referred to as "subpoenas" in quotation marks throughout this Order and Reasons.

[2] *See* LA. REV. STAT. § 15:257. A material witness warrant, which must be signed by a judge, allows prosecutors to arrest and jail uncooperative witnesses who are "essential" to a case after it has been shown that "it may become impracticable to secure the presence of the [witness] by subpoena . . ." *Id.* The witness must remain jailed until either he appears in court and posts bail or testifies in the criminal matter so as to moot the alleged non-cooperation. *Id.*

[3] *See* Doc. 52 at 17.

[4] *See id.* at 17–18.

[5] Doc. 1.

[6] Doc. 52.

Parish. The Defendants, all prosecutors at the Orleans Parish District Attorney's Office, include Cannizzaro, First Assistant District Attorney Graymond Martin, Assistant District Attorney and Chief of Trials David Pipes, and Assistant District Attorneys Iain Dover, Jason Napoli, Arthur Mitchell, Tiffany Tucker, Michael Trummel, Matthew Hamilton, Inga Petrovich, Laura Rodrigue, Sarah Dawkins, and John Doe.[7] For context, the allegations underlying the claims of each of the Plaintiffs are described below.

Plaintiff Renata Singleton was the victim in a domestic violence incident in 2014 involving her ex-boyfriend, Vernon Crossley. Singleton alleges that the DA's Office sent her two "subpoenas" after she told a victim-witness advocate that she did not want to pursue charges against Crossley or participate in any prosecution of him. Acting on the advice of a friend in law enforcement who told Singleton she had not been properly served because the "subpoenas" were left at her door, Singleton did not comply with the requests in the "subpoenas." In response, Defendant ADA Mitchell sought a material witness warrant for Singleton. A judge granted Mitchell's request, and Singleton spent five days in jail on a $100,000 bond before ultimately being released.

Plaintiff Marc Mitchell was shot in 2014 while playing basketball with his nephews. He testified against Jonterry Bernard, the shooter. Bernard was convicted on a charge of attempted murder and sentenced to prison. The DA's Office also charged another man, Gerard Gray, with attempted murder in the shooting on the theory that Gray ordered Bernard to shoot Mitchell. In multiple meetings with prosecutors, Mitchell told the prosecutors that he did not know whether Gray ordered Bernard to shoot him. According to Mitchell, prosecutors continued to question him about his recollection of the events

---

[7] This Court will use the term "Individual Defendants" to refer to all the ADAs plus Cannizzaro insofar as Plaintiffs make claims against him in his individual capacity.

leading up to the shooting. Mitchell ultimately quit cooperating with the prosecutors, and ADA Trummel and ADA Hamilton worked together to have a material witness warrant issued for Mitchell's arrest. Police arrested Mitchell in the lobby of the hotel where he worked, and he spent a day in jail on a $50,000 bond before being released.

Plaintiff Lazonia Baham was wanted for questioning by the DA's office in the 2013 killing of her daughter's boyfriend. Baham alleges that prosecutors wanted her to testify that she saw Isaac Jones, the defendant in the murder case, near the scene of the murder. She repeatedly told prosecutors that she only saw Jones near her house, not near the murder scene. Baham ultimately stopped taking calls from the DA's office, and ADA Napoli sought a material witness warrant for her arrest. Police arrested Baham a few days after Christmas Day in 2015 while she was sick. She spent a total of eight days jailed on the warrant before being released.

Plaintiff Jane Doe was the victim of molestation of a juvenile and child pornography. Doe alleges that the DA's Office in 2016 delivered a "subpoena" to her home demanding that she appear at their office to meet with prosecutors. Doe ultimately complied with their request after ADA Dover allegedly threatened Doe at her high school and later arrived in court with a material witness warrant application threatening to jail Doe.

Plaintiffs Fayona Bailey and Tiffany LaCroix were potential witnesses in different murder cases who allegedly received "subpoenas" from the DA's Office. Both ultimately hired a lawyer to challenge the "subpoenas," and their challenges were successful. Plaintiffs allege that ADA Petrovich sent the "subpoena" to Bailey around March 2017, and that ADA Rodrigue sent the "subpoena" to LaCroix in November 2016.

Plaintiff John Roe was attacked with a rifle in January 2016, and Roe's friend was murdered the next day. Police identified Michael Young as the suspect in both the attack on Roe and the murder of Roe's friend. Investigators questioned Roe about the incidents, and he cooperated with them. Although Roe provided police with his contact information at the time, he later moved and changed his phone number. Numerous subpoenas were sent to Roe's former address, but he alleges that he did not receive them. Nevertheless, Roe alleges that he was "not difficult to find" at the time because he maintains a Facebook account under his name.[8] Having failed to reach Roe, ADA Dawkins in August 2017 applied for a material witness warrant seeking Roe's arrest. A judge granted the request, and Roe spent three days in jail before being released.

Plaintiff SIV alleges that it has been threatened by Cannizzaro on multiple occasions and that it has been forced to alter the focus of its organizational mission—from generally advocating for victims of violent crime to protecting those same victims from zealous prosecutors—because of the DA's Office's use of "subpoenas" and other intimidating tactics.

On March 1, 2018, the Defendants filed a Joint Motion to Dismiss the claims of all Plaintiffs under Rule 12(b)(6).[9] The Defendants argue first that many of the Individual Defendants enjoy absolute immunity for the claims asserted against them. To the extent that any of the Individual Defendants' conduct is not absolutely immune from civil suit, Defendants argue that they enjoy qualified immunity. Defendants further argue that many claims are prescribed, and finally, for any remaining claims, that Plaintiffs fail to state a

---

[8] Doc. 52 at 59.

[9] *See* Doc. 63.

claim on which relief may be granted. Plaintiffs oppose. Oral argument was held before this Court on May 9, 2018.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts to "state a claim for relief that is plausible on its face."[10] A claim is "plausible on its face" when the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[11] A court must accept the complaint's factual allegations as true and must "draw all reasonable inferences in the plaintiff's favor."[12] A court need not, however, accept as true legal conclusions couched as factual allegations.[13] To be legally sufficient, a complaint must establish more than a "sheer possibility" that the plaintiff's claims are true.[14] If it is apparent from the face of the complaint that an insurmountable bar to relief exists and the plaintiff is not entitled to relief, the court must dismiss the claim.[15]

## LAW AND ANALYSIS

This Court will first address the extent to which the Individual Defendants enjoy absolute immunity from federal law claims by Plaintiffs other than SIV before turning to whether any of the remaining federal claims by those same Plaintiffs are barred by qualified immunity.[16] The Court will

---

[10] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

[11] *Id.* (citing *Twombly*, 550 U.S. at 556).

[12] Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009).

[13] *Iqbal*, 556 U.S. 662 at 678.

[14] *Id.*

[15] *Lormand*, 565 F.3d 228 at 255–57.

[16] To the extent that this Court finds that any of the Plaintiffs have alleged a constitutional violation for qualified immunity purposes, this Court will note that such a finding defeats Defendants' 12(b)(6) challenges to the same claims.

then analyze Defendants' 12(b)(6) challenges to those remaining federal claims by all Plaintiffs except SIV. Next, the Court will turn to Defendants' motion to dismiss the individual Plaintiffs' state law claims and SIV's federal and state claims. Finally, the Court will consider Defendants' argument that many of Plaintiffs' claims are time-barred.

## I. Absolute Immunity

Defendants argue that virtually all of Plaintiffs' claims for monetary damages are barred by absolute immunity.[17] Because determining whether a prosecutor enjoys absolute immunity turns on "the nature of the function performed" by the prosecutor,[18] this Court must analyze the "specific activities that give rise to the cause of action."[19] In other words, absolute immunity attaches to specific *conduct*, not specific *claims*.[20] If specific conduct is protected by absolute immunity, and that same conduct forms either a crucial foundation for or the entire basis of certain claims, a finding of absolute immunity may well defeat certain claims on a 12(b)(6) motion.

Plaintiffs identify five categories of conduct performed by the Individual Defendants that form the basis of their claims.[21] The categories include: (1) the creation and use of "subpoenas" to induce witnesses to meet with prosecutors outside of court; (2) verbal and written threats made to witnesses; (3) the misuse of material witness arrest warrants for investigative ends; and (4) the

---

[17] *See* Doc. 63.

[18] Loupe v. O'Bannon, 824 F.3d 534, 539 (5th Cir. 2016) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993)).

[19] Loughlin v. Tweed, No. 15-649, 2015 WL 3646777, at *5 (E.D. La. June 10, 2015) (Feldman, J.) (citing *Buckley*, 509 U.S. at 259).

[20] *See* Moon v. City of El Paso, 906 F.3d 352, 359 (5th Cir. 2018) ("Absolute immunity is not a rigid, formal doctrine, but attaches to the functions a prosecutor performs.").

[21] *See* Doc. 67 at 16.

failure to supervise.[22] This Court will analyze whether each type of conduct is covered by absolute immunity.

### a. An Overview of Absolute Immunity

In 1976, the U.S. Supreme Court in *Imbler v. Pachtman* extended the common law doctrine of absolute immunity to prosecutors.[23] Under *Imbler*, prosecutors enjoy absolute immunity from § 1983 claims seeking damages from individuals that arise from prosecutorial conduct "intimately associated with the judicial phase of the criminal process."[24] "Thus, 'the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.'"[25] On the one hand, "[a] prosecutor is absolutely immune for initiating and pursuing a criminal prosecution, for actions taken in her role as 'advocate for the state' in the courts, or when her conduct is 'intimately associated with the judicial phase of the criminal process.'"[26] "On the other hand, a prosecutor is afforded only qualified immunity for acts performed in the course of 'administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.'"[27] The Individual Defendants bear the burden of proving

---

[22] Doc. 67 at 16. Plaintiffs identify the prolonged detention of material witnesses as a fifth category of conduct that forms the basis of some of their claims. Because this Court finds that Plaintiffs fail to state a claim on which relief could be granted with regard to their prolonged detention claims, it need not decide whether prosecutors enjoy absolute immunity for the conduct underlying those claims. In any event, prosecutors would enjoy qualified immunity with regard to these claims because Plaintiffs have failed to allege a constitutional violation committed by the prosecutors.

[23] 424 U.S. 409, 427–29 (1976).

[24] *Loupe*, 824 F.3d at 538 (5th Cir. 2016) (Imbler v. Pachtman, 424 U.S. 409, 430 (1976)).

[25] *Id.* at 538–39 (quoting *Buckley*, 509 U.S. at 273).

[26] *Id.* at 539 (quoting Hart v. O'Brien, 127 F.3d 424, 439 (5th Cir. 1997), *abrogation on other grounds recognized by* Spivey v. Robertson, 197 F.3d 772, 775–76 (5th Cir. 1999)); *see also Buckley*, 509 U.S. at 270.

