# The Guardian



# Prosecuted by her legal counterpart: 'It destroyed my life in so many ways'

As a public defenders' investigator, Taryn Blume was shocked to find that she was facing criminal charges - charges initiated by her adversary in the DA's office. In New Orleans, it's become a disturbing pattern

*Aviva Shen in New Orleans*

Mon 1 May 2017 06.00 EDT

A s a public defenders' investigator in New Orleans, Taryn Blume was juggling a minimum of 70 cases on any given day. Many of her clients, among the poorest people in the city, were facing the prospect of spending the rest of their lives in prison.

Then something happened that shocked even Blume's most seasoned colleagues: Blume herself faced felony criminal charges for her work on one such case. The charges were initiated by the same prosecutor her office opposed every day in court.

"One Taryn Blume late of the parish of Orleans, between the first day of January in the year of our Lord, two thousand and fourteen, and the first day of April in the year of our lord, two thousand and fourteen in the parish of Orleans, did impersonate a peace officer or assumed, without

Case 2:17-cv-10721-JTM-JVM Document 181-4 Filed 01/14/20 Page 2 of 8

authority, any uniform or badge by which a peace officer is lawfully distinguished …" the indictment read.

"I had no idea why or what that meant," Blume, now 26, told the Guardian.

Prosecutors and public defenders are supposed to be adversaries in the courtroom. But prosecutors have a significant upper hand: a largely unchecked power to bring criminal charges against anyone they want. In most parts of the country, prosecutors don't wield this tool against their own professional opponents. But in New Orleans, it's become a pattern.

At least six defense attorneys and investigators say they faced threats of criminal charges by the Orleans parish district attorney for doing their jobs, the Guardian has found. Since DA Leon Cannizzaro took office in 2009, the attorneys have been accused of kidnapping, impersonation and witness tampering in the course of defending their clients. Each case has failed to stand up to scrutiny: all charges that have been brought were eventually dropped or overturned.

Legal experts said the practice of charging public defenders is highly unusual and raises ethical concerns.

"I can't think of any way to justify what the prosecutor's office has done," said Bennett Gershman, a professor at Pace Law School who studies prosecutorial misconduct. He said prosecutors could be using their charging power to gain a competitive advantage or to intimidate defense attorneys.

"It's an abuse of power by Cannizzaro's office," he said.

"I wouldn't want a prosecutor's office to dampen the ability or intimidate the ability of a public defender's office to do the investigation," said Carter Stewart, a former federal prosecutor who served as US attorney in southern Ohio. He told the Guardian he had never heard of prosecutors indicting public defenders anywhere else in the country.

The district attorney's office did not respond to multiple requests for interviews.

The threat of imprisonment is just one of the many challenges looming over the public defender's office in New Orleans, the most incarcerated city in the state with the world's highest incarceration rate. Its staff provides low-income clients with legal representation guaranteed by the US constitution, but Louisiana has faced multiple lawsuits arguing the state is violating its constitutional obligation by underfunding public criminal defense.

Repeated budget cuts have forced the public defenders to cut staff and, in a drastic move, stop taking new cases. Before they began refusing cases in 2016, New Orleans public defenders were shouldering more than double the American Bar Association's recommended caseload of 150 per year, often meeting their clients for just five minutes before trial.

\*\*\*

The day after the indictment in late 2014, Blume's office held a meeting to discuss the incident. Her colleagues were deeply shaken at the notion that one of them could face criminal charges for defending their clients. As a senior attorney addressed the investigators, she began to cry.

"I remember staring and thinking, 'Oh my God, I've never seen this woman cry before,'" Blume said.

Eventually, Blume discovered the charges stemmed from a misunderstanding. Her client, Curtis Hawthorne, had been accused of posing as a taxi driver and raping a tourist. He had been convicted and sent to prison for life days before Blume found out about her indictment.

The case had been long and ugly. At some point, Blume was asked to go track down a piece of evidence. She went to the housing authority police and gave her business card to the security guards. One of them came to the OPD office to give her the document she was looking for.

She wouldn't find out until later, but one of the officers mistakenly told the housing authority attorney that she worked for the prosecutor's office. The attorney, annoyed at the idea that the officers would be stuck in court all day, called the DA's office to ask Blume when they needed the officers to testify.

That moment of confusion would take over her life for the next two years.



