1          CRIMINAL DISTRICT COURT
2             PARISH OF ORLEANS
3            STATE OF LOUISIANA
4
5
6   STATE OF LOUISIANA        DOCKET NUMBER: 522-905
7   VERSUS                    SECTION "B"
8   TARYN BLUME
9
10
11  Transcript of the Contradictory Hearing in the
12  above referenced matter, as heard before the
13  Honorable Tracey Flemings-Davillier, Judge,
14  presiding on the date of April 12, 2016.
15
16
17            A P P E A R A N C E S
18
19  FOR THE STATE:
20      CHRIS BOWMAN, ADA
21      KYLE DALY, ADA
22      JASON NAPOLI, ADA
23
24  FOR THE DEFENSE:
25      MARK CUNNINGHAM, ESQUIRE
26      MICHAEL MAGNER, ESQUIRE
27
28
29  REPORTED BY:
30      WANDA TROUILLIER, CCR
31
32

# I N D E X

PAGE NUMBERS

OPENING STATEMENT FOR DEFENSE
    BY MR. CUNNINGHAM                              4


OPENING STATEMENT FOR THE STATE
    BY MR. BOWMAN                                 10


DEFENSE WITNESSES:

1) OLIVER NAQUIN
    Direct Examination by Mr. Magner             15
    Cross Examination by Mr. Bowman              29


2) ROBERT JENKINS
    Direct Examination by Mr. Magner             34
    Cross Examination by Mr. Bowman              39


3) SARAH CHERVINSKY
    Direct Examination by Mr. Magner             43
    Cross Examination by Mr. Bowman              54
    Redirect Examination by Mr. Magner           58


4) LAUREN BOUDREAUX
    Direct Examination by Mr. Magner             59
    Cross Examination by Mr. Bowman              97
    Redirect Examination by Mr. Magner          133


5) DERWIN BUNTON
    Direct Examination by Mr. Cunningham        137
    Cross Examination by Mr. Bowman             158
    Redirect Examination by Mr. Cunningham      169

## INDEX PAGE CONTINUED

STATE WITNESSES:

1)  ROBERT JENKINS
    Direct Examination by Mr. Bowman          178
    Cross Examination by Mr. Magner           182
    Redirect Examination by Mr. Bowman        187

2)  JUDGE FRANZ ZIBILICH
    Direct Examination by Mr. Bowman          190
    Cross Examination by Mr. Magner           201
    Redirect Examination by Mr. Bowman        221

ARGUMENT FOR DEFENSE BY MR. MAGNER            225

ARGUMENT FOR STATE BY MR. BOWMAN              232

REPORTER'S CERTIFICATE                        240

1          P R O C E E D I N G S
2     THE COURT:
3          All right.  Counsel ready on Taryn
4     Blume?
5     MR. BOWMAN:
6          Yes, Your Honor.
7     MR. CUNNINGHAM:
8          Good morning, Your Honor.
9     THE COURT:
10          Good morning.
11     MR. CUNNINGHAM:
12          Mark Cunningham here on behalf of Ms.
13     Blume, together with Mike Magner and P. J.
14     Kee.
15     THE COURT:
16          Why don't you call the case?
17     MR. BOWMAN:
18          This is Case Number: 522-905, State of
19     Louisiana versus Taryn Blume.  It's the
20     defendant's motion.
21     THE COURT:
22          All right.
23     MR. CUNNINGHAM:
24          Good morning, Your Honor.
25     THE COURT:
26          Good morning.
27          OPENING STATEMENT FOR DEFENSE
28     BY MR. CUNNINGHAM:
29          We're here on a Motion to Recuse,
30     pursuant to Article 680.  We plan to call
31     approximately five witnesses today.  We
32     expect the testimony of those witnesses to

1   establish, Your Honor, the circumstances
2   surrounding this prosecution, leading to
3   the conclusion that in pursuing this
4   prosecution Mr. Napoli was not motivated by
5   a search for justice or truth, but by a
6   desire to retaliate against a trial team
7   that stood up to his bullying tactics, and
8   then, also, to intimidate anyone else who
9   might have the gumption to do the same.
10         We believe the evidence will also show
11  that the conduct of Mr. Napoli reflects a
12  win at all cost culture at the Orleans
13  Parish District Attorney's Office where the
14  rules of professional conduct and
15  constitution are given short shrift.  All
16  this, of course, has led to a toxic
17  relationship between the Orleans Parish
18  Public Defenders and the District
19  Attorney's Office, and gives Mr. Napoli,
20  Mr. Cannizzaro, and his Office a very
21  personal stake in this prosecution.
22  However, even putting aside, Your Honor,
23  this personal stake, there is no dispute
24  that Mr. Napoli and Mr. Cannizzaro actively
25  participated in the prosecution in which
26  Ms. Blume is alleged to have impersonated a
27  peace officer.  Each, therefore, has
28  personal knowledge of information relevant
29  to the prosecution
30         Your Honor, you will recall that the
31  State contends that Ms. Blume
32  misrepresented herself in order to obtain

1    access to a Log at the HANO Security
2    Office, in which the complaining witness in
3    Hawthorne failed to report that she was
4    raped.
5    MR. BOWMAN:
6        Excuse me, Your Honor.
7    THE COURT:
8        Sure.
9    MR. BOWMAN:
10       I'm going to call for a sequestration of
11   witnesses.  I think they've got some
12   witnesses in here.
13   THE COURT:
14       All right.  Counsel -
15   MR. CUNNINGHAM:
16       Yes, Your Honor.
17   THE COURT:
18       - are there any witnesses here in Court?
19   I'm going to ask that if there are any
20   witnesses in Court that you wait in the
21   hall, and please do not discuss this case
22   while you're waiting.
23   CONTINUATION OF OPENING BY MR. CUNNINGHAM:
24       So, Your Honor, back to that log, in a
25   case where consent was a central issue in
26   the case of disclosure, the statement was
27   critically important for impeachment
28   purposes, yet it was never disclosed.  That
29   represented one of many discovery disputes
30   in the Hawthorne litigation.  The
31   relationship between Counsel in that
32   litigation became extremely acrimonious,

1    Your Honor.  Regardless of whether this
2    prosecution is motivated by person
3    interest, all this information is going to
4    be relevant in this prosecution for two
5    very important reasons.
6        First, Your Honor, this case against Ms.
7    Blume rests entirely on two witnesses.  One
8    of the witnesses had Ms. Blume's business
9    card in his rolodex.  We have reason to
10   believe that the other witness suffers from
11   dementia.  The credibility of these two
12   witnesses is therefore essential to the
13   Defense, and we believe that all of the
14   proceedings of the Hawthorne litigation are
15   going to be relevant to understanding and
16   evaluating that credibility.
17       Additionally, Your Honor, they have to
18   prove that, in fact, Ms. Blume engaged with
19   an intent to defraud.  They're not going to
20   be able to do that, and we think that all
21   the information about the Hawthorne
22   litigation is relevant to that issue, and
23   that's why we want to call, and fully
24   intend to call, Mr. Cannizzaro and Mr.
25   Napoli as witnesses at trial.
26       So, Your Honor, three points to keep in
27   mind as we go forward.  These are arguments
28   that at times have been raised by the
29   State, that I think are - that need to be
30   put aside, and I think, just waste our
31   time.
32       One, the State has argued that in

1    evaluating the standard, or in evaluating
2    this Recusal Motion, that the Court should
3    apply subjective standard in evaluating
4    whether there's a personal stake, or
5    interest in play.
6        Your Honor, this Court, you're bound by
7    *Ellis,* which is a Fourth Circuit case.
8    You're bound by *King,* which is a Supreme
9    Court case, both of these cases have been
10   fully briefed to the Court.  Both cases
11   held an objected standard is applicable in
12   deciding this Motion to Recuse.
13       Additionally, Your Honor, we've heard
14   time and time again, there's no Brady
15   violation in Hawthorne.  Judge Zibilich –
16   he never granted that new trial based on a
17   Brady violation.  So, there is no Brady
18   violation.  Well, what they're doing there
19   is conflating two very different standards.
20       Your Honor, the fact that the statement
21   in the Log did not result in a new trial
22   does not mean it was not Brady and should
23   not have been disclosed.  A statement can
24   be Brady and still not result in a new
25   trial, because the standard for deciding
26   whether a new trial is appropriate is
27   totally different than in deciding whether
28   a particular statement is *Giglio* or *Brady,*
29   and should be disclosed.  And it's that
30   kind of confusion of standards, which is
31   emblematic of the toxic relationship that
32   we've been talking about, of this effort by

the District Attorney to obtain a win, no
matter what.

And then, finally, Your Honor, I want to
make sure that the Court understands, this
Motion is not moot. We haven't seen Mr.
Napoli since the beginning of the case. He
has not made another appearance, but he's
still Counsel of Record. The Prosecution
refuses to disclose who will try this case.
As a result Mr. Napoli, Mr. Cannizzaro, may
still very well show up at trial, so this
Motion still very much is in play.

Your Honor, I'd like to close, very
briefly, before we call our first witness,
with a quote from an opinion by Judge Jones
out of the 34th Judicial District Court.
She wrote in a Judgment, an opinion
quashing a murder indictment last year, the
following: "The Orleans Parish ADA has
chosen to bypass those mandated legal
requirements in the Parish of St. Bernard
for unknown reasons; however, no one may
avail himself of ignorance of the law. The
District Attorney represents the state.
The State does not demand that a District
Attorney, or indeed, those assistants,
shall be overzealous in their performance
of their duties. All that is required is
that the zeal he displays, although active,
shall be reasonable. In his efforts to
procure a conviction a District Attorney
must be animated by his sense of public

1    duty.

2        In conducting a criminal case a

3    prosecuting attorney must be fair and

4    impartial, and see that the defendant is

5    not deprived of any constitutional

6    statutory rights, because he is a quasi-

7    judicial officer.  He seeks justice only,

8    equal and impartial justice.  It is as much

9    the duty of the District Attorney to see

10    that no innocent man suffers as it is to

11    see that no guilty man escapes."  Judge, in

12    quashing that indictment Judge Jones was

13    talking about Attorney Napoli.

14        Thank you.

15    THE COURT:

16        Thank you, Counsel.

17            OPENING FOR THE STATE

18    BY MR. BOWMAN:

19        I'm just going to cut right to the

20    chase, Your Honor.

21        This Motion is shameful.  It really is.

22    They have slandered Mr. Napoli.  They have

23    slandered the District Attorney.  I want to

24    quote from their case, this is their quote,

25    "This case involved an unprecedented effort

26    by OPDA, Orleans Parish District Attorney's

27    Office, to cover up what OPD, Orleans

28    Public Defenders claims is the District

29    Attorney's most recent failure to disclose

30    Brady evidence, and to retaliate against

31    Public Defenders who bring prosecutorial

32    misconduct to the attention of the Court."

1    This Motion has been sitting out here
2  for a year.  So, this is their day to put
3  up their evidence and show somehow that
4  Taryn Blume was framed, because that's what
5  they're accusing ADA Napoli and the
6  District Attorney himself as a principle to
7  this.  And really, when you think about it,
8  if they can prove that, then this Recusal
9  Motion is the least of those two guys –
10  that's the least of their worries at this
11  point, because that would be felony
12  conduct, but let's see what they can prove.
13    Your Honor will see the Log, finally,
14  today.  And when you're reviewing this
15  Motion the most important question that I
16  would ask Your Honor to keep considering is
17  why would ADA Napoli go to these monumental
18  Herculean efforts to keep the Defense from
19  getting a piece of evidence that contains
20  the same information that's in the 911 call
21  that ADA Napoli turned over to the Defense
22  Team in the Hawthorne case.  Why would he
23  go to these efforts to keep them from
24  getting information that he freely admitted
25  to in his opening statement in the case?
26  Why would he go to these efforts to keep
27  them from getting information that the
28  victim in the Hawthorne case, sitting right
29  in  that chair, right there, testified to?
30    You're going to hear from two witnesses
31  from the State.  You're going to hear from
32  Mr. Robert Jenkins, who will testify that

he initiated the complaint against Blume.
He will testify that he didn't call Jason
Napoli.  He will testify that he called
Graymond Martin, the First Assistant
District Attorney.  So, right from there,
unless they're going to include Mr. Jenkins
and the First Assistant in their grand
conspiracy theory, their theory is shot
from the start.

Then you will hear from Judge Zibilich,
who will again testify that there was no
Brady violation.  He will testify that it
was widely known to everybody, including
the jurors in the Hawthorne case, that when
the victim in that case showed up at the
Guste High-rise, she initially reported
being robbed, and didn't report being raped
until being interviewed by a Detective.

You know, Your Honor, they're grasping
at straws here, and I hope that you read
very carefully this Motion, because they
are so desperate that they are using Dog
Whistle language to imply that the District
Attorney is corrupt as a result of his
Italian Heritage.

I point you to where they say in the
Motion – they requested to question the DA
regarding "any close personal ties he
shares with the Napoli Family".  I'm kind
of curious to see who they're going to call
to establish that.

But a couple of things, based on their

1 opening statement, the credibility of

2 witnesses, that's not at issue right now.

3 That's for trial.  They keep arguing that

4 basically we should be recused because we

5 don't agree with their standard of the

6 evidence.  They see the evidence

7 differently than the District Attorney's

8 Office.  Well, that's the nature of a

9 trial.  If that was a standard for recusal

10 very little would get done in this

11 building.

12 They don't agree with the witnesses.

13 They claim that this is a must go on May

14 10.  When we were in here last time, oh,

15 we've got to go on May 10th, this has been

16 delayed too long, yet they still claim that

17 they're going to call the District Attorney

18 and Mr. Napoli at trial, but they haven't

19 filed the 507 Motion.  They haven't done

20 anything that they need to secure their

21 testimony at trial.

22 And finally, I've just got to go over

23 this one more time, the subjective versus

24 the objective standard.  *King* is clear,

25 Your Honor, the State briefed ad nauseam.

26 *King* was a plurality opinion.  They cannot

27 point to a single case where a Court has

28 applied an objective standard.  It's a

29 subjective standard.  Even the *Ellis* case

30 that they referred to, which if you read –

31 if Your Honor rereads the brief that we

32 have, we cover that when an Appellate Court

1   relies on the authority of a plurality
2   opinion, that's not a good decision.  We've
3   already covered that.  That's covered in
4   the brief.  But even in *Ellis* - even in
5   *Ellis* they said the defendant presented no
6   evidence.  You've got to be able to present
7   evidence to apply a standard.  They cannot
8   point to a single case where an objective
9   standard has been used for the recusal of a
10  District Attorney.
11       This is an eighteen month old third
12  class case, Your Honor.  And I have to be
13  honest with you, I sympathize with the
14  defendant that this case has dragged on
15  this long, but I didn't select her Defense
16  Strategy.  The reason this is going on so
17  long is because it has been their Defense
18  Strategy to try and put the District
19  Attorney's Office on trial.  And we're
20  going to go through that again today, but
21  it's time to get this case to trial.
22       Thank you, Your Honor.
23  THE COURT:
24       All right.  Thank you, Counsel.
25  MR. CUNNINGHAM:
26       Your Honor, the Defense would call
27  Oliver Naquin, who I believe is out of the
28  courtroom.  We also would like to call Mr.
29  Jenkins next.  He's under subpoena.  So, if
30  we could ask that he be brought here.
31  THE COURT:
32       Actually, I saw him come into Court, and

1    then leave.

2    MR. CUNNINGHAM:

3        Thank you.

4    THE COURT:

5        Good morning.

6    THE WITNESS:

7        Good morning.

8    **OLIVER NAQUIN, WHO WAS CALLED AS A WITNESS BY**

9    **THE DEFENSE, AFTER HAVING BEEN DULY SWORN TO**

10   **TELL THE TRUTH, WAS EXAMINED AND TESTIFIED AS**

11   **FOLLOWS:**

12                  DIRECT EXAMINATION

13   BY MR. MAGNER:

14   Q    Good morning, sir.

15   A    Good morning.

16   Q    Could you please state your name for the

17   Record?

18   A    Oliver Naquin.

19   Q    And where do you work, sir?

20   A    I work at the Guste High-rise.

21   Q    And how long have you been working there?

22   A    About close to eight years now.

23   Q    If you could speak into the microphone so

24   everybody can hear you.

25        Guste High-rise for about eight years?

26   A    Yes, close to that.

27   Q    And what are your duties there?

28   A    I'm a Security Officer.  I watch over the

29   building, what's going on around the building,

30   and in the building.

31   Q    I'd like to direct your attention to Mardi

32   Gras about three years ago.

1   A    Um-hum.

2   Q    Do you recall an incident where a woman

3   came into the office?

4   A    Yes.

5   Q    Tell us about that.

6   A    Well, I saw a female, a Caucasian female

7   walking up the driveway.  There's a parking lot

8   in the front and a parking lot in the rear.

9   She was walking in the front parking lot.  And

10  the doors are locked, so I pushed the door open

11  and I asked her could I help her, and she

12  stated that she had been robbed.  So, I let her

13  in, pulled out a chair, talked to her for a

14  little bit, gave her a bottle of water.  Once

15  she started laughing, I asked her was she ready

16  for me to call the police now, and I did.

17  Q    Okay.  Was that pretty much the sum and

18  substance of your dealings with her?

19  A    Pretty much.

20  Q    All right.  And did you log that encounter

21  with that woman in?

22  A    Yes.

23  Q    What was your general procedure for doing

24  that?

25  A    Well, she wasn't a resident, and it didn't

26  take place on the property, so it was just

27  logging that she came in, what she said, and

28  that I called the NOPD.

29  Q    Okay.

30      MR. MAGNER:

31          May I approach the witness, Your Honor?

32      THE COURT:

1        Yes.
2            FURTHER DIRECT EXAMINATION
3    BY MR. MAGNER:
4    Q   Sir, I'm showing you what's been marked for
5    identification as Exhibit D-1A.   Do you
6    recognize that?
7    A   Yes.
8    Q   Is that your Log?
9    A   Yes, sir.
10   Q   And your Log entry?
11   A   Yes, sir.
12   Q   Could you please read the Section after
13   5:10 a.m.?
14   A   "A Caucasian female came to the front door
15   of the Guste Homes and stated she had been
16   robbed.   NOPD was called.   They took control of
17   the situation."
18   Q   Was that accurate then?
19   A   Yes.
20   Q   Accurate now?
21   A   Yes.
22   Q   All right.
23       MR. MAGNER:
24           Your Honor, at this time we would offer
25       into evidence Exhibit D-1A.
26       THE COURT:
27           All right.
28       MR. MAGNER:
29           I have a copy for the Court, if you
30       would like.   May I approach, Your Honor?
31       THE COURT:
32           Yes.

1            FURTHER DIRECT EXAMINATION

2   BY MR. MAGNER:

3   Q   So, I'm going to fast forward a little bit,

4   Officer Naquin.  About sometime after that,

5   were you contacted by a young lady

6   investigating this case?

7   A   Yes.

8   Q   And do you recall the name of that young

9   lady?

10  A   Taryn Blume.

11  Q   And how did she get ahold of you?

12  A   She left her number at the front desk and I

13  returned her call.

14  Q   And what did she tell you?

15  A   That she was an investigator, and she

16  wanted to talk to me at my convenience.

17  Q   And did you agree to speak with her?

18  A   Yes.

19  Q   And where did you speak with her?

20  A   At their office, the Public Defender's

21  Office.

22  Q   Okay.  And that was the Public Defender's

23  Office?

24  A   Yes.

25  Q   And how did you know that it was the Public

26  Defender's Officer that you were going to?

27  A   I didn't before I got there, but they had

28  signs everywhere.

29  Q   Okay.

30      MR. MAGNER:

31          May I approach, Your Honor?

32      THE COURT:

1        Yes.
2           FURTHER DIRECT EXAMINATION
3    BY MR. MAGNER:
4    Q   I'm showing you what's been marked for
5    identification, sir, as Exhibit D-3.  Is this
6    the Office that you went into?
7    A   Yes.
8    Q   Was that the waiting room?
9    A   Yes.
10   Q   Did you see that sign?
11   A   Yep.
12      MR. MAGNER:
13          Your Honor, at this time we would offer
14      into evidence Exhibit D-3.
15      THE COURT:
16          All right.
17             FURTHER DIRECT EXAMINATION
18   BY MR. MAGNER:
19   Q   Did you have any doubt where you were, sir?
20   A   No.
21   Q   Did you have any concerns or problems that
22   you were at the Public Defender's Office?
23   A   No.
24   Q   Did that cause you any worry, or
25   intimidation?
26   A   No.
27      MR. MAGNER:
28          I'm offering D-3, and I have a copy for
29      the Court, if you'd like.
30      THE COURT:
31          Thank you.
32             FURTHER DIRECT EXAMINATION

BY MR. MAGNER:

Q   So, do you recall what time, approximately, you went there that morning?

A   It was early in the morning.  I don't really know what time.

Q   Okay.  And were there some circumstances going on in your life at the time?

A   Yes, my wife is very sick.  She was in the hospital at the time.

Q   Despite that, you agreed to come to the Office?

A   Yes, after I left work, I went to see my wife, and then I went to see Ms. Blume.

Q   Who did you meet with there?

A   Ms. Blume and another lady.  I don't remember her name.

Q   What did you understand the other lady's role to be?

A   That she was the Public Defender.

Q   And did they give you their business cards?

A   Yes.

MR. MAGNER:

        May I approach, Your Honor?

THE COURT:

        Yes.

            FURTHER DIRECT EXAMINATION

BY MR. MAGNER:

Q   Sir, I'm showing you what's been marked for identification as Exhibit D-1.

    Do you recall getting these business cards?

    This is a photocopy.

A   Um-hum.

1  Q    But did you get the original business
2  cards?
3  A    Yes.
4  Q    Did you turn them over to HANO's Attorney
5  at some point?
6  A    Yes, at some point.
7  Q    Was that Mr. Jenkins?
8  A    Yes, I suppose so.
9  Q    You remember dealing with an attorney?
10 A    Yes.
11 Q    The same attorney who's probably been
12 calling you a bunch in the last few days,
13 right?
14 A    Yes.
15 Q    And are these the business cards that you
16 received?
17 A    Those are the business cards.
18     MR. MAGNER:
19         Your Honor, at this time we'd offer into
20     evidence, Exhibit D-1.
21     THE COURT:
22         All right.
23     MR. MAGNER:
24         I've got a blow-up here of the same
25     exhibit.
26             FURTHER DIRECT EXAMINATION
27 BY MR. MAGNER:
28 Q    I don't want to block anybody's views, but
29 can you maybe turn a little bit this way,
30 Officer?
31     These are the same business cards?
32 A    Yes.

1   Q   Again, did you have any misunderstanding as
2   to who these young ladies were?
3   A   No.
4   Q   Do you see Ms. Blume in the courtroom
5   today?
6   A   Yes.
7   Q   And where is she?
8   A   Right there (indicating the defendant).
9       MR. MAGNER:
10          Okay.  Let the Record reflect the
11      witness has identified the defendant, Ms.
12      Blume.
13      THE COURT:
14          So noted.
15              FURTHER DIRECT EXAMINATION
16  BY MR. MAGNER:
17  Q   Were these young ladies polite to you?
18  A   Very.
19  Q   Did they ask you what happened –
20  A   Yes.
21  Q   – on the morning of the incident that we're
22  talking about?
23  A   Indeed.
24  Q   What did you tell them?
25  A   The same thing I told you.
26  Q   And what you just testified to here in
27  Court?
28  A   Yes.
29  Q   Did they try to get you to change, or
30  embellish the story at all?
31  A   Not at all.
32  Q   Was your perception that they simply wanted

1   to get to the facts?

2   A   That's it.

3   Q   How long was that meeting?

4   A   I don't know if it was even ten minutes,

5   for real.  I don't know if it was that long.

6   Q   Around that same time period had you

7   received some telephone calls from the District

8   Attorney's Office?

9   A   Yes.

10  Q   And had you spoken to them before you went

11  to see Ms. Blume and Ms. Boudreaux?

12  A   I think I spoke to them before I went to go

13  and meet with them, but I hadn't met with them.

14  Q   You spoke to them on the telephone?

15  A   Yes.

16  Q   And was that Assistant District Attorney

17  Jason Napoli?

18  A   Yes.

19  Q   Did you go to Mr. Napoli's Office at the

20  District Attorney's Office?

21  A   Yes.

22  Q   And tell us about that meeting with ADA

23  Napoli.

24  A   Well, the meeting with Mr. Napoli was very

25  similar to meeting with Ms. Blume.  He wanted

26  to know what happened, but he also wanted to

27  know what I talked to them about.  It's a

28  setting that really didn't - I didn't really

29  feel comfortable.  I can say that.  I really

30  didn't feel comfortable.

31  Q   All right.  Let's unpack that a little bit.

32  Mr. Napoli wanted to know what had happened

1   that night, right?

2   A   Yes.

3   Q   And did you tell them the same thing that

4   you told us today?

5   A   Yes.

6   Q   That you told Ms. Blume then?

7   A   Yep.

8   Q   Did he want to know, as I understand it,

9   what you told Ms. Blume and Ms. Boudreaux?

10      MR. BOWMAN:

11          Your Honor, I'm going to object at this

12      point.  We're kind of leading the witness.

13      THE COURT:

14          Basis?  I'm sorry?

15      MR. BOWMAN:

16          Leading.

17      THE COURT:

18          Counsel.

19      MR. MAGNER:

20          Sure.  Okay.

21             FURTHER DIRECT EXAMINATION

22   BY MR. MAGNER:

23   Q   I thought I understood you to say a moment

24   ago that he inquired about some other things,

25   about other than what happened that morning.

26   A   He did.

27   Q   Okay.  What else did he ask about?

28   A   He asked me what I told them, and did I

29   know how they were going about their case.

30   Q   How the Public Defender and the

31   Investigator were going about their case?

32   A   Yes.

1   Q   So, he wanted like Defense strategy?

2   A   I don't - I don't -

3   MR. BOWMAN:

4       Objection, leading again.

5   THE COURT:

6       Objection sustained.

7   MR. MAGNER:

8       Okay.

9           FURTHER DIRECT EXAMINATION

10  BY MR. MAGNER:

11  Q   You said a moment ago that you felt

12  uncomfortable meeting with Mr. Napoli, can you

13  explain that?

14  A   Unlike the Public Defender's Office, who

15  were very nice, they asked the questions and,

16  you know, I got on my way, I felt like I was

17  trying to be muscled in the District Attorney's

18  Office, and I didn't like the way that felt,

19  which is why I never returned.

20  Q   And who was trying to do that muscling?

21  A   Mr. Napoli.

22  Q   Officer Naquin, have you and I met before

23  today?

24  A   No.

25  Q   When was the first time you and I spoke?

26  A   A couple of days ago, by means of

27  telephone.

28  Q   And was it last Friday?

29  A   Yes.

30  Q   And did you tell me on the telephone what

31  you're telling me here today?

32  A   Yes.

1    Q   So, did you have any further contact with
2    Mr. Napoli after he tried to muscle you?
3    A   Yes, I met with him again.  I agreed to
4    meet with him again.  I just wouldn't go back
5    to the District Attorney's Office.
6    Q   Why?
7    A   Because I felt really uncomfortable there.
8    Q   Because of this muscling thing?
9    A   Yes.
10   Q   Where did you agree to meet with Mr.
11   Napoli?
12   A   The next time I met him it was in One Shell
13   Square.
14   Q   And who picked One Shell Square?
15   A   I did.
16   Q   Why?
17   A   It was a familiar area to me, and if I felt
18   uncomfortable, I could just get up and leave.
19   Q   Did you meet with him?
20   A   Yes, I met with him.
21   Q   What did you tell him?
22   A   He had a list of questions, I believe.  I
23   don't know.  It was a paper.  I really can't
24   say definitively what – I do know he was, at
25   that time, too, he was using terms that I
26   didn't really feel comfortable with.
27   Q   How so?
28   A   When we talked he mentioned the young lady
29   involved in the incident he used terms like
30   assault, and I would say, robbed.  And he would
31   say something else, and I would say robbed,
32   because she only told me she was robbed,

1  nothing else.

2  Q   So, from what I understand, you're saying,

3  he wanted you to change your story?

4      MR. BOWMAN:

5          Objection.  Leading.

6      THE COURT:

7          Objection sustained.

8      THE WITNESS:

9          I don't even know if I would go as –

10     THE COURT:

11         Sir, if there's an objection –

12     THE WITNESS:

13         I'm sorry.

14     THE COURT:

15         – then if I sustain it you can't answer

16     it.  Okay?

17     THE WITNESS:

18         Yes, ma'am.

19     THE COURT:

20         Okay.  All right.  Counsel.

21              FURTHER DIRECT EXAMINATION

22 BY MR. MAGNER:

23 Q   How did you perceive what Mr. Napoli was

24 trying to do?

25 A   He tried to get me to use terms that would

26 help him.

27 Q   Like what kind of terms?

28 A   Like assault, for me to say she was

29 assaulted.  That's not what she told me.  She

30 told me she was robbed.

31 Q   Okay.  And, in fact, was that what she told

32 you?

1   A   Yes.

2   Q   Did you stand your ground?

3   A   Yes.

4   Q   Did you meet with Mr. Napoli a third time?

5   A   We were supposed to meet another time, and

6   I had some other stuff going on.  I really

7   don't remember.  It was a lot of things going

8   on with my wife and my family, at that time,

9   but I did speak over the phone for a minute.

10  There was a conference at the High-rise.

11  Q   And, if you know, who organized that

12  conference?

13  A   I really don't know.

14  Q   Were you there in person, or on the

15  telephone?

16  A   No, I was on the phone.

17  Q   Did Mr. Napoli ask you for the Log that was

18  entered into evidence as Exhibit D-1A?

19  A   Yes.

20  Q   He did ask you for the Log?

21  A   Um-hum.

22  Q   When?

23  A   I think the first time we met, I think he

24  asked me about the Log.

25  Q   What did you tell him about the Log.

26  A   I didn't have access to that.  That's not

27  something I could give him.

28  Q   Did you acknowledge that such a Log

29  existed?

30  A   Oh, yes.

31  Q   On either the second or third time that you

32  met with Mr. Napoli did he ask you anything

1  about any misrepresentations by Ms. Blume or
2  Ms. Boudreaux, the Public Defender?
3  A    Not that I can recall, no.
4  Q    Were you called by the State to the Grand
5  Jury in this matter in the prosecution of Ms.
6  Blume?
7  A    Not that I can recall, no.
8       MR. MAGNER:
9            I tender the witness, Your Honor.
10      THE COURT:
11           All right.  Thank you, Counsel.
12                 CROSS EXAMINATION
13 BY MR. BOWMAN:
14 Q    Officer Naquin, you testified that you met
15 with Ms. Blume and Ms. Boudreaux at the Public
16 Defender's Office?
17 A    Yes.
18 Q    When did that meeting occur?
19 A    Some years ago.  I couldn't give you a
20 date.
21 Q    Can you narrow down the date a little bit?
22 A    Nope.
23 Q    You have no idea when it occurred?
24 A    Some years ago, but no.
25 Q    Okay.
26      MR. BOWMAN:
27           Excuse me for one second, Your Honor.
28           I'll come back to that.
29           FURTHER CROSS EXAMINATION
30 BY MR. BOWMAN:
31 Q    Now, you also testified that Mr. Napoli
32 continued using the word assault and you

1  preferred the word robbery?

2  A   Yes.

3      THE COURT:

4          One second, Counsel.  I apologize.

5      (COURT STOOD IN A BRIEF RECESS).

6      THE COURT:

7          All right, Counsel, back on the Record.

8          FURTHER CROSS EXAMINATION

9  BY MR. BOWMAN:

10 Q   Is a robbery a type of assault?

11 A   It can be.

12 Q   It can be?

13 A   Yes.

14 Q   It also can't be?

15 A   Well, if a person is struck –

16 Q   I'm sorry?

17 A   If a person is struck, yes, it can be a

18 type of assault.

19 Q   Okay.  So, to you an assault implies a

20 physical contact?

21 A   Yes.

22 Q   Let me ask you something about these

23 meetings where you were getting muscled.  Was

24 Mr. Napoli there by himself?  Was it just you

25 and Mr. Napoli?

26 A   The first meeting, yes.

27 Q   And the other meetings?

28 A   The next time I met with him it was, um,

29 Mike Kitchens, I think is his name.

30 Q   Okay.  And when did you turn over those

31 business cards to Mr. Jenkins?  You testified

32 that you turned them over to Mr. Jenkins.  When

did that occur?

A    I believe that was sometime last year.   I
initially gave –

Q    I'm sorry?

A    I believe it was sometime last year.

Q    I apologize.   I don't hear well, can I get
you to speak into the mike?

A    I believe it was sometime last year.

Q    Sometime last year.   Okay.

MR. BOWMAN:

        Give me a second, Your Honor, please.

        FURTHER CROSS EXAMINATION

BY MR. BOWMAN:

Q    Were you subpoenaed to testify at the trial
of this matter?

A    What trial?

Q    The Hawthorne matter?

A    No, I haven't got a subpoena.

Q    You never got a subpoena that you
disregarded?

A    Never got a subpoena.

Q    Let me ask you this, did the Defense – did
Mr. Boudreaux, in defending Hawthorne, because
it seems like you were an important witness,
did they call you to testify?

A    No.

Q    One final question.

        You said you went to the Public Defender's
Office to meet with Blume and Boudreaux,
correct?

A    Yes.

Q    Okay.   But you don't remember when that

1  occurred?

2  A   No.

3  Q   But you would agree that you couldn't have

4  told either Donald Gibson, or Charles Davis

5  about that meeting if it had not yet happened,

6  correct?

7  A   What?

8  Q   I'll rephrase.

9      You don't remember when the meeting

10 occurred?

11 A   Nope.

12 Q   But you couldn't have told Officer Donald

13 Gibson or Charles Davis -

14 A   Um-hum.

15 Q   - you couldn't have told them about that

16 meeting until after it happened, correct?

