# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RENATA SINGLETON; MARC MITCHELL; LAZONIA BAHAM; JANE DOE; TIFFANY LACROIX; FAYONA BAILEY; JOHN ROE; and SILENCE IS VIOLENCE, <br><br> *Plaintiffs*, <br><br> v. <br><br> LEON CANNIZZARO, in his official capacity as District Attorney of Orleans Parish and in his individual capacity; GRAYMOND MARTIN; DAVID PIPES; IAIN DOVER; JASON NAPOLI; ARTHUR MITCHELL; TIFFANY TUCKER; MICHAEL TRUMMEL; MATTHEW HAMILTON; INGA PETROVICH; LAURA RODRIGUE; SARAH DAWKINS; and JOHN DOE, in their individual capacities, <br><br> *Defendants*. | Civil Action No. 17-10721 <br><br> Section H <br> Judge Jane Triche Milazzo <br><br> Division 1 <br> Magistrate Judge Janis van Meerveld |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LAZONIA BAHAM'S CLAIMS AGAINST INDIVIDUAL DEFENDANTS

Defendants Jason Napoli, David Pipes, and Graymond Martin (collectively, the "Individual Defendants"), through undersigned counsel, respectfully submit this memorandum in support of their motion seeking summary judgment dismissing Lazonia Baham's only remaining claims against them—state-law tort claims for abuse of process.

Ms. Baham's remaining claims against the Individual Defendants are based solely on the allegation that Mr. Napoli sent her "several unlawful subpoenas" ordering her to appear at the DA's office. But Ms. Baham has inexcusably failed to preserve and come forward with copies of any of these documents that she claims to have received, and, even more inexcusably, has not even

conducted a thorough search of the papers in her home to find them. Instead, her claims appear to rest entirely on her own deposition testimony elicited through leading questions by her lawyer, which is inconsistent with (1) the clear testimony that she provided in the same deposition earlier that day; (2) the allegations stated in the operative Complaint; and (3) Ms. Baham's statement to a criminal-court judge, shortly after her arrest, that she "never got a subpoena."

Furthermore, even if this self-contradictory testimony is credited, Mr. Baham's hazy recollection provides no basis for a reasonable fact-finder to conclude that Mr. Napoli is responsible for sending a "DA subpoena" to Ms. Baham—and he has testified that he surely did not. Ms. Baham also cannot show any injury as a result of receiving "DA subpoenas," because her own allegations establish that she did not respond to them. Ms. Baham's claims are also prescribed, and her own deposition testimony demonstrates that she has no basis to invoke *contra non valentem*. Finally, Ms. Baham's claims are legally deficient because the tort of abuse of process would not apply to the alleged creation and use of a document that is not issued by a court and has no legal force. Because Ms. Baham's claims fail as a matter of law for multiple independent reasons, the Individual Defendants are entitled to summary judgment in their favor.

## BACKGROUND

On February 24, 2013, Isaac Jones attempted to murder Orlando Rickmon, shooting him multiple times in the stomach, the jaw, and the arm.[1] Mr. Rickmon survived but was seriously injured. While he was in still in the hospital, Mr. Rickmon viewed a photographic lineup and identified Isaac Jones as the man who shot him.[2] Mr. Rickmon's girlfriend, and the mother of his

---

[1] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 27.

[2] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 27.

child, was Dinnika Baham.[3] After the failed murder attempt, Mr. Jones began threatening to kill Dinnika, Mr. Rickmon, and their child to prevent Mr. Rickmon from testifying against him.[4] Dinnika also heard indirectly that Mr. Jones had threatened to kill her mother, Lazonia Baham, if he could not get to her.[5] On April 23, 2013, Ms. Baham called Dinnika to warn her that Ms. Baham had just seen Mr. Jones and another man in a burgundy van, and it looked like they were "plotting something."[6] Later that day, Mr. Jones and another man traveled in a red or burgundy van to the area near 4018 Baudin Street, where Mr. Rickmon's aunt lived.[7] Mr. Jones and the other man approached the house and opened fire, killing Mr. Rickmon and his friend, Desmond Bell, and injuring a young boy.[8]

Several days later, Dinnika contacted Detective Clinton Givens, who was investigating the murder, and gave a recorded interview in which she recounted the threats made by Mr. Jones and the phone call she received from Ms. Baham on the day of the murder.[9] Dinnika also stated that Ms. Baham had seen video footage on the news of the van used in the murder and had confirmed that it was the same van in which she had seen Mr. Jones earlier that day. Det. Givens asked Dinnika whether Ms. Baham would be willing to speak to him, and Dinnika stated that she would.[10] The following day, Ms. Baham called Det. Givens on the phone and confirmed that she had seen

---

[3] Dinnika is referred to by her first name herein to avoid confusion with her mother, Plaintiff Lazonia Baham, who is referred to as Ms. Baham.

[4] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 31.

[5] *See* Exhibit 2, Excerpts of Lazonia Baham Deposition, at 53.

[6] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 31; Exhibit 2, Baham Depo., at 54–55.

[7] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 17, 19, 22, 28.

[8] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 17, 19, 22, 28.

[9] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 31–32; Exhibit 2, Baham Depo., at 48–57.

[10] *See* Exhibit 2, Baham Depo., at 56.

Mr. Jones on the day of the murder in the same van shown on the news.[11] Ms. Baham declined to give an in-person interview to Det. Givens due to fear of Mr. Jones and his associates.[12] However, Ms. Baham provided her address (3520 Audubon Street) and two telephone numbers to Det. Givens.[13]

The charges against Mr. Jones for the murders of Mr. Rickmon and Mr. Bell were presented to the grand jury in August 2013.[14] Ms. Baham was subpoenaed to appear at the Orleans Parish District Attorney's Office before the grand jury on three separate dates in August 2013, and she admitted in her deposition that she received the three subpoenas.[15] However, she never appeared before the grand jury.[16] Mr. Jones was indicted for the murders, and over the next two years, as the case was delayed for various reasons, OPDA personnel tried in vain to contact Ms. Baham through letters to her known address and calls to her known telephone numbers.

