## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RENATA SINGLETON; MARC MITCHELL; LAZONIA BAHAM; TIFFANY LACROIX; and SILENCE IS VIOLENCE,<br><br>　　　　*Plaintiffs*,<br><br>v.<br><br>LEON CANNIZZARO, in his official capacity as District Attorney of Orleans Parish and in his individual capacity; GRAYMOND MARTIN; DAVID PIPES; JASON NAPOLI; ARTHUR MITCHELL; LAURA RODRIGUE; in their individual capacities,<br><br>　　　　*Defendants*. | Civil Action No. 17-10721<br><br>Section H<br>Judge Jane Triche Milazzo<br><br>Division 1<br>Magistrate Judge Janis van Meerveld |

## MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON RENATA SINGLETON'S CLAIMS AGAINST INDIVIDUAL DEFENDANTS

The only claim at issue in this (premature)[1] summary judgment motion is Plaintiff Renata

Singleton's allegation that the Individual Defendants Arthur Mitchell, David Pipes, and Graymond

Martin committed abuse of process under Louisiana law when they sent her—or sanctioned the

use of—a fake "subpoena" directing her to the office of the Orleans Parish District Attorney

---

[1] Plaintiff Renata Singleton reserves the right to supplement the record to this Opposition, and notes for the Court that the Orleans Parish District Attorney's Office ("OPDA") continues to produce responsive documents directly relevant to their Motion for Summary Judgment. For example, late on Friday, December 11, 2020, four days before the deadline for this Opposition, OPDA produced several text messages between Corey Porter, the investigator in Ms. Singleton's case, and the police officers who arrived at her house to arrest her the day before her arrest from the OPDA Office. Ex. 29. Accordingly, the Individual Defendants filed the instant motion and opposed an extension request from Ms. Singleton *before* all relevant documents were produced, including documents which have been in OPDA's possession for the entirety of this Action, and are unquestionably responsive to discovery requests served over one year ago.

1

("OPDA" or "DA") with an ulterior purpose.[2]  The primary argument raised by Defendants at this time is that Ms. Singleton did not, in fact, receive a fake subpoena.  Defendants deny sending her one.  However, that is not sufficient to grant them summary judgment.

This is a clear issue of disputed fact.  The prosecutor in Ms. Singleton's case swore that she received *two* DA subpoenas in the material witness warrant application ("Material Witness Bond") he filed with the court seeking her arrest, and Ms. Singleton testified to receiving a document consistent with a fake subpoena.  The prosecutor, Arthur Mitchell, now claims that his representation in the material witness warrant application was an error, and asks the Court to credit his testimony.  But this is an issue of credibility that cannot be resolved at this late stage.  And this motion by the Individual Defendants' ignores additional evidence that demonstrates that Ms. Singleton received a fake subpoena: the testimony of another prosecutor who worked on Ms. Singleton's case that she understood that OPDA used DA subpoenas to try to meet with Ms. Singleton; Mr. Mitchell's history of sending fake subpoenas in other cases, including under similar circumstances; and OPDA's concession that its records cannot be relied upon because the office had no requirement that its Assistant District Attorneys ("ADAs") keep the fake subpoenas they sent.  Taken together, this evidence demonstrates that whether Ms. Singleton received a fake subpoena is a genuine dispute of material fact, and that summary judgment should be denied.

The Individual Defendants make a handful of additional arguments related to prescription and the elements of abuse of process, versions of which were previously rejected by this Court in its order denying in part Defendants' Motion to Dismiss.  The record establishes that the Individual Defendants' creation and use of fake subpoenas meets the elements for abuse of process under

---

[2] Throughout this brief, Plaintiff will use the term "fake subpoena" and "DA subpoena" interchangeably to refer to any document commanding an individual to appear at the DA's office that was not issued by a Court pursuant to Article 66 of the Louisiana Code.

Louisiana law, and, because Ms. Singleton could have had no reason to know that she received a fake subpoena until the DA's policy and practice of sending fake subpoenas was revealed publicly in 2017, her claims are not prescribed.

For these reasons, and the reasons set forth herein, the Individual Defendants' motion for summary judgment must be denied in its entirety.

## FACTUAL BACKGROUND

### I.     OPDA's use of fake subpoenas.

OPDA has long used documents directing witnesses to appear at its office purported to be issued through valid legal process, but were actually created and disseminated by OPDA without court oversight.[3]  From approximately 2014 to 2017, OPDA attorneys used at least eleven different versions of fake subpoenas, with additional versions uncovered to Plaintiffs through discovery as recently as last week.[4]

In May 2014, an OPDA investigator was concerned that the fake subpoenas looked "unprofessional" and took it upon himself to design a fake subpoena template.[5]  First Assistant Graymond Martin, as the individual in charge of setting office policies on such matters, approved the template and emailed it to the entire OPDA office in May of 2014.[6]  The fake subpoena template stated that the recipient was "notified pursuant to LSA-SSRP art. 66 to appear before the District Attorney for the Parish of New Orleans, to testify to the truth according to your knowledge in such matters as may be required of you."[7]  The document had blanks to fill in the date and time of the meeting, the name of the prosecutor, the prosecutor's phone number, and the criminal case

---

[3] CSUMF ¶ 1.
[4] *Id.* ¶ 2.
[5] *Id.* ¶¶ 4-5.
[6] *Id.* ¶¶ 6, 11-12; *see also* Ex. 10 (May 13, 2014 email sent at Martin's direction).
[7] CSUMF ¶ 7; *see also* Ex. 10 (May 13, 2014 email sent at Martin's direction) at OPDA039343.

information, and directed the witness to 619 South White Street, the address of the District Attorney's office.[8]

