# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RENATA SINGLETON; MARC MITCHELL; LAZONIA BAHAM; TIFFANY LACROIX; and SILENCE IS VIOLENCE, | Civil Action No. 17-10721 |
| *Plaintiffs*, | Section H<br>Judge Jane Triche Milazzo |
| v. | Division 1<br>Magistrate Judge Janis van Meerveld |
| LEON CANNIZZARO, in his official capacity as District Attorney of Orleans Parish and in his individual capacity; GRAYMOND MARTIN; DAVID PIPES; JASON NAPOLI; ARTHUR MITCHELL; LAURA RODRIGUE; in their individual capacities, | |
| *Defendants*. | |

## COUNTERSTATEMENT OF UNCONTESTED FACTS IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON RENATA SINGLETON'S CLAIMS AGAINST INDIVIDUAL DEFENDANTS

Plaintiff Renata Singleton offers this counterstatement of undisputed facts to demonstrate the significant amount of evidence that has been adduced to date in discovery that is relevant to her legal claim against Individual Defendants Arthur Mitchell, David Pipes, and Graymond Martin (collectively, the "Individual Defendants") notwithstanding the fact that Defendants are continuing to produce highly-relevant evidence as recently as within the last week. *See* Opp'n at 1 n. 1 (describing documents produced that are relevant to Ms. Singleton's claims). The evidence cited here, as well as the evidence cited in Plaintiff's Response to Defendants' Statement of Uncontested Facts, is more than sufficient to demonstrate genuine disputes as to material fact that preclude granting Individual Defendants' Motion.

### A.    OPDA's Use of Fake Subpoenas

1.    Documents directing witnesses to appear at the District Attorney's office that purport to be issued through valid legal process, but in fact were created and disseminated by the District Attorney's office without court oversight, have long been in use by OPDA.[1]

2.    From 2013 to 2017, OPDA attorneys were using more than eleven versions of fake subpoenas, with more coming to light through this discovery process as recently as last week.[2]

3.    Seven of the ten versions of the OPDA fake subpoenas have no seal; eight have a space where an Assistant District Attorney can sign, instead of a clerk or a Judge.[3]

4.    In early 2014, an OPDA investigator, James O'Hern, designed a fake subpoena template.[4]

5.    Mr. O'Hern was concerned that the DA subpoenas being used were "skewed," "blurry" and "multiple generation copies," and as such looked "unprofessional."[5]

---

[1] Ex. 6 (Dep. of David Pipes (Rough Draft)) at 94:1-94:19; 157:9:11 ("Our office had been using some version of a DA notice, DA subpoena going back, as I said before, forever.").

[2] *Id.* at 129:7-155:22 (reviewing different fake subpoena forms with Chief of Trials David Pipes); Ex. 7 (compilation of first pages of the eleven different fake subpoena forms discussed); Ex. 8 (six uses of a fake subpoena form produced for the first time by Defendants on Wednesday, Dec. 9, 2020).

[3] *See* Ex. 7 (compilation of fake subpoenas) at 2, 4, 6, 7, 8, 9, and 11; *id.* at 2, 4-10.

[4] Ex. 9 (30(b)(6) Dep. of OPDA) at 220:11-24; Ex. 6 (Dep. of David Pipes (Rough Draft)) at 136:1-138:7.

[5] *See* Ex. 6 (Dep. of David Pipes (Rough Draft)) at 157:9-14 ("Our office had been using some version of a DA notice, DA subpoena going back, as I said before, forever. And a lot of times it was multiple generation copies, six the, generation copies of forms, they were skewed, they were blurry, they looked unprofessional.").

6.     First Assistant Graymond Martin, as the individual in charge of setting office policies on such matters, approved Mr. O'Hern's template and had his executive assistant send the template to the entire OPDA office in May of 2014.[6]

7.     The fake subpoena template stated that the recipient was "notified pursuant to LSA-CCRP art. 66 to appear before the District Attorney for the Parish of New Orleans, to testify to the truth according to your knowledge in such matters as may be required of you."[7]

8.     The template has blanks to fill in the date and time of the meeting, the name of the prosecutor, the prosecutor's phone number, and the criminal case information.[8]

9.     The template directs the recipient to a preprinted address: 619 South White Street, the address of the District Attorney's Office.[9]

10.     The template does not include space to obtain a signature or approval from a clerk or the Court.[10]

11.     The 2014 email sent at Martin's direction attaches a "revised DA Subpoena to be used from this date forward" and directs staff to "disregard any older forms of subpoenas. **Do not use any of the older subpoenas.**"[11]

---

[6] Ex. 10 (May 13, 2014 fake subpoena template email) at OPDA39340-43 (email attaching template); Ex. 6 (Dep. of David Pipes (Rough Draft)) at 164:21-165:12 (agreeing that responsibility for review and approval of the form would be Mr. Martin's responsibility); *id.* at 35:3-8 (noting that issues related to the administration of the office would go to First Assistant Graymond Martin).

