EXHIBIT 2

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2


 3


 4   RENATA SINGLETON; MARC
     MITCHELL; LAZONIA BAHAM;
 5   JANE DOE; TIFFANY LACROIX;
     FAYONA BAILEY; JOHN ROE;    CIVIL ACTION NO. 17-10721
 6   AND SILENCE IS VIOLENCE

 7                               SECTION H
     VERSUS                      JUDGE JANE TRICHE MILAZZO
 8
     LEON CANNIZZARO, IN HIS     DIVISION I
 9   OFFICIAL CAPACITY AS        MAGISTRATE JUDGE
     DISTRICT ATTORNEY OF        JANIS VAN MEERVELD
10   ORLEANS PARISH AND IN
     HIS INDIVIDUAL CAPACITY;
11   GRAYMOND MARTIN; DAVID
     PIPES; IAIN DOVER;
12   JASON NAPOLI, ET AL

13

14

15

16

17

18           Video Conference Zoom Deposition of RENATA

19   SINGLETON, taken on Thursday, September 3, 2020.

20

21

22

23

24

25
```

```
 1      Q    Any other times that you've been a
 2  plaintiff or a defendant in a lawsuit?
 3      A    No.
 4      Q    What's your current address?
 5      A    It is ███████████████████████████
 6  ████ Houston, Texas.
 7      Q    I'm sorry, I didn't catch the first part.
 8  I didn't catch after the number.  ███████
 9      A    ███████████████
10      Q    ██████████
11      A    ████████  ██████████  █████████████████
12      Q    █████████████  █████████
13      A    Yes.
14      Q    And what city is that?
15      A    Houston, Texas ████████
16      Q    How long have you lived at that address?
17      A    In mid-February.
18      Q    Where did you live immediately before
19  then?
20      A    At ███████████████
21      Q    ███████ █
22      A    ████████████  ████████████    That was
23  Houston, Texas ████████
24      Q    When did you start living at that address?
25      A    Last August, August 2019.
```

```
 1      Q    So you lived there from August 2019 until
 2  February 2020?
 3      A    Yes, I was staying with family members.
 4      Q    Where did you live before August 2019?
 5      A    I was in Irving, Texas.
 6      Q    What address?
 7      A    Can I get my ID, to get it off my ID,
 8  because I don't remember it?  It was ████████████
 9  ████████████   That's ████████████    Irving, Texas
10  ██████
11      Q    When did you start living at that address?
12      A    That was February of 2019.
13      Q    That was until about August 2019?
14      A    Yes.
15      Q    Where did you live before that?
16      A    Before that it was Chicago, Illinois.
17      Q    Do you recall the address?
18      A    I believe it was ██████████████████
19  and the city was Oak Park.
20      Q    Okay.
21      A    Oak Park, Illinois.  I don't remember the
22  ZIP code.
23      Q    About what dates did you live there?
24      A    I was there from maybe January of 2018
25  until September of 28 -- 2018.
```

14

```
 1      Q    Where were you living between September
 2  2018 and February 2019?
 3      A    So, I was in Kansas City, Missouri the
 4  month of September and October of 2018, and November
 5  and December I was at that ████ address, ████████
 6  ████████.  And January I was in a hotel in Irving,
 7  January and part of -- the beginning part of
 8  February, I lived in a hotel.
 9      Q    Before January of 2018, where were you
10  living?
11      A    November and December of 2017, I was in
12  Chicago.  I was living with a friend at the time
13  until I found a place.
14      Q    So when did you move to Chicago?
15      A    November of 2017.
16      Q    And where were you living before you moved
17  to Chicago?
18      A    In -- in New Orleans, 7510 Farwood Drive,
19  and that's New Orleans, Louisiana 70126.
20      Q    When did you start living at that address?
21      A    August of 2013.
22      Q    Until you said about November of 2017?
23      A    Yes.
24      Q    Okay.  Who lived with you at the Farwood
25  Drive address when you lived there?
```

```
 1      A     Myself and my three kids.

 2      Q     How old are your three kids now?

 3      A     They are 24, 20 and 15.

 4      Q     Did anyone else ever live with you there

 5  at the Farwood Drive address?

 6      A     Yes, Vernon Crossley.

 7      Q     When did he live at that address?

 8      A     So I want to say, roughly, around July of

 9  2014.  Yes, roughly, around July of 2014 up -- up

10  until maybe, like, a week after the incident that --

11  that brought us to court.

12      Q     Was that in November of 2014?

13      A     Yes, November -- yes, roughly maybe a week

14  or four days, something like that after.

15      Q     Are you married?

16      A     No, I'm not.

17      Q     Have you ever been married?

18      A     No.

19      Q     Are you currently employed?

20      A     Yes.

21      Q     Where are you employed now?

22      A     Lone Star Legal Aid.

23      Q     Lone Star what?

24      A     Legal Aid.

25      Q     What sort of work do you do for them?
```

```
 1        A     Payroll.

 2        Q     I'm sorry, I didn't hear you.

 3        A     Payroll.  Payroll.

 4        Q     Oh, payroll.  How long have you worked for

 5   them?

 6        A     I -- I started working at the end of

 7   November through a temp service.  I was officially

 8   hired April 1st.

 9        Q     Where did you work before that?

10        A     Before that -- so before that, I had -- I

11   worked at a temp job in Irving, which was from

12   January until May of 2019.  And before that job

13   was -- oh, you need the name of that company?

14        Q     Sure.

15        A     It is --

16        Q     That's okay if you don't remember the

17   name.  But what sort of work was it?

18        A     It was -- it was accounting.

19        Q     Accounting?

20        A     It was through a temp agency.  I believe

21   it was Andersen Group.

22        Q     Where did you work before that?

23        A     Before that it was Arbor Lodging.

24        Q     What was the first word?

25        A     Arbor, A-R-B-O-R.
```

```
 1      Q    Okay.  And what dates did you have that
 2 job?
 3      A    That was from November of 2017 until
 4 October of 2018.
 5      Q    What sort of work were you doing for them?
 6      A    Accounting.
 7      Q    That was in Chicago or near Chicago?
 8      A    That was in Chicago, yes, Chicago,
 9 Illinois.
10      Q    Where were you born, what city?
11      A    New Orleans.
12      Q    I'm sorry, what?
13      A    New Orleans.
14      Q    New Orleans.  Did you live in New Orleans
15 up until the time you moved to Chicago?
16      A    Yes -- well, no, I didn't.  There was --
17 after Hurricane Katrina, so from August of 2005 to,
18 roughly, March of 2007, I lived in Houston, Texas.
19      Q    Other than that, you lived in New Orleans
20 up until the time you went to Chicago?
21      A    Yes.
22      Q    Have you taken any kind of notes to help
23 you remember any of the events associated with this
24 lawsuit or with the incidents concerning this
25 lawsuit?
```

1  BY MR. PAUL:

2      Q    So I'm just talking about, did you or

3  someone else in your presence call 911 because of

4  something involving you?

5      A    Well, the time with my daughter.

6      Q    Right.

7      A    Which that was the November 20 -- 2014

8  date.

9      Q    And you mentioned in December 2018,

10  January 2019.  Were there other incidents when 911

11  was called?

12      A    Yes.

13      MS. MIKKILINENI:

14           Objection, Counsel.  Again, you're --

15  you're -- you need to clarify your question.  Other

16  incidents when 911 was called by whom?

17  BY MR. PAUL:

18      Q    When was that?

19      MS. MIKKILINENI:

20           Can you clarify your question first that

21  you're referring to Ms. Singleton calling 911?

22  BY MR. PAUL:

23      Q    When were the other incidents -- when were

24  the other incidents when 911 was called concerning

25  Mr. Crossley that you're aware of?

```
 1      MS. MIKKILINENI:

 2           Again, Counsel, I'm sorry, you have to

 3  clarify.  Who -- who was doing the call?  Are you

 4  asking Ms. Singleton if she called?

 5  BY MR. PAUL:

 6      Q    Ms. Singleton, do you understand what I'm

 7  asking?

 8      A    Yes.  When -- when the calls -- I didn't

 9  call, so I -- and I don't know who called.

10      Q    So at some time someone -- someone called

11  911 because of Mr. Crossley; you don't know who it

12  was?

13      A    Yes.

14      MS. MIKKILINENI:

15           Counsel, you have to -- you have to

16  clarify what we're talking about here.

17      MR. PAUL:

18           I'm trying to discover what we're talking

19  about.

20  BY MR. PAUL:

21      Q    What date -- what date was that that

22  you're talking about when someone else called 911?

23      A    It was December -- roughly, December or

24  January, either 20 -- December 2018 or January 2019.

25      Q    So other than those two incidents, are
```

```
 1  there other -- are there other incidents that you

 2  recall?

 3      A   No.

 4      (Unidentified speaker remote transmission

 5                  interference.)

 6  BY MR. PAUL:

 7      Q   Going back to November 2, 2014, you said

 8  your daughter called 911?

 9      A   Yes.

10      Q   Why did she call 911?

11      A   Because Vernon and I were arguing.

12      Q   Did he punch you in the face that night?

13      A   No.

14      Q   Did he take your phone so that you

15  couldn't call 911?

16      A   No.

17      Q   I'm going to play a sound recording for

18  you and ask you a few questions about it.

19                  (Sound recording played.)

20  BY MR. PAUL:

21      Q   Is that your voice in that recording,

22  Ms. Singleton?

23      A   Yes.

24      Q   Does that recording accurately reflect

25  what you told the 911 operator?
```

```
 1      A    Yes.

 2      Q    Is there anything else that you told the

 3 operator that was not reflected in that recording?

 4      A    Not that I can remember.

 5      Q    Is that Vernon Crossley screaming in the

 6 background?

 7      A    Yes.

 8      Q    What was that loud sound in the background

 9 in the second part of the recording, do you know?

10 Was it -- was it some kind of alarm?

11      A    Oh, that -- the alarm.  It could have been

12 the alarm, the house alarm.

13      Q    Why did you tell the operator that he was

14 punching you in the face?

15      MS. MIKKILINENI:

16           Objection.

17      MS. BOYKIN:

18           I'm sorry.  We're unable to hear Tara.

19      MR. PAUL:

20           I can't hear you.

21      MS. MIKKILINENI:

22           I'm sorry.  Can you hear me?

23      MR. PAUL:

24           It's very faint.

25      MS. MIKKILINENI:
```

1          Oh.  Can -- can you hear me?

2     MR. PAUL:

3          It's still very faint, Tara.

4     MS. MIKKILINENI:

5          All right.  Can you -- can you hear me?

6  I'm going to speak up as loud as I can.  I'm going

7  to try to call in as well.  I'm sorry about the

8  technical difficulties.

9     MR. PAUL:

10         We can hear you, it's just -- it's just

11 faint.  Go head.

12    MS. MIKKILINENI:

13         Okay.  Well, so I'm going to call in as

14 well.

15    MR. PAUL:

16         Okay.  It's better -- it's better now.

17    MS. MIKKILINENI:

18         It's better now, okay.  I'll just move my

19 computer.

20         So I was just objecting because I don't --

21 you characterized something from the recording that

22 I don't believe the recording reflected.

23 BY MR. PAUL:

24    Q    Okay.  You can answer, Ms. Singleton.

25    A    Can you repeat the question?

