EXHIBIT 4

1            UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF LOUISIANA

3
   * * * * * * * * * * * *
4
   RENATA SINGLETON,
5  MARC MITCHELL,
   LAZONIA BAHAM,
6  JANE DOE,
   TIFFANY LACROIX,
7  FAYONA BAILEY,
   JOHN ROE, and
8  SILENCE IS VIOLENCE,
                            CASE NO.
9         Plaintiffs,
                            2:17-cv-10721-JTM-JVM
10  v.
                       JUDGE JANE TRICHE MILAZZO
11  LEON CANNIZZARO, et al.,
                       MAG. JANIS VAN MEERVELD
12        Defendant.

13  * * * * * * * * * * * *

14

15      VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF

16               TIFFANY TUCKER DOVER

17             Location of witness:

18                law offices of

19    Stanley Reuter Ross Thornton & Alford, LLC

20         909 Poydras Street, Suite 2500

21             New Orleans LA  70112

22           Monday, September 28, 2020

23

24  Reported by:  DEBRA AMOS ISBELL, CCR,RDR,CRR

25  Job No: 183658

1  and ultimately the District Attorney.  But I don't

2  know -- we don't really have tabs on what everybody is

3  doing, so I can't speak for everybody, but I can speak

4  for myself when I say I never on my own authority

5  sought a Material Witness Warrant.

6      Q.    So every Material Witness Warrant that you

7  sought during your time at OPDA was ultimately

8  approved by Mr. Martin and Mr. Cannizzaro, Mr. Martin

9  or Mr. Cannizzaro?

10     A.    I can't necessarily -- I don't have

11 independent recollection of who specifically approved

12 it.  But it would have been somebody, whether

13 Mr. Martin or Mr. Cannizzaro, being notified of and

14 approving the seeking of a Material Witness Warrant.

15     Q.    And was Mr. Martin Mr. Cannizzaro's second

16 in command the entire time that you were at OPDA?

17     A.    Yes.

18     Q.    And it sounds like you reported to

19 ultimately Mr. Pipes, Mr. Martin and Mr. Cannizzaro

20 while you were there?

21     A.    Yes.  Other than the time where Ms. Bridges

22 was my Chief of Trials.

23     Q.    Can you tell me what is the role of a case

24 supervisor?  So, you know, you mentioned that

25 Mr. Pipes was your supervisor as the Chief of Trials.

1  So on a given case, what is the role that a supervisor

2  performs?

3      A.    Generally we would pretry all of our cases.

4  So when preparing for trial, we would meet with our

5  supervisor and just go through trial strategy or a

6  witness list, keep him apprised of any issues that we

7  could foresee would possibly happen in the case.  A

8  lot of times the junior ADAs would have to meet with

9  Mr. Pipes to go over a motion hearing, so a motion to

10 suppress evidence or a motion to suppress statement.

11 They would need to go to their supervisor and just go

12 through the legal issue of the case, how they intend

13 to meet their burden, and so on and so forth.

14      Q.    And were there any attorneys at OPDA that

15 you would have considered a mentor?

16      A.    I wouldn't name a specific ADA.  I think

17 there were attorneys that we would go to for ideas or

18 advice on how to handle a specific situation.  But

19 when I first started at the DA's office, there were

20 many attorneys that were more -- that were there for

21 much longer than me, so they were basically a wealth

22 of knowledge of how to handle cases.  And when you

23 come across different cases on your docket that, you

24 know, you've never seen before -- because as you're

25 handling hundreds of cases, there's always going to be

1  something that you're seeing for the first time.  So

2  you would just go to another ADA and say:  Have you

3  seen this kind of case before?  Whether it's a legal

4  issue or the background of the case, the underlying

5  facts, a different maybe law enforcement agency that

6  was handling it.  Some ADAs had better, you know,

7  relationships or knew some officers.  It was easier to

8  get a hold of them if you went to another ADA.  So it

9  was really just, you know, a group of attorneys

10 basically working through these cases and we would go

11 to each other and ask questions.

12        People would come to me and ask me questions

13 just because I was there for such a long time and I'd

14 come across a lot.  So I wouldn't say I had a specific

15 mentor, but I would just say that we used each other

16 as kind of a wealth of knowledge at the office in

17 order to get advice and things like that.

18    Q.    Would you say you were ever supervised by

19 anyone other than Mr. Pipes, Mr. Martin, and

20 Mr. Cannizzaro?  Would other senior ADAs be in a

21 supervisory capacity over you?

