# EXHIBIT 5

Page 1

 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF LOUISIANA

 3

   * * * * * * * * * * * *

 4

   RENATA SINGLETON,
 5 MARC MITCHELL,
   LAONIA BAHAM,
 6 JANE DOE,
   TIFFANY LACROIX,
 7 FAYONA BAILEY,
   JOHN ROE, and
 8 SILENCE IS VIOLENCE,
                              CASE NO.
 9          Plaintiffs,
                              2:17-cv-10721-JTM-JVM
10 v.
                         JUDGE JANE TRICHE MILAZZO
11 LEON CANNIZZARO, et al.,
                         MAG. JANIS VAN MEERVELD
12          Defendant.

13 * * * * * * * * * * * *

14

15      VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF

16              ARTHUR BERNARD MITCHELL, IV

17                Location of witness:

18                  law offices of

19      Stanley Reuter Ross Thornton & Alford

20                909 Poydras Street

21              New Orleans LA  70112

22              Monday, September 21, 2020

23

24 Reported by:  DEBRA AMOS ISBELL, CCR,RDR,CRR

25 Job No: 183490

1  copy of the signed copy.

2      Q.    Okay.  So just to clarify, you said you

3  would give it to someone who was meeting with you who

4  needed some kind of notice to show their home or

5  work or -- I'm sorry -- their work or their school

6  that they were going to court?

7      A.    Yes.

8      Q.    And how common was it for these notices to

9  be given to witnesses in the office?

10     A.    I don't know the frequency that anybody else

11  gave them.  But I know that if somebody asked me for

12  something for work to show that they were going to be

13  in court for the trial, that I would probably give

14  them the DA notice.  I can't speak on what anybody

15  else would do.

16     Q.    And the way that you're kind of describing

17  this, it makes it sound like someone would come and

18  meet with you and then you would give them this DA

19  notice to show their home or work; is that correct?

20     A.    Yes.

21     Q.    Okay.  So what about a notice that was

22  delivered to a witness by an investigator or somebody

23  else but directs the witness to come to your office to

24  meet with you?  So this is even before you meet with

25  the witness.  This is telling the witness to come meet

1  with you.  Can you tell me about that document?

2      A.    I don't think that I -- I've never directed

3  anybody to create a DA notice to give to a witness

4  that wasn't already meeting with me in order to be

5  coming to court.

6      Q.    Sorry.  Can you repeat that?  I might need

7  you to just speak up a lit bit because your voice

8  drops on the audio.  Sorry about that.

9      A.    That's fine.

10          I've never authorized or directed anyone to

11 put my name, my information, on any one of these DA

12 notices to bring to somebody's house that wasn't

13 already meeting with me that had requested something

14 for their own records or their own purposes to show

15 someone else where they had been.

16     Q.    Okay.  Did you ever hear anyone at OPDA

17 raise concerns about whether using these subpoenas

18 was unethical in any way?

19     A.    Not that I can recall, no.

20     Q.    Okay.  And these subpoenas, did they invoke

21 Article 66?  Do they say anything about Article 66?

22     A.    I would need to see it to know.  Can you put

23 it up on the screen for me?

24     Q.    You want me to put --

25          THE WITNESS:  Could we take a quick break?

1          MS. MIKKILINENI:  We can take a quick break.

2  No problem.

3          THE WITNESS:  Good.  Thank you.

4          THE VIDEOGRAPHER:  The time is 11:48 a.m.

5  We're off the record.

6          (A RECESS WAS TAKEN.)

7          THE VIDEOGRAPHER:  The time is 11:57 a.m.

8  We're on the record.

9  BY MS. MIKKILINENI:

10     Q.    Okay, Mr. Mitchell.  We were just talking

11  about the DA subpoenas, DA notices, fake subpoenas.

12  That was the topic that we were talking about before

13  we took a break.  So I'm going to ask you some more

14  questions about that.

15          Did you ever use -- and I think you sort of

16  have already alluded to this.  But you have used these

17  DA notices; is that correct?

18     A.    Yes.

19     Q.    And how many times would you estimate that

20  you've used one?

21     A.    Maybe approximately 10n, a little over 10.

22  I don't recall.  This is a guess.

23     Q.    Okay.  And under what sort of -- do you

24  remember the cases in which you used them and why?

25     A.    Yes.  I remember the printouts or the copies

1  of the ones that Mr. Paul showed me.  I remember a few

2  of those cases.  I believe there was one that I did

3  not recall.

4      Q.    Okay.  Well, why don't we take a look.

5  These will be familiar to you.  And let me pull out my

6  list here.

7            So the first -- let's take a look at the

8  document that is Bates stamped OPDA00216, Matt.  And

9  I'm going to share screen and pull it up for you as

10 well, Mr. Mitchell.

11           MR. PAUL:  Is this going to be Exhibit 3?

12           MS. MIKKILINENI:  00216.

13           MR. PAUL:  Are we going to call this

14 Exhibit 3?

15           MS. MIKKILINENI:  Oh, yes, I'm going to mark

16 that as Exhibit 3.  Thank you.

17           (PLAINTIFFS' EXHIBIT 3, DA SUBPOENA TO

18            NATASHA AMBO, 2/17/2016 - OPDA00216,

19            WAS MARKED FOR IDENTIFICATION.)

20     Q.    Does this look familiar, Mr. Mitchell?

21           MR. PAUL:  We see your menu.  It's not the

22 actual PDF.  It's your Windows directory.

23           MS. MIKKILINENI:  Oh, wait.  I'm sorry.

24 Hold on.  Stop share.

25     Q.    What was I just sharing?

1      A.     The file folder with the file names.

2      Q.     Oh, it was just the folder?  Okay.  Sorry

3 about that.  Let me try again.

4             All right.  Here we go.  Can you see that?

5      A.     Yes.  Yes, I do.  And I have a copy of it in

6 front of me.

7      Q.     Okay.  Great.  This is Plaintiffs' Exhibit

8 3.  Can you tell me what this is?

9      A.     It's the DA notice.

10      Q.     Okay.  So this is what we were just talking

11 about; correct?

12      A.     Yes, yes.

13      Q.     And do you remember this case?

14      A.     I do remember this case.  And I guess I need

15 to clarify something.  I believe earlier I said that I

16 hadn't gone out with my investigator with one of

17 these.  But I remember this case as well as the one

18 that was Dr. Traylor --

19             THE VIDEOGRAPHER:  Excuse me, sir.  We've

20 lost your video.

21             You're back.  Thank you.

22             MS. MIKKILINENI:  You're back.

23             THE WITNESS:  Okay.  That's fine.

24      A.     So for clarification purposes, I know

25 already I said that I hadn't gone out with any of

 1                 the same questions.  She wants

 2                 him to jail time.  She is

 3                 nervous about testifying.  I

 4                 explained the process.  She has

 5                 questions that I do not know

 6                 the answer to.  It may be

 7                 helpful if you reach out.  I

 8                 will also be at the DA's office

 9                 later for a meeting.  I could

10                 call her with you then.  V's

11                 number, 504-515-8695."

12      Q.    Okay.  And you had said this was not at the

13   time -- and then if you keep going actually to the

14   next -- scroll to the next page --

15      A.    Okay.

16      Q.    -- could you read what's at the top of that

17   page?

18      A.    Sure.  Again, this is not -- I don't believe

19   this has anything to do with my case.

20                 "Email to EMAD from VA.  Just

21                 spoke to the victim.  Can we

22                 set up a meeting?  She wants

23                 DEF to be prosecuted, but she

24                 does not want to testify.  I

25                 explained the process.  I think

1            it would be beneficial to her

2            to hear all of her options.  I

3            think if you explain what can

4            happen without going to trial,

5            she may be more onboard with

6            testifying.  Thanks, let me

7            know."

8       Q.    Okay.  And you said this has nothing to do

9  with your case because this is a different date.  Did

10  Leslie Broaden, State versus Leslie Broaden, did it

11  actually go to trial on February 18, 2016?

12       A.    I believe it did.  I don't know the date,

13  but we went to trial shortly after I got cursed out

14  and threatened by Ms. Ambo's family.  And Ms. Ambo did

15  not appear.  She did not participate in the

16  prosecution.  And I don't know that Mr. Broaden was

17  convicted.  He may have even been found not guilty.

18  I don't know.  He was definitely not convicted of the

19  DV strangulation.  He was not convicted of that.  So

20  he was not guilty.

21       Q.    And you don't remember for your case ever

22  having any conversations with the victim/witness

23  coordinator who talked to Ms. Ambo?

24       A.    I don't.  I don't.

25       Q.    Okay.  Let's go back to the document.

1      A.      Yes, ma'am.

2              MR. PAUL:  Exhibit 3?

3              MS. MIKKILINENI:  Yeah, this is back to

4   Exhibit 3.  Yeah.  Thanks.

5      Q.      Let's look at the document itself, not just

6   the information about Ms. Ambo.  But would you agree

7   that this is an example of a fake subpoena?

8      A.      This is an example of a DA notice.

9      Q.      And it says "subpoena" at the top; correct?

10     A.      It does.

11     Q.      And what does it say below "subpoena"?

12     A.      "A fine and imprisonment may be imposed for

13  failure to obey this notice."

14     Q.      Okay.  Is that correct, that language?

15     A.      This is a DA notice.  I understand that it

16  has no legal effect.  So that is not an accurate

17  statement.

18     Q.      Okay.  And let's look at the language under

19  Ms. Ambo's address.

20     A.      Yes.

21     Q.      Can you read that language?

22     A.          "You are hereby notified

23              pursuant to LSA-CCRP, Article

24              66, to appear before the

25              District Attorney for the

1              Parish of Orleans to testify to

2              the truth according to your

3              knowledge in such matters as

4              may be required of you."

5      Q.    Okay.  And is that language correct?

6      A.    I understand that it is not correct.  It is

7  my understanding that this is not a correct statement

8  and this DA notice has no legal effect.

9      Q.    Okay.  And the document -- and then let's

10  move even further down under the date and time.  The

11  location of where the subpoena is directing the

12  witness to go, what does it say?

13      A.    I believe at 619 South White Street.

14      Q.    And what is that address?

15      A.    That is the District Attorney's Office,

16  Orleans Parish District Attorney's Office.

17      Q.    Okay.  And that's your name and your phone

18  number above the address; correct?

19      A.    That is my name and I guess possibly my

20  office number at this time.  I don't recall.

21      Q.    Okay.  And so you agree that the statement

22  that this is a notification pursuant to Article 66 is

23  incorrect?

24      A.    That is my understanding.

25      Q.    Okay.  And you agree that the language about

1  a fine and imprisonment dates being imposed for

2  failure to obey this notice is incorrect; right?

3      A.    That is my understanding, that this DA

4  notice has no legal effect.

5      Q.    Okay.  And under the return of personal

6  service -- it's under:  "This is to certify that on

7  February 17th, 2016" -- what does it say right below

8  that?

9      A.    "I received the process of court of which

10  this is a duplicate."

11      Q.    So this subpoena says "I received" -- for

12  the return of personal service, it says:  "I received

13  the process of court of which this is a duplicate."

14  So what does that suggest to you?

15      A.    I don't know what it suggests to me.  That

16  this is a copy of something, I guess.  I don't know.

17      Q.    That this is a copy of something -- of

18  something that is a court process?

19      A.    A duplicate of the process of court.  That

20  is what the document says.

21      Q.    Okay.  And you agree this document has no

22  actual legal effect?

23      A.    I do agree that this document has no legal

24  effect.

25      Q.    And did you explain that to Ms. Ambo when

1  go?

2      A.    My name is on the subpoena.  I don't recall

3  putting it there or creating this document.  It does

4  tell the witness to go to 619 South White Street.

5      Q.    And that's your name; correct?

6      A.    Yes, that is my name.  Again, I do not

7  remember creating this document.