[27] *Loupe*, 824 F.3d at 539 (quoting *Buckley*, 509 U.S. at 273).

that the "the conduct at issue served a prosecutorial function" such that it is covered by absolute immunity.[28]

Two points bear mentioning here. First, absolute immunity only protects *individuals* from claims for *damages*.[29] Thus, it does not bar Plaintiffs' claims for damages and injunctive relief against Cannizzaro in his *official* capacity, nor does it bar claims against the Individual Defendants for injunctive relief. Second, the Louisiana Supreme Court in *Knapper v. Connick* held that prosecutors enjoy absolute immunity against *state* law claims in addition to the immunity they enjoy from § 1983 claims.[30] The full scope of absolute prosecutorial immunity under Louisiana law is not clear,[31] but the Louisiana Supreme Court in *Knapper* cited heavily to federal law in its decision and adopted the functional approach that federal courts employ when analyzing prosecutorial absolute immunity issues.[32] For this reason, any conduct for which prosecutors enjoy absolute immunity in this case will apply equally to Plaintiffs' federal *and* state law claims.

---

[28] Hoog-Watson v. Guadalupe Cty., Tex., 591 F.3d 431, 437 (5th Cir. 2009) (quoting *Buckley*, 509 U.S. at 274).

[29] *See* Burge v. Par. of St. Tammany, 187 F.3d 452, 466 (5th Cir. 1999) ("The rule in this circuit is that a Louisiana district attorney, sued in his or her official capacity, is a local government official who is not entitled to Eleventh Amendment immunity."); Chrissy F. by Medley v. Mississippi Dep't of Pub. Welfare, 925 F.2d 844, 849 (5th Cir. 1991) ("Neither absolute nor qualified personal immunity extends to suits for injunctive or declaratory relief under § 1983.") (citing Pulliam v. Allen, 466 U.S. 522, 541–42 (1984)).

[30] *See* Knapper v. Connick, 681 So. 2d 944, 950–51 (La. 1996) (holding that prosecutors enjoy absolute immunity from state law malicious prosecution claims); State v. King, 956 So. 2d 562, 572 (La. 2007) (J. Weimer, concurring) ("A district attorney is granted broad civil immunity.") (citing *Knapper*, 681 So. 2d at 950).

[31] *See* Lester v. Caddo Par., No. 15-2008, 2016 WL 6270767, at *5 (W.D. La. Oct. 26, 2016) (suggesting that the Louisiana Supreme Court merely "adopted the federal rules for absolute immunity for prosecutors" in *Knapper*); Spikes v. Phelps, 131 F. App'x 47, 49 (5th Cir. 2005) (noting that the Louisiana Supreme Court has not squarely addressed whether its state law doctrine of prosecutorial absolute immunity distinguishes between individual and official capacity claims).

[32] *See Knapper*, 681 So. 2d at 946–51 (citing *Imbler*, 424 U.S. at 409; *Buckley*, 509 U.S. at 259; *Burns*; 500 U.S. at 478).

### b. Functional Absolute Immunity Analysis for Each Category of Alleged Prosecutorial Misconduct

#### i. Creation and Use of "Subpoenas"

Plaintiffs Singleton, Doe, LaCroix, and Bailey allege that some of the Individual Defendants created and delivered to them documents manufactured to look like subpoenas that had not been approved by a judge.[33] Defendants argue that absolute immunity shields prosecutors from liability for such conduct because the prosecutors performed it as part of trial preparations in active cases against criminal defendants—a quintessential prosecutorial function entitled to absolute immunity.[34] Plaintiffs respond that the Individual Defendants should not enjoy absolute immunity for such conduct because it is actually "investigative," not prosecutorial, and regardless the conduct occurred while the Defendants "were acting outside of their authority as prosecutors."[35]

In *Loupe v. O'Bannon*, the Fifth Circuit held that a prosecutor did not enjoy absolute immunity for ordering the warrantless arrest of a witness just moments after a judge had refused to jail the same witness.[36] The court reasoned that such conduct was not protected by absolute immunity because it was "not intimately associated with the judicial phase of the criminal

---

[33] *See* Doc. 52. *See also* Doc. 52 at 83 (example of a "subpoena").

[34] *See* Doc. 63-1 at 32. The Defendants attach minute entries from state court proceedings to filings in this case to show that the "subpoenas" were all issued *after* the initial trial date in each underlying criminal prosecution. *See* Docs. 63-4, 63-9, 88-3. The entries support Defendants' contention except in Baham's case, but the order of Baham's allegations in the Amended Complaint nevertheless suggests that the relevant conduct by prosecutors also took place after an initial trial setting had passed in the underlying criminal prosecution against Isaac Jones. *See* Doc. 52 at 49–52. In any event, this Court takes judicial notice of the minute entries, matters of public record, without converting Defendants' 12(b)(6) motion to one for summary judgment. *See* Davis v. Bayless, 70 F.3d 367, 372 n.3 (5th Cir. 1995).

[35] *See* Doc. 67 at 17. *See also Loupe*, 824 F.3d at 540 (noting that absolute immunity for prosecutors does not extend to conduct performed "outside the judicial process").

[36] *See Loupe*, 824 F.3d at 536, 540.

process."[37] To support its reasoning in *Loupe*, the Fifth Circuit cited approvingly to the Ninth Circuit's decision in *Lacey v. Maricopa County*.[38] In *Lacey*, the Ninth Circuit held that a prosecutor who issued subpoenas to grand jury witnesses without receiving proper authorization from a court or grand jury for the subpoenas was not entitled to absolute immunity for liability stemming from such conduct.[39] The court in *Lacey* reasoned that a prosecutor should not enjoy immunity when he "avoided taking the steps that would have protected him from suit, perhaps precisely to avoid the scrutiny of the grand jury or the court."[40] The court explained further, "[w]here the prosecutor has side-stepped the judicial process, he has forfeited the protections the law offers to those who work within the process."[41]

Like the prosecutors in *Loupe* and *Lacey*, Individual Defendants Cannizzaro, Martin, Pipes, Mitchell, Napoli, Petrovich, Rodrigue, and Dover side-stepped the judicial process to the extent that they created and disseminated "subpoenas" to compel witnesses to meet with them outside of court. Article 66 of the Louisiana Code of Criminal Procedure allows prosecutors to seek a subpoena from a court ordering a witness to meet with the prosecutor for questioning.[42] A prosecutor need only show "reasonable grounds" to justify the subpoena's issuance.[43] The power to issue the subpoena, however, rests entirely with the court.[44] The statute preserves the court's discretion over the issuance of a subpoena by stating that the court "may order"

---

[37] *Id.* at 540.
[38] *See id.* at 540. (citing Lacey v. Maricopa Cty., 693 F.3d 896, 914 (9th Cir. 2012)).
[39] *Lacey*, 693 F.3d at 913–14.
[40] *Id.* at 914.
[41] *Id.*
[42] LA. CODE CRIM. P. art 66.
[43] *Id.*
[44] *Id.*

that the subpoena be issued.[45] If a subpoena is issued, it is the clerk of court, not the prosecutor, who issues it.[46] The comments to the article note that the common practice before the adoption of the article was for district attorneys to issue notices for questioning that could only be enforced through the threat of further action, such as a grand jury subpoena.[47] There is no suggestion in the statute that prosecutors now have, or have ever had, the power to issue subpoenas themselves.[48]

Allegations that the Individual Defendants purported to subpoena witnesses without court approval, therefore, describe more than a mere procedural error or expansion of authority. Rather, they describe the usurpation of the power of another branch of government. The "subpoena template" allegedly disseminated by First ADA Martin includes language that the recipient is "Hereby Notified pursuant to LSA-CCRP art. 66 to appear before the District Attorney for the Parish of Orleans."[49] Plaintiffs allege that Defendants' entire scheme operated outside of the process legally required by the Louisiana Code of Criminal Procedure.[50] To find that such *ultra vires* conduct is "intimately associated with the judicial phase of the criminal process" would give no meaning to the "judicial phase" element of the standard.[51]

Furthermore, that the alleged activity by the Individual Defendants took place as a means to a prosecutorial end is not dispositive of the issue.

---

[45] *Id.*

[46] *Id.*

[47] LA. CODE CRIM. P. art 66 cmt. (a).

[48] *See* La. Att'y Gen. Op. No. 92-366 at 2 (June 23, 1992) ("[O]nly a court, a Clerk of court or a coroner have authority under Louisiana law to issue subpoenas. A district attorney may only request that a subpoena be issued. Therefore . . . a district attorney has no authority to issue any type of subpoena . . .").

[49] Doc. 52 at 83.

[50] *See id.*

[51] *See Loupe*, 824 F.3d at 540.

Under that logic, virtually all activity engaged in by a prosecutor would be absolutely immune from civil liability. The U.S. Supreme Court has rejected expanding prosecutorial absolute immunity so broadly, noting in *Burns v. Reed* that "[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive."[52] When it comes to absolute immunity for prosecutors, "it is the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant, that is of primary importance."[53] This Court finds that granting the Individual Defendants absolute immunity for allegations of systematic fraud that bypassed a court meant to check powerful prosecutors would not protect the proper functioning of a district attorney's office. It would instead grant prosecutors a license to bypass the most basic legal checks on their authority. The law does not grant prosecutors such a license.

In *Imbler*, the Supreme Court justified expanding the common law doctrine of absolute immunity to prosecutors by stating,

> It is fair to say, we think, that the honest prosecutor would face greater difficulty in meeting the standards of qualified immunity than other executive or administrative officials. Frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation.[54]

The allegation that Defendant Martin disseminated a template of a "subpoena" throughout the Orleans Parish District Attorney's Office undermines any

---

[52] Burns v. Reed, 500 U.S. 478, 495 (1991).
[53] *Loupe*, 824 F.3d at 538 (quoting Kalina v. Fletcher, 522 U.S. 118, 125 (1997)).
[54] *Imbler*, 424 U.S. at 425.

suggestion that Plaintiffs' allegations were the result of "serious constraints of time."[55] This is not the type of conduct absolute immunity is meant to protect.

The Supreme Court in *Imbler* further reasoned that "[t]he affording of only a qualified immunity to the prosecutor also could have an adverse effect upon the functioning of the criminal justice system."[56] Here, however, it was prosecutors alleged misconduct that Plaintiffs say affected the proper functioning of the criminal justice system.[57] As Justice White noted in his concurrence in *Imbler*, "[w]here the reason for the rule extending absolute immunity to prosecutors disappears, it would truly be 'monstrous to deny recovery.'"[58] This is just such a scenario. As such, the Individual Defendants are not entitled to absolute immunity for their alleged role in creating or delivering "subpoenas" to victims and witnesses of crimes.