Jason Napoli got a judge to set Blume's bond at $50,000.
Photograph: Gerald Herbert/AP

The prosecutor on the Hawthorne case, Jason Napoli, got a judge to set Blume's bond at $50,000, an amount more typically used for people accused of violent assaults. The judge later told the public defenders she wasn't informed that Blume even worked for them.

"The judge never would have set bond at that amount if she had known this involved a dispute between the public defender and the district attorney's office," said Mark Cunningham, the head of the Louisiana Bar Association who represented Blume pro bono.

Stewart, the former US attorney, said there are procedures in place for prosecutors to deal with alleged misconduct that don't involve charging the opposing lawyer with a crime.

Stewart had heard a handful of similar complaints that public defenders were misrepresenting themselves while he was a prosecutor in San Jose, California, but "it never occurred to me to try to charge the person for some kind of misrepresentation", he said.

They could communicate directly with the public defenders' office, or submit a complaint to the state bar association. The alleged misconduct could even be raised at trial to try to win the jury over.

But Blume faced the repercussions of a criminal charge instead.

For the first time in her life, she started having panic attacks. She stopped coming into the office and started working from home as much as possible.

"I could not be at that office without physically and mentally breaking down," she said.

The office removed her from investigations, fearing the DA's rancor would compromise her clients. She was shifted to the office's juvenile conflict division. Through that role, she discovered she wanted to go to social work school to work with children. But the indictment followed her after she quit OPD and started school in New York; the pending felony charge barred her from any jobs or internships that involved children.

"It destroyed my life in so many ways," she said.

The charges against Blume reverberated beyond New Orleans. In December, the National Association for Public Defense issued a public letter to Cannizzaro warning the prosecution would undermine the system as a whole.

"The legitimacy of our criminal justice system depends upon defense lawyers and defense investigators doing their jobs, and doing them well, without fear of reprisal from a prosecutor acting more like a bully than the champion of truth and justice he is supposed to be," the letter said.

Mark Stephens, chair of NAPD's steering committee, said the actions of the Orleans DA cast a long shadow. "As crazy as it sounds, there's no reason it couldn't happen in your jurisdiction, that it couldn't happen to you," he said. "So definitely it could have a chilling effect on public defenders across the country."

On the day of trial, after 11 different prosecutors were assigned to Blume's case, the charges were abruptly dropped. But prosecutor David Pipes retained the right to reinstate them at any time, meaning the charges will hang over Blume's head until the statute of limitations is up in April 2018. It could also delay her ability to sue the DA for civil rights violations.

\*\*\*

This wasn't the first time Cannizzaro's office had brought charges against an OPD investigator. Like Blume, Emily Beasley was a young Tulane graduate who had started working at the office just a few weeks after college. In 2009, the DA charged her with contempt and two counts of kidnapping for speaking to two young girls outside their house while their mother slept inside. Beasley was led out of the courtroom in handcuffs.

Her two supervising attorneys, Danny Engelberg and Kenny Green, were also charged with contempt. Green and Beasley were convicted of contempt. The convictions were quickly overturned, and the DA dropped the kidnapping charges a few months later.

Beasley and Blume have been burned into the public defender office's collective consciousness. "You charge an investigator with kidnapping, that legacy lives on for years," said Cunningham. "The case goes away but people remember. That impacts how aggressively an investigator will investigate a case. It impacts how aggressively a lawyer will defend a client."

Attorneys and investigators said there was a prevailing feeling in the office that everyone was vulnerable.

Case 2:17-cv-10721-JTM-JVM   Document 181-4   Filed 01/14/20   Page 5 of 8

"Investigators are scared," Blume said. "Because it could have happened to any of us. And it still could."

Before Hurricane Katrina, it was pretty unusual to see a public defender out investigating cases, said Danny Engelberg, OPD's chief of trials.

In 2005, New Orleans was jailing more people per capita than any other major city, yet there were no full-time public defenders; only part-time attorneys appointed by judges. After the storm, the office was reshaped into an independent, full-time office that recruited top-performing, mission-driven lawyers from across the US.

"They believe in this basic concept that your lawyer and your defense shouldn't be dictated by the amount of money you have," said Engelberg. "Just because our clients don't have money, we're not going to back down from doing that."

That reform shocked a system accustomed to churning out convictions. Public defenders were operating under a "constant threat of contempt" by judges as the court tried to dislodge the reformers, according to OPD's website. Arrests of attorneys were so common that the OPD office had a wall decorated with their own mugshots. Two were injured by sheriff's deputies while being kicked out of court.