17 A   Yes.

18     MR. MAGNER:

19         Your Honor, I would -

20     MR. BOWMAN:

21         I haven't tendered the witness yet.

22         FURTHER CROSS EXAMINATION

23 BY MR. BOWMAN:

24 Q   Did you tell them at all about the meeting?

25 Did you tell them after about the meeting?

26 A   I told them I went, but nothing about it,

27 though.

28 Q   I'm sorry?

29 A   I said I might have told them that I met

30 with him, but I -

31 Q   You might have?

32 A   Yes.

1   Q   But you don't know for sure?

2   A   No, this was years ago.

3   Q   Okay.  Thank you.

4       MR. BOWMAN:

5           No further questions.

6       THE COURT:

7           All right.

8       MR. MAGNER:

9           I'm going to need a subpoena for Officer

10      Naquin, Oliver Naquin for May 10, for the

11      trial date, please, if we can get that.

12      THE COURT:

13          All right.  So noted.

14          Sir, are you finished with this witness?

15      MR. MAGNER:

16          I am, although I just - do want to

17      say one thing, Judge.  We're also here on

18      the Discovery Motion of the Defense, and

19      the Brady Motion of the Defense.  None of

20      these cards were turned over by the State

21      to us.  We had to find them on our own

22      investigation, despite a specific and

23      explicit request in our Discovery Motion,

24      which I'll offer into evidence in just a

25      moment, but I just want that -

26      THE COURT:

27          All right.  So noted.

28      MR. MAGNER:

29          Okay.  So, May 10th for Oliver Naquin,

30      please.

31      THE COURT:

32          All right.  Thank you, Mr. Naquin.  You

1          can step over here to the Sheriff's Deputy
2          and get your subpoena for May 10.
3               All right.  Counsel, next witness.
4       MR. MAGNER:
5               Robert Jenkins.
6       THE COURT:
7               Good morning, Mr. Jenkins.
8       MR. JENKINS:
9               Good morning, Your Honor.
10   ROBERT JENKINS, WHO WAS CALLED AS A WITNESS BY
11   THE DEFENSE, AFTER HAVING BEEN DULY SWORN TO
12   TELL THE TRUTH, WAS EXAMINED AND TESTIFIED AS
13   FOLLOWS:
14                   DIRECT EXAMINATION
15   BY MR. MAGNER:
16   Q    Good morning, Mr. Jenkins.
17   A    Good morning.
18   Q    You're a Private Attorney?
19   A    Correct.
20   Q    You're representing HANO in this matter?
21   A    It was the Guste Housing Development.
22   Q    I'm sorry.
23   A    And their Properties.
24   Q    Right.  And Guste is somewhat separate from
25   the rest of HANO?
26   A    That's correct.  They have several
27   properties that they have, and I do their legal
28   work.
29   Q    In connection with your work for the Guste
30   Homes, did you facilitate meetings between the
31   State and some of the HANO witnesses that are
32   involved in this case?

1    A    Yes.

2    Q    Did you likewise facilitate meetings

3    between me and Mr. Kee and some of those HANO

4    witnesses?

5    A    That's correct.

6    Q    All right.  And I'm going to show you

7    what's already introduced into evidence, Mr.

8    Jenkins, Exhibit D-1, and is this your

9    handwriting here on the right-hand-side?

10   A    Yes, it is.

11   Q    Could you read that for the Record, please?

12   A    April 13, 2015, card given to Mike Magner

13   from Guste, 2:07 p.m., Robert Jenkins.

14   Q    Okay.  What were the circumstances

15   surrounding you writing that?

16   A    One of the Officers retrieved that from his

17   Rolodex, Deputy Gibson, Your Honor, and gave it

18   to me, and we made a copy of it so you all

19   could have a copy of it.

20   Q    And there were two sets of business cards

21   involved in the case, did you also retrieve

22   some cards from Officer Naquin?

23   A    I did.

24   Q    Could these have been those cards?

25   A    That's correct.

26   Q    All right.  And have you preserved the

27   originals of those cards?

28   A    We still have them preserved.  They're

29   locked up in the safe at the Guste Housing,

30   because I just didn't want to carry them.  I

31   got the test message late yesterday, and I

32   didn't want to do that.

Q   Okay, but they're safe?

A   That's correct.

Q   And secure?

A   That's correct.

Q   All right.  And what were the circumstances surrounding you getting these cards from Officer Naquin?

A   As you were interviewing him you asked the question about the cards that were given to him by –

Q   Are we talking about Naquin now, or Gibson?

A   No, Naquin, first.

Q   Okay.

A   As you were interviewing him he stated that he had met with Ms. Blume several times, and that she had identified herself as someone who investigated for the Public Defender.

Q   Did I meet with Officer Naquin personally, or did we simply speak on the telephone?

A   No, we spoke on the phone, because what happened, he was supposed to be there and he had mechanical problems, or whatever.  So, when you came to my office I did a conference call with him.

Q   Right.  And that was last Friday?

A   That's correct.

Q   Thank you.

    Now, I'm going to show you another very similar business card.

    MR. MAGNER:

        May I approach, Your Honor?

    THE COURT:

1          Yes.
2               FURTHER CROSS EXAMINATION
3     BY MR. MAGNER:
4     Q    I'm showing you what's been marked for
5     identification as Exhibit D-2.  Do you see that
6     business card?
7     A    Yes.
8     Q    All right.  Was that a business card that
9     you provided me?
10    A    That's correct.
11    Q    Where did you obtain that business card
12    from?
13    A    We were meeting with Deputy Gibson, and you
14    interviewed him, and I think you had another
15    Officer there, and at some point you asked him
16    if he had the card.  And he indicated that he
17    had looked, he had searched, and he couldn't
18    find it.  And at some point, then you
19    indicated, something to the effect about, did
20    you check everywhere?  Did you have a Rolodex?
21    And we both said, well, why don't you go check
22    again?  And once he checked, he came back, and
23    he had this card.
24    Q    And he gave the original card to you?
25    A    That's correct.
26    Q    And did you make that handwritten entry on
27    the bottom?
28    A    I did.
29    Q    And read it for the Record, please.
30    A    "4-13-2015, card found, Captain Gibson,
31    1:25 p.m., Robert Jenkins".
32    Q    And did you witness Officer, I guess he

1   goes by Captain Gibson?

2   A   Yes.

3   Q   Did you witness him give me that – or give

4   you the original card, and I get the copy?

5   A   Right.  We made a copy of it and secured

6   the original that he found in the Rolodex.

7   Q   All right.

8       MR. MAGNER:

9           Your Honor, at this time we would offer

10      into evidence, Exhibit D-2.

11      THE COURT:

12          All right.  And you have a copy for me,

13      as well?

14      MR. MAGNER:

15          Oh, yes.  I'm sorry.

16      THE COURT:

17          Thank you.

18          FURTHER CROSS EXAMINATION

19  BY MR. MAGNER:

20  Q   On that same occasion, did we have an

21  opportunity to speak with Chief Davis?

22  A   That's correct.

23  Q   He didn't have any business cards, did he?

24  A   No, he did not.

25  Q   Last Friday when you and I met, where was

26  that?

27  A   At my office, 631 St. Charles Avenue.

28  Q   Towards the end of our meeting, did you

29  tell me anything about Chief Davis?

30  A   I did.

31  Q   What did you tell me?

32      BY MR. JENKINS:

1          Judge, can we approach?  I don't want to
2     put that on -
3     MR. MAGNER:
4          Sure.  This is a little sensitive,
5     Judge, and I have no problem with doing it
6     at the bench.
7     THE COURT:
8          That's fine.
9  (THERE WAS AN OFF RECORD DISCUSSION AT THE
10      BENCH).
11 (THERE WAS AN OFF RECORD DISCUSSION IN THE
12 JUDGE'S CHAMBERS).
13     THE COURT:
14          Okay.  We're back on the Record.
15     MR. MAGNER:
16          Judge, I just want it clear on the
17     Record that we went into Chambers, because
18     we were dealing with medical issues, and
19     that was the only reason why we did that.
20     THE COURT:
21          All right.  Thank you, Counsel.
22          Mr. Bowman.
23               CROSS EXAMINATION
24 BY MR. BOWMAN:
25 Q   On Direct, Mr. Jenkins, you testified that
26 you were present the day that Mr. Magner was
27 interviewing Donald Gibson?
28 A   Captain Gibson, yes.
29 Q   Captain Gibson.  Prior to that meeting, had
30 you requested that Charles Davis and Donald
31 Gibson search for business cards from Ms. Taryn
32 Blume?

1    A   Yes, we did.

2    Q   What were the results of those searches?

3    A   I asked him to do a search, multiple times,

4    and they found nothing, no cards.  So, I even

5    asked the CFO over there to follow-up and go

6    search that office, as well, to see if they

7    could determine if there were any cards from

8    Ms. Blume.  He did, and they didn't find

9    anything.

10   Q   And on the day in question, when you

11   requested that Donald Gibson search again, when

12   Mr. Magner was present, what specifically did

13   Mr. Magner request?

14   A   He requested the cards, and he said, We

15   talked about it.  We have searched, and we have

16   searched, and we couldn't find nothing.  And he

17   asked, "Well, do you have a Rolodex?"  And I

18   said, "We've searched everywhere.  Captain

19   Gibson?"  Captain Gibson said, "Yes."  And

20   Mr. Magner said, "Could you go search the

21   Rolodex, you know, research it?"  And he went,

22   came back shortly, and to his surprise he found

23   a card in the Rolodex.

24   Q   I'll get to that in a second.

25       So, prior to Mr. Magner requesting that Mr.

26   Gibson search his Rolodex, had anybody in the

27   room used the term, Rolodex?

28   A   No.

29   Q   And you said, Mr. Gibson was surprised to

30   have found the card?

31   A   Right.  He came back with a surprised look

32   on his face, because we had done an extensive

1    search, and then he came back and said, "Hey,
2    it was sitting right there in the Rolodex."
3    Q    Did you find it suspicious?
4    A    I found it odd and suspicious, yes.
5    Q    And let me ask you this, when did you
6    originally call the District Attorney's Office
7    to make a complaint against Ms. Blume?
8        MR. MAGNER:
9            I'm going to object that it's beyond the
10           scope of the Direct Examination.
11       THE COURT:
12           All right.  Mr. Bowman, do you want to
13           respond?
14       MR. BOWMAN:
15           Yes, Your Honor.  The Code of Evidence
16           says that I can ask a witness – we've got
17           the witness subpoenaed.  They called him.
18           I can cross him about whatever I want to
19           cross him about under the Code of Evidence,
20           not to mention the fact that Mr. Jenkins,
21           otherwise, is going to have to sit outside.
22           I think we might as well just get this done
23           with.
24       THE COURT:
25           Counsel.
26       MR. MAGNER:
27           We would object to that, and there are
28           additional reasons why we would object,
29           other than simply the timing of witnesses.
30           The interaction that we're about to hear
31           about, if the Court allows it, occurred in
32           late November, early 12, of 2014.  That's

1   seven to eight months after the time period
2   in question.  There has been no Prieur
3   Notice, no 404-B Notice.  We're going to be
4   talking about events that occurred seven or
5   eight months later.
6   THE COURT:
7       So, understanding that there's some
8   flexibility in the Code of Evidence, I just
9   think it keeps the Record cleaner if the
10  State then calls Mr. Jenkins,
11  notwithstanding the time delays, or his
12  time, in their case in chief.  And so, at
13  this time, I'm going to sustain the
14  objection.
15  MR. MAGNER:
16      Thank you.
17  MR. BOWMAN:
18      I apologize to Mr. Jenkins.
19  MR. MAGNER:
20      And we apologize to Mr. Jenkins.
21  MR. JENKINS:
22      No, that's all right.  I'll be here.
23  THE COURT:
24      Okay.
25  MR. BOWMAN:
26      No further questions, Your Honor.
27  THE COURT:
28      Thank you, Counsel.
29  MR. BOWMAN:
30      I'm going to need Mr. Jenkins to remain
31  under subpoena.
32  MR. JENKINS:

1      Okay.
2  THE COURT:
3      That's fine.
4      Mr. Magner, any further questions?
5  MR. MAGNER:
6      No, thank you, Mr. Jenkins.
7  THE COURT:
8      All right.  Thank you, Mr. Jenkins.
9  MR. MAGNER:
10     Sometime before you go, Robert, we may
11  need a subpoena for you for May 10, please,
12  for the trial date.
13     We'd call Sarah Chervinsky, please.
14  THE COURT:
15     Good morning, Ms. Chervinsky.
16  THE WITNESS:
17     Good morning, Judge.
18  **SARAH CHERVINSKY, WHO WAS CALLED AS A WITNESS**
19  **BY THE DEFENSE, AFTER HAVING BEEN DULY SWORN BY**
20  **THE COURT REPORTER TO TELL THE TRUTH, WAS**
21  **EXAMINED AND TESTIFIED AS FOLLOWS:**
22            DIRECT EXAMINATION
23  BY MR. MAGNER:
24  Q   Good morning, could you please state your
25  name for the Record?
26  A   Sarah Chervinsky.
27  Q   And who do you work for, Ms. Chervinsky?
28  A   The Orleans Public Defender's Office.
29  Q   How long have you been there?
30  A   As an Attorney, about five years.
31  Q   And before that?
32  A   I was a summer law clerk, in the summer of

1    2010, for a few months.  I was also a Staff

2    Investigator from 2007 to 2008.

3    Q   I'm going to direct your attention, Ms.

4    Chervinsky, to a period of time in early

5    February of 2015, approximately six weeks after

6    Ms. Blume had been indicted.

7    A   Yes, sir.

8    Q   Do you recall an incident where Mr. Napoli

9    made some statements to you?

10   A   Yes, I do.

11   Q   Where did that occur?

12   A   It was actually in the courtroom, at the

13   time it was Section L.

14   Q   Where were you at that moment?

15   A   Sure.  So, I was at a sidebar conference

16   with Judge Zibilich, along with another DA.  I

17   think it was Will Dunn, at that time.  We were

18   standing probably about right where I'm

19   sitting, actually, and speaking to the Judge.

20   That's where I was when it started.

21   Q   Okay.  Where was Mr. Napoli?

22   A   He was seated in the jury box.  It was one

23   of these chairs in the front row, right here.

24   I don't recall exactly which one.

25   Q   Describe what occurred.  What happened?

26   A   Sure.  So, I was finishing up a bench

27   conference regarding a different - an unrelated

28   matter.  Judge Zibilich made a comment that I

29   think he intended to be friendly, off the

30   Record, saying something to the effect of, why

31   couldn't I and Mr. Napoli get along, or be

32   friends?  He said it loud enough for both of us

1    to hear that.

2        As I was walking back to the podium to go

3    on the Record, I said, in Open Court, we can be

4    friends when he stops indicting me friends for

5    doing their jobs.

6    Q    And who were you referring to?

7    A    Mr. Napoli indicting Taryn Blume.

8    Q    All right.  Did Mr. Napoli respond?

9    A    He did.

10   Q    What did he say?

11   A    He was sitting in there.  He said it loud

12   enough for the Court to hear, and he said, "How

13   about you next, Sarah?"

14   Q    And how did you take that remark?

15   A    As a threat.

16   Q    What did you say in response?

17   A    I said, "For the Record, I'm not afraid of

18   you", from right where you're standing.

19   Q    Did Mr. Napoli respond to that?

20   A    He did, and he said - I think he said, "Not

21   yet you're not", or something like that.

22   Q    Did you feel that those statements were

23   made in jest?

24   A    No.

25   Q    Why not?

26   A    First of all, because Mr. Napoli and I

27   don't have a friendly relationship like that.

28   I think the Judge had intended to be light-

29   hearted, because at the time he had a collegial

30   relationship with both of us, but Mr. Napoli

31   and I did not have that kind of relationship.

32   Neither of us was smiling, or laughing, and I

1    knew that he had just indicted someone at my
2    office.  And so, I took it seriously.
3    Q   Okay.  Had you had another encounter with
4    Mr. Napoli involving him speaking to one of
5    your clients?
6    A   Yes.
7    Q   Tell us about that.
8    A   So, I was co-counsel, or second chair on a
9    case for a client in Section I, who was charged
10   with an attempted murder, a felon in possession
11   of a firearm.  We were at some type of pretrial
12   hearing, and there had been ongoing plea
13   negotiations in the case.  The DA's Office had
14   offered our client a plea deal for thirty-five
15   years, which the client had not agreed to
16   accept.
17       At some point, my co-counselor, or Lead
18   Counsel, was in Chambers with the Judge,
19   addressing an ex parte motion.  Our client was
20   standing at the podium, essentially, waiting
21   for the hearing to resume.  Mr. Napoli was in
22   the courtroom and started talking to my client,
23   without Counsel, basically, at the podium.
24   Q   You weren't his Counsel of Record at the
25   time?
26   A   I was second chair on the case, yes.
27   Q   And who was the Lead Public Defender?
28   A   Leon Roche.
29   Q   All right.  So, what was the client's name?
30   A   Michael Dabney.
31   Q   And so, he was represented by Counsel at
32   the time of this exchange?

1   A   Yes, sir.

2   Q   What did Napoli say to Mr. Dabney?

3   A   I did not overhear the words, at the time.

4   Our client later told us what was being - I

5   witnessed Mr. Napoli talking to our client.  I

6   didn't actually hear the conversation.  I

7   actually went up to the client and told him to

8   go sit down, to kind of try and defuse the

9   situation.

10      And our client told us later that Mr.

11   Napoli had basically threatened him to take a

12   plea deal.  His exact words were, "If you don't

13   take those thirty-five years, I'm going to bury

14   your ass."

15   Q   Now, I've not had the experience, really,

16   of practicing here, you know, at Tulane and

17   Broad, but it's kind of a rough and tumble

18   place, right?

19   A   It is.

20   Q   The exchanges that you've just described

21   with Mr. Napoli, is that just sort of status

22   quo?  Is that just how things are done between

23   ADA's and Public Defenders?

24   A   No, I don't feel that it is.

25   Q   Why is that?

26   A   Because I think that we're adversaries, but

27   we attempt to, and I attempt to, at least, have

28   professional interactions with my adversaries.

29      I feel like Jason Napoli, on these

30   occasions, and other occasions, has gone past

31   the point of it being professional and

32   adversarial, to the point of feeling like a

1   personal attack, or a personal threat.  And
2   that's how I've interpreted it.
3   Q   Have there been other occasions where you
4   have felt intimidated or threatened by Mr.
5   Napoli?
6   A   Yes.
7   Q   Tell us about that.
8   A   I, and this was fairly recently, in the
9   past few months, was again co-counsel on a case
10  in Section I.  The defendant's name was
11  Lawrence Martin.  He was charged with murder.
12  Mr. Napoli at some point decided that he
13  believed our client's mother was a witness that
14  he wanted to call at the trial, and he actually
15  sought an ex parte material witness warrant,
16  and had out client's mother arrested, and put
17  in jail as a material witness in the case.
18       When we came to Court to take her
19  testimony, after she was done testifying, Mr.
20  Napoli had her subpoenaed, and had her daughter
21  subpoenaed for the trial.  That's my client's
22  mother and sister.  They both accepted their
23  subpoenas.  We went out into the little anti-
24  room, outside the courtroom, and I was having a
25  conversation with the sister, who had just been
26  subpoenaed.  Mr. Napoli later told myself and
27  my co-counsel, that they were going to indict
28  my client's mother and the client's sister.
29  For what, I don't know, but that they were
30  going to indict both of them, and that
31  potentially, my co-Counsel and I could also be
32  indicted for the conversations that we were

having with those individuals, our client's
family members.

Q   Were you doing anything wrong in connection
with speaking to those family members?

A   No, sir.  They were potential trial
witnesses.  We were asking them questions about
their testimony.  We were not coaching them or
telling them what to say, at all.  We're
allowed to speak to witnesses before trial, and
they were our client's family members.

Q   Does Mr. Napoli's conduct affect your
ability to perform your constitutionally
mandated duties as a Defense Attorney?

    MR. BOWMAN:

        I'm going to keep objecting, this is
    leading.

    THE COURT:

        Counsel, you need to stand, first of
    all.  What's the basis for the objection?

    MR. BOWMAN:

        Leading.  Leading.

    THE COURT:

        Counsel, stand.

    MR. BOWMAN:

        Oh, I'm sorry.

    MR. MAGNER:

        It's an open ended question.

    MR. BOWMAN:

        It's leading, Your Honor.

    THE COURT:

        All right.  Counsel.

    MR. MAGNER:

1          I'll rephrase the question.
2     THE COURT:
3          Okay.
4             FURTHER DIRECT EXAMINATION
5  BY MR. MAGNER:
6  Q   Does Mr. Napoli's conduct affect you, or
7  not affect you in terms of the performance of
8  your duties as a Defense Counsel?
9     MR. BOWMAN:
10          Same objection.
11     THE COURT:
12          Objection is sustained.  Counsel, you
13     need to rephrase the question.
14     MR. MAGHER:
15          Okay.
16             FURTHER DIRECT EXAMINATION
17  BY MR. MAGNER:
18  Q   Does Mr. Napoli's conduct affect you?
19     MR. BOWMAN:
20          Same objection.
21     MR. MAGNER:
22          There's no way to ask –
23     MR. BOWMAN:
24          She can testify, if she wants to.  He
25     can't telegraph the answers to her.
26     THE COURT:
27          Objection overruled.
28     MR. MAGNER:
29          Thank you.
30             FURTHER DIRECT EXAMINATION
31  BY MR. MAGNER:
32  Q   Does it affect you?

1    A    Yes, I feel like it has a chilling affect.

2    Q    Explain what you mean by that.

3    A    So, the case that I was just describing

4    where we were talking with our client's mother

5    and sister, who are potential trial witnesses,

6    that is something that in the diligent

7    representation of our client we should do and

8    have to do is talk to the people about their

9    testimony and see what they're going to say,

10   and, you know, be in contact with them, if they

11   are willing to speak to us, which they were.

12   After being threatened with being indicted for

13   having those conversations, I think both myself

14   and my co-counsel backed off those

15   conversations.  We would have met with those

16   people, leading up to trial.  We would have

17   had, you know, further pretrial discussions

18   with them, and didn't.  And I think that part

19   of that had to do with the fact that we were

20   concerned that if Jason Napoli found out that

21   we had met with the witnesses before trial,

22   that he was going to drop indictments on the

23   witnesses, and on us for that, and so, I do

24   think it has an effect.

25        MR. MAGNER:

26             I tender the witness, Your Honor.

27        THE COURT:

28             All right.  Thank you, Counsel.

29                  CROSS EXAMINATION

30   BY MR. NAPOLI:

31   Q    Good morning, Ms. Chervinsky.

32   A    Good morning.

MR. MAGNER:

Your Honor, I'd object to Counsel Napoli
attempting another act of intimidation

MR. BOWMAN:

Your Honor, he's cross examining the
witness.

THE COURT:

Wait, wait, wait, Mr. Bowman, let Mr.
Magner finish his objection.

MR. BOWMAN:

Okay.

MR. MAGNER:

Considering he is the subject of this
Motion to Recuse, or one of the subjects of
this Motion to Recuse, it would be highly
improper for him to question this witness.

THE COURT:

All right.  Mr. Bowman, your response?

MR. MAGNER:

This would be the first official act,
other than personally returning an
indictment in this matter, since then, we
just think this would be completely
inappropriate and untoward.  And we
specifically object under Code of Ethics, I
believe its Rule 3.7, in light of the fact
that he has a personal interest in this
matter.  It's just highly improper and
unethical for him now to –

MR. BOWMAN:

Do I get to respond?

MR. MAGNER:

1          In good time.
2          - for him now to question this witness,
3     act as Counsel, and we believe, engage in
4     additional acts of intimidation.
5     THE COURT:
6          All right.  Thank you, Counsel.
7          Mr. Bowman.
8     MR. BOWMAN:
9          The whole reason we're here today is to
10    decide if the District Attorney's Office,
11    the District Attorney and Mr. Napoli get
12    recused.  There has been no judicial
13    finding yet that he should be recused, if
14    the Office should be recused, or District
15    Attorney Cannizzaro should be recused.
16    This is perfect, though, because this is
17    what we're dealing with.  You're seeing
18    that because he's getting up now to cross
19    examine a witness, he's intimidating
20    somebody.  I mean, their argument is when
21    he's taking a breath he's doing something
22    wrong.
23    THE COURT:
24         All right.  So, Counsel, what I'm going
25    to rule is that, I'm going to sustain the
26    objection at this time.  I think that it is
27    an issue.  I'm not going to characterize
28    the issue, or the problem with Mr. Napoli
29    doing the cross examination in this
30    context.
31         The District Attorney's Office has been
32    aptly represented by Mr. Bowman up until

1       this point, and I see no reason that Mr.
2       Napoli now should conduct the cross
3       examination under these circumstances.
4                   CROSS EXAMINATION
5    BY MR. BOWMAN:
6    Q   Good morning, Ms. Chevinsky.
7    A   Good morning.
8    Q   You don't like Jason Napoli much, do you?
9    A   No, I don't.
10   Q   Let me ask you something.  You referenced a
11   case in which you represented a defendant
12   named, Dabney?
13   A   Yes, sir.
14   Q   He was prosecuted by Jason?
15   A   Yes, sir.
16   Q   Where's Mr. Dabney these days?
17   A   Angola.
18   Q   For how long?
19   A   He received a life sentence.
20   Q   Okay.  What about Mr. Martin, where is he?
21      MR. MAGNER:
22          Objection to relevance.  Your Honor, the
23      issue is whether there was improper contact
24      between Counsel and a represented party.
25      They could be guilty.  They could be not
26      guilty.  They could be somewhere in
27      between.  That's the issue, not whether
28      they were in imprisoned.
29      THE COURT:
30          Mr. Bowman, response?
31      MR. BOWMAN:
32          I get to explore why she doesn't like

1    Jason Napoli.  Maybe she doesn't like Jason

2    Napoli because he keeps putting her clients

3    in jail.

4    THE COURT:

5         All right.  I'll give you some

6    flexibility on that.  Objection overruled.

7              FURTHER CROSS EXAMINATION

8    BY MR. BOWMAN:

9    Q   Mr. Martin?

10   A   He is in the Department of Corrections.  I

11   don't know where exactly he's located.

12   Q   For how long?

13   A   He pled guilty to a total of fifty years

14   sentence.

15   Q   Fifty or sixty?

16   A   Fifty.

17   Q   Now, you testified earlier that your

18   relationship in terms of working with Mr.

19   Napoli is not very good, that you believe in

20   having professional interactions with your

21   colleagues.

22   A   I try to.

23   Q   Including your colleagues at the District

24   Attorney's Office?

25   A   I try to.

26   Q   Now, you referenced a situation in Section

27   L.

28   MR. BOWMAN:

29        Give me a second.  I've got to find it.

30   Excuse me for one second, Your Honor.

31   THE COURT:

32        Sure.

1          FURTHER CROSS EXAMINATION
2    BY MR. BOWMAN:
3    Q   Okay.  It's your testimony that you said to
4    Judge Zibilich, "We can be friends when he
5    stops indicting my friends for doing their
6    jobs."
7    A   Yes, sir.
8    Q   Okay.  That quote is sitting in their
9    recusal motion kind of naked there.
10        MR. MAGNER:
11            Objection to the editorial comments.
12       Just ask questions.
13       THE COURT:
14            Go ahead, Mr. Bowman.
15            FURTHER CROSS EXAMINATION
16   BY MR. BOWMAN:
17   Q   It sounds like you were responding to
18   something.
19   A   Yes.
20   Q   What were you responding to?
21   A   The Judge had said when I was at the bench,
22   kind of looking at me and looking at Mr.
23   Napoli, who was sitting over here, like, you
24   know, something to the effect of, you know, why
25   can't y'all makeup and be friends, something
26   like that, and I was responding to what the
27   Judge had said?
28   A   So there was exchange with you and Napoli
29   before that?
30   A   Mr. Napoli and I have not spoken.  The
31   Judge made the comment, and I was responding to
32   the Judge's comment.

1   Q   Okay.  So, Mr. Napoli hadn't spoken to you
2   at that point?
3   A   I don't believe so.
4   Q   And you just come at him with, we can be
5   friends when he stops indicting my friends for
6   doing their jobs?
7   A   I said that the Judge, but yes, that's what
8   I said.
9   Q   You said it in open Court?
10  A   Right.
11  Q   I mean, do you consider that to be
12  professional?
13  A   I was responding to the Judge's question,
14  and it was the truth.
15  Q   What was the truth?
16  A   That we could be friends if he stops
17  indicting my friends for doing their jobs.
18  Q   Well, he's a prosecutor.  So, I mean, so he
19  can indict people as long as it's not your
20  friends?
21      MR. MAGNER:
22          Objection as to the argument.
23      THE COURT:
24          Objection sustained.
25      THE WITNESS:
26          It would be his job to indict her if she
27      had committed a crime.  She didn't commit a
28      crime.
29              FURTHER CROSS EXAMINATION
30  BY MR. BOWMAN:
31  Q   You don't believe she committed a crime?
32  A   No, I don't.

1  Q   Okay.

2     MR. BOWMAN:

3        Excuse me one second, Your Honor.

4     THE COURT:

5        Okay.

6     MR. BOWMAN:

7        I have no further questions, at this

8     time, but I'm going to need Ms. Chevinsky

9     to stay under subpoena.

10    THE COURT:

11       Okay.  So noted.

12       Counsel.

13    MR. MAGNER:

14       Yes, ma'am.

15             REDIRECT EXAMINATION

16 BY MR. MAGNER:

17 Q   Ms. Chervinsky, in response to Mr. Bowman's

18 question you said you did not believe that Ms.

19 Blume had committed a crime, why not?

20    MR. BOWMAN:

21       Objection, Your Honor.  That's calls for

22    opinion testimony.

23    THE COURT:

24       Response.

25    MR. MAGNER:

26       Based on her factual appraisal of the

27    situation.

28    THE COURT:

29       I'm going to sustain the objection.

30    MR. MAGNER:

31       I think it's fair comment in response to

32    State's –

1    THE COURT:

2         I sustained the objection, Counsel.

3    MR. MAGNER:

4         Thank you.  I have no further questions,

5    ma'am.  Thank you.

6    THE COURT:

7         Thank you, Ms. Chevinsky.

8    MS. CHEVINSKY:

9         Thank you, Judge.

10   MR. MAGNER:

11        Defense would call Lauren Boudreaux.

12   MR. BOWMAN:

13        Your Honor –

14   THE COURT:

15        Yes, sir?

16   MR. BOWMAN:

17        While we're waiting for Ms. Boudreaux,

18   may I step outside for two minutes?

19   THE COURT:

20        That's fine.

21   MR. BOWMAN:

22        Thank you.

23   (MR. BOWMAN EXITED THE COURTROOM).

24   MR. BOWMAN:

25        My apologies.

26   MR. MAGNER:

27        No problem.

28   THE COURT:

29        All right.  We're back on the Record.

30   LAUREN BOUDREAUX, WHO WAS CALLED AS A WITNESS

31   BY THE DEFENSE, AFTER HAVING BEEN DULY SWORN TO

32   TELL THE TRUTH, WAS EXAMINED AND TESTIFIED AS

FOLLOWS:

DIRECT EXAMINATION

BY MR. MAGNER:

Q   Good morning.

A   Good morning.

Q   Could you state your name for the Record, please?

A   Lauren Boudreaux.

Q   Ms. Boudreaux, where do you work at the present time?

A   Louisiana Center for Children's Rights.

Q   What do you do there?

A   I'm an attorney.

Q   And did you work as a Public Defender in this Court?

A   I did.  Well, in the Courthouse, yes.

Q   Generally?

A   Yes.

Q   For how long?

A   Almost eight years, from 2007 until 2015.

Q   All right.  And in 2013 thru 2015 you were working as a Public Defender?

A   Yes.

Q   Were you the Defense Counsel for Curtis Hawthorne?

A   I was, along with Chanel Long – well, Chanel Smith now.

Q   And, very briefly, what were the charges against Mr. Hawthorne?

A   Aggravated rape, aggravated kidnap, and armed robbery with a firearm.

Q   And broadly speaking, what was the defense

1   to the rape charge?

2   A   Consent.  It was consensual.

3   Q   Who was the ADA in the Hawthorne case?

4   A   Jason Napoli.

5   Q   Had you had previous cases with him?

6   A   I had.

7   Q   How did you get along with him?

8   A   It was always a little difficult trying to

9   get information, or discovery, filing motions.

10  There was consent asking the Court for

11  intervention.

12  Q   Did you have an investigator who assisted

13  you with the case?

14  A   Yes

15  Q   And who was that?

16  A   Taryn Blume.

17  Q   And had you worked with her previously?

18  A   I had.

19  Q   Can you generally describe her work

20  performance while you were the supervising

21  Public Defender?

22  A   She was a great Investigator.  She was

23  honest, and hardworking.  I never had any

24  issues with any complaints, or even suggestions

25  of her doing anything that would be

26  inappropriate, either by the witnesses, by the

27  State, by the Court, on any cases that I had.

28  It was always hardworking, honest, good work.

29  Q   Did you assist us in preparing a chronology

30  of the Hawthorne case?

31  A   I did.

32      MR. MAGNER:

1      May I approach, Your Honor?

2     THE COURT:

3          Yes.

4          FURTHER DIRECT EXAMINATION

5  BY MR. MAGNER:

6  Q   I'm showing you what's been marked for

7  identification as Defense Exhibit 8.  Is this

8  the chronology you helped us with?

9  A   Yes, it is.

10  Q   How did you develop this chronology?

11  A   The information in here is based on clocked

12  in, filed motions that were filed on behalf of

13  Curtis Hawthorne in Section L, under the case,

14  it was, I think, Case Number: 517-890, I

15  believe was the case number.  It is also listed

16  in the Docket Master for that case, under 517-

17  890.

18      And I also checked with our Case Management

19  System, and confirmed those dates and

20  information.

21  Q   Was the Record in this matter voluminous?

22  A   Yes.

23  Q   Would this summary, do you believe, assist

24  the Court in understanding the flow of events

25  in the Hawthorne case?