As the case approached trial on October 13, 2015, Alison Morgado (a Victim/Witness Coordinator) and OPDA investigators made a renewed effort to locate and contact Ms. Baham.[17] Ms. Morgado reached Ms. Baham on a new phone number, and Ms. Baham agreed to come the following day to meet with Mr. Napoli, who was handling Mr. Jones's case at the time.[18] However, Ms. Baham did not appear as agreed.[19] Investigator Michael Kitchens went to Ms. Baham's home

---

[11] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 32.

[12] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 32.

[13] *See* Exhibit 1, Excerpts of Supplemental Police Report, at 13.

[14] *See* Exhibit 3, Isaac Jones indictment.

[15] *See* Exhibit 2, Baham Depo., at 95–96, 103–106.

[16] *See* Exhibit 2, Baham Depo., at 112–114.

[17] *See* Exhibit 4, Excerpts of Alison Morgado victim-witness notes.

[18] *See* Exhibit 4, Excerpts of Alison Morgado victim-witness notes.

[19] *See* Exhibit 2, Baham Depo., at 123.

on Audubon Street multiple times but no one ever answered the door, even though there were indications that someone was at home.[20] Mr. Kitchens left a business card at Ms. Baham's home that contained Mr. Napoli's phone number.[21] Ms. Baham subsequently called Mr. Napoli on the phone number provided by Mr. Kitchens.[22] After Mr. Napoli explained why he was trying to contact Ms. Baham and informed her of the upcoming trial date, she cursed at him and hung up the phone.[23] After Ms. Baham failed to appear for trial on October 13, 2015, Mr. Napoli requested, and Judge Laurie White issued, a warrant for her arrest as a material witness.[24]

Over the next two months, the Orleans Parish Sheriff's Office made multiple unsuccessful attempts to serve Ms. Baham with a court subpoena at her home on Audubon Street.[25] On one occasion, it appears that a deputy sheriff was told, falsely, that Ms. Baham had moved.[26] Ms. Baham was finally arrested on the material-witness warrant in late December 2015 and released the following week after appearing before Judge White.[27] Judge White explained:

> Ms. Baham, the State has been sending you, through this court, witness subpoenas. We have not been able to get those to you. . . . I want you to understand, ma'am, when you are witness [sic] in a criminal prosecution, if you ignore a subpoena–

Ms. Baham interjected: "I never got a subpoena."[28]

---

[20] See Exhibit 5, Declaration of Michael Kitchens, at ¶¶ 5–8.

[21] See Exhibit 5, Kitchens Declaration, at ¶ 9.

[22] See Exhibit 6, Excerpts of Jason Napoli Deposition, at 98.

[23] See Exhibit 6, Napoli Depo., at 102.

[24] See Exhibit 7, Motion and Order for Material Witness Bond.

[25] See Exhibit 8, CourtNotify records for Ms. Baham.

[26] See Exhibit 8, CourtNotify records for Ms. Baham. Ms. Baham confirmed in her deposition that she lived at 3520 Audubon Street from 2005 through 2017. See Exhibit 2, Baham Depo., at 27.

[27] See Exhibit 9, Transcript of January 6, 2016 hearing.

[28] See Exhibit 9, Transcript of January 6, 2016 hearing, at 3.

Several weeks later, Ms. Baham briefly spoke with Mr. Napoli and made statements that were inconsistent with her earlier statements to Det. Givens and to Mr. Napoli, prompting Mr. Napoli to file a "Notice of Disclosure" to provide notice of the inconsistent statements.[29] Ms. Baham was subsequently called by Mr. Jones's lawyer at a witness in a hearing to perpetuate her testimony.[30] Contrary to the information that Ms. Baham and her daughter provided to Det. Givens, which clearly implicated Mr. Jones, Ms. Baham testified that she knew Mr. Jones *was not* the killer because she had seen him in a different part of town at the time of the murders.[31] Ms. Baham also contradicted the previous statements by her and her daughter linking Mr. Jones to the van used in the murders, testifying that he was on foot when she saw him.[32]

On November 13, 2017, Ms. Baham failed to appear in court despite having previously received personal service of a subpoena.[33] Judge White personally called Ms. Baham and left a voice message for her, but Ms. Baham never responded.[34] Judge White issued an instanter subpoena for Ms. Baham to appear on March 1, 2018, but Ms. Baham again failed to appear; instead, a lawyer appeared on her behalf.[35] Judge White expressed frustration at Ms. Baham's repeated failure to appear:

> You realize that she has ignored my subpoena. She has gotten service, and you realize by the grace of my goodness, she is not having another attachment issue. . . . And additionally, her daughter has been to Court on additional subpoenas and then said, mom will be here on Thursday, mom didn't come. So then I sent another

---

[29] *See* Exhibit 6, Napoli Depo., at 60, 65–66.

[30] *See* Exhibit 10, Excerpts of April 4, 2016 hearing.

[31] *See* Exhibit 10, Excerpts of April 4, 2016 hearing, at 13–14.

[32] *See* Exhibit 10, Excerpts of April 4, 2016 hearing, at 16–17.

[33] *See* Exhibit 11, Transcript of November 13, 2017 proceedings.

[34] *See* Exhibit 12, Excerpts of February 20, 2018 hearing, at 2–3.