OPDA sent hundreds of fake subpoenas to witnesses in criminal cases in New Orleans, and nearly 200 fake subpoenas based on the May 2014 Martin template.[9] Defendant Arthur Mitchell's name and phone number appear on eight fake subpoenas using this template.[10] Mr. Mitchell testified that senior prosecutor Tiffany Tucker (who worked with him on Ms. Singleton's case) gave the Martin template to him, and that his supervisor David Pipes, the OPDA Chief of Trials, directed him to use it.[11] Corey Porter, the main investigator in Renata Singleton's case, personally served at least thirteen of the fake subpoenas based on the Martin template upon witnesses.[12]

But the Martin template was not the only one in use by OPDA attorneys. Another type of fake subpoena that was sent was created by Tiffany Tucker, who downloaded a valid subpoena issued for an upcoming trial through the CourtNotify system, opened it in Microsoft Word, changed the language in the subpoena that had commanded the witness, Keith McGuire, to appear in court, to instead direct him to appear at the Orleans Parish District Attorney's office, changed the date on the subpoena from the trial date to an earlier date, and served this document through an OPDA investigator upon Mr. McGuire.[13] Other fake subpoenas used by OPDA prosecutors resembled notices or summons to trial, but rather than being signed by a judge, were signed by an

---

[8] CSUMF ¶¶ 8, 9.

[9] *Id.* ¶ 13; *see also* Ex. 11 (deposition exhibit 12 from Deposition of David Pipes) (191 versions of 2014 template).

[10] CSUMF ¶ 14; *see also* Ex. 12.

[11] CSUMF ¶ 20. Ms. Tucker has married and now uses the name Tiffany Dover. Because she went by Tiffany Tucker during the relevant time period, Plaintiff will refer to her as such throughout this document.

[12] CSUMF ¶ 22.

[13] *Id.* ¶ 24.

Assistant District Attorney.[14]  Some versions of the fake subpoena displayed the seal of the District Attorney's office, some did not.[15]  Because there was no OPDA policy requiring staff to maintain copies of case-related documents, including fake subpoenas, there is no way to know if all fake subpoenas have been found.[16]  Despite the fact that OPDA allegedly searched its files for all fake subpoenas, newly-identified fake subpoenas continue to come to light, including documents produced for the first time less than one week prior to the filing of this memorandum.[17]

## II.   Renata Singleton

On the night of November 2, 2014, Renata Singleton, an accountant and a mother of three children, had an argument with her former boyfriend, Vernon Crossley.[18]  Ms. Singleton's daughter called 911.[19]  According to the Police Incident Report, Ms. Singleton and Mr. Crossley "tussled over [the] phone."[20]  Ms. Singleton later testified, she and Mr. Crossley had a physical altercation, but she "wasn't 100 percent sure at the time. . .  exactly how it happened."[21]  Police arrived at Ms. Singleton's house; Mr. Crossley was arrested on site, ultimately charged with misdemeanor battery, and was released the next day on a $3,500 bond.[22]

Shortly thereafter, Ms. Singleton was contacted by Amy Jackson, a Victims Witness Advocate with OPDA.[23]  After the incident, Ms. Singleton had decided that she did not want to

---

[14] *Id.* ¶ 3; *see also* Ex. 7 (compilation of fake subpoena types) at 1, 2, 4-9.
[15] *Compare* Ex. 7 (compilation of fake subpoena types) at 1, 3, 5, 10 (with seal) *with id.* at 2, 4, 6-9, 11 (no seal); *see also* CSUMF ¶ 3.
[16] CSUMF ¶ 27.
[17] *Id.* ¶ 2; *see also* Ex. 8 (six uses of a fake subpoena form produced for the first time by Defendants on Wednesday, Dec. 9, 2020).
[18] CSUMF ¶ 37.
[19] *Id.* ¶ 38.
[20] *Id.* ¶ 39.
[21] *Id.* ¶ 40.
[22] *Id.* ¶ 41.
[23] *Id.* ¶ 42.

speak to a counselor or receive any domestic violence assistance.[24]  Ms. Singleton had ended her relationship with Mr. Crossley shortly after he was arrested, and was not interested in pursuing charges against him; Ms. Singleton was worried about the amount of time it would occupy—time spent away from work and her children.[25]

Arthur Mitchell became the lead prosecutor on Mr. Crossley's case sometime in March 2015.[26]  Senior prosecutor Ms. Tucker assisted Mr. Mitchell with the case; OPDA Chief of Trials David Pipes was the supervisor on the case.[27]  Mr. Mitchell met extensively with both Ms. Tucker and Mr. Pipes about the case, and many of the actions he took in the case were at their direction.[28] In March and April of 2015, CourtNotify records show three attempts made by a representative of the Sheriff's Office to leave a subpoena for Renata Singleton in her door.[29]  Such service is improper, as Mr. Mitchell admitted.[30]  Mr. Mitchell testified that he attempted to contact Ms. Singleton, but he admits that his notes in the file do not reflect what number he called or whether he left a voicemail.[31]  He testified that he printed various CourtNotify and instanter subpoenas and accompanied his investigator Corey Porter to an address they had for Ms. Singleton, and left the "subpoenas somewhere, either on the porch or in the door or somewhere around the outside of the residence prior to us leaving."[32]  He also testified that he gave Mr. Porter several copies of

---

[24] *Id.* ¶ 44.

[25] *Id.* ¶ 45.

[26] *Id.* ¶ 48.

[27] *Id.* ¶ 49.

[28] *Id.* ¶ 50.

[29] Ex. 27 (Courtnotify records).

[30] CSUMF ¶ 52; *see also* Ex. 5 (Mitchell Dep.) at 202:11-13 ("Ms. Singleton did not receive proper domiciliary service of personal service of these subpoenas.").

[31] CSUMF ¶ 53.

[32] *Id.* ¶ 60.