[7] Ex. 10 (May 13, 2014 fake subpoena template email) at OPDA039343.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at OPDA039341 (emphasis in original).

3

12.     The 2014 email also directs staff to "save the attached in a folder on your computer" per "the First Assistant D.A. Graymond Martin."[12]

13.     At least 191 fake subpoenas based on this template were sent between October 2013 and April 2017.[13]

14.     Defendant Arthur Mitchell is associated with at least nine fake subpoenas using this template, and recognizes that those fake subpoenas had no legal effect.[14]

15.     Jasmine Dansey, a witness in a domestic violence case, was a recipient of a fake subpoena issued by Arthur Mitchell.[15]

16.     Mr. Mitchell testified that he issued a fake subpoena to Ms. Dansey at her request, but Ms. Dansey never requested any kind of documentation from Mr. Mitchell.[16]

17.     Ms. Dansey received this subpoena from a man who was waiting in his car outside her house; she responded to the subpoena by appearing in court the following day.[17]

18.     No valid subpoena was issued for Ms. Dansey in the underlying criminal case, *State v. Vernell Nelson*.[18]

---

[12] *Id.*

[13] *See* Ex. 11 (191 fake subpoenas using this template) (introduced as Ex. 12 in Deposition of David Pipes).

[14] *See* Ex. 12 (nine fake subpoenas used in Defendant Mitchell's cases); *see also* Ex. 5 (Mitchell Dep.) at 126-160; *id.* at 126:15-16 ("This is a DA notice. I understand that it has no legal effect.").

[15] *See* Ex. 13 (fake subpoena for Jasmine Dansey).

[16] Ex. 5 (Mitchell Dep.) at 134:12-15 ("[s]he needed something -- I believe she was in school or she was working -- and needed something to appear in court."); Ex. 14 (Dansey Decl.) ¶ 12.

[17] Ex. 14 (Dansey Decl.) ¶ 7.

[18] *See* Ex. 15 (Docket Master for *State v. Vernell Nelson*).

19.     Mr. Mitchell testified that the fake subpoena was only used "for [Ms. Dansey's] purposes to come to court" and not to get Ms. Dansey to "meet with me,"[19] but he also testified Mr. Mitchell that he told Ms. Dansey to meet him at the DA's office before court: "I instructed her to wait for me at the DA's office with the [fake subpoena] return."[20] When Ms. Dansey appeared in Court pursuant to the subpoena, Mr. Mitchell took her in the back for a private interview.[21]

20.     Arthur Mitchell testified that senior prosecutor Tiffany Tucker[22] (who worked with him on Ms. Singleton's case) sent the Martin fake subpoena template to him, and that his supervisor, David Pipes, the OPDA Chief of Trials, directed him to use it.[23]

21.     Ms. Tucker testified that a witness's failure to comply with a fake subpoena (and its attempt to compel an out-of-court meeting) would be relevant to the court in evaluating whether it was impracticable to secure the presence of a witness with lawful service of process.[24]

---

[19] Ex. 5 (Mitchell Dep.) at 135:8-10.

[20] *Id.* at 134:10-11.

[21] S*ee* Ex. 14 (Dansey Decl.) ¶ 8.

[22] Ms. Tucker has now married and uses the name Tiffany Dover. Because she went by Tiffany Tucker during the relevant time period, Plaintiff will refer to her as such throughout this document.

[23] Ex. 5 (Mitchell Dep.) at 139:2-4 ("I was given this document by Tiffany Tucker, and I was told by David Pipes and other people to use this document.").

[24] Ex. 4 (Tucker Dep.) at 131:19-132:1 ("Q. Do you agree that the DA subpoenas were used as a tool to elicit the victims or witness to come to court or to the DA's office? And again, the failure to respond would be relevant information for the Court in seeking a Material Witness Warrant application; correct? MR. PAUL: Object to the form. A. Yes.").