```
 1     Q    Why did you tell the operator that Vernon
 2  Crossley was punching you in the face?
 3     MS. MIKKILINENI:
 4          Again, I'm going to note my objection that
 5  that is not what the recording reflects.
 6  BY MR. PAUL:
 7     Q    You can answer.
 8     A    When I spoke to the operator, I was -- I
 9  was hit in the face.  I wasn't 100 percent sure at
10  the time, like, exactly how it happened.
11     Q    I'm not sure I understand.  You're
12  saying --
13     A    So, like, in the midst of everything, once
14  my daughter came downstairs, she was trying to break
15  us apart.  And once I let him go, he ran out the
16  front door, and somewhere in that -- like, once he
17  was out the door and I shut the door and cut the
18  alarm on, I just felt, like, a stinging sensation in
19  my face.
20     Q    So you -- you're saying you thought at the
21  time that he had been punching you in the face?  At
22  the time you called 911, that's what you believed?
23     A    Yes.  Well, not punching, but I was hit in
24  the face.
25     Q    In that recording I just played for you,
```

1  you did say, he's punching me in my face; is that

2  correct?

3      MS. MIKKILINENI:

4          Objection.  I don't think that it's clear

5  that that is what the recording is saying.

6  BY MR. PAUL:

7      Q   I can replay that portion again, if you --

8  if you don't recall.  Is that what you recall?

9      A   I recall, like, yeah, I say punched.

10      MS. MIKKILINENI:

11          I didn't hear your question, Counsel.

12      MR. PAUL:

13          Sure.

14  BY MR. PAUL:

15      Q   Did you -- is it correct that you told the

16  911 operator, he's punching me in the face?

17      A   No.

18      Q   Let me replay a portion of this clip again

19  for you.

20              (Audio recording played.)

21  BY MR. PAUL:

22      Q   So, Ms. Singleton, in the clip I just

23  played for you, is it correct that you told the

24  operator, he is punching me in my face?

25      MS. MIKKILINENI:

```
 1              Objection.  Again, I just don't -- don't
 2    think it's clear.  You can answer if you want.
 3    BY MR. PAUL:
 4        Q    You can answer.
 5        A    Restate the question.
 6        Q    Sure.
 7        A    Repeat the question.
 8        Q    Sure.  You heard the clip that I just
 9    played?
10        A    Yes.
11        Q    I mean, is it correct that you told the
12    operator, he's punching me -- he's punching me in my
13    face; is that correct?
14        MS. MIKKILINENI:
15              Objection.  I think, again, the clarity is
16    about the tense.  It's not -- it's just not clear
17    what exactly -- what word.
18    BY MR. PAUL:
19        Q    And the operator asked you, who is
20    punching you in your face?  Who is punching you in
21    your face?  And you said, Vernon Crossley.  Is that
22    -- is that not what you just heard on that
23    recording?
24        A    I heard punch and hit.
25        Q    So are you denying that you told the 911
```

1       A    I -- I received a letter, roughly, within

2   the week -- within the week -- week, maybe two, of

3   the -- of the event, I received a letter in the

4   mail.

5       (Exhibit 1 was marked for identification.)

6   BY MR. PAUL:

7       Q    I'm going to introduce as Exhibit 1 a copy

8   of a letter.  This is -- let's see -- document A6

9   that was sent to you this morning.  It's stamped

10  with Bates No. INDEF01508.

11      MS. MIKKILINENI:

12          If you-all can give them a second to

13  actually pull the document, I think it will be

14  easier for her, for Ms. Singleton to see it

15  physically.

16      MS. BOYKIN:

17          I apologize.  I wish I were more

18  organized, but it was hard enough to get these

19  printed in of time.  Thank you for sending them

20  over, Matt.

21      MR. PAUL:

22          You're welcome.

23      MS. BOYKIN:

24          If you can see it on the screen.

25      MS. MIKKILINENI:

```
 1            Can you zoom in a little bit, Matt?
 2       MR. PAUL:
 3            Yes.
 4  BY MR. PAUL:
 5       Q    Can you see that, Ms. Singleton?
 6       A    Yes.
 7       MR. PAUL:
 8            Do you want me to keep waiting for you to
 9  find the paper?  I just have a few questions about
10  this one page.
11       MS. BOYKIN:
12            I found it.
13  BY MR. PAUL:
14       Q    Is this a copy of the letter that you were
15  just referring to?
16       A    Yes.
17       Q    How did you receive it?
18       A    By mail.
19       Q    You're sure about that?  Are you sure that
20  it was not left on your door?
21       A    No, I don't -- I'm not 100 percent sure.
22  I -- I feel like that I got it out the mailbox.
23       Q    So the letter states that the victim
24  advocate named Amy Jackson was assigned to you; is
25  that correct?
```

```
 1      A     Yes.

 2      Q     Did you ever speak with Amy Jackson?

 3      A     Yes.

 4      Q     When was the first time you spoke with

 5  her?

 6      A     After I received this letter.

 7      Q     How long after -- after you received the

 8  letter?

 9      A     I'm not -- I'm not sure.

10      Q     Was it approximately -- was it a few days?

11  Was it like a week?  Was it a month?

12      A     Oh, no, like a few days.

13      Q     A few days?

14      A     But not the next day.  It was -- it was a

15  few days.

16      Q     So very soon after you received the

17  letter?

18      A     Yes.

19      Q     What do you recall about that first

20  conversation with Ms. Jackson?

21      A     I recall us talking about the -- the

22  services that was offered.  I told her that I didn't

23  want to speak to the counselor or receive any

24  domestic violence assistance.

25      Q     Do you recall anything else about the
```

```
 1  conversation with Ms. Jackson?
 2       A    Yes.  I believe on this call that she
 3  had -- I believe on this call she was explaining to
 4  me what was meant with the DA had picked up the
 5  charges, and I remember telling her that -- I don't
 6  really remember the flow of the conversation.
 7            I remember her saying -- telling me what
 8  it meant that -- that the charges were picked up.  I
 9  remember, like, explaining to her, like, talking to
10  her about what happened that night, and explaining
11  to her that I didn't want to -- like, I didn't want
12  to go -- like, I didn't want to press charges --
13  charges.
14            I told her that, like, that night, that he
15  was drinking, and I just wanted him away from my
16  house and family, and I recall her saying that --
17  like, I don't want to misquote her, but, like, what
18  I got from what she said to me at that time was,
19  like, the -- the charges, like, it wasn't -- like, I
20  wasn't the person, like, could say if the charges
21  would be processed or not.  Like, it was the DA and,
22  like, that the charges would -- or that the case
23  would move on because of the -- that the charges
24  were picked up.
25       Q    Is that what you meant before when you
```

 1  said she explained what it meant that the charges

 2  had been picked up?

 3      A    Yes.

 4      Q    Did she tell you that you may have to come

 5  to court as a witness in the case?

 6      A    Yes, she did.

 7      Q    Did you tell her -- I'm sorry.  Go ahead.

 8      A    Yes, she did.  She did.

 9      Q    Did you tell her that you didn't want to

10  come to court?

11      A    Yes.

12      Q    After that -- after that first

13  conversation with Ms. Jackson, did you have other

14  conversations with her?

15      A    Yes.

16      Q    Did she call you periodically to keep you

17  updated on the progress of the case?

18      A    Yes.

19      Q    I'm going to play a portion of a video

20  clip for you and ask you a few questions about it.

21      MS. MIKKILINENI:

22          Counsel?

23      MR. PAUL:

24          Yes.

25      MS. MIKKILINENI:

1  case, she would call and, like, kind of explaining,
2  oh, today, you know, he's going to go to court and
3  do a -- you know, do his plea, and then, like, you
4  don't have to be there.
5           And then, like, the next time I remember
6  talking to her, she was like they going back to
7  court, and the DA would present whatever they had to
8  his lawyer or something like that, and she was like
9  you don't have to be there and, like --
10          (Video ended of Renata Singleton.)
11  BY MR. PAUL:
12     Q    Okay.  I'm going to stop there for now.
13  Is everything you said in that clip that I just
14  played accurate?
15     A    Yes.
16     Q    So Ms. Jackson, she called you and told
17  you that Mr. Crossley pled guilty or -- sorry, pled
18  not guilty; is that correct?
19     A    I don't remember it at this time, but she
20  would call with updates.
21     Q    And so, for example, when she told you
22  that when Mr. Crossley was going to court to enter
23  his plea, you didn't need to be there for that; is
24  that correct?
25     A    Yes.

```
 1      Q     And on another occasion, she told you that
 2   Mr. Crossley was going to court to get some
 3   materials from the DA, and she told you that you
 4   didn't have to be there for that; is that correct?
 5      A     Yes.
 6      Q     I'm going to play another portion of this
 7   video.
 8           (Video played of Renata Singleton.)
 9   MS. RENATA SINGLETON:
10           I remember like -- like, she kept calling,
11   and I guess maybe she sensed, like, the agitation in
12   my voice, and she was like would you prefer me not
13   to keep calling you and updating you?  I was like --
14   I was like, yes, I would prefer that.  She was like,
15   would you like for me to text you?  I was like, no,
16   not really, like, I don't really, you know, want
17   to -- like I really just wanted him to leave that
18   night and, like, I really didn't want to make a big
19   deal out of it, but when the cops came and, you
20   know, he was saying a couple things to the cops that
21   I know probably made the situation a lot worse than
22   it really was.
23           And, yeah, I think she just was like, you
24   know, if it kept going the way that -- you know, him
25   saying not guilty that I may eventually have to come
```

 1  to court, and I'm like I really don't want to do

 2  that.

 3           (Video ended of Renata Singleton.)

 4  BY MR. PAUL:

 5      Q    So, Ms. Singleton, is everything in that

 6  clip that I just played for you accurate?

 7  Everything that you said in that clip, is it

 8  accurate?

 9      A    Yes.

10      Q    Is it fair to say that Ms. Jackson called

11  you so often to inform you about the status of the

12  case, that you got annoyed by that?

13      A    Yes.  Well, I won't say that it was so

14  often.  It just was -- I was -- I was at work

15  whenever she would call, I would have to leave out

16  the office to go into the stairwell -- the stairwell

17  to speak with her.  So, yeah, it was -- I was

18  annoyed.

19      Q    And you told her that you wanted her to

20  stop calling you; is that correct?

21      A    She asked if I -- she asked would I prefer

22  that, and I told her, yes.

23      Q    And you also told her that you didn't want

24  her to text you either; is that correct?

25      A    Yes, that's correct.

1      Q    And Ms. Jackson told you again, that if

2   Mr. Crossley didn't plead guilty, you may have to

3   come to court to testify; is that correct?

4      A    Yes.

5      Q    And you told Ms. Jackson that you really

6   didn't want to come to court to testify; is that

7   correct?

8      A    Yes.

9      Q    You mentioned in that clip that when the

10  cops came, Vernon Crossley was saying a couple of

11  things to the cop that probably made the situation a

12  lot worse than it really was.  What were you

13  referring to there?

14     A    The way that he was talking to the cop,

15  like his demeanor, the way -- the things that he was

16  saying -- was saying to the cops, I felt it was

17  disrespectful.

18     Q    What was he saying to them?

19     A    Yeah, I don't -- I don't remember exactly

20  what -- I don't remember exactly.  I do know that he

21  was being disrespectful.

22     Q    Was he yelling at them?

23     A    I could hear him from inside, from where

24  he -- you know, from outside where they -- where him

25  and that cop was standing.