22    A.    No.

23    Q.    Did you ever work with Laura Rodrigue?

24    A.    Yes.

25    Q.    Was she senior to you?

1      A.     No.   So we were assigned to MOT Division

2    together.   So when I got moved to MOT, instead of

3    going into my own division, I got assigned with Laura

4    and we received, I think, four MOT Divisions at the

5    time.   So normally MOT attorneys would receive about

6    two divisions or sections of court to handle.   And

7    that would also just depend on the number of MOT-level

8    cases in the division or the section.   So some

9    sections had a higher MOT docket.   You may only have

10   one ADA for one MOT docket as opposed to smaller

11   divisions where you can handle one or two.

12   Ms. Rodrigue and I had four MOT sections, and we kind

13   of just shared the caseload and we would try the cases

14   together.

15      Q.    So it does sound like it's a little bit of a

16   different model than you were describing before where

17   attorneys kind of do their own cases and then maybe

18   first chair, second chair.   It sounds like you and

19   Laura actually worked fairly closely together in your

20   sections -- in your divisions, if I'm getting that

21   right?

22      A.     Yes.   So we handled the cases.   We would try

23   all the cases together.   Usually only one of us would

24   go to court on pretrial motions or things like that.

25   But ultimately you were tasked with trying all of

1  those -- those four sections of court, we were tasked

2  with trying those cases together, which we did.

3      Q.    And when you try a case together, does that

4  mean you also do the sort of trial prep and all of the

5  lead-up to the case and all of the decisions that are

6  made in a case, up until that point you do that

7  together as well?

8      A.    Yes.

9      Q.    And how had she been at the office longer

10  than you?  Was she sort of more senior just in terms

11  of experience or were you at the same level of

12  experience?

13          MR. FREEMAN:  Objection, compound.

14      A.    She was at the office -- she was at the

15  office longer than me, five years longer than me.

16      Q.    Years longer.  Aside from when you were the

17  Deputy Chief of Trials, did you have any other

18  supervisory responsibility during your time at OPDA?

19      A.    No.

20      Q.    And did you all have a separate personnel

21  supervisor in your office, so someone who was

22  unconnected to case-related stuff but that, you know,

23  you would go to with any issues of your employment or

24  performance or someone who sort of monitors your

25  performance for the purpose of tracking promotions,

1  recollection, I can't recall a DA investigator doing

2  that.  It's possible that they would have, but I was

3  never notified of such use of a fake subpoena.

4      Q.    Do you know if Material Witness Warrants

5  were sought on the basis of witnesses not responding

6  to the fake subpoena?

7      A.    I think that I have knowledge of that being

8  a factor in applying for a Material Witness Warrant.

9      Q.    Can you tell me about that?  How would it be

10  a factor in applying for a Material Witness Warrant?

11     A.    So generally speaking, when anybody applies

12  for a Material Witness Warrant, you want to give the

13  Court as much information about the case as possible.

14  So if using these DA subpoenas as a tool to try and

15  reach out to your victim or locate your victim or

16  witness, to try and either get them to the office or

17  to court was a tool that you used, that would be

18  relevant to the Material Witness Warrant and that

19  should be included.  Usually it's not the only thing.

20  Usually you have an investigator that's been

21  attempting to contact them.  Sometimes you have a

22  witness who tells you that they're never going to come

23  to court no matter what you do.  I've had witnesses

24  say:  You're not going to arrest me, like I'm never

25  showing up for court, I don't care what the judge

1  does, what, you know, you do -- anything.  Like you'll

2  have to arrest me to come.

3           So any information that is relevant to show

4  that even with a lawful subpoena the witness will not

5  comply is relevant to a motion for a Material Witness

6  Warrant.  So I would say if the DA subpoenas were used

7  as a tool in order to try and communicate with this

8  witness or meet with this witness to no avail, I think

9  that would be something that was relevant to putting

10  into your Material Witness Warrant.  And if it were

11  me, I would attach a copy so that the Court could see

12  exactly what was used.

13     Q.    So it was used as a tool to do outreach to

14  witnesses and the witness' failure to respond to that

15  tool, you thought, was relevant information to put in

16  the Material Witness Warrant application; correct?

17     A.    Yes.  I think the witness' unwillingness to

18  come to court is a very relevant portion when you're

19  applying for a Material Witness Warrant.

20     Q.    But the DA subpoena, the fake subpoena,

21  doesn't direct the witness to come to court; correct?

22  Doesn't it direct the witness to come to the DA's

23  office?

24     A.    Correct.  But I think it's just a factor

25  when you're applying for a Material Witness Warrant.

1   So I think if -- like under the Victims' Rights

2   legislation, we have an affirmative duty to reach out

3   and interview witnesses to determine restitution or,

4   you know, what their role was in the case for victims.

5   So if you have a person that is not willing to

6   participate at all in the process -- and usually they

7   will tell you:  I am not coming to court, like I don't

8   want anything to do with this case, I'm not coming.