8          MS. MIKKILINENI:  All right.  We're going to

9  take a look at Plaintiffs' Exhibit 6, which is

10  OPDA00230.  And again I will share this with you.

11          COURT REPORTER:  This will be Number 6?

12          MS. MIKKILINENI:  This is Exhibit 6, yes.

13          (PLAINTIFFS' EXHIBIT 6, DA SUBPOENA TO

14           JASMINE DANSEY, 5/4/2016 - OPDA00230, WAS

15           MARKED FOR IDENTIFICATION.)

16      Q.    Does this look familiar to you?

17      A.    It does look familiar to me.

18      Q.    Do you recognize the name of the person who

19  is being subpoenaed in this document?

20      A.    So I don't remember -- I'm not familiar with

21  the name of the victim in this case, but I am familiar

22  with the defendant, Mr. Vernell Nelson.  He had

23  several cases in Section C, misdemeanor cases, that we

24  did proceed to a judge trial.

25      Q.    This particular case was a misdemeanor case

1    that you proceeded to a judge trial on?

2        A.    Yes.

3        Q.    Okay.  And on the return of personal

4    service, it says it was served on May 4th, 2016, at

5    2:50 p.m.  And then there's a person who signed under

6    the section that says:  "I made due personal service

7    thereof by leaving same in the hands of the

8    aforesigned recipient."

9             So there's someone who signed as server of

10   process.  Do you recognize this signature?

11       A.    I don't.  I don't know who that is.  Yeah, I

12   don't know.

13       Q.    Okay.  Would it have been one of your

14   investigators?

15       A.    Yes, yes.

16       Q.    It would have been?

17       A.    It would have been an investigator.

18       Q.    Okay.  So you remember creating this

19   document?

20       A.    I do remember creating this document.  I

21   also remember -- I didn't recall the name -- but for

22   Ms. Dansey to come to court.  She would come to court

23   every time that Mr. Nelson's case was set.  She

24   indicated that she wished that the charges be

25   dismissed.  I indicated to her that I would seek a

1  dismissal.  I don't have authority to dismiss the

2  case.  Mr. Nelson also had several other cases.

3         On the date that Ms. Dansey came to court --

4  I believe she was in court this date, and I wasn't

5  able to meet with her because it was a busy day or for

6  some reason.  She used to come to court all the time

7  and tell me that she wanted to drop the charges.  She

8  would tell me that she wanted to be over it, go on

9  with their relationship with Vernell Nelson, what have

10 you.  And I instructed her to wait for me at the DA's

11 office with the return.  Because I was in court and

12 wasn't able to talk with her.  We met there, we

13 talked.  She needed something -- I believe she was in

14 school or she was working -- and needed something to

15 appear in court.  And she came to court, and she

16 ultimately testified that he hit her first, but then

17 she punched at him, and he slapped her or something.

18 However she described it, the judge found it fit to

19 find Mr. Nelson guilty, I believe, of this protective

20 order violation.  It might have been simple battery.

21 I don't recall.  But Mr. Nelson was found guilty of

22 one of the two.

23    Q.    What was the date of the trial?

24    A.    I don't know if it was 5/5 or sometime after

25 that.  I remember Vernell Nelson had a trial and

1    Ms. Dansey testified.

2         Q.    Okay.  So this subpoena is not necessarily

3    for trial?  This subpoena is to meet with you?

4         A.    It was not to meet with me.

5              MR. PAUL:  Object to the form.

6         A.    It was for trial.  I told you I don't

7    remember the date of the trial.  I guess it was 5/5.

8    It must have been 5/5 because this was for her

9    purposes to come to court.  It was not for her to sit

10   down and meet with me.  They had to seek me out every

11   time that court was set to tell me that she wanted

12   these charges to be dropped.  So she wanted to meet

13   with me and she wanted to come to testify if it went

14   to trial so that she could say exactly what she wanted

15   to say, that she had been saying to me the whole time,

16   that she wanted the charges dropped.  Ms. Dansey was

17   very cooperative and Ms. Dansey wanted to come to

18   court.  I don't know the exact trial date.  I'm

19   assuming it was 5/5.

20        Q.    But there was no court-issued subpoena for

21   her?  This was the only subpoena?

22        A.    I don't know.  I have not seen the records,

23   so I don't know.

24             MS. MIKKILINENI:  All right.  Let's take a

25   look at what's going to be Plaintiffs' Exhibit 7,

 1  OPDA00205.

 2          (PLAINTIFFS' EXHIBIT 7, DA SUBPOENA TO

 3           REGENA PAYTON, 11/17/2015 - OPDA00205, WAS

 4           MARKED FOR IDENTIFICATION.)

 5    Q.    Does this document look familiar to you?

 6    A.    It does.

 7    Q.    Do you remember creating this document?

 8    A.    I do.

 9    Q.    Okay.  Can you tell me about how you created

10  it?

11    A.    So Ms. Payton, I believe, prior to

12  arraignment, called -- or somehow found out that

13  Mr. Kevin Payton's case would be allotted to Section

14  C.  And she was transferred to my work number.  And we

15  had a lengthy conversation about Mr. Payton's drug

16  abuse and narcotics abuse, the fact that he had almost

17  died several times ingesting narcotics, and that

18  Ms. Payton felt as though the best thing for

19  Mr. Payton, the defendant, to get clean was for him to

20  go to jail.  There was an order of some kind of

21  rehabilitation for him.

22          Kevin Payton asked Ms. Regena Payton to use

23  her vehicle to go to the gas station or somewhere,

24  somewhere where he should have returned within an

25  hour.  He failed to return for about three days before

1  Ms. Payton reported the car had been stolen.  I

2  believe he was found in the car by State troopers or

3  other officers.  They spoke with Ms. Payton who told

4  them that she had let him borrow the car but not for

5  three or four days to go and get high somewhere or

6  what have you.

7          Ms. Payton came to several court hearings.

8  I believe -- maybe it had been set for trial and the

9  case got transported.  For some reason it got set

10  back.  But Ms. Payton wanted to come to trial because

11  she told me that she wanted to save her son's life.

12  And the only way that she would save his life would be

13  if the judge found him guilty and ordered him to

14  participate in some kind of rehabilitation program.

15          So Ms. Payton wanted to come to court.  The

16  subpoena was for her to come to court, to come and

17  testify in this case.

18      Q.    Can you describe this subpoena?  Is it

19  identical to the previous ones?

20      A.    It's a DA notice, sure.  The DA notice is

21  similar to the other ones that I've seen.

22      Q.    Okay.  So you've been describing this

23  document as being used to subpoena Ms. Payton to

24  court; is that correct?

25      A.    My understanding is that it was a document

1  of notice that I was giving to her to come to court

2  because she wanted something for her records.  These

3  people -- these witnesses, victims, whoever,

4  defendants -- regarding trial requested to have

5  something that they could put -- give to someone else

6  to say, hey, I will be in the courthouse -- I will be

7  somewhere else, not at my workplace or not in class,

8  for about three hours on November 18th, 2015.

9       Q.    And when did you -- and you served this the

10 date before; correct?

11      A.    I didn't serve it.  My investigator gave it

12 to her the day before, it looks like.

13      Q.    But you generated this document, and then

14 they served it the day before.  And was November 18th

15 the trial?

16      A.    I don't have the documents in front of me.

17 I believe so.  That was what I would have -- I would

18 have put that date on there as the trial date.

19      Q.    And if what the witnesses were seeking was a

20 document explaining that they needed to appear at

21 trial, why would you use -- why does this document

22 invoke Article 66?  Why does it say that -- it doesn't

23 actually say anything about trial; right?  It says

24 this meeting is with you at the DA's office.

25           MR. PAUL:  Object to the form.

```
 1       A.     So, ma'am, I didn't create this document.  I
 2  don't know why it says what it says.  I was given this
 3  document by Tiffany Tucker, and I was told by David
 4  Pipes and other people to use this document.  This is
 5  the document that we use to get people into court.
 6  I don't know when I met with this woman.  Sometimes I
 7  meet with witnesses at 7, 8 o'clock at night.  I can't
 8  go to court, I can't get an instanter.  I can't have
 9  the Sheriff's Office serve somebody the day before
10  because I'm being forced to trial.  They need 11 days
11  notice.  This is what I had.  So I gave this woman,
12  Ms. Payton, I gave Ms. Ambo -- went to her house,
13  tried to talk to her before I was told to get the fuck
14  away from around there.  I gave her that.  I gave
15  Ms. Dansey something for her records.  That's what I
16  was doing, giving the people notices so that they
17  would have something for their records to come
18  and appear for trial in court.
19       Q.     What would have happened if they hadn't
20  appeared for trial?  What if one of them -- did every
21  single one of these witnesses appear for trial?
22       A.     Ms. Ambo didn't.  So no.
23       Q.     Ms. Ambo didn't?
24       A.     And nothing happened.  I didn't request a
25  continuance or anything like that.  I don't know if
```

1  ex parte conversation with him, my understanding.

2      Q.    If the victim or witness had never been

3  properly served before seeking a Material Witness

4  Warrant application, should the Court know that before

5  it decides whether or not to issue the warrant?

6          MR. PAUL:  Objection.  Calls for

7  speculation.

8      A.    So I don't know what happens in every

9  instance.  But I know that in my application, I did

10 inform that service was not executed upon

11 Ms. Singleton.  I don't know what other people do and

12 I don't know about other judges.  I just know that the

13 one that I filed, I let the judge know that she

14 received improper service.  I don't know if it was on

15 more than one occasion that I indicated that, but I

16 definitely know on my application that I indicated

17 that it was improper service as it was left in door.

18     Q.    Would you agree that arresting and jailing

19 someone is a serious measure?

20     A.    I don't know that -- in what context?  I

21 don't understand.

22     Q.    Would you agree that arrest and detention

23 should be reserved for -- that it's a serious

24 consequence?

25     A.    Sure.  I mean it's a consequence that, under

1  the Constitution, if a judge deems it appropriate or a

2  police officer deems it appropriate, that they make

3  the call to jail someone.  I don't make that call.

4      Q.    Would you agree that arrest and detention

5  should be reserved for witnesses -- only for witnesses

6  who have very important information, extremely

7  important information?

8          MR. PAUL:  Object to the form of the

9  question.

10     A.    So once again, I believe that upon the

11 showing of whether or not a person comes to court

12 pursuant to a judge's subpoena, that the judge will

13 make a decision if he or she believes it's fit that

14 the person be jailed.  I don't make that decision.

15     Q.    Do you ever receive training about Material

16 Witness Warrants?

17     A.    No.  I don't remember receiving training

18 prior to the Material Witness Warrant that I had

19 applied for other than the sample that I was sent from

20 Tiffany Tucker, the one that she had previously either

21 created or gotten from somebody, and maybe Mr. Pipes

22 reviewed it.

23     Q.    And specifically, did you ever receive any

24 guidance, if not training, on what information is

25 considered essential to a proceeding such that a

1  Material Witness Warrant might be necessary?

2      A.     I know that after speaking with Ms. Tucker

3  and speaking with Mr. Pipes that they -- well, Tiffany

4  wasn't my supervisor; she was my senior.  But after

5  speaking with Mr. Pipes for sure, he believed that

6  that was appropriate, filing a Material Witness

7  Warrant was appropriate.

8      Q.     In the case -- in the one case in which you

9  filed a Material Witness Warrant?

10     A.     Yes.

11     Q.     When seeking a Material Witness Warrant, who

12 decides the bond amount?

13     A.     I don't know if I had a conversation with

14 Mr. Pipes or if I just copied and pasted the one that

15 Tiffany had done.  I don't recall.  But I don't think

16 that I made the decision of the amount, as far the

17 bond amount.

18     Q.     Did you need approval from Mr. Pipes in

19 order to apply for the Material Witness Warrant

20 application?

21     A.     Yes.

22     Q.     Or the Material Witness Warrant?  Okay.

23            All right.  Let's talk about the State

24 versus Vernon Crossley.