### ii. Threatening Witnesses

The second type of conduct underlying Plaintiffs' claims involves "the use of verbal and written threats to gain access to witnesses outside of court and to influence witnesses' testimony."[59]

### 1. Verbal Threats of Imprisonment by ADAs to Plaintiffs

Plaintiffs argue that threats of imprisonment allegedly made by several of the Individual Defendants to several of the Plaintiffs should not be protected by absolute immunity.[60] Defendants respond that absolute immunity extends

---

[55] *See* Doc. 52 at 11–12, 80–82.

[56] *Imbler*, 424 U.S. at 426.

[57] Doc. 52 at 66 ("Silence Is Violence does not recommend that victims or their family members appear at the District Attorney's Office without a Silence Is Violence representative present. This representative's role is not only to advocate for the victim, but to serve as a witness if the victim is threatened, including with perjury, obstruction, or a material witness warrant for engaging in constitutionally protected activity.").

[58] *Imbler*, 424 U.S. at 445 (White, J., concurring in the judgment) (citation omitted).

[59] Doc. 67 at 16.

[60] *See id.* at 18–19.

to the preparation of witnesses for criminal prosecutions, which includes ensuring those such witnesses show up to testify at trial.[61]

Unlike the *ultra vires* creation and issuance of "subpoenas," generalized threats of imprisonment made by prosecutors do not necessarily fall so far outside the criminal phase of the judicial process to warrant denial of absolute immunity for such threats. Although the distinction is an admittedly fine one, threatening to imprison a witness to compel cooperation in a criminal prosecution while possessing the lawful means to follow through on that threat is not the same as manufacturing documents in violation of the lawful process for obtaining court-approved subpoenas for witnesses. Threatening witnesses—particularly verbally—with imprisonment to further witness cooperation in an active criminal prosecution seems to this Court to fall into the category of "pursuing a criminal prosecution" as an "advocate for the state."[62] Holding that such conduct fell outside the protections of absolute immunity would, in fact, potentially subject prosecutors to civil liability for exercising authority they lawfully possess under the law of Louisiana and many other states. The resulting restriction of prosecutorial discretion is exactly the type of concern the Supreme Court expressed when it first addressed the issue of absolute immunity for prosecutors under § 1983 in *Imbler*.[63]

This is the result of applying a doctrine that at times "leave[es] unaddressed the wrongs done by dishonest officers" as an alternative to "subject[ing] those who try to do their duty to the constant dread of retaliation."[64] For these reasons, the Individual Defendants are absolutely

---

[61] *See* Doc. 88 at 7.
[62] *See Loupe*, 824 F.3d at 539.
[63] *See Imbler*, 424 U.S. at 424–29.
[64] *Id. at* 428 (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d. Cir. 1949)).

15

immune for threats of imprisonment made to Plaintiffs in active criminal prosecutions.

## 2. Verbal Threats by Cannizzaro to SIV

Separately, Plaintiff SIV asserts claims for damages against Defendant Cannizzaro in his individual capacity based on allegations that he threatened to prosecute SIV's executive director for obstruction of justice or witness coercion if she continued to encourage witnesses and victims to not cooperate with prosecutors. "The decision to initiate . . . criminal charges is at the core of the prosecutorial function."[65] Because the Second Amended Complaint alleges that Defendant Cannizzaro "sought to 'persuade' with [his] prosecutorial power," absolute prosecutorial immunity applies to that alleged conduct.[66]

### iii. Use of Material Witness Warrants

The third type of alleged prosecutorial misconduct involves allegations that prosecutors lied in material witness warrant applications.[67] In a case decided months after the parties' briefed this Motion to Dismiss, the Fifth Circuit in *Doe v. Harris County* considered whether prosecutors enjoy absolute immunity when applying for material witness warrants.[68] The court held that "the appearance of witnesses for trial is intimately associated with a prosecutor's advocacy," and thus prosecutors are entitled to absolute immunity from claims related to such conduct.[69] Because that is the exact type of conduct

---

[65] McGruder v. Necaise, 733 F.2d 1146, 1148 (5th Cir. 1984).

[66] *Id.*

[67] *See* Simon v. City of New York, 727 F.3d 167, 174 (2d Cir. 2013) ("A material witness warrant serves the purpose of securing a witness's presence at a trial or grand jury proceeding."); Cooks v. Rapides Par. Indigent Def. Bd., 686 So. 2d 63, 65–66 (La. App. 3 Cir. 1996) (noting that the purpose of Louisiana's material witness statute is "to provide a procedure to prevent a material witness from removing himself from or from being taken from the jurisdiction of the court and to insure testimony from a material witness").

[68] *See* Doe v. Harris Cty., Texas, No. 18-20270, 2018 WL 6039171, at *2 (5th Cir. Nov. 16, 2018).

[69] *Id.* (citing Harris v. Dallas Cty. Dist. Attorney's Office, 196 F.3d 1256 (5th Cir. 1999)).

from which Plaintiffs' claims arise here, the Individual Defendants enjoy absolute immunity for this alleged conduct.

### iv. Failure to Supervise

Plaintiffs seek to hold Defendants Cannizzaro, Martin, and Pipes individually liable for supervising assistant district attorneys in a way that allowed constitutional violations to flourish, and Plaintiffs seek to hold all Individual Defendants liable for their failure to intervene in the matter. Supervising prosecutors enjoy absolute immunity for claims arising from allegations that they failed to properly train or prevent unlawful conduct when the underlying conduct would be protected by absolute immunity.[70] This Court believes that the same rule should extend to claims of failure to intervene. Therefore, Defendants Cannizzaro, Martin, and Pipes are absolutely immune from damages for their failure to supervise all conduct underlying Plaintiffs' claims except the creation and issuance of "subpoenas."

For the reasons explained above, the Individual Defendants enjoy absolute immunity for claims seeking damages based on alleged: (1) verbal threats of imprisonment made to Plaintiffs and verbal threats of criminal prosecution made to SIV's director; (2) misstatements or omissions in applications for material witness warrants and general abuses of the material witness warrant process; and (3) failures to supervise or intervene in the aforementioned conduct. The Individual Defendants are not absolutely immune for claims seeking damages based on allegations of: (1) creating or issuing "subpoenas" to Plaintiffs and (2) failures to supervise or intervene in the aforementioned conduct.

---

[70] *See* Van de Kamp v. Goldstein, 555 U.S. 335, 345–48 (2009).

## II.  Qualified Immunity

Defendants argue that to the extent their conduct is not covered by absolute immunity, it is covered by qualified immunity. Therefore, the Court will now analyze whether the Individual Defendants enjoy qualified immunity from claims for which they do not enjoy absolute immunity.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."[71] "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"[72] The Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[73] The Court has instructed lower courts "not to define clearly established law at a high level of generality."[74]

### a.  Fourth Amendment Unlawful Subpoena Claims

Plaintiffs LaCroix, Bailey, and Doe allege that Defendants Dover, Petrovich, Rodrigue, and Martin violated the Fourth Amendment by compelling the Plaintiffs to meet with them outside of court through the use of "subpoenas."[75] Defendants argue that they enjoy qualified immunity for the conduct alleged in these claims because Plaintiffs were not "seized" for Fourth Amendment purposes.[76] Even if seizures occurred, Defendants argue, because

---

[71] Heaney v. Roberts, 846 F.3d 795, 801 (5th Cir. 2017) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).

[72] Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

[73] Id. at 741.

[74] Id. at 742.

[75] See Doc. 52 at 69. The same claims also are made against Cannizzaro in his official capacity.

[76] See Doc. 63-1 at 32–35.

the law was not clear at the time of the alleged conduct regarding whether a potential witness in a criminal case has a right to refuse to meet with prosecutors, qualified immunity should still apply.

"There is a clearly established right to be free from unreasonable seizures under the Fourth Amendment."[77] Nevertheless, a "seizure" must in fact occur for a violation to exist.[78] "A person is 'seized' for Fourth Amendment purposes 'when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of the citizen.'"[79] "A seizure occurs 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that they were not free to leave.'"[80] Even voluntary submissions to a show of state authority can constitute seizures for Fourth Amendment purposes.[81]

### i. Plaintiffs Bailey and LaCroix

Bailey alleges that ADA Petrovich seized her in violation of the Fourth Amendment by issuing a "subpoena" that demanded she meet with prosecutors, which forced Bailey to hire a private attorney to challenge the "subpoena."[82] Bailey alleges that she did not feel at liberty to travel until the "subpoena" was dealt with.[83] LaCroix makes similar claims against ADA Rodrigue.[84] The Defendants respond that neither Bailey nor LaCroix was ever seized for Fourth Amendment purposes because neither Plaintiff ever complied

---

[77] *Heaney*, 846 F.3d at 801 (citing Michigan v. Summers, 452 U.S. 692, 696 (1981)). *See* U.S. Const. amend. IV.

[78] *See* Terry v. Ohio, 392 U.S. 1, 16 (1968).

[79] McLin v. Ard, 866 F.3d 682, 691 (5th Cir. 2017) (quoting *Terry*, 392 U.S. at 19 n.16).

[80] *Id.* (quoting Michigan v. Chesternut, 486 U.S. 567, 573 (1988)).

[81] *Id.* at 691–94 (collecting cases) (holding that voluntary surrender to arrest warrants at a sheriff's office constituted a seizure for Fourth Amendment purposes).

[82] *See* Doc. 52 at 55.

[83] *See id.* at 56.

[84] *See id.* at 56–57. The Plaintiffs also claim ADA Martin violated the Fourth Amendment by instructing ADAs to use the "subpoenas." *See id.* at 69.

with the "subpoena." That is, neither Plaintiff ever met with prosecutors after receiving a "subpoena."

Plaintiffs cite to no authority suggesting that the mere delivery of a document purporting to require a meeting with prosecutors constitutes a Fourth Amendment seizure.[85] Substantial case law indicates that such conduct likely does not rise to the level of a seizure for Fourth Amendment purposes.[86] As such, Plaintiffs have failed to show that a constitutional violation occurred. Even if Plaintiffs' apprehension of travel caused by the issuance of the "subpoena" constituted a seizure, the Individual Defendants still would enjoy qualified immunity on these claims because Plaintiffs fail to show that witnesses to crimes possess a clearly established constitutional right to refuse to speak with prosecutors.

Further, refusing to appear does not qualify as a seizure. Although a seizure may occur absent physical force, no matter the circumstances, "*submission* to [an] assertion of authority is necessary."[87] Here, Plaintiffs argue they "submitted" to the prosecutors' show of authority—the "subpoenas"—by hiring an attorney to challenge the documents.[88] But disputing a show of authority does not involve submission. Plaintiffs' challenge

---

[85] The only case referenced by Plaintiffs in this regard is *California v. Hodari D.*, 499 U.S. 621 (1991), which is distinguishable from this case. Doc. 67 at 38.