Engelberg believes the indictments and threats facing his office are, in part, a reaction to the new OPD.

\*\*\*

Once two colleagues have been criminally charged, it becomes harder to dismiss threats as idle.

OPD attorney Thomas Frampton received his own warning just a few months after Blume was indicted. In the midst of plea negotiations for a client, Napoli confronted him with allegations that he had impersonated a prosecutor to a witness.

"He said, in a tone that I took to be aggressive, that I was 'this close', and he showed a very short distance with his fingers," Frampton said.

According to Frampton, Napoli told him he should come to the DA's office to discuss these allegations, because "we got a lot of flak for not doing that with Taryn before indicting her."

"I immediately cut off conversation with him and said I didn't want to have further conversation with him unless I had a lawyer present if they were implying that I might be indicted," Frampton said.

Luckily, he had documentation: the woman had signed a card affirming she understood she was speaking with a public defender, and Frampton had identified himself in text message exchanges with her. Still, he said, "I think we have to take it seriously after what they did to Taryn."

Frampton reported this accusation to chief defender Derwyn Bunton, according to Bunton's testimony in a May hearing.

Another OPD attorney, Sarah Chervinsky, testified in the same hearing that Napoli had threatened her in open court shortly after Blume's indictment. According to her testimony, a judge asked her

during an unrelated hearing why she and Napoli couldn't just get along. She said, "We can be friends when he stops indicting my friends for doing their jobs." Napoli shot back, "How about you're next, Sarah." Chervinsky told him she wasn't afraid of him.

"Not yet, you're not," he responded.

It wasn't the first time Chervinsky had faced Napoli's threats. According to her testimony, Napoli said he would bring criminal charges against her and her co-counsel for talking to a client's family members, and against the family members themselves.

In court, Chervinsky said the threats against her and the client's relatives made her hesitant to push the investigation further.

"After being threatened with being indicted for having those conversations, I think both myself and my co-counsel backed off those conversations," she said.

There's nothing they can do to stop the DA from charging their employees, but OPD has created new procedures to give themselves some insurance. One new rule requires investigators to conduct all out-of-office work in pairs so they have a witness for any interaction that may later be used against them. It's a resource-intensive precaution the strapped agency can hardly afford.

"When two people are going out to get a document, that means they're not doing work on another case, or other work on that same case," said Engelberg.

But, he said, "we have to protect our people."

$1,339,860
contributed
$1,500,000
our goal

# America faces an epic choice...

... in the coming year, and the results will define the country for a generation. These are perilous times. Over the last three years, much of what the Guardian holds dear has been threatened – democracy, civility, truth. This US administration is establishing new norms of behaviour. Anger and cruelty disfigure public discourse and lying is commonplace. Truth is being chased away. But with your help we can continue to put it center stage. It will be a defining year and we're asking for your help as we prepare for 2020.

Rampant disinformation, partisan news sources and social media's tsunami of fake news is no basis on which to inform the American public in 2020. The need for a robust, independent press has never been greater, and with your help we can continue to provide fact-based reporting that offers public scrutiny and oversight. Our journalism is free and open for all, but it's made possible thanks to the support we receive from readers like you across America in all 50 states.

*"America is at a tipping point, finely balanced between truth and lies, hope and hate, civility and nastiness. Many vital aspects of American public life are in play – the Supreme Court, abortion rights, climate policy, wealth inequality, Big Tech and much more. The stakes could hardly be higher. As that choice nears, the Guardian, as it has done for 200 years, and with your continued support, will continue to argue for the values we hold dear – facts, science, diversity, equality and fairness." –* US editor, John Mulholland

On the occasion of its 100th birthday in 1921 the editor of the Guardian said, "Perhaps the chief virtue of a newspaper is its independence. It should have a soul of its own." That is more true than ever. Freed from the influence of an owner or shareholders, the Guardian's editorial independence is our unique driving force and guiding principle.

We also want to say a huge thank you to everyone who supported the Guardian in 2019. You provide us with the motivation and financial support to keep doing what we do. We're asking our readers to help us raise $1.5m to support our rigorous journalism in the new year. Every contribution, big or small, will help us reach it. **Make a gift from as little as $1. Thank you.**

Support The Guardian



Learn more



Topics
- New Orleans
- features