26  A   I think so.  I mean, it helped me, and I

27  think it would help the Court.

28  Q   Does it fairly and accurate summarize the

29  key events as relates to Ms. Blume's case here?

30  A   Yes, it does.

31      MR. MAGNER:

32          Your Honor, at this time we would offer

1       into evidence Defense Exhibit 8.
2       THE COURT:
3           All right.
4       MR. BOWMAN:
5           The State's going to object, Your Honor.
6       The Docket Master in this case speaks for
7       itself.
8       THE COURT:
9           All right.  So, Counsel, what do you
10      have here, a chronology -
11      MR. MAGNER:
12          It's a chronology, yes, ma'am.
13      THE COURT:
14          - that's been prepared?
15      MR. MAGNER:
16          Yes, ma'am.
17      THE COURT:
18          Is it based on the Docket Master itself?
19      MR. MAGNER:
20          And other filings in the case.
21      THE COURT:
22          All right.  So, the Court's going to
23      sustain State's objection in this matter.
24      The Court agrees the Docket Master does
25      speak for itself.
26              FURTHER DIRECT EXAMINATION
27  BY MR. MAGNER:
28  Q   Now, I'm showing you what's been marked for
29  identification as Exhibit 8-A.  Is this the
30  Docket Master in the case?
31  A   Yes, that is a Certified copy of the Docket
32  Master, under 517-890, State versus Curtis

1   Hawthorne.

2   Q   And does this fairly and accurately, from

3   your review of it, depict what happened during

4   the course of the case?

5   A   Yes, I did review it and it does reflect

6   what happened in the case.

7       MR. MAGNER:

8           All right.  We would offer, at this

9       time, Exhibit 8-A.

10      THE COURT:

11          All right.  Counsel.

12      MR. BOWMAN:

13          No objection, Your Honor.

14      THE COURT:

15          Thank you.

16              FURTHER DIRECT EXAMINATION

17  BY MR. MAGNER:

18  Q   In the course of your representation of Mr.

19  Hawthorne, did you file an Omnibus Discovery

20  Motion?

21  A   I did, I believe it was on October 22,

22  2013.  I filed the Motion with the Clerk and

23  provided a copy to the State.

24  Q   And could you just briefly describe what

25  was contained in the Omnibus Discovery Motion?

26  A   Requesting that all discovery in the case,

27  documents, statements, all the discovery that

28  the State intended to use in its case against

29  Mr. Hawthorne.

30      It also included a Preservation of

31  Evidence, Suppression of Statement, Evidence

32  and Identification requests in there, as well.

1   Q   Did you request Brady Evidence, as well?

2   A   Yes, it's all listed in the Omnibus Motion.

3   Q   Is Exhibit D-4 that Omnibus Discovery

4   Motion?

5   A   Yes, that is the Omnibus Motion that I

6   filed, and that was a copy from October 22.

7       MR. MAGNER:

8           We would offer that at this time.

9       THE COURT:

10          All right.

11      MR. MAGNER:

12          Does the Court have any objection to our

13      using the Chronology as a Demonstrative

14      Exhibit?

15      THE COURT:

16          I don't.

17          Counsel.

18      MR. BOWMAN:

19          I don't understand why we can't just use

20      the Docket Master.  That's the official

21      document.

22      MR. MAGNER:

23          It's simpler.  It's clearer.  It relates

24      to just the specific issues in this case,

25      that's why.

26      MR. BOWMAN:

27          It was created by the Defense.  The

28      Docket Master stands for what happened in

29      Hawthorne.

30      THE COURT:

31          So, Counsel, for purposes of the Record,

32      in questioning Ms. Boudreaux, you need to

1        just use the Docket Master.
2        MR. MAGNER:
3             That's fine.
4        THE COURT:
5             Obviously, whatever you use at the
6        podium just for your own recollection, is
7        your decision.
8                  FURTHER DIRECT EXAMINATION
9    BY MR. MAGNER:
10   Q    In your Omnibus Motion, did you request the
11   defendant's statements?
12   A    I did.
13   Q    Did you request a written response to your
14   Discovery Motion?
15   A    Yes.
16   Q    Did you ever receive a written response to
17   your Discovery Motion?
18   A    No.
19   Q    Did you ever receive a written response to
20   any of your Discovery Motions?
21   A    No.
22        MR. BOWMAN:
23             Objection, relevance, Your Honor.
24        THE COURT:
25             All right.  She's already answered.
26                  FURTHER DIRECT EXAMINATION
27   BY MR. MAGNER:
28   Q    Did Mr. Napoli ever make any statements to
29   you concerning your filing of motions in the
30   Hawthorne case?
31   A    Pretty much, the more we filed it
32   aggravated him in having to respond to the

1   Motions, and that he wasn't going to respond,
2   and the more motions filed makes the deal go
3   up.
4   Q   What do you mean, the deal go up?
5   A   Any plea offer.
6   Q   And that was in the Hawthorne case that Mr.
7   Napoli told you that?
8   A   I had multiple cases going on with Mr.
9   Napoli.  I cannot say if it was specifically
10  about Mr. Hawthorne.  I know that we filed many
11  motions in Hawthorne, as we do in all of our
12  cases.  So, it could have been a general
13  statement about all my cases, but yes, it was
14  said.
15  Q   And did that reflect his attitude as you
16  perceived it?
17      MR. BOWMAN:
18          Objection, for leading the witness
19      again.
20      THE COURT:
21          Objection sustained.
22              FURTHER DIRECT EXAMINATION
23  BY MR. MAGNER:
24  Q   From what you could perceive, was his
25  statement an accurate statement?
26  A   We didn't receive any written responses
27  from the State in regards to any of our
28  motions, and he would get aggravated when we
29  had to address the motions that were filed in
30  open Court.  So, yes.
31  Q   Did you make a specific request of Mr.
32  Napoli for any reports of the incident at the

1   Guste Homes, the Guste Housing Project?
2   A   Yes, on multiple occasions.  The inventory
3   of discovery and supplemental requests for
4   discovery, in November, I think it's November
5   25, 2013, we had asked for surveillance,
6   reports, documentation from the Guste Housing,
7   or Guste Homes, I believe is what it's called,
8   because that is where the complaining witness
9   initially reported any crime, and so we
10   requested any and all documentation from Guste
11   Homes.
12   Q   I'm going to show you, Ms. Boudreaux,
13   what's been marked for identification as
14   Defense Exhibits 5, 6, and 7, if you just give
15   me a moment.  I'm trying to stay organized
16   here, and it's not my strong suit to do.
17       Generally speaking, Defense Exhibits 5, 6,
18   and 7, have you seen these before?  Have you
19   seen these recently?
20   A   Yes, that's the inventory of discovery and
21   supplemental requests.
22   Q   Generally, you've seen these recently?
23   A   I have.
24   Q   Okay.  Are these generally the Discovery
25   Motions that you filed in the case?
26   A   Those are.
27   Q   All right.  And let's just take them one at
28   a time.
29       What is five, and what was the purpose of
30   it?
31   A   This was an Inventory of Discovery to list
32   for the Court in writing, and for the Record in

1   Mr. Hawthorne's case, all items that had been
2   received as of November 25, 2013, from the
3   State.  It's listed by Item Number, and it's
4   specific as to each report, and what document,
5   or information was received.
6       It also contains a supplemental motion
7   request, or a motion for outstanding discovery,
8   listing the items believed to be outstanding
9   that the State needed to turn over to Defense.
10  Q    And Defense Exhibit D-6, what is that?
11  A    That is a Motion for Discovery, mandated by
12  Brady, Giglio, Kyles, Progeny, and in this it's
13  a general motion for any and all Brady
14  evidence, any evidence that the State would be
15  required to turn over under Kyles, Giglio, and
16  other case law.  And in this we specifically
17  request information regarding the Guste Homes
18  and reports that were generated by Guste Homes,
19  and specifically list a – let's see –
20  interviews by the security guard from Guste
21  Homes and those Reports, any other information
22  from Guste Homes, in regards to the complaining
23  witness alleged reporting of a robbery at the
24  time of the alleged incident.
25  Q    And Exhibit D-7, what is that?
26  A    This is a Motion for Discovery, another
27  Motion for Discovery that was filed January 31.
28  This is in regards to surveillance from Murphy
29  Oil.  There is an allegation that the
30  complaining witness's bank card was used, and
31  there was surveillance obtained and viewed by
32  the Detective.  It indicated that it did not

1  show Curtis Hawthorne using the complaining
2  witness's debit car, or bank card.  And so, we
3  requested that the surveillance be produced,
4  because the State has had it in their
5  possession for over a year, at that point.
6      MR. MAGNER:
7          Your Honor, at this time we would offer
8      into Evidence Exhibits D-5, 6, and 7.
9      THE COURT:
10         All right.
11             FURTHER DIRECT EXAMINATION
12 BY MR. MAGNER:
13 Q   Did you ever receive any written responses
14 from Mr. Napoli to any of these written
15 discovery requests?
16 A   No, not the ones we have – no – the ones we
17 have gone over, no.
18 Q   Did you direct Ms. Blume to conduct an
19 investigation at the Guste Homes?
20 A   I did.
21 Q   Did she do that, to the best of your
22 knowledge?
23 A   Yes, she did.  I asked her to go out to the
24 Guste Homes, and to gather whatever information
25 she could gather, based on the Police Report.
26 and the, I guess, the discovery that we had
27 received from the State at that point.  It was
28 part of our investigation.  It was crucial.
29 That was the initial reporting by the alleged
30 complaining witness, and so…
31 Q   Did she report back to you about her
32 investigation?

1   A   She did.

2   Q   And what did she tell you about the

3   existence of any Logs, or Reports of the

4   incident?

5   A   She had indicated that she spoke with, I

6   think it was a Sergeant, or a Captain Gibson.

7   I remember there was smooth jazz being played

8   in the office when she had interviewed him.

9   During her interview she learned of a Log that

10   the Guste Homes - that was, I guess, how they

11   documented the whatever they needed to document

12   at that time.  And, according to this Log by

13   Guste Homes, it listed the date and time of the

14   alleged incident for Curtis Hawthorne's case.

15   It stated there was a Caucasian female, and

16   that she said that she was robbed.

17   Q   Did she bring back a copy of the Log to

18   you?

19   A   She did not.

20   Q   Do you know why she did not?

21   A   I believe she was just given the

22   information from Sergeant Gibson, and so, I

23   think - I don't know if she was actually shown

24   it, or if she was just read the information

25   from Sergeant Gibson, at that time, but she did

26   not obtain a copy.

27   Q   Did you ask her to follow-up with the

28   Security Guard on duty?

29   A   I did, because Captain Gibson was not

30   actually the person there on the date of the

31   allegation, and so, Captain Gibson directed Ms.

32   Blume to, I believe, it was Mr. Naquin, who

1   would have been the Security Guard on duty at
2   the time of the alleged incident.
3   Q   Did you meet with Officer Naquin?
4   A   We did.  He came over to the Public
5   Defender's Office.  It was sometime in early
6   June, 2014.  I remember it being very early in
7   the morning, because –
8   Q   Why do you remember that?
9   A   Because I'm not a morning person, but we
10  met around 7:00 a.m.  It was after he got off
11  the nightshift.  And so, he came to the Public
12  Defender's Office and met with Ms. Blume and I
13  in the Seventh Floor Conference Room.
14  Q   In order to get to that Seventh Floor
15  Conference Room does one have to go through an
16  anti-room, or –
17  A   Yes.  So, you would take the elevator of
18  2601 Tulane Avenue to the Seventh Floor, and
19  that's where the Public Defender's Office main
20  floor is.  And when you get out of the
21  elevators the first thing you see is the
22  Orleans Public Defender's sign, and to the left
23  of the sign is the Conference Room.
24  Q   And this is already in Evidence, our D-3.
25  Is this that sign?
26  A   That is.
27  Q   And would Mr. Naquin have had to walk
28  passed that?
29  A   Yes, that's the door to the Conference Room
30  where we met with Mr. Naquin on that morning.
31  Q   Did you give Officer Naquin your business
32  card?

1   A   I did.

2   Q   Did Ms. Blume give Officer Naquin her

3   business card?

4   A   She did.

5   Q   We have blowups of Defense Exhibit 1.  Are

6   these those business cards?

7   A   Yes, that is my business card at the top

8   and Taryn Blume's in the middle.

9   Q   Okay.  And on Ms. Blume's card her phone

10  number is underscored there?

11  A   That is correct.

12  Q   Had you seen that in other occasions where

13  she did that?

14  A   Yes, she does underline her number.  It's

15  something that I think a lot of us would do,

16  because of the multiple numbers listed on the

17  business card, to make it easier for the

18  person.  That is the direct line.

19  Q   Did you misrepresent yourself to Officer

20  Naquin in any way?

21  A   No.

22  Q   Did Ms. Blume misrepresent herself?

23  A   Absolutely not.

24  Q   Would you expect that she could

25  misrepresent herself?

26  A   Never.

27  Q   Why are you so sure of that?

28  A   I have worked with Taryn.  I know Taryn,

29  and she would not misrepresent herself.  And

30  I've never seen her do anything dishonest or

31  unethical.  She does her job, and she does it

32  professionally and ethically, and does a great

1  job, and does not need to misrepresent herself.

2  Q   In connection with the charges and the

3  indictment against Ms. Blume, were you

4  questioned by Mr. Napoli about the facts and

5  circumstances of this case?

6      MR. BOWMAN:

7          Objection, relevance, Your Honor.  We

8      have gotten very far afield of what we're

9      here today for.  This is a Recusal Motion.

10     This isn't a trial of Ms. Blume.  That's

11     scheduled for May 10.

12     MR. MAGNER:

13         It goes to Mr. Napoli's bad fate in

14     investigating this matter, not speaking to

15     the fact witnesses, who were really

16     involved in this, and I think it is highly

17     relevant to the Recusal.

18     THE COURT:

19         All right.  The objection is overruled.

20     MR. MAGNER:

21         Thank you.

22             FURTHER DIRECT EXAMINATION

23 BY MR. MAGNER:

24 Q   Did Mr. Napoli talk to you about the facts

25 of this case?

26 A   Concerning the allegations of Ms. Blume?

27 Q   Yes.

28 A   Absolutely not.  He never came to me and

29 said anything about an alleged

30 misrepresentation by Ms. Blume pretending to be

31 a District Attorney to obtain the Security Log.

32 Q   To your knowledge, did he speak to Ms.

1  Blume about the facts of this case, the
2  misrepresentations?
3  A   Not to my knowledge.
4  Q   Were you asked to testify before the Grand
5  Jury?
6  A   No.
7  Q   Was Ms. Blume asked to testify before the
8  Grand Jury?
9  A   No, we found out about the investigation
10  after a Grand Jury was returned, on WDSU.com, I
11  think.
12  Q   Was the Management of the Public Defender's
13  Office contacted, to your knowledge, concerning
14  this -
15      MR. BOWMAN:
16          Objection, she can't answer -
17      MR. MAGNER:
18          May I please finish my question?
19      THE COURT:
20          Mr. Bowman, just let him finish his
21      question.  It is important for the Record.
22      Okay.  The way we do things here in Court,
23      everything goes on the Record.
24          So, Mr. Magner.
25      MR. MAGNER:
26          Yes, ma'am.
27      THE COURT:
28          And then Mr. Bowman will have an
29      opportunity to respond.
30              FURTHER DIRECT EXAMINATION
31  BY MR. MAGNER:
32  Q   Was the Management of the Public

1   Defender's Officer contacted, in any way, in
2   connection with an investigation of Ms. Blume
3   for misrepresentation?
4       THE COURT:
5           All right.  Mr. Bowman.
6       MR. BOWMAN:
7           Objection.  She can't possibly answer
8       for the Management of the Public Defender's
9       Office.
10      MR. MAGNER:
11          To her knowledge.
12      THE COURT:
13          All right.  To your knowledge.
14      Objection is overruled.
15      MS. BOUDREAUX:
16          To my knowledge, no, no one was
17      contacted at the Public Defender's Office
18      about the investigation.
19              FURTHER DIRECT EXAMINATION
20  BY MR. MAGNER:
21  Q   When you met with Officer Naquin, what did
22  he tell you?
23  A   He told us about the date of the alleged
24  incident, and that he was present.  He was
25  working with a, I think it was an Officer
26  Allen, who was on lunch, and was not physically
27  there at that time when the complaining witness
28  approached.  I think it was on February 9,
29  2013, was the date.
30      Officer Naquin had contact with the
31  complaining witness.  The complaining witness
32  said that she had just been robbed, and that

1    he, I guess, assisted her with contacting the

2    police.

3    Q   Now, did Officer Naquin have the Log with

4    him when he came to see you?

5    A   He did not.

6    Q   And how long after this meeting with

7    Officer Naquin did you first see the Log,

8    roughly?

9    A   June, 2014, is when we first met with

10   Officer Naquin.  It was the end of November,

11   2014, when I first saw the Log.

12   Q   And I'm showing you now, what's been

13   entered into evidence as Exhibit D-1A.  This

14   has been entered as the Log.  What Officer

15   Naquin told you, was it consistent with what

16   was in the Log?

17   A   Yes.

18   Q   Did you attempt to influence, or embellish,

19   or muscle his statement to make it better for

20   your case?

21       MR. BOWMAN:

22           Objection, leading again.

23       THE COURT:

24           Objection sustained.

25          FURTHER DIRECT EXAMINATION

26   BY MR. MAGNER:

27   Q   Did you do anything to encourage Officer

28   Naquin to change his story?

29       MR. BOWMAN:

30           Objection, leading again.

31       MR. MAGNER:

32           That's an open ended question.

1    THE COURT:
2        Objection overruled.
3    MR. MAGNER:
4        Thank you.
5    THE COURT:
6        You can answer it.
7    MS. BOUDREAUX:
8        No, the purpose of us meeting with
9    Officer Naquin, was because Naquin was the
10   initial Investigating Officer who met with
11   the complaining witness.  And he was the
12   first person that the complaining witness
13   gave information to, and so, in part of our
14   job investigating the case and representing
15   Curtis Hawthorne, we met with him to get
16   information to what he knew, what he knows.
17           FURTHER DIRECT EXAMINATION
18   BY MR. MAGNER:
19   Q   Did you suggest he should change the
20   verbiage?
21   MR. BOWMAN:
22       Objection, leading.
23   THE COURT:
24       Sustained.
25   MS. BOUDREAUX:
26       We never suggested that –
27   THE COURT:
28       Sustained.
29   MR. MAGNER:
30       You forgot the rules.
31   MS. BOUDREAUX:
32       I'm sorry.

1                FURTHER DIRECT EXAMINATION

2    BY MR. MAGNER:

3    Q   Did Officer Naquin say anything to you

4    about anyone else trying to contact him

5    concerning the incident of the Guste Homes?

6    A   Officer Naquin had stated that he'd been

7    contacted by someone from the District

8    Attorney's Office about meeting.  He couldn't

9    remember the name, but I believe it was Jason

10   Napoli.  He wasn't sure, but he had been

11   contacted by the State, and said that because

12   we had contacted him first, he met with us

13   first, because we had asked to meet with him

14   first.  And so, after our meeting he planned to

15   meet with the District Attorney's Office.

16   Q   You had dibs, though?

17   A   Yes, he's a very polite man, so he wanted

18   to, I guess, accommodate us first, since we

19   asked first.

20   Q   Now, as I understand it, you made a

21   specific request for Reports from the Guste

22   Homes on what date?

23   A   On March 10, 2014, in the Brady Motion.

24   Q   If you didn't have the Log, how did you

25   know to ask for such a Log?

26   A   Officer Naquin told us about the Log.

27   Sergeant Gibson gave us information from this

28   Log.

29   Q   But you'd filed this in March, but I think

30   you just told us that you spoke with Naquin on

31   June 2?

32   A   In the Incident Recall, the 911 call, the

1  phone call that is made to the Police says that

2  a woman has just been robbed.

3      And then it is sometime later after the

4  Sixth District Officers arrived, then there is

5  a reporting of an alleged rape.

6  Q   So, you asked for the Log in March?

7  A   Right.  Not specifically the Log, but we

8  asked for reports generated by Guste Homes

9  regarding a rape.

10 Q   Did you raise that issue in Court?

11 A   Yes.

12 Q   And did Mr. Napoli respond to you on your

13 request for any reports from the Guste Homes?

14 A   That there was nothing to turn over, that

15 there were no documents to turn over.

16 Q   And did you ask him again after you met

17 with Officer Naquin?

18 A   I did, and specifically requested the Logs,

19 that there was information in the Security Log

20 about the reporting of just a robbery, no

21 sexual assault.

22 Q   Okay.  Why was that important to you, first

23 to get some documentation of that complaint?

24 Why was that important to your defense?

25 A   Because Curtis never denied having sex with

26 the complaining witness.  It was a consent

27 based case, and the fact that the complaining

28 witness is not reporting any sexual assault,

29 that was probative and very important to the

30 Defense's case.

31 Q   And so, why was the Log, then, important if

32 you knew generally what she had said?  Why was

1  it important for you to get this Log?

2  A   The Log is a document of what was told and

3  what she said on that date.  We had no idea how

4  she was going to testify when it came time for

5  trial, so we needed it for impeachment, if

6  necessary.  We needed it with any officers, if

7  they remembered it differently, we needed this

8  in support of the Defense, and however the

9  State might present their case, if we needed it

10  for impeachment.

11  Q   In your mind, did you request that Log

12  clearly, and unequivocally?

13  A   I don't see how I did not, and I requested

14  it numerous times.

15  Q   Did you make a pest of yourself in Court to

16  get this thing?

17  A   Hopefully, I wasn't a pest.  Yes, we had to

18  file for this multiple times for the same

19  thing.

20  Q   Did Mr. Napoli ever say anything to you

21  concerning the Security Guard, or Officer

22  Naquin?

23  A   He had made some comment.  I could only

24  assume that it was after he had met with

25  Naquin, I'm not sure, but he made a comment

26  that, the Security Guard doesn't help you.  So,

27  he had to have, I would assume, met with the

28  Security Guard at that point to know if, in

29  fact, it helps the Defense or not, to make a

30  comment like that.

31  Q   Did you lay in the gap, or try to surprise

32  him in connection with this Log?

1    A   No, we requested it over months, multiple
2    times, though.
3    Q   When was the case originally set for trial?
4    A   The first trial setting, I believe, was in
5    January of 2014, which was like four months
6    after the indictment.  It was then set in March
7    of 2014, and we had moved for a continuance
8    based on all the outstanding discovery, and
9    Brady requests that were outstanding, nothing
10   turned over by the State.
11        And then, again, it was set in August,
12   2014, and ultimately went to trial in December,
13   2014.
14   Q   And did you have a personal situation that
15   resulted in the continuance of the August trial
16   date?
17   A   Yes, my grandmother died the day before the
18   trial setting.
19   Q   Was there a competency issue in the
20   Hawthorne case?
21   A   Yes, competency was raised, I believe it
22   was in the summer of 2014.
23   Q   And was Mr. Hawthorne examined for
24   competency?
25   A   He was.  He was examined by Dr. Deland, as
26   well, I think the State hired Dr. Blue, Michael
27   Blue, to evaluate him.
28   Q   Did Mr. Napoli make any comments to you
29   concerning the issue of competency that you
30   thought were unusual?
31   A   Well, first he tried to subpoena Chris -
32   Well, he did get an Instanter Subpoena for

1    Chris Morrell, an Attorney at the Public
2    Defender's Office, at the time, to get him to
3    testify concerning a previous representation of
4    Curtis Hawthorne, and why Chris Morrell did not
5    raise competency at that time, for that case,
6    on behalf of Curtis Hawthorne.
7    Q    So, he tried to subpoena another lawyer in
8    your Office?
9    A    Right.  Yes.
10   Q    Okay.
11   A    And so, my Office said to file a Motion to
12   Quash that subpoena.
13   Q    So, when was the trial ultimately held?
14   A    December 1st and 2nd of 2014.
15   Q    When did you finally get the Log that you
16   had been requesting?
17   A    I think it was November 25, 2014.
18   Q    And how did you get that?
19   A    We received it from the HANO Officers.  I
20   don't know the specific Officer that handed it,
21   or gave it to Ms. Blume, but we got it from
22   their office after communications with Sergeant
23   Gibson, Officer Naquin, and I cannot remember
24   the Lieutenant - I can remember Lieutenant, but
25   the rank above, so, I guess Captain Gibson.
26   Q    Okay.  Did you request a subpoena for
27   somebody from HANO to testify?
28   A    Yes, we did have an Instanter Subpoena go
29   out for Captain Gibson, just for the purpose of
30   laying the foundation for authentication of the
31   Log, in case we needed to use it at trial.
32   Q    Ultimately, did you need to use the Log at

1  trial?

2  A   We did not ultimately use the Log, because

3  the complaining witness testified that she did

4  not report sexual assault to the Officer, even

5  thought that was indicated in the police

6  reports.  So, we did not need to use it.

7  Q   So, she testified consistently that when

8  she first reported it she said that she had

9  been robbed, correct?

10  A   Yes, consistently with that Log.

11  Q   So, why do you believe that this Log still

12  constituted Brady or Giglio type evidence?

13       MR. BOWMAN:

14            Objection, she's not a legal expert,

15       Your Honor.

16       MR. MAGNER:

17            She was the Lawyer handling the case.

18       THE COURT:

19            Order in Court.  I'm sorry, Counsel.

20       MR. MAGNER:

21            Yes, ma'am.

22       THE COURT:

23            Go ahead.

24            What's the response to Mr. Bowman's

25       objection?

26       MR. MAGNER:

27            Well, she is a legal expert.  She was

28       the Defense Attorney handling the case, and

29       I'm asking from her perception as the

30       Defense Attorney in that case why she

31       considered this Log to be –

32       THE COURT:

1          Objection is overruled.
2     MR. MAGNER:
3          Thank you.
4     THE WITNESS:
5          In the Police Report, as written by the
6     Detective, from interviews from this
7     complaining witness, the complaining
8     witness said that she advises the HANO
9     Officers and Detectives that she's been
10    sexually assaulted.  This contradicts what
11    she said, and she was not sexually
12    assaulted.  That was not reported.  She
13    only reported a robbery.  Curtis, as I
14    said, did not deny having sex with the
15    complaining witness.  It was a consent
16    base.  This goes to his defense, and it was
17    absolutely exculpatory, and should have
18    been disclosed by the State.
19              FURTHER DIRECT EXAMINATION
20    BY MR. MAGNER:
21    Q   During that fall of 2014, were there some
22    press reports concerning the NOPD's Sex Crimes
23    Unit?
24    A   Yes, the Inspector General, they had an
25    audit of Sex Crimes Investigations, and I think
26    five detectives, and their investigations
27    during a span of time.
28    Q   Was one of those detectives the detective
29    in the Hawthorne case?
30    A   Yes, Vernon Haynes.
31    Q   Did you take any action to obtain materials
32    relating to the Inspector General's Report?

1    A   Yes, first I filed a Brady Motion, trying
2    to get the information regarding the
3    investigation from the State.  That failed, so
4    I filed –
5    Q   When you say, failed, what does that mean?
6    A   Well, Mr. Napoli advised that he did not
7    have any, I guess, documentation pertaining to
8    that investigation, and the Judge did not order
9    him to, I guess, produce that.  I filed, then,
10   a Motion, or a Subpoena Duces Tecum.  That was
11   sent to the City Attorney's Office, as well as
12   the Inspector General's Office, the D.A.'s
13   Office, and I think the P.I.B.  I'm not sure if
14   I served the P.I.B., too, but it was definitely
15   the City Attorney's Office and the I.G.'s
16   Office.
17   Q   And did the Judge allow you to issue the
18   Subpoena Duces Tecum to the I.G.?
19   A   Yes, they offered, or gave the City
20   Attorney's Office a chance to quash, to file a
21   Motion to Quash, but ultimately a subpoena
22   return was delivered to the Court, in which the
23   Court reviewed the documents.
24   Q   Was this in open Court?
25   A   It was in open Court.
26   Q   Tell us what happened when the subpoena
27   return was returned.
28   A   So, the City Attorney – I can't remember
29   the specific Assistant Attorney – the Assistant
30   District Attorney appeared with the reports
31   just regarding Curtis Hawthorne.  Curtis
32   Hawthorne's case was investigated by Detective

1    Haynes during the time period that the
2    Inspector General's, I guess, investigation was
3    conducted, and he was one of the detectives,
4    Vernon Haynes was, I guess, his cases were
5    picked by the Inspector General to, I guess,
6    audit.
7    Q    So, what happened next, after they make the
8    physical return?
9    A    The Judge reviews the report, then he hands
10   it to Mr. Napoli, where at that time we were in
11   Section L, it was on the third floor, where
12   Section G, presently is.  Mr. Napoli had the
13   folder sitting in the witness chair, and
14   reviewed them.  And the Judge told him to
15   review all documents and to, I guess, to make
16   sure that I had everything that was in there,
17   and Mr. Napoli first said that I had everything
18   that was contained in the subpoena return.
19   Because of the close proximity of where I was
20   sitting in the jury box, which is a little bit
21   closer than it is set up right now, I could
22   tell based on, I guess, the formatting of one
23   of the Reports, that I did not, in fact, have
24   one of the Reports that was in there.  Mr.
25   Napoli fought me, saying that we did, in fact,
26   have the Report, we did have everything that
27   was in there.  And so, the Judge then said,
28   well, if she has everything, then just – what's
29   the harm, just give it to her.  Give her a
30   copy.
31   Q    Let me make sure I understand.  So,
32   Napoli's looking through the file himself?

1    A   Yes, he had it.  It was a Manilla folder
2    with the Reports in it.
3    Q   And you were kind of looking over –
4    A   Yes, I was sitting in the jury box, which
5    was very close.
6    Q   And you see something that you didn't have?
7    A   I could tell by the formatting of the
8    Report.  I had reviewed the reports numerous
9    times, and so, I could tell by, I guess, how
10   big the paragraph was that I did not, in fact,
11   have one of the reports that was in there.
12   Q   So, Judge Zibilich says, basically, to
13   Napoli, well, if she's got it, what's the harm
14   in giving her another copy?
15   A   Right, because he had asserted, multiple
16   times that I had had everything that was
17   contained in there.
18       After being ordered to copy the reports
19   that were in there –
20   Q   Who ordered who, to copy what?
21   A   Judge Zibilich ordered Mr. Napoli to copy
22   it.  Napoli refused, that he would not copy it.
23   So, the Judge asked Mr. Ronnie Burke, the
24   Minute Clerk, to make a copy, who, in fact, did
25   make a copy for me.
26   Q   Wait, wait, wait, so, Napoli refused the
27   Judge's order to make a copy of the Report?
28   A   Yes.
29   Q   Is that typical?
30   A   Yes.
31   Q   And so, then what happened, Judge Zibilich
32   did what?

1   A   Mr. Ronnie Burke, the Minute Clerk, then
2   made a copy for me in the Secretary's Office.
3   He gave me a copy of the Report, and it was a
4   Report that I had not received from the State.
5   Q   Did it have significant conflicting
6   information in your estimation?
7   A   Yes, it had information concerning the
8   complaining witness's sobriety, based on what
9   she reported to the Officers.  It had
10   conflicting information about how she located
11   the car which Curtis was driving that night.
12   It also had information about reporting of the
13   incident that was conflicting with another
14   report.  And then, at the end of the Report, it
15   contained information from Detective Haynes,
16   how he, after receiving the CODAS hit in the
17   case, and received the name of, Curtis
18   Hawthorne, instead of going to obtain an arrest
19   warrant in the case, he tried to locate Curtis
20   Hawthorne first.  And after not being able to
21   locate Curtis Hawthorne, I guess, to discuss
22   the CODAS hit, he then went to the District
23   Attorney's Office, and it reports that - it was
24   around five days later when he goes to the
25   District Attorney's Office - and it was
26   mutually decided that a warrant would be
27   issued.
28   Q   Do you believe that these inconsistencies
29   were material, from your view as the Defense
30   Attorney?
31   A   Yes, I think the Detective had questions
32   with the allegations presented by the

1  complaining witness, and so, he was hesitant to
2  get the arrest warrant. He waited, and he
3  tried to find Mr. Hawthorne, and he conferred
4  with the District Attorney and they mutually
5  agreed.
6  Q  So, but this inconsistent report had not
7  been turned over to you in connection with your
8  Brady and Giglio request?
9  A  No, and according to the Report, it was May
10  24, 2014, is when it was authored.
11  Q  And if you had just relied on what Mr.
12  Napoli had told you, would you have gotten that
13  report?
14  A  No.
15  Q  Was that typical in your dealings with him?
16  A  Yes.
17  Q  How so?
18  A  I'd file Motions in writing and ask for
19  specific documents, and go into Court and ask
20  to have it set in Court on the Record to have
21  documents turned over, because it's not
22  something that he would, I guess, do without
23  being ordered to do so.
24  Q  Did you ever just go to the District
25  Attorney's Office to look at Mr. Napoli's file?
26  A  I did not look at Mr. Napoli's file, but I
27  did meet with the Screener, Paige Klein, before
28  the case was brought to a Grand Jury, in which
29  I was allowed to review the State's file, and I
30  sat in the Office with Paige Klein. Actually,
31  Ms. Blume was present, and she sat there with
32  us. Ms. Klein and me, looked over the

1  information the State had received at that
2  time.
3  Q   In light of what Mr. Napoli told you about
4  there being no report, or entry at the Guste
5  Homes, would it have done you any good to go
6  look at his file at the D.A.'s Office?
7  A   No, because there was no information in
8  there from Guste Homes.
9  Q   And was your perception of that based on
10  what he told you, that no such thing existed?
11  A   Right, he told me there was no document to
12  turn over.
13  Q   Do these efforts to have to birddog these
14  things in your case, did that effect your
15  ability to represent your client to the best of
16  your ability?
17     MR. BOWMAN:
18        Objection, leading.
19     MR. MAGNER:
20        I'll rephrase.
21     THE COURT:
22        All right.
23        FURTHER DIRECT EXAMINATION
24  BY MR. MAGNER:
25  Q   The issue with the Log, and tracking down
26  the Log, and the IG Report, and the
27  inconsistent Detective Haynes Report, what
28  effect, if any, did that have on your ability
29  as a Defense Attorney representing Mr.
30  Hawthorne?
31  Q   We have to constantly ask the State to do
32  their job, by going into Court, filing Motions,

1   and ask the Court to be involved and order that
2   the State do their job.  We would not know
3   about this information had we not done our job
4   representing Curtis Hawthorne doing an
5   investigation, and then having to go in and
6   file motions repeatedly, to ask the State to do
7   their jobs.  It's time consuming, and it takes
8   away from what I had been doing preparing for
9   the defense.
10       Also, if the State had not turned over, if
11  we had not learned about the information, it
12  would have affected the Defense.  It would have
13  affected how the case went.  I think that we
14  spent more time fighting over discovery and
15  asking the State to do their job, which was
16  unnecessary and quite ridiculous.
17  Q   Did you ever observe Mr. Napoli attempt to
18  intimidate your client, Mr. Hawthorne?
19  A   Yes, there was a date where we were up in
20  Section L, I think it was for one of the many
21  pretrial conferences that were set, that was
22  set in the case in an effort to try to get the
23  case to plead before the trial setting.  I
24  noticed that there was some interaction going
25  on between Mr. Napoli and my client, who was in
26  the box where they put the inmates in Section
27  L, where ever Section L was, it was very close
28  to the jury box, and so, when I walked over to
29  where Mr. Napoli and Curtis were seated, Mr.
30  Napoli was telling Curtis, I'm going to bury
31  you.  I'm going to bury you.
32       I asked the Court to –

1   Q   Do you remember those words, specifically?

2   A   Yes.

3   Q   And that term, bury you, do you remember

4   that specifically?