[35] *See* Exhibit 13, Transcript of March 1, 2018 proceedings, at 2–3.

subpoena. So she can sue everybody, but it's not going to keep me from arresting her if she ignores the Court subpoena.[36]

On March 5, 2018, Mr. Jones pleaded guilty to manslaughter and admitted that he killed Orlando Rickmon, contrary to Ms. Baham's testimony stating that he could not have done it. At a sentencing hearing the following day, Judge White lamented that the prosecution of the case had been impaired by the refusal of witnesses to cooperate and appear to testify:

> This was a plea agreement reached through the Defense and the State, and I accepted it with knowledge that you all [the victims' families] had been informed and were aware of the difficulties with the case. And as I said earlier, it makes me unhappy every day in this court that people will use the police for what they want to use the police for, but then they will not go to the police to try to assist or provide testimony whenever there is a murder or when there's violence in their neighborhood or even to relatives. . . . [S]adly, for the District Attorney's Office to get a case together and to get witnesses here we must have the witnesses present. . . . This Court issued an arrest warrant at one time for one of the witnesses because we could not get her to come to court. . . . I only accept a plea on the morning of trial before a jury comes up when there is a case that has the difficulties that this case had, and the difficulties stem from the violence involved, the number of victims involved, the witnesses that were not willing to cooperate.[37]

## PROCEDURAL HISTORY

Ms. Baham initially asserted claims against OPDA, Mr. Martin, Mr. Pipes, and Mr. Napoli under the First, Fourth, and Fourteenth Amendments, alleging wrongful arrest, compelled speech, retaliation, and prolonged detention, along with vague allegations of substantive-due-process violations. Ms. Baham also asserted Louisiana state-law claims for fraud and abuse of process.

On the Defendants' Rule 12(b)(6) motion, the Court dismissed Ms. Baham's Fourteenth Amendment prolonged-detention claim, concluding that "[i]n Orleans Parish, . . . it is not the responsibility of prosecutors to ensure that material witnesses receive prompt initial appearances before a judge." Doc. No. 116 at 38. The Court also dismissed Ms. Baham's fraud claim,

---

[36] *See* Exhibit 13, Transcript of March 1, 2018 proceedings, at 3.

[37] *See* Exhibit 14, Excerpts of March 6, 2018 sentencing, at 7, 11–12.

concluding that she "chose not to respond to the 'subpoenas' sent to her" and that "[a]ny harm alleged by her was not because of misrepresentations in the 'subpoenas.'" *Id.* at 42. The Court also held that all Individual Defendants are shielded by absolute prosecutorial immunity with respect to all alleged conduct other than creating or issuing unlawful subpoenas (and failure to supervise or intervene in relation to such conduct). *See id.* at 17 The Court also held that the Individual Defendants are entitled to qualified immunity with respect to any remaining federal claims. *See id.* at 18–26.[38] Finally, the Court later granted partial summary judgment dismissing all claims for injunctive relief against the Individual Defendants for lack of standing. *See* Doc. No. 200.

As a result of the rulings described above, Ms. Baham has only one remaining claim against Mr. Napoli, Mr. Pipes, and Mr. Martin—a state-law claim for abuse of process. Moreover, based on the Court's immunity rulings, that claim is limited to seeking damages for whatever injury Ms. Baham may have suffered due to receiving allegedly unlawful subpoenas directing her to appear at the DA's office—any claim for damages based on arrest and imprisonment pursuant to a material-witness warrant is barred by absolute immunity.

## LEGAL STANDARD

Summary judgment must be granted as to all or part of any claim or defense "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). "The question at summary judgment is whether the record, taken as a whole, could lead a rational trier-of-fact to find for the non-moving party." *Koerner v. CMR Construction & Roofing, LLC*, 910 F.3d 221, 227 (5th Cir. 2018) (quotation omitted). "Credibility determinations have no place in summary judgment proceedings because

---

[38] *See also* Doc. No. 179 (granting qualified immunity on supervisory claims against Mr. Cannizzaro, Mr. Martin, and Mr. Pipes).

non-movants' summary judgment evidence must be taken as true." *Id.* (quotations omitted). "However, self-serving allegations are not the type of significant probative evidence required to defeat summary judgment, and a vague or conclusory affidavit [without more] is insufficient to create a genuine issue of material fact in the face of conflicting probative evidence." *Id.* (quotations omitted).[39] "Therefore, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the fact for purposes of . . . summary judgment.'" *Id.* at 227–28 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

The Supreme Court has explained that "[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). The Fifth Circuit has similarly noted that testimony "made in response to a leading question" may be "so inconsistent with [the witness's] several times reiterated testimony . . . that it is without probative force and is to be disregarded." *See General Motors Corp. v. Muncy*, 367 F.2d 493, 497 (5th Cir. 1966). Finally, other courts have recognized that

> Judges may, under certain circumstances, lawfully put aside testimony that is so undermined as to be incredible. The removal of a factual question from the jury is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury.

---

[39] For example, in *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001), the Fifth Circuit held that the testimony of the defendant (Lawrence) that another person (Peterson) had paid his debts for him was insufficient to create a genuine issue of fact and defeat summary judgment. The Fifth Circuit explained: "Lawrence produced no evidence of this payment. Peterson is now dead, and Lawrence has no documentation confirming Peterson's repayment of the loans; it does not seem any such evidence exists. Such self-serving allegations are not the type of significant probative evidence required to defeat summary judgment." *Id.* (quotation omitted).

*Johnson v. Wash. Metro. Area Transit Auth.,* 883 F.2d 125, 128 (D.C. Cir. 1989); *see also Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 470 (S.D.N.Y. 1998) (Sotomayor, J.) (granting summary judgment because "[f]rom the complaint, to plaintiff's deposition, to his opposition papers to defendants' summary judgment motion, plaintiff's allegations of the events at issue are replete with inconsistent and contradictory statements").