CourtNotify and instanter subpoenas and that Corey Porter independently attempted to deliver these subpoenas to Ms. Singleton.[33]

The first time Ms. Singleton came across any notice regarding Mr. Crossley's case—either fake or court-issued—was when she came home from work and noticed a piece of paper folded up in her living room. (Q: "was that the first document that you received that was a subpoena or appeared to be a subpoena? A: Yes.").[34] Ms. Singleton understood it was a court document related to Mr. Crossley's case,[35] but was "confused [about the document]. I didn't know exactly where it come from or, you know, how it ended up on my living room floor."[36] Finding it suspicious, Ms. Singleton reached out to her friend Kenyatta Phillips, a police officer with the New Orleans Police Department, about it; Ms. Phillips told her that it was probably a notice stating the court date for Mr. Crossley's trial, but that Ms. Singleton had not yet been properly served.[37] And Ms. Singleton herself knew from her job as an accountant, and from research she did on the Internet, that leaving a document in the door was not proper service.[38] Because she recognized that the document was related to court, she understood that she would eventually be properly served:

> Q: So based on your knowledge and your experience and whatever research you did, what was your conclusion as to whether you would have to be properly served in order for that document to be effective against you?
>
> A: That -- that I would be getting served soon.[39]

---

[33] *Id.* ¶ 61.
[34] *Id.* ¶ 63.
[35] *Id.* ¶ 64.
[36] *Id.* ¶ 69.
[37] *Id.* ¶ 67.
[38] *Id.* ¶ 70.
[39] *Id.* ¶ 71.

Based on her conclusion that she had not been properly served, she did not respond to the document and waited instead to be officially served.[40]

On April 24th, Mr. Mitchell sought a material witness warrant application for Ms. Singleton's arrest.[41]  That application clearly states that an OPDA investigator "left two subpoenas at the residence for SINGLETON to appear at the District Attorney's Office on April 24, 2015."[42] It also states that "[t]he State has reason to fear SINGLETON will not appear in Court pursuant to a subpoena as she has failed to appear pursuant to an appointment with the undersigned, and she has failed to appear in court at every other trial setting that she was issued a subpoena for," and describes every document that was attempted to be served upon Ms. Singleton as a "subpoena."[43] The material witness warrant application was granted and signed by the court that same day.[44]

Ms. Singleton never received any other notice or court-issued document until late May.[45] Ms. Singleton's oldest son signed for a subpoena directing Ms. Singleton to appear for court.[46] Understanding that she had *now* been properly served, Ms. Singleton fully intended to go to court on the date listed on the subpoena.[47]   However, Ms. Singleton was never able to comply.   The following night, police officers arrived at Ms. Singleton's house.[48]   When Ms. Singleton opened the door, they informed her there was a warrant out for her arrest.[49]   Confused, Ms. Singleton told them she was served with a subpoena to appear in court, and that she intended to do so.[50]   Ms.

---

[40] *Id.*
[41] *Id.* ¶ 72; *see also* Ex. 3 (Motion for Material Witness Bond for R. Singleton).
[42] CSUMF ¶ 74; *see also* Ex. 3 (Motion for Material Witness Bond for R. Singleton).
[43] CSUMF ¶¶ 72, 75; *see also* Ex. 3 (Motion for Material Witness Bond for R. Singleton).
[44] CSUMF ¶ 76.
[45] *Id.* ¶¶ 80-81.
[46] *Id.* ¶ 80.
[47] *Id.* ¶ 82; *see also* Ex. 1 (Singleton Decl.) ¶ 3.
[48] CSUMF ¶ 83.
[49] *Id.* ¶ 85.
[50] *Id.* ¶ 86.

Phillips arrived at Ms. Singleton's house and spoke with the police.[51] Ms. Phillips, who recognized the police officers, told them that Ms. Singleton was subpoenaed and planned to go to court.[52] Ms. Phillips told the officers that she would accompany Ms. Singleton to the DA's office the next morning.[53] The police initially refused, responding that they had a warrant to pick up Ms. Singleton, and there was nothing they could do about it.[54] But eventually one of the policemen called OPDA.[55] He talked to investigator Corey Porter,[56] who had previously texted the police about Ms. Singleton that he "[n]eed[ed] her in jail by this weekend."[57] The police officer told Ms. Singleton that the person he spoken to agreed to allow her to come in to OPDA's office the following morning instead of being arrested.[58] Mr. Porter notified the DA.[59]

The following day, Ms. Phillips accompanied Ms. Singleton to the DA's office.[60] They were met by Arthur Mitchell, who introduced himself and took them upstairs to a conference room.[61] Ms. Singleton showed Mr. Mitchell the subpoena she received the day before, and asked why she was being arrested.[62] Mr. Mitchell told her that it was because she was hiding from the DA's office.[63] During the meeting Tiffany Tucker entered the room.[64] Ms. Phillips was also asked by Mr. Mitchell to leave the room.[65] Mr. Mitchell questioned Ms. Singleton about where she was

---

[51] *Id.* ¶ 87.
[52] *Id.* ¶ 88.
[53] *Id.* ¶ 89.
[54] *Id.* ¶ 90.
[55] *Id.* ¶ 91.
[56] *Id.* ¶ 91.
[57] *Id.* ¶ 84.
[58] *Id.* ¶ 92.
[59] *Id.* ¶ 93.
[60] *Id.* ¶ 94.
[61] *Id.* ¶ 95.
[62] *Id.* ¶ 96.
[63] *Id.* ¶ 97.
[64] *Id.* ¶ 98.
[65] *Id.* ¶ 99.

when he was attempting to serve her, and accused her of "hiding."[66]  Ms. Singleton made clear

that she had never evaded Mr. Mitchell's attempts to contact her, and emphasized that she fully

intended to comply with the properly-served subpoena that summoned her for trial, as she had

explained to the police officers the night before.[67]   Eventually, feeling "railroaded" by Mr.

Mitchell's questions, Ms. Singleton asked for a lawyer.[68]  Ms. Singleton was told she didn't need

a lawyer, because she was the victim.[69]  Ms. Singleton responded that "she didn't feel like a victim,

that she felt as though was more of a defendant or like more of an accused in this instance."[70]  Mr.

Mitchell and Ms. Tucker then attempted to ask Ms. Singleton several questions about Mr.