22.     OPDA investigator Corey Porter personally served at least thirteen of the fake

subpoenas based on the Martin template upon witnesses.[25]

23.     OPDA investigator Corey Porter was the investigator in Renata Singleton's case

and left subpoenas at her residence.[26]

24.     Tiffany Tucker testified that she altered a CourtNotify subpoena by downloading

a valid subpoena for trial issued through the CourtNotify system, opening it in Microsoft Word,

changing the language in the subpoena that commands the witness to appear in court to instead

direct the witness to appear at the Orleans Parish District Attorney's Office, and changing the

date on the subpoena from the trial date to an earlier date.[27]  Ms. Tucker testified that she did not

"specifically recall how many times [she had] done this or specific cases that [she had] done it or

specific cases where other ADAs have possibly used CourtNotify in some kind of altered

fashion."[28]

25.     Tiffany Tucker "served" this document through OPDA investigator Corey Porter

upon a witness.[29]

---

[25] Ex. 16 (fake subpoenas served by Corey Porter); Ex. 17 (OPDA Resp. to LaCroix's Second Interrogatories) Resp. to No. 4 (describing fake subpoenas served by Corey Porter).

[26] *See* Ex. 3 (Motion for Material Witness Bond for R. Singleton) at OPDA 18398 (describing subpoenas left by Porter "for SINGLETON to appear at the District Attorney's Office"); Ex. 5 (Mitchell Dep.) at 218:24-219:5 ("Q. And you were -- and Corey Porter was your investigator at the time; is that correct? A. He was. Q. Okay. And did he travel to Ms. Singleton's house independently from you to deliver subpoenas to that address? A. I believe -- I believe he did.").

[27] Ex. 4 (Tucker Dep.) at 138:11-141:4; Ex. 18 (fake CourtNotify subpoena sent to K. McGuire) at INDEF00780 (introduced as Ex. 3 in Deposition of Tiffany Tucker).

[28] Ex. 4 (Tucker Dep.) at 156:9-10; 15-18.

[29] *Id.* at 140:12-20.

26.     The altered CourtNotify subpoena used in that case does not have a seal.[30]

27.     OPDA policies did not require that copies of DA subpoenas be kept in the DA file, and, thus, it is not surprising that in some cases DA subpoenas were sent but not maintained in the case file.[31]

28.     In April 2017, an investigative piece about the use of fake subpoenas by the Orleans Parish District Attorney's Office was published in *The Lens*, a local newspaper.[32]

29.     On April 21, 2017, Mr. O'Hern sent Graymond Martin an older version of a fake subpoena used in 2010, titled "Subpoena" at the top, but with a signature for the Assistant District Attorney where a Judge or clerk would sign a legitimate subpoena.[33]

30.     On April 26, 2017, Graymond Martin sent a memorandum to MOT attorneys, the Trial Division, and the Magistrate Division directing them to use yet another fake subpoena form.[34]

---

[30] Ex. 18 (fake CourtNotify subpoena sent to K. McGuire) at INDEF00780.

[31] *See* Ex. 6 (Dep. of David Pipes (Rough Draft)) at 121:1-8 ("Q. When you were describing the policies the office has with respect to documentation, you said there's a policy that District Attorney's will keep documents or references to important documents or events somewhere in the case file but no specific requirements that all documents that were contemplated or served get put in the Ford; is that right? A. Yes.").

[32] Charles Maldonado, *Orleans Parish Prosecutors Are Using Fake Subpoenas To Pressure Witnesses To Talk To Them*, THE LENS, http://thelensnola.org/2017/04/26/orleans-parish-prosecutors-are-using-fake-subpoenas-topressure-witnesses-to-talk-to-them (Apr. 26, 2017).

[33] Ex. 19 (April 21, 2017 O'Hern email) at OPDA086344-45.

[34] Ex. 20 (April 26, 2017 memorandum) at OPDA00653-54; *see also* Ex. 21 (April 26, 2017 Martin email) at OPDA039344-45 (directing Sherry Walker to send contents of memorandum and attachment to all Assistant District Attorneys).

31.     In the April 2017 memorandum, Mr. Martin said it had "been brought to [his] attention that some ADA's may be using forms to be delivered to witnesses in cases that may not have been approved by me as appropriate."[35]

32.     He directs staff to take a series of steps, including having the "investigator locate the witness and deliver a notice to appear at our office."[36]

33.     The fake subpoena template attached to the memorandum is titled "Notice to Appear" and is virtually identical to the "Subpoena" form sent by Mr. O'Hern on April 21, 2017, except for the changed title.[37]

34.     Mr. Martin specifies in the memorandum that the "Notice to Appear" "may be delivered to witnesses," but states that "[a]ny other self-created or modified notice that may be floating around the office in your computer or on some network is expressly prohibited unless the form has been approved by me."[38]

35.     On April 28, 2017, Mr. Martin drafted a new memorandum that revoked the "Notice to Appear."[39]

36.     The new memorandum removed the information about having an investigator provide a "notice to appear" to witnesses, and replaced it with instructions to have the investigator "deliver a letter to the witness requesting that the witness appear at our office."[40]

---

[35] Ex. 20 (April 26, 2017 memorandum) at OPDA00653.