```
 1     Q    The video clip that I just played for you,
 2  do you recall when that video interview was
 3  recorded?
 4     A    No, I don't.
 5     Q    Do you know what year it was?
 6     A    It was 20 -- 2017.
 7     Q    Do you know when this lawsuit was filed?
 8     A    I don't remember when.
 9     Q    If the records reflect that it was
10  October 2017, does that sound correct to you?
11     A    Yes.
12     Q    Did you give that video interview before
13  or after the lawsuit was filed?
14     A    I don't remember.
15     Q    Who was interviewing you?
16     A    I believe her name was Anna.
17     Q    How many people were there?
18     MS. MIKKILINENI:
19          Counsel, can you clarify that you're still
20  referring to the video clip that you played her and
21  who -- can you just refer -- you're sort of asking
22  very vague questions.  Can you just clarify to what
23  you're referring?
24     MR. PAUL:
25          That's correct.  I'm referring to the
```

 1      A     Yes, I'm pretty sure I did.

 2      Q     Which number would Ms. Jackson call you

 3  on?

 4      A     My cell phone.

 5      Q     Did she ever call you on a different

 6  number?

 7      A     Not that I'm aware of.

 8      Q     You mentioned before Ms. Jackson would

 9  inform you about different court proceedings that

10  were coming up in Vernon Crossley's case; is that

11  correct?

12      A     Yes.

13      Q     Do you recall ever being informed about a

14  trial date for Mr. Crossley?

15      A     No.

16      Q     So you never got a voice mail or text

17  message telling you the date set for trial?

18      A     Not that I recall.

19      Q     Do you think you would recall that if you

20  had?

21      A     Yes.

22      Q     So you never got a voice mail or text

23  message telling you that you need to be in court for

24  a trial date; is that correct?

25      A     Yes.

```
1        MS. MIKKILINENI:
2            I think you need to clarify the question,
3    Counsel.  You asked a compound question there.  Can
4    you just repeat your question so that it's clear?
5        MR. PAUL:
6            It's okay.  I got it.
7    BY MR. PAUL:
8    Q    I'm going to play another portion of this
9    video for you.
10           (Video played of Renata Singleton.)
11       UNIDENTIFIED SPEAKER:
12           Well, could you tell us about when was the
13   first time you saw a subpoena you had your -- or you
14   heard anything about a subpoena.
15       MS. RENATA SINGLETON:
16           So one day I -- I remember coming home and
17   I will always come home after my youngest son.
18   Like, he will always be the first person in the
19   house, and he's, like, obsessed with checking the
20   mail and stuff, so I will have to -- most of the
21   time I go up to his room, like, I will always find
22   the light bill.  So I kind of stop things from
23   coming, had everything setup to be paperless, like,
24   to go straight to my e-mail instead.
25           But one day there was -- I came home from
```

1   work and there was a piece of paper that was folded

2   up, and I'm guessing it was in the door, and when he

3   opened the door, it kind of slid to the middle of

4   the living room floor, and I kind of when I came

5   home was like, what is that, but just didn't pay --

6   pay it any mind.

7           And maybe later that day or the next day,

8   maybe, I picked it up, and it was -- I'm guessing it

9   was a subpoena, but like, it didn't look official

10  like, and when I asked my friend about it, she was

11  like they're going to have to serve you, so it's

12  probably just a notice telling you that the court

13  date is coming up, but they going to serve you, you

14  know, like official papers to let you know to come

15  to court.

16          (Video ended of Renata Singleton.)

17  BY MR. PAUL:

18      Q    Ms. Singleton, is everything that you said

19  in that clip I just played for you accurate?

20      A    Yes.

21      Q    So one day you came home and found a piece

22  of paper on your living room floor; is that correct?

23      A    Yes.

24      Q    And you assumed that it must have been in

25  your door and had fallen on the floor when your son

RENATA SINGLETON on 09/03/2020

58

 1  opened the door; is that correct?

 2      A    Yes.

 3      Q    And later that day or the next day you

 4  picked up the paper and you looked at it; is that

 5  correct?

 6      A    Yes.

 7      Q    You asked your friend about that document?

 8      A    Yes, I did.

 9      Q    Who was the friend that you talked to?

10      A    Her name is Kenyatta.

11      Q    Why did you ask her about it?

12      A    She -- she's a police officer.

13      Q    So you believed that she would have been

14  familiar with subpoenas?

15      A    Yes.

16      Q    Did you take a picture and send it to her

17  -- strike that.

18           Did you take a picture of the document and

19  send it to her?

20      A    I don't remember.  I -- I showed it to

21  her.

22      Q    And your friend -- after you showed it to

23  her, your friend told you they're going to have to

24  serve you, so it's probably just a notice telling

25  you that the court date is coming up; is that

1  correct?

2       A     From what I -- yes, from what I remember.

3       Q     What was the court date on the document?

4       A     I don't remember.

5       Q     But your friend told you they're going to

6  serve you official papers to let you know to come to

7  court; is that correct?

8       A     Yes.

9       Q     So was it your understanding that you did

10 not have to comply with that document because you

11 were not properly served?

12      A     I -- like, I was -- I was just confused.

13 I didn't know exactly where it came from or, you

14 know, how it ended up on my living room floor.

15      Q     Did you do any research -- did you do any

16 research of your own to see whether you would have

17 to be properly served?

18      A     I believe I did.

19      Q     What did you do?

20      A     Well, also, I -- like my line of work, I

21 have been served with court documents several times,

22 so I was a little familiar with the process.

23      Q     Did you do research on Google to find out

24 whether you would have to be properly served?

25      A     It's possible.

1      Q    Let me -- let me play a portion of the
2  video clip for you again.
3           (Video played of Renata Singleton.)
4      MS. RENATA SINGLETON:
5           I don't.  I don't.  I don't remember what
6  all it said.  All I remember is that when I got it
7  and I showed it to my friend, she like -- she was,
8  like, yeah, they going to have to serve you.  I
9  remember Googling, like, to see if they were, you
10  know, going to have to serve me.
11          And, like, I would get served all the time
12  at -- at KIPP because they would always come -- the
13  sheriff's office would always come to be bring
14  garnishments to the office, and like, I was just
15  waiting one day for them to show up and be like, you
16  know, this one is for you, but never happened.
17          (Video ended of Renata Singleton.)
18  BY MR. PAUL:
19      Q    So I'll stop there.  Does that refresh
20  your recollection about searching on Google to see
21  whether you would have to be served?
22      A    Yes.  Yes, it does -- it don't.  Like, I
23  don't remember, but -- I don't remember at this time
24  physically doing it, but I know I Google all the
25  time, so it was possible.

```
 1      Q     So based on your knowledge and your

 2  experience and whatever research you did, what was

 3  your conclusion as to whether you would have to be

 4  properly served in order for that document to be

 5  effective against you?

 6      A     That -- that I would be getting served

 7  soon.

 8      Q     But that's -- that's not quite what I

 9  asked.  I'm asking what was your understanding of

10  the effectiveness of the document that was actually

11  served to you?  Did you believe that was something

12  that you had to comply or obey with at the time?

13      A     Wait.  Restate the question.  I'm sorry.

14      Q     So the -- do you believe that you had not

15  been properly served with that document that you got

16  that we were just discussing?

17      A     Oh, yes, yes.  The paper, the -- the -- I

18  remember the paper, it was -- it just wasn't

19  professional.  It was cut off, it -- like the print,

20  like, I remember, like, it being real distorted.

21  Like it just -- yeah, there wasn't any seals on it.

22  It was just like somebody copied something and then

23  left it there.

24      Q     So was it your understanding that you did

25  not have to obey with that document; you did not
```

```
 1   have to comply with that document?

 2        A    Yes.

 3        Q    Do you recall what the document ordered

 4   you to do?

 5        A    I don't remember.

 6        Q    Whatever the document ordered you to do,

 7   is it fair to say that you didn't do it?

 8        A    Yes.

 9        Q    Did the document actually have the word

10   subpoena on it?

11        A    I don't remember.

12        Q    After your friend told you that the

13   document was probably just a notice and that you

14   would have to be formally served, did you

15   essentially put it out of your mind?

16        A    I did.

17        Q    Did you talk to a lawyer about it?

18        A    No.

19        Q    Did you talk to anyone else about it other

20   than your friend?

21        A    Not that I remember.

22        Q    Did you feel like you were going to get in

23   trouble if you didn't respond to it?

24        A    No.

25        Q    So this document that we've been
```

63

 1  talking -- been talking about, was this the first

 2  subpoena that you recall receiving?

 3      MS. MIKKILINENI:

 4          Objection to the characterization as a

 5  subpoena.

 6  BY MR. PAUL:

 7      Q    Let's put aside for a second whether it

 8  was a subpoena or not.  Is this the first document,

 9  whether it was a subpoena or appeared to be a

10  subpoena, okay, is that the first one?

11      MS. MIKKILINENI:

12          Again, I'm going to object to the

13  characterization of this appearing to be a subpoena

14  or being a subpoena.

15  BY MR. PAUL:

16      Q    You can answer.

17      A    Restate the question.  I'm sorry.

18      Q    Sure.  This document that we've just been

19  discussing, was that the first document that you

20  received that was a subpoena or appeared to be a

21  subpoena?

22      A    Yes.

23      Q    When did you receive it?

24      A    I don't recall.

25      Q    Was it before -- was it before or after

1  you started working at KIPP?

2      A    Oh, it was -- it was after.

3      Q    Do you know about how long after?

4      A    Yeah, I don't remember.

5      Q    You started at KIPP in January 2015; is

6  that right?

7      A    Yes.

8      Q    Was it in the earlier part of the month?

9      A    That I --

10     Q    That you started working at KIPP?

11     A    Yes, it was January the 7th.

12     Q    So when you received this first document,

13 was it more like a week after that?  Was it more

14 like two month after?  Do you have any -- any sense

15 of how it relates to when you start working at KIPP?

16     A    No, I don't -- I don't -- yeah, I don't

17 relate it to working my -- you know, starting my job

18 there.

19     Q    Did you receive any other documents at

20 your house, whether they were subpoenas or something

21 else, documents about Vernon Crossley's case?

22     A    No.

23     Q    So you never received any other subpoenas?

24     A    Yes.

25     Q    To make sure I'm clear, up until the

1   time -- between the time when Vernon Crossley was

2   arrested up until the time when you were arrested,

3   you're saying that you only received one subpoena at

4   your house?

5       A    Two.  Well, one subpoena and that notice.

6       Q    We'll call it a notice.  So the notices

7   what were -- we were just discussing, that's the

8   document that you're calling a notice?

9       A    Yes, the paper that was found in the

10  living room.

11      Q    Okay.

12      A    Yes.

13      Q    And what's the subpoena that you were

14  talking about?

15      A    My son -- my oldest son received the

16  subpoena.  He say it was May -- it was like the day

17  before or a -- the day -- it was the day before the

18  cops came to my house, which was the day before I

19  was arrested.

20      Q    So that was late May, correct?

21      A    Yes.

22      Q    So let me be more clear of that date.  Do

23  you recall receiving other notices like the one that

24  we discussed or different?

25      A    No.