9              That would all be relevant.  So I think

10  rather than just keep the motion limited to specific

11  facts, it's important for the judge to know the

12  entirety of your attempts to get this witness to come

13  to court or come to the office or speak to the

14  witness, what the communications were from this

15  witness to you, whether it was positive or negative.

16  I think the Court is entitled -- because they're

17  issuing a warrant for somebody's arrest -- to know

18  exactly what was done.

19       Q.    Do you agree that the DA subpoenas were used

20  as a tool to elicit the victims or witness to come to

21  court or to the DA's office?  And again, the failure

22  to respond would be relevant information for the Court

23  in seeking a Material Witness Warrant application;

24  correct?

25              MR. PAUL:  Object to the form.

Page 132

```
 1      A.     Yes.

 2      Q.     And that's a very different purpose than the

 3 one you just described to me about using them as

 4 excuse notes, giving them to witnesses and victims to

 5 give to their employers or give to their schools;

 6 correct?

 7      A.     Correct.  It's a very different tactic.

 8 Your question earlier was if I was aware of any ADA

 9 using the CourtNotify or -- I'm sorry -- the DA

10 subpoenas in order to get them to the office and

11 inserting them into a Material Witness Warrant.  I,

12 myself, have used a DA subpoena as part of a Material

13 Witness Warrant because I was not using DA subpoenas

14 to have witnesses come to court or come to the office.

15           But you asked if I know of any instances.

16 Yes.  Renata Singleton, my understanding is that DA

17 subpoenas were used to attempt multiple times to meet

18 with her, and ultimately that information was placed

19 into a Material Witness Warrant motion.  So while I

20 may not have been using them for that purpose, your

21 broad question of did anybody use it, yes, that was

22 used that way.  But that was not something that I was

23 personally using it for.  I can't recall a single

24 Material Witness Warrant that I applied for where I

25 attached or made reference to a DA subpoena that was
```

1  not complied with.

2      Q.    But you did mention not a DA subpoena, but a

3  CourtNotify document that you entered information for

4  the witness to appear at the DA's office.  Was that a

5  document that you then used in the course of the

6  Material Witness Warrant application?

7      A.    Yes.  So in that instance on that Material

8  Witness Warrant that I obtained for Keith McGuire, who

9  was a victim of second degree battery -- and just

10  for -- I guess just to have the entire picture, so

11  Keith McGuire was initially a cooperative victim in

12  this case.  He had been seeking or talking to my

13  investigator about coming to the office for trial

14  prep.  We agreed on a time for him to come to the

15  office.  I think it was Friday, March 3rd.  He agreed

16  to come to the office.  He provided my investigator

17  with the address where he was working that day so my

18  investigator could go and serve him with the actual

19  subpoena for trial on March 6th and give him a copy

20  just so that he knew that our appointment was Friday,

21  March 3rd.

22          That same day we called Mr. McGuire back,

23  and my investigator met with him a second time to have

24  him sign a HIPAA release so that we could obtain his

25  medical records because, as a result of the incident,

1  his jaw was broken.  And again he agreed to meet with

2  my investigator, he signed the HIPAA release form.  So

3  twice in the same day.  So essentially earlier in the

4  day he received a Court -- he was served with a

5  CourtNotify subpoena for March 6th for the trial and

6  he had that extra copy of just the appointment time

7  that he had previously scheduled with my investigator

8  at the time, Corey Porter.  Later that day he signed

9  the HIPAA waiver.

10         Friday, March 3rd came.  He did not show up

11  at the office.  My investigator attempted to reach him

12  by phone a number of times.  At some point he

13  indicated to my investigator that he was on his way, I

14  think he said from the VA.  He said he was biking over

15  to the office.  He never showed up.  My investigator

16  again got him on the phone, and he told my

17  investigator, who had -- so the investigators were on

18  the fourth floor at the DA's office.  My office was on

19  the third floor.  My investigator walked downstairs

20  with him still on the phone and put him on speaker so

21  that I could hear what they were talking about.  And I

22  just had this reaction to record part of the phone

23  call just so that, you know, there was proof of what

24  he was saying.  He essentially said that he would

25  never come to court.  He said the case had been going

1  on for two years.  He said he wasn't concerned about

2  being arrested, he'd been to jail a number of times,

3  and said more things at length that I think you have a

4  copy of.  But he essentially said he was not coming.

5          So on Monday, when he did not show up for

6  court, that is when I applied for the Material Witness

7  Warrant and referenced so that the Court knew he was a

8  cooperative witness, and then on Friday everything

9  changed.  He decided he wasn't coming, he did not show

10  up for trial, and that's why I obtained the Material

11  Witness Warrant.  I referenced the judge to the

12  recording that we had of him.  And when he was

13  arrested that day, we found out exactly why he so

14  quickly changed from being a cooperative victim to an

15  uncooperative victim, because his first phone call

16  when he was arrested and put in jail was to his

17  sister, where he admitted that the defendant's mother

18  paid him not to come to court.