25     A.     Okay.

1      Q.    What was your position on that team?

2      A.    When I first got to Section F, I was a

3  junior attorney in the section.  And I believe

4  Mr. Crossley was charged with domestic battery and

5  simple robbery, which are junior-level offenses.  And

6  I think that the charges may have been amended to two

7  misdemeanors.  I don't remember exactly what the

8  history of the case was before I got there.  But once

9  I got there, I was first chair on the file.

10      Q.    And first chair means you were the lead on

11  that team?

12      A.    Yes.

13      Q.    Were you empowered as lead or as first

14  chair, were you empowered to make every decision or

15  would you need approval for certain decisions?

16      A.    Sure.  I didn't know what decisions to make

17  because I had been a lawyer for like four months and

18  had been at the office for like three weeks.  So I

19  didn't know what decisions I could make.  I just know

20  I sat down and read my files and I did the things that

21  I was told based on who I was told to reach out to.

22      Q.    And Tiffany Tucker was the senior on that

23  case?

24      A.    She was the senior in the section, yes.

25      Q.    The senior in the section?  Was she your

1  co-counsel on that case?

2      A.    Yes, she was.

3      Q.    And the supervisor on the case was

4  Mr. Pipes?

5      A.    Yes.

6      Q.    Who were the investigators on the case?

7      A.    Corey Porter was the investigator assigned

8  to Section F at the time.  So he was the investigator.

9      Q.    Was Michael Levasseur also one of the

10 investigators?

11     A.    I don't know.  Maybe Corey asked him to

12 assist in some things.  But as far as who was assigned

13 to Section F as my investigator, it was Corey Porter.

14     Q.    And Frank Bivens?

15     A.    Frank Bivens, I believe, may have assisted

16 in some things.  But the investigator who was assigned

17 to my section and who was assigned to the case was

18 Corey Porter.

19     Q.    Corey Porter.  Do you know if Corey Porter

20 is post-certified?

21     A.    I don't.

22     Q.    You don't know?

23     A.    I don't.

24     Q.    You don't know if he was post-certified at

25 the time?

1      A.      I don't know.

2      Q.      And in working with Mr. Porter, did you give

3  him instructions in the case?

4      A.      Instructions insofar as could you -- I've

5  been having issues contacting this witness; could you

6  like give me the number, find a good address?  Things

7  of that nature.  Yes, I asked him to do those things.

8      Q.      And so did you ask him to contact the

9  witnesses in that case?

10     A.      I believe I did.

11     Q.      And did you give him instructions on how to

12 contact the witnesses?

13     A.      I was new at that time.  I didn't know

14 anything.  So I guess he had been at the office for

15 longer than I had.  I didn't know anything.  So I

16 don't know that I told him every little thing to do.

17 I don't know that.

18     Q.      Would your communications with Mr. Porter be

19 documented anywhere like in emails?

20     A.      Yes.

21     Q.      Would they be documented anywhere else?  In

22 your notes?

23     A.      Potentially somewhere in the file, maybe on

24 the Case Activity Sheet.  That would be about it.

25     Q.      Did you often meet with Ms. Tucker to

1   discuss the case?

2       A.    I discussed pretty much all of my cases with

3   Tiffany, especially the ones that were set for like

4   motion or trial just to update her as to what I was

5   doing in the case and what was going on.  But we would

6   also -- both of us would meet with Mr. Pipes.

7       Q.    Ultimately you would report up to Mr. Pipes?

8       A.    Yes.

9       Q.    And how often did you meet with Ms. Tucker?

10      A.    We talked every day about all the cases,

11  especially because I was brand new and didn't really

12  know much.  Tiffany had to kind of like teach me how

13  to do some things as far as like working the programs

14  that we used, like the case management software and

15  things of that nature, things I didn't know how to

16  work.

17      Q.    And how often would you meet with Mr. Pipes?

18      A.    I can't recall if it was every day.

19  Multiple times a week I would meet with him.  I don't

20  know if it was every day, though.

21      Q.    Who was the victim/witness coordinator in

22  this case, do you remember?

23      A.    I know the witness coordinator assigned to

24  the section was Julie Ferguson.  I think Amy Jackson

25  might have been like the domestic violence advocate --

1  Amy Jackson, I believe.

2          COURT REPORTER:  I'm sorry.  Can you repeat

3  that?  I didn't understand that.

4          THE WITNESS:  All right.  I said Julie

5  Ferguson was the advocate assigned to the section that

6  I was assigned to, Section F.  However, I believe that

7  Amy Jackson was the domestic violence advocate

8  assigned to Mr. Crossley's case.

9     Q.    And did you give -- were you in regular

10 communication with Ms. Jackson?

11    A.    I don't know about regular communication.  I

12 would ask her for information on the file, I believe.

13 I asked her for information.

14    Q.    Did you give her instructions in this case?

15    A.    I didn't instruct her on what to do in this

16 case.  Again, I don't know how long Ms. Jackson had

17 been there, but I didn't tell her what to do.  I was

18 brand new.  I didn't know what to tell her to do.  I

19 just asked her for information as to whether or not

20 she had previously been in contact with Ms. Singleton

21 and if she had a good number.

22          MS. MIKKILINENI:  I'm going to show you what

23 I'm marking as Plaintiffs' Exhibit 15, which is

24 OPDA18027.

25          THE WITNESS:  Okay.

1            (PLAINTIFFS' EXHIBIT 15, CASE NOTES,

2            VERNON CROSSLEY - OPDA18027, WAS MARKED

3            FOR IDENTIFICATION.)

4     Q.    And this goes back to something you were

5  saying earlier, Mr. Mitchell, about the disposition of

6  this case.  Because on the second entry on this

7  page -- sorry -- the third entry on this page there's

8  a note under "remarks."

9     A.    Yes, I see that.

10    Q.    What does that note say?

11    A.    "Amended bill to misdemeanor per GMAR."

12    Q.    So does that mean that Mr. Crossley was only

13  facing misdemeanor charges in this case?

14    A.    I believe so.

15    Q.    Okay.  And can you tell me the date on that

16  entry?

17    A.    It says February 27th.  I don't know if

18  that's a '14.  I think it says '14, February 27th,

19  '14.

20    Q.    This is for the same entry, the one that

21  says "amended bill to misdemeanor"?

22    A.    Yes.

23    Q.    Oh, okay.  It says:  "Next date, February

24  27th" --

25    A.    Oh, you're saying the date for the entry?

1          Let's look at the CourtNotify -- let's page

2    down actually to the page that's Bates stamped

3    OPDA018942.

4        A.    Yes.

5        Q.    And if you can see the notification date for

6    February 24th, 2015.

7        A.    Yes.

8        Q.    Can you read what the description for the

9    service of this subpoena is?

10       A.    "Not enough service time."

11       Q.    And can you tell me what that means?

12       A.    That there was not enough service time.

13       Q.    Not enough service time before what?

14       A.    For the Sheriff's Office to serve this

15   subpoena is my assumption.

16       Q.    So was this subpoena properly served?

17       A.    I have no idea.  I don't know.  It says "not

18   enough service time," so I don't know.

19       Q.    So if you looked at this -- if you looked at

20   this information, what would you assume about this

21   subpoena?

22       A.    That it was not issued to the person.

23       Q.    So it was not properly served?

24       A.    Right.

25       Q.    There's an event date listed up at the top.

1  Do you see that?

2      A.    I do.

3      Q.    What does that date mean?  What is that date

4  and what does it mean?

5      A.    2/27 of 2015.  It appears that that was the

6  first trial setting.

7      Q.    Okay.  So that means that the subpoena is to

8  appear in court on February 27, 2015; correct?

9      A.    February 27, 2015, yes.

10     Q.    Okay.  And where would this subpoena, this

11  CourtNotify subpoena, tell Ms. Singleton to report?

12     A.    To court, Section F.

13     Q.    To court, Section F?

14     A.    Right.

15     Q.    So does "not enough service time" in this

16  context mean that he did not serve her in time before

17  the trial date?

18     A.    Right.  Or that for whatever reason, the

19  issue date and the trial date, there was not enough

20  time in between those two dates for this subpoena to

21  be served.

22     Q.    Okay.  And do you remember what happened on

23  the trial date?

24     A.    I don't.  I don't think -- this was not my

25  file at this time.  I was not -- I was still in

1  Magistrate at this time.  I don't know anything about

2  February 22nd, 2015, the 24th of 2015, or the 27th of

3  2015 as it relates to my information in this case.  I

4  didn't get into this case until March.

5      Q.    When did you --

6      A.    March.

7      Q.    Okay.  Yeah.  That was my next question.

8      A.    Right.

9      Q.    So let's scroll down to the next page.  And

10  you see here the CourtNotify history for March 6,

11  2015.  Were you involved at this point?

12      A.    I don't know if I had requested that the

13  subpoena be issued.  But I know that from the March

14  20th of 2015 date it was my case at that time.

15      Q.    This was your case at this time?

16      A.    Yes.  I don't know about the 6th.  I don't

17  know that I inputted the information for it to be

18  issued on March the 6th or if the prior attorney had

19  done that prior to me getting on the case.  But I do

20  know that on March 20th of 2015 I was assigned to

21  Section F.

22      Q.    Okay.  And can you read the note next to --

23  there's two entries:  Tyrone Vail, March 6th, 2015, at

24  2:02 p.m., and Tyrone Vail, March 6th, 2015, at

25  2:05 p.m.  Can you read the note for each of those

1  entries?

2      A.     It says:  "3rd att in door" and "3rd att in

3  door."

4      Q.     And what would you assume that that meant?

5      A.     This was the third attempt that the

6  Sheriff's Office had tried to serve Ms. Singleton.

7  And because they could not reach her or speak with her

8  or physically serve her, that this notice was left in

9  her door.

10     Q.     So was this subpoena properly served upon

11 Ms. Singleton?

12     A.     I don't believe as far as personal

13 domiciliary service.  However, Ms. Singleton had

14 received notice, I believe, at this time, and as I

15 stated in my warrant applications with Judge Pittman.

16     Q.     What kind of notice?

17     A.     She had received notice of this trial date.

18     Q.     What do you mean by "notice"?

19     A.     That she was notified via the subpoena being

20 left in her door that stated that this trial was set

21 for March the 20th of 2015, as I stated in my

22 application.

23     Q.     So notwithstanding the fact that this was

24 not properly served, your position in your Material

25 Witness Warrant application was that she had received

1  notice of the trial date; is that correct?

2      A.    So I listed in my Material Witness Warrant

3  application that she did not receive proper service.

4  That's listed in my application.

5      Q.    Okay.  And did you think that -- or was it

6  your view that leaving the subpoena in the door was

7  sufficient notice -- was sufficient to put her on

8  notice of the trial date?

9      A.    I don't know.  I didn't make the decision.

10  I'm not a judge, so I don't know.  I filed my

11  application with the judge.

12      Q.    Do you make an independent legal judgment

13  about the facts that you put in your submissions to

14  the Court?

15      A.    I gave the Court the information that I had

16  present, and the Court decided whether or not it was

17  appropriate for that warrant to be issued.

18      Q.    And so did you believe that your judgment

19  about whether this fact was relevant to whether she

20  actually knew that there was a trial date was

21  irrelevant to a Material Witness Warrant application?

22          MR. PAUL:  Object to the form.

23      A.    I put all of the information that I had as

24  it related to the case, my understanding of the

25  service attempts on Ms. Singleton, into the

1  application and filed it with the judge.

2      Q.    And do you assess the facts for yourself

3  before you put them in a Material Witness Warrant

4  application or any other submission to the judge to

5  evaluate whether you believe that they meet the legal

6  standard that is required?

7      A.    I don't know about any other filings that I

8  filed that are not at issue in this case.  All I know

9  is I put in the information that I had as it related

10  to the Sheriff's Office's service attempts on

11  Ms. Singleton into my motion or application for a

12  Material Witness Warrant and gave it to the judge.

13      Q.    But in general, do you evaluate the facts

14  that you put in your submissions to the Court to

15  ensure that they meet the legal standard that you are

16  saying that they meet?