[86] *See Hodari D.*, 499 U.S. at 625–29 (suggesting that a seizure cannot occur where a plaintiff fails to comply with an official's show of authority); Martinez v. Carr, 479 F.3d 1292, 1299 (10th Cir. 2007) ("[T]he issuance of a citation, even under threat of jail if not accepted, does not rise to the level of a Fourth Amendment seizure."); Britton v. Maloney, 196 F.3d 24, 29–30 (1st Cir. 1999) ("*Terry* cannot be read to mean that the issuance of a summons (any more than a testimonial subpoena or a call to jury duty) would constitute a seizure simply because it threatens a citizen with the possibility of confinement if he fails to appear in court.").

[87] *McLin*, 866 F.3d at 691 (quoting *Hodari D.*, 499 U.S. at 626) (emphasis in original) (internal quotations omitted).

[88] Doc. 67 at 38–39 ("Plaintiffs submitted to the fraudulent subpoenas by treating them as they would real ones and undertaking the time, expense, and travel necessary to hire an attorney to challenge them.").

to the "subpoena" represented a show of defiance, the antithesis of submission. Accordingly, because neither Baham nor LaCroix was ever physically confined, nor did they ever submit to prosecutors' show of authority, their Fourth Amendment rights were not violated. Thus, the Individual Defendants enjoy qualified immunity from claims for monetary damages by Plaintiffs Bailey and LaCroix alleging that their receipt of "subpoenas" violated their Fourth Amendment rights.[89]

### ii. Plaintiff Doe

Unlike Bailey and LaCroix, Plaintiff Doe eventually met with prosecutors after allegedly receiving two "subpoenas." The meeting, however, occurred pursuant to a court order, not in response to the receipt of a "subpoena."[90] The question, then, is whether Doe's submission to the court's show of authority was unlawful. The allegations made by Doe, however, focus on the show of authority by prosecutors, not the court. Doe has thus failed to allege a Fourth Amendment violation by prosecutors in this regard, and the Individual Defendants enjoy qualified immunity from this claim.[91]

### b. First Amendment Claims

### i. Compelled Speech Claims

Plaintiffs Baham, Mitchell, Singleton, Doe, and Roe allege that they were compelled to speak with prosecutors against their will by the Defendants in violation of the First Amendment.[92] Additionally, Plaintiffs Bailey and

---

[89] Because Plaintiffs Bailey and LaCroix fail to allege a constitutional violation in this regard, they also have failed to state a Fourth Amendment claim based on the alleged receipt of "subpoenas" upon which relief could be granted. Accordingly, these claims are dismissed.

[90] *See* Doc. 52 at 54 ("The court ordered [Doe's attorney] to arrange a meeting for Ms. Doe to meet with prosecutors.").

[91] Because the Amended Complaint alleges sufficient facts to show that Cannizzaro had a policy of using "subpoenas" in violation of the Fourth Amendment rights of witnesses and victims of crimes, Doe's claims for injunctive relief survive Defendants' Motion to Dismiss.

[92] Doc. 52 at 70.

LaCroix claim that Cannizzaro's allegedly unlawful policy of compelling witnesses to speak with prosecutors violated their First Amendment rights even though they did not actually speak with prosecutors in response to "subpoenas."[93] Defendants argue that they enjoy qualified immunity from such claims because no constitutional violation occurred and, even if it did, the Defendants did not violate a "clearly established" right.

"[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."[94] But "the First Amendment's guarantee of freedom from 'compelled speech' is not absolute."[95] Indeed, if the First Amendment prohibited courts from compelling material witnesses to testify, then all material witness warrant statutes would violate the Constitution.[96]

At issue here is whether prosecutors' use of "subpoenas" to compel witnesses into meeting privately with prosecutors outside of court violates the First Amendment's compelled speech doctrine. Neither the Supreme Court nor the Fifth Circuit has provided a clear standard for analyzing compelled speech claims in this context. The Fifth Circuit has suggested that the government can defeat a compelled speech claim by showing that "essential operations of government require [the speech] for the preservation of an orderly society—as in the case of compulsion to give evidence in court."[97] The Second Circuit, however, has held that "the First Amendment right not to speak protects the

---

[93] *Id.*

[94] Wooley v. Maynard, 430 U.S. 705, 714 (1977).

[95] Entm't Software Ass'n v. Blagojevich, 469 F.3d 641, 651 (7th Cir. 2006).

[96] *See* W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 645 (1943) (Murphy, J., concurring) (explaining that "the right to refrain from speaking at all" can be overcome when "essential operations of government may require it for the preservation of an orderly society—as in the case of compulsion to give evidence in court.").

[97] United States v. Arnold, 740 F.3d 1032, 1035 (5th Cir. 2014) (quoting United States v. Sindel, 53 F.3d 874, 878 (8th Cir. 1995)) (internal quotations omitted).

right to refuse to make false statements to the government,"[98] and that "the right *not* to speak may be abrogated only under carefully policed circumstances."[99]

This Court need not decide today whether any of the Defendants violated any of the Plaintiffs' First Amendment rights by compelling witnesses into meeting privately outside of court to discuss active criminal cases through the use of "subpoenas." Plaintiffs fail to show that witnesses possess a clearly established right under the First Amendment to refuse to speak to prosecutors about active criminal cases. For that reason, the Individual Defendants enjoy qualified immunity from Plaintiffs' First Amendment compelled speech claims for damages.

### ii. Retaliation Claims

Plaintiffs allege that Defendants retaliated against them for exercising their First Amendment right to refuse to speak.[100] Defendants argue that the Individual Defendants enjoy qualified immunity from these claims to the extent they seek monetary damages from the Individual Defendants.[101]

"The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities."[102] To establish a First Amendment retaliation claim, a plaintiff in the Fifth Circuit must show: (1) that she engaged in constitutionally protected activity; (2) that the defendant's actions caused her "to suffer an injury that would chill a person of ordinary firmness from continuing the engage in that activity;" and (3) that the

---

[98] Burns v. Martuscello, 890 F.3d 77, 85 (2d Cir. 2018) (citing Jackler v. Byrne, 658 F.3d 225, 241 (2d Cir. 2011)).

[99] *Burns*, 890 F.3d at 85 (emphasis in original).

[100] *See* Doc. 52 at 70–72.

[101] *See* Doc. 63-1 at 37.

[102] Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002).

defendant's "adverse actions were substantially motivated against" her exercise of constitutionally protected speech.[103]

Plaintiffs engaged in constitutionally protected activity when they refused to speak to prosecutors absent a valid court order to do otherwise.[104] Plaintiffs allege injuries in the form of threats of imprisonment that prevented them from continuing to refuse to speak.[105] It appears, based on the timing of Plaintiffs' refusals to speak and the follow-up responses by prosecutors, that the adverse actions suffered by Plaintiffs were likely motivated by their refusal to speak.[106] Therefore, Plaintiffs have alleged a constitutional violation.[107] Nevertheless, because Plaintiffs' right to refuse to speak with prosecutors absent a court order was not clearly established when the violations occurred, the Individual Defendants enjoy qualified immunity from the civil damages sought in these claims.

---

[103] Brooks v. City of W. Point, Miss., 639 F. App'x 986, 989 (5th Cir. 2016) (quoting *Keenan*, 290 F.3d at 258)).

[104] *See Burns*, 890 F.3d at 85; *Jackler*, 658 F.3d at 241.

[105] *See* Izen v. Catalina, 398 F.3d 363, 368 n.5 (5th Cir. 2005) (noting that threatened prosecution constitutes in retaliation for an exercise of protected speech constitutes First Amendment infringement) (quoting Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir. 2001)).

[106] Plaintiff Singleton alleges that prosecutors caused her arrest immediately after she refused to answer their questions during a private meeting. Doc. 52 at 42. Plaintiff Mitchell alleges that prosecutors caused his arrest because he no longer wished to meet with them privately. *Id.* at 47. Plaintiff Baham alleges that prosecutors caused her arrest because she refused to meet with them. *Id.* at 50. Plaintiffs Doe, Bailey, and LaCroix allege they were threatened with arrest for refusing to meet with prosecutors. *Id.* at 53, 55, 56.

[107] Because this Court finds that Plaintiffs have alleged a constitutional violation in this regard, their claims for injunctive relief and for monetary damages from Cannizzaro in his official capacity remain. That is, they have stated facts to make out plausible First Amendment retaliation claims. This holding, however, does not apply to Plaintiff Roe's retaliation claim. The allegations do not show that Roe's arrest was substantially motivated by his refusal to speak. In fact, Roe never refused to speak in the first place. He never got the chance because prosecutors never reached him. *See* Doc. 52 at 58–62. As such, Plaintiff Roe has failed to state a First Amendment retaliation claim, and his claim must be dismissed.

### c. Fourteenth Amendment Substantive Due Process Claim

In Count Five of the Amended Complaint, Plaintiffs allege:

> Each of Defendant Cannizzaro's official policies, practices and customs described above, separately and in combination, shocks the conscience and violated the Fourteenth Amendment rights of all Plaintiffs and poses an ongoing risk of violating the Fourteenth Amendment rights of Plaintiff Baham, Plaintiff Doe, Plaintiff Roe, and the rights of Plaintiff Silence Is Violence and its clients.[108]

An executive official violates a person's substantive due process rights when the official's conduct is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."[109] The burden "to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme."[110] The Supreme Court's "test for the substantive component of the due process clause prohibits 'only the most egregious official conduct,' and will rarely come into play."[111]

Plaintiffs' allegations that prosecutors manufactured "subpoenas," deliberately side-stepping judicial oversight of the subpoena process, appears to this Court to represent a breed of official misconduct. Claims that the practice was not only condoned but directed by top prosecutors and the DA himself only make the allegations more disturbing. This Court believes that

---

[108] Doc. 52 at 73.

[109] *See* Reyes v. N. Texas Tollway Auth., 861 F.3d 558, 562 (5th Cir. 2017) (explaining that the Fifth Circuit applies the "shock the conscience" standard instead of rational basis when executive conduct is involved).

[110] Doe *ex rel.* Magee v. Covington Cty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 868 (5th Cir. 2012) (quoting J.R. v. Gloria, 593 F.3d 73, 80 (1st Cir. 2010)).

[111] Jordan v. Fisher, 823 F.3d 805, 812–13 (5th Cir. 2016), *as revised* (June 27, 2016) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).

Plaintiffs' claims sufficiently shock the conscience such that they allege a constitutional violation.[112]

Nevertheless, the Individual Defendants are entitled to qualified immunity on these claims. Plaintiffs fail to cite to any case law suggesting that the Defendants' violated a clearly established right of Plaintiffs. In their opposition to Defendants' Motion for Summary Judgment, Plaintiffs cite only to *Rochin v. California*, in which the Supreme Court held that illegally breaking into a person's apartment, attempting to pry open his mouth, and forcibly extracting the contents of his stomach amounted to conduct that "shocks the conscience."[113] This case is distinguishable from *Rochin*, and it does not support a finding that the prosecutors in this case violated clearly established law. Accordingly, the Individual Defendants enjoy qualified immunity for claims seeking damages based on allegations of substantive due process violations.