5   A   I remember, I'm going to bury you.  And so,

6   I asked the Court to please admonish Mr.

7   Napoli, and ask him to not speak to my client,

8   and to not make any comments to him, especially

9   to tell him that he's going to bury him.

10  Q   And so that we're clear, you were

11  representing Mr. Hawthorne at the time that you

12  observed this exchange between Mr. Napoli and

13  your client?

14  A   Yes.

15  Q   Now again, I've never really practiced here

16  at Tulane and Broad, what you've described,

17  isn't this just all part of, you know, like how

18  business is done at Tulane and Broad between

19  Public Defenders and ADA's?

20  A   Intimidation of the defendant to try to get

21  him to plead, no?

22  Q   I mean, but it's kind of a rough and tumble

23  place, huh?  I mean, your dealings with ADA

24  Napoli, are they typical of other ADA's in the

25  District Attorney's Office?

26  A   I have not had many issues and problems

27  with any other ADA as I've had with Mr. Napoli.

28  Q   You said that Ms. Blume was indicted on

29  WDSU?

30  A   I think it was WDSU.  I was one of the on

31  line news sites.

32  Q   And do you know who returned the indictment

1   before Judge Herman?

2   A   Jason Napoli.

3   Q   And do you know, did he ask that bond be

4   set for Ms. Blume?

5   A   I think he asked for $50,000.

6   Q   I'm sorry?

7   A   I think $50,000.

8   Q   And typically, what would a $50,000 bond

9   be, you know, in this world?  You know, what

10  type of charge would a $50,000 bond be?

11      MR. BOWMAN:

12          Objection, what is her basis for

13      knowledge to be able to answer this

14      question?

15      MR. MAGNER:

16          I'll set the foundation, Judge.

17      THE COURT:

18          All right.

19              FURTHER DIRECT EXAMINATION

20  BY MR. MAGNER:

21  Q   Are you generally familiar, or were you

22  generally familiar, when you were working as a

23  Public Defender, at what level bond would be

24  set for offenders, arrested persons?

25  A   Working at the Public Defender's Office for

26  a length of time I've seen - I've had many

27  different charges, cases, and defendants

28  charged with varying crimes, and with varying

29  bonds for the crimes of violence, an armed

30  robbery, someone with multiple priors.

31  Q   Does Ms. Blume have any criminal history?

32  A   No.

1   Q   Was she ever a flight risk to anybody?

2   A   No.

3   Q   Did Judge Zibilich have a Christmas Party

4   that year?

5   A   He did.

6   Q   This was after Ms. Blume was indicted?

7   A   Yes.

8   Q   Did Judge Zibilich say anything concerning

9   Mr. Napoli and the charges against Ms. Blume?

10  A   Yes.  So, I was hesitant to go to the

11  Christmas party, just because of the timing

12  and, I guess, the anger I felt at what they had

13  done to, or what they were doing to Taryn, and

14  so, I think, likely in an effort to, I guess,

15  make things better between the Public

16  Defender's Office and the D.A.'s Office, Judge

17  Zibilich said something to the effect that,

18  this is only something that he was ordered to

19  do.  This isn't something that - that Jason

20  didn't do this, this was something he was

21  ordered to do.  I then said, Judge, I

22  understand that this was something that - this

23  was Mr. Napoli.  He asked permission to do

24  this, and he was allowed to do this, and this

25  is his -

26  Q   His baby?

27  A   Yes.

28  Q   And did Mr. Napoli chime in?

29      MR. BOWMAN:

30          I'm going to object right here, because

31      now we have gotten off into what Franz

32      Zibilich is saying, and what the witness

1    thinks Mr. Napoli was doing, that she has
2    no basis for having - this testimony has no
3    basis in fact.
4    THE WITNESS:
5        I could -
6    MR. MAGNER:
7        This is the crux of -
8    THE COURT:
9        Counsel.  Ms. Boudreaux, no.
10   MR. MAGNER:
11       Yes.  This is the crux of the matter,
12   and what I'm going to ask Ms. Boudreaux
13   right now, is what did Mr. Napoli say -
14   MR. BOWMAN:
15       I agree -
16   MR. MAGNER:
17       May I finish my statement?
18       What did Mr. Napoli say concerning
19   whether he was ordered to do this, or
20   whether he did it on his own volition?
21   THE COURT:
22       All right.  The objection is overruled
23   for purposes of this particular question.
24   THE WITNESS:
25       When asked by Judge Zibilich if this was
26   on his own, like if this was his case, like
27   did he initiate the investigation, he said
28   - Napoli said, yes.
29   MR. NAPOLI:
30       I wasn't there.
31   THE WITNESS:
32       You were there -

1    THE COURT:

2        Stop.

3    THE WITNESS:

4        Sorry.

5    MR. MAGNER:

6        No, let's not do that.

7    THE WITNESS:

8        I'm sorry.

9    MR. MAGNER:

10       I tender the witness, Your Honor.

11   THE COURT:

12       All right.  Thank you, Counsel.

13       Mr. Bowman.

14              CROSS EXAMINATION

15   BY MR. BOWMAN:

16   Q   Good morning.

17   A   Good morning.

18   Q   Let's see if we can get through some of the

19   easy stuff, first.

20   A   Thank you.

21   Q   So, you are testifying that Mr. Napoli

22   offered to allow you to have open file

23   discovery in this case, correct?

24   A   I don't think I testified to that.

25   Q   So, you're saying he didn't offer you open

26   file discovery?

27   A   I believe Jason made a comment, it was

28   after - it was during the Motion for a New

29   Trial, after the trial was conducted, Mr.

30   Napoli said that he sent a text message,

31   through Chanel Long, who tried the case with

32   me, saying that Chanel was invited to go to the

1   District Attorney's Office to look at his file
2   and to get whatever requests I had made.
3   Q   Okay.  So when he said that in the January
4   5, 2015, Motion for a New Trial, when he said,
5   "I offered the Defense Open File Discovery.
6   I'm sure you told the Judge."  "No, he didn't."
7   Correct?
8   A   He sent a text message to Chanel Long
9   saying that Chanel Long could go over to their
10  office.
11  Q   So, he did offer Open File Discovery?
12  A   Open File Discovery, if Mr. Napoli just has
13  a Manilla folder with something in it, that
14  would not satisfy all of the Discovery rules
15  and regulations, and in fact, the report that
16  he should have had and should have turned over.
17  Q   You can explain, please answer yes, or no.
18  Did he offer Open File Discovery?
19  A   According to his text message that he
20  produced, a text to Ms. Chanel Long, at some
21  point he had offered Ms. Chanel Long to go over
22  to review the file for all the requests that I
23  had made.  So, I guess, if that's what y'all
24  are considering allowing Open File Discovery,
25  then he had sent a text to Chanel Long, at some
26  point, yes.
27  Q   Did somebody from the Defense Team go over
28  and take a look at the file?
29  A   I went over and looked at the file with
30  Paige Klein before the case was indicted.
31  Q   No, I'm not talking about that.  I'm
32  talking about after Mr. Napoli offered Open

File Discovery?

A   I don't know.  I was in the hospital with my grandma.  She was dying.

Q   You did not, though?

A   I did not.

Q   Okay.  So, you don't know what he would, or would not have produced, because you didn't take him up on the offer?

A   I do know that when Mr. Napoli made multiple assertions on the Record that we had everything, that he'd turned over everything, and actually in the Motion for New Trial, after he said that we did have everything, that he did tender everything, then he changed his argument to that we weren't entitled to a Report that I requested, and then it went back to he had given us everything.  So, we know, in fact, that we did not have everything.  And so, therefore, the State had not tendered everything.

MR. BOWMAN:

May I approach, Your Honor?

THE COURT:

Yes.

FURTHER CROSS EXAMINATION

BY MR. BOWMAN:

Q   I'm handing the witness what's been marked as S-1.  Do you recognize that document?

A   Yes, this is the Affidavit that was submitted soon after the indictment.  I don't know the exact date.

1   Q   We're going to come back to it, but I just
2   want to know, right now, before we go any
3   further, the statements in there, are those
4   true and correct?
5   A   Yes.
6   Q   To the best of your knowledge?
7   A   Yes.
8       MR. BOWMAN:
9           I'm handing the witness what's
10      previously been marked as Defense 1-A.
11               FURTHER CROSS EXAMINATION
12  BY MR. BOWMAN:
13  Q   You've seen that, obviously?
14  A   Yes.
15  Q   Who signed it?
16  A   Who signed this copy?
17  Q   Who signed the entry regarding your client?
18  I'm sorry, regarding the victim?
19  A   The entry that was - I believe it was
20  Sergeant Naquin, or Sergeant Gibson.
21  Q   They signed it?
22  A   No, there is no signature on this copy.
23  Q   There are no signatures on it, is there?
24  A   No, there are not.
25  Q   Okay.  The reason I'm asking you that is
26  because you say repeatedly, we request reports,
27  reports, reports, would you describe that as a
28  report?
29  A   Actually, we asked Mr. Naquin about that.
30  And at the time of the incident, February,
31  2013, this is how they were documenting stuff.
32  They now have gone to do Incident Reports, and

1   they now write full reports, according to what
2   Officer Naquin told us, but this is how they
3   documented information at that time.  And so,
4   yes, in fact, a report, according to Officer
5   Naquin, Sergeant Gibson and the other officers
6   at HANO.
7   Q   How long were you a Public Defender for?
8   A   Almost eight years.
9   Q   How many police reports did you review in
10  your work as a Public Defender?
11  A   Many reports.
12  Q   Many, like you can't count them all?  Have
13  you ever seen a report - I mean, have you ever
14  seen a report that -
15  A   Yes, it's similar to an Incident Recall.
16  Isn't that a report?
17      MR. MAGNER:
18          Excuse me, Your Honor.  I'm going to
19      object.  This is argument.  It's really not
20      questioning.
21      THE COURT:
22          Objection sustained.
23              FURTHER CROSS EXAMINATION
24  BY MR. BOWMAN:
25  Q   Let me ask you this, you said that you
26  didn't get that thing until the week before
27  trial?
28  A   Right.  The trial was set the Monday after
29  Thanksgiving.  We received it, I think it was
30  like the 25th of November, 2014.
31  Q   But based on your testimony, you knew it
32  existed for some period of time before that?

1    A    Correct.

2    Q    So, why didn't you just simply say to Mr.

3    Napoli, we need the HANO Log?

4    A    I did on numerous occasions, and numerous

5    written motions, and we did it verbally.

6    Q    Can you show me the Motion where you said,

7    I want the HANO Log?

8    A    The Brady Motion that was filed on March

9    10, 2014, where we requested all Reports from

10   the Guste Housing, Reports from Security

11   Guard's, notes that were drafted in regards to

12   information where the complaining witness

13   reports an alleged robbery to the Security

14   Guard.

15        On November 25, 2014, we requested

16   generally information from the Guste High-rise,

17   surveillance, as well as any reports.

18        And then, again, in our like Motion for

19   Discovery.  So, that's two specific requests

20   for the Logs.

21   Q    Is the word HANO Log anywhere in those?

22   A    The Guste Housing one.

23        MR. MAGNER:

24           Objection, Judge.  She read the

25        request.  That is just an argument, posing

26        as a question.

27        MR. BOWMAN:

28           I'll move on.  I'll move on.

29             FURTHER CROSS EXAMINATION

30   BY MR. BOWMAN:

31   Q    Let me ask you this, you were talking about

32   the Inspector General's Report, and you did an

1    S.D.T. to get certain documents, why didn't you
2    just do a subpoena duces tecum to get the Log,
3    if Napoli wasn't giving it to you?
4    A   The Law requires the State to turn over
5    evidence.  Even if I filed a subpoena, it would
6    not have –
7       MR. BOWMAN:
8           Your Honor, I'm going to ask the witness
9       to be responsive.  That's not responsive.
10      MR. MAGNER:
11         And I object to Counsel interrupting the
12      witness.
13      MR. BOWMAN:
14         That's not responsive.
15      THE COURT:
16         All right.  So, Counsel, let her respond
17      if there's an issue, then you can take it
18      up with your following question.
19         Ms. Boudreaux.
20      MS. BOUDREAUX:
21         Thank you.
22         Because I thought filing a Motion for
23      Discovery and Supplemental Motion for
24      Discovery, a Brady Motion for Discovery,
25      the State would do their job and turn over
26      what they're entitled to turn over.  If the
27      State would have done their job, then we
28      wouldn't – it's not necessary.
29          FURTHER CROSS EXAMINATION
30    BY MR. BOWMAN:
31    Q   But you've already agreed that yourself,
32    you had some confusion about whether or not

this was a Log, or a Report.  You testified
earlier that Officer Naquin explained to you
that this was the manner in which they
documented things.

MR. MAGNER:

I object to the question.  It's multi-
part, it's argumentative, it assumes facts
not in evidence about the witness being
confused.  I've heard no confusion here,
Judge.

THE COURT:

Counsel.

MR. BOWMAN:

Her testimony speaks for itself.  She
said that she had a conversation with
Naquin about whether or not the Log was
actually considered a report.  She
testified earlier that it was, and that -

We can read back what the testimony was.

THE COURT:

So, the point is, I guess, what is the
question that you were getting to?  You
were summarizing, but what's the question?

MR. BOWMAN:

My question is that it was clear that
even the witness, even the witness saw
that calling this thing a report was a
little bit unusual because of the nature of
it.

THE COURT:

Okay.  So, why don't you just ask that
question?

1    MR. BOWMAN:
2        Okay.  Well, I just did.
3    THE WITNESS:
4        Well, that's why I made sure to say, I
5    called it a Log, a report, notes, because I
6    didn't want y'all to come back to say, oh,
7    this isn't a Log, this is a report, or this
8    is a note, this is not a Log.  So, I was
9    very - I put any and all reports, logs,
10   notes, that were drafted by Security Guards
11   at the Guste Housing Development in regards
12   to the complaining witness in this case
13   about reporting a robbery, which is listed
14   in the Incident Recall, which is also
15   similar to this Log that you consider an
16   NOPD Report.
17            FURTHER CROSS EXAMINATION
18   BY MR. BOWMAN:
19   Q   And did Mr. Napoli turn over the 911 calls
20   to you?
21   A   Yes, we have the 911 call.
22   Q   Did he turn them over timely?
23   A   I don't know the date of the turning over
24   of the 911, but as of November 25, we did have
25   that in the inventory, but I don't know the
26   date, the specific date it was turned over, but
27   on November 25, 2013, we did have that.
28   Q   And you're still familiar with the facts of
29   the Hawthorne case?
30   A   Yes.
31   Q   First of all, who appeared, or who spoke on
32   the 911 call?

1    A    I don't want to say any names.

2    Q    No, but you don't have to say names.  You

3    can describe their relative positions, or

4    involvement in the case.

5    A    Someone called for the complaining witness.

6    Q    Okay.

7    A    And then the complaining witness gets on

8    the phone and reports that she was robbed.

9    Q    And so the first person, that someone, do

10   you remember who that someone was?

11   A    I don't know the specific person.

12   Q    Was it Officer Naquin?

13   A    I can't recall.

14   Q    Okay.

15   A    But I know that the complaining witness

16   then says - after that person, I guess,

17   initiates the call, that I have someone here

18   who would like to report something, the

19   complaining witness gets on the 911 call and

20   says that she's been robbed.  She does not

21   report a sexual assault.

22   Q    She didn't report a sexual assault?  A

23   rape?

24   A    Right.

25   Q    Okay.  So, you had that information?

26   A    Right, that does not alleviate the State's

27   obligation to turn over exculpatory information

28   that they had in their possession.

29   Q    Well, you said that you needed the Log for

30   impeachment.  If anybody had said otherwise,

31   you could have impeached them with that tape,

32   correct?

1    A   We're entitled to the documents.  It
2    doesn't alleviate the State of their duties.
3        MR. BOWMAN:
4            Your Honor, I'm going to ask that you
5        instruct the witness to answer the
6        question.
7        MR. MAGNER:
8            I believe she's answered it, Judge.
9        MR. BOWMAN:
10           It's non-responsive.  I asked could she
11       have impeached a witness with the 911 call?
12       THE COURT:
13           All right.  I'm going to instruct the
14       witness.  Ms. Boudreaux, just please answer
15       the question as presented by Mr. Bowman.
16       MS. BOUDREAUX:
17           I guess, that's true, it depends - I
18       don't know how the complaining witness is
19       going to testify.  We don't know.  I can't
20       predict the future.  I couldn't predict the
21       future at that point, and so, I don't know
22       what I could have used to impeach.  I
23       needed to have all the discovery, and
24       course, I was entitled to all of the
25       discovery.
26               FURTHER CROSS EXAMINATION
27   BY MR. BOWMAN:
28   Q   Okay.  And while we're here, you keep
29   referring to the victim as the complaining
30   witness.  Your client was convicted, correct?
31   A   He was convicted.
32   Q   So, she's the victim?  She was a victim of

1    a rape that your client was found guilty of?

2    A    And I -

3        MR. MAGNER:

4            Judge, this is just rhetorical argument.

5        THE COURT:

6            Is there an objection?

7        MR. MAGNER:

8            Object.

9        THE COURT:

10            Objection sustained.

11            FURTHER CROSS EXAMINATION

12   BY MR. BOWMAN:

13   Q    You were discussing - we've heard a lot

14   today, about Naquin's visit to the Public

15   Defender's Office.  When did that visit occur?

16   A    That was June 2, I think it that was the

17   date, in 2014.  It was early in June.

18   Q    Early in June?

19   A    Yes.

20   Q    First of all, Ms. Blume is not accused

21   right now of misrepresenting herself to Officer

22   Naquin?

23   A    I don't know.  I don't think a Bill of

24   Particulars was answered.  I don't know the

25   specifics of what the allegations are.  I can

26   only say what Ms. Blume and I did in the

27   investigation.

28   Q    So, you're saying that you met with Naquin

29   in June of 2014, but if the crime that Ms.

30   Blume is accused of committing had already been

31   completed at that point, that issue would be

32   irrelevant, correct?

1      MR. MAGNER:
2          Objection to the argument.
3      THE COURT:
4          Counsel, well, I'm going to say, I don't
5      understand the question.  Can you rephrase?
6      MR. BOWMAN:
7          Your Honor, we keep hearing about a
8      meeting that occurred in June.  If I may,
9      can I have the Record for the case?
10     THE COURT:
11         Sure.
12     MR. MAGNER:
13         If it will move things along, Judge, the
14     Indictment states that this occurred
15     between January 1 and April 1, 2014.  Both
16     of those happened to be your duty days,
17     Judge.  And I also represent, as an Officer
18     of the Court, nothing of any moment
19     happened between those dates.
20     THE COURT:
21         All right.  Counsel.
22     MR. BOWMAN:
23         So, my question, Your Honor is, if the
24     crime had been completed before Officer
25     Naquin went to the Public Defender's
26     Office, there is no significance, or
27     relevance to that meeting.
28     MS. BOUDREAUX:
29         Well, I think that –
30     MS. MAGNER:
31         No, no, no.
32     THE COURT:

1       Ms. Boudreaux.  Okay.  Wait, just let me
2   back up.
3       Ms. Boudreaux, I understand –
4   MS. BOUDREAUX:
5       Sorry.
6   THE COURT:
7       – you're used to being on the other
8   side.  I need you to refrain from speaking.
9       All right.  Mr. Bowman, so, your
10  question is, again, if the crime had
11  occurred prior to the meeting with Mr.
12  Naquin, then what?
13  MR. BOWMAN:
14      What significance, or relevance does the
15  meeting with Naquin have to these
16  proceedings that we're presently here for
17  today?
18  THE COURT:
19      Counsel.
20  MR. MAGNER:
21      And I object.  That's lawyer argument.
22  It's not a question.  Certainly, it would
23  have some bearing on the defendant's state
24  of mind, but again, that's something that
25  we lawyers can argue.  It's not a proper
26  question to this witness.
27  THE COURT:
28      All right.  Objection is sustained.
29          FURTHER CROSS EXAMINATION
30  BY MR. BOWMAN:
31  Q   According to the affidavit you have a
32  strained personal relationship with Mr. Napoli?

1   A   It became stained, I guess, even more so at
2   that point in time.
3   Q   Was it strained before?
4   A   It was always difficult with cases in
5   getting discovery.
6   Q   You didn't get along?
7   A   This particular case was - it was rude and
8   unprofessional.  Is that what -
9   Q   Yes, that's what I'm asking.
10      You had said something about, and I'm sorry
11  to bring this up, but the illness of your
12  grandmother, and her passing.  And that,
13  according to your testimony today, and in your
14  affidavit, Mr. Napoli was unsympathetic?
15  A   He made some comments like, I could try the
16  case, she was in a coma, not having any
17  meaningful conversations.
18  Q   Did he make those comments to you?
19  A   He made the comment on the Record about how
20  my - that the death of my grandmother
21  inconvenienced his witnesses.
22  Q   And you were in Court that day?
23  A   Yes, because that's when we went in to pick
24  the date of December 2, for the case that they
25  were so eager to try in August.
26  Q   Let me ask you this, how did you
27  communicate with Mr. Napoli?
28  A   Through written motions, in the hallway,
29  text messages.
30  Q   Text messages?
31  A   Yes.
32  Q   Your cell phone number is - 621-6747?

1   A   Yep.

2   MR. BOWMAN:

3        If we're going to be talking about text

4   messages, Your Honor, none of these were

5   produced in discovery.  We asked for all of

6   the State's evidence, and we've never

7   received any.

8   MR. BOWMAN:

9        This is impeachment evidence.  It

10  impeaches direct testimony that she's just

11  given today.

12  MR. MAGNER:

13       We're still entitled to the evidence.

14  THE COURT:

15       All right.  Counsel, I'm going to

16  overrule the objection for purposes now.

17  I'd like to move forward and see what these

18  text messages say.

19  MR. BOWMAN:

20       I'm handing the witness a document –

21  MR. MAGNER:

22       May I see a copy, please?

23  (MR. MAGNER IS PROVIDED A COPY OF THE

24       DOCUMENT).

25       Judge, I've been handed about, well,

26  exactly thirty-two pages of text messages

27  here.  I've never seen them before.  I'm

28  going to need an opportunity to read

29  through them.  I think it's only fair to

30  me.  It's only fair to the witness.

31  MR. BOWMAN:

32       I don't object to that, as long as the

```
 1        witness stays up here, and doesn't
 2        communicate with the attorneys.
 3        THE COURT:
 4            I'm fine with that.
 5        MS. BOUDREAUX:
 6            May I use the restroom?
 7        THE COURT:
 8            Yes, you can use the restroom.
 9            So, the Court's going to take a very
10        short recess with respect to this matter,
11        and then I will handle some other matters
12        that we can get done.
13     (THIS MATTER IS RECESSED.  OTHER UNRELATED
14        MATTERS WERE HANDLED BY THE COURT).
15        THE COURT:
16            All right.  Counsel ready to proceed
17        with Blume again.  Ms. Boudreaux.
18            All right.  Counsel, we're back on the
19        Record on Case: 522-905.
20        MR. BOWMAN:
21            Your Honor, I'm presenting the witness
22        with what's been marked as S-2.
23        MR. MAGNER:
24            Was S-1 the affidavit?
25        THE COURT:
26            Yes.
27        MR. BOWMAN:
28            Yes.
29        MR. MAGNER:
30            And you introduced that into evidence?
31        MR. BOWMAN:
32            Yes.
```

1    MR. MAGNER:

2        We have no objection.

3    THE COURT:

4        All right.  Thank you, Counsel.

5    MR. BOWMAN:

6        I want to allow the witness to go

7    through it.  She can tell me when she's

8    ready.

9    MR. MAGNER:

10       Judge, twenty minutes ago I asked Mr.

11   Bowman if the witness could review these

12   same text messages so we wouldn't all be

13   sitting here watching her read them.  He

14   said, no.  So, now, he's wasting the

15   witnesses time, the Court's time, and

16   everybody else's time for some kind of

17   grand standing theatrics.

18   MR. BOWMAN:

19       It's not grand standing theatrics, Your

20   Honor.  My cross examination has been

21   broken up in the mist of all of this, and

22   I'm not going to - it's impeachment

23   evidence.  I'm not going to allow a witness

24   to sit there and review it for an hour.  I

25   had no idea -

26   THE COURT:

27       All right.  So noted, Counsel.

28       It's noted for the Record.  I'm not a

29   kindergarten teacher.  I just want to get

30   what we need to get on the Record.  I think

31   it's fair to give Ms. Boudreaux an

32   opportunity, which is what both parties

1   really want, is for her to have an
2   opportunity to review.  That's the ultimate
3   purpose, whether she's done it before, or
4   whether she does it now, I think it's no
5   need to argue over it.
6   MR. BOWMAN:
7       Thank you, Your Honor.
8       Are you ready?
9   MS. BOUDREAUX:
10      Yes.
11  MR. BOWMAN:
12      Okay.  Thank you.
13      Just for the Record, is S-2, text
14  messages between Lauren Boudreaux and Jason
15  Napoli, between 7-25-14, is the first one
16  on page one, and then on page 32, Your
17  Honor, 3-2-2015.
18          FURTHER CROSS EXAMINATION
19  BY MR. BOWMAN:
20  Q   Now, you just reviewed those text messages?
21  A   I reviewed what was handed to me, and it
22  says that this is a conversation with Lauren
23  Boudreaux.
24  Q   Okay.  Do you recognize those
25  conversations, those text messages?
26  A   Sure.  I mean, yes.  That was a text
27  message exchange between Jason Napoli and I.
28  Q   Those are the text messages between the two
29  of you?
30  A   I don't have all of my text messages.  At a
31  certain point I got a new phone, but this is
32  what it says on here.  I don't have my

1    information, but this is what it says on here.

2    Q   I mean, for example, there was a picture of

3    a dog that you sent him.  I'm assuming that's a

4    picture of your dog, correct?

5    A   There's a picture, yes, of his dog.  Yes.

6    Q   And then there's a picture of your dog, as

7    well, right?

8    A   Right.

9    Q   And that's your dog?

10   A   I can say that, yes, this is my number, and

11   that is my name.  I have not had a chance to

12   review with any official documents to make sure

13   that these are all in fact, but, yes, I

14   recognize the text messages.

15   Q   In reviewing that, do you see a strained

16   personal relationship in the communications

17   between yourself and Mr. Napoli?

18   A   The conversations from 7-25-2014 they

19   changed after a while, as far as the length and

20   the shortness of responses.  I don't see how

21   that – it doesn't change my answers from

22   earlier that it was difficult dealing with Mr.

23   Napoli, as far as getting discovery and the

24   motions that we filed and the State's

25   obligation to turn over discovery.

26   Q   I agree they changed, but about when do

27   they change?

28   A   After the death of my grandmother, because

29   when trying to get the case continued your

30   Office was trying to force other attorneys in

31   my office to take over the case and to try it,

32   and to move forward, instead of allowing a

1   continuance, or agreeing with a continuance,

2   which eventually occurred, but after many

3   fights.

4   Q   Let's talk about that for a few minutes.

5   You testified earlier that Mr. Napoli was

6   unsympathetic with what you were dealing with?

7   A   He said on the Record, when I came back -

8   Q   Well, I'll -

9   A   Right.  I see my text message, yes, but…

10  Q   Let me - I'll ask the question, and you can

11  answer.

12      It appears that on page six he had texted

13  you something about trying to get a plea, I

14  believe, in the Hawthorne case.

15      MR. MAGNER:

16          Your Honor, I'm objecting, these are not

17      in evidence.  They're not properly

18      evidence.  They haven't been admitted into

19      evidence.  They're hearsay.  They're being

20      introduced for some improper purpose, and

21      we would object.

22      THE COURT:

23          Counsel, response.

24      MR. BOWMAN:

25          This entire hearing - first of all, this

26      isn't hearsay.

27      THE COURT:

28          No, no.  I didn't ask about the entire

29      hearing.  Respond to the objection.