## DISCUSSION

"An abuse of process claim originates from the common law and is recognized under [Louisiana] jurisprudence as a compensable tort under LSA-C.C. art. 2315." *No Drama, LLC v. Caluda*, 177 So. 3d 747, 751 (La. App. 5th Cir. 2015) (quotation omitted). "The essential elements of a cause of action for abuse of process are (1) the existence of an ulterior purpose; and (2) a willful act in the use of the process not in the regular prosecution of the proceeding." *Duboue v. City of New Orleans*, 909 F.2d 129, 132 (5th Cir. 1990). "The precise inquiry involves the misuse of a process already legally issued whereby a party attempts to obtain some result not proper under law." *Id.*; *see also Delcambre v. Mancuso*, 268 So. 3d 325, 331 (La. App. 3rd Cir. 2019) ("An abuse of process occurs when the actor employs legal process in a manner technically correct, but for a wrongful and malicious purpose to obtain an unjustifiable end or an object which it was not the purpose of the particular process employed to effect.") (quotation omitted). "The tort of abuse of process involves the malicious use of a legal process *after* the process has been instituted." *Duboue*, 909 F.2d at 132. "The plaintiff must also prove damage resulting from the abuse." *Orrill v. Mortgage Electronic Registration Systems, Inc.*, No. 06-cv-10012, 2008 WL 1867706, at *2 (E.D. La. Apr. 24, 2008).[40]

---

[40] "Louisiana courts conduct a duty-risk analysis to determine whether to impose liability under Article 2315." *Nagle v. Gusman*, 61 F. Supp. 3d 609, 620 (E.D. La. 2014).

Ms. Baham alleges that the Individual Defendants committed the tort of abuse of process by sending her fraudulent "subpoenas" ordering her to appear for questioning at the DA's office. But Ms. Baham has never produced any copies of these alleged documents, and the record as a whole could not lead any rational factfinder to conclude that any of the Individual Defendant is responsible for sending such a document to Ms. Baham. Ms. Baham's allegations also establish that she suffered no injury as a result of any allegedly fraudulent subpoenas. Ms. Baham's claims also must be dismissed because they are prescribed on the face of the pleadings, and because her own deposition testimony demonstrates that she cannot prove the "exceptional circumstances" necessary to invoke *contra non valentem*. Finally, Ms. Baham's claims fail as a matter of law because the tort of abuse of process would not apply to the alleged creation and use of a document that is not issued by a court and has no legal force.

I. **Ms. Baham has never produced a copy of any unlawful "DA subpoenas" that were allegedly sent to her by any of the Individual Defendants, and her own vague and self-contradictory testimony, which is inconsistent with her allegations in the Complaint, cannot create a genuine dispute of fact.**

   A. **The Complaint alleges in a conclusory manner that Ms. Baham received "several unlawful subpoenas" ordering her to appear at the DA's office, but it includes no other details about these alleged documents, and she has never produced copies of any of these alleged documents.**

   In the Second Amended Complaint (the "Complaint"), Ms. Baham alleges that she "received several unlawful subpoenas demanding that she appear at the District Attorney's Office." Doc. No. 52 at ¶ 270. The Complaint does not state even approximately when Ms. Baham claims to have received such documents, other than to allege that they were received "[i]n the months that followed" several alleged phone calls with an investigator from the DA's office (which are also undated). *See id.* The Complaint also includes no other information about what these

allegedly unlawful subpoenas said or what they looked like. Nor does it provide any information about when Ms. Baham allegedly received these documents.[41]

At best, the Complaint alleges that the documents were received at some point between February 2013 and October 13, 2015. *See* Doc. No. 52 at ¶¶ 261–273. Ms. Baham does not allege in the Complaint that the documents she received included the word "subpoena" or that they bore the seal of the District Attorney's Office. Notably, although the "DA subpoena" form that was being used by the DA's office in 2014 and 2015 was attached as an exhibit to the Complaint, *see* Doc. No. 52 at 83, Ms. Baham *did not* allege that the documents she received were based on that form. In response to an interrogatory propounded by Mr. Napoli, Ms. Baham admitted that she could not recall the date on which any allegedly unlawful subpoena was received or the date and time when she was allegedly ordered to appear at the DA's office.[42]

Ms. Baham has never been able to produce any copy of any unlawful subpoena that was allegedly delivered to her. This omission is notable because Ms. Baham was able to locate "quite a few" other subpoenas in her possession concerning the same case, which she provided to her lawyers.[43] The omission is also notable because, as Ms. Baham testified, she "keeps everything."[44] Ms. Baham suggested in her deposition that she had not even conducted a thorough search for the alleged subpoena: "I had stuff in storage. I just—and I still have a whole lot of stuff that I didn't

---

[41] By contrast, Plaintiffs Fayona Bailey and Tiffany LaCroix quoted specific language from the "subpoena" that they allegedly received, and Ms. Bailey included the date on which she was allegedly ordered to appear at the DA's office. *See* Doc. No. 52 at ¶ 304–307, 317–318.

[42] *See* Exhibit 15, Baham Response to Interrogatory No. 16 by Jason Napoli.

[43] *See* Exhibit 2, Baham Depo., at 20.

[44] *See* Exhibit 2, Baham Depo., at 248.

get a chance to get through. . . . A whole lot of paper. Probably be in—paperwork I never got a

chance to get to."[45]

Ms. Baham alleges that the "unlawful subpoenas were issued at the direction of Defendant

Napoli," but that allegation is based solely "[o]n information and belief." *See* Doc. No. 52 at ¶ 271.

Ms. Baham has never produced any evidence showing that Mr. Napoli sent her any unlawful

subpoena. In his deposition, Mr. Napoli testified clearly and unambiguously that he is sure he

never sent Ms. Baham a fake subpoena.[46] Additionally, Michael Kitchens, the OPDA investigator

who was working with Mr. Napoli in trying to locate Ms. Baham, has submitted a sworn

declaration stating that he never delivered any document to Ms. Baham ordering her to appear at

the DA's office.[47]

**B.     Ms. Baham clearly testified in her deposition that the only subpoena she ever
        received ordering her to come to the DA's office was a grand jury subpoena in
        2013, long before Mr. Napoli began working on the Isaac Jones case.**

In her deposition, Ms. Baham contradicted her allegation in the Complaint that she

"received several unlawful subpoenas demanding that she appear at the District Attorney's

Office," Doc. No. 52 at ¶ 270, testifying repeatedly that she received only one subpoena directing

her to come to the DA's office.[48] Ms. Baham also testified, clearly and unambiguously, that she

had received this subpoena in 2013, several months after Orlando Rickmon was killed:

---

[45] *See* Exhibit 2, Baham Depo., at 248; *see also id.* ("I probably could find—it will take me—I
don't know how long.").