Crossley's case.[71]  Ms. Singleton again indicated that she did not want to answer questions without

a lawyer.[72]  At that point, investigator M.J. Audibert made a phone call, and a few minutes later, a

New Orleans Police Department officer came and arrested Ms. Singleton.[73]  Ms. Singleton was

immediately taken to jail.[74]   She remained incarcerated for six days and five nights.[75]   Ms.

Singleton remains upset that her arrest record can still be found online.[76]

Ms. Singleton was eventually released on an ankle monitor, and the defendant pled guilty

before Ms. Singleton was called to testify at trial.[77]  In 2017, after the local newspaper *The Lens*

reported widely that the DA's office had used fake subpoenas, Ms. Singleton realized that the

---

[66] *Id.* ¶ 100.
[67] *Id.* ¶ 101.
[68] *Id.* ¶ 102.
[69] *Id.* ¶ 103.
[70] *Id.* ¶ 104.
[71] *Id.* ¶ 105.
[72] *Id.* ¶ 106.
[73] *Id.* ¶ 107.
[74] *Id.* ¶ 108.
[75] *Id.* ¶ 108.
[76] *Id.* ¶ 111.
[77] *Id.* ¶ 113

document she had been served had been fake.[78]  This was a shock to Ms. Singleton, especially as she came to realize the fake subpoena played a part in her being jailed pursuant to the material witness warrant.[79]  As a result, she no longer trusts law enforcement or the criminal justice system.[80]

When asked whether he would done anything differently in the case of Renata Singleton, David Pipes said, "nothing particular comes to mind"[81] and observed that "[i]t is an unfortunate necessity of our practice that sometimes for the good of the State, for the good of society, that victims sometimes suffer."[82]

## STANDARD OF REVIEW

A motion for summary judgment should be granted if the record, taken as a whole, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980).  When ruling on a motion for summary judgment, the Court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 585 (1986); *Merritt-Campbell, Inc. v. RxP Prod., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  The Court "must not resolve factual disputes by weighing conflicting evidence since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp.*, 622 F.2d 887, 892 (5th Cir. 1980) (citations omitted).  Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury

---

[78] *Id.* ¶ 109.
[79] *Id.* ¶ 110.
[80] *Id.* ¶ 112.
[81] *Id.* ¶ 115.
[82] *Id.* ¶ 116.

could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961 (5th Cir. 1999).  A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc.*, 164 F.3d 957, 961.

## ARGUMENT

The question of whether OPDA sent, and Ms. Singleton received, a fake subpoena is a quintessential issue for the trier of fact that cannot be resolved on summary judgment.  The Individual Defendants ignore the substantial and significant evidence in the record that they sent Ms. Singleton a fake subpoena.  This evidence must be weighed and judged by a jury, not by this Court on a record in which virtually every material fact is disputed.

The Individual Defendants' legal arguments on abuse of process and prescription similarly fail, for the reasons they failed when the Court addressed practically identical arguments at the Motion to Dismiss stage of this litigation.  As the evidence in the record shows, the elements for Ms. Singleton's abuse of process claims are clearly satisfied, and her claims are not prescribed. Summary judgment should thus be denied.

## I.     The central issue—Ms. Singleton's receipt of the fake subpoena—turns on credibility determinations that must be made by a trier of fact.

The factual issue at the center of Ms. Singleton's state-law claims is simple: whether Defendants sent Ms. Singleton a fake subpoena commanding her presence at the Orleans Parish District Attorney's office.  Defendants deny sending Ms. Singleton a fake subpoena.  But Defendants' denial is contradicted on its face by the application for a material witness warrant in Ms. Singleton's case, filed by Mr. Mitchell and approved by Mr. Pipes, which plainly states that an OPDA investigator "left two subpoenas at the residence for SINGLETON to appear at the

District Attorney's office on April 24, 2015."[83]  It is undisputed that no written motion or court order under Article 66 were filed in this case, both of which are necessary for a valid subpoena to the District Attorney's office to issue.  *See* La. Code. Crim. Proc. Ann. art. 66 (1999).  Defendants do not attempt to argue that the subpoenas to the District Attorney's office referenced in the material witness warrant application were valid Article 66 subpoenas.  Rather, they claim that the reference to subpoenas by the District Attorney's office resulted from Mr. Mitchell copying and pasting the language from another material witness warrant application, which also relied on fake subpoenas to seek a witness's arrest.  Def.'s Mot. For Summ. J. at 12 ("Mr. Mitchell explained in his deposition that the language about appearing at the DA's office is incorrect, and that he believes it was erroneously carried over from the document he was using as a model for the motion (a draft motion for a material-witness warrant in an earlier case).").  Setting aside that Mr. Mitchell's defense requires him to admit that he made material misrepresentations to the court in seeking the arrest of Ms. Singleton, this assertion is implausible on its face.  It requires the trier to fact to believe that Mr. Mitchell accidentally copied and pasted the words "to appear at the District Attorney's office" in the relevant sentence in the material witness warrant application for Ms. Singleton, while entering, in that same sentence, the correct trial date, the correct number of subpoenas left by Mr. Porter (two), and the correct date of delivery of the subpoena.[84]

To believe that Mr. Mitchell's sworn representation in the material witness warrant to the court was merely a copy-paste error rather than a purposeful demand summoning her to the District Attorney's office requires a credibility determination that can only be made by a factfinder.  *Cf. Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("Documents or objective evidence

---

[83] CSUMF ¶ 74; Ex. 3 (Motion for Material Witness Bond for R. Singleton).
[84] *Id.*

may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."). The trier of fact must evaluate Mr. Mitchell's defense in light not just of the plausibility of the defense itself, but also his own testimony about fake subpoenas he sent in other cases, and the ample record that OPDA explicitly condoned and facilitated such practice.[85] Mr. Mitchell testified that he was sent the fake subpoena template by Ms. Tucker, and directed by his supervisor, Mr. Pipes, to use it.[86] Though in his responses to Requests for Admissions he denied issuing "any document that was 'not issued pursuant to governing law,'"[87] he testified in his deposition that he was responsible for sending numerous fake subpoenas summoning witnesses to the OPDA's office,[88] and that those fake subpoenas in fact had no legal effect.[89] And in at least one of the cases in which he sent a fake subpoena, Mr. Mitchell's testimony as to why he issued the fake subpoena—that the victim had requested it because "she needed something—I believe she was in school or she was working— and needed something to appear in court,"[90] is at direct odds with the witness's own story. As the witness, Jasmine Dansey, states, she had told Mr. Mitchell that she did not want to talk to him; she never requested any document from him, but was served the fake subpoena by a man from the DA's office who was waiting for her in his car outside her house.[91] She responded to the subpoena

---

[85] *Id.* ¶ 1.