[36] *Id.*

[37] *Compare id.*, *with* Ex. 19 (April 21, 2017 O'Hern email) at OPDA086345.

[38]  Ex. 20 (April 26, 2017 memorandum) at OPDA00653.

[39] Ex. 22 (April 28, 2017 Memorandum re: Revised Witness Contact Policy) at OPDA00624.

[40] *Id.*

B.      **The Underlying Incident and OPDA's Attempts to Contact Ms. Singleton, Including the Use of a Fake Subpoena**

37.      On the night of November 2, 2014, Ms. Singleton, an accountant and mother of three children,[41] had an argument with her former boyfriend, Vernon Crossley.[42]

38.      Ms. Singleton's daughter called 911.[43]

39.      According to the Police Incident Report, Ms. Singleton and Mr. Crossley got into an argument over messages on Ms. Singleton's phone, and "tussled over [the] phone."[44]

40.      Ms. Singleton and Mr. Crossley had a physical altercation, but as Ms. Singleton testified, she "wasn't 100 percent sure at the time . . . exactly how it happened."[45]

41.      Police arrived at Ms. Singleton's house; Mr. Crossley was arrested, charged with a misdemeanor, and released the next day on a $3,500 bond."[46]

42.      Shortly thereafter, Ms. Singleton was contacted by Amy Jackson, a Victim Advocate with OPDA.[47]

---

[41] Ex. 2 (Singleton Dep.) at 14:24-15:3 ("Q. Okay. Who lived with you at the Farwood Drive address when you lived there? A. Myself and my three kids. Q. How old are your three kids now? A. They are 24, 20 and 15.").

[42] *Id.* at 29:7-11 ("Q. Going back to November 2, 2014, you said your daughter called 911? A. Yes. Q. Why did she call 911? A. Because Vernon and I were arguing.").

[43] *Id.* at 29:7-9.

[44] Ex. 23 (New Orleans Police Department Incident Report) at INDEF01522.

[45] Ex. 2 (Singleton Dep.) at 32:9-10 ("I wasn't 100 percent sure at the time, like, exactly how it happened.").

[46] Ex. 24 (Dec. 12, 2014 Criminal Appearance Bond) at INDEF01706.

[47] Ex. 25 (Avery letter) at INDEF01508; Ex. 2 (Singleton Dep.) at 42:2-18 ("Q:. Did you ever speak with Amy Jackson? A. Yes. Q. When was the first time you spoke with her? A. After I received this letter. Q. How long after -- after you received the letter? A. I'm not – I'm not sure. Q. Was it approximately -- was it a few days? Was it like a week? Was it a month? A. Oh, no,

43.     Ms. Singleton and Ms. Jackson talked about various services offered to victims of domestic violence.[48]

44.     Ms. Singleton stated to Ms. Jackson that she did not want to speak to a counselor or receive any domestic violence assistance.[49]

45.     Ms. Singleton had ended her relationship with Mr. Crossley and was worried about missing time at work and with her children to pursue charges against him.[50]

46.     As Ms. Singleton explained to Ms. Jackson when Ms. Jackson called several more times to talk about Mr. Crossley's case, Ms. Singleton had to leave her office in order to take her calls which was burdensome.[51]

47.     Ms. Jackson reported to the prosecutors initially assigned to Ms. Singleton's case, Bonycle Thornton and Tiffany Tucker, that she and Ms. Singleton had spoken about the case.[52]

48.     Arthur Mitchell became lead prosecutor on Ms. Singleton's case sometime in March 2015.[53]

---

like a few days. Q. A few days? A. But not the next day. It was -- it was a few days. Q. So very soon after you received the letter? A. Yes.").

[48] *Id.* at 42:21-24 ("I recall us talking about the -- the services that was offered. I told her that I didn't want to speak to the counselor or receive any domestic violence assistance.").

[49] *Id.*

[50] Ex. 1 (Singleton Decl.) at ¶ 1.

[51] Ex. 2 (Singleton Dep.) at 48:13-18 ("Well, I won't say that it was so often. It just was -- I was -- I was at work whenever she would call, I would have to leave out the office to go into the stairwell -- the stairwell to speak with her. So, yeah, it was -- I was annoyed.").

[52] Ex. 26 (Email from A. Jackson to B. Thornton and T. Tucker, dated Dec. 11, 2014) at OPDA068915.