```
 1      Q    So you recall receiving one notice at a
 2  date that you can't remember, and you recall
 3  receiving a subpoena in late May?
 4      A    Yes.
 5      Q    And as far as you can recall, there were
 6  no other documents about Vernon Crossley's case that
 7  you received?
 8      A    That's correct.
 9      Q    I think you said something a minute ago
10  about the notice.  You said it looked like there
11  was -- it looked like it was copied or something
12  like that.  Can you explain what you meant.
13      A    So, like, it just -- it wasn't like --
14  yeah, it looked like it was a copy of something else
15  that was cut off, and, like, I remember, like,
16  the -- the -- like even the way that it was centered
17  on the piece of paper wasn't like -- it just didn't
18  look like something that would have came from a
19  courthouse, a judge.  It just wasn't professional or
20  official looking.
21      (Exhibit 2 was marked for identification.)
22  BY MR. PAUL:
23      Q    I'm going to show you a document marked as
24  Exhibit 2.  Can you see this?
25      A    Yes.
```

```
 1      Q    This was A8 in the documents I sent you
 2  this morning.  I believe it's a document that was
 3  produced by your counsel yesterday.
 4      MS. BOYKIN:
 5          If you can see it you can go ahead.
 6  BY MR. PAUL:
 7      Q    Can you see it on the screen here?
 8      A    Yes, I can see it.
 9      Q    Is this a copy of the subpoena that you
10  received in late May?
11      A    It looks -- yeah, it looks familiar.
12      Q    Do you -- based on everything you know, do
13  you believe this is the copy of the subpoena that
14  you received in late May?
15      MS. MIKKILINENI:
16          Objection.  Asked and answered.
17  BY MR. PAUL:
18      Q    You can answer.
19      A    It looks similar.  I feel like something
20  is missing, though, like -- like it was more
21  verbiage on the -- on the paper.
22      Q    So is it fair to say that you're not sure
23  whether this is a copy of the one that you received
24  in May?
25      A    Yes.
```

```
 1        (Exhibit 3 was marked for identification.)

 2   BY MR. PAUL:

 3       Q    I'm going to show you another document

 4   that's marked as Exhibit 3.  This is A9, in what I

 5   sent this morning.  Can you see the document?

 6       MS. BOYKIN:

 7            Can you just give me the Bates stamps on

 8   the -- on the document.

 9       MR. PAUL:

10            Yes, it is INDEF01474.

11   BY MR. PAUL:

12       Q    Can you see it clearly, Ms. Singleton?

13       MS. MIKKILINENI:

14            I think you might need to zoom in.

15       THE WITNESS:

16            Yes, I have a copy in front of me.

17   BY MR. PAUL:

18       Q    This is a document showing that on

19   March 6, 2015, Tyrone Vail with the sheriff's office

20   made a third attempt to serve you with a subpoena

21   and left the subpoena in the door of your house.  Do

22   you have any reason to dispute that that's true?

23       MS. MIKKILINENI:

24            Objection.  Speculation.

25   BY MR. PAUL:
```

```
 1      A     Yeah, I -- I don't.  I don't know.

 2      Q     Are you aware that on April 23rd, Tyrone

 3 Vail made a third attempt to serve you with a

 4 subpoena and left a copy of that subpoena in the

 5 door of your house?

 6      MS. MIKKILINENI:

 7           Same objection.

 8      THE WITNESS:

 9           I don't know.

10 BY MR. PAUL:

11      Q    Do you have any reason to dispute that

12 claim?

13      MS. MIKKILINENI:

14           Same objection.  I have a continuing

15 objection to this whole line of questioning.

16      THE WITNESS:

17           I don't know.

18 BY MR. PAUL:

19      Q    Are you aware that on April 29th, 2015,

20 Tyrone Vail made a third attempt to serve you with a

21 subpoena and left a copy of the subpoena in the door

22 of your house?

23      A    I don't know.

24      Q    Do you have any reason to dispute that

25 claim?
```

 1     MS. MIKKILINENI:

 2          Objection.  And, again, I'm going to just

 3   note that there's nothing in any of the documents or

 4   anything you've indicated to us where these

 5   documents were actually left, so I don't know how --

 6     MR. PAUL:

 7          That's not a proper objection.  Please let

 8   the witness answer.

 9     THE WITNESS:

10          I don't know.

11     MS. MIKKILINENI:

12          She can't answer the question because you

13   asked the question whether it left at her house.

14   BY MR. PAUL:

15     Q    Are you aware that on May 7th, 2015,

16   Tyrone Vail made a third attempt to serve you with a

17   subpoena and left a copy of the subpoena in the door

18   of your house?

19     A    And left where?

20     Q    In the door of your house?

21     A    I don't know.

22     Q    Do you have any reason to dispute that

23   claim?

24     A    I don't know.

25     Q    Did you ever find any documents from the

 1   DA's office stuck under the windshield of your car?

 2       A    No.

 3       Q    Do you believe that any subpoena or notice

 4   that you received was somehow improper?

 5       MS. MIKKILINENI:

 6            Objection.  That's an ambiguous question.

 7   What do you mean by improper?

 8   BY MR. PAUL:

 9       Q    You can answer.

10       A    Repeat the question, please.

11       MS. MIKKILINENI:

12            Yeah.  And I'm also going to object to the

13   characterization of any document as a subpoena.

14   BY MR. PAUL:

15       Q    Do you believe that any subpoena or notice

16   that you received was somehow improper?

17       A    Well, I guess, yes, the -- the notice that

18   I found in the living room.

19       Q    Why do you believe that was improper?

20       MS. MIKKILINENI:

21            Objection.  We don't know what you mean by

22   "improper."

23   BY MR. PAUL:

24       Q    You can answer.

25       A    Because I felt it just wasn't -- it

```
 1  wasn't -- it just didn't look like a official -- it
 2  looked like a -- like a notice, like a memo or...
 3      Q   Do you believe that it was illegal?
 4      MS. MIKKILINENI:
 5          Objection.  Calls for her to make a legal
 6  conclusion.
 7  BY MR. PAUL:
 8      Q   You can answer.
 9      A   Yeah, the -- yeah, I don't -- I don't
10  know.  I didn't -- I don't think I felt like it was
11  illegal.  I just felt like it wasn't the official
12  document.
13      Q   Did you believe that it was fraudulent?
14      MS. MIKKILINENI:
15          Objection.  Calls for a legal conclusion.
16  BY MR. PAUL:
17      Q   You can answer.
18      A   No, I didn't think it -- I didn't think it
19  was fraud.  I just thought, like, it wasn't official
20  or professional, like I stated.
21      Q   You just told me you believed it was
22  proper -- strike that.
23          You just told me you believed it was
24  improper because it didn't look official, and do you
25  believe it was improper for any other reason?
```

```
 1      A    Well, just the -- just the confusion
 2  around how it ended up in my living room.
 3      Q    Can you explain what you mean?
 4      A    That I didn't know where the document came
 5  from.  Like I said, it just appeared in the living
 6  room.
 7      Q    Do you have a copy of that notice that you
 8  received?
 9      A    I don't.
10      Q    Do you know what happened to it?
11      A    I'm not sure.  Yeah, I'm not sure what
12  happened to it.
13      Q    Did you throw it away shortly after you
14  got it, or did you save it?
15      A    Yeah, I don't remember.
16      MS. BOYKIN:
17           I'm sorry.  Something had popped up on my
18  screen.  Okay.  We're good.
19  BY MR. PAUL:
20      Q    Do you have any sort of file for documents
21  relating o Vernon Crossley's case and your arrest?
22      A    No.
23      Q    You have no documents, like, at your home
24  concerning Vernon Crossley's case and your arrest?
25      A    No.
```

1      Q      Did you ever have a file containing those

2   things?

3      A      I didn't have a file.  I had the subpoena

4   and I had, like, paperwork from when -- like when I

5   was arrested, and whatever I got from the courthouse

6   that day.

7      Q      That's what I'm asking about.  Is that --

8   do you still have that file?

9      A      No, I don't.

10      Q      What happened to it?

11      A      I don't -- I don't know.

12      Q      When was the last time you had it?

13      A      The last time I -- I want to say 2017,

14   maybe.

15      Q      Did you provide the documents in that file

16   to your lawyers in this current case?

17      A      Yes, I believe I -- I believe I -- I

18   believe they asked for it and I think I -- I

19   remember -- I don't remember -- I remember finding

20   it, and I don't remember if I gave her the official

21   document or I gave her a copy of it.

22      Q      But there was no copy of this notice in

23   that file?

24      A      Of which notice?

25      Q      Of the notice that you received before you

1  received the subpoena that we've been talking about?

2      MS. MIKKILINENI:

3          I think you need to clarify that.

4  BY MR. PAUL:

5      Q    The notice that you received at your house

6  that we've been talking about that you asked a

7  friend about, I'm just saying, was that -- was there

8  a copy of that notice in the file that you gave to

9  your lawyers?

10     A    I don't -- I don't think so.  I don't

11 remember.  I don't remember still having it.

12     MR. PAUL:

13         Would y'all like to take a break for

14 lunch?

15     MS. MIKKILINENI:

16         Sure.  We would like to take a break.  How

17 long do -- how long should we take?

18     MR. PAUL:

19         Is 45 minutes long enough?

20     MS. MIKKILINENI:

21         Yeah.  Liv, you want to check in with

22 Ms. Singleton and see if that is okay?

23     MS. BOYKIN:

24         Yeah.  Off the top, I think that will

25 work.

1      MR. PAUL:

2           We can make it a little longer if you

3  like, it's fine with me.

4      MS. MIKKILINENI:

5           I think 45 minutes should be fine, yeah?

6      MS. BOYKIN:

7           Yeah.

8      MR. PAUL:

9           So back at 12:45 unless we hear otherwise.

10               (Lunch recess.)

11  BY MR. PAUL:

12     Q    Ms. Singleton, so at some point a police

13  officer had come to your house to arrest you?

14     A    Yes.

15     Q    When was that?

16     A    That was -- that was the night before I

17  was actually arrested.

18     Q    Do you recall what date it was?

19     A    I don't recall the specific date.  I want

20  to say somewhere between May 27th and May 29th.

21     Q    What time of day was it when they came?

22     A    It was -- it was night.

23     Q    So it was dark?

24     A    Oh, yes, it was dark.

25     Q    Were they from the New Orleans Police

```
 1  Department?

 2       A    Yes.

 3       Q    You're sure they were not from the

 4  sheriff's department?

 5       A    I'm pretty sure they -- that it was NOPD.

 6       Q    How many police officers came?

 7       A    Two officers.

 8       Q    What were their names?

 9       A    I don't -- I don't -- I don't know their

10  name.

11       Q    What did they look like?

12       A    African American cops.

13       Q    Male or female?

14       A    Males.

15       Q    Were they old, young?

16       A    Yeah, it -- yeah, it was -- I would say

17  maybe between 30 and 40, maybe.

18       Q    What kind of haircut did they have?

19       A    I don't recall.

20       Q    So what happened when they showed up at

21  your door?