19          So that's just an example of we had a very

20  cooperative victim.  Unfortunately in this city this

21  happens quite frequently, where people are pressured

22  not to come to court.  And he decided that he would

23  rather be in jail than come to court as he was

24  subpoenaed to.

25          So with that information, the only thing

1   that we could do was hold him until the trial, which

2   did go to trial.  The judge ended up giving me a

3   one-week continuance from the March 6th date.  I think

4   we started trial on March 13th, so that we had time to

5   get him into custody, which we did.  We went to trial

6   and the defendant was convicted.

7           A lot of times -- we don't take these

8   Material Witness Warrants lightly.  This was a

9   defendant who also had an open second-degree murder at

10  the time.  He had had a previous case from a

11  second-line shooting where he shot into a crowd of

12  people with an AK47.  In that case witnesses were

13  afraid to testify and the case had to be reduced.

14  This defendant was affiliated with a gang and he was

15  specifically in the central city area.  The police

16  were very familiar with him.  All of his crimes

17  occurred in broad daylight because everyone was so

18  afraid of him.  So there was a -- we had to weigh the

19  victim's wishes not to come to court with the threat

20  that this person presented to the community.  And at

21  the end of the day, the victim testified truthfully

22  that this was the person that broke his jaw because he

23  owed him money, I think, for drugs.

24          The witness did not lie on the stand.  He

25  was pretty hostile with me.  But I think if you read

1  the transcript -- and obviously no one here was

2  there -- but the defense tried really hard to make it

3  seem like he was the aggressor.  He got really choked

4  up when the defense attorney was questioning him.  So

5  there were a lot of things that went into this case.

6  And we fully litigated the subpoenas that he received

7  as well as the medical records with the defense in

8  this case.  So -- and those were attached to the

9  Material Witness Warrants.

10        There was no intent to dissuade the Court or

11  misrepresent anything to the Court.  The judge had

12  exactly what was mentioned in front of her when she

13  considered this Material Witness Warrant.  And she had

14  also been afforded the opportunity to hear the prior

15  motion regarding the defendant's prior bad acts and

16  was able to weigh the fact that this person was a

17  grave threat to the community and that this case

18  needed to proceed and the victim was material.

19    Q.    Let's take a look as what I'm going to mark

20  Plaintiffs' Exhibit 3, which is INDEF00780.

21        (PLAINTIFFS' EXHIBIT 3, DOCUMENTS RE

22         KEITH McGUIRE, STATE OF LOUISIANA VS.

23         JOHNQUELL BIBBINS - INDEF00765-00832,

24         WAS MARKED FOR IDENTIFICATION.)

25        MR. PAUL:  What is it?

1              MS. MIKKILINENI:  It's INDEF00780.  But I

2    realize it's actually in the document that I sent you

3    that begins -- it's a range, it's a Bates range,

4    INDEF00765 to INDEF00832.  So it's in that range.  You

5    might have to just page through it for a second.  And

6    I will also put this up on the screen share.

7              MR. PAUL:  Tell me the Bates number one more

8    time.  Sorry.

9              THE WITNESS:  780.

10             MS. MIKKILINENI:  INDEF00780.

11     Q.     Does this document look familiar?

12     A.     Yes.

13     Q.     This is the document that you referenced

14   that you had opened for CourtNotify?

15     A.     Yes.

16     Q.     And it's correct that you opened a valid

17   CourtNotify subpoena and this opened in Word; correct?

18     A.     Yes.

19     Q.     And you changed the language that stated --

20   that commands the witness to appear in court to

21   instead appear at the Orleans Parish District

22   Attorney's Office; correct?

23     A.     Correct.

24     Q.     Okay.  And maybe you can actually -- it's

25   just for the record.  Would you mind just reading the

1   sentence that begins with "you are hereby commanded"?

2   A.      Sure.

3           "You are hereby commanded to

4           appear in the Orleans Parish

5           District Attorney's Office on

6           Friday, March 3rd, 2017, at 9

7           o'clock a.m. in Section F at

8           Orleans Parish Criminal

9           District Court, 2700 Tulane

10          Avenue, New Orleans."

11  Q.      And you agree, we're all in agreement, that

12  you altered a CourtNotify subpoena that already

13  existed for Mr. McGuire to put in the location of the

14  Orleans Parish District Attorney's Office; correct?

15  A.      Correct.  So I altered only the first line.

16  So "you are hereby commanded to appear" -- I altered

17  "in the Orleans Parish District Attorney's Office" and

18  the date.