17      A.    I evaluate the facts and I put them in the

18  motion before the judge.

19      Q.    Okay.  Let's look at the next page.

20  Actually there's a few repeats here.  Let's sort of

21  scroll down or page through to OPDA18946.  And can you

22  tell me what this -- can you tell me the date here and

23  what this shows?

24      A.    The event date is April 24th of 2015.  On

25  March 25th of 2015 Tyrone Vail with the Sheriff's

1  Office indicated in the description that this was the

2  third attempt in door.  My understanding was that this

3  was the Sheriff's Office attempt to serve -- third

4  attempt to serve Ms. Singleton with a subpoena for

5  this case.

6      Q.    And again, the subpoena was left in the

7  door; correct?

8      A.    Yes, that's my understanding.

9      Q.    So was this subpoena properly served?

10     A.    I don't know whether it was properly served

11  or not as it relates to domiciliary service or

12  personal service.  Did Ms. Singleton sign for it?  No.

13  So it's not proper domiciliary service, it's not

14  proper personal service.

15     Q.    Sorry.  You said at first you didn't know,

16  but you just said that it was not proper personal

17  service, it was not proper domiciliary service; is

18  that correct?

19     A.    That's what I'm saying, yes.

20     Q.    Okay.  So to summarize -- and feel free to

21  page back through the pages that we just looked at,

22  OPDA18942 to 18946 -- and actually, you know what,

23  let's move down to OPDA18947.  Because there's a

24  different entry for this date, which is April 23rd,

25  2015.  And again, can you read the description for

1  this?

2      A.      Tyrone Vail.  Description:  "Third attempt

3  in door" with a date 4-22-15.

4      Q.      So to summarize each of these entries, can

5  you identify a single one of these subpoenas that was

6  not left in a door?

7      A.      As far as the ones that had descriptions for

8  it, they appear to say they're an attempt in door.

9      Q.      So were any of these subpoenas properly

10  served?

11     A.      Ms. Singleton did not receive proper

12  domiciliary service or personal service of these

13  subpoenas.

14             MS. MIKKILINENI:  All right.  Let's take a

15  look at OPDA18079, which I'm marking as Plaintiffs'

16  Exhibit 18.

17             (PLAINTIFFS' EXHIBIT 18, CASE ACTIVITY

18              SHEET, VERNON CROSSLEY - OPDA18079-18080,

19              WAS MARKED FOR IDENTIFICATION.)

20     A.      Okay.

21     Q.      Okay.  Now, this -- we've discussed this

22  type of document a couple of times.  Is this a Case

23  Activity Sheet you were describing earlier?

24     A.      Yes.

25     Q.      So this is where you document or where an

1  attorney in the office would document communications

2  with witnesses; correct?

3      A.    Yes.

4      Q.    Okay.  Do you recognize these particular

5  notes?

6      A.    I do.

7      Q.    Is this your handwriting?

8      A.    Yes, it is.

9      Q.    And the initial under ADA, can you read

10 that?

11     A.    AMIT.

12     Q.    So those are your initials?

13     A.    The first letter of my first name and the

14 first three letters of my last name.

15     Q.    Do you recall taking these notes?

16     A.    I do.

17     Q.    Do these notes accurately reflect your

18 attempts to contact Ms. Singleton?

19     A.    Yes.

20     Q.    Okay.  Let's take a look at the first page,

21 OPDA18079.  And before we get into the substance, do

22 you know where you kept this log?

23     A.    I don't -- it should have been in the file,

24 the case file.

25     Q.    It would have been in the file, the case

1  file?

2     A.     It should have been, yes.

3     Q.     Did you ever take that case file home with

4  you?

5     A.     This one specifically, no.  I may have made

6  copies of the police report and brought it home.  But

7  as far as like the file, no.

8     Q.     Do these notes show whether you -- whether

9  they were documented contemporaneously.  So in other

10  words, were these notes taken -- can you tell if these

11  notes were taken at the time that you tried to call

12  her?

13     A.     Yes.  Any time I entered something in the

14  description of activity, it was shortly after I had

15  attempted the activity or done the activity.

16     Q.     So writing down that date, is this the

17  contemporaneous documentation?

18     A.     Yes.

19     Q.     And how do you know?

20     A.     Because it's my handwriting and it's the

21  date, and I know that I attempted to call

22  Ms. Singleton on several dates; never received any

23  answer.  I called --

24     Q.     So you specifically -- sorry.  So you

25  specifically remember documenting it at the time?

1     A.     Yes.

2     Q.     So you never came back and documented it on

3  a different day?

4     A.     No.

5     Q.     Okay.  Let's talk about what these notes

6  reflect about your attempts to contact Ms. Singleton.

7  You attempted to contact her on March 7th; correct?

8     A.     Yes.

9     Q.     Do the notes show a phone number where you

10 called her?

11    A.     No, they don't.

12    Q.     And do you know what phone number you would

13 have called?

14    A.     I don't remember.  I think at some point I

15 was informed that I had been calling her house phone

16 number.  So yeah, I think I was calling the house

17 phone.

18    Q.     Do you remember who told you that?

19    A.     I think I may have learned that from Amy

20 Jackson, that she had a cell phone number for

21 Ms. Singleton and I was using the number from the

22 police report.

23    Q.     Okay.  And do the notes show what time you

24 called her?

25    A.     They don't.

1     Q.    Do the notes show whether you left a voice

2 mail?

3     A.    They don't.

4     Q.    Okay.  And then you called her once on March

5 20th; correct?

6     A.    Yes.

7     Q.    And do those notes show the phone number

8 where you called her?

9     A.    They don't.

10    Q.    Okay.  And do you know what phone number you

11 would have used then on March 20th?

12    A.    Again, I believe it would be the house phone

13 number.

14    Q.    The house phone number?

15    A.    Yes.

16    Q.    And do these notes show what time you called

17 her?

18    A.    They don't.

19    Q.    Do they show whether you left a voice mail?

20    A.    No, they don't.

21    Q.    And then you called her once on March 25th,

22 and she did not answer; correct?

23    A.    Correct.

24    Q.    And again, do the notes show the phone

25 number where you called her?

1      A.     No.

2      Q.     Do they show what phone number you would

3  have used?

4      A.     No, they don't.

5      Q.     And do you know which number you would have

6  used on March 25th?

7      A.     Again, I believe it was the house phone

8  number.

9      Q.     You think you were using the house phone

10  number?

11     A.     Yes.

12     Q.     Okay.  And do these notes show the time that

13  you called her?

14     A.     These do not, no.

15     Q.     Okay.  Do they show whether you left a voice

16  mail?

17     A.     No.

18     Q.     Could you read for me the complete note for

19  March 25th?

20     A.     "Victim did not receive proper service via

21  CourtNotify.

22            Under, indented:  "Called victim - no

23  answer."

24     Q.     Okay.  Let's look at the second page, which

25  is OPDA18080.

1     A.     Yes.

2     Q.     And these notes reflect several attempts to

3  contact Ms. Singleton; is that correct?

4     A.     That is correct.

5     Q.     Okay.  And all of these attempts took place

6  on the same day, on April 20th; is that correct?

7     A.     That's correct.

8     Q.     According to these notes?

9     A.     Yes.

10    Q.     Do these notes show the phone number where

11 you called her?

12    A.     No.

13    Q.     And again, do you know what phone number you

14 would have used?

15    A.     I don't remember exactly what time Amy

16 Jackson gave me the cell phone number for

17 Ms. Singleton, but at some point I began calling her

18 cell phone number.

19    Q.     And do you remember when that was?

20    A.     I don't.  I don't.

21    Q.     Okay.  And do these notes show the time that

22 you called her?

23    A.     Yes.

24    Q.     Okay.  And do they show whether you left a

25 voice mail?

1      A.      I don't see it there.  No, I don't see that.

2      Q.      Can you read the first note next to the time

3  12:20?

4      A.      Yes.  "Called victim.  Phone rang for three

5  minutes but no one answered."

6      Q.      And then can you read the second note, which

7  is also at 12:20?

8      A.           "Put witness in CourtNotify

9              for a second time.  Service of

10             subpoena dated 3/25/15 was

11             improper; said 'service left in

12             door.'"

13     Q.      Okay.  So this note discusses a previous

14  CourtNotify entry; is that correct?

15     A.      Yes.

16     Q.      And what does it say about that entry?

17     A.      That it was -- that service of subpoena

18  dated 3/25/15 was improper and said service left in

19  door.

20     Q.      Okay.  And the last entry for April 20th is

21  at 3 p.m.; is that correct?

22     A.      Yes.

23     Q.      Okay.  Could you read the first note there?

24     A.           "Printed subpoena.  Traveled

25             to victim's last known address

```
 1              to serve victim with subpoena.

 2              Accompanied by Investigators

 3              Corey Porter, Frank Bivens, and

 4              Michael.

 5                "Victim unable to be

 6              contacted at home.  Traveled to

 7              a different address associated

 8              with the victim and was

 9              unsuccessful.

10                "Called victim three times

11              and left voice mail at an

12              alternate number.  Also texted

13              victim to inform that I was

14              attempting to serve her."

15      Q.    Okay.  So the very first line you read, it

16  says "printed subpoena."  Correct?

17      A.    Yes.

18      Q.    Where was it printed from?

19      A.    The CourtNotify text.  I believe that's what

20  that refers to, CourtNotify.

21      Q.    That's referring to printing a subpoena from

22  CourtNotify?

23      A.    Right.

24      Q.    Okay.  Let's take a look back at the

25  CourtNotify entry for April 20th, 2015.  And that
```

1  again is Exhibit 17, OPDA18940.  And let me share this

2  screen again.  And let's scroll down to OPDA18947.

3  And it says -- what does it say for 4/20?

4       A.    Tyrone Vail, Tyrone Vail, Tyrone Vail.

5       Q.    And the status -- the status --

6       A.    Printed.

7       Q.    Printed; right.  So it says "printed."  And

8  then who does it say for the responsible party?

9       A.    Tyrone Vail.

10       Q.    And the date and time?

11       A.    4/20/2015, 3:21.

12       Q.    Okay.  So did Tyrone Vail print this

13  subpoena or did you print this subpoena?

14       A.    I believe -- it says status "printed" for

15  Tyrone Vail.  He printed it.  I also recall printing a

16  CourtNotify subpoena as well as making copies of my

17  instanter subpoena for the trial date.

18       Q.    Okay.  Did Tyrone Vail print the subpoena

19  and give it to you?

20       A.    No.

21       Q.    Okay.  Let's go back to Exhibit 18, 18079,

22  which are your notes.

23       A.    Yes.

24       Q.    Okay.  Does this note say what address you

25  went to?  And now we're back at the second page.

1    A.    No.

2    Q.    The entry for 4/20.

3    A.    It does not.

4    Q.    And is that documented anywhere, to your

5 knowledge?

6    A.    The house number and the coded stuff, no.

7    Q.    Okay.  Is there any way for us to know what

8 address you went to as documented in this note?

9    A.    No, not from these notes.

10    Q.    And what did you do with that subpoena when

11 you arrived at the address that you had for

12 Ms. Singleton?

13    A.    Corey Porter had it in his possession.  He

14 gave it to him, the CourtNotify subpoena as well as

15 the instanter subpoenas.  Vail made copies of them,

16 gave them to Mr. Porter.

17         We went to the home.  I was accompanied by

18 Mr. Porter and two other investigators.  They knocked

19 on the door, no answer.  I believe maybe knocked on a

20 window, no answer.  And traveled to another address

21 that was associated with Ms. Singleton.  No answer

22 there.

23         I believe Mr. Porter left the instanters as

24 well as the CourtNotify subpoenas somewhere, either on

25 the porch or in the door or somewhere around the

1  outside of the residence prior to us leaving.