## III. Failure to State a Claim

The Defendants additionally argue that Plaintiffs' remaining claims should be dismissed for failure to state a claim on which relief could be granted.

### a. Fourth Amendment Material Witness Warrant Claims

Although the Individual Defendants enjoy absolute immunity from civil damages for Plaintiffs' claims that the Defendants violated the Fourth Amendment by abusing the material witness warrant process, claims for injunctive relief against the Individual Defendants and claims for injunctive relief and damages against Cannizzaro in his official capacity remain.

---

[112] This finding defeats Defendants' argument that Plaintiffs have failed to state a substantive due process claim upon which relief could be granted.
[113] Rochin v. California, 342 U.S. 165, 172 (1952).

Plaintiffs Singleton, Baham, Mitchell, Roe, and SIV allege that Defendants Cannizzaro, Mitchell, Pipes, Napoli, Trummel, Hamilton, and Dawkins violated the Fourth Amendment by "relying on false allegations, material omissions, and plainly insufficient factual allegations in applications for material witness warrants."[114] Defendants argue that Plaintiffs' allegations fail to state a claim on which relief may be granted.[115]

In *Franks v. Delaware*, the U.S. Supreme Court held that an official violates the Fourth Amendment when the official makes materially false statements—either deliberately or with reckless disregard for the truth—in support of a warrant that are necessary to a court's finding of probable cause.[116] The Fifth Circuit has extended the applicability of *Franks* beyond affirmatively false statements to material omissions.[117] The Fifth Circuit has not, however, decided whether *Franks* extends to material witness warrants. But other federal courts have held that it does.[118] Because innocent material witnesses deserve at least as much constitutional protection as criminal defendants, this Court believes that it is appropriate to extend *Franks* to material witness warrants.

Under *Franks*, a court must consider whether an official's statements or omissions were "necessary to [a] finding of probable cause."[119] "The test for

---

[114] Doc. 52 at 68.

[115] Doc. 63-1 at 31.

[116] *See* Franks v. Delaware, 438 U.S. 154, 155–56 (1978).

[117] Michalik v. Hermann, 422 F.3d 252, 258 n.5 (5th Cir. 2005) ("The Fifth Circuit has interpreted *Franks* liability to also include liability for an officer who makes knowing and intentional *omissions* that result in a warrant being issued without probable cause.") (emphasis in original).

[118] *See, e.g.*, United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003); Al-Kidd v. Gonzales, No. 1:05-093, 2012 WL 4470776, at *4 (D. Idaho Sept. 27, 2012); United States v. Padilla, No. 04-60001, 2007 WL 188146, at *2–5 (S.D. Fla. Jan. 22, 2007); Mayfield v. Gonzales, No. 04-1427, 2005 WL 1801679, at *7 (D. Or. July 28, 2005).

[119] *Franks*, 438 U.S. at 156. It is not clear to this Court whether the Fourth Amendment requires a probable cause finding to justify detaining a material witness. *See Ashcroft*, 563

probable cause is not reducible to 'precise definition or quantification.'"[120] This is especially true in the context of material witness warrants. The Sixth and Ninth Circuits have held that probable cause exists when the statutory prerequisites for arresting a material witness have been met.[121] The parties seem to agree that such a standard is the appropriate one here.[122]

Louisiana's Material Witness Statute requires prosecutors to show that a witness's testimony "is essential to the prosecution" and that "it may become impracticable to secure the presence of the person by subpoena."[123] Thus, this Court believes probable cause exists to detain a material witness in Louisiana if the facts and circumstances within the knowledge of the prosecutor show that the witness's testimony is essential to the state's case and that it may become impracticable to secure the witness's presence at trial by subpoena.

---

U.S. at 745 (Kennedy, J., concurring) ("If material witness warrants do not qualify as 'Warrants' under the Fourth Amendment, then material witness arrests might still be governed by the Fourth Amendment's separate reasonableness requirement for seizures of the person."); Adams v. Hanson, 656 F.3d 397, 408 n.6 (6th Cir. 2011) ("The probable-cause standard may be inapplicable, however, because '[t]he typical arrest warrant is based on probable cause that the arrestee has committed a crime,' which is not the standard for the issuance of material-witness warrants.") (quoting *Ashcroft*, 563 U.S. at 745). Faced with the exact question, the Third Circuit in *Schneyder v. Smith* held that material witness warrants need only be supported by objective reasonableness, not probable cause. 653 F.3d 313, 322–25 (3d Cir. 2011); *see* Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991) (describing the probable cause standard as "more stringent" than the "lower standard" of objective reasonableness). Because material witnesses deserve as much protection under the Fourth Amendment as criminal defendants and the Third Circuit's standard has not spread into other circuits, this Court will apply the probable cause standard to Plaintiffs' *Franks* claims.

[120] Fla. v. Harris, 568 U.S. 237, 243 (2013) (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)).

[121] *See* White by Swafford v. Gerbitz, 892 F.2d 457, 461 (6th Cir. 1989); *Perkins*, 148 F. Supp. 2d at 1183 ("The probable cause required by *White* was a showing that the statutory requirements had been met.") (citing *White*, 892 F.2d at 461); Bacon v. United States, 449 F.2d 933, 943 (9th Cir. 1971).

[122] *See* Docs. 63-1 at 27, 67 at 25.

[123] LA. REV. STAT. § 15:257.

Under *Franks*, to assess whether allegedly false statements and omissions were necessary to a finding of probable cause, a court must "consider the faulty affidavit as if those errors and omissions were removed."[124] A court must then "examine the 'corrected affidavit' and determine whether probable cause for the issuance of the warrant survives the deleted false statements and material omissions."[125] Accordingly, this Court must consider whether probable cause existed to detain Plaintiffs Singleton, Baham, Mitchell, and Roe if the allegedly false statements were deleted from, and the allegedly material omissions were added to, their respective warrant applications.

### i. Singleton's *Franks* claims

The statement supporting probable cause in the application for Singleton's material witness warrant read as follows:

> The testimony of Singleton is essential to the prosecution of the above entitled case. She is the victim of the simple battery and criminal damage to the property amounting less than $500.

> The State has reason to fear Singleton will not appear in Court pursuant to a subpoena as she has failed to appear pursuant to an appointment with the undersigned, and she has failed to appear in court at every other trial setting that she was issued a subpoena for.

> Singleton received improper domiciliary service, as a subpoena was left in the door of the residence of Singleton on March 6, 2015. Singleton did not appear for trial when it was set on March 20, 2015.

> The undersigned has made attempts to contact Singleton since March 2015. The undersigned attempted to contact Singleton numerous times at the phone number provided by Singleton, to no avail.

---

[124] *See* Winfrey v. Rogers, 901 F.3d 483, 494–95 (5th Cir. 2018).
[125] *Id.* at 495.

The Sheriff's Office has made numerous attempts to serve Singleton at her primary address with no success. They have been to her residence three times and have left subpoenas in her door due to no one accepting service at the residence on her behalf.

On April 20, 2015, the undersigned contacted Orleans Parish District Attorney's Office Victim-Witness Advocate Amy Jackson, to determine if Jackson possessed alternative phone numbers for Singleton. The undersigned was informed that Singleton had never been cooperative with Victim-Witness Advocate Jackson, but did provide the undersigned with an alternative phone number for Singleton. The undersigned attempted to contact Singleton at the alternative phone number, to no avail.

Orleans Parish District Attorney Investigator Corey Porter has made numerous attempts to locate Singleton since April 20, 2015. On that day, the undersigned, accompanied by Investigator Porter, traveled to the last known address for Singleton in an attempt to serve Singleton with a subpoena and conduct an interview, to no avail.

On April 21, 2015, Investigator Porter traveled to the Astor Crowne Plaza, the last known employer of Singleton. Investigator Porter learned that Singleton had ceased her employment with the Astor Crowne Plaza approximately one month prior.

On April 21, 2015 Investigator Porter traveled to the last known residence of Singleton with a subpoena and conduct an interview. Investigator Porter observed a Toyota Camry, associated with Singleton, parked in the driveway of the residence. Investigator Porter knocked on the front door of the residence and waited for a response from someone present inside of the residence, to no avail. Investigator Porter left two subpoenas at the residence for Singleton to appear at the District Attorney's Office on April 24, 2015.

On April 23, 2015, the undersigned attempted to
contact Singleton at the last known phone numbers of
Singleton, to no avail.[126]

Singleton objects to the truthfulness of the application on the following
grounds: (1) that it created a misleading impression that Singleton was validly
served with subpoenas for the April 24th trial date; (2) that the "subpoenas"
left by Porter at Singleton's home were not validly created subpoenas; (3) that
Singleton was not home when sheriff's deputies attempted to serve her with
subpoenas at her home; and (4) that saying Singleton had "never been
cooperative" with a victim-witness advocate misleadingly suggests Singleton
would not respond to a validly issued subpoena.[127]

The problem with Singleton's objections is that for the most part they
challenge *truthful* statements as misleading. The application does not state
that Singleton was ever validly served with a subpoena; it states that she
"received improper domiciliary service" and that subpoenas were left at her
door, which does not imply that proper service occurred.[128] Instead, the
application truthfully conveys that deputies unsuccessfully attempted to serve
Singleton with a subpoena. Similarly, Singleton does not challenge the fact
that she refused to cooperate with the DA's Office.

Excluding the allegedly false statements in the warrant that some of the
"subpoenas" left at Singleton's home were not actually subpoenas, and adding
the omitted allegation that Singleton was not home when service was
attempted on her, does not change the fact that the application as amended
would contain probable cause to arrest Singleton on a material witness
warrant. Such an application would still show that Singleton was a key witness

---

[126] Doc. 63-3.
[127] *See* Doc. 67 at 27–28.
[128] *See* Doc. 63-3.

to the prosecution's case, that service was attempted on her numerous times but never accomplished, and that Singleton had not been cooperative with the investigation by the DA's Office in the underlying criminal offense against her. Such statements are sufficient to show that her testimony was essential to the prosecution's case and that it may have been impracticable to secure her testimony by subpoena. As such, Singleton's *Franks* claim must fail.