30      MR. BOWMAN:

31          I apologize, Your Honor.

32          This isn't hearsay.  These are, by her

1  own testimony, the witness's words.  Now
2  the fact in the Law is very clear on this,
3  the fact that Mr. Napoli's words come in
4  with her words to give them context is
5  completely admissible.  Not to mention the
6  fact that this is a Motion Hearing, even if
7  it were hearsay, it is still admissible.
8  THE COURT:
9      So, what's the purpose of - what's the
10  relevance of the text messages, just from
11  my context?
12  MR. BOWMAN:
13      The witness has testified that she had a
14  strained personal relationship with Mr.
15  Napoli.  Your Honor will have a chance to
16  review the full import of all the text
17  messages.  It shows - the text messages
18  themselves show actually a really chummy
19  relationship that turns after the
20  indictment of Ms. Blume.  It's clear that
21  something changes after Ms. Blume is
22  indicted.  You see text messages where -
23  THE COURT:
24      I don't want you to go into the context
25  of the text messages.
26  MR. BOWMAN:
27      Okay.  And beyond that, Your Honor,
28  there has been testimony that Mr. Napoli
29  was completely unsympathetic when the
30  witness's grandmother was in the hospital
31  in a coma, and ultimately passed away.  The
32  text messages show otherwise.  The text

1    messages show a person that is repeatedly
2    apologizing.
3    THE COURT:
4        All right.  I'm going to allow it, and
5    overrule the objection.  I'll note the
6    objection for the Record, Counsel, but
7    sticking to the specifics of why you've
8    identified these text messages are
9    relevant.  I'd ask that your questions
10   remain specific, and limited to those
11   particular issues.
12   MR. BOWMAN:
13       Yes, ma'am.
14   THE COURT:
15       Okay.
16          FURTHER CROSS EXAMINATION
17   BY MR. BOWMAN:
18   Q   Okay.  So, back to page six.  It appears as
19   though you sent Mr. Napoli a message saying
20   that you were dealing with your grandmother in
21   the hospital, and you really couldn't talk.
22   A   This was after my grandmother had been in
23   the hospital, in ICU, for two months, which I
24   assumed the role of caretaker, pretty much.
25   So, he knew about this, and this was after two
26   months of dealing with him, trying to get the
27   case continued, and so, he pressed forward.
28   So, yes, he told me he was sorry, but I'm sorry
29   my grandmother passed away, and he was still
30   trying to force trial for an aggravated rape,
31   kidnapping, and armed robbery trial.  So, I'm
32   not really sure how that could be really

1    sympathetic to anything.  Then, when we did go
2    back into Court he did on the Record say that
3    my grandmother's passing inconvenienced him and
4    his witnesses.  And so, I don't see how it was
5    very professional or sympathetic to try to push
6    forward on the aggravated rape trial, knowing
7    that I was sleeping in the ICU with my
8    grandmother as she died.
9        So, that's just my opinion.  Sorry.  But,
10   yes, he said, I'm sorry, Lauren, on page six.
11   Q   Is that all he said?
12   A   On page six, yes, I'm sorry is on page six.
13   Q   And on page seven?
14   MR. MAGNER:
15       Your Honor, the rule of completeness, I
16   think, requires that there's another entry
17   on page six where Mr. Napoli says that Ms.
18   Boudreaux and Mr. Hawthorne –
19   THE COURT:
20       Wait, wait, wait.  So, if you're asking
21   that the other entry be read into the
22   Record –
23   MR. MAGNER:
24       Yes, I am.
25   THE COURT:
26       Okay.
27   MR. MAGNER:
28       About it interfering with his ability to
29   play golf.  That's the entry I'm looking
30   for.
31   THE COURT:
32       Counsel, I don't need you to testify.  I

1    just needed you to put on the Record that
2    you wanted the other entry read for
3    completeness.
4        Thank you.
5    MR. MAGNER:
6        Thank you.
7        At the top of that same page, page six.
8    MR. BOWMAN:
9        I'll be happy to read into the Record
10   the entirety of all of these.  It's going
11   to take a while, but I'll be more than
12   happy to do it.
13   THE COURT:
14       That's not the point.  The point is that
15   if you're questioning on a specific topic,
16   or questioning a specific exchange, that
17   exchange should be read into the Record,
18   not the whole thing, if we're not going to
19   question on the whole thing.
20   MR. BOWMAN:
21       I understand, but to be accurate, Your
22   Honor, for the Record, Mr. Magner is
23   referring to a text message that was sent
24   on August 2, 2014.  I was referring to an
25   exchange that began on 8-5-2014, three days
26   later.
27   THE COURT:
28       Okay.  It's understood.  So, for
29   purposes of this particular questioning,
30   I'm going to overrule any objection that
31   the previous text has to be read into it,
32   since your questioning pertains to August

1      5, as opposed to August 2.
2      MR. BOWMAN:
3          Thank you, Your Honor.
4      THE COURT:
5          All right.
6              FURTHER CROSS EXAMINATION
7  BY MR. BOWMAN:
8  Q   So, then, going on to page seven, it
9  appears - Excuse me, I said August 5th, it says
10 August 5th up there.  It was actually August
11 4th, at 9:48 p.m.  This line of text between Mr.
12 Napoli and the witness began regarding the
13 illness of Ms. Boudreaux's grandmother.
14     It continues on page -
15     MR. MAGNER:
16         Judge, I object to Counsel testifying.
17     He needs to ask questions, please.
18     THE COURT:
19         Sustained.
20             FURTHER CROSS EXAMINATION
21 BY MR. BOWMAN:
22 Q   Page seven.  Did he say he was sorry on
23 page seven?
24 A   Yes, he said, I'm sorry, and then was still
25 trying to go forward with the trial.  So, I was
26 in the ICU, and the text before this is where
27 we were discussing my grandmother being taken
28 off of life support, and he's texting me about
29 moving forward for trial, but yes, he said I'm
30 sorry.
31 Q   And what did he tell you about the trial?
32 What did he say?  Did he say, I expect you to

1   be there?  Did he say, you have to be there?
2   A   He was trying to move forward on a case
3   that I had from the arrest of Curtis Hawthorne.
4   It was my case.  I represented Curtis
5   Hawthorne.  Yes.  Sorry.
6   Q   Okay.
7       MR. MAGNER:
8           Your Honor, I'm going to expand my
9       objection under Rule 403, at this point
10      it's repetitive, a waste of time.
11      THE COURT:
12          All right.  Mr. Bowman.
13      MR. BOWMAN:
14          Your Honor, this entire hearing has
15      been –
16      THE COURT:
17          Mr. Bowman, I'm not interested in the
18      entire hearing.
19      MR. BOWMAN:
20          Well, they've been allowed to put on all
21      the evidence that they want.  I get to
22      rebut.
23      THE COURT:
24          Okay.  Let's back up.  There's an
25      objection made.  There was a basis for the
26      objection.  Then you get to respond.
27      Right?  You get to respond, and it's on the
28      Record.  I believe in making a Record.
29      MR. BOWMAN:
30          I understand, Your Honor.
31      THE COURT:
32          So, the objection has been based on Rule

1    403.  You need to respond on that basis,
2    not they did it so I get to do it.
3    MR. BOWMAN:
4        Give me a second, Judge.
5        It's my understanding – what's the basis
6    of the objection.  I'm trying to figure out
7    what I'm trying to respond to.
8    MR. MAGNER:
9        I object under Rule 403.  It's
10   cumulative.  It's repetitive.  It's a waste
11   of time.  And it is not probative of any
12   issue in the case.
13   MR. BOWMAN:
14       The main issue in this case, at least in
15   the issue that Defense has presented is
16   what kind of person is Jason Napoli.  This
17   is directly probative of that issue.  It
18   shows his interactions with Ms. Boudreaux,
19   not to mention –
20   THE COURT:
21       All right.  So, Counsel, I'm going to
22   overrule the objection.
23   MR. BOWMAN:
24       Okay.
25   THE WITNESS:
26       On 8-5-2014, at 7:22 a.m., I informed
27   Jason Napoli in a text message that they
28   were running a Neurological Test, and
29   taking my grandmother off of the
30   ventilator.  At 7:32, ten minutes later, he
31   says, "Okay.  I'm sorry.  I know you're not
32   drawing this out on purpose.  I don't want

1    to do anything behind your back.  I'm going

2    to let Franz know the situation, and

3    request that Chanel be ready to try this

4    thing if you're unavailable.  I understand

5    if you can't try the case, but my victim

6    had to take off last time, and I can't

7    force her to go through this again."  This

8    is -

9             FURTHER CROSS EXAMINATION

10  BY MR. BOWMAN:

11  Q   Can you finish reading?

12  A   "I'm sorry this has gotten so complicated."

13  Q   Okay.

14  A   This case was set for trial.  It could have

15  been continued.  It was ultimately, jointly

16  continued.  It was my case.

17      Chanel Long had agreed to assist me with

18  trying the case, which we normally get someone

19  else to try a case with us, but it was my case.

20  I had been on the case since arrest, and Curtis

21  Hawthorne was my client.

22  Q   And how many times, as a result of your

23  grandmother's illness, did the case have to get

24  continued?

25  A   Once.  It was continued in March, because

26  Mr. Napoli did not turn over discovery.  That's

27  in the Motion for Continuance I had to take,

28  which should have been a State continuance.  It

29  was March 10.  The beginning January court date

30  was continued because Discovery hadn't been

31  tendered.  That was four months after the

32  indictment.  And then it was set again in

1  March, and that trial was continued, based on
2  the Motion we discussed earlier, because of
3  outstanding Discovery that was still owed from
4  the State.
5      And then the case was set the day before my
6  grandmother died, and that was continued
7  because of her death.  I apologize for the
8  delay.  It was set on December 2, after that,
9  and we tried the case.
10     On June 16, it was continued because
11  competency had been raised.
12     Yes, and then we were accused by the State
13  of paying Dr. Deland for her recommendation to
14  the Court.  It's in the transcript.
15 Q   Okay.  Did you ever text him about the
16  Discovery that was missing?
17 A   I don't know.  I filed Motions with the
18  Court as required.  I mean, I filed with the
19  Court.  Do we have to send text messages now?
20  I filed multiple motions for discovery with the
21  Court, and they were addressed in Court.  I
22  don't see how that wasn't sufficient.
23 Q   I'm not making any accusations.  I'm just
24  asking a question.
25 A   Okay.  No, I don't know.  I don't know if I
26  had sent Motions regarding the Discovery in the
27  text message.  Like I said, I filed written
28  Motions in Court, in the Court file.
29 Q   And then it appears that your relationship
30  soured after your Investigator was indicted by
31  the District Attorney's Office.
32 A   It soured.  I don't know the exact date

1   when it soured, but I know that the comment
2   that was made when I returned back to Court
3   about my grandmother's death interfering with
4   Mr. Napoli's witnesses, if I had to pick a
5   date, I would think that, I don't know, that
6   might be a good date to pick, but I think it
7   had been souring throughout the entire time
8   when I was dealing with her death.
9   Q   Can you show me an example of a text
10  message where you feel it began to sour?
11  A   I don't know, but I know –
12      MR. MAGNER:
13          I object, Your Honor.  I just think this
14      is repetitive, and not terribly relevant.
15      THE COURT:
16          Well, objection is sustained in terms of
17      the repetitiveness.
18      MR. BOWMAN:
19          I'll come back to this.
20          FURTHER CROSS EXAMINATION
21  BY MR. BOWMAN:
22  Q   Following Ms. Blume's indictment, the
23  Public Defender's Office –
24      MR. MAGNER:
25          I'm sorry to interrupt, but before we
26      move on, are these being offered into
27      evidence?
28      MR. BOWMAN:
29          Yes.
30      MR. MAGNER:
31          Okay.  I have not been provided a copy.
32      In light of the fact that they're being

1     offered into evidence, we would orally move
2     that Mr. Bowman be cited for contempt.
3           On page four, at the bottom, and on page
4     ten, at the bottom, it lists the
5     complaining witness's name.  That's the
6     same conduct for which Mr. Cunningham and I
7     were cited for contempt, we think here,
8     this is a brazen attempt to just ignore the
9     Rules, and we'd make that Motion at this
10    time.
11    THE COURT:
12          All right.  Counsel, your motion is
13    noted for the Record.  The Court is going
14    to reserve any ruling on that issue.
15          Proceed.
16    MR. BOWMAN:
17          Thank you.
18              FURTHER CROSS EXAMINATION
19    BY MR. BOWMAN:
20    Q   Following Ms. Blume's indictment, the
21    Public Defender's Office did an internal
22    investigation, did it not?
23    A   I'm sorry?
24    Q   The Public Defender's Office did an
25    internal investigation into the matter, did it
26    not?
27    A   I don't know what the office did.
28    Q   So, you did not participate in any internal
29    investigation?
30    A   I did not participate in an internal
31    investigation.  I believe you're - I don't know
32    what you're asking.

1    Q   That's okay.  I'm asking, to your
2    knowledge, was there an internal investigation
3    following the indictment?
4    A   I am not aware of any internal
5    investigation.
6    Q   Okay.  And let me ask you this, when is the
7    first time you met with Ms. Blume's attorneys?
8    A   I don't remember the exact date.  I know we
9    met.  We ate at Dis & Dat, and had some hot
10   dogs.
11   Q   I'm sorry?
12   A   We ate at Dis & Dat for lunch.  We had hot
13   dogs.  I don't remember the exact date, though.
14   Q   Was it before or after you filed your
15   Motion for a New Trial?
16   A   I believe after.  I don't know.
17   Q   You're  not sure?
18   A   The Motion of a New Trial was filed
19   December 29.
20   Q   The Motion for a New Trial, I believe, was
21   filed January 5.
22   A   That was the date the Hearing was held.
23   The Motion, I have a clocked in copy with the
24   date of January 29, 2015 (sic).  If you would
25   like a copy of that, that that's when it was
26   filed in Court.  And the Hearing and the Ruling
27   was set January 5.
28   Q   When did you serve it on Counsel for the
29   State?
30   A   On the date of December 29, 2015.  This is
31   actually where Section L was at the time.  I
32   came into Court.  Mr. Ronnie Burke – there's a

1  signature, and the date at the top, and I
2  served the State.
3  Q   And that was after Ms. Blume had been
4  indicted, correct?
5  A   Correct.  I think y'all did an indictment
6  around the 16th or 17th of December.
7  Q   Let me ask you this, why didn't you attach
8  the Log to the Motion for a New Trial?
9  A   I don't know.  Did we reference the Log?
10 Did we discuss the Log?
11 Q   Absolutely, the whole Motion was about the
12 Log, but I'm asking you, why didn't you attach
13 it as an exhibit?
14 A   We didn't attach exhibits.  I didn't attach
15 any exhibits to the Motion.
16 Q   Did you still have possession of the Log,
17 at that time?
18 A   We received the Log, or the Report, or
19 however you want to call it, from the Guste
20 Homes on, I guess, November 29, I believe, or
21 the 25th, around the 25th or the 29th of
22 November, 2014.
23 Q   And when you filed your motion, did you
24 still have possession of the Log?
25 A   Yes.
26 Q   You still had possession of it at that
27 time?
28 A   Yes.
29 Q   And you turned it over to Mr. Hawthorne's
30 Appellate Counsel?
31 A   The entire Record was copied.  I wasn't
32 involved in turning over the Record to the

1   Appellate Counsel.  I know that that file was
2   made and designated for the Record, and we
3   moved for an Appeal for him.
4   Q   So, let me take a step back, just so you
5   can explain that.  In the Public Defender's
6   Office, after a trial, y'all get off the case,
7   and I believe it's the Louisiana Appellate
8   Project that comes on?
9   A   After a trial, if there is a guilty
10  verdict, we file whatever Motions in regards to
11  a New Trial, Motion for Appeal and Designation
12  of the Record.
13  Q   And explain the process of how that works
14  in the Public Defender's Office, giving the
15  file, your trial file to the Appellate Counsel,
16  so the Appellate Counsel can prepare the
17  Appeal.
18  A   I don't know.  That's not part of my job.
19  I work as the Trial Attorney, and so, I do the
20  trial work, and then I file the motions after
21  trial.
22  Q   Well, who do you give the file to?  I mean,
23  you must give it to somebody in the office?
24  A   We turn in closed files to our
25  Administrator, whoever is in charge of our
26  cluster, the Public Defender's cluster, the
27  Admin. Person.
28  Q   And at the time that Mr. Hawthorne's case
29  was going on, who was that individual?
30  A   April, I believe.
31  Q   And her last name, please?
32  A   Leblanc.

1   Q   April Leblanc.

2       And it's your testimony that when you gave

3   your copy of the Hawthorne file to Ms. April

4   Leblanc, the Log was in it?

5       MR. MAGNER:

6           Objection, Your Honor.  This is just

7       irrelevant.

8       THE COURT:

9           Counsel, relevance.

10      MR. BOWMAN:

11          It actually is very relevant, Your

12      Honor, because the State believes that it

13      is possible that the Log was destroyed,

14      following Ms. Blume's indictment, which

15      would tend to evidence guilt.

16      MS. BOUDREAUX:

17          We still have –

18      THE COURT:

19          Wait, wait, Ms. Boudreaux.

20      MS. BOUDREAUX:

21          Sorry.

22      THE COURT:

23          Objection is sustained.

24      MR. BOWMAN:

25          Give me a second, Your Honor.

26      THE COURT:

27          All right.

28      MR. BOWMAN:

29          No further questions at this time, Your

30      Honor.

31      THE COURT:

32          Thank you, Counsel.

REDIRECT EXAMINATION

BY MR. MAGNER:

Q   Ms. Boudreaux, I'm going to be very brief.
Could you turn to the top of page six of those
text messages?

A   Yes.

Q   Do you see the reference there to golf?

A   Yes.

Q   Could you read that?  That's from Mr.
Napoli?

A   Yes, on August 2, 2014, at 1:19:20, I
think, p.m.  The message reads:  "I really
wanted to play golf next weekend, and you are
ruining that, you and Curtis."

Q   And Mr. Hawthorne's name is Curtis, his
Christian name?

A   Yes, that's his name.

Q   All right.  At the bottom, starting at the
bottom of page nineteen, there are references
to the Haynes materials.  Could you put that in
context for us, please?

A   When we learned of the investigation from
the IG's Office, of the Sex Crime Detectives, I
then notified the Court that I was filing a
Motion regarding this investigation, and the
investigation into Detective Vernon Haynes'
work, and his work through NOPD, and in
investigating sex crimes.

    Mr. Napoli had informed me that he was
going to file a Motion in Limine in regards to
whatever Motion I was going to file to seek the
documents about the investigation into the Sex

1    Crime Detectives.
2        He indicated in his text that, I'm going to
3    file a Motion in Limine in Court tomorrow,
4    regard Haynes.  That may bring the number down.
5    If you want to try again with Curtis.
6    Q    And when you said, bring the number down,
7    what were you two referring to in that
8    exchange?
9    A    I assumed that he meant the number as far
10   as the plea offer.
11   Q    All right.  And then, does it continue on
12   in that same vain?
13   A    Yes.  He asked if I could be in Section L
14   the next day.  I said that I would try to file
15   something the next day.  That it likely won't
16   be everything that I will to file in the case,
17   though, and that I had to do a jail visit in
18   the morning, and I asked him what time he was
19   going to L.  We talked about being there, and
20   then a few text messages down we talked about,
21   I guess, the plea offer of thirty-five years.
22   And then, Napoli said that, if you can get him
23   to twenty-five, or higher, I'll bring it to the
24   D.A., and the complaining witness.
25   Q    And that was in the context of these
26   Haynes, IG Records that you had said that you
27   were going to subpoena?
28   A    Yes, it was in the same line of text
29   messages from November 13, 2014.
30   Q    And that was the Report that had the
31   inconsistencies in it that you told us about
32   earlier?

1    A    Correct.

2    Q    In terms of the importance or materiality

3    of the HANO Log, which I think is Exhibit 1,

4    when you were cross examining a witness, is it

5    helpful to you to have more than one basis to

6    impeach a witness with a prior inconsistent

7    statement?

8    A    Yes.

9    Q    Now, is it helpful to you in your

10   experience to have an inconsistent statement in

11   writing?

12   A    Yes, that way you'll have something to show

13   that witness and use for impeachment.

14   Q    Is that why you were pursuing that Log?

15   A    Yes.

16   Q    The text messages that Mr. Bowman

17   introduced, I think began on July 25, is that

18   correct?

19   A    Yes, 2014.

20   Q    Did you have other text messages with Mr.

21   Napoli before that date?

22   A    Yes, they're not listed here, but, yes.

23   Q    In fact, did he send you a text concerning

24   Officer Naquin, before then?

25   A    I don't remember if it was a text, or if it

26   was a conversation that we had in Court after

27   the meeting with Officer Naquin, what I had

28   talked about on Direct, that I assumed it was

29   after Mr. Napoli met with Naquin, because

30   Napoli told me that the Security Guard doesn't

31   help your case.

32   Q    Okay.  And in addition to the written

1  discovery motions you made, did you make oral
2  requests for the HANO Log in Open-Court?
3  A   Yes, repeatedly.
4  Q   And did Mr. Napoli respond to those oral
5  requests that "no such Log existed"?
6  A   That there were no documents to turn over.
7  Q   Thank you.
8      MR. MAGNER:
9          No further questions.
10     THE COURT:
11         All right.  Thank you, Ms. Boudreaux.
12     MS. BOUDREAUX:
13         Thank you.
14     MR. CUNNINGHAM:
15         Your Honor, I would call Derwin Bunton.
16     THE COURT:
17         Counsel, do you wish to keep Ms.
18     Boudreaux under subpoena?
19     MR. BOWMAN:
20         Yes, Your Honor.
21     THE COURT:
22         Okay.
23     MR. MAGNER:
24         Does the State have any realistic
25     expectations that they're going to recall
26     Ms. Boudreaux?
27     MR. NAPOLI:
28         Yes.
29     MR. BOWMAN:
30         We may.
31     MR. MAGNER:
32         I see, Mr. Napoli said, yes, but…

1    MS. BOUDREAUX:
2         I'll sit in the area out there.  You can
3    just call me.
4    MR. MAGNER:
5         Okay.
6    THE COURT:
7         Good afternoon.
8    MR. BUNTON:
9         Good afternoon.
10   DERWIN BUNTON, WHO WAS CALLED AS A WITNESS BY
11   THE DEFENSE, AFTER HAVING BEEN DULY SWORN TO
12   TELL THE TRUTH, WAS EXAMINED AND TESTIFIED AS
13   FOLLOWS:
14                  DIRECT EXAMINATION
15   BY MR. CUNNINGHAM:
16   Q   Good afternoon, Mr. Bunton.
17   A   Good afternoon.
18   Q   Will you introduce yourself for the Record?
19   A   My name is Derwin Bunton.  I'm the Chief
20   Public Defender for Orleans Parish.
21   Q   What are your duties as Chief Public
22   Defender?
23   A   I manage and supervise the attorneys and
24   other staff at the Orleans Public Defender's
25   Office, and work to deliver Public Defender
26   Services for the Parish.
27   Q   And are you familiar with Ms. Taryn Blume?
28   A   I am.
29   Q   How do you know Ms. Blume?
30   A   She is one of our Investigators at our
31   Office.
32   Q   What does an Investigator at your Office

1   do?

2   A    Well, the Investigators in our Office

3   perform the very important function of

4   investigating cases, which includes talking to

5   witnesses, adverse and non-adverse, getting

6   statements, collecting evidence, reviewing the

7   scene, and providing information to the Lead

8   Attorney in the preparation of our cases.

9   Q    Now, do you have an expectation for your

10  Attorneys and Investigators with respect to

11  whether they speak to witnesses adverse, or

12  not?

13  A    I do.

14  Q    And what is that expectation?

15  A    Well, our Investigators are trained so that

16  when they encounter witnesses in the field they

17  are to identify themselves so that they let

18  whoever they're speaking with know they

19  represent the Orleans Public Defender's Office,

20  and the Defendant in the case for which they're

21  investigating.

22  Q    Why is it important that they're talking to

23  witnesses, at all?

24  A    Well, it's important to talk to witnesses,

25  because witnesses have very important

26  information.  It can be exculpatory

27  information, so that if the State has the wrong

28  person we're able to show that to the Court.

29  It could be inculpatory information.  And even

30  if it's bad information we want to know it.

31  That may help provide information to the client

32  and the lawyer to make plea negotiations go a

1    lot faster and smoother.
2    Q    Are your lawyers doing the jobs if they
3    don't talk to the witnesses?
4    A    They are not.   They are not.
5    Q    And do your lawyers have a right to talk to
6    witnesses?
7    A    They do.
8    Q    And what's the basis for that right?
9    A    Well, the basis for that right is in our
10   Constitution you have a right to a defense, and
11   that includes being able to review and examine
12   evidence, and speak to and consult with
13   witnesses.
14   Q    Now, in your job you must speak with a
15   District Attorney from time to time?
16   A    I do.
17   Q    And has the District Attorney ever
18   expressed to you concern about your
19   professional staff contacting witnesses?
20   A    He has.
21   Q    What has he said?
22   A    What he has said in the past, generally, is
23   that he was getting reports that investigators
24   were not identifying themselves with our
25   office, and were identifying themselves as –
26   either misleadingly, or were just pretending to
27   be other folks.   I think one of the specific
28   complaints he made was that he was hearing
29   stories of investigators going to witnesses and
30   saying, I'm with the Defense Attorney D.A.'s
31   Office, very quickly, and sort of misleading in
32   those interactions.

1   Q   And did you ask the District Attorney to
2   substantiate his claims?
3   A   I asked him who was doing this.  I told him
4   I took such things seriously, and that he
5   should let me know if he gets specific
6   information about one of our folks doing it,
7   and he didn't provide any the last time we
8   talked about it.
9   Q   So, the District Attorney has never
10  provided you with any details or specifics
11  about his complaints?
12  A   No.
13  Q   Did you talk to, or offer to respond to his
14  complaints in any other way, by implementing
15  protocols or policies?
16  A   Yes, I assured him, like I said, that I
17  took such situations seriously, and wanted to
18  develop a process where we could do this case
19  by case.  And that if there was specific
20  information or instances on both sides where we
21  had concerns that we could raise them
22  organizationally, and deal with them without
23  any formal process.
24  Q   Now, did Mr. Cannizzarro take you up on
25  your offer?
26  A   He did not.
27  Q   Did he give you an explanation for why he
28  didn't take you up on his offer?
29  A   The last time we talked about it, Mr.
30  Cannizzaro stated that - reiterated his
31  concerns.  He, at one point, said, if my guys
32  are acting up, you should file on them, and

1  that he had to - and he was going to take what

2  action he thought was appropriate to support

3  his guys.

4  Q   Now, is your impression that Mr. Cannizzaro

5  likes your professional staff talking to

6  witnesses?

7  A   No.

8     MR. BOWMAN:

9        Objection, we're leading the witnesses

10    again.

11              FURTHER DIRECT EXAMINATION

12  BY MR. CUNNINGHAM:

13  Q   What's your impression about Mr.

14  Cannizzaro's view of your attorney's and

15  paralegals, or investigators contacting

16  witnesses?

17  A   My impression is that he does not like our

18  Staff contacting witnesses.

19  Q   What has he told you about that?

20  A   What he told me was - well, in the last

21  meeting where we actually talked about this, I

22  brought it to his attention that nobody owns

23  witnesses, and that we have a right to talk to

24  witnesses.  What he told me was that it is

25  absolutely true, we have a right to talk to

26  witnesses, but that he can advise witnesses not

27  to talk to us, and tell them that in talking

28  with us, we would only hurt them and twist

29  their words, which I responded by saying, that

30  is not the law, and that is not the Rule of

31  Ethics on contacting witnesses.

32  Q   Why were you concerned with that response?

1   A   Well, I was concerned about that response
2   because if that was how his staff was being
3   trained, then that was problematic, and it
4   would stop folks from talking to the Defense in
5   the field, and it would be a violations of
6   Ethics and Law.
7   Q   So, your view, based on his statement was
8   that he was actually actively discouraging
9   witnesses from talking to your attorneys and
10  investigators?
11  A   Yes.
12  Q   What else has the District Attorney's
13  Office done to deter, or discourage witnesses
14  from talking to your investigators and
15  attorneys?
16  A   Well, one other thing I did raise with him
17  was talking with clients in jail, and I raised
18  that as a violation of Rule 4.2, Rule of
19  Ethics.  His response was, these guys are dying
20  to talk to me, and I told him that's not the
21  rule, and that folks who are represented should
22  be getting notified, and there should be
23  permission sought from the attorney
24  representing them.  And he didn't seem to think
25  that there was any action that needed to be
26  taken on that score, either.
27  Q   So, he offered you no concession or change
28  in policy or position?
29  A   No, he did not.
30  Q   And does that kind of conduct continue to
31  this day?
32  A   To my knowledge, yes, we continue to get

1   those reports.

2   Q   Now, has your staff ever been the subject

3   of any threats, or other acts of intimidation

4   by the District Attorney's Office for

5   interviewing witnesses?

6   A   Well, we, as far back as 2009, were sort of

7   on notice when we had one of our investigators

8   arrested for kidnapping because they spoke with

9   a witness, a young witness in a rape case.  And

10  so, we became very cautious, sort of ever

11  since.

12      And certainly, since then, and since I've

13  been Chief, the reports that have come through

14  the office about threats to our staff, threats

15  to our lawyers about how they're representing

16  our clients, continue to come into the office.

17  Q   Now, you mentioned that kidnapping charge.

18  That was Emily Beasley?

19  A   That is correct.

20  Q   What happened there?

21  A   Well, what happened in that case, it was

22  another sort of serious case.  Ms. Beasley had

23  gone out into the field, and was able to talk

24  to a young complaining witness in that case,

25  and asked her about the circumstances

26  surrounding the crime.  She was clear on who

27  she represented, and she was allowed to talk

28  with the minor complaining witness.

29      And very soon thereafter a Bill of

30  Information was filed charging her with

31  kidnapping, which spurred a number of Court

32  processes, and ultimately led to her arrest on

1  those charges.

2  Q   And what happened to those charges?

3  A   Those charges were ultimately dismissed, or

4  refused, I do believe, and Emily continued to

5  work for our Office for a time.  She no longer

6  works at our Office at this point, but we

7  certainly – we then took the situation

8  seriously, and as a result, also, was very

9  clear in telling folks again to identify

10  themselves.

11  Q   Now, you just had a Chief of Trials retire

12  recently, right?

13  A   Correct.

14  Q   Who was that?

15  A   Kendall Green.

16  Q   And Mr. Green worked for Public Defenders

17  for how long?

18  A   Thirty-three years.

19  Q   And what is your view of Kendall Green's

20  performance in his capacity as a Defender, and

21  then ultimately, Trial Manager?

22      MR. BOWMAN:

23          Objection.

24      MR. CUNNINGHAM:

25          I'm sorry.

26      THE COURT:

27          Counsel.

28      MR.BOWMAN:

29          Objection, relevance.

30      THE COURT:

31          Relevance, Counsel.

32      MR. CUNNINGHAM:

1          We're going to move on to an instance
2     where Mr. Green was, in fact, charged.
3     THE COURT:
4          All right.  I'll allow the answer.
5          You can answer, Mr. Bunton.
6     MR. BUNTON:
7          His performance has been exemplary,
8     heroic.
9              FURTHER DIRECT EXAMINATION
10   BY MR. CUNNINGHAM:
11   Q   Why would you say "heroic"?
12   A   Kenny's been around for a long time, and he
13   has, as Chief of Trials, stood up many times
14   for our lawyers in open Court, defending them
15   against contempt, standing in the way of
16   contempts, as well.
17   Q   And when you say, standing in the way of
18   contempt, has he, himself, been charged with
19   contempt?
20   A   Yes, multiple times.
21   Q   Was he charged with contempt in connection
22   with the Beasley matter?
23   A   He was.
24   Q   And what were the circumstances of that
25   charge?
26   A   Well, they went to a full hearing on the
27   contempt, I believe.  He was charged, our now
28   Chief of Trials, Daniel Engelberg was charged,
29   and they both went to full trial on the
30   contempt charges.  He was, during the
31   proceedings, found guilty, and then, the
32   charges were then reversed and dismissed.

1  Q    And they were reversed by the Fourth
2  Circuit, isn't that right?
3  A    That's correct.
4  Q    And the Fourth Circuit reversed him because
5  he was charged with violating an order that had
6  been withdrawn, or vacated several days before
7  he was accused of violating it?
8  A    That's correct.  He was charged with
9  violating an order that did not exist.
10 Q    And that order was related to contacting
11 witnesses?
12 A    It was related to contacting witnesses,
13 particularly it was – it all spun out of the
14 Emily Beasley Bill of Information and charge,
15 and as one of the Attorneys supervising Ms.
16 Beasley, he was charged in that matter, and it
17 was alleged that there was an order not to
18 contact the complaining witness, but that order
19 actually was from a separate and unconnected
20 case, and nonetheless had expired, but the
21 D.A.'s Office still filed the Rule, and charged
22 him with contempt.
23 Q    Now, with your attorneys and investigators
24 getting charged with contempt and kidnapping,
25 in response to contacting witnesses, and that's
26 part of their job, what do you say to them?
27 A    Well, there's a great many things I say to
28 them.  From on a technical standpoint we try to
29 make adjustments so that we, from a training
30 standpoint, and from an operational standpoint,
31 can avoid as many miscommunications as
32 possible.

1    From an organizational standpoint, I tell
2  them that - like Kenny, they are what stands
3  between the State and our clients, and that
4  every one of them is a hero and shero to our
5  clients, and that it is imperative that we not
6  be deterred from representing people in
7  accordance with the Constitution's Ethics and
8  Professional Standards.
9  Q   It's gotta have some impact on the
10  performance, though, don't you think?
11       MR. BOWMAN:
12            Objection.  That was more of a statement
13       than a question.
14       THE COURT:
15            Sustained.
16            FURTHER DIRECT EXAMINATION
17  BY MR. CUNNINGHAM:
18  Q   How, if at all, do you believe that these
19  threats, charges, other act of intimidation
20  have impacted the performance of your attorneys
21  and investigators?
22       MR. BOWMAN:
23            I'm going to object.  I've tried to bite
24       my tongue for a while, but we are so far
25       off of the train of relevance.  I'm not
26       sure where any of this fits into what we're
27       dealing with today.
28       THE COURT:
29            Counsel.
30       MR. CUNNINGHAM:
31            Your Honor, we're seeking the recusal,
32       both of Mr. Napoli and Mr. Cannizzaro,

1    based on their personal interest in this
2    case.  This case represents one of a series
3    of cases that, in fact, collectively
4    represent a pattern whereby the District
5    Attorney's Office -
6    THE COURT:
7         Okay.  That's fine, Counsel, I don't
8    need testimony.
9         I'm going to overrule the objection, at
10    this time.  You can answer Mr. Bunton.
11    MR. BUNTON:
12         Well, this kind of environment effects
13    their performance in a number of ways.
14    From a very technical standpoint, and
15    organizational level it makes things take
16    longer, and it costs resources and money,
17    so that we have to create different
18    protocols and procedures to identify
19    ourselves, get signatures for our
20    interactions in the field, going in in
21    pairs, into the field, is going to make
22    things take longer.
23         The performance, from a sort of non-
24    technical standpoint, there has certainly
25    been expressed, by our Investigative Staff,
26    concern that they might be charged simply
27    for doing their jobs, and that they are, at
28    various times, scared and reluctant because
29    the District Attorney has a penchant for
30    charging them for talking to witnesses.
31         FURTHER DIRECT EXAMINATION
32    BY MR. CUNNINGHAM:

1   Q   So at this time, when your Office is in

2   financial crisis, and thirty something other

3   Districts are in financial crisis, this is all

4   impacting your budget?

5      MR. BOWMAN:

6         Objection, Your Honor, leading, and

7      also, irrelevant.

8      THE COURT:

9         Counsel.

10     MR. CUNNINGHAM:

11        Again, Your Honor, I believe it's part

12     of the pattern of practice, and the fact

13     that it would impact his budget, or not, is

14     relevant to the determination of motive for

15     the conduct itself.

16     THE COURT:

17        So, you mean impacting the budget in

18     terms of having to - for example - the

19     example that Mr. Bunton used with sending

20     two people out, as opposed to one, and that

21     would -

22     MR. CUNNINGHAM:

23        And depriving him of resources, which

24     then, in fact, deprives him of his Office's

25     ability to -

26     THE COURT:

27        So, I'm going to sustain the objection

28     on this point.