[46] *See* Exhibit 6, Napoli Depo., at 312–313.

[47] *See* Exhibit 5, Kitchens Declaration, at ¶¶ 11–14.

[48] *See, e.g.*, Exhibit 2, Baham Depo., at 12 ("I got several, many subpoenas. One of them was, they
sent me, tell—tell me to go to the DA office, and all the rest was for me to go into the courtroom.").
Ms. Baham's deposition testimony contradicted her allegations in other critical ways as well. For
example, Ms. Baham alleged in the Complaint that the material-witness motion submitted by Mr.
Napoli was false and fraudulent because Mr. Napoli "withheld from the court that Ms. Baham had
talked with him on multiple occasions, and . . . that she had told him that she planned to attend

Q: So this is back in 2013, correct? This is about four months after the murder?

A: That's when I received them to go to the DA office.

Q: That's when you what, ma'am?

A: Received the subpoena to go to the DA office.

Q: So you received the subpoenas to go to the DA's office in 2013, several months after the murder?

A: Yes.[49]

Furthermore, Ms. Baham confirmed in her deposition that the only subpoena she had received directing her to come to the DA's office was a lawfully issued grand jury subpoena. As noted above, Ms. Baham received three court-issued subpoenas ordering her "to appear before the GRAND JURY for the Orleans Parish Criminal District Court located in the Orleans Parish District Attorney's Office, 619 South White St. New Orleans, Louisiana," on three dates in August 2013.[50] Ms. Baham was shown copies of these three subpoenas during her deposition (one of which contained her signature, which she identified), and she testified that she had received them.[51]

When asked to reconcile her receipt of the three grand jury subpoenas with her testimony that she received only one subpoena to appear at the DA's office, Ms. Baham expressed some confusion, though she was confident that she had received at least the subpoena with her signature

---

court." Doc. No. 52 at ¶ 274. The Court relied heavily on this allegation in denying the Defendants' Rule 12(b)(6) motion on Ms. Baham's Fourth Amendment claim. *See* Doc. No. 116 at 34–35. Yet Ms. Baham testified in her deposition that she had never spoken with Mr. Napoli until *after* her arrest on the material-witness warrant. *See* Exhibit 2, Baham Depo., at 123–124.

[49] *See* Exhibit 2, Baham Depo., at 104.

[50] *See* Exhibit 2, Baham Depo., at 95–96, 103–106; *see also* Exhibit 16, August 15, 2013 grand jury subpoena to Ms. Baham (introduced as Exhibit 3 during her deposition); Exhibit 17, August 22, 2013 grand jury subpoena to Ms. Baham (introduced as Exhibit 4 during her deposition); Exhibit 18, August 29, 2013 grand jury subpoena to Ms. Baham (introduced as Exhibit 5 during her deposition).

[51] *See* Exhibit 2, Baham Depo., at 95–96, 103–106.

on it.[52] Ms. Baham confirmed that, aside from the grand jury subpoenas that were shown to her

and discussed in her deposition, she had not received any other subpoenas directing her to appear

at the DA's office:

> Q: All right. So I just showed you three subpoenas, correct? So aside from those
> subpoenas, did you receive any other subpoenas telling you to come to the DA's
> office?
>
> A: No, not that I'm aware of. Just the letter and subpoena that I got when I stay
> over there to the DA office. All the rest I was going to Court.[53]

Later in the day, counsel for the Individual Defendants returned to this topic to make sure there

had been no misunderstanding, with respect to terminology or otherwise:

> Q: So, Ms. Baham, earlier this morning I was asking you some questions about
> Grand Jury subpoenas. Do you recall that?
>
> A: Yes.
>
> Q: There were three Grand Jury subpoenas that were addressed to you?
>
> A: Yes, I seen them.
>
> Q: I asked you other than those subpoenas, did you receive any other subpoenas
> telling you to come to the DA's office, and you said no, correct?
>
> A: No, I ain't seen no more. I said, I had more subpoenas, but it wasn't with the
> DA office. It's for the courts.
>
> Q: I just want to be clear. Were there any other sort of documents that you received
> telling you to come to the DA's office?
>
> A: Not that I could recall, no.[54]

---

[52] *See* Exhibit 2, Baham Depo., at 106–107; *see also id.* at 109 ("Q: I just showed you three subpoenas, correct? A: Yes. Q: You received at least one of those; is that correct? A: Yes."); *id.* at 111 (confirming again that she had received the grand jury subpoena with her signature on it).

[53] *See* Exhibit 2, Baham Depo., at 116–117 (objection omitted).

[54] *See* Exhibit 2, Baham Depo., at 165–166.

C.      **Later in her deposition, in response to leading questions by her lawyer, Ms. Baham contradicted her earlier testimony without explanation by testifying that she received a "DA subpoena" containing the seal of the DA's office in late 2015 (or perhaps in 2016, after she was released from jail).**

Later in the deposition, however, in response to leading questions by her own lawyer, Ms. Baham provided answers that flatly contradicted her testimony earlier in the day. Contrary to her earlier testimony that the only subpoena she had received ordering her to appear at the DA's office was a grand-jury subpoena, Ms. Baham testified that she received a document in the mail that was labeled "subpoena," that had the District Attorney's seal on it, and that ordered her to appear at the DA's office.[55] Ms. Baham's lawyer then showed her a copy of the blank "DA subpoena" form that is attached to the Complaint, to which Ms. Baham responded: "That—that's the one. I seen that. That's the one from the DA."[56]

Although she responded to the coaching from her lawyer, Ms. Baham did not explain how or why she had failed to mention that document when she previously testified that the grand jury subpoena was the only document she received ordering her to come to the DA's office. Nor did she explain how or why she was now able to remember important details about the document (such as the presence of the seal and the word "subpoena") that were not included in the Complaint. Even more puzzling (or disturbing), Ms. Baham continued to insist that she had received only one subpoena ordering her to come to the DA's office—notwithstanding that she had now identified at least two subpoenas that she received and that ordered her to come to the DA's office.