[86] CSUMF ¶ 20; *see also* Ex. 5 (Mitchell Dep.) at 139:2-4 ("I was given this document by Tiffany Tucker, and I was told by David Pipes and other people to use this document.").

[87] Ex. 34 (Mitchell Resp. to Pls.' First Requests for Admission) Resp. to No. 17.

[88] CSUMF ¶ 14; Ex. 12 (compilation of eight fake subpoenas sent in Mr. Mitchell's cases). Mr. Mitchell actually estimated he had sent "approximately 10, a little over 10" fake subpoenas, though Plaintiffs are aware only of the eight attached in Exhibit 12. Ex. 5 (Mitchell Dep.) at 116:21.

[89] CSUMF ¶ 14; *see also* Ex. 5 (Mitchell Dep.) at 126:15-16 ("This is a DA notice. I understand that it has no legal effect.").

[90] CSUMF ¶ 15-16.

[91] *Id.* ¶ 17. Ex. 14 (Dansey Decl.) ¶ 8, 12.

14

by appearing in court the following day.[92]  And Ms. Dansey stated that when she appeared in court pursuant to the subpoena, Mr. Mitchell "called me to the back to talk to me alone" about her testimony.[93]  There is thus sufficient evidence in the record of Mr. Mitchell's repeated and deliberate use of DA subpoenas to cause a factfinder to question the credibility of Mr. Mitchell's assertion that the reference to DA subpoenas in Ms. Singleton's material witness warrant application was inadvertent.

The credibility of Mr. Mitchell must also be weighed alongside other evidence that supports Ms. Singleton's testimony that the document she found in her living room was a fake subpoena.  For example, when Ms. Tucker was asked if she knew of instances of any Assistant District Attorney using fake subpoenas in order to compel attendance at the DA's office and inserting those fake subpoenas into material witness warrant applications, she testified, "Yes. Renata Singleton, my understanding is that DA subpoenas were used to attempt multiple times to meet with her, and ultimately that information was placed into a material witness warrant motion."[94]  This testimony directly undercuts the Individual Defendants' defense.

Despite the varying forms of the fake subpoenas produced by OPDA and OPDA's lack of note keeping, the record indicates that Ms. Singleton was served with a fake subpoena, consistent with OPDA's broader practice.  The Individual Defendants argue that because Ms. Singleton referred to the fake subpoena she received as a "notice," and stated that the document "just wasn't professional or official looking" and that "it looked like a—like a notice, like a memo," and the document she received appeared not to have a seal, it could not be a fake subpoena.  Def.'s Mot. For Summ. J at 12.  But as established by the deposition testimony of Mr. Pipes and Ms. Tucker,

---

[92] CSUMF ¶ 17; Ex. 14 (Dansey Decl.) ¶ 7.
[93] CSUMF *Id.* ¶ 19; Ex. 14 (Dansey Decl.) ¶ 8.
[94] CSUMF ¶ 114; Ex. 4 (Tucker Dep.) at 132:16-19.

there were multiple versions of a fake subpoena in use by OPDA during the relevant time period, any of which could have been the one that Renata Singleton received.  At least one version that was used by Tiffany Tucker was an altered CourtNotify subpoena that would have been identical to the CourtNotify subpoenas that Mr. Mitchell testified were left at Ms. Singleton's residence, and which resembles the document Ms. Singleton says she received.  With respect to altering CourtNotify subpoenas, Ms. Tucker testified that she did not "specifically recall how many times [she had] done this or specific cases that [she had] done it or specific cases where other ADAs have possible used CourtNotify in some of kind altered fashion."[95]  And numerous other examples of fake subpoenas have been uncovered in discovery in this lawsuit—many of which are without a seal, could be described as a "notice," and are entirely consistent with Ms. Singleton's description of the document she received.[96]  Admittedly, Ms. Singleton testified that she could not be sure about the precise details of the document she received—but that is not required of her. She remembers receiving a court document entirely consistent with any number of the fake subpoenas that were in use by OPDA, and that, in addition to extrinsic evidence described above, is sufficient to survive summary judgment.

The Individual Defendants attempt to argue that since Ms. Singleton did not respond to the document she found, it could not have been a fake subpoena.  But as Ms. Singleton testified, after showing the document to her friend, an NOPD police officer, and based on her research and experience, she understood that a document left at her house, and presumably in her door, was not proper service.[97]  Relying on this advice, among other things, Ms. Singleton did not take any action as she waited to receive proper service of any summons.  Ms. Singleton was correct; under

---

[95] CSUMF ¶ 24; Ex. 4 (Tucker Dep.) at 156:9-10,15-18.
[96] CSUMF ¶ 3; *see also* Ex. 7 (compilation of fake subpoena types).
[97] CSUMF ¶¶ 67-71.

Louisiana law, the notice Ms. Singleton found in her living room was not properly served and thus had no legal effect. *See* La. Code Crim. Proc. Ann. art. 735 (1989). Regardless, her understanding has no bearing on what that document actually was, a fake subpoena, and that OPDA intended to summon Ms. Singleton through its use. As Mr. Mitchell testified, and as represented in the material witness warrant application, every document that was left at Ms. Singleton's house was a "subpoena" of one form or another.[98] There is no evidence anywhere in the record that Ms. Singleton was sent anything *other* than a subpoena, compelling her either to court or to the DA's office.