[53] Mr. Mitchell stated that the case did not become his until March 20, 2015. Ex. 5 (Mitchell Dep.) at 197:13-14 ("But I know that from the March 20th of 2015 date it was my case at that

49.     Senior prosecutor Tiffany Tucker assisted Mr. Mitchell with the case; OPDA Chief of Trials David Pipes was the supervisor on the case.[54]

50.     Mr. Mitchell testified that he met extensively with both Ms. Tucker and Mr. Pipes about the case, and many of the actions he took in the case were at their direction.[55]

51.     In March and April of 2015, CourtNotify records show entries that reflect a representative of the Sheriff's Office leaving subpoenas "in [a] door."[56]

52.     Mr. Mitchell admitted in his deposition that "Ms. Singleton did not receive proper domiciliary service or personal service" of the subpoenas the Sheriff's Office attempted to serve in March and April of 2015.[57]

53.     Mr. Mitchell attempted to contact Ms. Singleton by telephone on March 7, March 20, and March 25, 2015, but his notes do not reflect what number he called or whether he left a voicemail.[58]

---

time."). However, he also testified that he attempted to get in touch with Ms. Singleton as early as March 7, 2015. *Id.* at 205:5-8 ("Q. Okay. Let's talk about what these notes reflect about your attempts to contact Ms. Singleton. You attempted to contact her on March 7th; correct? A. Yes.").

[54] *Id.* at 188:2-6 ("I discussed pretty much all of my cases with Tiffany, especially the ones that were set for like motion or trial just to update her as to what I was doing in the case and what was going on. But we would also -- both of us would meet with Mr. Pipes.").

[55] *Id.* at 184:2-7 ("I know that after speaking with Ms. Tucker and speaking with Mr. Pipes that they -- well, Tiffany wasn't my supervisor; she was my senior. But after speaking with Mr. Pipes for sure, he believed that that was appropriate, filing a Material Witness Warrant was appropriate.").

[56] Ex. 27 (CourtNotify records) at OPDA18942-47.

[57] Ex. 5 (Mitchell Dep.) at 202:11-13 ("Ms. Singleton did not receive proper domiciliary service or personal service of these subpoenas.").

[58] *Id.* at 205:5-207:23.

54.     Mr. Mitchell next attempted to contact Ms. Singleton by telephone on April 20, 2015 (but again failed to record whether he left a voicemail).[59]

55.     That same day, April 20, 2015, Mr. Mitchell printed a CourtNotify subpoena and made copies of instanter subpoenas for the trial date, April 24, 2015.[60]

56.     Mr. Mitchell and his investigators traveled to an address that they had for Ms. Singleton and knocked with no answer.[61]

57.     Mr. Mitchell does not know what address he visited at this time at because the address is not documented anywhere in his notes.[62]

58.     Mr. Mitchell and his investigators traveled to another address that was associated with Ms. Singleton, and there was "[n]o answer there."[63]

59.     There is no record of the second address Mr. Mitchell and Mr. Porter visited.[64]

60.     Mr. Mitchell's investigator Corey Porter left the "subpoenas somewhere, either on the porch or in the door or somewhere around the outside of the residence prior to [Mr. Mitchell and Mr. Porter] leaving."[65]

---

[59] *Id.* at 208:2-209:5.

[60] *Id.* at 211:14-17.

[61] *Id.* at 212:17-20.

[62] *Id.* at 212:7-9.

[63] *Id.* at 212:20-22.

[64] *Id.* at 213:3-214:1.

[65] *Id.* at 212:23-213:1.

61.     Mr. Mitchell gave Mr. Porter several copies of CourtNotify and instanter subpoenas and Mr. Porter independently traveled to an address to deliver subpoenas for Ms. Singleton.[66]

62.     There is no record of what address Mr. Porter used to attempt to deliver these subpoenas to Ms. Singleton.[67]

63.     The first time Ms. Singleton came across a subpoena was when she came home from work and noticed a piece of paper folded up in her living room that she guessed had been in the door.[68]

64.     She understood the document to be some kind of document related to Mr. Crossley's case.[69]

65.     Ms. Singleton asked her friend, Kenyatta Phillips, a police officer with the New Orleans Police Department ("NOPD"), about it.[70]

66.     Ms. Phillips told her that it was probably a court notice stating the court date.[71]

67.     Ms. Phillips noted that, regardless of what the document was, Ms. Singleton hadn't been properly served.[72]

---

[66] *Id.* at 238:14-19; *id.* at 219:2-5.

[67] *Id.* at 213:3-214:1.

[68] Ex. 2 (Singleton Dep.) at 57:21-58:6.

[69] Ex. 1 (Singleton Decl.) at ¶ 2.

[70] Ex. 2 (Singleton Dep.) at 58:7-15.

[71] Ex. 2 (Singleton Dep.) at 58:22-59:8; Ex. 33 (Phillips Decl.) ¶ 4.