22       A    When -- well, when they knocked, I opened

23  the door, and they asked who all was home, and I

24  told them who was there.  And they asked if I could

25  go put on some clothes because I -- I was in my
```

1   night clothes and asked for me to go change.

2           And I went change, I came back to the

3   door, and by this time my oldest son was at the

4   door, and they asked that I walk away from the house

5   with them, like, closer to where the -- the police

6   car was parked.

7       Q    Did they tell you that there was a warrant

8   out for your arrest?

9       A    Yes.

10      Q    Did you tell them that you had received a

11  subpoena to appear in court in a few days?

12      A    Yes, I did.

13      Q    Did you tell them you were planning to

14  show up in court?

15      A    Yes, I was.

16      Q    Was that true?

17      A    Yes, it was.

18      Q    So at that point either you or your sister

19  called your friend Kenyetta; is that correct?

20      A    Somewhere during the time I was out there

21  my sister pulled up.  Like, at some -- at some -- I

22  went inside to retrieve my purse to get the subpoena

23  to show to them, and I recall when I came back out

24  the door, like, my sister and the younger kids

25  were -- including her kids, were approaching the

```
 1  house.
 2      Q    Did someone call your friend Kenyetta to
 3  come over to the house?
 4      A    Yes, my sister.
 5      Q    And she worked for NOPD at the time?
 6      A    Yes.
 7      Q    What happened when she got there?
 8      A    She asked what was going on.
 9      Q    Let me play a clip for you here for one
10  second.
11      MS. MIKKILINENI:
12          And, Counsel, can you just identify what
13  it is you're playing and whether it's been produced.
14      MR. PAUL:
15          I'm playing another clip from this
16  interview that was produced by the plaintiffs.
17      MS. MIKKILINENI:
18          Great.  Thank you.
19          (Video played of Renata Singleton.)
20      MS. RENATA SINGLETON:
21          At the time working -- still working as a
22  cop but, what, RTA, so she was a little more mobile
23  and then -- but I knew, like, she had worked this
24  area a of couple years back when she was first
25  started, and was familiar with a lot of the
```

```
 1  officers.
 2          So when called the -- at first they were
 3  like, well, who are you calling, and I told them,
 4  and they were like -- but then when she showed up
 5  they were like, oh, yeah, I know her.  So they went
 6  to talking and laughing and joking, and like she
 7  went to telling them, like, you know, y'all can't do
 8  this, you know, this is my friend and, like, I
 9  promise, like, I will bring her myself to the DA
10  office.  So I --
11          (Video ended of Renata Singleton.)
12  BY MR. PAUL:
13      Q    Ms. Singleton, is everything in that clip
14  I just played accurate?
15      A    Yes.
16      Q    The police officers who showed up at your
17  house to arrest you knew your friend Kenyetta; is
18  that correct?
19      A    Yes.
20      Q    And you said before that -- that when your
21  friend showed up, she was laughing and joking with
22  the police officers who were there; is that correct?
23      A    More -- more so, like, when she got out
24  the car, like, oh, I know her because, like, when I
25  mentioned who we were calling, they were, like, no,
```

1  we don't know her.  And when she pulled up, they was

2  like, oh, yeah, okay, like, I do know her.

3     Q    When your friend Kenyetta told the other

4  police officers that's my friend, you can't do this;

5  is that correct?

6     MS. MIKKILINENI:

7          Objection.  That's -- I don't think that's

8  an accurate representation of the clip.

9  BY MR. PAUL:

10    Q    Is that correct, Ms. Singleton?

11    A    No.  I think what was being said, from

12 what I interpret from what she was saying, was that,

13 like, I know this -- I know her, I know the

14 situation, and I know that she have planned on going

15 to court, that she got the subpoena.

16    Q    You're saying in your video, in the clip

17 that we just played, you said -- your friend said

18 you can't do this, that's my friend.  Is that -- is

19 that a paraphrase of what she said?  Is that -- is

20 that what she actually said to them?

21    MS. MIKKILINENI:

22          Objection.  Yeah, objection.  I'm not --

23 I'm just not sure that that's an accurate portrayal

24 of the clip.  You can replay the clip, but...

25    MR. PAUL:

```
 1              Let's do it.
 2              (Video played of Renata Singleton.)
 3      MS. RENATA SINGLETON:
 4              -- this area of couple years back when she
 5   was first started, and was familiar with a lot of
 6   the officers.
 7              So when we called the -- at first they
 8   were like, well, who are you calling, and I told
 9   them, and they were like -- but then when she showed
10   up they were like, oh, yeah, I know her.  So they
11   went to talking and laughing and joking, and like
12   she went to telling them, like, you know, y'all
13   can't do this, you know, this is my friend.
14              (Video ended of Renata Singleton.)
15   BY MR. PAUL:
16      Q    Is it correct that your friend Kenyetta
17   told the police, you can't do this, this is my
18   friend?
19      A    That was a paraphrase.
20      Q    What did she actually tell them?
21      A    I don't remember verbatim what -- what
22   exactly she said to them, but it was along the line
23   like, I know her, I know this, the -- the case.  I
24   know what's going on, I -- I can guarantee you
25   that -- like, pretty much, like, she was there for
```

1   support and just was begging them not to arrest me

2   in front of my kids.

3       Q    And she promised the -- she promised the

4   officers if they did not arrest you, she would bring

5   you to the DA's office the next morning; is that

6   correct?

7       A    She said that she would come with me to

8   the DA's office the next morning and she did.

9       Q    Did someone call the DA's office?

10      A    One of the cops walked away from -- well,

11  of course, they were, like -- like -- we have a

12  warrant to pick her up.  Like there is nothing,

13  like, they could do about it, and after a while, one

14  of them said, let me call the DA, and he walked away

15  from where we were standing, and he made a phone

16  call.

17      Q    And what happened then?

18      A    A few minutes later he came back and he --

19  he said that they agreed to it.  He was, like, the

20  DA said that -- he was, like -- like, this is --

21  I'm -- I'm putting myself on the line, just make

22  sure you bring her in on tomorrow.

23      Q    He said he talked to someone at the DA's

24  office who said, you're putting yourself on the line

25  if you -- if you let her not come in here?  What --

```
 1      A    No.

 2      MS. MIKKILINENI:

 3           Objection.

 4      MR. PAUL:

 5           I'm not sure I understand.

 6      MS. MIKKILINENI:

 7           Yeah, you could just -- she can only

 8  testify as to what she knows, not what the cop was

 9  told.

10  BY MR. PAUL:

11      Q    Is that -- by what you just said?

12      A    Well, I --

13      MS. MIKKILINENI:

14           You can try to answer the question,

15  Ms. Singleton.

16      THE WITNESS:

17           Okay.  I need the -- I wanted the

18  question, again.  I'm sorry.

19  BY MR. PAUL:

20      Q    So you said one of the police officers

21  walked away and said he's going to call the DA?

22      A    Yes.

23      Q    And then came back and said -- and said

24  what?

25      A    And said that the DA agreed to let the --
```

 1  the -- Kenyatta bring me in the next morning.

 2      Q    What did he say about someone putting

 3  themselves on the line?

 4      A    No, that was -- he was saying that.

 5      Q    So the police officer was saying that who

 6  was putting herself on the line?

 7      A    He was, for asking the DA to believe that

 8  she would bring me to the DA office.  Basically

 9  saying, like, if she didn't do what she's saying

10  that she was going to do, like, it would be on him,

11  not the DA.

12      Q    Did he say anything about who he talked

13  to?

14      A    No.

15      Q    What happened the next morning?

16      A    The next morning, like, I got up and I

17  went to work, and as soon as I got there, I called

18  my manager into a conference room and explained to

19  her what was going on.

20      Q    What did she say?

21      A    Yeah, I don't -- I don't recall exactly

22  what she said, but basically she -- she allowed me

23  to leave work that day to take care of what I needed

24  to take care of.

25      Q    So at some point did you come to the DA's

```
 1  office?

 2      A    Yes, right after I left there I went to

 3  the DA's office.

 4      Q    About what time did you go?

 5      A    Yeah, I -- it was still pretty early in

 6  the day.  I don't remember a specific time.  Like it

 7  was -- it was maybe before noon.

 8      Q    So did you walk in the front door?

 9      A    Yes.

10      Q    There's a metal detector when you first

11  walk in; is that correct?

12      A    I don't remember.

13      Q    Do you remember anything about what you

14  saw when you first came into the office?

15      A    There was a receptionist desk when I

16  walked into my immediate right.

17      Q    Okay.  Was there someone sitting at the

18  desk?

19      A    Yes.

20      Q    Who was it?

21      A    I don't know.

22      Q    Can you describe the person?

23      A    I can't.

24      Q    Was it a man or a woman?

25      A    It was a male.
```

```
 1        Q     Did you speak to him?

 2        A     Yes.  Like we have to sign in and let him

 3   know who we -- who we were there to see.

 4        Q     What did you tell them?

 5        A     I believe I gave them the subpoena.

 6        Q     Did you tell them who you were there to

 7   see?

 8        A     Yeah -- I don't recall.

 9        Q     Did you know who you were there to see?

10        A     Not at that time, I don't think.  I don't

11   think I was aware of who I was supposed to see.  It

12   was just like the DA, like, that's -- that's all.

13        Q     So you showed him the subpoena and said

14   I'm here about the subpoena or something like that?

15        A     Yeah, something of that nature.

16        Q     And what happened then?

17        A     He said have a seat.

18        Q     And did you?

19        A     I'm sorry?

20        Q     Did you --

21        A     Huh?

22        Q     Did you have a seat?

23        A     Oh, yes, yes.

24        Q     What happened after that?

25        A     We sat there for a while, maybe 30
```

1    minutes, 30, 40 minutes.

2        Q    And then what happens?

3        A    And then Mr. Arthur came down the steps

4    to -- and approached where we was sitting.

5        Q    So did he introduce himself to you?

6        A    Yes.

7        Q    What was his name that he told you?

8        A    I'm sorry?

9        Q    What was his name that he told you?

10       A    Arthur Mitchell.

11       Q    And what happened after that?

12       A    He led us upstairs to, like, a conference

13   room.

14       Q    Do you recall which floor that was on?

15       A    Second floor.

16       Q    How big of a room was it?

17       A    It was a nice size room.  There was a

18   table that probably sits, roughly, 10 to 15.

19       Q    Was there anybody else in the room?

20       A    Not in the beginning.

21       Q    Did you and Mr. Mitchell -- was your

22   friend still with you at that point?

23       A    Yes, she was.

24       Q    What happened then?

25       A    Once we were in the room -- yeah, like, I

 1  don't remember exactly how the conversation started.

 2  I still had the subpoena, and I gave it -- I showed

 3  it to him, and I was -- like, at the time, I -- I

 4  know I remembered a lot better than I do now that

 5  that subpoena was even -- either served that -- that

 6  day before the officer arrived and it was for a

 7  court date the following week.  And, like, yeah, I

 8  was just asking, like, why was I being arrested.

 9       Q    And did he tell you why you were being

10  arrested?

11       A    Yes.

12       Q    Why did he say you were being arrested?

13       A    He said I was hiding from the DA's office.

14       Q    Did he start asking you questions about

15  the incident with Vernon Crossley?

16       A    Not right away.

17       Q    So what -- what happened before then,

18  before he started asking you questions about

19  Mr. Crossley?

20       MS. MIKKILINENI:

21            Objection.  And you need to clarify your

22  time line.

23  BY MR. PAUL:

24       Q    And talking about, you're sitting in the

25  room with Mr. Mitchell.  He hasn't started asking

1  you questions about Vernon Crossley.  What was --

2  what were you talking about?

3      A    The conversation was centered -- centered

4  around the police that showed up at my house to

5  arrest me the night before.

6      Q    What do you recall about what was said by

7  either of you?

8      MS. MIKKILINENI:

9          Can you clarify, Matt, who you're talking

10 about because there are multiple people in this

11 room -- in the room that your -- for this

12 conversation.

13 BY MR. PAUL:

14     Q    Mr. Mitchell and you, Ms. Singleton?

15     A    So what -- what were we talking about, was

16 that the question?

17     Q    Yes.

18     A    That we were talking about the arrest the

19 night before, well, the attempted arrest the night

20 before.

21     Q    And what do you recall about what was said

22 by each of you?

23     A    I recall asking questions at some -- at

24 some time in the conversation, Kenyetta asked

25 something along the line, like, why was the police

 1  sent to pick her up, and he immediately asked, like,

 2  do you have anything to do with this case, and she

 3  was, like, I'm her friend, I'm here for support, and

 4  he was, like, well, if you don't have anything to do

 5  with it, I'm going to ask that you leave the room.

 6      Q    What else do you recall about what was

 7  said?

 8      A    Once she left, the conversation went to --

 9  so, like, I told him, like, we got, you know, -- I

10  got the paper, I got the subpoena, and like I had

11  every intention on coming to court, and he said

12  that, oh, we have been trying to contact you, and

13  I'm like, well -- oh, no, he was like, you never

14  answer the phone.

15           So at that time, I was like, I talked to

16  Ms. Jackson a couple of times, and he said like --

17  like he said something like as if Ms. Jackson never

18  talked to me at all.  So he was like, yeah, we been

19  calling you and coming out to your house, and I

20  asked, at that time, I was like, well, what number

21  are you calling, and he gave me that house number

22  which I -- you know, I knew was the house number at

23  the time, and I said to him, like, that's not the

24  number that Ms. Jackson and I have spoke on several

25  times we have talked, and it was like -- he was like