19  Q.      And because the date was actually for the

20  date of trial; correct?  The real subpoena was for a

21  different date?

22  A.      Yes.  So on the Bates stamp 781, that was

23  the original subpoena.  And the only language that was

24  changed was "Orleans Parish District Attorney's

25  Office" and "Friday, March 3rd."

1     Q.    Again, for the record, could you just read

2  the sentence that begins:  "You are hereby commanded"?

3     A.    Sure.  And this is 781.

4              "You are hereby commanded to

5              appear in the Criminal Court

6              for the Parish of Orleans for

7              trial on Monday, March 6th,

8              2017, at 9 o'clock a.m. in

9              Section F at Orleans Parish

10             Criminal District Court, 2700

11             Tulane Avenue, New Orleans."

12    Q.    So both of these -- and you conceded

13 earlier that you printed off both of these.  And

14 exactly how were they served on Mr. McGuire?

15    A.    So it was by Corey Porter.  And I think he

16 may have been with Chad Stokes during this case, who

17 was another investigator.  Sometimes they went out in

18 pairs.  It looks like he served him with those on

19 2/24/2017 at 12:25 p.m., and that's referred to at the

20 bottom of each document.

21    Q.    So the return here with these codes says the

22 printed date, which was 2/22/17; correct?

23    A.    Right.

24    Q.    And the served date, which is 2/24/17 at

25 12:25 p.m., as you just mentioned?

Page 154

1      A.      Okay.

2      Q.      So I wanted to -- and I wanted to go back to

3  something that you had said about DA subpoenas, and in

4  particular the form that we looked at together that

5  had been circulated to the whole office, the template

6  form that we've been referring to as -- you've been

7  referring to as DA notices, DA subpoenas, I've been

8  referring to as a fake subpoena.  And you had stated

9  earlier that you don't remember giving a DA subpoena

10  or any of the notices that were used for similar

11  purposes which instructed to -- in order to instruct a

12  witness to appear at the DA's office at a particular

13  time for a meeting; correct?

14      A.      I'm sorry.  I guess can you rephrase your

15  question?

16      Q.      Sure.  You had stated that you don't recall

17  using the DA subpoena, the fake subpoena, in order

18  to -- in order to instruct a witness to meet at the

19  DA's office with you; is that correct?

20      A.      I don't independently recall a specific case

21  where I used it on the front end to notify a witness

22  of an appointment time.

23      Q.      And so but you did, you did alter this

24  CourtNotify subpoena in Mr. McGuire's case basically

25  for that purpose; correct?

1    A.    Correct.  So the notice that is attached to

2  the Material Witness Warrant application for Keith

3  McGuire is what was altered.  I don't have any

4  recollection of what you're referring to as a fake

5  subpoena or what I'm referring to as a DA subpoena,

6  that uniform template that was distributed to the

7  office, I don't recall that specifically being used by

8  myself in a case to advise a witness of an

9  appointment.

10    Q.    And regardless of whether or not Mr. McGuire

11  asked for it, you did provide him a document that told

12  him he was compelled to show up at the DA's office at

13  a certain time and a certain date or face legal

14  consequences; correct?

15    A.    Yes.  I provided him a copy of exactly what

16  is attached to the motion and the language contained

17  in that document is what we've been referring to, I

18  think, as State's Exhibit Number 3 -- or Plaintiffs'

19  3.  Sorry.

20    Q.    And that language states that there are

21  legal -- that language states that the document is a

22  subpoena and that there are legal consequences for

23  failure to appear; correct?

24    A.    Yes.  It says:

25            "To testify the truth

1              according to your knowledge ...

2              and not to fail under penalty

3              of a fine of $250."

4         I don't believe it threatens any kind of jail

5    time on it.  And that was given to Mr. McGuire on

6    February 24th of 2017.

7         Q.    Did you come up with this idea to

8    specifically alter a CourtNotify subpoena?

9         A.    I don't recall the first time ever seeing it

10   be done.  I can tell you for this time the reason why

11   it was used was because we had already created the

12   actual subpoena under CourtNotify, so it was a

13   convenience thing just to make Mr. McGuire aware of

14   the time that we had jointly selected for him to come

15   to the office.  I don't specifically recall how many

16   times I've done this or specific cases that I've done

17   it or specific cases where other ADAs have possibly

18   used CourtNotify in some kind of altered fashion.

19        Q.    Was it the first time you had done it?

20        A.    I don't recall.

21        Q.    So you may have done it in other cases?  You

22   just don't remember?

23        A.    That's possible.  I don't have any

24   independent recollection of how many times I did this

25   or specific cases that I would have done it in.