2      Q.    Sir, could you repeat that last sentence?

3      A.    I said the instanters and CourtNotify

4  subpoenas were left somewhere at the exterior of

5  Ms. Singleton's home.  I'm not sure about the other

6  address that we went to.  But we left the instanters

7  and the CourtNotify subpoenas -- Corey Porter did --

8  outside the exterior of Ms. Singleton's home.

9      Q.    And how do you know it was Ms. Singleton's

10 home?

11     A.    It was the same address recorded on the

12 CourtNotify subpoenas, Farwood Drive.

13     Q.    And those were the CourtNotify subpoenas

14 that had been previously left in the door?

15     A.    Yes.

16     Q.    Okay.  But these notes don't actually say

17 that that was the same -- that you delivered the

18 subpoenas to that address; is that correct?

19     A.    No, they don't say that.

20     Q.    Okay.  So we don't know from these notes

21 which addresses you actually delivered the subpoenas

22 to; correct?

23     A.    That is not reflected in these notes, no.

24     Q.    And these notes reflect all of your attempts

25 to contact Ms. Singleton; correct?

 1      A.      Yes.

 2      Q.      Okay.  On April -- and on April 20th you

 3 called her once, and then you went to an address that

 4 you have not documented here.

 5      A.      Yes.

 6      Q.      You left the subpoenas.  You then went to a

 7 different address, and you're not sure where the

 8 subpoenas were left at that different address?

 9      A.      I don't know about the second address.  As

10 far as --

11      Q.      You then --

12      A.      I'm sorry.

13      Q.      No.  Go ahead.  I'm sorry.  No, no, no.

14 Please continue.

15      A.      So I was going to say like this is the

16 things that I did on my end.  I know that Corey sent

17 me an email of the things that he had tried to do.

18 And I had spoken with Ms. Jackson about her attempts

19 to contact Ms. Singleton.  So this is the stuff that I

20 did on my end.

21      Q.      Uh-huh (positive response).  And just to

22 confirm these notes, though, and what they capture,

23 you went to those two addresses, you then called her

24 and texted her.  And all of this happened the same

25 day; correct?

1    A.    Yes.

2    Q.    Okay.  And did you leave a voice mail?

3    A.    I don't remember.  I combined this.  I said:

4          "Called ... three times and

5           left a voice mail at an

6           alternate number.  Also texted

7           victim to inform I was

8           attempting to serve her."

9    Q.    Do you know what that alternate number is?

10   A.    I don't have it written down here.  But the

11 only other number that I had was the number that came

12 from Amy Jackson in an email.

13   Q.    Okay.  And in the very last entry -- let's

14 look at the last entry.  Did you text Ms. Singleton?

15   A.    Yes, from the work cell phone.

16   Q.    From your work cell phone?

17   A.    Yes.

18   Q.    So your work cell phone should have a record

19 of this text message; correct?

20   A.    It should.

21   Q.    And you would not have destroyed that text

22 message or the phone; correct?

23   A.    I would not have.

24   Q.    And that phone is still in your possession?

25   A.    It is not.

Page 216

1    Q.    Why?  What happened to it?

2    A.    I know we changed phones at some point.  I

3  don't know where the old phones are.  We got new

4  office phones at some point.

5    Q.    Are you familiar with the document retention

6  policy in your office for domestic violence cases?

7    A.    I don't know.

8    Q.    Are you familiar with a policy that states

9  that all documents associated in domestic violence

10  criminal cases must be retained for 10 years after the

11  end of the year in which the sentence is imposed?

12    A.    I'm not sure.  I can't recall that I was

13  aware of that.  I don't know.

14    Q.    Okay.  And Mr. Crossley was sentenced in

15  2015; correct?

16    A.    2015?  I believe so.

17    Q.    Okay.  So according to this policy, you

18  would have been required to keep all records related

19  to his case until 2025; correct?

20    A.    Yes.

21          MR. PAUL:  Object to the form.

22    A.    I don't know the policy -- I don't know

23  about the policy.

24    Q.    Okay.  Can you remember the contents of the

25  text message that you sent Ms. Singleton?

1      A.      If I remember, I'm guessing it was something

2  like:  Ms. Singleton, hi.  My name is Arthur Mitchell.

3  I've been trying to contact you to secure your

4  presence for trial.  Please call me back.  I don't --

5      Q.      And did you save this text -- I'm sorry.  Go

6  ahead.

7      A.      I said I don't remember exactly what I said

8  to her.

9      Q.      All right.  Did you save this text message

10 to the DA file?

11     A.      I don't recall.  I don't know.

12     Q.      Can you read into the record the last entry

13 on the first page, which is OPDA18079?

14     A.            "Next page details attempts

15                 made to contact victim (Renata

16                 Singleton) prior to trial.

17                   "Because attempts to contact

18                 victim to meet -- because

19                 attempts to contact victim met

20                 with no avail, the State filed

21                 for a Material Witness Bond."

22     Q.      Okay.  Let's talk about the Material Witness

23 Bond that you sought.

24     A.      Yes.

25                 MR. PAUL:  Can we take a short break, just

1  for a few minutes?

2            MS. MIKKILINENI:  Yeah, we can take a short

3  break.  That sounds fine.

4            MR. PAUL:  Five minutes?

5            MS. MIKKILINENI:  Sure.

6            THE VIDEOGRAPHER:  The time is 3:05 p.m.

7  We're off the record.

8            (A RECESS WAS TAKEN.)

9            THE VIDEOGRAPHER:  The time is 3:12 p.m.

10  We're on the record.

11            MS. MIKKILINENI:  Thank you.

12      Q.    Mr. Mitchell, I actually want to go back

13  before we jump into the motion for Material Witness

14  Bond.  I want to go back to the subpoenas that you

15  brought to Ms. Singleton's house.

16      A.    Yes.

17      Q.    Or to the house that you thought was

18  Ms. Singleton's.  Can you tell me what subpoenas you

19  left that are documented in these witness contact

20  notes?

21      A.    We had copies of instanter subpoenas from

22  Section F for Ms. Singleton as well as the printouts

23  from CourtNotify.

24      Q.    And you were -- and Corey Porter was your

25  investigator at the time; is that correct?

1      A.    He was.

2      Q.    Okay.  And did he travel to Ms. Singleton's

3  house independently from you to deliver subpoenas to

4  that address?

5      A.    I believe -- I believe he did.

6      Q.    Do you know what dates he did?

7      A.    I don't remember.  I don't recall the date.

8      Q.    And was that before or after you traveled

9  there together?

10      A.    I don't know the exact dates.  I know he

11  emailed me one time and let me know about a contact

12  attempt, that he went to go knock on the door by

13  himself one evening after work hours.  I don't

14  remember the date, though.

15      Q.    Okay.  Did he leave a subpoena at that time?

16      A.    I don't know.  I don't recall.  I don't

17  recall.

18      Q.    Did he tell you that he had left a subpoena?

19      A.    I don't recall.  He may have.  I really

20  don't recall.

21      Q.    Is it likely he would have?  That's why he

22  would have traveled out there?

23      A.    Again, I can't say for sure.  I know he

24  contacted me about going out there.  I don't recall

25  whether or not he said he brought a subpoena or one of

1   the copies with him.  I don't remember.  I don't

2   remember.

3       Q.     Ms. Singleton's case was in 2015; correct?

4       A.     That's correct.

5       Q.     And we were looking at some of these other

6   DA notices that you had sent in other cases.  Those

7   were all somewhat around the same time; is that

8   correct?

9              MR. PAUL:  Object to the form.

10      A.     Yes.  I saw some like from 2016.  I don't

11  remember all the dates.

12      Q.     Let's take a look actually at the Traylor

13  subpoena, which I think is OPDA -- which I think is

14  Plaintiffs' Exhibit 10, but I might have to look at a

15  couple to make sure because I have these things by

16  case name.

17      A.     Hold on.  Yes, Number 10.  I see it.

18      Q.     It is 10?  Okay.  Great.  This was -- can

19  you tell me the date?

20      A.     I saw one for 6/15/2015, and I saw one for

21  8/4/2015.

22      Q.     Yeah.  Let's take a look at the subpoena for

23  Dr. Angela Traylor.

24      A.     Sure.

25      Q.     What was the date for that again?

1     A.     The trial date was -- the first one was 6/15

2  of 2015 and the second trial date was 8/4/2015.

3     Q.     Okay.  And if you look at the screen share,

4  the service of this was when?

5     A.     July 28th, 2015.

6     Q.     And do you know who delivered this subpoena?

7     A.     I was with Corey Porter when we brought that

8  out there, as I stated earlier.

9     Q.     Right.  Mr. Porter, Corey Porter, had

10 delivered several of these documents; is that correct?

11    A.     I don't know if he delivered several.  As

12 far as what I know is that whenever I was -- if I was

13 with Mr. Porter and I gave one of these notices -- he

14 was present at that one that he -- I never directed

15 him to deliver like the DA notices.

16    Q.     Sorry.  Can you repeat that?

17    A.     I said I never directed him -- like said

18 say:  Hey, go out and deliver this notice to this

19 witness.  I don't recall doing that.

20    Q.     Did he deliver DA notices for other

21 attorneys?

22    A.     I'm not sure what he did for other people.

23 I don't know.

24    Q.     But he delivered a DA notice with you to

25 Ms. Traylor just a few months after Ms. Singleton's

EXHIBIT 5

1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF LOUISIANA

3

   * * * * * * * * * * * *

4

   RENATA SINGLETON,
5  MARC MITCHELL,
   LAONIA BAHAM,
6  JANE DOE,
   TIFFANY LACROIX,
7  FAYONA BAILEY,
   JOHN ROE, and
8  SILENCE IS VIOLENCE,
                              CASE NO.
9          Plaintiffs,
                           2:17-cv-10721-JTM-JVM
10  v.
                         JUDGE JANE TRICHE MILAZZO
11  LEON CANNIZZARO, et al.,
                         MAG. JANIS VAN MEERVELD
12          Defendant.

13  * * * * * * * * * * * *

14

15     VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF

16           ARTHUR BERNARD MITCHELL, IV

17              Location of witness:

18                 law offices of

19      Stanley Reuter Ross Thornton & Alford

20              909 Poydras Street

21             New Orleans LA  70112

22           Monday, September 21, 2020

23

24  Reported by:  DEBRA AMOS ISBELL, CCR,RDR,CRR

25  Job No: 183490

1  again is Exhibit 17, OPDA18940.  And let me share this

2  screen again.  And let's scroll down to OPDA18947.

3  And it says -- what does it say for 4/20?

4      A.    Tyrone Vail, Tyrone Vail, Tyrone Vail.

5      Q.    And the status -- the status --

6      A.    Printed.

7      Q.    Printed; right.  So it says "printed."  And

8  then who does it say for the responsible party?

9      A.    Tyrone Vail.

10      Q.    And the date and time?

11      A.    4/20/2015, 3:21.

12      Q.    Okay.  So did Tyrone Vail print this

13  subpoena or did you print this subpoena?

14      A.    I believe -- it says status "printed" for

15  Tyrone Vail.  He printed it.  I also recall printing a

16  CourtNotify subpoena as well as making copies of my

17  instanter subpoena for the trial date.

18      Q.    Okay.  Did Tyrone Vail print the subpoena

19  and give it to you?

20      A.    No.

21      Q.    Okay.  Let's go back to Exhibit 18, 18079,

22  which are your notes.

23      A.    Yes.

24      Q.    Okay.  Does this note say what address you

25  went to?  And now we're back at the second page.

Page 212

1      A.    No.

2      Q.    The entry for 4/20.

3      A.    It does not.

4      Q.    And is that documented anywhere, to your

5  knowledge?

6      A.    The house number and the coded stuff, no.

7      Q.    Okay.  Is there any way for us to know what

8  address you went to as documented in this note?

9      A.    No, not from these notes.

10     Q.    And what did you do with that subpoena when

11 you arrived at the address that you had for

12 Ms. Singleton?

13     A.    Corey Porter had it in his possession.  He

14 gave it to him, the CourtNotify subpoena as well as

15 the instanter subpoenas.  Vail made copies of them,

16 gave them to Mr. Porter.