### ii. Mitchell's *Franks* claims

The statement supporting probable cause in the application for Mitchell's material witness warrant read as follows:

> The testimony of Mark Mitchell is essential to the prosecution of the above entitled case.
>
> On 4/4/16 Assistant District Attorney's Mike Trummel, Matthew Hamilton, as well as District Attorney's Office investigator Pamela Butler, and victim witness counselor Julie Ferguson met with Mark Mitchell outside his place of work. This meeting took place after numerous text messages and phone calls in which Mark Mitchell indicated this would be the last meeting he would have with the District Attorney's Office and did not want to move forward with the case. At the meeting Mark Mitchell stated the only way in which he would testify was if he was arrested.
>
> Mark Mitchell has given statements to the New Orleans Police Department implicating the defendant, Gerard Gray, in the above numbered case. Mark Mitchell has also testified at a trial against Gerard Gray's codefendant, Jonterry Bernard.[129]

Mitchell objects to the truthfulness of the application on the following grounds: (1) it falsely says Mitchell stated "the only way in which he would testify was if he was arrested;" (2) it omits that he signed a subpoena during the April 4th

_____

[129] Doc. 63-10.

meeting with prosecutors agreeing to testify in court on April 11, 2016; (3) it omits that Mitchell had cooperated with prosecutors in the past and had met with them several times to prepare the case for trial; (3) it omits that Mitchell had previously testified against the co-defendant in the case; and (4) it omits that prosecutors had pressured Mitchell to "alter his account of events" to support the state's case.[130]

Deleting the allegedly false statements—that Mitchell would only testify if arrested—and adding the material omissions—that Mitchell had cooperated with prosecutors in the past and had signed a subpoena in the presence of prosecutors agreeing to appear in court just two days before the material witness warrant was issued—to Mitchell's application, this Court finds that Mitchell has stated a viable *Franks* claim. At least one federal district court has held that omitting the fact that a material witness had previously cooperated with investigators constitutes a particularly concerning material omission for *Franks* purposes.[131] This Court agrees and finds it even more troubling to omit that the material witness signed a subpoena agreeing to appear in court just days before prosecutors then sought to jail the witness on the grounds that securing his testimony by subpoena may be impracticable. If the allegedly false statement that Mitchell would only testify if arrested is deleted from the warrant, the only statement left supporting the application would be the fact that he "did not want to move forward with the case."[132] That

---

[130] Doc. 67 at 29. Mitchell additionally objects on the ground that prosecutors told the judge orally that Mitchell had bought a bus ticket to leave town, but in fact Mitchell had bought no such bus ticket. *Id.* Because no such fact appears in the application, this Court cannot consider it as part of Mitchell's *Franks* claim.

[131] *See Al-Kidd*, 2012 WL 4470776, at *3 ("In particular, this Court finds the omissions that the Plaintiff 1) is a United States citizen with familial and community ties to the United States and 2) had previously cooperated with law enforcement were material and necessary to the Magistrate Judge's probable cause determination.").

[132] Doc. 63-10.

statement alone—particularly in light of the material omissions—is not enough to show probable cause to arrest Mitchell on a material witness warrant. As such, his *Franks* claim survives.

### iii. Baham's *Franks* claims

The statement supporting probable cause in the application for Baham's material witness warrant read as follows:

> The testimony of Lazonia Baham is essential to the prosecution of the above entitled case.
>
> Lazonia Baham was notified by Orleans Parish District Attorney's Office Investigator Mike Kitchens that she was an essential witness in the above stated case and would be needed to testify. Ms. Baham refused to meet with ADA Jason Napoli and cut off all communication with the District Attorney's Office. Despite multiple visits to her home, Ms. Baham refuses to speak with Investigator Kitchens and has refused to return multiple phone calls. The actions of Ms. Baham indicate that she is intentionally avoiding service and will not come to court on her own accord.
>
> Lazonia Baham has given statements to the New Orleans Police Department implicating the defendant, Issac Jones, in the above numbered case.[133]

Baham objects to the truthfulness of the application based on the following allegedly intentional and material omissions: (1) that Baham had previously spoken several times with investigators from the DA's Office; (2) that the DA's Office had pressured her to change her recollection of events to support the state's case; (3) that Defendant Napoli had sent Baham "subpoenas;" and (4) that Baham had stated she would come to court if subpoenaed.[134]

---

[133] Doc. 63-8.
[134] Doc. 67 at 31.

Deleting the allegedly false statement—that Baham would not come to court on her own accord—and adding the material omissions—that she had previously spoken with investigators several times and that she told prosecutors she would come to court if subpoenaed—this Court finds that Baham has stated a viable *Franks* claim. Baham alleges that she told prosecutors she would respond to a subpoena. Baham's refusal to speak with a DA's Office investigator, without more, does not indicate that it may have been impracticable to secure her testimony by subpoena when the application fails to state whether service had ever been attempted on her and that she had said she would respond to a subpoena. As such, Baham's *Franks* claim survives.

### iv.  Roe's *Franks* claims

The statement supporting probable cause in the application for Roe's material witness warrant read as follows:

> The testimony of Roe is essential to the prosecution of the above entitled case.  Roe is a named victim in the bill of indictment.

> The State has reason to fear Roe will not appear in Court. Attempts to reach Roe at his home and by phone by members of the Orleans Parish District Attorney's Office have been unsuccessful. Messages left for Roe have gone unanswered.

> Roe has given statements to the New Orleans Police Department implicating the defendant in the above numbered case.[135]

Roe objects to the truthfulness of the application on the following grounds: it omits that (1) he cooperated with police near the time of the incident the DA's Office was investigating; (2) despite having notice that Roe had moved, prosecutors only sent subpoenas to Roe's old address; (3) neither prosecutors

---

[135] Doc. 63-11.

nor police had attempted to contact Roe for nearly two years after he first cooperated in the underlying investigation; and (4) prosecutors "did not make basic reasonable attempts to locate Roe" such as attempting to reach him through Facebook.[136] Roe further objects that saying "[a]ttempts to reach [him] at his home . . . have been unsuccessful" is false because prosecutors knew he had moved but had not tried to locate him at his new home.[137]

Construing the allegations in the light most favorable to Roe, this Court will consider the statement regarding attempts to reach him at his home as false. Deleting that statement from the application and adding the facts that Roe had been cooperative from the beginning and had simply moved and changed phone numbers, this Court finds that such an application would not have shown that it may have been impracticable to secure Roe's presence in court via subpoena. Instead, this application merely shows that prosecutors had trouble tracking down Roe. Failing to respond to subpoenas sent to an old address and to messages left at a since-changed phone number does not indicate that Roe would not have responded to a subpoena. As such, Roe's *Franks* claim survives.

### b. First Amendment Compelled Speech Claims

Even though the Individual Defendants enjoy qualified immunity from Plaintiffs' First Amendment compelled speech claims seeking monetary damages, monetary claims against Cannizzaro in his official capacity and claims for injunctive relief against the Defendants remain.

Prosecutors in Louisiana may compel witnesses to meet with them out of court by securing a subpoena from a judge.[138] Prosecutors do not, however,

---

[136] Doc. 67 at 34.
[137] *Id.*
[138] LA. CODE CRIM. P. art 66.

have the power to force witnesses to talk to them absent a court order.[139] Nor do they have the power to imprison witnesses who refuse to speak with them absent a judicially approved material witness warrant, which judges should only grant when the witness's testimony is "essential" and the state shows "that it may become impracticable to secure the presence of the person by subpoena."[140]

Plaintiffs Baham, Mitchell, Singleton, Doe, and Roe allege that they were unlawfully compelled to speak with prosecutors who used fraudulent shows of authority to secure the presence of the Plaintiffs at private meetings. Additionally, Plaintiffs Mitchell and Baham allege that the State encouraged them to change their stories, behavior that could be characterized rather innocently as a memory recollection effort or more villainously as an attempt to foster fabricated testimony.[141] At the Motion to Dismiss stage, such allegations are sufficient to overcome a 12(b)(6) challenge to Plaintiffs' First Amendment compelled speech claims against Defendant Cannizzaro in his official capacity and against the Individual Defendants for injunctive relief.

The same cannot be said for Plaintiffs Bailey and LaCroix. Neither woman ever met with prosecutors in response to the receipt of a "subpoena." Thus, even if prosecutors attempted to compel them to speak, neither Bailey nor LaCroix ever spoke in response to such conduct. Plaintiffs' argue that their hiring of an attorney to challenge the "subpoenas" represents sufficient compelled speech to support their claims. This Court disagrees. Plaintiffs Bailey and LaCroix have failed to state a First Amendment compelled speech claim that is plausible on its face.

---

[139] *See id.*
[140] *See* LA. REV. STAT. § 15:257.
[141] *See* Doc. 52 at 46, 50.

### c. Fourteenth Amendment Prolonged Detention Claims

Plaintiff Baham alleges that Defendant Napoli violated her Fourteenth Amendment Due Process rights by causing her to be jailed on a material witness warrant then refusing to ensure she received a prompt court appearance. She also alleges an official capacity claim against Defendant Cannizzaro on the ground that Napoli was following the DA's allegedly unlawful policy of causing material witnesses to be deprived of prompt initial appearances when she sat in jail for more than a week awaiting an initial appearance following her arrest in 2015. Plaintiffs Doe and Roe seek injunctive relief against Cannizzaro regarding the same allegedly unlawful policy, and SIV asserts a prolonged detention claim on the same grounds.

The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law."[142] "Prohibition against improper use of the 'formal restraints imposed by the criminal process' lies at the heart of the liberty interests protected by the Fourteenth Amendment due process clause."[143] Said differently, incarcerating a person without sufficient due process constitutes a textbook Fourteenth Amendment violation.

In Orleans Parish, however, it is not the responsibility of prosecutors to ensure that material witnesses receive prompt initial appearances before a judge. Rule 15.0(12) of the Rules for the Orleans Parish Criminal District Court provides that "[i]f a material witness warrant of arrest is issued . . . the court shall require the moving party to file the material witness motion and the capias/warrant with the Clerk of Court." Rule 15.0(9) further provides that

---

[142] U.S. Const. amend. XIV.

[143] Jones v. City of Jackson, 203 F.3d 875, 880–81 (5th Cir. 2000) (quoting Board of Regents v. Roth, 408 U.S. 564, 575 (1972)).

"[w]henever a capias has been executed, the clerk shall place the individual on the docket and jail list of the appropriate Section . . . ."

Pursuant to Rule 15.0(12), Defendant Napoli filed a material witness motion before Judge Laurie White that was granted on October 13, 2015.[144] Baham alleges that police arrested her on December 29, 2015.[145] According to Rule 15.0(9), it then became the clerk of court's responsibility to place Baham on the appropriate judge's docket to be brought to court for an initial appearance.

Baham alleges that she was not brought to court for an initial appearance until January 6, 2016.[146] It is not clear from the record why Baham spent more than a week in jail before being taken to court for an initial appearance. What is clear is that it was not the responsibility of prosecutors— but of the clerk of court—to ensure that Baham received a prompt initial appearance before a judge. As such, prosecutors cannot be held liable under the Fourteenth Amendment for allegedly prolonged detentions of material witnesses. Plaintiffs have thus failed to state a Fourteenth Amendment prolonged detention claim on which relief could be granted.

## IV. Plaintiffs' State Law Claims

### a. Abuse of Process

Plaintiffs allege that Defendants committed the tort of abuse of process under Louisiana law. Specifically, Plaintiffs allege abuse of the material witness and investigative subpoena legal processes. Defendants argue that they are absolutely immune from civil damages for such claims and that the remaining claims should be dismissed for failure to state a claim.