29     MR. CUNNINGHAM:

30        Okay, Your Honor.

31        FURTHER DIRECT EXAMINATION

32  BY MR. CUNNINGHAM:

1    Q    Let's talk about Mr. Napoli.  Do you know
2    Mr. Napoli?
3    A    I do.
4    Q    How do you know Mr. Napoli?
5    A    I know him through Reports that have come
6    through my Office, and I've seen him around the
7    Courthouse, as well.
8    Q    What kind of Reports are you receiving in
9    your Office?
10   A    The Reports on Mr. Napoli are usually
11   concerning threats, or unprofessional behavior
12   that my staff has either witnessed, or been the
13   target of.
14   Q    Now, are these Reports typical of all
15   Assistant District Attorneys?
16   A    No.  No.
17   Q    How are the Reports different for Mr.
18   Napoli, compared to what else you receive?
19   A    Well, as a part of practice, in our roles,
20   there's always some amount of tension between
21   Assistant District Attorneys and our Public
22   Defenders here, but what's different about Mr.
23   Napoli is - has been his willingness to be
24   particularly - he threatens, then takes action
25   that we believe is either unprofessional, or
26   unethical.  Where others, it's usually
27   posturing, or things like that, and usually are
28   not as disrespectful, or take particular action
29   in certain events.
30   Q    What's the reputation of Mr. Napoli at your
31   Office?
32   A    It's not a good one.  He's has a reputation

1    of being unethical, being a bully, and
2    intimidating staff and lawyers.
3    Q   Have you had to have meetings with your
4    staff to talk just about Mr. Napoli?
5    A   My Leadership Team and I have definitely
6    had meetings where on the Agenda is Mr. Napoli
7    and the latest threat that Mr. Napoli may have
8    leveled against someone, or the latest bit of
9    unprofessionalism that folks believe ought to
10   be actionable.  So, yes.
11   Q   Now, are we talking about threats from a
12   year ago, or is this conduct still going on?
13   Q   It's ongoing.  It's ongoing.  I think there
14   was even a case where it was alleged that a
15   private attorney, I think, Mr. Euci Phillips,
16   in Court shoved Mr. Napoli, and there was some
17   reporting around Mr. Napoli's involvement, and
18   sort of instigation in that.
19       I've had run-ins with Mr. Napoli on the
20   Hawthorne case, where we were arguing for a
21   continuance, and in Chambers Mr. Napoli relayed
22   to me that we were - he criticized us for not
23   having Lauren's back in that case.
24       And those have been ongoing, and I think
25   he's threatened lawyers with litigation, with
26   charges, and so, we've had a number of them.
27   Q   More recently, have you received any
28   reports from Mr. Frampton, Thomas Frampton,
29   regarding Mr. Napoli?
30   A   I have.
31   Q   What was that Report?
32   A   That Report, as it was relayed to me, was

1    Mr. Napoli saying something to the effect, to
2    Mr. Frampton, you're coming real close, and he
3    was hinting at being charged for
4    misrepresentation with a witness, and that he
5    should come and talk to him and the District
6    Attorney, because something to the effect of
7    'cause we took a lot of heat for that, or we
8    got in trouble for not doing that with Taryn.
9    Q    How long ago did you hear about that
10   report?
11   A    That was just a couple of days ago.
12   Q    You talked about how you've implemented
13   this two person policy for interviews, and
14   expanded your training, what else have you done
15   in response to these threats and intimidation?
16   A    We've continued to, like I said, provide
17   the training, supervision, support to our
18   Staff.  We've created policies where they're
19   supposed to leave their card, write their names
20   very clearly on the back of the card,
21   identifying themselves, and we now have a
22   statement that is signed when we meet with
23   witnesses, that is the witness signing the
24   statement attesting to them talking to us, and
25   understanding that they were talking to us as
26   the Public Defender's Office.
27   Q    What are you trying to do to catalog or
28   document the reports that you are receiving?
29   A    We maintain a misconduct Log in our office
30   for things that folks believe might be
31   actionable, so that we have a place to sort of
32   store any complaints.

1   Q   Now, I want to switch back to the Curtis
2   Hawthorne case.  You'd mentioned a moment ago
3   that you had a role.  What was your role in
4   that case?
5   A   Well, we were seeking a continuance in that
6   case, because over the course of that case
7   Lauren's grandmother, who she was very close
8   to, had passed away, and we wanted to have a
9   continuance in that case so that Lauren could
10  maintain her representation, finish out the
11  representation in the case, but still being
12  able to be there for her family at the passing
13  of her grandmother.
14  Q   And what happened?
15  A   Well, the State opposed, initially, such a
16  continuance.  And at one point, I think, Mr.
17  Kendall Green was appointed to the case to
18  finish it out.  I stepped in to talk with the
19  Court, and that was what I referenced to
20  earlier, is in that conversation with the Court
21  and in Chambers.  Mr. Napoli was present for
22  that, and criticized our Office for not, again,
23  having Lauren's back.
24      I ultimately talked with Leon - Mr.
25  Cannizzaro, our District Attorney, about giving
26  a continuance in that case.  Ultimately, we
27  were able to work it out, and Lauren was able
28  to be with her family, and she was also able to
29  finish the case.
30  Q   Now, let's move forward to the indictment.
31  Had anybody talked to you about - Let me put it
32  to you this way, before an indictment, did

1    anybody ever complain to you about Ms. Blume
2    and her conduct?
3    A    No.
4    Q    Had there been any motions filed by the
5    State against Ms. Blume concerning her conduct,
6    her performance?
7    A    Not to my knowledge, no.
8    Q    Had you received any reports from your
9    subordinates, from any attorneys regarding Ms.
10   Blume, or her performance?
11   A    Only positive ones.
12   Q    Did the District Attorney reach out to you
13   to talk to you about Ms. Blume?
14   A    No.
15   Q    So, the first notice you had of an issue
16   was when the indictment came down, is that
17   right?
18   A    That's correct.
19   Q    What was your reaction to the news of that
20   indictment?
21   A    I was upset that an indictment had come
22   down against one of my Staff, one of my
23   colleagues, and so, huddled up with our
24   Leadership Team to talk about the sort of
25   ramifications, and moving forward with the
26   indictment.  We wanted to provide as much
27   support as we could to Taryn, and certainly
28   wanted to make her aware that we were going to
29   support her through this.  Reached out for
30   Counsel, and thankfully, the first folks we
31   called said, yes, that being you and Mr.
32   Magner.

1      We also had a meeting as an office, where
2  motions sort of ran over about folks being very
3  upset at this sort of tactic, being bullied and
4  intimidated, being charged for doing our job.
5  And it was a terrifying experience for Taryn,
6  and an infuriating experience for me.
7  Q   What about the timing of the indictment?
8  How did the timing of the indictment impact
9  your reaction?
10  A   Well, the timing of the indictment was odd,
11  simply because it was a sort of off-day for a
12  Grand Jury to be handling indictments, and the
13  indictment came down one day after we had a
14  demonstration on the Court steps in solidarity
15  with other advocates around the country after
16  the Michael Brown killing - police killing.
17      And so, we thought it odd that, especially
18  in what is essentially a misdemeanor, there
19  would be a Special Grand Jury setting, and that
20  the indictment would come down and that that
21  indictment would be timed after our
22  demonstration?
23      MR. BOWMAN:
24          Your Honor, at this point, I'm going to
25          object to this whole line of questioning
26          and the path that we're going down here.
27          Now, the argument appears to be that the
28          District Attorney's Office indicted the
29          defendant because of a protest that went on
30          at the Court, that no evidence has been
31          offered of any of this.  We're getting
32          very, very far afield of what we're here to

1    do today, Your Honor.
2    THE COURT:
3         All right, Counsel.  Mr. Cunningham.
4    MR. CUNNINGHAM:
5         There is evidence of the protest.  We
6    just heard it, but I don't plan to spend
7    any time on it.
8    THE COURT:
9         Okay.  Thank you.
10             FURTHER DIRECT EXAMINATION
11   BY MR. CUNNINGHAM:
12   Q   You eventually found out that Mr. Napoli
13   brought this case to the Grand Jury, is that
14   right?
15   A   I did.
16   Q   What was your reaction of hearing that
17   news?
18   A   Honestly, my initial feeling was that the
19   Grand Jury had been manipulated to produce an
20   indictment.  That was my first feeling when I
21   heard it, and I thought it was odd that the
22   person complaining of the conduct would also be
23   the person handling the Grand Jury.
24   Q   Now, there was a bond demand in this case,
25   originally, is that right?
26   A   Correct.
27   Q   Do you recall what that bond demand was?
28   A   I think it was somewhere in the
29   neighborhood of seventy-five thousand dollars
30   on the case.  And I also came to learn later
31   that when the Judge, I believe it was Judge
32   Herman, handed down the bond, after presiding

1   over the indictment, was not informed that the
2   indictment was against one of our
3   investigators, and the bond amount was set
4   incredibly high, given the case.
5   Q   So, Mr. Napoli didn't tell Judge Herman
6   that it was one of your staff that he was
7   indicting?
8   A   No, he did not.
9   Q   Would you expect Judge Herman to have known
10  who Taryn Blume was?
11  A   No.
12  Q   How do you feel about not being contacted
13  by the DA regarding this particular indictment?
14      MR. BOWMAN:
15          Objection, Your Honor, relevance.  How
16      Mr. Bunton feels -
17      THE COURT:
18          Sustained, Counsel.
19          FURTHER DIRECT EXAMINATION
20  BY MR. CUNNINGHAM:
21  Q   What was your reaction to the indictment
22  when you'd not been interviewed or contacted
23  regarding the complaints?
24      MR. BOWMAN:
25          Same objection, Your Honor
26      THE COURT:
27          Sustained.  Sustained, and I think Mr.
28      Bunton did provide response in that nature.
29      MR. CUNNINGHAM:
30          Fair enough, Your Honor.
31          FURTHER DIRECT EXAMINATION
32  BY MR. CUNNINGHAM:

1   Q   Now, District Attorney Cannizzaro has
2   represented to Mr. Magner and myself that he
3   has a good working relationship with your
4   office.  How would you describe your
5   relationship with the District Attorney's
6   Office?
7   A   Well, I can't say it's a good working
8   relationship, certainly after his Office has
9   sought this indictment against one of our
10  Staff.  So, I would disagree.  I guess it's a
11  matter of interpretation, but I certainly don't
12  interpret our relationship as a good working
13  one.
14  Q   How would you describe it?
15  A   Contentious.  I think it's necessarily
16  adversarial.  That's sort of the ethos of our
17  Office, it's also tense, and our Offices, at
18  this point, are very much at odds.
19      MR. CUNNINGHAM:
20          Thank you, Mr. Bunton.  I tender the
21      witness.
22      THE COURT:
23          All right.  Thank you, Counsel.
24      MR. BOWMAN:
25          Just some quick things.
26              CROSS EXAMINATION
27  BY MR. BOWMAN:
28  Q   Do you have any evidence that the District
29  Attorney's Office, ADA Napoli, knew who Taryn
30  Blume was before she was indicted, had any
31  thoughts about her?
32  A   I'm not sure what you're asking, if they

1   knew who Taryn was?

2   Q   If they had an opinion of her, good or bad?

3   A   The only thing I know is they had

4   interactions from the Hawthorne case.  They

5   would have certainly interacted during and

6   after trial.

7   Q   But you have no evidence that the DA, Jason

8   Napoli, or anyone in the District Attorney's

9   Office had any opinion of Taryn Blume, prior to

10  her indictment, any bias towards her?

11  A   No.

12  Q   Okay.  Thank you.

13      Do you have any evidence that Mr. Napoli

14  possessed the Log prior to the trial of Curtis

15  Hawthorne?  Do you have any evidence on that?

16  A   The only thing that was reported to me was

17  Mr. Napoli's denial of the existence of the

18  Log, but he never claimed possession of the

19  Log.

20  Q   So, you have no evidence that he actually

21  possessed the Log, or even knew it existed.

22  A   The evidence that he knew it existed, we

23  knew that from reports.  I knew that from

24  reports.  He asserted it did not exist, but

25  there were no reports that he possessed it.

26  Q   So, you had no evidence that he knew it

27  existed, no evidence that he possessed it?

28  A   We didn't have any evidence that he

29  possessed it.

30  Q   Did you have any evidence that he knew it

31  existed?

32  A   A statement asserting that it doesn't exist

1    would seem to be evidence that he knew it
2    didn't exist, but was, in fact, wrong in that
3    assertion.  So, if you're asking me if I know
4    he was wrong when he stated on the Record that
5    it did not exist, I have no evidence to provide
6    that would show that he knew he was wrong.
7         MR. BOWMAN:
8              May I approach the witness, Your Honor?
9         THE COURT:
10             Yes.
11        MR. BOWMAN:
12             I'm handing the witness what's been
13        marked S-3.
14             FURTHER DIRECT EXAMINATION
15   BY MR. CUNNINGHAM:
16   Q    Do you recognize the document that I've
17   given you?
18   A    I do.
19   Q    What is it?
20   A    It is the affidavit I supplied in
21   connection with this case.
22   Q    Okay.  Did you draft that affidavit?
23   A    I did not draft it, but I did review and
24   sign it, yes.
25   Q    Who drafted it?
26   A    It was drafted by attorneys for Ms. Taryn
27   Blume, but again it is a recitation of facts
28   that I know.
29   Q    But it was drafted by her attorneys?
30   A    Correct.
31   Q    I have a couple of questions about it. I'd
32   like to direct your attention to paragraph six,

1   under the heading "Mr. Napoli's exclusive
2   control over the investigation".
3   A   Um-hum.
4   Q   You say, "I've been informed by several
5   sources", what sources?
6   A   In relation to –
7   Q   It's the last bullet point on page two.
8   A   Those sources include information from my
9   staff and from my meeting with the District
10  Attorney.
11  Q   So, the District Attorney told you that Mr.
12  Napoli had exclusive control over this
13  investigation?
14  A   What Mr. Cannizzaro told me when we met in
15  the meeting that happened after the indictment,
16  was that this was brought to him personally by
17  one of his guys, he did not name the guy.  And
18  then, from other sources and from Staff, I
19  found out that it was Mr. Napoli, and I also
20  found out that it was Mr. Napoli who signed the
21  indictment in the case.
22  Q   Well, a lawyer signs every indictment,
23  correct?
24  A   I would hope.
25  Q   Yes, okay.
26      So, several sources, the people on your
27  Staff, you don't remember who that was?
28  A   Not in particular.
29  Q   Okay.  Also, under paragraph six, but on
30  the next page, under the bullet entitled "Mr.
31  Napoli's failure to take prompt action against
32  Ms. Blume" –

1    A    Um-hum.

2    Q    - what would you consider to be prompt

3    action?

4    A    Well, sort of my frame of reference was the

5    Emily Beasley case.  Ten months did not lapse

6    in between the discovery of what the District

7    Attorney's Office thought was criminal conduct

8    and a Bill of Information.

9    Q    So, your testimony is it would make the

10   charges against Ms. Blume more credible if the

11   DA had taken prompt action?

12   A    Not what I said.

13   Q    Okay.  Well, then, I'm sorry.  Explain it

14   to me again, because I must have misunderstood

15   what you said.

16   A    All I said is that they failed to take

17   prompt action, and I thought that was odd.

18   Q    So, and what I'm asking you is, what is

19   prompt action, is it one month, two months, one

20   week, two hours?  Give me some sort of time

21   frame.  What is prompt action?

22   A    Well, within the context of Mr. Hawthorne's

23   case, the case had been going on for a number

24   of years, and Mr. Napoli had been on the other

25   side of that case for a good long time, and had

26   been in contact with the different witnesses

27   who are part of that case over the course of

28   the years.

29   Q    When was the District Attorney's Office

30   informed of the conduct that led to Ms. Blume's

31   indictment?

32   A    That, I do not know.

1  Q   If they took action within two weeks of it,
2  would that be prompt?  Would you consider that
3  prompt?
4  A   If they took action fairly swiftly, within,
5  yes, a matter of weeks, that would be, I think,
6  prompt.
7  Q   Okay.  The next bullet point down –
8  A   Um-hum.
9  Q   – "Mr. Napoli's personal animosity and
10 threats against OPD attorneys", how many cases
11 have you litigated against Mr. Napoli?
12 A   None.
13 Q   None.  Did you personally witness any of
14 the things that you're complaining about in
15 this affidavit?
16 A   Again, these were reports provided to me.
17 So, no.
18 Q   Okay.  One of the things in there is, you
19 say that Mr. Napoli has been accused of making
20 physical threats against members of your Staff.
21 What members of your staff has he physically
22 threatened?
23 A   Attorneys.
24 Q   Who?  What's the names?
25 A   At least one instance, I think, it was
26 reported, this was a while ago, so, I can't
27 remember the specific lawyer, but I believe it
28 was in the context of a case, maybe a motions
29 hearing where things got heated.
30 Q   But you said threats, so, it's at least
31 two, right?
32 A   Well, there's one threat that's made out in

1   the affidavit.  Are you talking about other
2   physical threats?
3   Q   I'm talking about physical threats.  And I
4   just would like to know who these people are
5   who have been physically threatened.
6   A   It's hard to remember specifics, but, yes,
7   there were allegations of physical threats.
8   Q   I mean, you would consider that to be
9   pretty significant, an attorney physically
10  threatening another attorney, correct?
11  A   I would consider that significant.
12  Q   And this was some time ago, correct?
13  A   Um-hum.
14  Q   Did you file a Bar Complaint?
15  A   Did not.
16  Q   Also, under that same paragraph, you
17  referenced that your attorneys have filed
18  motions against Mr. Napoli alleging
19  prosecutorial misconduct.  To your knowledge,
20  has a single one of those motions ever been
21  granted?
22  A   To my knowledge, these were usually in the
23  context of discovery.  I don't think so.  None
24  come to mind.
25  Q   All right.  But your argument is that Mr.
26  Napoli regularly commits prosecutorial
27  misconduct?
28  A   Our argument is as I lay it out, is that we
29  have to file motions in context of cases.
30  Q   Let me rephrase my question, then.
31  A   Um-hum.
32  Q   Ms. Blume is alleging that her indictment

1  was a retaliatory act for pointing out
2  prosecutorial misconduct.  You're saying you've
3  got a bunch of attorneys in your Office that
4  have alleged prosecutorial misconduct against
5  Mr. Napoli in the past.
6  A   Um-hum.
7  Q   Did he indict any of those individuals?
8  A   He did not.
9  Q   I'd like to cover some things that you
10  covered with Mr. Cunningham.
11  A   Um-hum.
12  Q   Moving on to paragraph eight.  Do you feel
13  as though it's a priority in your office to
14  protect the legal rights and the constitutional
15  rights of the clients that your office
16  represents?
17  A   I do.
18  Q   Okay.  And let me ask you this, under
19  Louisiana Law, does a victim have a right to
20  deny a request of a defendant's attorney to
21  speak to them?
22  A   Absolutely, just as they have the right to
23  deny to talk to the Prosecution.
24  Q   Yes, so, would it be unethical for the
25  District Attorney's Office to inform a victim
26  of that right?
27  A   To inform a victim that they can speak to
28  whomever they want?
29  Q   Or that if they don't want to speak to
30  someone, they don't have to.
31  A   And not to speak to whoever they don't want
32  to speak to.

1    Q   If they don't want to, if the victim does
2    not want to, they do not have to speak to a
3    defense attorney, or a defense attorney's
4    employee, would that be unethical for the
5    office to do that?
6    A   No, and the rule applies to DA's as well.
7    Q   After Ms. Blume's indictment, did the
8    Public Defender's Office perform an internal
9    investigation?
10   A   I did speak with our Chief of Trials - our
11   Deputy Chief of Trials.  I also spoke with Ms.
12   Blume, and Ms. Lauren Boudreaux about the case.
13   I also took a look at the case file, and the
14   notes therein.
15   Q   And what was the findings of that
16   investigation?
17   A   She had done nothing wrong.
18   Q   Okay.  Did you speak with Mr. Napoli?
19   A   No.
20   Q   Did you try and speak with any of the
21   witnesses?
22   A   No.
23       MR. BOWMAN:
24           Your Honor, may I approach?
25       THE COURT:
26           Yes.
27            FURTHER CROSS EXAMINATION
28   BY MR. BOWMAN:
29   Q   I'm handing the witness an exhibit that's
30   been marked S-4.  Do you recognize what I've
31   just placed in front of you?
32   A   Yes.

1    Q   What is that?  Can you please describe it?
2    A   It is titled, "Identification of
3    Investigator, Orleans Public Defenders, and it
4    has our address under that.
5    Q   And, of course, that's a copy of a form
6    that your office uses, correct?
7    A   That is correct.
8    Q   And, if I'm not mistaken, that form – I'm
9    not sure how many – you know, it's the old
10   carbon copy jobs, you know, where you write on
11   it and it produces two or three copies of the
12   same form?
13   A   That's correct.
14   Q   What's the purpose of that?
15   A   Again, it's part of some of the operational
16   procedures we put in place after the charge of
17   kidnapping.
18   Q   Okay.
19   A   It was part of that sort of evolution.
20   Q   So, you had one of those when the Hawthorne
21   case was going on, that form was available?
22   A   I'm actually not particularly sure when
23   this form was available, but also it's a form
24   generally used when a statement is taken.
25        MR. BOWMAN:
26            Your Honor?
27        THE COURT:
28            Yes.
29            FURTHER CROSS EXAMINATION
30   BY MR. BOWMAN:
31   Q   I'm handing over this exhibit marked S-5.
32   A   Um-hum.

1   Q   Do you recognize that?

2   A   I do.

3   Q   What is it?

4   A   It is the same form, but a copy of one that

5   has been filled out completely.

6   Q   And what's the date?

7   A   It is August 25, 2012.

8   Q   So, that came before the Hawthorne

9   Investigation?

10  A   Correct.

11  Q   So, those forms were available during the

12  Hawthorne Investigation?

13  A   And they're usually used when a statement

14  is taken.  I don't think there was a statement

15  taken from any of the HANO Officers, but yes.

16  Q   But in your Internal Investigation of the

17  Blume matter, did you find one of those forms

18  in the file, executed by either Donald Gibson,

19  or Charles Davis?

20  A   Not to my knowledge, but I also don't

21  remember - I don't remember the form in that

22  case, no.  It could be in the file, but I don't

23  remember.

24      MR. BOWMAN:

25          I'm looking for one of the Exhibits,

26      Your Honor.

27      THE COURT:

28          Was it State or Defense?

29      MR. BOWMAN:

30          It's a Defense Exhibit.  This was

31      previously introduced by Defense.  I'm

32      going to mark it as S-6.  Never mind.  Here

1    it is.

2         May I?

3    THE COURT:

4         Yes.

5         FURTHER CROSS EXAMINATION

6    BY MR. BOWMAN:

7    Q   I'm approaching the Witness with Defense

8    Exhibit 1A.  Do you recognize that copy, sir?

9    A   I believe it's part of the Log.

10   Q   Yes.  When you were performing your

11   Internal Investigation into this matter, you

12   said you reviewed the file, was that document

13   in there in the file when you reviewed it?

14   A   I cannot remember this specific document.

15   I think there were pieces of lots of different

16   kinds of discovery and documents.  I want to

17   say, yes, but I can't remember specifically.  I

18   reviewed the file almost two years ago now.

19        MR. BOWMAN:

20             One second, Your Honor.

21             Thank you, Mr. Bunton.

22             No further questions, Your Honor.

23        THE COURT:

24             Thank you, Counsel.

25        MR. CUNNINGHAM:

26             Very briefly, Your Honor.

27             REDIRECT EXAMINATION

28   BY MR. CUNNINGHAM:

29   Q   Just so there's no confusion, Mr. Bunton,

30   would you expect that form that was marked as

31   S-5, to have been filled out, or to have seen

32   it in the file if there was no written

1   statement taken?

2   A   Not normally, no.

3   Q   And just again, so there's no confusion,

4   when you spoke to the District Attorney about

5   his efforts to discourage witnesses from

6   speaking to your attorneys and investigators,

7   he did not tell you he was advising them of

8   their right not to speak to you, he told you

9   something else, right?

10   A   That is correct.

11   Q   What did he tell you?  He affirmatively

12   told me that he can tell witnesses not to talk

13   to us, and that all we're going to do is hurt

14   them and twist their words.  That's what he

15   told me.

16       MR. CUNNINGHAM:

17           Thank you, Mr. Bunton.  That's all.

18       THE COURT:

19           All right.  Thank you, Mr. Bunton.

20       MR. BOWMAN:

21           At this moment, Your Honor, and in an

22       abundance of caution, I'm going to offer,

23       file and introduce that for Motions

24       purposes, only.

25           I believe we're up to S-5 now.

26       THE COURT:

27           All right.  Counsel.

28       MR. CUNNINGHAM:

29           Your Honor, that concludes our

30       witnesses; however, we would at this time

31       offer and introduce what has been marked as

32       Defendant Exhibits 9, 10, 11, 12 and 13,

1    all of which are Court Records that are
2    self-authenticating.  Two of the documents,
3    marked as Exhibits 9 and 10, are from the
4    Thirty-Fourth Judicial District Court, the
5    State of Louisiana, Parish of St. Bernard,
6    in the matter of State of Louisiana versus
7    Merlin Smothers, and constitutes judgments
8    and orders entered by the Court.
9    The other documents that have been marked
10   as D-11 reflects the State's response to
11   Taryn Blume's Motion for Discovery and
12   Motion for Preservation of Evidence,
13   Exhibit 12 constitutes Taryn Blume's Motion
14   for Discovery and Motion for Preservation
15   of Evidence.
16       And Exhibit D-13, is a copy of the
17   Screening Action Form that was entered in
18   this matter, and Jason Napoli's name is
19   identified as the Screener.
20   THE COURT:
21       All right.  Thank you, Counsel.
22   MR. DALY:
23       Your Honor, the only Exhibit we would
24   object to is the, I believe it's a District
25   Court's Judgment, out of St. Bernard
26   Parish, as being totally irrelevant to
27   these proceedings.
28   THE COURT:
29       All right.  Counsel, relevance.  That's
30   Defense Exhibit 10.
31   MR. CUNNINGHAM:
32       It's actually, Your Honor, both 9 and

10.

THE COURT:

Is it 9 and 10?   Okay.

MR. CUNNINGHAM:

9 and 10 are both from St. Bernard Parish.   Both of those judgements include a case in which ADA Mr. Napoli was the Attorney of Record.   One of the judgements deals with Brady issues, and has an adverse finding.   The other actually quashes an indictment, a Second Degree Murder Indictment due to Mr. Napoli's breech of the law.

MR. DALY:

Your Honor, if I can respond briefly. That still has nothing to do with how Mr. Napoli or Mr. Cannizzaro feel about Taryn Blume, or the Orleans Public Defender's Office.

THE COURT:

All right.   Counsel, based on a standard that is required for Motion to Recuse, I'll let you respond to Mr. Daly.

MR. CUNNINGHAM:

Yes, it's part of the pattern of practice, Your Honor, of obtaining, and winning at all cost without regard to the Rules of Professional Conduct, or the Rules of the Court, or the Law.

THE COURT:

Thank you.

All right.   Counsel, looking at the

1   grounds for a Motion to Recuse, looking at
2   whether or not the District Attorney should
3   be recused because of his personal interest
4   in a particular cause, I guess, that's what
5   I'm requesting Mr. Cunningham, that you
6   respond to, this personal interest vis-a-
7   vis Ms. Taryn Blume, and how the Court
8   Records from St. Bernard Parish, Exhibits 9
9   and 10, are relevant to that particular
10  requirement.
11  MR. CUNNINGHAM:
12      Those particular Exhibits, again, Your
13  Honor, reflect part of a pattern and
14  practice that we believe we've demonstrated
15  through the testimony of the witnesses here
16  today, that extends now, outside of this
17  District, in an effort to obtain an unfair
18  advantage against litigants and against
19  defense attorneys at all costs, and we
20  believe that that is part of the
21  retaliatory motive in this particular case,
22  and the part of the pattern of intimidation
23  that we have seen in this case, as well.
24  THE COURT:
25      So, giving the requirement, the Rule,
26  basically, the standard, I should say, with
27  respect to Louisiana Code of Procedure,
28  Article 680, Grounds for Recusal –
29  MR. MAGNER:
30      Judge, I'm sorry to interrupt, there's
31  additional basis.  This is also our
32  Discovery Motion, and in both of these

1    instances Mr. Napoli was found not to have
2    turned over Brady Evidence, such as we have
3    here, as well.  So, that was our other
4    basis for introducing it.  I apologize for
5    interrupting the Court.
6    THE COURT:
7        And so, the Brady issue is not, although
8    it is indirectly related to the
9    circumstances and the context of this case,
10   the Brady issue was already adjudicated in
11   Judge Zibilich's Court, in Section L.  And
12   so, that Court is not revisiting.  This
13   Court is only allowed the discussion and
14   testimony about alleged Brady violations,
15   or what took place vis-à-vis that
16   particular issue, so the Court could have a
17   context for this particular case, but I'm
18   going to agree and sustain the State's
19   objection as to Defense Exhibits 9 and 10.
20   MR. CUNNINGHAM:
21       Your Honor, just very briefly, I think
22   you may have misunderstood the point being
23   made by Mr. Magner.  We're also introducing
24   those Exhibits with respect to our Motion
25   to inforce our Motion for Discovery related
26   to the non-production of Brady in this
27   case, as opposed to Hawthorne.
28   THE COURT:
29       So, but it's related to a different, for
30   lack of a better word, proceeding in this
31   particular case, not the Motion to Recuse.
32   And I think Mr. Daly is objecting, because

1    of the Motion to Recuse issue and from what
2    I'm hearing you say, it's regarding the
3    Discovery issue?
4    MR. CUNNINGHAM:
5        Well, our position is, it regards both.
6    And we would certainly proffer to it, to
7    the extent that you are excluding it -
8    THE COURT:
9        Sure.
10   MR. CUNNINGHAM:
11       - for purposes of the Motion to Recuse,
12   and would introduce it, also, then with
13   respect to our Motion for Discovery.
14   THE COURT:
15       All right.  So noted, Counsel.
16   MR. BOWMAN:
17       Your Honor, may we approach?
18   THE COURT:
19       Yes.
20  (THERE WAS AN OFF RECORD DISCUSSION AT
21   SIDEBAR).
22   MR. CUNNINGHAM:
23       Your Honor, in order to satisfy Mr.
24   Bowman's concern, we are not offering the
25   affidavit of Dean Ciolino into evidence as
26   part of our Motion to Recuse, although it
27   was attached to our original motion.
28   THE COURT:
29       Okay.
30   MR. BOWMAN:
31       Mr. Ciolino, Your Honor, is under
32   subpoena, and I have informed Defense

1    Counsel, I don't need to call him so long
2    as the affidavit is not considered, you
3    know, to be part of the Record, and in
4    evidence.
5    THE COURT:
6         All right.  So noted, Counsel.
7    MR. CUNNINGHAM:
8         Thank you, Your Honor.
9    THE COURT:
10        You're welcome.
11        And so, as to this particular
12   proceeding, we will adjourn for a half an
13   hour, until about 2:30; however, we will
14   handle other matters that are on the
15   Docket.
16   (COURT IN RECESS).
17   THE COURT:
18        All right.  Counsel, ready to resume on
19   the Blume matter?
20   MR. CUNNINGHAM:
21        Yes, ma'am.
22   MR. BOWMAN:
23        Yes, Your Honor.
24   MR. MAGNER:
25        Judge, while we're waiting for Mr.
26   Jenkins, I just wanted to signal to the
27   Court, we are going to have an objection to
28   Mr. Jenkins testifying as to any hearsay
29   from the HANO Officers.  We think if the
30   HANO Officers statements are important, and
31   relevant, that they would be called here
32   today.  So, I just wanted to alert the

1          Court to that fact.
2          THE COURT:
3               Thank you, Counsel.
4          THE COURT:
5               Mr. Bowman, is there any need for
6          response?
7          MR. BOWMAN:
8               No, not at this time, Your Honor.
9          THE COURT:
10              Okay.
11         MR. BOWMAN:
12              I mean it is a Motion Hearing.  Hearsay
13         is admissible at a Motion Hearing.  We can
14         just save it on a question by question
15         basis, if that's okay with Your Honor.
16         THE COURT:
17              All right.
18         MR. MAGNER:
19              And, while we're waiting, the other
20         issue, Judge, so that I can save some time
21         later.
22              I suspect that Mr. Bowman will be asking
23         Mr. Jenkins about events that occurred in
24         late November and early December of 2014.
25         That's seven or eight months after the
26         scope of the indictment, which is January 1
27         to April 1, 2014.  That's when they said
28         that these things occurred.  So, we'd
29         object to the relevance and materiality of
30         discussions and testimony about what
31         happened on the eve of the Hawthorne trial,
32         or on the first day or two of the Hawthorne

1    trial.

2    MR. BOWMAN:

3        Your Honor, the whole - this whole

4    hearing is about the issue of - they have

5    made it an issue, the relative time between

6    the District Attorney's Office finding out

7    something, and filing a charge.

8        Mr. Jenkins will testify that he

9    notified, he made the District Attorney -

10   THE COURT:

11       All right.  So, Mr. Bowman, I don't need

12   you to testify as to what he's going to

13   testify to.

14   MR. BOWMAN:

15       Okay.

16   THE COURT:

17       We will take it, as you indicated, on a

18   case by case basis.  Obviously, I can't

19   rule prematurely.

20       All right.  Mr. Jenkins.  We're ready

21   for him.

22       Thank you.

23   THE COURT:

24       Good afternoon.

25   MR. JENKINS:

26       Good afternoon.

27   ROBERT JENKINS, WHO WAS CALLED AS A WITNESS BY

28   THE STATE, AFTER HAVING BEEN DULY SWORN TO TELL

29   THE TRUTH, WAS EXAMINED AND TESTIFIED AS

30   FOLLOWS:

31              DIRECT EXAMINATION

32   BY MR. BOWMAN:

1   Q   Good morning, Mr. Jenkins.  In December of
2   2014, did you call the District Attorney's
3   Office, specifically, the First Assistant, and
4   make a complaint regarding Taryn Blume?
5   A   Well, if I can explain.  I didn't call to
6   make a complaint.  What happened is, I called
7   because initially, there was a trail going on,
8   and some of our officers were being called to
9   come over.  So, I wanted to say, if you could
10  give me an hour and a half notice, or two hours
11  notice, then I can send them over.  So, I asked
12  Deputy Gibson, or Captain Gibson, who is it
13  that contacted you, and he said, Taryn Blume.
14  And I asked him from where, and he said, she
15  indicated that she was from the District
16  Attorney's Office.  So, that's when I called
17  the District Attorney's Office to speak –
18      MR. MAGNER:
19          Your Honor, I'm going to object, and
20      move to strike.  That's the hearsay that I
21      was referring to.
22      THE COURT:
23          I understand.  I'm going to overrule the
24      objection at this point.
25      MR. JENKINS:
26          I called the District Attorney's Office
27      and I initially got the receptionist.  I
28      said, look, I'm just calling to speak with
29      someone, I'm looking for the Investigator
30      Taryn Blume.  That's actually what
31      happened, and she indicated to me that, we

don't have anybody by that name.  I said,
oh, maybe she's new.  Can you check?

So, she put me on hold.  She came back,
and she said, I don't have any information
on that.

So, then, I said, can you connect me
with Mr. Graymond Martin?  And that's when
I spoke to him.

FURTHER DIRECT EXAMINATION

BY MR. BOWMAN:

Q   And what was the nature of the
conversation?

A   I explained to him –

MR. MAGNER:

Objection to hearsay, other than what
Mr. Jenkins said.

THE COURT:

Objection is overruled.