Ms. Baham's testimony in response to leading questions by her lawyer also contradicted her earlier testimony about when she received the subpoena ordering her to appear at the DA's office. Contrary to her earlier testimony that she received the subpoena in 2013, several months

---

[55] *See* Exhibit 2, Baham Depo., at 211.

[56] *See* Exhibit 2, Baham Depo., at 213.

after the murder of Orlando Rickmon, Ms. Baham testified that she received the subpoena to appear at the DA's office "probably like a month or so" after she received a letter dated September 22, 2015.[57] Ms. Baham did not attempt to reconcile these contradictory statements or explain how the date she remembered had jumped more than two years into the future during the course of the deposition.[58]

When asked to state everything she could remember about the allegedly unlawful DA subpoena, Ms. Baham's testimony was exceedingly vague and clearly relying on the document she had just been shown by her lawyer:

> Q: Can you tell me everything you remember about the document that you actually received?
>
> A: Telling me to go to the DA office.
>
> Q: What else did it say?
>
> A: They had to—year, the address and thing on there.
>
> Q: The address—
>
> A: Just like what you have—like the one with the seal on it. That—that is the one I went to the DA office with. That's the best to my knowledge of what I could understand it.[59]

---

[57] *See* Exhibit 2, Baham Depo., at 211.

[58] Even with the help from her lawyer, Ms. Baham could not keep the story straight about when she supposedly received the "DA subpoena." At first, Ms. Baham testified that she received the document "a couple of months *after* [she] got arrested" in December 2015. *See* Exhibit 2, Baham Depo., at 212 (emphasis added); *see also id.* ("Q: Before you got arrested? A: Arrested, yes. Q: I'm sorry, Ms. Baham, just to—I think I asked in a confusing way. Before you got arrested? A: No, no, no, no, no, not before I got arrested."). Later in the deposition, however, Ms. Baham testified that she *did* in fact receive the subpoena to appear at the DA's office before she was arrested. *See id.* at 246–247.

[59] *See* Exhibit 2, Baham Depo., at 240–241.

Ms. Baham was unable to describe any other details about the document she supposedly received without referring to the blank "DA subpoena" form. And because Ms. Baham claims to have found the document in her mailbox,[60] she would not be able to identify who supposedly left it there.

### D. Viewing the record as a whole, no rational factfinder could conclude that any of the Individual Defendants is responsible for sending a "DA subpoena" to Ms. Baham.

Ms. Baham has failed to preserve and bring forth the one critical piece of evidence that (if it ever existed in the first place) would prove whether she received a "DA subpoena"—the document itself. Furthermore, Ms. Baham admitted that even now, three years after this lawsuit was filed, she still has not conducted a thorough search of the papers at her house: "I probably could find—it will take me—I don't know how long."[61] Under the circumstances, Ms. Baham cannot defeat summary judgment by relying solely on her own testimony. In *Lawrence*, 276 F.3d at 197, the Fifth Circuit held that a debtor could not defeat summary judgment in a promissory-note action by relying solely on his own testimony that another person had paid his debt, where there was "no documentation confirming [this] repayment of the loans."

Yet the problem with Ms. Baham's testimony is not merely that, like the defendant in *Lawrence*, it is unsupported—it is also exceedingly vague, even with the most charitable

---

[60] *See* Exhibit 2, Baham Depo., at 241. Ms. Baham's reversals, contortions, and self-contradictions concerning the location of the alleged missing "DA subpoena" are emblematic of her testimony in general. In response to a request to admit that she had no copies of any unlawful "DA subpoena" in her possession, Ms. Baham stated that "she may have a copy in an out-of-state storage unit to which she does not currently have access," and that she and her counsel were "working diligently to obtain access to the unit." *See* Exhibit 19, Response to RFA No. 4 by Jason Napoli. When Mr. Napoli submitted an interrogatory inquiring about this supposed storage unit, Ms. Baham refused to provide any information and instead amended her previous RFA answer to admit that she had no copies of any unlawful "DA subpoena." *See* Exhibit 15, Baham Response to Interrogatory No. 13; Exhibit 20, Baham Amended Response to RFA No. 4. Yet even after this admission, Ms. Baham continued to testify in her deposition that the subpoena probably does exist somewhere in her own home in papers that she has not even looked through.

[61] *See* Exhibit 2, Baham Depo., at 248.

interpretation, and both self-contradictory and inconsistent with the allegations of her Complaint. The testimony given by Ms. Baham in response to her lawyer's leading questions, which contradicts without explanation her clear testimony given earlier in the same day, is precisely the sort of testimony that can and should be "put aside" because it is "so undermined as to be incredible." *Johnson*, 883 F.2d at 128; *see also Muncy*, 367 F.2d at 497 (testimony "made in response to a leading question" may be "so inconsistent with [the witness's] several times reiterated testimony . . . that it is without probative force and is to be disregarded"). This testimony is also inconsistent with Mr. Baham's assertion to Judge White on January 6, 2016, that she "never got a subpoena."[62] Ms. Baham's testimony is "so internally inconsistent [and] implausible on its face that a reasonable factfinder would not credit it." *Anderson*, 470 U.S. at 575.