Ultimately, the question of whether the Individual Defendants sent, and Ms. Singleton received, a fake subpoena is a classic question of disputed fact. The Individual Defendants inappropriately gloss over these issues of fact and evidence, requesting that the Court improperly weigh evidence and make credibility determinations for multiple witnesses, including those called by the Individual Defendants and Ms. Singleton. *See Cannon v. Monsanto Co.*, No. CIV. A. 05-5558, 2008 WL 2959708, at *4 (E.D. La. July 30, 2008) (holding that even where the weight of the evidence may favor the moving party, "discrepancies in the record require a weighing of the evidence at trial by the trier-of-fact"). As such, it is utterly improper to grant summary judgment.

## II. Defendants misunderstand abuse of process under Louisiana law, the elements of which are squarely met here.

### A. Ms. Singleton was harmed by receiving the fake subpoena.

The Individual Defendants argue that even if it could be established that they sent, or caused to have sent, a fake subpoena, and that Ms. Singleton received it, Ms. Singleton cannot establish abuse of process under Louisiana law because she did not actually *comply* with the fake

---

[98] CSUMF ¶ 75; *see also* Ex. 3 (Motion for Material Witness Bond for R. Singleton).

subpoena.  This is a distortion of the claim of abuse of process as a matter of law.  The tort of abuse of process does not require that Ms. Singleton show that she suffered harm resulting from compliance with the fake subpoena; rather, it requires only a showing that her receipt of the fake subpoena caused her injury—regardless of whether she complied with it.  Ms. Singleton easily makes that showing.

The tort of abuse of process requires two elements: "(1) the existence of an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular prosecution of the proceeding." *Mills v. City of Bogalusa*, No. CV 13-5477, 2016 WL 2992502, at *14 (E.D. La. May 24, 2016) (citing *Waguespack, Seago & Carmichael (A PLC) v. Lincoln*, 768 So. 2d 287, 290-91 (La. App. 2000)).  In arguing that Ms. Singleton was not harmed because she did not comply with the fake subpoena, the Individual Defendants attempt to graft an element of detrimental reliance onto the tort of abuse of process that does not exist.  They cite *Orrill v. Mortgage Electronic Registration Systems, Inc.* for the proposition that "A plaintiff alleging abuse of process 'must also prove damage resulting from the abuse." No. 06-cv-10012, 2008 WL 1867706, at *2 (E.D. La. Apr. 24, 2008).  But in *Orrill*, the court held that the "damage" element was not met because the plaintiff could not establish any "irregularity in the process." *Id.*  In other words, the requirement of "damage" is nothing more than the standard requirement that the abuse of process cause an injury; not that the plaintiff relied on the inappropriate process in any specific way.

Importantly, Ms. Singleton was harmed by the DA subpoena in multiple ways.  First, she suffered the inherent harm of having received a fake, deceptive document from an office of law enforcement—from the very people she had relied on to protect her.  Defendants are not just ordinary agents of the state; they are prosecutors entrusted with the impartial execution of our laws.  *See United States v. Smith*, 814 F.3d 268, 277 (5th Cir. 2016) ("A prosecutor's role is not

that it shall win a case, but that justice shall be done." (citations omitted)); *United States v. Calhoun*, 478 F. App'x 193, 196 (5th Cir. 2012) (Haynes, J., concurring) ("Prosecutors are held to a higher standard than even the high professional standards applicable to all attorneys.")  The Individual Defendants violated that trust by deliberately deceiving victims and witnesses, including Ms. Singleton.  Only after local news broke the story in 2017 did Ms. Singleton learn that OPDA had sent hundreds of fake subpoenas to witnesses in Orleans Parish, that she was one of the recipients, and that the fake subpoena was one of the bases for the material witness warrant that led to her arrest.[99]  As a result of this experience, she no longer trusts law enforcement or the justice system.[100]  As she testified:

> I wish that every time I thought about this situation, I didn't cry. I wish that when I watch TV and something pertaining to jail or some type of mistreatment in the justice system, like, I wish that I didn't -- I didn't cry.  I wish that I didn't feel that this -- this feeling.  I just wish that -- I don't -- I don't to want to feel this way anymore, like, and I don't know what -- what that would take to make that -- that feeling go away.[101]

Defendants are also incorrect that Ms. Singleton was not harmed because she did not respond to the fake subpoena—it is simply untrue that she ignored the fake subpoena she received. As she testified, she was confused by how an apparent court document ended up on her living room floor.[102]  She researched the issue and spoke to her friend who worked at the New Orleans Police Department, and believed that because the document had not been properly served, she should wait until she received proper service before complying.[103]  Ms. Singleton's receipt of the fake subpoena required her to expend time and effort understanding her legal obligations.  That

---

[99] CSUMF ¶¶ 109-110.
[100] *Id.* ¶ 112.
[101] Ex. 2 (Singleton Dep.) at 148.
[102] CSUMF ¶¶ 63, 69.
[103] CSUMF ¶¶ 65-67, 70-71.

she correctly concluded that she should wait until she was properly served does not vitiate the harm of her being forced to respond to the fake subpoena she received.

Finally, and significantly, the fake subpoena, and Ms. Singleton's purported noncompliance with the fake subpoena, was relied on as a basis for seeking the material witness warrant that resulted in Ms. Singleton's arrest.[104]   The Individual Defendants correctly note that this Court held that they are absolutely immune for their actions in seeking the material witness warrant.  Def.'s Mot. For Summ. J. at 8.  But this Court held that the Individual Defendants are liable for the "creation and use of 'subpoenas' to obtain out-of-court meetings with witnesses."[105] Ms. Tucker testified that fake subpoenas were used to provide the courts with information suggesting that, because the witness did not comply with the DA's attempt to compel an out-of-court meeting with her, that securing the presence of the witness was impracticable.[106]  It was thus foreseeable to the Individual Defendants that one of the likely results of sending the fake subpoena was that it would, as it did here, be a reason for a witness to be arrested on a material witness warrant.  Ms. Singleton thus easily satisfies the element of injury needed to establish that an abuse of process occurred here.[107]

---

[104] CSUMF ¶¶ 72, 74.