[72] Ex. 2 (Singleton Dep.) at 58:22-59:8; Ex. 33 (Phillips Decl.) ¶ 5.

68.     Ms. Singleton testified that the paper "wasn't professional or official looking," and reiterated, "it just wasn't professional. It was cut-off, it—like the print, like, I remember, like, it being real distorted. Like it just—yeah, there wasn't any seals on it. It was just like somebody copied something then left it there."[73]

69.     Ms. Singleton testified, she was "confused [about the subpoena].  [She] didn't know exactly where it come from or . . . how it ended up on [her] living room floor."[74]

70.     Ms. Singleton herself knew from her job as an accountant, and additional research she did on the Internet, that leaving a document in the door was not proper service.[75]

71.     Based on her conversation with Ms. Phillips, and her knowledge and experience, Ms. Singleton did not respond to the document and waited to be officially served with papers.[76]

**C.     The Material Witness Warrant, Ms. Singleton's Receipt of a Valid Subpoena, Subsequent Arrest, Interrogation, and Imprisonment**

72.     On April 24, 2015, Mr. Mitchell filed a material witness warrant application with the criminal district court for the Parish of Orleans that stated that "The State has reason to fear SINGLETON will not appear in Court pursuant to a subpoena as she has failed to appear pursuant to an appointment with the undersigned, and she has failed to appear in court at every other trial setting that she was issued a subpoena for."[77]

---

[73] *Id*. at 66:19-20, 61:18-23.

[74] *Id*. at 59:12-14.

[75] *Id*. at 60:8-25.

[76] *Id*. at 61:1-7.

[77] Ex. 3 (Motion for Material Witness Bond for R. Singleton) at OPDA18397.

73.     Mr. Mitchell entered the correct trial date, the correct number of subpoenas left by Mr. Porter for Ms. Singleton (two), and the correct date of subpoena delivery.[78]

74.     The Material Witness Warrant Application for Renata Singleton filed by Mr. Mitchell also states "Investigator Porter left two subpoenas at the residence for SINGLETON to appear at the District Attorney's Office on April 24, 2015."[79]

75.     The Material Witness Warrant Application describes every document that was attempted to be served upon Ms. Singleton as a "subpoena."[80]

76.     The Material Witness Warrant Application was granted and signed by the court on April 24, 2015.[81]

77.     On May 21, 2015, Arthur Mitchell requested an alias capias to be issued for Renata Singleton.[82]

78.     Mr. Mitchell was "requested by [his] supervisor" to file the alias capias for Renata Singleton on that date.[83]

---

[78] Ex. 5 (Mitchell Dep.) at 236:13-15 (trial date); *id.* at 236:16-20 (number of subpoenas); *id.* at 237:8-16 (date of subpoena delivery).

[79] Ex. 3 (Motion for Material Witness Bond for R. Singleton) at OPDA18398.

[80] *Id.*

[81] *Id.* at OPDA18399.

[82] Ex. 5 (Mitchell Dep.) at 249:16-250:8.

[83] *Id.* at 250:9-250:16.

79.     On May 27th, Mr. Mitchell texted Corey Porter, "Hey Mr. Porter, what's the procedure to have Renata Singleton picked up? I went to the sheriff's office last week and had her put in NCIC.  We're set for trial next week on 6/4/15."[84]

80.     In late May, Ms. Singleton's oldest son received a court subpoena[85] and signed for it.[86]

81.     Until late May, when Ms. Singleton's son signed for a subpoena served at her home, Ms. Singleton never received any notice or court-issued document other than the one she found on her living room floor.[87]

82.     After being properly served, Ms. Singleton fully intended to go to court on the date listed on the subpoena.[88]

83.     On the evening of May 28, 2015, the day after Ms. Singleton's son signed for the subpoena, police officers arrived at Ms. Singleton's house.[89]

84.     Text messages between the police and OPDA investigator Corey Porter show that Mr. Porter had requested that Ms. Singleton be arrested, telling police that he "[n]eed[ed] her in jail by this weekend."[90]

---

[84] Ex. 28 (text message from Arthur Mitchell to Corey Porter).

[85] Ex. 2 (Singleton Dep.) at 65:13-19.

[86] Ex. 1 (Singleton Decl.) ¶ 3.

[87] Ex. 2 (Singleton Dep.) at 64:25-65:25.

[88] *Id.* at 85:7-17, 118:18-19, 119:17-22, 121:20-21, 142:12-14; Ex. 1 (Singleton Decl.) ¶ 3.

[89] Ex. 2 (Singleton Dep.) at 83:12-84:19.

[90] Ex. 29 (texts to and from C. Porter) at OPDA87597.