```
 1   real dismissive.

 2          And he say -- he said that him and someone

 3   else was outside my house one night -- well, one

 4   evening for hours, that they knew that I was inside

 5   the house, and they were knocking and I wouldn't

 6   open the door.  And he could hear me -- he said I

 7   knew you were in there because I could hear -- I

 8   could hear you talking.

 9          So I was like, so I'm hiding from you and

10   not opening the door, but I'm talking to where you

11   can hear me still talk?  And he was like, yes.  And

12   he said that we left a subpoena on your car.  So I

13   asked him, which car did you leave the subpoena on,

14   if he remembered.  And, yeah, he didn't -- he didn't

15   remember, like, which car it was.  Like your car,

16   and I was like, okay, well, which car is my car?

17          And, like, most of the time, like, he just

18   was real dismissive.  Like it didn't matter, like,

19   what I said to him to say, like, I got the subpoena,

20   I was coming to court.  It was like, yeah, you been

21   hiding from us.

22     Q    Was it true about you being at home when

23   they were trying to knock on your door and didn't

24   reach you?  As far as you know, is that true?

25     A    That -- that never happened.
```

1      MS. MIKKILINENI:

2           Objection.  It calls for speculation.

3  BY MR. PAUL:

4      Q    You said that never happened?

5      A    Not that I'm aware of.  I didn't have a

6  reason not to open the door if someone knocked; and,

7  furthermore, I would not be inside my house talking

8  where I know the person outside the house could hear

9  me speak if I'm hiding, like, that didn't make sense

10  at all to me.

11     Q    Was there any time around April 20th or

12  April 21st, 2015, when you were at home and someone

13  was knocking at your door and you did -- you would

14  not come to the door?

15     A    That never happened.

16     Q    Give me one second to change my lights.

17          At some point in your conversation with

18  Mr. Cross -- with Mr. Mitchell, he started asking

19  you about Vernon Crossley; is that correct?

20     A    Yes.

21     Q    And do you recall what he asked you?

22     A    He -- yeah, he just -- I think he was,

23  like, well the night of -- like, the night of

24  November 2nd or whatever the date was and, like, he

25  proceed -- like, I don't remember the exact question

 1  that he asked me.

 2      Q    Did you tell him that you didn't want to

 3  answer any questions without a lawyer present?

 4      A    Yes, I asked for a lawyer.

 5      Q    So you did tell him you didn't want to

 6  answer any questions without a lawyer present?

 7      MS. MIKKILINENI:

 8           Asked and answered, Counsel.

 9      MR. PAUL:

10           It was not clear.

11  BY MR. PAUL:

12      Q    Did you tell him that you didn't want to

13  answer any questions without a lawyer present?

14      A    I asked to have a lawyer.  Like, my friend

15  was out the room, it was just between, like, all the

16  things that he was saying to me that it wasn't

17  making sense, so I didn't know at that -- I was

18  confused.  I didn't know what to believe, what was

19  going on, like, I felt like I was being railroaded.

20      Q    I'm just asking, did you say, I don't want

21  to answer any questions without a lawyer present?

22      A    Yes, I asked for a lawyer.

23      Q    I hear what you're saying.  I'm saying,

24  did you also say I'm not going to answer any

25  questions without a lawyer present?

1      A    I don't recall saying that.  I recall

2    asking for a lawyer.

3      Q    Did you answer any questions about

4    Mr. Crossley?

5      A    No, I didn't.  I didn't answer any

6    questions.

7      Q    So at some point did other people come

8    into the room?

9      A    Yes.

10     Q    Who came into the room?

11     A    There was a white female and two white

12   males.

13     Q    Can you describe the two white males?

14     A    One of them had on a dark colored Polo

15   type shirt.  He was roughly late 40s, early 50s

16   maybe.  I want to say like late 40s.  Like he

17   wasn't, like, obese like, but he wasn't thin or

18   frail.  He had, like, you know, like, a decent

19   amount of weight on him.

20     Q    He was wearing a dark colored Polo?

21     A    Yes, Polo type shirt.  You know, like a

22   pull over with the three buttons.

23     Q    Did he wear any kind of uniform, I guess,

24   any sort of markings on him of being an official

25   person?

```
 1      A    Yeah, it did -- it did -- I don't remember
 2  exactly what it was, but I did feel like that -- his
 3  shirt was like a -- a uniform type shirt.
 4      Q    Did it say anything on it, the shirt?
 5      A    Yeah.  I can't -- I don't remember.  Like,
 6  he sat on the same side the table with me, like,
 7  toward all the way to the end.  So, like, I seen
 8  him, you know, from my side view.
 9      Q    Did he have a gun?
10      A    Yes, he did have -- well, he had a holster
11  and like a -- yeah, I can't -- I can't -- I can't
12  say if he had a gun or not.  I know he had, like, a
13  walkie-talkie or a Nextel phone type stuff he
14  clipped to his belt or something.
15      Q    You said he had a holster for a gun but
16  you're not sure whether he actually had a gun?
17      A    Yeah, I don't -- I don't recall if --
18      MS. MIKKILINENI:
19           Objection.
20      THE WITNESS:
21           -- I was just seeing the gun.
22      MS. MIKKILINENI:
23           Objection.  I think you're misstating what
24  she said.
25  BY MR. PAUL:
```

1      Q     Who was the other white male?

2      A     I don't know, but he -- he appeared to

3   be -- he was older than the -- the other guy, so he

4   could have been in his mid 50s or -- he didn't say

5   much so, like -- really he didn't say anything, so

6   the guy with the Polo shirt said -- he talked when

7   he got in the room.

8      Q     So the other guy, what was he wearing?

9      A     I don't remember.

10     Q     Do you remember anything else at all about

11  his appearance?

12     A     No, I don't.

13     Q     Do you know what color hair he had?

14     A     I want to say that maybe, like, he had

15  some gray, not a whole head full of gray, but he had

16  maybe like mixed -- like a mixed color hair.

17     Q     You said a little bit of gray in his hair,

18  is that --

19     A     Yes.

20     Q     How about the first guy, what kind of hair

21  did he have?

22     A     Yeah, I don't -- I don't -- I don't

23  remember.  I want to say maybe darker.  I don't -- I

24  don't fully remember.

25     Q     He wasn't bald?

```
 1      A     Yeah, I don't -- I don't remember.  Like
 2  right now, I don't -- I can't vision his hair at
 3  all.
 4      Q     Did the second guy have a walkie-talkie or
 5  gun or anything like that?
 6      A     If he did, I didn't notice it.  I only
 7  noticed the first one because he pulled it out.
 8      Q     You said the first guy was the guy who did
 9  most of the talking?
10      A     Yes.
11      Q     What did he say?
12      A     He said, oh, I -- when -- I asked -- I
13  think I asked for the lawyer, and he said that,
14  Ms. Singleton, you don't need a lawyer, you're a
15  victim.
16      Q     That was -- that's the guy in the dark
17  Polo who said that?
18      A     Yes.
19      Q     What else did he say?
20      A     Yeah, I don't -- I don't recall.  I don't
21  recall what -- what exactly was said after that.  I
22  know when he said that I responded to him that I
23  didn't feel like a victim, and, yeah, I don't -- I
24  really don't recall what was said after that.
25  All -- because the next thing I do remember is him
```

 1  speaking into the -- the walkie-talkie or the

 2  Nextel, whatever it was, and saying that to send a

 3  unit.

 4     Q    Are those the actual words he said, send a

 5  unit?

 6     A    I need a unit, he said something, yes.

 7     Q    Did the white female say anything to you?

 8     A    She didn't say anything.  She sat on the

 9  same side of the table with Mr. Mitchell.  I

10  remember she didn't have -- she didn't have on the

11  same kind of uniform shirt.  She was dressed, like,

12  business casual.

13     Q    So what happened after the guy said send a

14  unit or something similar?

15     A    Like, within a few minutes, they put

16  the -- the police walked in and put the handcuffs on

17  me.

18     Q    Was that a uniformed police officer?

19     A    Yes.

20     Q    And what happened after that?

21     A    We walked -- we walked back downstairs,

22  and as we were exiting the building, Kenyetta walked

23  up and asked, like, what -- what was going on, like,

24  why y'all -- why -- why -- why she's still being

25  arrested.

```
 1        MR. PAUL:

 2             Let's take a very short break, about five

 3   minutes.

 4        MS. MIKKILINENI:

 5             Sure.

 6                     (Brief recess.)

 7   BY MR. PAUL:

 8        Q    Ms. Singleton, we were just talking about

 9   some events at the DA's office.  So at some point

10   after that, you were arrested; is that correct?

11        A    Yes.

12        Q    You recall what day of the week that was?

13        A    It was a Friday.

14        Q    Did you know who the judge was who was --

15   who was presiding over Vernon Crossley's case?

16        A    I didn't know her, no.

17        Q    You didn't know her?

18        A    No.

19        Q    So at the time you didn't know who the

20   judge was --

21        A    No.

22        Q    -- on the case?

23        A    No.

24        Q    Let me -- let me play another clip from

25   the interview that we -- that we played some other
```

```
 1      Q     And that was the time when she said, at

 2   this time the Court is going to be dismissing this;

 3   is that correct?

 4      A     Yes.

 5      Q     You recall that Judge Pittman said, "You

 6   are under no further bond obligations to the Court

 7   but I just want you to understand something.  If you

 8   are going to call the police to report an offense,

 9   make sure it's true and accurate.  If it is true and

10   accurate, you need to make sure that you appear at

11   any and all court proceedings involving it.  If you

12   are not going to do that, don't call, don't bother

13   the police.  Don't delay criminal proceedings as

14   you've done in this matter, which is why I had to do

15   what I had to do."