1      Q.    And would you have sought a Material Witness

2  Warrant application -- would you have sought Material

3  Witness Warrants on the basis of such a document in

4  another case?

5      A.    I think that's kind of speculative.  There

6  is no way to really know what, given each case -- we

7  do these Material Witness Warrants on a case-by-case

8  basis just weighing the risks of potentially releasing

9  the defendant back out into the community to

10 potentially putting a witness or a victim in jail to

11 compel their testimony.  So I can't speculate that I

12 would have applied for a Material Witness Warrant

13 based on this.  I don't -- I can tell you I wouldn't

14 have only relied on an altered CourtNotify subpoena to

15 apply for a Material Witness Warrant for any witness.

16 And I certainly would have attached it, as I did with

17 Mr. McGuire's, to the Motion for Material Witness Bond

18 as I have with every application for Material Witness

19 Warrant that I filed since becoming an Assistant

20 District Attorney, so that the Court had the

21 opportunity to see exactly what was used.

22           And I mean the courts are familiar with

23 CourtNotify subpoenas.  And even calling Mr. McGuire's

24 subpoena in the motion, I mean, the Court is aware

25 that there is no mechanism on CourtNotify to issue a

1  subpoena to the District Attorney's Office.

2          So when a Court saw this, I think it can be

3  safely assumed they knew that this had been an altered

4  document.  There's no mechanism to generate a

5  CourtNotify subpoena through CourtNotify to be issued

6  to the District Attorney's Office.

7    Q.    So it would have --

8          MR. PAUL:  Sorry.  To be clear, are you

9  asking her whether she would have done it in a

10  hypothetical case or whether she recalls doing it in

11  other specific cases?

12   A.    I thought it was hypothetically?

13   Q.    I think I asked both questions, whether you

14  recalled doing this in a different case, but then also

15  whether -- and my hypothetical was really just sort of

16  something that I think that you just suggested, which

17  is that this is an appropriate basis upon which to

18  seek a Material Witness Warrant in some cases.  Is

19  that what you just sort of said?

20   A.    I think -- I think my answer was not that

21  direct.  I think that that is a factor that can be put

22  into a Material Witness Warrant, but I don't think it

23  would be appropriate to just rely on an altered

24  CourtNotify subpoena for missing one appointment at

25  the office to ever jail somebody on a Material Witness

1  Warrant.  I don't think that would be sufficient.  I

2  don't think a judge would take that and view that as

3  an appropriate motion for a Material Witness Warrant.

4         So that can be part and parcel of a motion

5  requesting a warrant for a witness' arrest to compel

6  their testimony at trial, but I don't think that I

7  personally can say that I would never just rely on a

8  CourtNotify subpoena to apply for a Material Witness

9  Warrant.

10  Q.    Let's unpack that a little bit.  You were

11  saying that it's not appropriate for the CourtNotify

12  subpoena to be the sole basis of the Material Witness

13  Warrant application; is that correct?

14  A.    Right.  Because then you are assuming that

15  the only reason to apply for a Material Witness

16  Warrant is because the witness failed to meet at one

17  appointment at the District Attorney's Office, which

18  is not the burden that the State needs to meet or any

19  party seeking a Material Witness Warrant needs to meet

20  in order to secure a Material Witness Warrant.

21         We need to show that, even with proper

22  service, it would be unachievable or unlikely that the

23  witness would come to court to testify at a trial.  So

24  I don't think that demonstrating that the witness

25  failed to appear at one meeting with myself, I don't

1  notice, if there's a letter sent to the witness.

2  Anything that was tangible that was correspondence

3  between the office or the Court and the witness that

4  can be used to show that the witness cannot be

5  compelled for trial, I think that's relevant to the

6  Motion for Material Witness Warrant.

7      Q.    And the flip side of that, is it

8  inappropriate not to attach those documents but to

9  rely on them in a Material Witness Warrant application

10  to the Court?

11      A.    So I don't think I can speak to what is

12  inappropriate.  I think that's up to the Court as to

13  what they believe is enough for us to meet our burden

14  when applying for a Material Witness Warrant.  I can

15  only speak to my actual applications that I've had for

16  Material Witness Warrants and my personal belief that

17  I would rather attach everything than just represent

18  what was done to the Court.  I'd like the Court to see

19  with their own eyes what exactly was given to the

20  witnesses, which is why I always attached it to my

21  motions.  I wouldn't classify it as inappropriate to

22  not attach exhibits, but I think ultimately the judge

23  is the person to decide if the State is able to meet

24  their burden for a Material Witness Warrant without

25  the exhibits attached and just relying on the word of

1  the prosecutor.

2      Q.     And so you believe sort of in this duty of

3  candor to the Court that it's important to attach all

4  of these documents, and yet you're referring to this

5  document which is clearly not a subpoena as a subpoena

6  in your application.  And the document itself is

7  called a subpoena; correct?