17           We went to the home.  I was accompanied by

18 Mr. Porter and two other investigators.  They knocked

19 on the door, no answer.  I believe maybe knocked on a

20 window, no answer.  And traveled to another address

21 that was associated with Ms. Singleton.  No answer

22 there.

23           I believe Mr. Porter left the instanters as

24 well as the CourtNotify subpoenas somewhere, either on

25 the porch or in the door or somewhere around the

1  outside of the residence prior to us leaving.

2      Q.    Sir, could you repeat that last sentence?

3      A.    I said the instanters and CourtNotify

4  subpoenas were left somewhere at the exterior of

5  Ms. Singleton's home.  I'm not sure about the other

6  address that we went to.  But we left the instanters

7  and the CourtNotify subpoenas -- Corey Porter did --

8  outside the exterior of Ms. Singleton's home.

9      Q.    And how do you know it was Ms. Singleton's

10  home?

11      A.    It was the same address recorded on the

12  CourtNotify subpoenas, Farwood Drive.

13      Q.    And those were the CourtNotify subpoenas

14  that had been previously left in the door?

15      A.    Yes.

16      Q.    Okay.  But these notes don't actually say

17  that that was the same -- that you delivered the

18  subpoenas to that address; is that correct?

19      A.    No, they don't say that.

20      Q.    Okay.  So we don't know from these notes

21  which addresses you actually delivered the subpoenas

22  to; correct?

23      A.    That is not reflected in these notes, no.

24      Q.    And these notes reflect all of your attempts

25  to contact Ms. Singleton; correct?

1      A.      Yes.

2      Q.      Okay.   On April -- and on April 20th you

3  called her once, and then you went to an address that

4  you have not documented here.

5      A.      Yes.

6      Q.      You left the subpoenas.   You then went to a

7  different address, and you're not sure where the

8  subpoenas were left at that different address?

9      A.      I don't know about the second address.   As

10  far as --

11      Q.      You then --

12      A.      I'm sorry.

13      Q.      No.   Go ahead.   I'm sorry.   No, no, no.

14  Please continue.

15      A.      So I was going to say like this is the

16  things that I did on my end.   I know that Corey sent

17  me an email of the things that he had tried to do.

18  And I had spoken with Ms. Jackson about her attempts

19  to contact Ms. Singleton.   So this is the stuff that I

20  did on my end.

21      Q.      Uh-huh (positive response).   And just to

22  confirm these notes, though, and what they capture,

23  you went to those two addresses, you then called her

24  and texted her.   And all of this happened the same

25  day; correct?

1      A.     Yes.

2      Q.     Okay.  And did you leave a voice mail?

3      A.     I don't remember.  I combined this.  I said:

4             "Called ... three times and

5              left a voice mail at an

6              alternate number.  Also texted

7              victim to inform I was

8              attempting to serve her."

9      Q.     Do you know what that alternate number is?

10     A.     I don't have it written down here.  But the

11  only other number that I had was the number that came

12  from Amy Jackson in an email.

13     Q.     Okay.  And in the very last entry -- let's

14  look at the last entry.  Did you text Ms. Singleton?

15     A.     Yes, from the work cell phone.

16     Q.     From your work cell phone?

17     A.     Yes.

18     Q.     So your work cell phone should have a record

19  of this text message; correct?

20     A.     It should.

21     Q.     And you would not have destroyed that text

22  message or the phone; correct?

23     A.     I would not have.

24     Q.     And that phone is still in your possession?

25     A.     It is not.

1     Q.     Why?  What happened to it?

2     A.     I know we changed phones at some point.  I

3  don't know where the old phones are.  We got new

4  office phones at some point.

5     Q.     Are you familiar with the document retention

6  policy in your office for domestic violence cases?

7     A.     I don't know.

8     Q.     Are you familiar with a policy that states

9  that all documents associated in domestic violence

10  criminal cases must be retained for 10 years after the

11  end of the year in which the sentence is imposed?

12     A.     I'm not sure.  I can't recall that I was

13  aware of that.  I don't know.

14     Q.     Okay.  And Mr. Crossley was sentenced in

15  2015; correct?

16     A.     2015?  I believe so.

17     Q.     Okay.  So according to this policy, you

18  would have been required to keep all records related

19  to his case until 2025; correct?

20     A.     Yes.

21          MR. PAUL:  Object to the form.

22     A.     I don't know the policy -- I don't know

23  about the policy.

24     Q.     Okay.  Can you remember the contents of the

25  text message that you sent Ms. Singleton?

1      A.      If I remember, I'm guessing it was something

2  like:  Ms. Singleton, hi.  My name is Arthur Mitchell.

3  I've been trying to contact you to secure your

4  presence for trial.  Please call me back.  I don't --

5      Q.      And did you save this text -- I'm sorry.  Go

6  ahead.

7      A.      I said I don't remember exactly what I said

8  to her.

9      Q.      All right.  Did you save this text message

10 to the DA file?

11     A.      I don't recall.  I don't know.

12     Q.      Can you read into the record the last entry

13 on the first page, which is OPDA18079?

14     A.           "Next page details attempts

15               made to contact victim (Renata

16               Singleton) prior to trial.

17                 "Because attempts to contact

18               victim to meet -- because

19               attempts to contact victim met

20               with no avail, the State filed

21               for a Material Witness Bond."

22     Q.      Okay.  Let's talk about the Material Witness

23 Bond that you sought.

24     A.      Yes.

25               MR. PAUL:  Can we take a short break, just

1  for a few minutes?

2          MS. MIKKILINENI:  Yeah, we can take a short

3  break.  That sounds fine.

4          MR. PAUL:  Five minutes?

5          MS. MIKKILINENI:  Sure.

6          THE VIDEOGRAPHER:  The time is 3:05 p.m.

7   We're off the record.

8          (A RECESS WAS TAKEN.)

9          THE VIDEOGRAPHER:  The time is 3:12 p.m.

10   We're on the record.

11          MS. MIKKILINENI:  Thank you.

12      Q.    Mr. Mitchell, I actually want to go back

13  before we jump into the motion for Material Witness

14  Bond.  I want to go back to the subpoenas that you

15  brought to Ms. Singleton's house.

16      A.    Yes.

17      Q.    Or to the house that you thought was

18  Ms. Singleton's.  Can you tell me what subpoenas you

19  left that are documented in these witness contact

20  notes?

21      A.    We had copies of instanter subpoenas from

22  Section F for Ms. Singleton as well as the printouts

23  from CourtNotify.

24      Q.    And you were -- and Corey Porter was your

25  investigator at the time; is that correct?

1      A.    He was.

2      Q.    Okay.  And did he travel to Ms. Singleton's

3  house independently from you to deliver subpoenas to

4  that address?

5      A.    I believe -- I believe he did.

6      Q.    Do you know what dates he did?

7      A.    I don't remember.  I don't recall the date.

8      Q.    And was that before or after you traveled

9  there together?

10      A.    I don't know the exact dates.  I know he

11  emailed me one time and let me know about a contact

12  attempt, that he went to go knock on the door by

13  himself one evening after work hours.  I don't

14  remember the date, though.

15      Q.    Okay.  Did he leave a subpoena at that time?

16      A.    I don't know.  I don't recall.  I don't

17  recall.

18      Q.    Did he tell you that he had left a subpoena?

19      A.    I don't recall.  He may have.  I really

20  don't recall.

21      Q.    Is it likely he would have?  That's why he

22  would have traveled out there?

23      A.    Again, I can't say for sure.  I know he

24  contacted me about going out there.  I don't recall

25  whether or not he said he brought a subpoena or one of

1  the copies with him.  I don't remember.  I don't

2  remember.

3      Q.    Ms. Singleton's case was in 2015; correct?

4      A.    That's correct.

5      Q.    And we were looking at some of these other

6  DA notices that you had sent in other cases.  Those

7  were all somewhat around the same time; is that

8  correct?

9            MR. PAUL:  Object to the form.

10     A.    Yes.  I saw some like from 2016.  I don't

11 remember all the dates.

12     Q.    Let's take a look actually at the Traylor

13 subpoena, which I think is OPDA -- which I think is

14 Plaintiffs' Exhibit 10, but I might have to look at a

15 couple to make sure because I have these things by

16 case name.

17     A.    Hold on.  Yes, Number 10.  I see it.

18     Q.    It is 10?  Okay.  Great.  This was -- can

19 you tell me the date?

20     A.    I saw one for 6/15/2015, and I saw one for

21 8/4/2015.

22     Q.    Yeah.  Let's take a look at the subpoena for

23 Dr. Angela Traylor.

24     A.    Sure.

25     Q.    What was the date for that again?

1      A.      The trial date was -- the first one was 6/15

2  of 2015 and the second trial date was 8/4/2015.

3      Q.      Okay.  And if you look at the screen share,

4  the service of this was when?

5      A.      July 28th, 2015.

6      Q.      And do you know who delivered this subpoena?

7      A.      I was with Corey Porter when we brought that

8  out there, as I stated earlier.

9      Q.      Right.  Mr. Porter, Corey Porter, had

10 delivered several of these documents; is that correct?

11     A.      I don't know if he delivered several.  As

12 far as what I know is that whenever I was -- if I was

13 with Mr. Porter and I gave one of these notices -- he

14 was present at that one that he -- I never directed

15 him to deliver like the DA notices.

16     Q.      Sorry.  Can you repeat that?

17     A.      I said I never directed him -- like said

18 say:  Hey, go out and deliver this notice to this

19 witness.  I don't recall doing that.

20     Q.      Did he deliver DA notices for other

21 attorneys?

22     A.      I'm not sure what he did for other people.

23 I don't know.

24     Q.      But he delivered a DA notice with you to

25 Ms. Traylor just a few months after Ms. Singleton's

1  my lawyer had emailed -- I have it.  I haven't

2  reviewed it, so I don't know exactly what's in the

3  email.

4      Q.    Do you recall Ms. Jackson telling you that

5  Ms. Singleton had changed jobs?

6      A.    I don't recall.

7      Q.    Do you recall Ms. Jackson telling you -- did

8  you know that Ms. Singleton was an accountant?

9      A.    I don't recall.

10     Q.    Did you know that she worked full time at

11  the time you were trying to reach her?

12     A.    I don't know.  I don't recall.

13     Q.    Okay.  Let's look at the last sentence of

14  Roman numeral VIII.  Can you read that, please?

15     A.    The last sentence or the whole paragraph?

16     Q.    Just the last sentence.  Actually, you know

17  what -- I'm sorry -- read the whole paragraph, please.

18     A.         "On April 21st, 2015,

19                Investigator Porter traveled to

20                the last known residence -

21                Singleton in an attempt to

22                serve Singleton with a subpoena

23                and conduct an interview.

24                Investigator Porter observed

25                the Toyota Camry, associated

1                   with Singleton, parked in the

2                   driveway of the residence.

3                   Investigator Porter knocked on

4                   the door of the residence and

5                   waited for a response from

6                   someone present inside of the

7                   residence, to no avail.

8                   Investigator Porter left two

9                   subpoenas at the residence for

10                  Singleton to appear at the

11                  District Attorney's Office on

12                  April 24th, 2015."

13       Q.    Okay.  Let's talk about the last sentence.

14  He left two subpoenas at the residence for

15  Ms. Singleton to appear at the District Attorney's

16  Office on April 24th, 2015.

17       A.    Yes.

18       Q.    Can you explain why he left two subpoenas?

19       A.    So I'm not sure why two subpoenas were left.

20  Again, maybe one in the door, one in the driveway or

21  in the walkway or on the front porch.  I don't know.

22  And these were the instanter subpoenas and CourtNotify

23  subpoenas directing Ms. Singleton to appear at court,

24  Section F, for trial and not at the District

25  Attorney's Office.

1      Q.     So which part of that sentence is true and

2  which are you saying is not true?