---

[144] Doc. 63-8 at 2.
[145] Doc. 52 at 51.
[146] *Id.*

### i. Abuse of Process: Louisiana's Material Witness Statute

Because Louisiana extends absolute immunity to prosecutors to the same extent as federal law does, for the reasons explained previously in this Order and Reasons, Defendants are absolutely immune from civil damages arising from allegations that they abused the process of the material witness statute. Claims against Defendant Cannizzaro in his official capacity and those against the Individual Defendants for injunctive relief remain.

To succeed on a Louisiana abuse of process claim, a plaintiff must show an improper willful act in the use of a legal process and the existence of an ulterior purpose.[147] Plaintiffs allege that prosecutors applied for material witness warrants—a legal process that exists to secure essential witness testimony in court—with the ulterior purpose of securing private meetings with the witnesses outside of court. The material witness statute arms prosecutors with an extraordinary tool for ensuring that witnesses with testimony necessary to the state's case do not skip trial dates.[148] The statute does not exist as a means of forcing witnesses into private meetings with prosecutors, which is exactly how Plaintiffs allege that the Defendants abused the process. Therefore, Plaintiffs' remaining abuse of process claims survive.

### ii. Abuse of Process: Louisiana's Investigative Subpoenas

As previously explained in this Order and Reasons, the Individual Defendants do not enjoy absolute immunity for the creation and use of "subpoenas" to obtain out-of-court meetings with witnesses. Plaintiffs allege that the Defendants flouted the investigative subpoena process provided by

---

[147] *See* Mills v. City of Bogalusa, No. 13-5477, 2016 WL 2992502, at *14 (E.D. La. May 24, 2016) (citing Waguespack, Seago and Carmichael v. Lincoln, 768 So. 2d 287, 290–91 (La. App. 1 Cir. 2000)).

[148] *See* LA. REV. STAT. § 15:257. *See also Ashcroft*, 563 U.S. at 749 n.2 (J. Ginsburg, concurring) (noting "the importance of vigilant exercise" of judicial oversight when analyzing material witness warrant applications)

Article 66 of the Louisiana Code of Criminal Procedure by serving "subpoenas" on several of the Plaintiffs with the ulterior purpose of avoiding judicial oversight.[149] Such allegations amount to an abuse of process. Taken as true, Plaintiffs' allegations show that the Defendants did not follow the investigative subpoena procedure provided for by law and that the reason for such activity was to avoid judicial oversight.[150] Plaintiffs, therefore, have stated plausible abuse of process claims involving the investigative subpoena process.

### b. Fraud

Plaintiffs Singleton, Baham, Doe, Bailey, and LaCroix also make state law fraud claims against Cannizzaro in his official capacity and against Defendants Mitchell, Napoli, Petrovich, Rodrigue, Dover, Doe, and Martin in their individual capacities. A fraud claim under Louisiana law requires a plaintiff to show that she was injured because she reasonably relied on a defendant's intentionally deceiving misrepresentation of material fact.[151] Defendants argue that Plaintiffs' fail to state a claim because "none of them actually appeared at the DA's office as directed."[152] That is, even if prosecutors made intentionally deceiving misrepresentations of material fact in the "subpoenas," the Plaintiffs suffered no injury because of such misrepresentations.

As to the fraud claim by Plaintiff Singleton, this Court agrees with Defendants. Singleton alleges that she did not respond to the "subpoenas" left at her home.[153] Although she eventually met with prosecutors at the DA's Office, Singleton alleges that she attended that meeting under the threat of

---

[149] *See* La. Code Crim. P. art 66.

[150] *See* Doc. 52 at 75.

[151] Schaumburg v. State Farm Mut. Auto. Ins. Co., 421 F. App'x 434, 442 (5th Cir. 2011) (citing Wooley v. Lucksinger, 14 So. 3d 311, 378–79 (La. App. 1 Cir. 2008)).

[152] Doc. 63-1 at 43.

[153] *See* Doc. 52 at 41–42.

arrest pursuant to a material witness warrant. In fact, Singleton alleges that she ignored the "subpoenas" on the advice of a friend.[154] Any injuries alleged by Singleton, then, did not occur because of her reliance on alleged misrepresentations made by prosecutors. Her fraud claims must fail.

The same reasoning warrants the dismissal of Plaintiff Baham's fraud claim. She also chose not to respond to the "subpoenas" sent to her.[155] Any harm alleged by her was not because of misrepresentations in the "subpoenas."

The allegations by Plaintiffs Doe, Bailey, and LaCroix differ in a materially different respect. Each of these Plaintiffs allege that they hired private attorneys in direct response to being served with "subpoenas." That is, they suffered an injury—the cost of a private attorney—because they reasonably relied on the threats of fines and imprisonments that appeared as intentionally deceptive material misrepresentations within the "subpoenas." Defendants have cited to no case law suggesting that such an injury is insufficient to establish a fraud claim under Louisiana law. At this early stage in the proceedings, Plaintiffs Doe, Bailey, and LaCroix have pleaded sufficient facts to support their fraud claims to survive Defendants' 12(b)(6) challenge.

## V.    SIV's Claims

SIV alleges federal and state law claims based both on violations of its own rights and separately for violations of the rights of its clients.[156] Defendants move to dismiss these claims on the ground that SIV "has failed to adequately allege any actionable violation of its own rights or the rights of its 'clients.'"[157]

---

[154] *See id.* at 40.
[155] *See id.* at 50.
[156] *See* Doc. 52.
[157] Doc. 63-1 at 46.

### a. SIV's First Amendment Retaliation Claim

Because Defendant Cannizzaro enjoys absolute immunity for his threats of prosecution to SIV, its claims against him seeking civil damages must be dismissed. SIV's claims against Cannizzaro in his official capacity and for injunctive relief based on the DA's Office's allegedly unlawful *policy* of retaliation, however, are sufficient to overcome Defendants' 12(b)(6) challenge for the same reason such claims by the other Plaintiffs survive.

### b. SIV's Other Federal Claims

Defendants move to dismiss SIV's remaining federal claims on two separate grounds. First, Defendants argue that SIV's claims on behalf of its clients must fail because Plaintiff Mitchell is SIV's only client identified by name in the Amended Complaint, and "his claims fail for all the reasons explained [in the Motion to Dismiss]."[158] This Court has already decided that some of Plaintiff Mitchell's claims survive Defendants' Motion. Additionally, Defendants have cited to no case law providing that SIV cannot make claims on behalf of clients who are mentioned without a name in the Amended Complaint.[159] As such, SIV's claims on behalf of its clients survive.

Second, Defendants argue that SIV's own claims must be dismissed because SIV has not "adequately alleged facts showing that its own rights were violated."[160] Under the doctrine of organizational standing, however, an entity may bring claims "where it devotes resources to counteract a defendant's allegedly unlawful practices."[161] The allegedly unlawful activity need not

---

[158] *See* Doc. 63-1 at 46.

[159] *See id.*

[160] *Id.* at 46.

[161] Scott v. Schedler, 771 F.3d 831, 837 (5th Cir. 2014) (quoting Ass'n of Cmty. Organizations for Reform Now v. Fowler, 178 F.3d 350, 360 (5th Cir. 1999)).

violate the organization's *own* rights.[162] Instead, all an organization must show is "that it has suffered a concrete and demonstrable, and redressable, injury as a direct result of the defendant's allegedly illegal conduct."[163]

Here, SIV alleges that it was forced to devote resources to educating and representing witnesses and victims of crime because of the allegedly unlawful policies of the DA's Office. It need not—and indeed does not appear to—allege violations of its own constitutional rights to bring claims against Defendants.[164] At the pleadings stage, SIV's allegations are sufficient to state claims on which relief could be granted.[165]

This Court recognizes that Defendants do not challenge SIV's Article III standing in their Motion to Dismiss, and that in their Reply brief they expressly reserved such a challenge.[166] Thus, Defendants may challenge both SIV's "associational" standing—its standing to bring claims on behalf of its clients—and SIV's organizational standing at a later juncture.[167]

### c. SIV's State Law Claims

As an initial matter, Defendants' do not appear to challenge SIV's fraud claims under Louisiana law in their Motion to Dismiss except to argue that

---

[162] *See, e.g.*, Latino All. for Human Rights v. Governor of Georgia, 691 F.3d 1250, 1260 (11th Cir. 2012) (holding that organizations alleging redirection of resources caused by allegedly unconstitutional statute resulted in organizational standing for plaintiffs); Friendly House v. Whiting, No. 10-1061, 2010 WL 11452277, at *6 (D. Ariz. Oct. 8, 2010) ("The organizational Plaintiffs have sufficiently alleged that the civil rights violations they claim will . . . require, or have already required, them to divert resources and that the violations will injure their organizational missions. Plaintiffs have alleged a sufficient injury in fact for purposes of standing to raise their civil rights claims.").

[163] *Fowler*, 178 F.3d at 361 n.7.

[164] *See* Doc. 67 at 31.

[165] *See, e.g.*, OCA-Greater Houston v. Texas, 867 F.3d 604, 612 (5th Cir. 2017) (finding that an organization possessed organizational standing where it alleged that "its time and resources [were spent] in a way they would not have been spent absent" the challenged law).

[166] *See* Docs. 63-1; 88 at 21.

[167] *See OCA-Greater Houston*, 867 F.3d at 610 (explaining the difference between associational and organizational standing).

such claims are barred by absolute immunity.[168] This Court has already decided that Defendants' alleged creation and use of "subpoenas" is not covered by absolute immunity. Because that is the alleged conduct that underlies Plaintiffs' fraud claims, Defendants do not enjoy absolute immunity from SIV's fraud claims.

Regarding SIV's abuse of process claims, Defendants argue that such claims should fail because "SIV cannot satisfy the basic tort-law requirement of causation."[169] In support, Defendant argues that the redirection of resources "fails, as a matter of law, to allege a harm that was directly caused by Defendants."[170] Defendants cite to no case law to support this argument.

SIV alleges that Defendants' use of "subpoenas" and misuse of the material witness warrant statute caused SIV to re-direct resources away from its core mission to "ensur[e] that victims of crime are not victimized again by the District Attorney's Office."[171] More specifically, SIV has alleged that Defendants abused the legal process necessary for material witness warrants and investigative subpoenas, that such abuses were done with the ulterior purpose of coercing victims and witnesses of crimes into out-of-court meetings, and that SIV suffered damages by having to re-allocate its resources because of the alleged violations. At the pleadings stage, such allegations are sufficient to state abuse of process claims under Louisiana law. Therefore, SIV's abuse of process claims survive to the extent they are not barred by absolute immunity.[172]

---

[168] *See* Doc. 63-1 at 48.

[169] *Id.*

[170] *Id.*

[171] Doc. 52 at 67.