MR. JENKINS:

I explained to him that, indeed, we
can't afford to let these officers be
sitting there seven or eight hours, so, if
your office can give me proper notice, I
can get them over there timely.  And he
asked me who was it, and I said, Taryn
Blume.  And he said, Robert, I don't know
who that is.  I said, well, Captain Gibson
has indicated that she said she worked for
the District Attorney's Office, and that's
what we did.

So, after I got off the phone and I hung
up with him, I called Captain Gibson.  I

said, do you have a number on her?  And I
got the number, and I called her - I think
the first time there was no answer, but at
some point, we did speak, and I explained
to her that we didn't want to have them
waiting over there all this time, and
things of that nature.  It was just taking
too long.  And then, I said, do you work
for the District Attorney's Office?  And
her statement to me was, I'll get back to
you.  That was it, I'll get back to you.
And I said, Okay.

It was getting close to the time, and I
said, I can't have them go over there, so,
I called back, and she called me back
later.  She did call back, and she
indicated to me that we no longer need
them, and then she told me, I do not work
for the District Attorney's Office, I work
for the Public Defender's Office.  That's
what she told me.

FURTHER DIRECT EXAMINATION

BY MR. BOWMAN:

Q   One last question.  When you were having
this conversation with Mr. Martin, did he
indicate that there was any kind of preexisting
investigation of Ms. Blume?

A   No, the only thing he said was that,
Robert, she doesn't work for us.

Q   Okay.

A   And that was that.  And as I said, the only
individuals I spoke with was the Receptionist

1   and Mr. Martin.

2       I knew about the trial that was going on,

3   because I think it was Jason Napoli and

4   Brittany Reed, they were in trial, but I had no

5   contact with them, because they were in trial.

6       MR. BOWMAN:

7           Thank you, Mr. Jenkins.  No further

8       questions.

9                   CROSS EXAMINATION

10  BY MR. MAGNER:

11  Q   So, as I understand it, Mr. Jenkins, you

12  were concerned as the Attorney for Guste Homes?

13  A   Yes.

14  Q   You didn't want these two officers to have

15  to have to sit in Court all day, the way you've

16  had to sit here?

17  A   That's correct.

18  Q   Right.  That's what you were trying to

19  avoid?

20  A   That's correct.

21  Q   And you called the person you understood to

22  be Ms. Blume, correct?

23  A   She identified herself as, Ms. Blume,

24  that's correct.  I didn't know her.

25  Q   And you got a phone number from Captain

26  Gibson for her?

27  A   Correct.  Correct.

28  Q   You asked her if you could arrange

29  something where they could be on call, right?

30  A   That's right.

31  Q   You understood that this was the first day

32  of the trial?

1  A   I didn't know if it was the first day or
2  not.  I didn't know about what that was.  I
3  knew that the trial was going on.
4  Q   Yes, you knew it was in the middle of the
5  trial.
6  A   Right.
7  Q   And you've been in a lot of trials in your
8  career?
9  A   That's correct.
10  Q   And often times trials can be hectic and
11  confusing occurrences, right?
12  A   Of course.
13  Q   And sometimes there are misunderstandings,
14  right?
15  A   Of course.
16  Q   And you indicated in your testimony that
17  you asked Ms. Blume, essentially two things,
18  could your guys be on call, you know, and get
19  an hour and a half notice –
20  A   That's correct.
21  Q   – and does she work for the D.A.'s Office?
22  A   That's correct.
23  Q   Okay.  Your testimony is, she responded to
24  you, I'll get back to you?
25  A   That's correct.
26  Q   Is it possible that she could have been
27  answering your first question, rather than your
28  second question?
29  A   I don't know.  All I can tell you is that
30  her statement was, I'll get back to you.
31  Q   Right.
32      Let's talk a little bit more about Captain

1    Gibson.
2        MR. BOWMAN:
3            I'm going to object, at this point.
4        This is outside the scope of my Direct
5        Examination.  And, as Mr. Jenkins earlier,
6        I wanted to just take care of Mr. Jenkins,
7        and I was told I couldn't question him
8        outside the scope of the Direct Examination
9        of Defense Counsel.
10       THE COURT:
11           Right.
12       MR. MAGNER:
13           And I didn't want Mr. Jenkins to testify
14       five minutes ago about his conversations
15       with Captain Gibson, but he did.  So…
16       THE COURT:
17           Okay.
18       MR. MAGNER:
19           So, I do think it's relevant, and I'm
20       going to get to the point, forthwith.
21       THE COURT:
22           All right.  So, guys, listen.  I need
23       you all to refrain from the argument, he
24       did it, so I get to do it, and stick to the
25       legal arguments.
26       MR. MAGNER:
27           Yes, I will be addressing his testimony
28       on Direct.
29       THE COURT:
30           Okay.
31       MR. MAGNER:
32           Okay?

FURTHER CROSS EXAMINATION

BY MR. MAGNER:

Q   So, you told us a few moments ago that Captain Gibson was under the impression that Ms. Blume was with the D.A.'s Office?

A   Correct.

Q   And that's the same Captain Gibson we talked about this morning, correct?

A   That's correct.

Q   And he is the same Captain Gibson who found Ms. Blume's card, which we have here as D-2, in his Rolodex, right?

A   That's correct.

Q   Now, there hasn't been a rash of Reports of overweight, middle aged white guys breaking into the Guste Homes and planting business cards, have there?

    MR. BOWMAN:

        Objection, Your Honor.

    MR. MAGNER:

        I think it's perfectly relevant, in light of the specter that Mr. Bowman -

    THE COURT:

        Objection sustained.

    MR. MAGNER:

        Thank you.

        FURTHER CROSS EXAMINATION

BY MR. MAGNER:

Q   Have there been a lot of reports of fat white boys trying to sneak into Guste Homes?

    MR. BOWMAN:

        Same objection, Your Honor.

```
 1        THE COURT:
 2            Objection sustained.
 3        MR. MAGNER:
 4            Oh, I'm sorry, sustained.  Okay.
 5                FURTHER CROSS EXAMINATION
 6   BY MR. MAGNER:
 7   Q    Have there been any reports of my
 8   attempting to enter the Guste Homes without
 9   authorization?
10   A    Not at all.
11   Q    All right.  Have you and I known each other
12   for a very long time?
13   A    Very long time.
14   Q    Have you found me to be a reliable Attorney
15   to deal with?
16   A    Yes.
17        MR. BOWMAN:
18            Objection.
19        THE COURT:
20            He's already answered, Counsel.
21                FURTHER CROSS EXAMINATION
22   BY MR. MAGNER:
23   Q    Captain Gibson has the title of, Captain,
24   with the Guste Security?
25   A    Correct.
26   Q    He's not a trained police officer, is he?
27   He was a Cracker Barrel Manager?
28   A    Not that I know of.  He was a Manager at
29   Cracker Barrel, correct.
30   Q    And he was not post-certified as a
31   policeman?
32   A    Not that I'm aware of.
```

1   Q   And when you spoke with Ms. Blume the
2   second time, she told you clearly and
3   unequivocally, that she was with the Public
4   Defender's Office, and not the D.A.'s Office?
5   A   That's correct.
6   Q   When you made the call to the D.A.'s
7   Office, and you spoke to the Receptionist, and
8   you spoke to Graymond, you were just trying to
9   solve a problem, right?
10  A   Yes.
11  Q   You weren't making a complaint against
12  anyone?
13  A   No, I was actually trying to make sure that
14  they didn't have to be there the entire day,
15  and that they would just call me, and we would
16  get them there, because they're pretty close.
17  Q   And that was what was first and foremost on
18  your mind?
19  A   Right.  Right.
20       MR. MAGNER:
21            I tender the witness.
22       THE COURT:
23            All right.
24       MR. BOWMAN:
25            A brief redirect, Your Honor.
26            REDIRECT EXAMINATION
27  BY MR. BOWMAN:
28  Q   In the course and scope of your
29  conversation with Mr. Martin you did inform
30  him, am I correct —
31       MR. MAGNER:
32            Objection, leading.

1     MR. BOWMAN:

2         All right.  I'll rephrase.

3         FURTHER REDIRECT EXAMINATION

4  BY MR. BOWMAN:

5  Q   What did you tell Mr. Martin when you spoke

6  -

7     MR. MAGNER:

8         Objection, repetitive.

9     MR. BOWMAN:

10        I didn't even get to finish asking the

11  question.

12     THE COURT:

13        Yes, let Mr. Bowman, please finish his

14  question.

15        FURTHER REDIRECT EXAMINATION

16  BY MR. BOWMAN:

17  Q   In the course of your conversation what did

18  you tell First Assistant District Attorney

19  Graymond Martin about the conduct of Taryn

20  Blume?  What did you tell him?

21     MR. MAGNER:

22        Objection, repetitive.  It's been asked

23  and answered.

24     THE COURT:

25        Objection is overruled.  You can answer.

26     MR. JENKINS:

27        What I told him is that my Captain over

28  at the Facility had stated that Ms. Blume

29  stated that she was working with the

30  District Attorney's Office, and that she

31  needed these witnesses to come over and

32  testify.  I told him that I can't have them

out there the whole day, so if we could
just get some time, then I would do so, but
the fact of the matter is, his statement
was, too, that he didn't know her, he's
never heard of her.

MR. BOWMAN:

    Can you give me one second, Your Honor.

THE COURT:

    Sure.

    FURTHER REDIRECT EXAMINATION

BY MR. BOWMAN:

Q   Your conversation with Taryn Blume, did
occur before or after you spoke to Mr. Graymond
Martin?

A   If I recall, it was after I spoke with him,
when he said that she didn't work for us.

MR. BOWMAN:

    One second.

    No further questions, Your Honor.

THE COURT:

    All right.  Thank you, Counsel.

    Thank you, Mr. Jenkins.

MR. JENKINS:

    Sure.

THE COURT:

    All right.  Mr. Bowman.

MR. BOWMAN:

    The State calls, Judge Franz Zibilich.

JUDGE ZIBILICH:

    Good afternoon.

THE COURT:

    Good afternoon, Judge.

JUDGE FRANZ ZIBILICH, WHO WAS CALLED AS A
WITNESS BY THE STATE, AFTER HAVING BEEN DULY
SWORN TO TELL THE TRUTH, WAS EXAMINED AND
TESTIFIED AS FOLLOWS:

                    DIRECT EXAMINATION

Q   Good afternoon, Your Honor.

A   Good afternoon.

Q   Can you just state your name and title for
the Record?

A   Judge Zibilich, Judge, Section L, Criminal
District Court, New Orleans.

Q   And in that capacity did you preside over
the case of the State of Louisiana versus
Curtis Hawthorne?

A   I did.

Q   In December of 2014?

A   I did.

Q   Did you preside over the post-trial motions
that were heard on January 5, 2015?

A   I'm not sure of the date, but I did preside
over post-trial motions in the matter.

Q   Let me go back to the case.  What was your
understanding of the facts of the case, in
particular, the nature of the victim's initial
report?

A   At the end of the day it was a simple who
do you believe case.

    As pertains to the initial report, my
recollection is that the alleged rape took
place.  The victim was dropped off some place
near to the Guste High-rise.  She found herself
at the Guste High-rise, ran into someone who

1   probably purported to be a Security Guard.  I
2   can't recall whether that individual was in
3   uniform, or not.  I think, not.  She reported
4   to that individual that she had just been
5   robbed.
6   Q   And she later reported being raped?
7   A   It's my understanding that after she
8   uttered the words that she had just been
9   robbed, that particular contacted NOPD.  Two
10  members of the NOPD was sent out, and at that
11  particular point in time, whether it was a half
12  hour later, an hour later, or whatever, she
13  confided in those two police officers that not
14  only had she been robbed, she had been
15  kidnapped and raped, as well.
16  Q   And in the course of presiding over the
17  case, did the State ever attempt to forward
18  some theory that she immediately reported being
19  raped to the Security Guard at the Guste High-
20  rise?
21  A   Not that I recall.  I mean, that certainly
22  didn't come across at the Evidentiary Hearing
23  on the Motions.
24  Q   Do you remember the 911 call?
25  A   You'll have to help me, and then maybe the
26  recollection will come.
27  Q   Do you remember what was stated in the 911
28  call that was made from the Guste High-rise?
29  A   In the 911 call from whom to whom?
30  Q   From the Security Guard and the victim,
31  ultimately to, I guess, the 911 Dispatcher.
32  A   And that's my recollection, that that was

1   the call wherein she announced that she was not
2   only robbed, but raped, as well.  And it's
3   possible I could be wrong on that, but that's
4   my recollection.
5   Q   To your knowledge, was the 911 call turned
6   over to the Defense in this case?
7   A   I'm trying to review in my mind the Motion
8   for New Trial, right now it's that that was
9   likely an issue, and if such a call existed, it
10  was turned over.
11  Q   Okay.  Are you familiar with the Opening
12  Statement that the State of Louisiana made in
13  that case?
14  A   I did have the opportunity to review my
15  notes.  So, I have some familiarity, yes.
16  Q   And what did the State of Louisiana say
17  regarding the initial report of the victim in
18  that case?
19  A   The State, through Mr. Napoli, was very
20  candid that the initial reporting that she made
21  to the non-NOPD Officers, before the NOPD
22  Officers arrived on the scene, that she, in
23  fact, had stated that she was robbed.  And he
24  went as far as to say, he meaning Mr. Napoli,
25  that you will not hear her testify that she
26  told the initial people, or person, that she
27  interviewed with, that she had been raped.
28  That came out right out the box.
29  Q   What was the subject of the post-trial
30  motion?
31  A   There were several things that were argued
32  in the post-trial motion.  One of the big deals

that was argued was that that particular
report, and I think they referred to it as a
Log Report, had not been turned over to the
Defense.  That was the essence.

There were other arguments made that there
was supposedly a gun report that had not been
turned over.  Again, upon reviewing my notes,
the gun report involved the initial arrest of
the defendant, after the DNA had come back
positive, and that the police had gotten in
contact with the defendant's girlfriend, and
had informed the defendant's girlfriend that
they had a DNA match, and where was he?  At
some point in time, shortly thereafter, she
alerted to them that he was to come pick up a
child that they had together, albeit that they
were not married.  He was going to go to the
park.  The police came.  She warned the police
that he had a gun.  So, the gun was no secret.

Q   With respect to the portion of the post-
trial motion regarding what you described
earlier as the Log Report, did you deny that
motion?

A   I did.

Q   Why?

A   Well, I can remember asking Ms. Boudreaux,
on at least five or six occasions, Ma'am, what
are you suggesting to me, here?  Where is the
harm?  Isn't this harmless?  Weren't you aware
of the allegations that she had only reported
that she had been robbed?  And I recall,
specifically, that every time I asked her,

1   where's the harm, where's the harm, didn't you
2   know, didn't you know, the answers I received
3   were, unfortunately, non-responsive.
4       The bottom line was, it was no secret.  Mr.
5   Napoli had already spoken about the fact that
6   the initial report only concerned itself with a
7   robbery.  She did not deny, and as a matter of
8   fact, I think at some point in time, although I
9   have a date in my head of like November 14, she
10   admitted that she had received that Log Report,
11   or that Log, or that Report, or whatever it is
12   that you want to call it, approximately a week
13   before trial.  I do recollect, with
14   particularity, that that particular report,
15   albeit that the Defense had recognized that
16   they were in possession of same, did not get
17   introduced into evidence at the trial.
18   Q  What evidence, if any, was presented by the
19   Defense in the Hawthorne matter that the State
20   of Louisiana, or for that matter, any State
21   actor, knew of the existence of the so called
22   Log Report, at the time of the trial?
23   A  In the post-trial motion?
24   Q  Yes, Your Honor.
25   A  I don't recall that being the issue,
26   because I thwarted that issue by asking the
27   Defense, isn't it a fact that you were in
28   possession of that Log?
29   Q  Okay.
30   A  And there was an admission that they were
31   in possession of that Log.  So, it was nothing
32   I pursued.

1  Q   One other question about the Hawthorne
2  matter.  The case was tried in December of
3  2014.  Do you remember how many times it was
4  continued as a result of an illness to Public
5  Defender, Lauren Boudreaux's grandmother?
6  A   The number I have in my mind is two.  I
7  don't know if the first setting was June or
8  August, and the Defense Attorney indicated to
9  me how very, very, very close she was to her
10 grandmother.  The State did not wish to have
11 the matter continued.  I insisted that it be
12 continued, under these circumstances.  Ms.
13 Boudreaux did not seem to be in the State of
14 mind that one would need to be in to try a case
15 wherein the penalty was life.  The case was
16 reset.  I was certainly aware of the fact that
17 the victim was not from here, that the victim
18 was being inconvenienced.  We all have problems
19 with victims in this building, and throughout
20 the Criminal Justice System.
21     The grandmother hung on, and when the case
22 was reset, the second time the grandmother was
23 still alive, and Mr. Boudreaux was still taking
24 care of her grandmother, possibly even living
25 with her grandmother, and was again, not in the
26 state of mind, or position to try the case.
27 And although the State wished to try the case,
28 I overruled the State's objection, and
29 continued the case again.
30 Q   Now, with respect to the Prosecutor on that
31 case, Mr. Napoli, have you ever seen him
32 physically threaten somebody in Court?

1   A   The skinny guy that just walked up here?

2   Q   Yes, the skinny guy that just walked in.

3   A   I have not seen that.  If you're talking,

4  physically, I have not seen that.

5   Q   Have you ever seen him act unethical in any

6  manner, in any way, shape, or form?

7   A   I've seen his behavior as such that he

8  should have been sentenced to Saturday School.

9   Q   Well, that's not really what I'm asking

10  you, Your Honor.

11   A   I mean, you know, I'm not Plaxmeyer.  I

12  don't necessarily have jurisdiction over

13  ethics.

14   Q   I'll rephrase.

15   A   His behavior has been less than stellar on

16  a couple of occasions.

17   Q   I'll rephrase.  Let me ask you this

18  question.

19       It's been alleged that multiple motions

20  have been filed regarding - accusing Mr. Napoli

21  of Prosecutorial Misconduct.  I know that

22  you're a Judge, who he's practiced before a

23  great many times, have you ever found him to

24  have committed an act of Prosecutorial

25  Misconduct?

26   A   No, had that been the case, he would not

27  have been invited, or even allowed back in my

28  Court.

29   Q   Was there an incident that occurred one

30  time in your Chambers regarding a verbal

31  altercation between Mr. Napoli and Mr. Kendall

32  Green, of the Orleans Public Defender's Office?

1    A    If my memory serves me correctly, it might
2    have been right back here where we sit, so the
3    answer is yes.  I don't remember exactly where
4    it was, but my memory tells me it happened in
5    this very room.
6    Q    And what occurred during that incident?
7    A    In appropriate verbiage from both, which I
8    believe included expletives from both.  I
9    believe I told Mr. Napoli to stifle, and I
10   think I told Mr. Green - I think my exact words
11   were - it was about a year ago.  I think Mr.
12   Green's a year or two older than me.  I said,
13   "Mr. Green, you're sixty-two years old.  You
14   should know better."  I can recall that that
15   verbal warning by myself did not get the result
16   that I was looking for, and I have a vague
17   recollection of one of them saying something
18   about outside, and Mr. Green kind of getting
19   up, as if to possibly move on Mr. Napoli.  I
20   said, "Sir, don't do this."
21   Q    Mr. Green moved on Mr. Napoli?
22   A    Well, he didn't move towards him.  He just
23   made like a little move, like up from his
24   chair.
25   Q    Okay.
26   A    And I immediately thwarted that.  I told
27   both of them, they didn't want me to go there,
28   if those were my words, more or less.
29   Q    Do you have a tradition, or did you have a
30   tradition regarding a Christmas Party with your
31   Court Staff, and some of the attorneys who
32   practiced before you regularly?

1    A    Since I've only been a Judge for four years
2    and some change, I don't know how long it takes
3    for a tradition to be made, but yes, the first
4    year I served this community, I took my Staff
5    to lunch someplace, and I had noticed, even as
6    early as then that the various factions in this
7    building were not getting along with one
8    another, in what I thought was an appropriate
9    manner.   I wanted to have the fistful of
10   Assistant District Attorneys that had been
11   assigned to me to come over to my house after I
12   had taken my Staff to lunch, for a couple of
13   drinks, maybe some appetizers, and I likewise
14   invited the fistful, or so, members of the
15   Indigent Defender's Office, and I was hoping
16   that we could all sit there and be in a
17   situation that was not as adversarial.
18   Q    For the Record, you're a former Indigent
19   Defender, correct?
20   A    Many, many years ago, yes.
21   Q    But I'd like to bring you back to the
22   Christmas Party in '14.
23   A    That would have been my third year on the
24   bench.
25   Q    So, not long after the conviction of Curtis
26   Hawthorne?
27   A    True.
28   Q    And the indictment of Blume?  Do you
29   remember that party?
30   A    I do.
31   Q    What occurred during that party?
32   A    I don't know where my Staff and I went to

1    eat.  I don't know if it was Mr. John's, Bon
2    Ton, I can't remember where we went to eat, but
3    we had a nice lunch and I brought my staff back
4    to my house, where we exchanged Christmas
5    presents, and as tradition happens, I was
6    expecting the Assistant District Attorneys, who
7    had been assigned to my Court in Section 14,
8    and the ones who remembered from 13, that
9    wanted a free beer, and the ones that were from
10   2012, that wanted a free drink, or two, so I
11   was expecting a dozen or so Assistant District
12   Attorneys and/or their significant others, as
13   well as a similar number of Indigent Defenders,
14   with or without their significant others.
15       I recall at some particular point in time,
16   myself asking my Secretary, Emily, I said,
17   "What time did you tell these people to come
18   over?"  She said, "Some of them were worried
19   about leaving the Court, or Office before 5:00
20   o'clock."  I said, something about "Emily, it's
21   6:00 o'clock.  What's going on here?"  My
22   feelings were going to be hurt that nobody was
23   going to show up at my house, which would have
24   been quite unusual, especially because the
25   booze was going to be free.
26       It got back to me that some Indigent
27   Defenders had called Emily, my Secretary, who
28   was at my house, wondering whether or not Mr.
29   Napoli was in attendance.  She informed me that
30   Mr. Napoli had not arrived yet, so she told
31   them that, no, Mr. Napoli was not there.  It
32   was a little bit like a beehive after that.  A

1  fistful, or so, or more of Indigent Defenders

2  arrived almost simultaneously, and the cynic in

3  me would suggest that they came because they

4  thought Mr. Napoli was not going to be there.

5  Q   And at that party, do you remember

6  expressing an opinion that any work that Mr.

7  Napoli may or may not have done on the Taryn

8  Blume case, that he was acting under orders,

9  and that the Public Defenders shouldn't take it

10 out on him.

11 Q   Well, I certainly didn't know that to be a

12 fact, but that was my suggestion.  I recall

13 telling them, in spite of - words to the effect

14 of, in spite of Mr. Napoli's big britches, I

15 didn't think that Mr. Napoli could make that

16 call unilaterally, and that was something that

17 likely had come from above, and just like the

18 jobs that you have, I'm sure he was just taking

19 orders, but that was me opining.

20 Q   And do you have any memory of Mr. Napoli

21 chiming in at that point, saying, no, no, it

22 was me, all on my own?

23 A   No.

24 Q   Okay.

25 A   I do not recall that.

26    MR. BOWMAN:

27        Excuse me for one second.

28        I want to go back, very briefly, Your

29    Honor, to the August trial setting, the

30    August 2014 trial setting in State of

31    Louisiana versus Curtis Hawthorne.

32        FURTHER REDIRECT EXAMINATION

BY MR. BOWMAN:

Q   Did you order Kenny Green to be prepared for trial?

A   I did.

Q   And, ultimately, what ended up becoming of that trial date?

A   If the August 14, trial date was the second setting where I told Mr. Green that he had been in the Court enough times and knew how to try a case under the gun, from our previous years back in the 80's in the Office, that I expected that the case should be tried some kind of way, in either there was a meeting of the minds, or I changed my mind, or somebody talked me into a continuance, but it didn't happen.

Q   Did the State join in a continuance?

A   I don't recall.  My gut tells me, yes, but I don't recall.

    MR. BOWMAN:

        One second.

        No further questions, Your Honor.

    THE COURT:

        All right.  Thank you.

    MR. BOWMAN:

        Thank you, Your Honor.

    JUDGE ZIBILICH:

        Okay.

            CROSS EXAMINATION

BY MR. MAGNER:

Q   Good afternoon, Judge.

A   Good afternoon.

    You're just dying for this moment, huh?

1    Q   There are many, many things I'd like to ask
2    you.  I'd be stretching the limits of
3    relevancy.
4    A   It's okay.  Good to see you.
5    Q   It's good to see you, sir.
6        Your interactions, and perhaps your
7    problems with Mr. Napoli have gone beyond just
8    many mere misunderstandings, you issued a Rule
9    to Show Cause why he should not be held in
10   contempt, correct?
11   A   I don't know if I issued a technical Rule
12   to Show Cause, but I at the very least,
13   threatened to hold him in contempt, and had
14   some sort of modified hearing thereon.
15   Q   Right.  And that stemmed from an incident
16   in this very room, where when he was walking
17   out the door, he basically, dropped an F-bomb
18   on you, right?
19   A   I don't know if it was on me, but I heard
20   the F-bomb clearly, and naturally, I was not
21   pleased, although I don't know what that has to
22   do with this, but I heard it.
23   Q   It was brought up earlier, so I wanted to
24   expand upon it a little bit.
25   A   Okay.
26   Q   And essentially what you heard Mr. Napoli
27   say was he was glad he didn't have to fucking
28   try any cases before you anymore?
29   A   That's not what I heard.  I heard –
30   Q   Well, what did you hear?
31   A   I heard F, and then the door was closing,
32   and I don't know if it was F-Zibilich, F-this

1   Section, F-this Court, but it wasn't as long as
2   your version.
3   Q   I obviously will accept your version.  You
4   were there.
5       So, you had an, however informal, Rule to
6   Show Cause the following Monday, with Mr.
7   Napoli, Mr. Cannazzaro, and anybody else?
8       MR. BOWMAN:
9           At this point, Your Honor, I'm going to
10          lodge another objection on the ground of
11          relevance.  This had nothing to do with
12          whether or not Mr. Napoli has a subjective
13          personal interest, or a subjective bias
14          against Ms. Blume, or whether or not the
15          District Attorney, or the District
16          Attorney's Office has a subjective personal
17          interest, or bias against Ms. Blume.
18      THE COURT:
19          All right, Counsel, so, the objection is
20          relevance.
21      MR. MAGNER:
22          And I believe it is relevant.  I believe
23          the State brought these issues up, about
24          whether or not Mr. Napoli behaved himself
25          before the Judge.  I think it is perfectly
26          relevant.
27          I think it also goes, and I'll say it in
28          front of the Judge, I think it also goes to
29          an issue of bias.  I'll say that with all
30          respect.
31      THE COURT:
32          The objection is overruled.

MR. MAGNER:

    Thank you.

JUDGE ZIBILICH:

    I forgot the question.

MR. MAGNER:

    All right.

    FURTHER CROSS EXAMINATION

BY MR. MAGNER:

Q   So, you had some type of hearing.

A   I did.

Q   And there was Mr. Napoli and Mr. Cannizzaro, and anybody else who showed?

A   I don't recall Mr. Cannizzaro, at all.  I recall it just being, for lack of a better word, even for me, horrified, and instead of running after him and tackling him in the hall, or having the Sheriff do something, I took a couple - two or three deep breaths, and within moments, Mr. Cannizzaro's daughter was in my Chambers begging me to, for lack of a better phrase, sleep on it over the weekend, as opposed to knee-jerking.  And for whatever reason, I complied with that request.

Q   All right.

A   I thought about it, I thought about it, I thought about it, I thought about it, and I thought if I write this letter to Mr. Plaxmeyer, after doing much research, and after talking to other Judges, obviously, more experienced than I, I was very concerned as to whether I had an absolute duty to report the behavior.  And consulting with various

1   individuals, I was left with the conclusion
2   that it was up to me.
3   Q   Okay.
4   A   And I thought that if I would have sent
5   such a letter it might have had career
6   ramifications.  So, I invented something
7   called, Zibilich Diversion.
8   Q   Understood.  Understood.
9       But you obviously gave this a great deal of
10  thought and waived the issue, true?
11  A   For me it was a great deal of thought.
12  Q   And you like Jason Napoli –
13  A   Of course.
14  Q   – do you not?
15  A   Of course.
16  Q   Okay.  I don't think I'm sharing any
17  confidences, but you told me you like him,
18  right?
19  A   I probably had mentioned that to you.
20  Q   Right.  And I may not be certain about
21  this, but you'll correct me if I'm wrong, you
22  told him that he reminded you of yourself when
23  you were a young prosecutor, am I wrong?
24  A   You're wrong there.
25      MR. BOWMAN:
26          Objection, relevance.
27      MR. MAGNER:
28          Okay.
29      THE COURT:
30          All right.  He's already answered the
31      question.
32      MR. MAGNER:

1           And I stand corrected on that.
2      JUDGE ZIBILICH:
3           His Boss told me that he reminded the
4      Boss of a younger Zibilich.  Younger
5      Zibilich would never have used those sort
6      of words in open-Court.
7      MR. MAGNER:
8           I absolutely stand corrected.  Okay.
9           FURTHER CROSS EXAMINATION
10   BY MR. MAGNER:
11   Q   And you are close personal friends with the
12   District Attorney, are you not?
13      MR. BOWMAN:
14           Objection, relevance, Your Honor.
15      THE COURT:
16           Sustained.
17      MR. MAGNER:
18           I think it does go to the witness's
19      perception of these proceedings.
20      THE COURT:
21           I'm sustaining the objection, Counsel.
22      MR. MAGNER:
23           Okay.
24           FURTHER CROSS EXAMINATION
25   BY MR. MAGNER:
26   Q   More recently, Mr. Napoli accused you, in
27   writing, of prejudging –
28      MR. BOWMAN:
29           Objection.
30           FURTHER CROSS EXAMINATION
31   BY MR. MAGNER:
32   Q   – a case, did he not?

1   MR. BOWMAN:

2       Objection, relevance.

3   THE COURT:

4       Relevance, Counsel?

5   MR. MAGNER:

6       It has to go, again, and I apologize,

7   Judge, I think it has to go to the issue of

8   bias.  I can proffer what I was going to

9   ask, that basically, Mr. Napoli, within the

10  last two weeks, accused Judge Zibilich of

11  essentially, misconduct -

12  JUDGE ZIBILICH:

13      If I can just stop you, the pleading is

14  Public Record.  You don't need to ask me

15  the question.  I mean, I'll bet dollars to

16  donuts that you have the pleadings.

17  THE COURT:

18      Judge, with all due respect, this is a

19  hearing.

20  JUDGE ZIBILICH:

21      Oh, I'm sorry.  I'm sorry.

22  THE COURT:

23      The purpose is not of the Public Record,

24  but for purposes of a Motion to Recuse,

25  which I need to decide.

26  JUDGE ZIBILICH:

27      I'm sorry.

28  THE COURT:

29      All right.

30      So, continue on, Mr. Magner.

31  MR. MAGNER:

32      Yes.

THE COURT:

That there was a –

FURTHER CROSS EXAMINATION

BY MR. MAGNER:

Q   Did you recently –

THE COURT:

No, no, not the question as to Judge Zibilich, but explain to me why it's relevant.

MR. MAGNER:

All right.  Again, it has to do with the pattern and practice of this ADA and how he goes about handling his cases, and winning at all costs, and disrespecting the Court, disrespecting the Law, and disrespecting the Rules, and this is a clear example of that.

THE COURT:

Mr. Bowman.

MR. BOWMAN:

Mr. Napoli is not on trial, despite their efforts otherwise.  The defendant in this case is Taryn Blume.  What should be relevant to the Court is any evidence that Mr. Napoli, the District Attorney, the District Attorney's Office possessed a subjective biased or personal interest in the case against Ms. Blume.

THE COURT:

All right.  The objection is sustained.

MR. BOWMAN:

Thank you.

1       MR. MAGNER:

2           Your Honor, I believe they opened the

3       door by bringing Mr. Napoli's character,

4       his good behavior.

5       THE COURT:

6           And I allowed the questioning about his

7       character and his behavior.  Some unrelated

8       complaint does not have anything to do with

9       this particular issue.

10      MR. MAGNER:

11          All right.  I'll be careful here.

12      THE COURT:

13          Okay.

14      MR. MAGNER:

15          And you'll stop me if I -

16          FURTHER CROSS EXAMINATION

17  BY MR. MAGNER:

18  Q   Did he in the last few weeks accuse you of

19  misconduct?

20      MR. BOWMAN:

21          Objection, relevance.

22      THE COURT:

23          Sustained.

24      MR. MAGNER:

25          Okay.

26          FURTHER CROSS EXAMINATION

27  BY MR. MAGNER:

28  Q   Were you present when Mr. Napoli told

29  Curtis Hawthorne that he was going to bury him

30  at trial?

31  A   I don't know if I recall those exact words.

32  Q   The same sentiment?

1    A    I mean, I –

2         MR. BOWMAN:

3              Objection.  Objection.

4              We're back to the same place.  Whether

5         Mr. Napoli said that, or didn't say that,

6         what relevance does that have to whether or

7         not he had a subjective bias.

8              Curtis Hawthorne is not the defendant

9         here, Your Honor.

10        THE COURT:

11             Counsel, I understand that.  I am going

12        to overrule the objection at this point.

13        MR. MAGNER:

14             Okay.

15             FURTHER CROSS EXAMINATION

16   BY MR. MAGNER:

17   Q    So, maybe not those exact words, but that

18   sentiment?

19   A    Mr. Magner, I've been at this for thirty

20   something years.

21   Q    And doing it very well.

22   A    Thank you.

23        I can recall going down to St. Bernard

24   Parish hundreds of times, and Mr. Diaz would

25   say, right in front of my client, I'm putting

26   your guy in the penitentiary for the rest of

27   his life.  I've heard it from Assistant U.S.