And even if one were inclined to credit Ms. Baham's most recent, highly coached story about her alleged "DA subpoena" and discount the other versions of the story, the vagueness of Ms. Baham's recollection provides no basis for a reasonable fact-finder to conclude that Mr. Napoli is responsible for sending a "DA subpoena" to Ms. Baham—particularly when he has unambiguously testified that he did not.[63] As to Mr. Pipes and Mr. Martin, Ms. Baham has not even *alleged* that they personally sent her any fraudulent subpoena or directed that any such document be sent to her. *See generally* Doc. No. 52. Because the record as a whole could not lead any rational factfinder to conclude that any of the Individual Defendant is responsible for sending a "DA subpoena" to Ms. Baham, the Individual Defendants are entitled to summary judgment.

---

[62] *See* Exhibit 9, Transcript of January 6, 2016 hearing, at 3.

[63] *See* Exhibit 6, Napoli Depo., at 312–313.

II.     **Even if Ms. Baham could prove that she received unlawful "DA subpoenas" sent by the Individual Defendants, her own allegations establish that she suffered no injury as a result.**

Even if the Court concludes that Ms. Baham's deposition testimony creates a genuine dispute as to whether she received an unlawful "DA subpoena" that was sent by the Individual Defendants, Ms. Baham's claims would nevertheless fail because she suffered no injury as a result. Ms. Baham admitted in her Complaint that she "did not go to the private meetings at the District Attorney's Office," as allegedly directed by the "unlawful subpoenas" that she claims to have received. *See* Doc. No. 52 at ¶ 272. The Court relied on Ms. Baham's allegations to dismiss her fraud claims, explaining: "She also chose not to respond to the 'subpoenas' sent to her. Any harm alleged by her was not because of misrepresentations in the 'subpoenas.'" *See* Doc. No. 116 at 42 (footnote omitted). Moreover, unlike two of the other Plaintiffs in this action, Ms. Baham does not allege that she hired an attorney in response to the "subpoenas." *See id.*

A plaintiff alleging abuse of process "must also prove damage resulting from the abuse." *Orrill v. Mortgage Electronic Registration Systems, Inc.*, No. 06-cv-10012, 2008 WL 1867706, at *2 (E.D. La. Apr. 24, 2008). Because Ms. Baham's own allegations establish that she suffered no such damage, her claims must be dismissed.

III.    **Ms. Baham's claims are prescribed on the face of the pleadings, and she cannot prove the "exceptional circumstances" necessary to invoke *contra non valentem*, particularly when she has testified that, before December 2015, she believed the "DA subpoena" she allegedly received was illegal.**

Even if the Court concludes that Ms. Baham's deposition testimony creates a genuine dispute as to whether she received an unlawful "DA subpoena" that was sent by the Individual Defendants, and as to whether she suffered some injury as a result, that same testimony establishes that her claims are prescribed.

The tort of abuse of process is subject to a liberative prescriptive period of one year, which "commences to run from the day injury or damage is sustained." *No Drama, LLC v. Caluda*, 177 So. 3d 747, 752 (La. App. 5th Cir. 2015). If "prescription is evident from the face of the pleadings, . . . the plaintiff bears the burden of showing the action has not prescribed." *Spott v. Otis Elevator Co.*, 601 So. 2d 1355, 1361 (La. 1992). Ms. Baham alleges in the Complaint that she received unlawful subpoenas before October 13, 2015, more than two years before suit was filed on October 17, 2017. *See* Doc. No. 52 at ¶¶ 270–273. Additionally, although Ms. Baham's deposition testimony is unclear and self-contradictory as to when she allegedly received an unlawful subpoena, none of her accounts would put the date at less than one year before suit was filed. Accordingly, Ms. Baham's abuse-of-process claim based on the alleged receipt of unlawful subpoenas is prescribed on its face.

The Plaintiffs previously argued that those who allegedly received unlawful subpoenas were initially "not aware of the facts necessary to plead their claims," because "[n]o one who received on the of the fraudulent subpoenas had reason to question its legitimacy." *See* Doc. No. 67 at 5, 9–10. At the Rule 12(b)(6) motion-to-dismiss stage, the Court accepted the Plaintiffs' allegations and declined to dismiss Ms. Baham's claims on the basis of prescription, relying on the doctrine of *contra non valentem*. *See* Doc. No. 116 at 47.[64]

However, Ms. Baham cannot carry her summary-judgment burden of producing evidence that would establish the elements of *contra non valentem* and save her claims from prescription. In her deposition testimony, Ms. Baham admits having at least constructive notice of the alleged facts underlying her claim more than one year before filing suit. Ms. Baham testified that when

---

[64] *See also* Doc. No. 116 at 47 ("At this early stage in the proceedings, this Court agrees. . . . Taken as true, Plaintiffs Singleton, Baham, and Doe's allegations show they had no reason to know of the critical facts underlying their claims until at least April 2017 . . . .").

she received the allegedly unlawful subpoena to appear at the DA's office, something seemed "not

right about it" because it was "different from the other subpoenas" she had received.[65] She testified

that she believed the document she received was illegal after she went to the court and the DA's

office and spoke to someone about it:

> Q: When did you believe it was illegal?
>
> A: You know, when everybody in the courtroom—when I go there and the deputies, none of them don't know what it is—really is, and when the—when the lady saying that must be the new thing they doing.
>
> Q: What day was that?
>
> A: When I went over there to the DA office.
>
> Q: Was this before you got arrested?
>
> A: Yes.
>
> Q: And you showed somebody the subpoena you say?
>
> A: I went—to the lady in the courtroom and over there I showed the deputy at the DA office.[66]

In response to further questioning, Ms. Baham confirmed her answer once again:

> Q: Ms. Baham, I just asked you when did you start to believe they were unlawful . . . and you said when you went to the DA's office; is that correct?
>
> A: I went to the DA. I had done been telling them when I'm showing them the subpoena something ain't right about the subpoena. I went to—when I went there with them saying, I don't know what this—what this about and thing. It must be that new thing what they doing, Cannizzaro and them doing.
>
> Q: And that was before you got arrested, correct?
>
> A: Yes.[67]

---

[65] *See* Exhibit 2, Baham Depo., at 243.