[105] Order and Reasons (Dkt. No. 116) at 40-41.

[106] CSUMF ¶ 21.

[107] The Individual Defendants allege in passing that Ms. Singleton's claims against Mr. Pipes and Mr. Martin fail because they did not personally send her a fraudulent subpoena or direct that such a document be sent to her. Def.'s Mot. For Summ. J. at 13. However, basic principles of tort liability hold otherwise. It is hornbook law that a defendant is liable for the reasonably foreseeable consequences of his tortious conduct. Restatement 2d Torts § 435 (actor is liable for harm resulting from its conduct unless it appears to a court "highly extraordinary" that conduct would result in harm); *Istre v. Fidelity Fire & Cas. Ins. Co.*, 628 So.2d 1229, 1232 (La. Ct. Ap. 1993) (concluding automobile accident caused by an intersection lacking working traffic signal was a "reasonably foreseeable" result of backhoe operator's negligent cutting of power line even though construction site was four miles away from intersection and backhoe operator cut power lines an hour before accident occurred), *writ denied*, 634 So.2d 852 (La. 1994); *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 467 F. Supp. 1257, 1288 (E.D. La. 1978) (relying on Restatement 2d

### B.     The evidence establishes that Defendants acted with an ulterior purpose.

Defendants argue that Ms. Singleton cannot show that Defendants acted with the ulterior purpose of coercing her to appear for questioning at the DA's office, because the fake subpoenas were dated for April 24, 2015, the date set for Vernon Crossley's trial.  They insist it "makes no sense that Mr. Mitchell would attempt to coerce Ms. Singleton to appear for private questioning with him at the DA's office at the same time that both of them were expected to be in court." Def.'s Mot. For Summ. J. at 15.

A fake subpoena summoning an individual on the same date as trial does not exclude its use for the ulterior purpose of privately coercing witnesses.   As Jasmine Dansey avers, Mr. Mitchell pulled her aside for a private, coercive investigative *in court* after she appeared pursuant to receiving a fake subpoena issued by him.[108]  And Mr. Mitchell himself testified that he told Ms. Dansey to meet him at the DA's office before court: "I instructed her to wait for me at the DA's office with the [fake subpoena] return."[109]  That the fake subpoenas dated for the day of trial does not vitiate the evidence that the fake subpoenas were being used to secure private meetings *even as late as the day of trial*.

---

Torts for proposition that party was liable for foreseeable conduct) (subsequent history omitted). And of course, a defendant also need not be able to foresee the specific individual his conduct will harm; "[t]he duty of any person is the obligation of due care to refrain from any act which would cause foreseeable harm to others even though the nature of that harm or the identity of the harmed person or harmed interest is unknown at the time of the act." *Gresham v. Davenport*, 524 So.2d 48, 54 (La. Ct. App. 1988), *rev'd on other grounds*, 537 So.2d 1144 (La. 1989); *see also Istre*, 628 So.2d at 1232; Restatement 2d Torts § 435 ("If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.").

[108] CSUMF ¶ 19.
[109] CSUMF ¶ 19; *see also* Ex. 5 (Mitchell Dep.) at 134:10-11.

Moreover, the sequence of events leading up to Ms. Singleton's arrest in OPDA's office underscores that the ulterior purpose for sending fake subpoenas was to both secure private investigative interviews and to "intimidate, coerce, and threaten witnesses after criminal proceedings have already been initiated," as alleged in the Complaint.[110]   The Individual Defendants used Ms. Singleton's noncompliance with the fake subpoena as a basis for seeking the material witness warrant, arguing that it illustrated that securing her presence for court was impracticable.  In stark contrast, after that warrant was issued, Mr. Porter texted police officers to arrest Ms. Singleton on the warrant, telling the police not that OPDA needed her in Court, but that they, "[n]eed her in jail by this weekend."[111]   Police arrived at her house on May 28, 2015, to arrest Ms. Singleton on the material witness warrant.  She told police that she intended to comply with the subpoena for court, and would go the next day to OPDA's office to meet with prosecutors.  OPDA, allegedly so concerned about Ms. Singleton's reliability in showing up for Court, then permitted and trusted Ms. Singleton to appear at OPDA's office the next day.[112]   Ms. Singleton arrived as promised, only to be ushered in to meet with Mr. Mitchell and Ms. Tucker.[113]   Ms. Singleton was questioned for several minutes, and after refusing to answer questions about Mr. Crossley's case without a lawyer, was arrested inside OPDA.[114]   A jury confronted with these facts could conclude that OPDA had the ulterior purpose of seeking private, coercive investigative interviews—like the one they conducted with Ms. Singleton—and that DA subpoenas were a tool used for this purpose.  The "ulterior purpose" element of abuse of process is easily satisfied in Ms.

---

[110] Second Amended Complaint ¶ 442 (Dkt. No. 52) (Count VII, Abuse of Process).
[111] CSUMF ¶ 84.
[112] *Id.* ¶¶ 92-93.
[113] *Id.* ¶¶ 95, 98.
[114] *Id.* ¶¶ 100-102, 105-107.

Singleton's case.  It is, at a minimum, a question that can only be resolved for a factfinder.  For this reason, summary judgment at this stage is improper.

### C.    Abuse of process applies to the creation and use of fake subpoenas.

In an argument that has already been rejected by this Court in its order on the Motion to Dismiss, the Individual Defendants again contend that there can be no abuse of process for allegations that the Defendants used fraudulent documents that were not "legally issued." Def.'s Mot. For Summ. J. at 16 ("The tort of abuse of process concerns the misuse of "legally issued" process after it has been legally issued—not the unilateral creation of a document that purports to have legal effect but has none whatsoever."). In other words, Defendants argue that because their alleged conduct was *illegal*, they did not abuse any "legally issued" process.