85.     The officers told Ms. Singleton there was a warrant out for her arrest.[91]

86.     Ms. Singleton told the officers she had received a subpoena to appear in court in a few days, and that she intended to show up in court.[92]

87.     Ms. Singleton's friend, Ms. Phillips, arrived at the house to talk to the police.[93]

---

[91] Ex. 2 (Singleton Dep.) at 85:7-9.

[92] *Id.* at 85:10-17.

[93] *Id.* at 86:2-8; Ex. 33 (Phillips Decl.) ¶ 7.

88.     Ms. Phillips, who recognized the police officers at Ms. Singleton's house, told them that Ms. Singleton had gotten a subpoena and planned on going to court.[94]

89.     Ms. Phillips told the officers that she would accompany Ms. Singleton to the DA's office the next morning.[95]

90.     The police initially responded that they had a warrant to pick up Ms. Singleton, and there was nothing they could do about it.[96]

91.     One of the policemen called the DA's office and talked with investigator Corey Porter—the investigator on Ms. Singleton's case.[97]

92.     The policeman told Ms. Singleton that the person he talked to had agreed to allow her to come in to the DA's office the following day instead of being arrested.[98]

93.     Text messages show that when informed by the police that "She's [Ms. Singleton] coming in the morning" to the DA's office, Corey Porter responded, "Ok .. I notified my da."[99]

94.     The following day, Ms. Phillips accompanied Ms. Singleton to the DA's office.[100]

---

[94] *Id.* at 87:23-88:2, 88:11-15; Ex. 33 (Phillips Decl.) ¶¶ 7, 8.

[95] *Id.* at 90:7-8; Ex. 33 (Phillips Decl.) ¶ 9.

[96] *Id.* at 90:10-13; Ex. 33 (Phillips Decl.) ¶ 10.

[97] *Id.* at 90:13-16; Ex. 30 (OPDA's Response to Renata Singleton's Third Set of Interrogatories) Resp. to No. 23.

[98] Ex. 2 (Singleton Dep.) at 90:18-22; Ex. 33 (Phillips Decl.) ¶ 12.

[99] Ex. 29 (texts to and from C. Porter).

[100] Ex. 5 (Mitchell Dep.) at 257:3-21; Ex. 4 (Tucker Dep.) at 269:21-25; Ex. 33 (Phillips Decl.) ¶ 13.

95.     Ms. Singleton and Ms. Phillips were met by Arthur Mitchell, who introduced himself and took them upstairs to a conference room.[101]

96.     Ms. Singleton showed Mr. Mitchell the subpoena she received the day before, and asked why she was being arrested.[102]

97.     Mr. Mitchell told Ms. Singleton that she was being arrested because she was hiding from the DA's office.[103]

98.     At some point, Ms. Tucker entered the room.[104]

99.     Ms. Phillips was asked by Mr. Mitchell to leave the room.[105]

100.    Mr. Mitchell questioned Ms. Singleton about where she was when he attempted to serve her, and accused her of "hiding."[106]

101.    Ms. Singleton made clear that she had never evaded Mr. Mitchell's attempts to contact her, and emphasized that she fully intended to comply with the subpoena she was properly served with.[107]

102.    Feeling "railroaded" by Mr. Mitchell's questions, Ms. Singleton asked for a lawyer.[108]

---

[101] Ex. 2 (Singleton Dep.) at 95:3-13; Ex. 33 (Phillips Decl.) ¶ 14.

[102] *Id.* at 96:2-8.

[103] *Id.* at 96:12-13.

[104] Ex. 5 (Mitchell Dep.) at 258:6-10.

[105] Ex. 2 (Singleton Dep.) at 97:23-98:5; Ex. 33 (Phillips Decl.) ¶ 15.

[106] *Id.* at 96:12-13, 98:15-99:21.

[107] *Id.* at 98:8-14.

[108] *Id.* at 101:14-19.

103.     Ms. Singleton was told that she didn't need a lawyer because she was the victim.[109]

104.     Mr. Mitchell testified that Ms. Singleton responded "that she didn't feel like a victim, that she felt as though was more of a defendant or like more of an accused in this instance and did not feel like a victim."[110]

105.     Mr. Mitchell and Ms. Tucker attempted to ask Ms. Singleton several questions about Mr. Crossley's case.[111]

106.     Ms. Singleton indicated that she did not want to answer questions without a lawyer.[112]

107.     Investigator M.J. Audibert made a phone call, and a few minutes later, an NOPD officer came and arrested Ms. Singleton.[113]

108.     Ms. Singleton was taken to jail[114] and remained incarcerated for six days and five nights.[115]

---

[109] *Id.* at 105:12-15.