16           "We have been dealing with this matter for

17   some time, wasting my time, Mr. Moroz's time,

18   state's time, don't do it, okay?"

19      MS. MIKKILINENI:

20           I'm objecting because the document speaks

21   for itself.

22   BY MR. PAUL:

23      Q     "If you don't want to be bothered with it,

24   don't call NOPD.  Don't put us through this.  So, I

25   hope to never see you in the future under these
```

 1  circumstances."

 2          "Okay?  You've wasted your parents' money

 3  behind some foolishness that they shouldn't have

 4  even had to come up with a dime, okay?  I'm going to

 5  remind you you are an adult with children.  Your

 6  parents shouldn't even had to have come down here to

 7  spend one dollar on this foolishness.  If it wasn't

 8  the truth, go and tell them you committed perjury,

 9  then you can face the time and you face some

10  criminal charges.  So, the only thing I'm asking you

11  is, get yourself together."

12          "Don't put us through any of this

13  foolishness like this again.  You are free to go."

14          Does that accurately reflect what Judge

15  Pittman said to you on June 4th?

16      A    Yes.

17      MS. MIKKILINENI:

18          And I'm just going to object because the

19  document speaks for itself, but go ahead,

20  Ms. Singleton.

21      THE WITNESS:

22          Yes.

23  BY MR. PAUL:

24      Q    How did you feel when she said this -- how

25  did you feel when she said those things to you?

```
 1        MS. MIKKILINENI:

 2             Objection, irrelevant.  I'll put this on

 3   lodging objection because it's not clear that the

 4   document was quoted correctly, so this line of

 5   questioning is somewhat misleading.

 6   BY MR. PAUL:

 7        Q    You can answer.

 8        A    I felt that -- I felt that -- I felt the

 9   same way I felt when I went to the DA's office.  I

10   felt that no one wanted to hear -- no -- she never

11   asked me any questions.  I felt like no one wanted

12   to hear anything that I had to say.

13             I felt like it was established that I was

14   hiding.  There was no proof that I was hiding.  I

15   opened the door when the police knocked at my door

16   that night.  I opened the door numerous times during

17   that period.  Like, I didn't have a reason to hide.

18             I thought I would get served, and when I

19   got served, I intended on going to court, and I felt

20   like I was railroad, and before I could even appear

21   in court, I was in jail for days for something that

22   I felt like the day that I went to the DA's office

23   that it could have been corrected, but at that time,

24   I was already being accused of hiding and running,

25   and I have no way of knowing none of this -- not one
```

 1  of the events that happened, really happened.

 2          Like the paper you gave me today saying

 3  something about Tyrone was at my house, but Arthur

 4  Mitchell told me to my face that he was at my house.

 5  I don't see his name on -- on -- on this paper or

 6  anything else.  Like I just felt like it was all

 7  made up to -- to appear that I was hiding, and no

 8  one allowed -- gave me the chance to say anything.

 9          And I felt -- I felt -- I felt very

10  disrespected at the time that we were in court.

11  Yeah, I -- like, I just felt like it wasn't right.

12  It was -- I just thought it wasn't right at all, and

13  it's like no one asked me anything, no one -- it's

14  like, you calling the house phone or you left on the

15  car, it's like -- it just was so much confusion

16  about what was going on.

17          Like when I talked to Amy on the phone,

18  she -- she did -- she did say that if the court --

19  if it went to trial, I would have to go to court.  I

20  didn't say, like, I wouldn't show up.  Like I knew

21  that once I was served to go to court, like, I

22  didn't have a choice about the matter.  She also

23  said to me over the phone that if -- if Mr. Crossley

24  took a plea that I wouldn't need to go to court or

25  he -- or I wouldn't have to go to court, but they

```
 1   would want to call me and see if I agreed with what
 2   was being offered to him, and I told them whatever
 3   they decided was fine.
 4           Like, and I also told her on that last
 5   phone call, like, the last time we talked you stated
 6   that you didn't -- I didn't -- I didn't have a
 7   choice on what -- if this court proceeding
 8   continued, so I was like, I don't -- whatever you
 9   offer him, I don't want have to any say in it.  Like
10   whatever you need to do -- like pretty much just do
11   it.
12           Like so it wasn't about, like, me hiding
13   or trying not to go -- avoid going to court for any
14   reason, and it's like that's what was in they head,
15   and that's just what -- what they stuck with.
16           Like one -- one day Vernon's lawyer
17   knocked on my door, and I -- I didn't know who he
18   was from a can of paint, and I opened the door just
19   like I would any other time, and so I just don't
20   understand, like, how all these times, like, they're
21   saying they came to my house, like, they never was
22   able to get anyone.
23           And I wouldn't have told my three kids,
24   like, don't answer the door, don't do this, because
25   evidently my son eventually answered the door.
```

1      Q    Did you say before that you believed that

2    it was made up?

3      MS. MIKKILINENI:

4          Can we -- can we take a -- can we take a

5    break, a couple minutes.

6      MR. PAUL:

7          Let's finish this line of questions and we

8    can take a break.

9    BY MR. PAUL:

10     Q    Did you say before that you felt like it

11   was made up?

12     A    I felt like their perception of what

13   was -- was going on was made up.  It wasn't my true

14   feelings.  It wasn't what actually was happening.

15   It was what they perceived what was going on.

16     Q    You believed the sheriff's office actually

17   was not trying for over two months to serve

18   subpoenas on you at your house?

19     A    I don't -- I don't -- I don't know if

20   that's true or not.  All I know is I wasn't served,

21   and when I was served, I was going to court.  So as

22   far as leaving in the door -- like my mailbox is not

23   connected to a door.  There's a mailbox in front of

24   the house that, like, you stick something in the

25   door, like -- like how can I know that it was in the

1   door or on my car?  Like how would I know that it

2   was on -- like, it's just -- I don't know.  It's

3   just -- yeah.

4       Q    If you had had notice of the trial date

5   without being formally served, would you have gone

6   to the trial?

7       MS. MIKKILINENI:

8           Objection.  Calls for speculation, and

9   it's also a vague question.  I don't know what kind

10  of notice you're talking about.

11  BY MR. PAUL:

12      Q    You can answer.

13      MS. MIKKILINENI:

14          Can you clarify your question to ask -- to

15  clarify what kind of notice you mean?  Counsel, are

16  you going to clarify your question?

17  BY MR. PAUL:

18      Q    I'm asking -- you can answer the question.

19      A    What -- can you repeat the question?

20      Q    If you had known about the trial date but

21  you were not formally served, would you have shown

22  up at the trial?

23      A    Like, how would I have known about it

24  without being served?

25      Q    If you got informal notice that was not

```
 1   properly served?

 2        MS. MIKKILINENI:

 3             We are continuing objection to there being

 4   vagueness of this question.

 5   BY MR. PAUL:

 6        Q    Just, for example, if you had got a piece

 7   of paper at your door saying trial date on

 8   February 23rd, but it was not formally served, would

 9   you have appeared at the trial on February 23rd?

10        A    Yeah, I don't -- I don't -- I don't know

11   how to answer the question.

12        Q    You don't know whether you would have or

13   not?

14        A    No, I'm saying I don't know like --

15   like -- like I have stated, like, I was under the

16   impression that I would be served to go to court.

17   When the notice came, I thought that -- that the

18   serve -- like, I would be -- I would be served

19   sometime right after that.  When I wasn't served, I

20   didn't know that anything was still even happening

21   with the case.

22             Like, I had a full life, three kids,

23   working full-time, kids that's heavy into

24   activities.  So at that time, Mr. Crossley was out

25   my life, and the -- that -- like, I wasn't focused
```

 1  to come and they not show up after making multiple

 2  calls.

 3      Q    Do you feel like the police should not

 4  have come within minutes when you told 911 that you

 5  were being punched in the face?

 6      MS. MIKKILINENI:

 7          Objection.  Calls for speculation and

 8  misleading and it's argumentative.

 9      THE WITNESS:

10          Can you repeat the question?

11 BY MR. PAUL:

12      Q    Sure.  Do you feel like the police should

13  not have come within minutes when you told 911 that

14  someone was punching you in your face at your house?

15      A    No.  I feel like they should have came

16  within minutes.  I wanted them come within minutes.

17  I didn't want to wait two days while there was a

18  drunk person on my lawn screaming and causing a big

19  scene in my neighborhood.

20      Q    So do you think that the police and

21  prosecutors should not have taken the case against

22  Mr. Crossley as seriously as they did?

23      MS. MIKKILINENI:

24          Objection.  Calls for speculation and a

25  legal conclusion as well as argumentative.

```
 1  BY MR. PAUL:

 2       Q    You can answer.

 3       A    I didn't -- I didn't feel like that.  I

 4  didn't feel like I -- I -- I don't have any -- I

 5  don't have any feelings about what they did or how

 6  they prosecuted him.  My issue was with the fact

 7  that I was arrested for calling the police.

 8  That's -- that was -- that was my issue.

 9            Or let me say it like I was arrested

10  because the DA -- the DA wasn't able to serve me.

11       Q    You feel like you were arrested because

12  the DA was not able to serve you?

13       A    Yes.  That was what I was arrested for,

14  right, the bench warrant?

15       Q    Do you think the Orleans Parish DA's

16  office stopped using material witness warrants

17  altogether?

18       MS. MIKKILINENI:

19            Objection.  Irrelevance, calls for

20  speculation, also calls for a conclusion.  She's not

21  an expert in this matter.