8      A.     Correct.  I referred to it as a subpoena, I

9  labeled it as State's Exhibit 1 and I attached it to

10  the back of the motion so that the Court would review

11  it for itself and determine what exactly was given to

12  the witness in this case.

13      Q.     So did the fact that you attached it relieve

14  you of the burden of accurately describing it in your

15  Material Witness Warrant application?

16      A.     I don't necessarily think it relieves me of

17  any burden.  But I think it shows, I would say, good

18  faith on my part.  I'm not trying to misrepresent

19  something to the Court.  I'm not trying to not be

20  candid to the Court.  I'm including everything that

21  I'm referring to so the Court can see and determine

22  for itself what was actually given.

23          Now, if the Court agreed or disagreed on my

24  characterization of that document as a subpoena, the

25  judge signed the Material Witness Warrant based on the

 1   representations made in my motion as well as the

 2   exhibits that were attached to that motion.  She

 3   had all of -- she was armed with all of those at the

 4   time that she signed my Motion for Material Witness

 5   Bond.  She also was afforded the opportunity to listen

 6   to the recording herself, if requested.  I don't

 7   recall if she requested to look into it or not at this

 8   time.  But I did make mention to it in my motion and

 9   was willing to provide a copy to the Court.

10            So I can't, I can't speculate as to what

11   Judge Pittman relied on when signing the Material

12   Witness Warrant.  She could have found that the notice

13   to meet for an appointment was completely irrelevant

14   as it related to applying for a Material Witness

15   Warrant and us meeting our burden.  She could have

16   relied on the fact that the witness said he was never

17   coming to court, he would have to be arrested.  I

18   think that in and of itself is enough to meet our

19   burden that, given the chance to subpoena this

20   witness, coupled with the fact that he ignored the

21   March 6th CourtNotify subpoena to show up in court,

22   that could have been enough to meet our burden.  So I

23   can't speculate as to what Judge Pittman relied on in

24   my motion.

25            All I can say is what I provided to the

1  Court.  I provided her in totality everything that was

2  used when communicating with Keith McGuire and why I

3  believed that a Material Witness Warrant was

4  necessary, which ended up being true, because he

5  confirmed on the front end, before he got a Material

6  Witness Warrant, that he would have to be arrested and

7  would never come to court.

8           And then we found out the motive behind that

9  statement after he was arrested, was because the

10 defendant's mother paid him not to come to court.

11          So I can't speculate at this time what Judge

12 Pittman relied on.  All I can say is this is what was

13 presented to her and these were the exhibits that were

14 attached and afforded to her at the time that she was

15 considering my motion.

16   Q.     As far as you know, are you the only ADA who

17 ever physically altered a valid court subpoena?

18   A.     I'm not familiar specifically with any other

19 ADA who has done so.

20   Q.     Did you advise any other attorneys that this

21 was a practice that they could engage in in order to

22 give witnesses notice of meetings at the DA's office?

23   A.     No.

24   Q.     Did anyone advise you that this was a

25 practice that you could engage in for that purpose?

1      A.     No.

2      Q.     Did you ever tell anybody else about your

3   alteration of this CourtNotify subpoena?

4      A.     I believe once the complaint was filed, I

5   discussed it with people, some -- maybe attorneys

6   representing us in the complaint or in the lawsuit.

7   But I don't recall ever, you know, congregating with

8   other ADAs and saying this was what was used in this

9   case.  Possibly my co-counsel for trial would have

10  known that this altered CourtNotify subpoena was used.

11  We litigated at length with defense counsel for

12  Johnquell Bibbins, so my co-counsel would have known

13  about this CourtNotify subpoena.  But I don't have any

14  independent recollection of discussing this with any

15  other ADAs.

16     Q.     Who was your co-counsel?

17     A.     Zachary Popovich.

18     Q.     And did you --

19     A.     Sorry.  Can I just clarify?

20     Q.     Sure.

21     A.     So he was not responsible for any trial prep

22  with me.  He basically just came onto the case as my

23  second chair, but he wouldn't have any knowledge of

24  documents that were prepared and given to him -- or to

25  a witness in this case.