3      A.     The part about appearing at the District

4  Attorney's Office as relates to the subpoena was

5  erroneously left in as it was a statement that was

6  previously contained in the Material Witness Warrant

7  sample that Ms. Tucker had previously provided me

8  with.

9      Q.     Okay.  Let's breakdown the sentence.

10  Because the date, April 24th, 2015, that's correct;

11  isn't that right?

12      A.     I believe that that was the trial date, yes.

13      Q.     Okay.  So that date is correct?  That was

14  not pulled from another document?

15      A.     Right.

16      Q.     And it's also correct, based on what you

17  just told me, that Investigator Porter left two

18  subpoenas at the residence for Singleton; correct?

19      A.     So, yes, I believe he left multiple

20  subpoenas at the residence.

21      Q.     Okay.  So it's correct that it was

22  Investigator Porter.  And we know that that is true

23  because he was the investigator on this case and he

24  had previously left subpoenas at her residence along

25  with you; correct?

1      A.     It was Investigator Porter, yes.

2      Q.     It was Investigator Porter.  He did leave

3 two subpoenas at the residence for Ms. Singleton?

4      A.     Yes, I believe that that is a true

5 statement.

6      Q.     On April 24th, 2015?

7             MR. PAUL:  Object to the form.

8      A.     So I don't believe that he left them on

9 April 24th, 2015.  I believe he left them on April

10 21st of 2015 and that they were telling Ms. Singleton

11 to appear in court on April 24th, 2015, for the trial

12 date.

13     Q.     Okay.  But the April 24th, 2015 refers to

14 Ms. Singleton's trial date, you think?

15     A.     To Vernon Crossley's trial date, not

16 Ms. Singleton's trial date.

17     Q.     I'm sorry.  I'm sorry.  Thank you for the

18 correction.  To Vernon Crossley's trial date; correct?

19     A.     Yes; that's correct.

20     Q.     So the only part of that sentence that you

21 think was pulled from a different template is the

22 part -- is the phrase "to appear at the District

23 Attorney's Office"?

24     A.     That is because that is an inaccurate

25 statement, yes.

1      Q.     And how do you know it's an inaccurate

2  statement?

3      A.     Because the CourtNotify subpoenas and the

4  instanter subpoenas that I printed out don't make

5  mention of witnesses appearing -- or Ms. Singleton

6  specifically appearing in the District Attorney's

7  Office.  It mentions Ms. Singleton appearing in court,

8  Section F, for Vernon Crossley's trial.

9      Q.     But you printed out those subpoenas and

10 attempted to deliver them on April 20th; correct?

11 This is referring to April 21st, and it doesn't

12 mention you at all.  It mentions only Investigator

13 Porter traveling to the residence of Singleton.

14     A.     Right.  I know that I gave Mr. Porter

15 several copies of the instanter subpoena as well as

16 several copies of the CourtNotify subpoena that

17 indicated Ms. Singleton was ordered to appear in

18 Section F before Judge Pittman for trial on April

19 24th, 2015, in State versus Vernon Crossley.

20     Q.     And so, again, just to confirm, it's just

21 the phrase "to appear at the District Attorney's

22 Office" that you believe that you erroneously pulled

23 from a different document?  Every single other

24 assertion in that paragraph is true?

25     A.     I believe that the other assertions in the

1  paragraph came from Corey Porter and the part about

2  appearing at the District Attorney's Office was from

3  the previous document that I was working from.

4      Q.    Could it have come from Corey Porter, that

5  language, since everything else in that paragraph came

6  from Corey Porter?

7      A.    In writing the Material Witness Warrant, I

8  imported Mr. Porter's information into the Word

9  document, imported the specific facts and

10 circumstances of my attempts to contact Ms. Singleton

11 and have Ms. Singleton served with court subpoenas,

12 and erroneously forgot to take this part out about the

13 District Attorney's Office.

14     Q.    But no other language in this paragraph or

15 in this motion for Material Witness Bond reflects

16 language pulled from anywhere else; is that correct?

17 Just that one -- let me count the words actually.

18 Just those one, two, three, four, five, six, seven

19 words.  Those are the only words that carried over

20 from this other motion that you filed -- sorry -- that

21 Ms. Tucker sent you?

22     A.    So I said before as it related to Roman

23 numeral II, I believe that that information was pulled

24 from the previous document I was working from along

25 with the information of the witness in the previous

1  document, appearing at the DA's office.

2      Q.    And this is a document -- again, this

3  document is the one that your counsel just produced on

4  Friday.

5      A.    I don't know when he produced it.  I gave it

6  to him on Friday.

7      Q.    Okay.  How long have you known about this

8  lawsuit?

9      A.    Since I was sued sometime in 2017.  I don't

10 remember the date.  I think it was in 2017.  Whenever

11 the suit was first filed and I was informed that y'all

12 were suing me or that Ms. Singleton was suing me,

13 that's when I became aware of this case.

14     Q.    And are you aware of the claims in the case?

15     A.    I am aware of the claims in the case.

16     Q.    Are you familiar with the allegations in the

17 complaint that relate to you and to Ms. Singleton?

18     A.    Yes, I believe so.

19     Q.    And you understand that one of the claims

20 arises out of the delivery of a DA subpoena to

21 Ms. Singleton; is that correct?

22     A.    Yes, that is correct, that that is one of

23 the claims.

24     Q.    And so the motion for Material Witness Bond

25 that references the delivery of the DA subpoena, that

1      Q.     Okay.  And look at the language under Roman

2  numeral X.  It states -- what does it state actually,

3  if you wouldn't mind reading it?

4      A.          "Singleton failed to appear

5                  at trial scheduled in Section F

6                  on April 24, 2015, even after

7                  the numerous subpoenas that she

8                  received at her primary

9                  residence.  The conduct of

10                 Singleton is a reasonable basis

11                 for the undersigned to attest

12                 that Renata Singleton will not

13                 honor her subpoena and appear

14                 at the next trial setting

15                 scheduled for this matter."

16     Q.     So it states that she failed to appear at

17  trial despite receiving numerous subpoenas; correct?

18     A.     That is correct.

19     Q.     And what to you mean here by "receive"?  How

20  did she receive numerous subpoenas?

21     A.     They were left at her door.  As I stated

22  earlier in my motion, they were left at her door.  And

23  again, I brought this before Judge Pittman, made my

24  motion, it was copied to Judge Pittman, she read it,

25  defense counsel was there, and the warrant was issued.

1      Q.    But there's other incorrect information in

2  this motion to Judge Pittman; right?

3            MR. PAUL:  Object to the form.

4      A.    So that the lines -- again, in number II I

5  indicated that I'm not sure whether or not I had an

6  appointment.  I don't have any vivid memory of an

7  appointment or whether somebody told me that or

8  whether I left that in erroneously in creating this

9  document.  But I know for a fact that the subpoena

10  that I gave to Mr. Porter was a CourtNotify

11  subpoena and a copy of an instanter subpoena that

12  requested or required or ordered Ms. Singleton to

13  appear in court, not at the District Attorney's

14  Office.  That's what --

15      Q.    What do you think is -- I'm sorry.  Go

16  ahead.

17      A.    I said that's what I know.  That's what I

18  know about the statements that were made.

19      Q.    What is the standard that you need to meet

20  in order to obtain a Material Witness Warrant?

21      A.    I don't recall the standard at this time.  I

22  don't recall.

23      Q.    You don't recall the standard?

24      A.    Not at this time I don't.

25      Q.    Did you -- in drafting this warrant, did you

1  think about whether -- the fact that you had met the

2  legal standard before you filed this in front of Judge

3  Pittman?

4      A.    I believe that I did.  I let Mr. Pipes

5  review it, and I would say -- I filed it.  So I

6  believe so.  As a new ADA, new lawyer, what have you,

7  I was being instructed to prepare this Motion and

8  Order for Material Witness Warrant.  After I showed it

9  to my supervisor, I was instructed to file the motion

10 into court and have a hearing in front of Judge

11 Pittman.

12     Q.    Under Roman numeral XI it states that the

13 bail should be fixed in the amount of $100,000; is

14 that correct?

15     A.    Yes, that is correct.

16     Q.    Did you recommend this amount to the court?

17     A.    I did.  I believe that that was contained in

18 one of the working documents that I was using to

19 create my application for a Material Witness Warrant.

20 I didn't just pull that amount out of the air.  I was

21 told to put that in.

22     Q.    So you copy/pasted that amount from a

23 different document; is that correct?

24           MR. PAUL:  Object to the form.

25     A.    I said I don't know if I did.  But I know

1  that that amount of bail, I didn't just pull that out

2  of the air and say, oh, I'm just going to ask for

3  $100,000.  I was told to put that in there, that

4  amount.

5       Q.    Who told you to?

6       A.    I don't recall.  But I would not just say,

7  oh, 100,000 is the amount.  I didn't know what to put.

8  I was copying and pasting my information, deleting

9  information from the previous document.  And I was

10 told to put an amount, and that's what I did.

11      Q.    Was it your supervisor who told you to put

12 that amount?

13      A.    I don't recall explicitly or specifically.

14 But I do know that Mr. Pipes reviewed this document

15 before it being filed.

16      Q.    So he approved this bond amount?

17      A.    Yes.

18      Q.    And he approved this application and all of

19 the information in it?

20      A.    Yes.

21      Q.    Did you think this was an amount that

22 Ms. Singleton was likely to be able to pay?

23      A.    I don't know what I thought.  Once again, I

24 was told to put this amount, and this is the amount

25 that I put.  I don't know what I thought about how

1  much she could pay.  I don't recall.

2     Q.    Is this an amount typical for a material

3  witness?

4     A.    I don't know anything about what is typical

5  for material witnesses because I only know what I was

6  told to do on this one Material Witness Warrant that I

7  applied for.

8     Q.    What is the date this Material Witness

9  Warrant was issued?

10     A.    I don't know.  It looks like the order was

11  signed on April 24th of 2015.

12          MS. MIKKILINENI:  Okay.  Let's look at

13  OPDA18557, which I'm marking as Plaintiffs' Exhibit

14  21.

15     A.    Okay.

16          (PLAINTIFFS' EXHIBIT 21, RETURN OF SERVICE,

17           RENATA SINGLETON, 4/27-29/2015 - OPDA18557,

18           WAS MARKED FOR IDENTIFICATION.)

19     Q.    Can you tell me what this is, Mr. Mitchell?

20     A.    The return of service or like the receipt of

21  service that I eventually received.  I don't see a

22  case number.  I don't see what case it is.  I can see

23  Renata Singleton's name.  I said 7510 Farwood Drive,

24  New Orleans, Alabama, 70126.  And I see dates for

25  attempts of service.

1      Q.    And can you tell me what those handwritten

2  notes say?

3      A.    "1st 4-27-15, 2nd 4/28/," and then there's

4  "4/29/15."  And it says "in door" under that 4/29/15.

5      Q.    And this was after your motion for Material

6  Witness Bond was granted; correct?

7      A.    I believe so, yes.

8      Q.    And is it fair to say that, based on this

9  handwritten note, the subpoenas were left in the door?

10     A.    On the 4/29 date it says "in door."  I don't

11  know whether it was left in the door or not, but it

12  says "in door" on 4/29.

13     Q.    "In door."

14           MS. MIKKILINENI:  Okay.  Let's take a look

15  at Plaintiffs' Exhibit 22, which is OPDA18363.

16           (PLAINTIFFS' EXHIBIT 22, ALIAS CAPIAS,

17            RENATA SINGLETON, 5/21/2015 - OPDA18363,

18            WAS MARKED FOR IDENTIFICATION.)

19     Q.    Can you explain to me what this document is?

20     A.    I believe this is an alias capias for the

21  material witness, and at the bottom it's signed by the

22  judge.  The order, the capias, is in fact signed by

23  the judge.

24     Q.    And when was this capias issued?

25     A.    It looks like -- I see 5/21/2015.

1    Q.    And what's the process for requesting a

2  capias?  I know we talked about it a little bit.  But

3  what would have been the process for requesting this

4  capias?