[172] For the same reasons that the other Plaintiffs' abuse of process claims regarding the alleged misuse of the material witness warrant statute are barred by absolute immunity, so too are SIV's.

## VI. Prescription

The Defendants also argue that most of the claims by Plaintiffs Singleton, Mitchell, Baham, and Doe are prescribed. Plaintiffs respond that they had no reason to know the critical facts underlying their claims more than a year before they filed suit, and that in any event Louisiana tolling principles prevented their claims from prescribing.[173]

### a. § 1983 Claims

Although Section 1983 provides a federal cause of action, federal courts look to state law to determine the statute of limitations for such claims.[174] In particular, federal courts apply the prescriptive period that the state in which the cause of action arose provides for personal injury torts.[175] In Louisiana, the relevant time period is one year from the day the injury was suffered.[176] Federal courts also apply state tolling principles to § 1983 claims.[177]

It is federal law, however, that determines when a § 1983 actions accrues.[178] When determining what accrual period applies to a § 1983 claim, courts "look first to the common law of torts" for guidance.[179] That is, courts determine which tort the § 1983 claim most resembles then apply the relevant accrual period for that tort to the § 1983 claim. In no instance, however, would the accrual period begin before the Plaintiffs had knowledge of the facts that

---

[173] *See* Doc. 67.

[174] Wallace v. Kato, 549 U.S. 384, 387 (2007) ("Section 1983 provides a federal cause of action, but . . . the statute of limitations . . . is that which the State provides for personal-injury torts.").

[175] *Id.*

[176] LA. CIV. CODE art. 3492.

[177] King-White v. Humble Indep. Sch. Dist., 803 F.3d 754, 764 (5th Cir. 2015) ("We have accordingly recognized that state equitable tolling principles control in § 1983 cases.") (internal citations omitted).

[178] *Wallace*, 549 U.S. at 388 ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law.").

[179] Manuel v. City of Joliet, Ill., 137 S. Ct. 911, 920 (2017).

caused their respective injuries. "Under federal law, a cause of action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action. The statute of limitations therefore begins to run when the plaintiff is in possession of the critical facts that he has been hurt and who has inflicted the injury."[180]

### i. Singleton, Baham, and Doe's Claims

Defendants argue that Plaintiffs Singleton, Baham, and Doe's § 1983 claims are prescribed because the alleged misconduct underlying those allegations occurred more than one year before Plaintiffs filed suit. Plaintiffs respond that they had no reason to know of the critical facts underlying their claims—that the "subpoenas" delivered to them were not lawfully created— until *The Lens* published a story in April 2017 publicly revealing, for the first time, the use of "subpoenas" by prosecutors in Cannizzaro's office. At this early stage in the proceedings, this Court agrees. Absent the "subpoenas," Plaintiffs' claims would disappear. To say the Plaintiffs had reason to know documents designed to appear authentic were in fact fraudulent before such information became more widely known would stretch the "reason to know" standard too broadly. Taken as true, Plaintiffs Singleton, Baham, and Doe's allegations show they had no reason to know of the critical facts underlying their claims until at least April 2017, which was less than a year before they filed suit.

### ii. Mitchell's Claims

Defendants also argue that Plaintiff Mitchell's § 1983 claims are prescribed because he filed suit more than a year after the alleged conduct underlying his claims occurred. Mitchell responds that he had no reason to

---

[180] Martinez v. Hidalgo Cty., Texas, 727 F. App'x 77, 78 (5th Cir. 2018) (quoting Piotrowski v. City of Houston, 237 F.3d 567, 576 (5th Cir. 2001)) (internal quotations and citations omitted).

know about the alleged misstatements in the application for the material witness warrant on which he was arrested—the conduct underlying his claims—because the application was not legally attainable until September 2017, which was less than a year before he filed suit. Even so, Defendants argue, Mitchell had reason to know about his claims because of a meeting he had with Orleans Parish Criminal District Court Judge Laurie White. Mitchell alleges that Judge White told him during the meeting "she wanted to apologize for what had happened to him, and . . . prosecutors had misled her."[181] The meeting allegedly occurred "shortly after" an April 2016 trial.[182]

As an initial matter, it is not exactly clear when the meeting with Judge White took place. But even assuming it took place more than a year before the initial Complaint was filed in this case in October 2017, this Court does not have before it sufficient evidence to determine whether anything that transpired during that meeting resulted in Mitchell having reason to know about his claims. Mitchell alleges that he "did not know" critical facts necessary to his claim until less than a year before he filed suit.[183] Defendants have not presented sufficient evidence to overcome this allegation at the Motion to Dismiss stage.

### b. State Law Claims

Defendants also argue that state law abuse of process and fraud claims by Plaintiffs Singleton, Mitchell, Baham, and Doe are prescribed. These claims are subject to a one-year prescriptive period.[184] The conduct underlying

---

[181] Doc. 52 at 48.

[182] *See id.*

[183] *Id.* at 49.

[184] *See* No Drama, LLC v. Caluda, 177 So. 3d 747, 751–52 (La. App. 5 Cir. 2015) (holding that abuse of process claims are subject to a one-year prescriptive period); Cerullo v. Heisser, 213 So. 3d 1232, 1236 (La. App. 5 Cir. 2017) (holding that fraud claims are subject to a one-year prescriptive period).

Plaintiffs' claims occurred more than one year before Plaintiffs filed suit.[185] Plaintiffs' state law claims, then, are facially prescribed.

"When a petition reveals on its face that prescription has run, the plaintiff has the burden of showing why the claim has not prescribed."[186] Plaintiffs cite to Louisiana's doctrine of *contra non valentem* to support their argument that their claims—even though facially prescribed—are not time-barred under Louisiana law.

"[T]he doctrine of *contra non valentem* . . . is an exception to the general rules of prescription."[187] The doctrine requires that prescription be suspended under "principles of equity and justice" when a plaintiff is "effectually prevented from enforcing his rights for reasons external to his own will."[188] There are four different situations in which the doctrine may apply.[189] Plaintiffs argue that two apply here: fraudulent concealment and the discovery rule.[190]

"[T]he discovery rule . . . provides that prescription commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based."[191] "[T]he ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct."[192]

---

[185] *See* Doc. 52.

[186] Wimberly v. Gatch, 635 So. 2d 206, 211 (La. 1994).

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *See id.* at 211–12 (recognizing fraudulent concealment and the discovery rule as two of the four situations in which *contra non valentem* may suspend prescription).

[191] *Id.* at 211.

[192] Marin v. Exxon Mobil Corp., 48 So. 3d 234, 246 (La. 2010).

The Louisiana Supreme Court has noted that the doctrine of *contra non valentem* should only be applied in "exceptional circumstances."[193] This Court believes this case presents just such circumstances. Plaintiffs—none of whom had any experience in law—allege that the Defendants abused their authority by skirting legal requirements to coerce Plaintiffs to meet with prosecutors outside of court.[194] Plaintiffs reasonably believed they had to do what prosecutors told them. For the same reasons that Plaintiffs' § 1983 claims are not prescribed at this time, neither are their state law claims. The Defendants have not presented sufficient evidence to contradict Plaintiffs' allegations that they should have known about the critical facts necessary to their claims more than a year before they filed suit. Plaintiffs' inaction was reasonable considering their relatively limited education and experience in criminal law and Defendants' allegedly fraudulent behavior. For the purposes of this Motion to Dismiss, Louisiana's discovery rule suspended prescription from commencing on Plaintiffs' state law claims until information about the alleged practices of Cannizzaro's office became widely known beginning in April 2017.[195] Therefore, Defendants are not entitled to dismissal of any of Plaintiffs' remaining claims on prescription grounds.[196]

---

[193] *Id.* at 245 (La. 2010) (quoting Renfroe v. State ex rel. Dept. of Transp. and Development, 809 So. 2d 947, 953 (La. 2002)).

[194] *See* Doc. 67 at 13.

[195] Even though Plaintiff Mitchell's claims do not involve receipt of a "subpoena," for the same reasons his § 1983 claims are not prescribed, neither are his state law claims.

[196] Even if the discovery rule did not apply to Plaintiffs' state law claims, the fraudulent concealment rule would. Claims by each of the relevant Plaintiffs involve allegations that the Defendants engaged in fraud, that the fraud effectually prevented them from pursuing their claims, and that it was reasonable for them to delay in filing suit. *See* Prevo v. State ex rel. Dep't of Pub. Safety & Corr. Div. of Prob. & Parole, 187 So. 3d 395, 398–99 (La. 2015) (listing the elements of a fraudulent concealment *contra non valentem* claim); Harvey v. Davis, 432 So. 2d 1203, 1204 (La. App. 4 Cir. 1983) (affirming trial court's application of fraudulent concealment rule where plaintiffs alleged that the defendants engaged in a scheme to intentionally conceal facts necessary to plaintiffs' claims in a medical malpractice case).

## CONCLUSION

For the foregoing reasons, Defendants' Motion is **GRANTED IN PART**. The following claims remain:

- Count I: Plaintiffs Mitchell, Baham, and Roe's § 1983 claims under *Franks* for injunctive relief and damages against Cannizzaro in his official capacity and those seeking injunctive relief against Defendants Napoli, Trummel, Hamilton, and Dawkins in their individual capacities

- Count II: Plaintiffs Doe and SIV's § 1983 claims seeking injunctive relief against Cannizzaro in his official capacity for the creation and use of "subpoenas"

- Count III: Plaintiffs' § 1983 compelled speech and retaliation claims seeking damages and injunctive relief against Cannizzaro in his official capacity, and Plaintiffs' § 1983 retaliation claims seeking injunctive relief against Defendants Napoli, Dover, and Dawkins in their individual capacities

- Count V: Plaintiffs' § 1983 substantive due process claims seeking damages and injunctive relief against Cannizzaro in his official capacity

- Counts VI and VII: Plaintiffs' § 1983 failure to supervise and failure to intervene claims seeking monetary damages and injunctive relief from Defendants Cannizzaro, Martin, and Pipes in their individual capacities and seeking monetary damages and injunctive relief against Cannizzaro in his individual capacity regarding the alleged creation and use of "subpoenas," and Plaintiffs' § 1983 claims seeking damages from Cannizzaro in his

official capacity and seeking injunctive relief from Cannizzaro, Pipes, and Martin for all other claims for which this Court found that Plaintiffs adequately alleged a constitutional violation

- Count VIII: Plaintiffs' abuse of process claims except those seeking civil damages against the Individual Defendants based on prosecutors alleged abuse of Louisiana's Material Witness Statute
- Count IX: Fraud claims by Plaintiffs Doe, Bailey, LaCroix, and SIV against Cannizzaro in his official capacity and against Defendants Martin, Dover, Petrovich, and Rodrigue in their individual capacities

Plaintiffs' claims not specifically listed above are hereby **DISMISSED**.

New Orleans, Louisiana this 28th day of February, 2019.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**