28   Attorneys.

29   Q    Not me.

30   A    Not you.

31        I've heard it from former Assistant

32   District Attorneys.  Do I recall those specific

1   words by Mr. Napoli, no, I don't, but I'm sure
2   you're correct that there was a sentiment along
3   those lines, which I've been hearing, like I
4   said, for thirty plus years.
5   Q   And because it happens elsewhere, or it
6   happens often, that doesn't make it right,
7   correct?
8       MR. BOWMAN:
9           Objection, relevance.
10      THE COURT:
11          Objection is overruled.
12          FURTHER CROSS EXAMINATION
13  BY MR. MAGNER:
14  Q   It doesn't make it right?
15  A   I never really thought of it in terms of
16  right or wrong, I thought of it in terms of
17  hopefully I wouldn't act that way if the shoe
18  were on the other foot.
19  Q   Well, how about ethical?  An attorney
20  cannot speak to a represented party, correct?
21  You know that's unethical conduct, right?
22  A   It's at the very least, unprofessional.
23  Q   All right.  Was there an occasion where the
24  Public Defender in the Hawthorne case, Ms.
25  Boudreaux, subpoenaed the Investigator, the
26  IG's file regarding the Sex Crimes
27  Investigator, Detective Haynes, do you recall a
28  series of motion practice concerning that?
29  A   I have a vague recollection of that.
30  Q   Okay.  Do you recall that you had to order
31  Mr. Napoli to turn over a report of Detective
32  Haynes that Ms. Boudreaux said she had not

1   received from Mr. Napoli?

2   A   I recall there being a discovery dispute,

3   wherein one side said they didn't get it.  The

4   other side said, I gave it.  And my frustration

5   was that, I'm not going to sit here and preside

6   over which lawyer do I believe.  You know,

7   we're not going to have these loose, open file

8   things.  Things are going to have to be in

9   writing.  Mr. Napoli, whether you gave it, or

10  not, it's not going to hurt anything to give

11  it.  Give it.

12  Q   Did you have to order him to do that?

13  A   I think I said it pretty much like I just

14  said it.

15  Q   Okay.

16  A   And that would have been an order, yes.

17  Q   Do you recall Mr. Napoli refusing to turn

18  over that supplemental report of Detective

19  Haynes to Ms. Boudreaux?

20  A   No, I don't.

21  Q   Do you recall your Courtroom Deputy –

22  that's Mr. Burke, Ronnie Burke?

23  A   My Minute Clerk.

24  Q   Minute Clerk.  I'm sorry.  Having to make a

25  copy of the Report for Ms. Boudreaux, does that

26  refresh your recollection, at all?

27  A   I recall from reading, several days ago,

28  the Motion for New Trial transcript, something

29  to that effect.

30  Q   So, your very initial testimony here today

31  was the Hawthorne case was a simple case of who

32  do you believe, right, the defendant or the

1  victim?

2  A   Most cases in this building come down to

3  that.

4  Q   Okay.

5  A   But this was going to be a case where it

6  was apparent, especially after hearing the

7  Opening Statements, if not before, that the

8  State's position was that they had DNA, and the

9  victim was going to claim it was a rape.  I

10  don't know what other choices the defendant

11  had, unless he was going to prove that he was

12  in Rome at the time, since his DNA was there.

13  So, it was going to be consent.  So that was

14  going to be the "who do you believe" component

15  of the case.

16  Q   So, in that type of setting, the

17  credibility of the complaining witness, or the

18  victim is essential.  It's an essential part of

19  the case, true?

20  A   If I would sit there as a judger of fact,

21  that's what I would believe.

22  Q   Right.  And to the extent that the Defense

23  sought any inconsistent, or potentially

24  inconsistent statements of that witness, that

25  would be important evidence, correct?

26  A   Of course.

27  Q   And if there was a written Log entry that

28  the complaining witness had been robbed, but

29  did not say anything about being raped, that

30  would be an important piece of evidence,

31  correct?

32  A   It would be an important piece of evidence,

obviously, if the Defense was unaware of that
factual backdrop.
Q    If they were aware that there was, in fact,
a written Log entry, but did not have that Log
entry, and made demand upon the State for that
Log entry, that would have been an important
piece of exculpatory evidence, correct?
A    If they didn't have it already.
Q    Right.
A    But if you take a close look, sir, if you
take a close look at Code of Criminal Procedure
Article 718, the question then becomes whether
or not that was law enforcement that had some
connecity with the State of Louisiana, or
whether it was law enforcement at all.
Q    And unfortunately, that particular sub-
issue, if you will, was never brought to the
attention of this Court until after the verdict
and the only time it was brought to my
attention thereafter was relative to the motion
for new trial.
Q    I understand.  And you decided that there
was not sufficient evidence to grant a new
trial, correct?
A    I decided that the evidence that the
Defense was complaining about not being in
possession of, even if they didn't have the
actual document, there was certainly clear and
convincing evidence to me, that they knew what
she said in that initial report, and that's why
I continued to ask her, and I'm sure you have a
transcript of the Motion for New Trial, ma'am,

1    tell me where the harm is.  Tell me where the
2    harm is.  You didn't get it, but you knew what
3    it contained.  Tell me where the harm is.  I
4    never got an answer.
5    Q    And, you're looking at, at that point, at
6    the standard of what is a sufficient basis to
7    grant a new trial?
8    A    Of course, that's what's before me.
9    Q    But to the extent that the State knew about
10   that Log entry, and did not turn it over, that
11   would be problematic, would it not?
12        MR. BOWMAN:
13            Objection.  Assumes facts not in
14        evidence.  There has been no evidence,
15        none, zero, that Mr. Napoli knew of the
16        existence of that Log at the time of the
17        trial.
18        MR. MAGNER:
19            Judge, we've introduced the specific
20        Brady request asking for a Log Entry,
21        Report, any way that she could have, and we
22        spent a lot of time on that.  So…
23        THE COURT:
24            But the objection is that it has not
25        been entered into evidence that Mr. Napoli
26        actually knew of the existence of such, not
27        whether it was requested.
28        MR. MAGNER:
29            Yes, and Officer Naquin testified that
30        Mr. Napoli asked him about the Log.
31        THE COURT:
32            Counsel.

1    MR. BOWMAN:

2         Give me one second.

3         We'll withdraw our objection for now.

4    MR. MAGNER:

5         Thank you.

6         FURTHER CROSS EXAMINATION

7    BY MR. MAGNER:

8    Q    So, that would have been an important piece

9    of favorable evidence to the Defense if they

10   had made a specific express request for that

11   Log, correct?

12   A    Of course it would.  I mean, anything

13   exculpatory is something that the State is

14   mandated to turn over.  If it's evidence that

15   would have been favorable to the defendant and

16   that evidence was material as to either the

17   guilt or punishment, of course it needed to be

18   turned over, assuming that they didn't already

19   have it, or some semblance of it.

20   Q    I understand.

21        And you're concerned about the cumulative

22   nature of it, if they knew of it from some

23   other source, but didn't have the document,

24   then that was one of your concerns at the New

25   Trial Motion, right?

26   A    What was clear to me, because I take

27   copious notes during a trial, but it was clear

28   to me after reviewing my notes that this was no

29   secret.  This was nothing new.  This was not

30   newly discovered evidence.  This was something

31   that was put out there by both sides in their

32   respective opening statements.

1    Everybody knew.  It was not a secret that
2    she had only reported that she had been robbed.
3    Q   Right.
4    A   So, all a document would have done was to
5    confirm that, which is exactly why I asked Ms.
6    Boudreaux, ad nauseam, where is the harm?  What
7    is contained therein that you didn't already
8    know, assuming that you didn't have the
9    document?  But it did come to my attention
10   during that Motion for a New Trial, that, in
11   fact, she had the document.  I think that Mr.
12   Napoli's position was that she had had the
13   document for months.  There was no way of me
14   knowing that, but I think she admitted, oh, I
15   can't recall the exact date.  I have one week
16   in my head, that she had the document one week
17   in advance of trial.
18   Q   Right.
19       And your understanding is that she obtained
20   that from HANO directly?
21   A   I don't know what my understanding was.
22   Q   Were you aware that Ms. Boudreaux had
23   requested the Log, specifically, and in
24   writing, and orally, as well, in open court?
25   A   I'm going to tell you what my problem is
26   with this.
27   Q   You can tell me all the problems you have –
28   A   Was I aware?  The Indigent Defender's
29   Office has a tendency to be quite thorough, so
30   I'm guessing –
31   Q   Judge, I'm asking that you please – that
32   you just answer my question.

1   A   Am I specifically aware, no.

2   Q   Okay.

3   A   Which is going to bring me to an

4   explanation that's not going to hurt anybody.

5   The laissez faire conduction of discovery

6   around here makes you pull your hair out of

7   your head.

8   Q   Both sides?

9   A   Yes.  It makes you pull your hair out of

10   your head.

11   Q   This side'll file something, meaning the

12   Defense.  The State'll say, you can have it,

13   you can't have it.  I don't have it on me.

14   Come get it at the office.  You can have open

15   file.  You know, if you're not getting open

16   file discovery after it's been offered to you,

17   come back and tell me.

18       Most of this discovery stuff was not

19   litigated to the extent that you're attempting

20   to litigate right now, pretrial.  Most of it

21   came up post-trial.  And there was nothing that

22   went on during the trial that led me to believe

23   that this stuff wasn't already known by the

24   Defense.  And they could have screamed and

25   hollered before trial.  They know how I am

26   about discovery matters, and I would have made

27   sure it got done.

28   Q   So, if I understand you correctly, what

29   you're saying is that to get away from a

30   laissez faire, loosey goosey approach to this,

31   that a responsible Public Offender should make

32   specific written requests for the Discovery

1  that they feel they need, right?

2  A   In the world that we live in, that's the

3  best way to do it.  I wish I could just go get

4  the State's file, have it stamped like you

5  would do in your new world, like Jones Walker,

6  and give it to the other side and that'd be the

7  end of it.

8  Q   All right.  Now, at the Motion for New

9  Trial, actually, didn't Mr. Napoli take it one,

10  or more levels further?  Didn't he tell you

11  that somehow the Public Defender's Office had

12  prevented him from getting that HANO Log?

13  A   I don't recall that.

14  Q   All right.  Let me see if I can refresh

15  your recollection.

16  A   Please.

17     MR. MAGNER:

18         May I approach?

19     THE COURT:

20         Yes.

21     JUDGE ZIBILICH:

22     (Witness was presented a document)

23         Do you want me to read it out loud?

24         FURTHER CROSS EXAMINATION

25  BY MR. MAGNER:

26  Q   Why don't you just read it to yourself to

27  see if that refreshes your recollection?

28  A   Okay.

29     (Witness reviews the document).

30     What date was this case tried, in December

31  of 2013, or 2014?

32  Q   2014, sir, I believe, December 1st and 2nd,

1   and what I've shown you there is the transcript

2   for the New Trial Motion on January 5th.

3   A   Okay.

4   Q   I guess of 2015.

5   A   This is very conclusionary, but you can ask

6   me the question.

7   Q   Sure.

8   A   So, what I wanted to ask you, and see if

9   this refreshes your recollection, didn't Mr.

10  Napoli tell you that the Public Defender's

11  Office acquired the documents a year before,

12  and put him at a disadvantage of not even

13  knowing that the documents existed?

14  A   That's what the argument says.

15  Q   Okay.  That's what Mr. Napoli said, right?

16  A   It's attributed to him, but I don't know if

17  it's a year.  I think it has between January

18  and December, of 2014, right?

19  A   Right, and if it would have been all the

20  way to December, 2014, it would have been days,

21  or weeks, as opposed to a year.

22  Q   So, what Napoli is telling you here is that

23  through the bad conduct of the Public

24  Defender's Office, he was prevented from even

25  having, or knowing about this Log, and that

26  would certainly suggest to you that he'd have a

27  personal interest in this matter involving Ms.

28  Blume, isn't that correct?

29  A   I think that is somewhat of a leap.

30  Q   Okay.  But that's what he argued to you at

31  the Motion for New Trial, right, that he was

32  prevented from having this Log entry, this

1  Report?

2  A   Can I tell you something?  So, when lawyers

3  --

4  Q   Answer my question, Judge, first.

5  A   Did he tell me that he was prevented?  It

6  says what it says.

7  Q   All right.

8  A   It says what it says.  That having been

9  said, I sometimes take it with a grain of salt

10  when somebody tells me that they're prevented

11  by the other side.  If I don't see them

12  handcuffed, or in jail, or restrained, I'm not

13  that impressed.

14  Q   Is Mr. Napoli given to hyperbole,

15  exaggerating things, or maybe getting a little

16  spun up over something?

17  A   Any more than you or I?

18     MR. BOWMAN:

19         Objection.  Objection.

20     THE COURT:

21         Sustained.

22     MR. MAGNER:

23         I'd like to proffer the incident in the

24     Torregano Case.  I don't have the pleading.

25     I do have a newspaper article, and that was

26     what I was going to ask Judge Zibilich.

27     THE COURT:

28         I'll let you do it after the Hearing,

29     Counsel.

30     MR. MAGNER:

31         After the Hearing.  Yes, ma'am.  Thank

32     you.

1    I tender the witness.

2    REDIRECT EXAMINATION

3    BY MR. BOWMAN:

4    Q   Did you ever order Mr. Napoli to turn over

5    something in discovery and seeing him defy that

6    Order, or disobey that Order?

7    A   Not to my knowledge, because commonsense

8    tells me that if I ordered him to do something,

9    which I have before, and the other side didn't

10   get what I ordered him to turn over, then I'm

11   sure they would have come back hollering or

12   screaming.

13   Q   We're talking about some discovery

14   practices.  During the post-trial Motion,

15   during the Hearing on it - First of all, let's

16   take a step back on that.  The Court received

17   that hearing and held a hearing the same day?

18   A   The Court received the Motion, and the Code

19   of Criminal Procedure allows for that Motion to

20   be filed, literally a Nano second before

21   sentencing.

22       I hate that provision in the Code of

23   Criminal Procedure, but it is what it is.  And

24   when I received that Motion a Nano second

25   before sentencing, as I've done before, I

26   always ask the same question, have you had an

27   opportunity, State, to review the Motion?

28   Would you like an opportunity to file an

29   opposition?  I will have a Hearing on this

30   Motion, and the sentencing will be put off.

31       When I made that offer in this particular

32   case, on that date, I was met with, by Mr.

1   Napoli, no, I'm ready to proceed.  It was not
2   my suggestion, in other words, that we proceed
3   on that day, because I wanted everybody to have
4   an opportunity to file responsive pleadings,
5   opposition memoranda, or whatever.  And Mr.
6   Napoli was ready to proceed on that date.
7   Q    That's fine.  I have a couple of questions
8   about that hearing on that date.
9        Did you lecture the Defense regarding open
10  file discovery at that hearing?  Do you
11  remember that?
12  A    Did I lecture them?
13  Q    Yes.
14  A    I think I may have asked in response to a
15  statement made by Mr. Napoli, "Well, you
16  offered open file discovery."  And I think my
17  exact words were along the lines of this, "If
18  you are offered open file discovery and you
19  didn't take advantage of same, that is
20  mindboggling to me."
21  Q    What about –
22  A    Or words to that affect.
23  Q    What about – do you have any memory in
24  presiding over that trial, during the entire
25  time, did any Defense Attorney from the Public
26  Defender's Office come in and say, hey, there's
27  a Log that the HANO Police Officers have, can
28  someone please get it for me?"  Do you remember
29  anything like that?
30  A    No, because I would have gone through the
31  roof.
32  Q    Would you sign an SDT if the Public

1    Defender's Office had asked to subpoena that
2    Log?
3    A   I'm sure I would have.  And the way the
4    procedure works in my Section of Court is,
5    instead of an SDT being presented and a Motion
6    to Quash being filed before I sign an Order
7    ordering the production of same, I order the
8    production of same.  The Subpoena Duces Tecum
9    return is not directed to the State.  It's not
10   directed to the Defense.  It's directed to me.
11   I shove it in a drawer, and they have the time
12   between when I receive the SDT and when I
13   receive the response to file a Motion to Quash,
14   should they so choose.  It saves time.
15   Q   Now, on January 5, 2015, you held a
16   hearing.  One of the issues at the Hearing was
17   whether or not there was a Brady violation with
18   respect to the Log.
19   A   Um-hum.  I recall that being one of the
20   issues contained in the Motion for New Trial.
21   Q   Right.  Prior to January 5, had you ever
22   heard an allegation from the Public Defender's
23   Office regarding a Brady violation, regarding a
24   Log from HANO?
25   A   In the Hawthorne case, no.
26   Q   One final question, Your Honor.
27       The transcript that Mr. Magner showed you
28   that apparently contained a statement from Mr.
29   Napoli, that he argued on January 5, was that
30   the reason that you made your decision?  Was
31   you decision based on his argument that he was
32   prevented from getting it by the acts of the

1   Public Defender's Office?

2   A   No.

3       MR. BOWMAN:

4           Excuse me one second.

5           We have no further questions.

6       THE COURT:

7           All right.  Thank you.

8           Thank you, Judge.

9       JUDGE ZIBILICH:

10          Y'all have a good day.

11      MR. MAGNER:

12          I don't think we'll need a trial

13      subpoena, Judge.

14      THE COURT:

15          All right.  Thank you.

16          All right.  Mr. Bowman.

17      MR. BOWMAN:

18          The State rests, Your Honor.

19      THE COURT:

20          All right.  Thank you, Counsel.

21      MR. MAGNER:

22          We have no further witnesses, Judge.

23      THE COURT:

24          All right.  Thank you, Counsel.

25          All right.  Final statements?  Final

26      Argument?

27              FINAL ARGUMENT FOR DEFENSE

28      BY MR. MAGNER:

29          It's been a long day, Judge, and I'll do

30      my best to be very brief.

31          In some ways some of the most

32      significant testimony occurred right at the

1   end.  When I refreshed the Judge's
2   recollection, you know, to the fact that
3   Mr. Napoli, at the Motion for a New trial,
4   said that in between January 2014 and
5   December of 2014, that somehow the Public
6   Defender's Office had put him at a
7   disadvantage of not knowing that the HANO
8   Logs even existed.
9       He argued at the Hearing for the New
10  Trial that the Public Defender's Office had
11  prevented him, in some way, from getting
12  this information, from getting this Log,
13  and that put him at a disadvantage.  That
14  was one of his basis for opposing the
15  Motion for a New Trial.  Aside from the
16  fact that it's simply not true and it's
17  completely made up, it shows, and it's
18  emblematic of how Mr. Napoli reacted, one
19  can say, overreacted to being challenged on
20  these Brady issues.
21      He never provided any written responses
22  to these discovery motions.  He never
23  provided the HANO Log.  He was asked for it
24  specifically.  Ms. Boudreaux testified
25  that she filed a very specific written
26  motion for it.  She asked for it in open-
27  Court.  She asked for it orally, and he
28  never produced it.
29      Judge Zibilich also made it very clear,
30  this was a case of credibility, and who do
31  you believe?  Do you believe the victim, or
32  do you believe the defendant?  And where

you have the victim saying nothing about a
rape, and that that is recorded in a
written Log, by a HANO Police Officer, that
is an important piece of evidence. Was it
enough for Judge Zibilich to grant a new
trial? No, he told us that, but still,
it's undeniably Brady, Giglio, Kyles
evidence. Mr. Napoli was asked for it
specifically, and he should have turned it
over, and he didn't turn it over.

And that is our theory, that we believe
that because of his failure, because he was
caught with that failure, that's why he
lashed out at Ms. Blume.

That's not the only Brady violation
here. We heard from Ms. Boudreaux that she
had to file a subpoena duces tecum from the
Inspector General to get other reports,
supplemental reports from the investigating
detective. She testified that Mr. Napoli
said that she had it. She could see that
she didn't have it. And she said that
Judge Zibilich ordered that it be produced.
That was another aspect of Brady that was
not produced.

I think, you know, to the contrary from,
you know, what Judge Zibilich says, Mr.
Boudreaux is anything but laissez faire.
She aggressively, actively, relentlessly
sought this piece of evidence, and it
embarrassed Mr. Napoli. And we think that
that is why he needs to be recused from

this case, and has not really had a role in
this case since then.

We know that he made the determination
of which witnesses would be called before
the Grand Jury.  We know that the
favorable witness, Officer Naquin, who very
clearly said that, you know, he knew
exactly where he was, and who he was
speaking to, and had gotten their business
cards.  He wasn't called to the Grand Jury,
and Mr. Napoli made that determination.

There's another matter here that
probably doesn't require me to comment on
it, but we have asked specifically over and
over again for these business cards,
because we knew that they were there.  We
knew that Ms. Blume gave them to these HANO
Officers.  And we have documentation of the
fact that she did that.  And so, for Mr.
Bowman to suggest, even for a second, that
I somehow had something to do with that
business card showing up in Captain
Gibson's Rolodex, is beyond outrageous.
And it shows why the District Attorney's
Office has such an axe to grind here.

When Mr. Bowman introduces evidence that
has the victim's name on it, no big thing.
Who cares?  No one is going to worry about
it.  When Mr. Cunningham and I produced
that Supplemental Report, which Ms.
Boudreaux testified to, about Detective
Haynes, when we do that we're cited for

1    Criminal Contempt.  We have to bring it up

2    to the State Supreme Court to have it

3    undone.

4    THE COURT:

5         Wait.  I usually don't interrupt during

6    Closing.  This Court did not make any

7    ruling on Contempt.  This Court only

8    addressed the initial issue with respect to

9    whether or not the statute applied to

10   protect that victim's name from being

11   released.  I did not make any ruling on the

12   contempt issue.  The Supreme Court set that

13   up on its own accord.

14   MR. MAGNER:

15        Yes, Judge.  And I certainly don't mean

16   any criticism, or disrespect.

17   THE COURT:

18        I understand.  I just want to clear the

19   Record.

20   MR. MAGNER:

21        Right.  What my point is, when we do

22   something inadvertently, which was

23   perfectly allowable, it turns out that the

24   Supreme Court essentially held that once

25   the victim's name had been put in the

26   Public Record once she testified that

27   there really was no violation here, for us

28   that's a Criminal Contempt matter.  For Mr.

29   Bowman, when he does it, it's ahhh, no big

30   deal, you know, we're just introducing some

31   text messages here.  That, again, is

32   evidence of why the District Attorney's

1   Office cannot handle this case
2   responsively.
3       There are many other indicia of why both
4   Mr. Napoli and the District Attorney's
5   Office, and the District Attorney should
6   not be permitted to prosecute this case.
7       The moving force in the case is the ADA
8   in the underlying case, Mr. Napoli.  He's
9   the one who presented the witnesses before
10  the Grand Jury.  He made the determination.
11  He signed the screening sheet.  He was the
12  Judge, Jury and Executioner.  He's the one
13  who went to Judge Herman and asked for a
14  $50,000 bond for a twenty-three year old
15  woman with no criminal history.  That's
16  outrageous, Judge.
17      And, you know, we'll have our day in
18  Court, I guess, if the DA's Office is
19  intent, or whoever is intent on pursuing
20  this matter, but again, it's just further
21  evidence that they're out of control, and
22  that they're particularly out of control in
23  this case, for whatever reason.
24      So, the standard for whether or not they
25  should be recused from the case is whether
26  they have a personal interest in the case.
27  That's the standard in the Code of Criminal
28  Procedure, that's the standard in the Code
29  of Ethics, and clearly, we have undeniable
30  evidence that they do, and that they were
31  going to stop at nothing to make sure that
32  - they were going to take this shot across

the bowel, you know, whether she was
collateral damage, or not, they were going
to do this, and they were going to take
what they intended to do.

Mr. Bunton, completely unrebutted,
testified that the District Attorney told
him that it was perfectly proper, perfectly
allowable for him to tell victims of a
crime not to talk to Defense Counsel.
That's an ethical violation.  That's
unrebutted.  And it goes beyond that.  Not
only should they not talk to Defense
Counsel, but Defense Counsel - all they're
going to do is hurt them, and twist their
words, and twist their story.

If that doesn't show a compass that's
askew, and a perverse personal interest in
this, and perhaps many other matters, I
just don't know what would.

The threats and the disrespect and the
intimidation to the other public defenders,
whether it's Sarah Chevinsky or Thomas
Frampton, are just further examples of how
this ADA will do whatever he needs to do,
Code of Ethics, whatever, you know, to
secure his conviction.

And what the State has seemed to lose
all sight of is that they have all the
cards, that they have all the power, that
they have all the control, but that's sort
of not enough.  They need to go further,
and this prosecution is just one clear

example of how far that can go.

THE COURT:

All right.  Thank you, Counsel.

Mr. Bowman:

CLOSING ARGUMENT FOR THE STATE

BY MR. BOWMAN:

I'm going to end where I began, Your Honor.  Today's Hearing was shameful.

I'm going to start right here.  Jason Napoli has never been found by any Court, and they haven't produced any evidence, he's never been found to violate Brady. You know, and not every prosecutor - I'll just leave it at that.  Not every Prosecutor can say that.

Here's the issue, they were trying to try Ms. Blume's case that's set for trial on May 10, today.  They presented a bunch of evidence that is relevant to her guilt, or whether she's guilty or not guilty.

So, their first argument is, we don't agree with the way the District Attorney seized the evidence, therefore, he should be recused.  That is not a good basis for recusal under the law of Louisiana.  If that were the basis, we'd have a recusal hearing in every case.

It is a subjective standard, and I encourage Your Honor to back to the King decision.  The King decision is really interesting.  Look at what King was about. A Prosecutor took the stand, a DA, and he

said, "Yes, this defendant was in my cross
hairs when I heard about the rumors that he
was spreading about me."  In that case,
three Justices on the Louisiana Supreme
Court said, recusal is not even necessary.

One justice clearly said it was a
subjective standard, Justice Weimer.

The three that it's unclear whether or
not they apply a subjective or an objective
standard, they say objective at first, but
they decided on subjective grounds, but
they did say, yes, this is a close call.
This was a close call.  I encourage Your
Honor to look over King again.

So, where are we then?  Where did we
start this day?  They needed to present
evidence to show that Mr. Napoli and the
District Attorney framed Ms. Blume to
retaliate against, presumably, I guess,
Lauren Boudreaux for making a Brady
violation.

So, let's see where we are here.  Mr.
Jenkins took the stand and said, he made
the complaint in the midst of the Hawthorne
trial, that he made a complaint against Ms.
Blume, he told First Assistant District
Attorney Graymond Martin that this
individual was representing herself as a
District Attorney's Office Investigator.
So, unless he's in on it, I guess, I'm not
sure where the frame-up argument comes.

And then the testimony of Judge

1    Zibilich.  You heard him, no specific
2    requests for the Log.  No claims of Brady
3    violations before the January 5, 2015
4    Hearing.
5        That was after Ms. Blume had been
6    indicted.  You cannot retaliate against
7    someone for something that has not yet
8    happened.  They hadn't made their Brady
9    claim when she was indicted.
10       They're citing their evidence.  You
11   know, it's very clear from the witnesses
12   they put up, the Public Defender's Office
13   doesn't like Jason Napoli.  That's clear,
14   but then again, that's not a basis for
15   recusal.  The basis for recusal, they need
16   to show that Mr. Napoli, the District
17   Attorney Cannizzaro, the District
18   Attorney's Office has a subjective bias, or
19   prejudice against Ms. Blume.  To be honest,
20   Your Honor, they haven't put up any
21   evidence to establish that.
22       The evidence - they don't like Jason
23   Napoli.  They make some claims about him,
24   but the credibility of it is questionable.
25   I encourage Your Honor, go look over those
26   text messages again.  Ms. Boudreaux is very
27   chummy with Mr. Napoli, until Mr. Napoli
28   indicts Ms. Blume, and then after that her
29   attitude towards him changes.
30       We keep on going back to Naquin. Naquin
31   was not called to testify before the Grand
32   Jury.  By the time Naquin met with the

1    Public Defender's Office, Ms. Blume's crime
2    had been completed.
3        You know, I'm a little bit curious
4    because Mr. Magner seems to say that I'm
5    accusing him of planting business cards.  I
6    don't believe I've done that today.  It
7    just brings me back to my Shakespeare.
8        With respect to Mr. Bunton's testimony
9    again, credibility issues, all of these
10   things that apparently happened years and
11   years ago, and months ago, no one can say
12   who these physical threats were made
13   against.  No one can say who brought it to
14   Mr. Bunton's attention.  No disciplinary
15   complaints were filed, but now they're
16   there.  And that makes Mr. Napoli,
17   according to the defendants, a bad person.
18       Merlin Smothers, this is my favorite,
19   Your Honor.  They read you that long
20   judicial opinion.  What was that about?
21   What was the issue in that case?  The
22   Orleans Parish District Attorney's Office
23   goes down to St. Bernard to prosecute a
24   case.  The District Attorney in St. Bernard
25   Parish had given oral permission to the
26   District Attorney's Office to do so.  The
27   Judge ruled that it needed to be in
28   writing.  That's what we're dealing with.
29       It sounds good when they're saying all
30   those things, but it was a difference
31   between something being in writing, and
32   getting oral permission.

1      They've had their chance to put up their
2  evidence now.  They've put up no credible
3  evidence that somehow Ms. Blume has been
4  framed.  They can't establish that this was
5  retaliatory.
6      It's time to get this case to trial,
7  Your Honor.  We encourage the Court to deny
8  the Motion.
9  THE COURT:
10      All right.  Thank you, Counsel.
11      So, Counsel, here's where we are, and
12  obviously, I understand that you all would
13  expect to have, or would like to have a
14  ruling today.  What I am going to do is, I
15  need to digest everything that has been
16  given.  Obviously, you all have been
17  involved with this case for a while, well
18  before this actual case.  And so, what I'm
19  going to do is, I'd like to issue a written
20  ruling on this case, and I'm going to do
21  that in two weeks, two weeks from today,
22  which would be April 26.
23  MR. MAGNER:
24      Judge, we did have the Discovery Motion
25  scheduled for today, too.  That sort of
26  got away from us.
27      We tried to -
28  THE COURT:
29      Right.
30  MR. MAGNER:
31      Can we deal with that on the 26th, too?
32  THE COURT:

1        Yes, that's fine with me.

2        So, Ms. Bechet, just put the Discovery,

3   also, for April 26.

4   MR. MAGNER:

5        And I do get to make my Proffer?

6   THE COURT:

7        Yes, you may.

8   MR. MAGNER:

9        I'll do it as briefly as I can.

10  THE COURT:

11       All right.

12  MR. MAGNER:

13       I would have asked Judge Zibilich,

14  primarily concerning a NOLA.com Article,

15  concerning the Torregano case.  Time did

16  not allow me to get the pleadings

17  themselves.  It is written by Ken Daly,

18  April 4, 2016.  It talked about Mr. Napoli

19  accusing Judge Zibilich of making

20  disparaging remarks at the bench about the

21  State's case before the Jury is selected.

22  And again, later within the earshot of

23  jurors retiring to their lounge.

24       The Defense Attorney in the case, Ms.

25  Nandi Campbell, said that she had never

26  seen a filing so disrespectful of a sitting

27  Judge.

28       The pleading is quoted also as saying

29  that the Court has stated that the victim

30  was enticing this harassment, according to

31  Mr. Napoli.  And he said that, basically,

32  that the Judge had prejudged the case, and

1    was trying to influence the Jury.  And so,

2    in light of that, we think that that's

3    important and relevant.  We also think it

4    frankly shows a bias -

5    MR. BOWMAN:

6        I'm going to object, at this point, Your

7    Honor.  He can make the Proffer.  He can't

8    continue to do argument.

9    MR. MAGNER:

10       - that, you know, with these type of

11   allegations, which were very incendiary,

12   that despite that, Judge Zibilich still,

13   you know, is a big fan of Mr. Napoli's.

14   THE COURT:

15       All right.  Mr. Bowman, do you want to

16   put anything on the Record?

17   MR. BOWMAN:

18       No, ma'am.

19   THE COURT:

20       All right.  So, let the Record reflect

21   the District Attorney's Office has declined

22   to respond.

23       All right.  So, Counsel, this is set for

24   April 26, 2016.

25       Ms. Blume, I'll just ask that you get

26   your subpoena for that date.

27   MR. BOWMAN:

28       Oh, we've got my contempt to get back

29   to, Your Honor.  They made a Motion for it.

30   THE COURT:

31       We'll handle Contempt on April 26, 2016.

32   MR. MAGNER:

1       We're asking that that be Criminal
2   Contempt, consistent with the same
3   allegations against Mr. Cunningham and
4   myself.
5   THE COURT:
6       Thank you, Counsel.
7   MR. BOWMAN:
8       Your Honor, can we get a written Motion
9   on that, then?  I need a written Motion if
10  they want to do this.
11  MR. CUNNINGHAM:
12      Your Honor, we're going to withdraw this
13  Motion.
14  THE COURT:
15      Thank you, Counsel.
16  *****            **********            *****

1
2
3                        C E R T I F I C A T E
4
5        This certificate is valid only for a transcript accompanied
6     by my original signature and original required seal on this
7     page.
8
9        I, WANDA TROUILLIER, Official Court Reporter in and for
10    the State of Louisiana, employed as an Official Court Reporter
11    by the Orleans Parish Criminal District Court, Section "B", for
12    the State of Louisiana, as the officer before whom this
13    testimony was taken, do hereby certify that this testimony was
14    reported by me in the stenotype reporting method, was prepared
15    and transcribed by me or under my direction and supervision,
16    and is a true and correct transcript to the best of my ability
17    and understanding, that the transcript has been prepared in
18    compliance with transcript format guidelines required by
19    statute or by rules of the Board, or by the Supreme Court of
20    Louisiana, and that I am not related to counsel, or to the
21    parties herein, nor am I otherwise interested in the outcome of
22    this matter.
23
24    _____
25        WANDA TROUILLIER,
26        CERTFIED COURT REPORTER, SECTION "B"
27
28
29    New Orleans, Louisiana
30    April 20, 2016
31
32