[66] *See* Exhibit 2, Baham Depo., at 245 (objection omitted).

[67] *See* Exhibit 2, Baham Depo., at 247 (objection omitted).

Thus, Ms. Baham clearly testified that, before her arrest in December 2015, she believed that the

"DA subpoena" she allegedly received was unlawful, and that she believed, and even told others,

that "something ain't right about the subpoena."[68]

> The Louisiana Supreme Court has explained that
>
> Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. ***Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry.*** Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription.

*Campo v. Correa*, 828 So. 2d 502, 510–11 (La. 2002) (quotations omitted, emphasis added). At

the very least, Ms. Baham had constructive knowledge that the alleged subpoena was unlawful on

the date when she claims to have received it and realized that it was "not right." Her testimony

plainly indicates that she was "on guard" and her attention was excited at that time. *See Campo*,

828 So. 2d at 510–11.

Furthermore, there is no basis to conclude that any of the Individual Defendants "engage[d]

in conduct which prevent[ed] the plaintiff from availing [her]self of [her] judicial remedies." *See*

*Prevo v. State ex rel. Dep't of Pub. Safety & Corr. Div. of Prob. & Parole*, 187 So. 3d 395, 398

(La. 2015). "[T]here are three elements which must be established in order for the third category

of *contra non valentem* to apply: (1) the defendant engages in conduct which rises to the level of

concealment, misrepresentation, fraud or ill practice; (2) the defendant's actions effectually

prevented the plaintiff from pursuing a cause of action; and (3) the plaintiff must have been

---

[68] *See* Exhibit 2, Baham Depo., at 245–247.

reasonable in his or her inaction." *Id.* at 398–99. "Where plaintiff is able to establish such conduct, prescription is suspended until plaintiff is made aware of the truth of the matter." *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F. Supp. 388 (E.D. La. 1997). Ms. Baham cannot show that any Individual Defendant engaged in "concealment, misrepresentation, fraud or ill practice," and even if she could, her own testimony establishes that she was nevertheless able to discern the illegality of the alleged "DA subpoena" by December 2015 at the latest. In short, there was nothing—and certainly no action by the Individual Defendants—preventing Ms. Baham from timely filing suit.

## IV.   Because the tort of abuse of process is based specifically on misuse of lawfully issued court process, it would not apply to the alleged creation and use of a document that is not issued by a court and has no legal force.

Ms. Baham's abuse-of-process claims also must dismissed because her allegations, even if proven, do not set forth a legally cognizable claim. More than one hundred years ago, the Fifth Circuit held that Louisiana law (specifically Article 2315 of the Louisiana Civil Code) would recognize the common-law tort of abuse of process. *See Gonsouland v. Rosomano*, 176 F. 481, 486–87 (5th Cir. 1910). From this early date, the Fifth Circuit recognized that abuse of process "is applicable to all kinds of abuses *in the service of lawful process*." *Id.* at 486 (emphasis added). Eighty years later, the Fifth Circuit explained again that "[t]he precise inquiry" in a claim for abuse of process "involves a misuse of a process already *legally issued* whereby a party attempts to obtain some result not proper under law." *Duboue v. City of New Orleans*, 909 F.2d 129, 132 (5th Cir. 1990) (emphasis added). Louisiana courts have similarly held that an abuse-of-process claim necessarily involves misuse of *lawful* process. *See, e.g.*, *Almerico v. Dale*, 927 So. 2d 586 (La. App. 5th Cir. 2006)  ("In reviewing Louisiana cases on abuse of process, we find none in which the 'process' part of the cause of action has been considered anything other than *legal* process, or *court* process.") (emphasis added); *Delcambre v. Mancuso*, 268 So. 3d 325, 331 (La. App. 3rd Cir.

2019) ("An abuse of process occurs when the actor employs *legal process* in a manner *technically correct*, but for a wrongful and malicious purpose to obtain an unjustifiable end or an object which it was not the purpose of the particular process employed to effect.") (quotation omitted, emphasis added).

As previously recognized by the Court, the Plaintiffs allege that the Defendants used "a document manufactured . . . to look like a court-ordered subpoena that was, in fact, nothing more than an invitation by prosecutors to meet with them outside of court." Doc. No. 116 at 1. "Because the 'subpoenas' were not actually approved by a judge, but instead were engineered by prosecutors, the documents did not give anyone the authority to fine or jail witnesses who failed to appear." *Id.* at 2; *see also* Doc. No. 52 at ¶ 447 (alleging that the Defendants "creat[ed], serv[ed], and/or approv[ed] official-seeming 'subpoenas'" that "conveyed the material misrepresentation that the 'subpoenas' were real"). Ms. Baham alleges that the Individual Defendants sent such a document to her. But even if Ms. Baham could prove these allegations (and she cannot), such actions would not be cognizable under the tort of abuse of process. Simply put, there is no "process." The tort of abuse of process concerns the misuse of "legally issued" process after it has been legally issued— not the unilateral creation of a document that has no legal effect (even if it purports to). *See Duboue*, 909 F.2d at 132. Because Ms. Baham's allegations, even accepted as true, would not establish that any of the Individual Defendants committed the tort of abuse of process, the Individual Defendants are entitled to judgment as a matter of law.

## CONCLUSION

For the reasons explained above, Jason Napoli, David Pipes, and Graymond Martin are entitled to summary judgment in their favor on the abuse-of-process claims asserted by Lazonia Baham. Additionally, because there are no other claims pending against Mr. Napoli, he should be dismissed as a party to the case.

Respectfully submitted,


 /s/ Matthew J. Paul
Richard C. Stanley, 8487
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
STANLEY, REUTER, ROSS, THORNTON
  & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile:  (504) 524-0069

*Counsel for Graymond Martin, David Pipes, and Jason Napoli*