As this Court recognized in denying the Individual Defendants motion to dismiss on the abuse of process claims, the Individual Defendants' argument misunderstands the law.  In this context, "legally issued" means that the process at issue is normally associated with legal proceedings or courts.  *See Almerico v. Dale,* 927 So. 2d 586, 594 (La. Ct. App. 2006) (explaining that "the 'process' part of the cause of action" must refer to "legal process, or court process"); *see also Ioppolo v. Rumana*, 581 F. App'x 321, 326 (5th Cir. 2014) (rejecting the claim because the process at issue—an organization's internal disciplinary proceeding—was not "legal process, or court process")*.

Courts have never limited this tort to process that was *validly* issued. Indeed, the Louisiana Court of Appeals specified that abuse of process occurs when a government officer "fail[s] to comply with the proper procedures or rules set out by law for conducting official actions." *Taylor v. State*, 617 So. 2d 1198, 1205–06 (La. Ct. App. 1993).  Under Louisiana law:

> The action is not for the wrongful bringing of an action or prosecution, but for the improper use, or rather 'abuse' of process in connection therewith ... [that is], for a

> perversion of legal process. . . . when he seeks by the use of such process to 'attain some collateral objective, outside the scope of the operation of the process employed,' a tort arises.

*Hebert v. La. Licensed Prof'l Vocational Rehab. Counselors*, 4 So.3d 1002, 1009 (La.App. 3 Cir. 2009), *writs denied*, 9 So.3d 144 (citing Law of Torts, Volume I, § 4.9, Harper and James) (citations omitted).

Here, Article 66 of the Louisiana Code of Criminal Procedure provides the "proper procedures or rules set out by law for conducting [the] official action[ ]" at issue here—the issuance of investigative subpoenas by the District Attorney. *Taylor*, 617 So. 2d at 1205-06. Article 66 states plainly that prosecutors seeking to subpoena a witness must submit any proposed subpoenas to be signed by a judge. *See* La. Code. Crim. Proc. Ann. art. 66 (1999). Defendants abused the process laid out in the Louisiana Code by creating and issuing subpoenas that *explicitly invoked* Article 66 but were concededly not overseen or signed by a judge. This was clearly an effort to "obtain a result not proper under law," discussed in *Ioppolo,* and to attain a "collateral objective, outside the scope of the operation of the process employed," reviewed in *Hebert*—all to secure coercive investigative interviews without court oversight. This constitutes abuse of process.

## III.    Ms. Singleton's claims are not prescribed.

This court previously dismissed the argument that Plaintiffs claims were prescribed in its Order on the Motion to Dismiss because Plaintiffs had alleged that they "had no reason to know of the critical facts underlying their claims—that the 'subpoenas' delivered to them were not lawfully created—until *The Lens* published a story in April 2017 publicly revealing, for the first time, the use of 'subpoenas' by prosecutors in Cannizzaro's office." As this Court stated, "to say the Plaintiffs had reason to know documents designed to appear authentic were in fact fraudulent

before such information became more widely known would stretch the 'reason to know' standard too broadly."

Discovery has demonstrated that Ms. Singleton would have no reason to know that the notice she received was fraudulent.  As her testimony establishes, she found a document that appeared to be some kind of court notice related to Mr. Crossley's case in the middle of her living room, having been left in her door—and after discussions with Ms. Phillips and conducting research, understood that the notice had not been properly served therefore did not require her to comply with it.[115]  She had no reason to believe that this notice was fraudulent, as she testified, "I didn't think it was fraud."[116]  It was not until 2017 that she became aware that the notice she received, and the notice described in her material witness warrant application as a subpoena to the District Attorney's office, was not a subpoena at all.[117]

Defendants' attempt to argue that the doctrine of *contra non valentem*, which suspends prescription, does not apply to Ms. Singleton, amounts to: "Ms. Singleton did not receive a fake subpoena."  Def.'s Mot. For Summ. J. at 18-19.  Again, question of whether the notice Ms. Singleton received was a fake subpoena is a question of fact that cannot be resolved on summary judgment.  The evidentiary record establishes that Ms. Singleton could not have known that she had received in fake subpoena in 2015.  Her claims are thus not prescribed.

## CONCLUSION

For the reasons provided above, this Court should deny summary judgment.


Dated:  December 15, 2020                    Respectfully Submitted,

---

[115] CSUMF ¶¶ 63-71.
[116] CSUMF ¶ 109 [Renata depo at 79:18-19].
[117] CSUMF ¶ 109.

_s/ Tara Mikkilineni_

Tara Mikkilineni (*pro hac vice*)
Katherine Chamblee-Ryan (*pro hac vice*)
Ryan C. Downer (*pro hac vice*)
Laura Gaztambide Arandes (*pro hac vice*)
Jeffrey Stein (*pro hac vice*)
Civil Rights Corps
1601 Connecticut Avenue NW, Suite 800
Washington, D.C. 20009
Tel: (202) 844-4975

Mariana Kovel (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (646) 905-8870
mkovel@aclu.org

Somil Trivedi (*pro hac vice*)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 715-0802

Bruce Hamilton
La. Bar No. 33170
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70156
Tel: (504) 522-0628

Gerald S. Sachs (*pro hac vice*)
Venable LLP DC
600 Massachusetts Ave. NW
Washington, DC 20001
Tel: (202) 344-4269

Sarah S. Brooks (*pro hac vice*)
Venable LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Tel: (310) 229-0408

Allison B. Gotfried (*pro hac vice*)
Venable LLP
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Tel: (212) 370-6227

*Attorneys for Plaintiffs*

26

## <u>CERTIFICATE OF SERVICE</u>

  I certify that on December 15, 2020, I electronically filed the foregoing Memorandum in Opposition to Motion for Summary Judgment on Renata Singleton's Claims Against the Individual Defendants using the CM-ECF System, which caused notice to be sent to via email to all counsel of record.

               *s/* Tara Mikkilineni