[110] Ex. 2 (Mitchell Dep.) at 260:12-15.

[111] *Id.* at 260:17-21.

[112] *Id.* at 260:22-23.

[113] *Id.* at 262:16-19; Ex. 30 (OPDA Resps. to Singleton's Third Interrogatories) Resp. to No. 24.

[114] Ex. 1 (Singleton Decl.) ¶ 5 ("They lied to me, they accused me of hiding from them when I wasn't, they locked me up, and no one was held accountable.").

[115] Ex. 2 (Singleton Dep.) at 185:20-21.

### D.        The Consequences of OPDA's Actions on Ms. Singleton and Others

109.    Years after receiving the fake subpoena, Ms. Singleton learned she was a recipient of a fake subpoena.[116]  Before then, she had no reason to believe that the notice she found in her living room was fraudulent, as she testified ("I didn't think it was fraud.").[117]

110.    Ms. Singleton learned that the fake subpoena had been used as a basis for her material witness warrant.[118]

111.    Ms. Singleton remains upset that her arrest record can be found online.[119]

112.    Ms. Singleton has lost any trust or faith in law enforcement and the criminal justice system.[120]

113.    Ms. Singleton was eventually released on an ankle monitor,[121] and Mr. Crossley pled guilty before Ms. Singleton was called to testify at trial.[122]

114.    Tiffany Tucker, when asked if she knew of instances of any Assistant District Attorney using fake DA subpoenas in order to compel attendance at the DA's office and inserting those fake subpoenas into material witness warrant applications, she testified: "Yes. Renata Singleton, my understanding is that DA subpoenas were used to attempt multiple times to

---

[116] *See* Ex. 1 (Singleton Decl.) ¶ 2.

[117] *See* Ex. 2 (Singleton Depo.) 79:18-19; *see also id.* at 79:19-20("I just thought, like, it wasn't official or professional, like I stated.").

[118] *See* Ex. 1 (Singleton Decl.) ¶ 5.

[119] *See id.*

[120] *See id.*

[121] Ex. 31 (Transcript of June 3, 2015 proceedings in *State v. Singleton*) at ODPA17928-37.

[122] Ex. 32 (Docket Master for *State v. Vernon Crossley*) at OPDA18390-94.

21

meet with her, and ultimately that information was placed into a Material Witness Warrant motion."[123]

115.    David Pipes's answer to the question of whether he would have done anything differently in the case of Renata Singleton, was "nothing particular comes to mind."[124]

116.    Pipes noted, "It is an unfortunate necessity of our practice that sometimes for the good of the State, for the good of society, that victims sometimes suffer."[125]

Dated:  December 15, 2020                     Respectfully Submitted,

                                              _s/_ Tara Mikkilineni
                                              _____

Katherine Chamblee-Ryan (*pro hac vice*)     Mariana Kovel (*pro hac vice*)
Tara Mikkilineni (*pro hac vice*)            American Civil Liberties Union Foundation
Ryan C. Downer (*pro hac vice*)              125 Broad Street, 18th Floor
Laura Gaztambide Arandes (*pro hac vice*)    New York, NY 10004
Jeffrey Stein (*pro hac vice*)               Tel: (646) 905-8870
Civil Rights Corps                           mkovel@aclu.org
1601 Connecticut Avenue NW, Suite 800
Washington, D.C. 20009
Tel: (202) 844-4975

Somil Trivedi (*pro hac vice*)               Bruce Hamilton
American Civil Liberties Union Foundation     La. Bar No. 33170
915 15th Street NW                           ACLU Foundation of Louisiana
Washington, DC 20005                         1340 Poydras St., Suite 2160
Tel: (202) 715-0802                          New Orleans, LA 70156
                                             Tel: (504) 522-0628

---

[123] Ex. 4 (Dep. of Tucker 132:16-19).

[124] Ex. 6 (Dep. of David Pipes (Rough Draft)) at 290:2-3.

[125] *Id.* at 288:23-289:1.

Gerald S. Sachs (*pro hac vice*)
Venable LLP DC
600 Massachusetts Ave. NW
Washington, DC 20001
Tel: (202) 344-4269

Allison B. Gotfried (*pro hac vice*)
Venable LLP
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Tel: (212) 370-6227

Sarah S. Brooks (*pro hac vice*)
Venable LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Tel: (310) 229-0408

Michael S. Blume (*pro hac vice*)
Venable LLP
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Tel: (212) 370-5500

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 15, 2020, I electronically filed the foregoing Plaintiff's Counterstatement of Undisputed Material Facts using the CM-ECF System, which caused notice to be sent to via email to all counsel of record.


*s/* Tara Mikkilineni