22  BY MR. PAUL:

23       Q    You can answer.

24       A    Like, I -- I don't -- I don't have a -- I

25  don't have a feeling about the -- yeah, I don't have
```

```
 1  enough information about what the material witness
 2  is, what is it used for.
 3      Q    I'm just trying to better understand what
 4  you said when you -- when you said, I don't want
 5  this to happen again to anyone else.  What in your
 6  view would make that so?  What would ensure that
 7  this doesn't happen again to anyone else?
 8      MS. MIKKILINENI:
 9           Objection.  She's not an expert in this
10  field.  She can testify about what happened to her.
11      THE WITNESS:
12           For myself, I would have -- I would have
13  felt better if, like, once I was served if I was
14  given an opportunity to actually show up for court.
15  BY MR. PAUL:
16      Q    Are you saying you feel like they should
17  have made more efforts to serve you?
18      A    Yeah.  I don't -- I can't speak towards
19  that.  I -- I don't know what actually happened,
20  like -- like, I don't know.  I felt like I was in
21  hiding, and just like the police found me there that
22  night, just like Mr. Crossley lawyer found me there
23  the day he came, like, I didn't feel like I was out
24  of reach.
25      Q    Do you have any view or opinion on how the
```

 1  Orleans Parish DA's office should change its

 2  policies or practices?

 3      MS. MIKKILINENI:

 4          Objection, irrelevant.

 5      THE WITNESS:

 6          Yeah, I don't -- I -- I -- I'm not certain

 7  on how to answer that.

 8  BY MR. PAUL:

 9      Q    When you say you're not certain, do you

10  mean that you don't have any opinion or view on how

11  policies should be changed?

12      A    I can only speak for, like, the -- the --

13  the ordeal that I went through.  I don't know, like,

14  what to -- when, like, that -- that, like -- when

15  the material witness is used, how it's used.  Yeah,

16  I don't -- I don't have enough background to -- to

17  make a decision, like, how the policy should change.

18      Q    So you're suing Arthur Mitchell personally

19  in this lawsuit; is that correct?

20      A    Yes.

21      Q    Do you believe that Arthur Mitchell did

22  something wrong that caused you harm?

23      A    Yes.

24      Q    What did he do wrong that caused you harm?

25      A    I mean, I know that the things that he say

1  to me on the day that we were there, that those

2  things weren't true.

3       Q    So when you met with him at the DA's

4  office, you believe he said things to you that were

5  not true?

6       A    Yes.

7       Q    Okay.  What else do you believe he did

8  that was wrong that caused you harm?

9       A    So just the way the case was handled.

10      Q    Can you be more specific on that?

11      A    That -- yeah, I'm not -- I, like, just --

12 just the fact that I ended up in jail for six days,

13 that's...

14      Q    That what?

15      A    That that was the issue.

16      Q    So you blame Arthur Mitchell for you

17 ending up in jail for six days?

18      A    I blame whoever had anything to do with

19 that -- that process, and I don't -- I don't --

20 honestly, I -- in my opinion, I do not feel that

21 he's a honest person.  And I feel like in a -- in a

22 job where you are serving -- servicing the public,

23 like, you don't just -- you do what's right for --

24 for the public, not what's right for your -- your --

25 your convictions or winning a case.

 1          Aside from that, can you point to any

 2   specific thing he did in handling this case that you

 3   believe is wrong?

 4      A    I just believe that the way the case was

 5   handled was -- was wrong.  Like, I only can speak

 6   on, like, what he said to me.  I have no notion of

 7   what was said to the judge.  I have no notion of

 8   what was said to anybody else that led to me being

 9   arrested.

10      Q    Do you believe that Arthur Mitchell should

11   be forced to pay you money out of his own funds?

12      MS. MIKKILINENI:

13          Objection.

14      THE WITNESS:

15          I don't -- I don't have a feeling.  I

16   don't -- yeah, I don't know how to feel about that

17   question.

18   BY MR. PAUL:

19      Q    You are suing him, correct?

20      A    Yes.

21      Q    You're asking that a judgment be entered

22   against him to make him pay you money out of his own

23   funds; is that correct?

24      A    You'll have to speak to my attorney about

25   that.

RENATA SINGLETON on 09/03/2020

147

```
1      Q    How much money do you think Arthur
2   Mitchell should have to pay you?
3      MS. MIKKILINENI:
4           Objection.  This is -- this is boarding on
5   privilege issues, so I'm going to actually caution
6   Ms. Singleton from answering.  Can you clarify your
7   question so that it does not require her to disclose
8   privileged information.
9   BY MR. PAUL:
10     Q    I'm not asking you anything that you
11  talked about with your lawyers.  I don't want you to
12  tell me what you told them or what they told you.
13  I'm just asking, how much money do you believe
14  Arthur Mitchell should have to pay you?
15     A    It's -- is it -- is it fair for me to
16  answer, like, your question and ask a question as
17  well?
18     Q    You can try.
19     MS. MIKKILINENI:
20          Go ahead, Ms. Singleton.
21     THE WITNESS:
22          How much do you feel that Arthur Mitchell
23  owe me for the time that I spent in that jail cell
24  away from my babies?
25  BY MR. PAUL:
```

```
 1      Q    Your lawyers will have to ask him that at
 2  his deposition, but for now, I'm asking you what you
 3  think.
 4      A    Okay.  I can't -- I can't -- I can't -- I
 5  can't -- I can't -- honestly, I can't verbally put
 6  an amount to it.  I wish that every time I thought
 7  about this situation, I didn't cry.  I wish that
 8  when I watch TV and something pertaining to jail or
 9  some type of mistreatment in the justice system,
10  like, I wish that I didn't -- I didn't cry.  I wish
11  that I didn't feel that this -- this feeling.
12           I just wish that -- I don't -- I don't
13  want to feel this way anymore, like, and I don't
14  know what -- what that would take to make that --
15  that feeling go away.  I can't get back -- I can't
16  get back my time.  I can't get back, like, the
17  things that happened to me, like, I can't put an
18  amount on that.
19      Q    You're suing David Pipes personally also;
20  is that correct?
21      A    What's the name?
22      Q    David Pipes.
23      A    No, I don't -- that name doesn't sound
24  familiar.
25      Q    Do you know who David Pipes is?
```

1     A     I don't know who David Pipes is.

2     Q     Do you know whether you're suing him

3  personally?

4     A     I don't know.

5     Q     Do you have any reason to -- do you

6  personally have any reason to believe that he did

7  something wrong to cause you harm?

8     A     Yeah, I don't know who -- I don't know --

9  I don't know who he is.

10    Q     Do you know who Graymond Martin is?

11    A     Raymond Martin?

12    Q     Graymond with a G, Graymond Martin.

13    A     No, the name doesn't -- the name doesn't

14  sound familiar.

15    Q     Do you know whether you're suing him in

16  this case?

17    A     I don't know.

18    Q     Do you have any reason -- do you

19  personally have any reason to believe he's done

20  something wrong that caused you harm?

21    A     I believe that whoever was in the process

22  of whatever happened that landed me where I -- where

23  I was for those six days, so whoever played a part

24  in -- in that process.

25    Q     Whoever played any part whatsoever, is

 1  that what you're stating?

 2       A    Yes.

 3       MS. MIKKILINENI:

 4            Objection.  That's a vague question.

 5  BY MR. PAUL:

 6       Q    How did you first become involved in this

 7  lawsuit?

 8       MS. MIKKILINENI:

 9            Objection to the extent that this involves

10  any privilege.  Can you rephrase your question?

11            I'm sorry.  Objection to the extent that

12  this involves Ms. Singleton talking about any

13  conversations she had with her lawyers or anything

14  else that is privileged.

15  BY MR. PAUL:

16       Q    You can answer.

17       A    I was contacted, actually, one day.  I

18  believe I -- I believe her name was Emily.

19       MS. MIKKILINENI:

20            Ms. Singleton -- Ms. Singleton, I'm going

21  to actually stop -- I think this might all be

22  privileged, and so I'm actually going to instruct

23  the witness not to answer.

24       MR. PAUL:

25            If she was contacted one day by someone

```
 1   would you not, Ms. Singleton?
 2        A    I don't know, like, who he would be
 3   jealous of.  I think he was upset because I said
 4   that my text messages weren't on silent and --
 5        Q    I got you.  He was mad with the way you
 6   responded; is that fair?
 7        A    I guess he was mad with what he found out
 8   when his nephew text my phone.
 9        Q    Got you.  Okay.
10             So back to the cell phone.  So correct me
11   if I'm wrong, it was a blue Galaxy Samsung?
12        A    It sounds -- that sounds about right.  I'm
13   not 100 percent sure.
14        Q    Okay.  Do you remember how much you paid
15   for that in 2014?
16        A    I don't.
17        Q    Because the police report lists it at
18   $600.  Would you say that's fair?
19        A    I don't think so.  I don't know, though.
20        Q    You don't think it was 600?
21        A    I would never pay 600 for a --
22   MS. MIKKILINENI:
23             Objection to the relevance of this.
24   BY MR. FREEMAN:
25        Q    Okay.  And the reason I'm asking -- the
```

1   reason I'm asking how much you paid, because you

2   said earlier that I believe Mr. Crossley's daddy

3   gave you $100 for it; is that correct?

4        A    Yes, that was the replacement cost.

5        Q    Yeah, I was just wondering, like, it just

6   seems like -- the police report listed $600.  It

7   seems like $100 is kind of a shabby value for a $600

8   phone, you know what I'm saying?

9        MS. MIKKILINENI:

10           Objection.  Is that a question?

11      MR. FREEMAN:

12           I'm asking -- there will be, if you let

13   me.

14   BY MR. FREEMAN:

15       Q    Ms. Singleton, did you feel like $100 was

16   sufficient to reimburse you for a damaged phone that

17   the police valued or said you valued at $600?

18       A    Well, I didn't value it because I would --

19   I would never pay $600 for any type of cell phone.

20       Q    Okay.  And at this point you don't recall

21   how much it was?

22       A    No, I don't.  And it could have been --

23   $100 was the replacement cost.

24       Q    And you were able to buy a new phone with

25   the $100?

1      A     Well, the insurance claim.

2      Q     Got you.  Okay.  Fantastic.  All right.

3  Bear with me.

4            So getting back to some of the things you

5  said to Mr. Paul about -- and this is about the case

6  itself, about after -- after the case went to the

7  DA's office, up until the time that you were

8  incarcerated, up until the time we're here today,

9  you specifically said you were upset because you

10  said the way the case was handled was wrong.  I'm

11  paraphrasing, but that pretty much is what you said.

12            Does that sound fair?  Is that a fair

13  assessment, you were upset with -- that the case --

14  the way the case was handled was wrong?

15      A     In my opinion.

16      Q     And that's fair.  I completely -- just --

17  I accept that, and I want to ask you what

18  specifically about the way that it was handled were

19  you unsatisfied with?

20      A     The arrest that landed me in jail for six

21  days.

22      Q     Okay.  The fact that the -- that the

23  sheriff's deputies came out and arrested you, that

24  the judge ordered the sheriff's office to come out

25  and arrest you; that was one thing?

1      A    Yes.

2      Q    Okay.  And that the sheriff's office, the

3  Orleans Sheriff's Office, came out and had their

4  deputies come and put you in jail, right?

5      A    Yes.

6      Q    Okay.  And -- okay.  So --

7      A    No, no, no, no, that -- wait.  I'm sorry.

8  Say that again.

9      Q    I was saying that the judge issued a bench

10  warrant for your arrest, you were upset about that?

11      A    Yes.

12      Q    Okay.  And that the sheriff's office sent

13  deputies out there to arrest you, and had you

14  arrested?

15      MS. MIKKILINENI:

16          Objection.  The objection is to the

17  ambiguity of this in terms of what incident you're

18  referring to.

19      MR. FREEMAN:

20          I agree with you, Counselor.  I do believe

21  there is ambiguity.  That's why I'm asking her for

22  specifics, so I'm just trying to help her.  If your

23  client can give me specifics, I'd be more than happy

24  to take those.

25      MS. MIKKILINENI:

```
 1              You're asking her about her emotional
 2   reaction, not about a particular fact?
 3       MR. FREEMAN:
 4              I'm asking her why she believes this case
 5   was handled wrong and the basis of this litigation.
 6   Since this -- since she is the lead plaintiff in
 7   this case, I believe it's a fair question as to what
 8   specifically does she believe was the -- what was
 9   handled wrong in this matter, and she said that the
10   way the judge issued a bench warrant, the way that
11   the sheriff's deputies arrested her --
12       MS. MIKKILINENI:
13              Well, then object to that because I don't
14   think that was a fair characterization of her
15   testimony.  If you go back to the record and where
16   she said that, that would be fine but --
17       MR. FREEMAN:
18              The record speaks for itself.  I prefer
19   her to testify than you.  So why don't we get back
20   to her.
21   BY MR. FREEMAN:
22       Q    Ms. Singleton?
23       A    Yes.
24       Q    Can you answer the question if you're able
25   to?
```