Page 267

1  meetings with witnesses who had unrelated warrants
2  that we were obliged to have them booked on, because
3  you go down a road of making it seem like you're
4  giving the witnesses preferential treatment where we
5  go in and ask for warrants for defendants who fail to
6  appear or have attachments or warrants issued for them
7  all of the time.  So there is no exceptions that are
8  made.
9           If you have an active warrant, as far as I'm
10 concerned, in cases that I've dealt with, I would
11 always make sure that you are booked on that warrant.
12 I don't know what we would have explained to the
13 judge, that she had an open -- that the warrant that
14 she issued, we just decided to ignore and let the
15 person leave.
16      Q.   So that just to quickly clarify, then, were
17 the police already there in the room when you walked
18 into the interview?
19      A.   For sure they were not in the room.  I'm
20 just not sure if M.J. called the police -- like called
21 dispatch for the unit prior to the meeting, after the
22 meeting.  I'm not sure when that happened.  But that
23 ultimately was the only reason why he would have been
24 involved.  So if he was in the room for the interview,
25 then there was always going to be him radioing.  He

1    was the one that had the NOPD radio.  So he would have

2    been the one radioing it.  And if he was there for the

3    entire interview, then that was known from the

4    beginning, whether he called it in at the beginning or

5    at the end.

6         Q.    And was she -- from that conference room?

7         A.    I'm sorry?  You cut out.  I'm sorry.

8         Q.    Sorry.  Did police come into that conference

9    room and take Ms. Singleton from the conference room?

10        A.    I don't believe so.  I think she was

11   escorted back downstairs.  I'm not 100 percent

12   familiar with that.  I think I may have left before

13   police arrived.  But my understanding is that she was

14   brought downstairs to meet the unit that had arrived.

15        Q.    By who?

16        A.    I'm not sure.

17        Q.    And let's talk about what you were saying

18   about how there was an open warrant that you couldn't

19   ignore.  This was a warrant that was based on a motion

20   that you all had filed; correct?

21        A.    Correct.  And ultimately issued by the

22   Court.

23        Q.    And the warrant was based on representations

24   made by your office that Ms. Singleton was

25   uncooperative; correct?

Page 269

1    A.    It was that she was unable to be served

2  after numerous attempts.

3    Q.    And you represented to the Court that

4  because she could not be served after numerous

5  attempts, it was likely she was not going to appear

6  for court; is that correct?

7    A.    Correct.

8    Q.    Did Ms. Singleton say anything in that

9  interview about her unwillingness to appear for court?

10    A.    I don't recall specific details about her

11  representing if she would be willing to come to court

12  or not.

13    Q.    And she came to the DA's office voluntarily;

14  correct?

15    A.    She came to the DA's office after the police

16  showed up at her house to arrest her.

17    Q.    But she came to the DA's office to talk to

18  the DAs who were involved in the Vernon Crossley case;

19  correct?  She wasn't brought to --

20    A.    Yes.

21    Q.    -- she wasn't brought into the DA's office

22  by police, was she?

23    A.    I believe she came with a police officer to

24  the District Attorney's Office who she was friendly

25  with.

1     Q.    But that person came as her friend, not as a

2 police officer escorting her to the DA's office under

3 sort of the color of law, I guess?

4     A.    It was unknown to me why the police officer

5 came or what their relationship is.  All I know is

6 that she arrived at the District Attorney's Office

7 with a police officer with her.

8     Q.    And she came and she asked to speak to

9 Arthur Mitchell or to you; is that correct?

10    A.    I don't know who she asked to speak to.  I

11 didn't speak to the front desk person who does the

12 intake or checks people in.  So I'm not sure what she

13 specifically represented when she came to the office.

14    Q.    And she came -- and when you walked into

15 that room, she was talking to Mr. Mitchell; correct?

16    A.    Yes.

17    Q.    And he was asking her questions; correct?

18    A.    Yes.

19    Q.    And then at any point during this

20 conversation did you tell her that she was going to be

21 arrested?

22    A.    I don't recall specifically telling her

23 that.

24    Q.    And so you all had a conversation.  She was

25 responding.  And then she said she felt like she

1    needed to talk to her lawyer; correct?

2        A.    Correct.

3        Q.    And you waited until after she said that she

4    wanted to talk to her lawyer to call her in and to

5    have her arrested; correct?

6        A.    I don't believe that.  I don't specifically

7    know at what point M.J. dispatched for a unit.  I

8    don't know if it was before or after.

9        Q.    The police were not in the room at the point

10   at which she said she didn't -- she thought she needed

11   to talk to a lawyer; is that correct?

12       A.    Correct.

13       Q.    And then she said she wanted to talk to a

14   lawyer, and you all ceased the interview.  And then

15   what happened?  Was there just silence?

16       A.    I know that I left.  I don't know who

17   remained in the room with her until the unit arrived.

18   I can't really speak to what was said or if anybody

19   else spoke to her after I left the room or what really

20   transpired.  All I can say is what I was a witness to.

21   And I know that once she indicated that she felt like

22   she needed an attorney, we ceased the interview and I

23   left.  And my understanding is she was booked.

24       Q.    Yes.  And she was subsequently arrested and

25   taken to jail; correct?