5    A.    I know I had a hearing before the judge

6  after I filed my motion with defense counsel present,

7  and I believe the judge signed the order.  I don't

8  know what happened after that.

9    Q.    Why did you request this capias to be issued

10  on this date?

11    A.    Because I was instructed to file the

12  Material Witness application or the request and motion

13  for Material Witness Warrant and provided the order to

14  the judge to sign.  I don't know why the dates are

15  what the dates are, but I was requested by my

16  supervisor to file that.

17    Q.    So your supervisor requested that you file

18  the motion for Material Witness Warrant for

19  Ms. Singleton and then also directed you to request a

20  capias to be issued for her?

21        MR. PAUL:  Object to the form.

22  Mischaracterization.

23    A.    I'm not sure.  I was asked to prepare the

24  Motion and Order for Material Witness Warrant.  I

25  don't recall reviewing this document.  I don't know.

1  I know that I was asked to file a warrant and get the

2  judge to sign the order.

3            MS. MIKKILINENI:  Let's take a look at

4  OPDA18489.  Do you see that, Matt?

5            Actually hold on a second.

6            MR. PAUL:  What is it?  I can't find it.

7            MS. MIKKILINENI:  Yeah.  You know what,

8  sorry, scratch that.

9            Okay.  We might just go back to that in a

10  second.

11            Let's talk about -- actually, you know what,

12  Matt, if you don't mind just taking a short break.

13  This is actually an important document that was left

14  out of my exhibits.  If you don't mind just taking a

15  short break, I will pull that very quickly, and I'll

16  send you a copy, and then we can screen share and take

17  a look at it.

18            MR. PAUL:  You're going to email me a copy

19  of it right now?

20            MS. MIKKILINENI:  I'm sorry?

21            MR. PAUL:  You're going to email me a copy

22  of it right now?

23            MS. MIKKILINENI:  Yeah.  I just need to pull

24  it.  I'm going to email it to you first and then we

25  can go back.  So if we could just take maybe a

1  five-minute break, that should be more than enough

2  time.  Thank you.

3            THE VIDEOGRAPHER:  The time is 3:59 p.m.

4  We're off the record.

5            (A RECESS WAS TAKEN.)

6            THE VIDEOGRAPHER:  The time is 4:06 p.m.

7   We're on the record.

8            MS. ANDRIEU:  Tara, hi.  It's Donna Andrieu.

9  Have you sent that exhibit to Bobby and me?

10           MS. MIKKILINENI:  I have not but --

11           MR. PAUL:  I'll forward it to you.

12           MS. MIKKILINENI:  Thank you, Matt.

13           He's going to forward it to you right now.

14           MS. ANDRIEU:  Okay.  Appreciate it.  Thank

15  you.

16           MS. MIKKILINENI:  All right.  We're going to

17  mark this Plaintiffs' Exhibit 23, and it's Bates

18  Number OPDA18489.

19           (PLAINTIFFS' EXHIBIT 23, INSTANTER 522-558,

20            RENATA SINGLETON, 6/4/2015 - OPDA18489, WAS

21            MARKED FOR IDENTIFICATION.)

22      Q.   Mr. Mitchell, could you take a look at this

23  document and tell me what it looks like to you?

24      A.   It likes like an instanter subpoena for

25  Section F.

Page 257

1  office was.  And then they would be asked to sit in

2  the waiting area.

3      Q.    And did Renata Singleton come to the

4  District Attorney's Office on May 29th to meet with

5  you?

6      A.    I don't remember the exact date, but she

7  definitely showed up at the DA's office Monday.

8      Q.    And did you come down to the lobby to greet

9  her?

10     A.    I was called down and told that

11 Ms. Singleton was in the lobby.  I don't know -- I

12 don't remember if Tiffany was there at that time or if

13 I had to wait for Tiffany to come back.  But I

14 definitely contacted Tiffany, letting her know that

15 Ms. Singleton was there.  I spoke with Pipes about the

16 fact that Ms. Singleton was there.  And at some point,

17 after several minutes, I did go downstairs to greet

18 Ms. Singleton.

19     Q.    Was she alone?

20     A.    She was not.  She was with her police

21 officer friend.

22     Q.    Did you take her somewhere to talk to her?

23     A.    We initially spoke in the lobby.  I

24 introduced myself.  I'm Arthur Mitchell, I'm the

25 prosecutor in the case.

1            After that we went upstairs to the second

2  floor, I think we took the elevator, and went to a

3  conference room on the second floor.

4      Q.    And did you take just her or also her

5  friend?

6      A.    I believe the friend was there as well.

7  They were seated in the conference room.  At some

8  point Tiffany Tucker came down.  We both went into the

9  room.  And Tiffany and I were present in the

10 conference room with Ms. Singleton and her friend.

11     Q.    And did Ms. Tucker introduce herself?

12     A.    I believe she did.

13     Q.    Did you talk to Ms. Singleton?

14     A.    So I -- after introducing myself and, I

15 guess, my title at the office to Ms. Singleton, I

16 believe her friend started asking questions.  And

17 Tiffany asked whether or not the friend was like a

18 witness in this case, like if she knew anything about

19 the facts and circumstances of the case against

20 Mr. Vernon Crossley.  At which point I believe I

21 stated that she was not in the police report, and that

22 the officer lady also said that she was not present

23 the night that the alleged domestic battery and

24 robbery took place.  And so Tiffany asked her to leave

25 because she was not a witness to the case.

1      Q.    So Tiffany asked her whether she was a

2   witness in the case, and when she learned that she was

3   not a witness, she asked her to leave; is that

4   correct?

5      A.    Yes.  She asked me, and I told her that this

6   woman was not listed in our police report.

7      Q.    You told who?

8      A.    Tiffany.  Tiffany also asked me if this

9   woman was a witness in the case, and I told her her

10  name was not in the police report -- which it wasn't.

11     Q.    Okay.  And after Ms. Singleton's friend

12  left, what happened?

13     A.    After Ms. Singleton's friend left,

14  Ms. Singleton -- I believe she asked why she was

15  present at the office.  I was asked by Tiffany Tucker

16  to explain like the contact attempts that we had had

17  on Ms. Singleton, at which point I did that.  I said

18  that we tried to call her several times, tried to

19  knock on the door.  Even went to her place of

20  business.  The Sheriff's Office went to deliver

21  subpoenas in an attempt to serve her, and nobody could

22  find her, nobody could contact her.

23           And after that I didn't really say much.  I

24  was pretty new, and Tiffany pretty much spoke

25  throughout the remainder of the conversation with

1   Ms. Singleton.

2       Q.    And what did Ms. Singleton say in response

3   to your attempts to contact -- your statements about

4   your attempts to contact her?

5       A.    That I had been calling the house phone

6   number.  I remember asking her whether that second

7   number that I got from Amy Jackson was a good number

8   for her.  She indicated to me that that was a good

9   number and it was her cell phone number.  I told her I

10  had called one day and left messages.  I don't recall

11  what she said.

12          Ms. Singleton also advised that she didn't

13  feel like a victim, that she felt as though she was

14  more of a defendant or like more of an accused in this

15  instance and did not feel like a victim.

16      Q.    And what happened next?  Who spoke next?

17      A.    I believe -- I don't recall if I asked her

18  or if Tiffany asked her what happened in this case

19  just in preparation for trial, just trying to speak

20  about the facts and circumstances of the case for

21  trial preparation.

22          Ms. Singleton indicated that she wouldn't

23  speak to anybody without her lawyer.

24          Tiffany advised her that she wasn't being

25  accused of a crime, so there was really no need for

1  protection, so she doesn't need a lawyer.

2          And again, Ms. Singleton refused to answer

3  any questions without a lawyer present.

4      Q.    And was anyone else in the room -- did

5  anyone else come into the room during this

6  conversation?

7      A.    At some point Investigator M.J. Audibert

8  came into the room, and he sat in the room.  I don't

9  recall if he asked any questions.  I don't recall.  I

10  know he was in the room at some point, though.

11          COURT REPORTER:  What was his name?

12          THE WITNESS:  M as in moon, J as in jupiter,

13  Audibert, A-U-D-I-B-E-R-T.

14      Q.    And did -- was there anybody else in the

15  room besides you, Tiffany Tucker, M.J. Audibert, and

16  Ms. Singleton?

17      A.    Ms. Singleton -- no.  Just me, Tiffany,

18  M.J., and Ms. Singleton that I recall.

19      Q.    Did Mr. Pipes come into the meeting at any

20  point?

21          MR. PAUL:  Tara, could you take down the

22  exhibit, please?

23          MS. MIKKILINENI:  I'm sorry?

24          MR. PAUL:  Could you take down the exhibit

25  so we have you full screen?

1          MS. MIKKILINENI:  Oh, I'm sorry.  Yeah,

2 yeah.  I'm sorry about that.

3     Q.    Did Mr. Pipes come into the room at any

4 point?

5     A.    No.  no, I don't believe he did.

6     Q.    Did Ms. Singleton attempt to contact a

7 lawyer?

8     A.    I don't think so.  I don't think she

9 attempted to contact a lawyer.

10     Q.    And after she said she wanted to talk to a

11 lawyer, what happened next in the conversation?

12     A.    Like I said before, I believe that either

13 Tiffany or myself attempted to re-engage conversation.

14 Ms. Singleton said that she would not speak to us

15 without a lawyer present.

16          And I remember M.J. Audibert made a phone

17 call to see whether or not the warrant was active in

18 NCIC.  And a few minutes later an NOPD officer came

19 and arrested Ms. Singleton.

20     Q.    What happened before M.J. Audibert checked

21 to see if the warrant was active in NCIC?  Did you or

22 Tiffany tell him to check that?

23     A.    No, I didn't tell him to check that.  I

24 don't remember Tiffany telling him to check that.  So

25 no, I don't believe either of us told him to check

1  that.

2         I didn't know that that was a thing to

3  check.  I didn't know anything about what was going

4  on.  That's why I wasn't saying much.  And I don't

5  recall if Tiffany asked him to.  I don't think she

6  did.  But I know he made a call.

7     Q.    And after he made that call, did he then

8  call someone from NOPD to come and arrest

9  Ms. Singleton?

10    A.    I don't know how many calls he made.  I just

11 know he called to confirm that it was an active

12 warrant.  And shortly after, about five minutes later,

13 10 minutes maybe, an NOPD officer was there and

14 arrested Ms. Singleton.

15    Q.    How many NOPD officers came?

16    A.    I just recall one.

17    Q.    And how did he arrest Ms. Singleton?

18    A.    I believe he placed her in handcuffs or some

19 kind of restraints.  I don't know what was said.  I

20 just know he walked Ms. Singleton out of the building.

21    Q.    How did Ms. Singleton react?

22    A.    I don't remember.

23    Q.    Let me just walk through the sequence of

24 events again because I want to make sure I get them

25 right.  It's really important.

1          Ms. Singleton -- the conversation proceeded

2   with Ms. Singleton telling you that she didn't want to

3   answer questions because she wanted to speak to a

4   lawyer?

5      A.    No.  It started with me telling Tiffany

6   Tucker -- and let Ms. Singleton know -- the attempts

7   that we made to try to contact her.

8          Ms. Singleton told me that I was calling the

9   wrong number because it was the house number.

10          I told her I had an alternate number, and I

11   gave her that number.

12          And Ms. Singleton said:  Oh, okay.  That is

13   my cell phone number.

14          I asked her if she received any of my calls.

15          I don't remember what she said.

16          After that, I believe when either Tiffany or

17   myself tried to speak to Ms. Singleton as it related

18   to trial preparation and speaking to her about what

19   happened in the case, that is the point when

20   Ms. Singleton said that she would not speak with us

21   without an attorney present.

22      Q.    And you mentioned she also said before that

23   point, I assume, that she felt like she was being

24   treated like the accused and not like a victim; is

25   that correct?