# EXHIBIT 6

ROUGH DRAFT
* * * * *
** ROUGH DRAFT WARNING **
NOT EDITED - FOR REVIEW PURPOSES ONLY
NOT A CERTIFIED TRANSCRIPT

CASE NAME:  SINGLETON v. CANNIZZARO
DATE:  12/4/2020
WITNESS:  DAVID STEPHEN PIPES, JR.

This UNCERTIFIED DRAFT transcript was created by DEBRA AMOS ISBELL, CCR,RDR,CRR, using computer-aided transcription.
This rough draft meets suggested Guidelines for Professional Practice for the National Court Reporters Association, Section IV, Parts 1 through 9, pursuant to NCRA rules.  This uncertified rough draft CANNOT BE QUOTED in any pleading or for any other purpose.  By receiving this unofficial draft transcript, you are agreeing to purchase the certified transcript of this matter. This unofficial draft transcript is provided to you solely as a litigation support tool for use in-house by you, other members of your staff, associate counsel, paralegals, or expert consultants.
There will be discrepancies in this rough draft and the final form because the rough draft has not been edited, proofread, finalized, indexed or certified.  There WILL ALSO BE a discrepancy in page and line numbers.
Court reporter work product; not to be reproduced; not to be filed in any manner in court.  Please dispose of when final transcript is received.

* * * * *

THE VIDEOGRAPHER:  My name Darryl Russell.

I am the legal videographer in association with TSG

Reporting, Incorporated.  Due to the severity of

COVID-19 and following the practice of social

distancing, I will not be in the same room with the

witness.  Instead I will record this videotaped

deposition remotely.  The reporter, Debra Isbell, also

Rough Transcript

ROUGH DRAFT

1 the two of them, and then I had the six MOT attorneys

2 working with me. Then we restructured after that

3 where the three of us were over the trial sections.

4 In fact, that might have been when Ms. Parker left. I

5 would need to double check -- and the MOT attorneys

6 reported directly to the DA.

7 Q. Did I actually go ahead and enter that as

8 Exhibit 2? If I didn't, can I do that now, Debbie?

9 COURT REPORTER: (Nodding head

10 affirmatively.

11 MS. ARANDES: Thank you.

12 Q. So just to be clear, you served as a chief

13 over the MOT division prior to becoming the Chief of

14 Trials in mid 2014 and have not served as the direct

15 supervisor of the MOT division at any point since

16 then?

17 A. Not exactly. There was a period prior to me

18 serving as the MOT Chief where I was one of the three

19 chiefs of trials over the try division. At that time

20 Bobby Freeman was Chief ore the MOTs. Bobby moved on

21 from that position. I replaced Bobby as Chief of the

22 MOTs, and the Trials Division was split between

23 Ms. Parker and Ms. Bridges. After that there was

24 another restructuring where I went back to being Chief

25 over the trial sections, and the MOT attorneys

Rough Transcript

ROUGH

ROUGH DRAFT

1    reported directly to the DA.  So I was the Chief of

2    Trials prior to being the Chief of MOT and then

3    subsequent to being the chief of MOT.

4        Q.    Understood.  So just to make sure I

5    understand, since mid 2014, after that time period

6    when you served as the Chief of Trials over MOT, you

7    have not actually served as the Chief over MOT again?

8        A.    Correct.

9        Q.    But you do answer questions from MOT

10   attorneys and work with them if they come to you; is

11   that fair?

12       A.    Yes.  Any time an attorney comes into my

13   office from any division, I try to help them out.  One

14   of the disadvantages of having been there as long as I

15   have, I'm sort of the guy you go to get answers from

16   everything from why aren't the lights on in my office,

17   why doesn't my computer work, how do I get my evidence

18   transferred from CENP to the Clerk's Office.

19       Q.    So if I was going to add a line to my

20   organizational chart to reflect the direct lines of

21   supervision, it would go from the MOT attorneys to the

22   District Attorney, Leon Cannizzaro; is that right?

23       A.    Post 2014, yes.

24       Q.    Yeah, post mid 2014 when things were

25   restructured.

Rough Transcript

ROUGH DRAFT

1     A.     Yes.

2     Q.

3     Q.     Is what is your relationship as the Chief of

4  Trials since mid 2014 to First Assistant Graymond

5  Martin?

6     A.     He is my direct supervisor.  Issues that are

7  related to the administration of the office, you know,

8  form, structure, positions, I would take to him.

9  Issues related to cases I would take to the District

10  Attorney.  Mr. Martin has some authority with regard

11  to reductions for pleas, depending on when in time

12  you're talking, that authority kind of varied.  I

13  would consider Graymond my immediate supervisor, but

14  virtually anything I would take to Graymond I would at

15  the same time take to the DA depending on who was in

16  the office at the moment I walked in there to report

17  some issue.  There were things that I would take to

18  the DA first and then bring to Graymond just to keep

19  him in the loop afterwards depending on, again, who

20  was physically in the office when I came to the fourth

21  floor with the issue.

22     Q.     Okay.  So on my chart your direct

23  supervision would go to both Mr. Martin and for

24  Mr. Cannizzaro, and for the most part, administrative

25  Issues you'd go first to Mr. Martin and case issues

Rough Transcript

ROUGH DRAFT

1  you'd go to Mr. Cannizzaro, but there's some Flex in

2  that and you actually talked to both of them for any

3  big-scale issues; is that fair?

4      A.    Yes.  What I would say is the block directly

5  above me would be the First Assistant.  However, the

6  DA's policy was such that I could go to him on any

7  issue.  And my practice with Mr. Martin was virtually

8  any issue I would bring to him, either he or I would

9  bring to the District Attorney.

10     Q.    So looking again at this chart, is the same

11 relationship where Mr. Martin is the direct supervisor

12 but Mr. Cannizzaro, his door is open and he's

13 available, would that also be true for the chiefs of

14 the other divisions, to the best of your knowledge?

15     A.    You would probably need to speak to them on

16 that.  But to the best of my knowledge, yes.  I mean

17 certainly the other chiefs would go to the First

18 Assistant and to the DA the same way I would.

19     Q.    But, for example, the Chief of

20 investigations, to your knowledge, the Chief of

21 investigations doesn't report to you.  The Chief of

22 investigations reports to Mr. Martin and ultimately

23 Mr. Cannizzaro; is that right?

24     A.    Correct.  They definitely do not report to

25 me.  They'll sometimes consult with me if it's a

Rough Transcript

ROUGH
ROUGH DRAFT

1  trials issue, they've got a complaint about an

2  attorney wanting this or that or they want to shift

3  around which attorneys -- which investigators are

4  assigned to which sections.  But they very much do not

5  report to me in the chain of command.

6       Q.    And that's true to the best of your

7  knowledge for the appeals division, the Screening

8  Division, and the social services division as well?

9       A.    Correct.

10       Q.    Has Mr. Martin served as the First Assistant

11  for the entire time that you've been at 07 -- sorry.

12  Let me try that again.

13            Approximately when did Mr. Martin take the

14  position of First Assistant to the District Attorney?

15       A.    He came in in 2009 at the beginning at the

16  official term of Mr. Cannizzaro.  I do not remember

17  the exact date.  He was not there forever the

18  unexpired term that Mr. Cannizzaro served out prior to

19  him taking his own term of office.

20       Q.    Has he been the First Assistant to the

21  District Attorney since he started that position in

22  2009, to the best of your knowledge?

23       A.    Yes, he has.

24       Q.    Do you remember a period of time when

25  Mr. Martin served as the acting Chief of

ROUGH

ROUGH DRAFT

1  issue with the office of disciplinary counsel.  And

2  the definition I'd like to use today.  Does that work

3  for you?  Does that make sense?

4       A.    It makes sense, though I don't know I would

5  say they were Article 66 subpoenas just simply

6  because, again, there's a stings between an Article 66

7  subpoena, a trial subpoena, a Grand Jury subpoena, and

8  what we now refer to as DA notices that are none of

9  those three things.

10      Q.    Yeah.  And let me make sure I'm being clear

11 here.  I'm talking specifically about documents that

12 purport to demand a victim or witness come to the

13 District Attorney's Office that are not properly

14 served and requested Article 66 subpoenas.

15      A.    I understand what you're saying.  But the

16 reason I draw that stings is we have both trial and

17 Grand Jury subpoenas that direct witnesses to come to

18 the DA's office.  The definition I would use would be

19 a document that purports to direct a witness to appear

20 somewhere that wasn't properly issued by a court.  I

21 wouldn't limit it to Article 66 subpoenas simply

22 because, again, it's not -- just because a document

23 tells them to come to our office does not necessarily

24 mean it is not a real subpoena.  That are real

25 subpoenas that direct witnesses to come to our office

Rough Transcript

ROUGH

ROUGH DRAFT

1   that aren't Article 66 subpoenas.

2       Q.    That's a great point actually.  So what I'd

3   like to talk about first is the office's attempt to

4   identify the universe of fake subpoenas that were sent

5   over the last several years.  So by your own

6   definition, whether or not something was a true

7   subpoena or not depends on whether or not it was

8   actually issued by a court; is that right?

9       A.    Correct.

10      Q.    When OPDA -- sorry.  Let me step back.

11          You were involved in the process by which

12  OPDA reviewed its files in order to ascertain what

13  fake subpoenas and how many fake subpoenas were sent

14  since at least 2014; is that right?

15      A.    Yes.

16      Q.    And the office made a decision not to look

17  at the files that had been closed prior to 2014 for

18  financial reasons; is that right?

19      A.    I don't believe it was for financial

20  reasons.  We had been given a specific request, one

21  from the City council and I believe one from

22  disciplinary counsel that had specific date ranges on

23  it.  I also believe that the particular document that

24  was at issue that we were searching for we determined

25  came in a use in 2014.

ROUGH DRAFT

1    Q.    Would you agree that documents that fit the

2    definition of fake subpoena that we've been

3    discussing, documents that direct an individual that

4    come to the District Attorney's Office that were not

5    issued by the Court, were in use prior to 2014?

6    A.    Absolutely.  They've been in use since the

7    1920s.

8    Q.    In the Orleans Parish District Attorney's

9    Office they've been in use since the 1920s; right?

10   A.    I mean throughout the State they've been in

11   use throughout the 1920s.  I say the 1920s because in

12   the constitution they make note that an Article 66

13   came into being was an attempt to address the issue of

14   DA ease office issuing subpoenas in the 1920s

15   constitution.  So I have personal experience dealing

16   with them since I've been at the DA's office and files

17   going back to at earliest the 90's.  I know in

18   conversation with other individuals going back to the

19   '70s, they were used in one form or not.

20   Q.    But OPDA has not made any extensive attempts

21   to identify fake subpoenas that were given to

22   individuals prior to 2014; is that right?

23   A.    Not to my knowledge, no.

24   Q.    So when you participated in the review of

25   OPDA files as part of the investigations being done

ROUGH DRAFT

1  with the Louisiana Disciplinary Board and also the

2  request of the city council, you were looking at files

3  from 2014 to approximately 2017; is that right?

4      A.    It was files that were closed from 2014, and

5  the irritable search was through 2017.  I think we

6  continued to search files that were closed out for a

7  little bit longer passed that, but I don't remember

8  the exact date.

9      Q.    Are you still looking in your files to

10  ensure that there are no fake subpoenas in those

11  files?

12      A.    No.  If we come across one, we note it.  But

13  we are not specifically searching files for them any

14  further. .  Most files that we're closing out now that

15  were cases that were originated subsequent to the

16  office ceasing to use those forms.

17      Q.    Understood.  So when you were reviewing

18  files in an attempt to identify fake subpoenas, what

19  were the directions given to the people who were

20  looking about what they were looking for?

21      A.    They were to go page by page through the

22  physical files and page by page through the

23  electronically scanned files looking for any document

24  which purported to direct an individual to a location

25  that was not assigned by the Court.  That included the

Rough Transcript

ROUGH DRAFT

1 Jim O'Hern 2014 form, other forms, letters that said

2 you are to appear in court.  It was pretty broad.

3 Pretty much anything that could reasonably -- even

4 unreasonably be construed to do that we pulled.

5     Q.    So did you pull, for example, the trial

6 subpoenas or the Grand Jury subpoenas that you were

7 just talking about that direct individuals to the

8 District Attorney's Office but would not be proper if

9 they had not been issued by a court?

10     A.    I'm sorry.  If you could repeat that.  I'm a

11 little confused by what you're referring to.

12     Q.    Sure.  Let me try to make it clear.  When I

13 was talking about the definition of a fake subpoena,

14 you said there are documents that direct an individual

15 to the District Attorney's Office, including trial

16 attorneys and Grand Jury subpoenas; is that right?

17     A.    Yes.

18     Q.    But those documents would only be legitimate

19 subpoenas if they had actually been issued by the

20 Court; is that fair?

21     A.    By issued do you mean signed by?  Yes.  For

22 instance, if I generate a piece of paper that says you

23 are directed to appear at the DA's office and I take

24 it to the court and the court signs off on T that is a

25 real subpoena whether I printed it out at my office or

Rough Transcript

ROUGH DRAFT

1   requests and fulfilling them.  They don't do a whole

2   lot on their own.

3       Q.    I understood.  That's what I had gotten from

4   what you said earlier.  So are you aware of any time

5   that an investigator had served a fake subpoena

6   without being asked to do so by the trial attorney?

7       A.    I'm not aware of that happening, no.

8       Q.    But the fake subpoena templates that were in

9   the office, including the Jim O'Hern 2014 template you

10  referenced, were sent to everyone in the office

11  including investigators; correct?

12      A.    Yes.  I mean it is conceivable in the

13  office, especially in screening, that you might have:

14  Hey, go send a subpoena to this person.  I don't have

15  any knowledge of that.  I'd be speculating to that.

16  But yeah, they were sent office wide.  Although I will

17  note that that's literally you hit the group office

18  wide and it goes to everyone.  The email servers,

19  especially back then, were not particularly robust.

20      Q.    But because a form was available, you could

21  see trial attorneys directing investigators to fill

22  out a DA subpoena and serve it; is that right? ?

23      A.    It's possible.  I'm not aware of it

24  happening.

25      Q.    There are cases where, upon review of the

Rough Transcript

ROUGH DRAFT

1  file, no fake subpoena was identified that OPDA has

2  admitted but a fake subpoena was sent; correct?

3      A.    I'll take you at your word on that.  I don't

4  have any specific knowledge of that.  I'm not denying

5  T. again, I'm not all that familiar with some of the

6  things that have been mated or stated in the

7  litigation.

8      Q.    You read various depositions as part of your

9  preparation for your 30(b)(6) deposition; correct?

10     A.    Yes.

11     Q.    Did you review the deposition transcript of

12  Laura Rodrigue?

13     A.    I believe I did, yes.

14     Q.    Ms. Rodrigue testified that she sent a DA

15  subpoena to Anthony Williams in the Cardell Hayes

16  litigation and that he then came to the DA's office to

17  meet with her pursuant to that DA subpoena.  Are you

18  familiar with that?

19     A.    I don't have a specific memory of it, but I

20  don't have a reason to doubt it.  I'm sure I probably

21  read that in the deposition, but that was a while ago.

22     Q.    But there is no copy of that fake subpoena

23  that exists?

24     A.    I'll take you at your word of that.  I

25  assume that's true.  I don't know.

Rough Transcript

ROUGH DRAFT

1    Q.    When you were describing the policies the

2  office has with respect to documentation, you said

3  there's a policy that District Attorney's will keep

4  documents or references to important documents or

5  events somewhere in the case file but no specific

6  requirements that all documents that were contemplated

7  or served get put in the Ford; is that right?

8    A.    Yes.

9    Q.    So it would not be surprising that in some

10 cases there were documents that didn't make it into

11 the file; is that fair?

12   A.    Correct.

13          MS. ARANDES:  Actually let me take a quick

14 break, get some water, feed my kid, get back.  I don't

15 know -- it's early for a lunch break.  We can take it

16 if you want, but I'm happy to take a quick 10,

17 15-minute break.

18          MR. PAUL:  It's not early for us.  It's

19 probably a good time for us.

20          MS. ARANDES:  Okay.  Great.  So let's take a

21 break.  When do you guys want to come back?

22          MR. PAUL:  Give us like 40 minutes so we

23 make sure we have enough time.

24          THE WITNESS:  1 Clock?

25          MR. PAUL:  Break until 1 or a little sooner.

Rough Transcript

ROUGH DRAFT

1          THE WITNESS:  I can do it a little sooner.

2          THE VIDEOGRAPHER:  Going off the record.

3   The time is 12:12.  (Lunch recess.)

4          THE VIDEOGRAPHER:  Media number 3, on the

5   record at 1:05.

6   BY MS. ARANDES:

7       Q.    Okay, Mr. Pipes.  I had a couple of

8   followups from some of of the things we discussed

9   earlier.  One question I had was you mentioned that

10  there was sort of a book of instanters and you could

11  just rip one out and fill it out.  Did I get that

12  right?

13      A.    At various times, yes.  When I first started

14  at criminal district court, it was not uncommon.  You

15  go to the minute clerk and they will give you a book

16  of presigned instanters for just to fill out when you

17  need them because they don't want to be bothered every

18  time you need a subpoena.  So it was a book of carbon

19  copied forms all presigned by the minute clerk, and

20  you just put the name of the person you wanted

21  instantered to it and gave it either to the Sheriff to

22  serve or if you had a POST certified law enforcement

23  officer or interrogate.

24      Q.    Did that practice stop at the court at some

25  point?

ROUGH DRAFT

1    A.    After Katrina it trended down.  We finally

2  said, look, no, if you want an instanter, go get an

3  instanter on a case-by-case basis.  Don't get planning

4  instanters presigned by the Court.  I honestly don't

5  know when it fully stopped.  But that was the practice

6  pre-Katrina under the Jordan administration and

7  probably before that when I started.  But any time you

8  needed abdomen instanter, you'd simply go to the

9  minute clerk and say I need instanters and they will

10 give them to you.  And that was the same thing for

11 Public Defenders, private attorneys.  You just ask and

12 they will give them to you.  And if they know you,

13 they've got no problem giving you a stack of blank

14 ones presigned.

15    Q.    Okay.  When you said we want to make sure

16 and go request the instanter in a specific case, are

17 you talking about OPDA?  Is there a policy on that, to

18 the best of your knowledge?

19    A.    Could you rephrase that?  Because I don't

20 remember that specifically.

21    Q.    Sure.  I think what you said was we made a

22 decision to go and get instanters in specific cases

23 rather than getting blank instanters.

24    A.    That was me and the other chiefs of trail

25 when we were Advising policies.  We wanted to make it

Rough Transcript

ROUGH
ROUGH DRAFT

1  was looking for some particular thing of who might

2  have screened it.  I don't know what he would have

3  been looking for.  Generally speaking, he didn't

4  review pleadings.

5      Q.    And what about disclosures?  You said one of

6  the things you like to look in your cases is discloses

7  before they go to the other side.  To the best of your

8  knowledge, does Mr. Cannizzaro do the same thing for

9  MOT cases under his supervision?

10     A.    He would tell us make sure something is

11 disclosed, but he wouldn't review the documents the

12 way I would.

13     Q.    Do you ever then review pleadings or

14 disclosures for MOT cases to make sure that they are

15 in accord with the standards that you normally do

16 them?

17     A.    No.  Only if a MOT attorney came to me and

18 said, hey, can you look at it, I might give it a once

19 over.  But it wouldn't be that they have a requirement

20 to run a pleading past me.  There might be, for

21 instance -- there's a lot of form sharing in the

22 office where if I've got an issue that another

23 attorney -- if I've handled it before and another

24 attorney has one, I would send him a copy of what I

25 did or what I sent.  You'd have that happen a lot.

Rough Transcript

ROUGH DRAFT

1  And you might have an attorney -- up, some of the MOTs

2  were more -- some of younger MOTs might be like:  Hey,

3  can you look at this before I file it?  And I'd

4  happily look at it.  But there wasn't a sort of like:

5  Before you file X motion, I need to see it with the

6  MOT attorneys.

7      Q.    We talked a little bit about your personal

8  use of fake subpoenas as a trial attorney.  How did

9  you come to know that any physician of a fake subpoena

10  form existed, if you remember?

11      A.    When I was in screening, I mean it was a

12  form we had.  I honestly don't remember who first gave

13  it to me or showed it me to me.  But there were

14  versions of that that were in use when I started in

15  2003 in the Screening Division.  At the time I was

16  screening generally nonvictim cases so I really dent

17  use them then, but I knew they existed.

18      Q.    So what I'd like to do -- and Mr. Paul,

19  maybe you can help me out with this -- I sort of

20  separated the various types of fake subpoenas that

21  we've identified to date and sort of put them together

22  in different buckets so we can talk about them.  And

23  I've actually gone ahead and arranged them

24  chronologically so you can see the dates on which the

25  fake subpoenas we have were used. .  There's 14

ROUGH DRAFT

1  different documents that were provided, Matt, that are

2  these compilations.  Do you think we can pull them out

3  now and get them for him?  I'll mark them each as an

4  exhibit while you go pull them if that's helpful.  Do

5  you have them separated?

6            MR. PAUL:  I do.

7            MS. ARANDES:  Great.  Okay.  So I'm going to

8  enter as Exhibit 8 the document -- and I think it was

9  called version A, if you have the title --

10            MR. PAUL:  No, I don't.  Just give me the

11  starting Bates number.

12            MS. ARANDES:  Sure.  This is a one-page

13  document starting OPDA 086345.  It says Subpoena at

14  the top, District Attorney for the Parish of Orleans,

15  to Special Agent Jeff Jacobs.  The date is October

16  18th, 2010.

17            MR. PAUL:  There's only one page that you're

18  talking about hear?

19            MS. ARANDES:  One page.

20            (EXHIBIT 8 WAS MARKED.

21             FOR IDENTIFICATION.)

22            MS. ARANDES:  I'll go ahead and share that.

23  And I'm going to enter that he is all and then we can

24  talk about them, if you want to keep looking.

25            This is the page.

Rough Transcript

ROUGH DRAFT

1    Q.    Can you see it on the screen, Mr. Pipes?

2    A.    I can.

3    Q.    Okay.  Are you familiar with a subpoena that

4    looks like this?

5    A.    I'm looking at it. I've seen it.  I would

6    recognize this as one of the forms that was used, yes.

7    Q.    Okay.  This is one of the fake subpoenas

8    that was used by the OPDA?

9          MR. PAUL:  Object to the form of the

10   question.

11   A.    It appears to be, yes.

12   Q.    Okay.  I'm going to pull up version -- what

13   I'm going to call version B, and I'm going to enter

14   that as Exhibit 9.

15         (EXHIBIT 9 WAS MARKED.

16             FOR IDENTIFICATION.)

17         MS. ARANDES:  The Bates number this is

18   Plaintiffs' 12396.

19   Q.    I'm showing it.  It has the seal at the top.

20   This one says January 14th, 2013.  (FRAZIER).  This is

21   another form that has been filled in.

22         Are you familiar with this version of the

23   fake subpoena form, Mr. Pipes?

24   A.    Not specifically, but it appears to be a

25   document from our office.  I'm not familiar with this

1  particular document or this particular case.

2      Q.    Okay.  You would agree, looking at it, that

3  it would satisfy the conditions to be a fake subpoena

4  based on the definition we're using here today?

5          MR. PAUL:  Object to the form of the

6  question.

7      A.    I would agree that the very broad definition

8  of any document requesting -- or directing a person to

9  a place without court signature, it would fall under

10  that category, yes.

11     Q.    All right.  I'm going to enter as

12  Exhibit 11 -- sorry, I think I'm on Exhibit 10.  .  And

13  this is going to be Plaintiffs' 12395.

14          (PLAINTIFF'S EXHIBIT 10 WAS MARKED.

15           FOR IDENTIFICATION.)

16  BY MS. ARANDES:

17     Q.    And I'll share this.  And again, this is a

18  seal at the top.  It says Subpoena.  It's January

19  28th, 2013.  And it says failure to appear will result

20  in court action.  Would you agree that this also

21  constitutes a fake subpoena?

22     A.    I would not.  This is an actual court-issued

23  subpoena.

24     Q.    Okay.  And how do we know that?

25     A.    I know that because I recognize it to be the

ROUGH DRAFT

1  CourtNotify subpoena in Word, altered the language,

2  printed it and had it served on an individual in one

3  of her cases, you've never taken any steps to assess

4  whether any other trial attorney has done that?

5        MR. PAUL:  Object to the form of the

6  question.

7        MR. FREEMAN:  Object to the form.  It

8  assumes facts not in evidence.  You can answer if you

9  know.

10     A.    I'll be honest if with you.  The first I

11  lettered she would have did that would be in that

12  deposition when she reviewed it.  Court November has

13  been down for over a year and a half now if not

14  longer.  So it's not something that could be done now.

15  So I wouldn't have had a reason to address that with

16  the Trials Division.  So no, it wouldn't have occurred

17  to me.

18     Q.    Is CourtNotify still down currently?

19     A.    Yes.  That's part of the reason why as of

20  this moment you cannot obtain a subpoena for a

21  witness.  And depending on the section, a defendant at

22  criminal district court.

23     Q.    Okay.  My last one, I promise, I'm going to

24  enter as Exhibit 22 what I'll call version N.  The

25  Bates number is OPDA 296.  This says subpoena,

ROUGH DRAFT

1    District Attorney's Office, pursuant to Louisiana Code

2    of Criminal Procedure, Article 66.  It's dated April

3    11th, 2017.

4              (EXHIBIT 223 WAS MARKED.

5               FOR IDENTIFICATION.)

6        A.    All right.  I see the document.

7        Q.    Are you familiar with this form?

8        A.    I'm not.  It purports to be an Article 66

9    subpoena.  It is signed by a criminal district court

10   judge.  And it appears to have been served by someone.

11   I do not recognize the process server's signature.  I

12   do represent Judge Buras' signature.  Go on.

13       Q.    So how would you assess whether or not this

14   was a letting Article 66 subpoena?

15             MR. FREEMAN:  Object to the form of the

16   question.

17       A.    I assess it by noting that it bears of

18   signature of a judge in criminal district court.

19       Q.    Okay.  I wanted to go through all those.

20   And one question I have is:  Were any of the versions

21   that we looked through the subpoena that you were

22   talking about with respect to when O'Hern came to you

23   in late 2013 or early 2014 and said I think we need to

24   do something about that he is forms?  Can you tell me

25   which form he was referring to, if you know?  Have I

Rough Transcript

ROUGH
ROUGH DRAFT

1  given it to you?

2      A.      When investigator Hearn came to me, the

3  forms he presented to me were the forms that became

4  Exhibits 12 and the one that bears the signature line

5  for the court, 13, pages 2 and 3.  Those are the

6  documents he showed me, like the Mock-ups he had.

7  What he was referring to was the plethora of all of

8  the forms that were in existence before that.

9           Our office had been using some version of a

10  DA notice, DA subpoena going back, as I said before,

11  forever.  And a lot of times it was multiple

12  generation copies, six the, generation copies of

13  forms, they were skewed, they were blurry, they looked

14  unprofessional.  And he wanted to use a new form

15  because one of the issues we had been having -- I mean

16  he didn't say this, but we had been having issues with

17  people I am period of time naturing D A investigators.

18  So he wanted to make a new form.  So I sent them to

19  Graymond and those are the forms they wound up using.

20      Q.      Was it you or Mr. O'Hern or both were

21  concerned that fake subpoenas didn't look

22  professional?

23           MR. PAUL:  Object to the form of the

24  question.

25      A.      We didn't express that right there at that

Rough Transcript

ROUGH DRAFT

1   point.  O'Hern wanted to use this new form because it

2   looked more professional as -- I mean the forms that

3   we had been using were -- some of them literally were

4   it should, had been recycled out of garbage.  That

5   wasn't like a discussion we had.  He literally handed

6   it to me as I was walking to court and I said:  Take

7   it to Graymond.  And I believe that was Graymond's

8   intention, was to unify it so there would be a single

9   form we would be using instead of however many you've

10  shown me so far.

11      Q.    And the form that Mr. O'Hern put together,

12  which again you referred to as the O'Hern 2014

13  subpoena and I referred to it as version E earlier and

14  I'm going to share again.

15          This form, versions of which were given to

16  victims and witnesses and has been produced as

17  Exhibit 12, it says Subpoena on the top and it says "a

18  fine and imprisonment may be imposed for failure to

19  obey this notice.."  Did that language give you any

20  pause when Mr. O'Hern showed this to you and suggested

21  that this be the standard form that be used?

22      A.    I will be honest with you.  I don't know

23  that I even would have noted that language when he

24  showed it to me.  It was a very quick:  Hey, I want to

25  use that.  Well, you need to talk to Graymond.  I

Rough Transcript

ROUGH

ROUGH DRAFT

1  doubt at that time I even noticed that language.

2       Q.    Did you note that language later when

3  Mr. Martin sent it out to the entire office to be

4  used?

5       A.    I honestly don't recall.  It was such an

6  innocuous document, I honestly didn't pay it much mind

7  because it wasn't something I thought the trial

8  attorneys would be using.

9       Q.    Why would you consider it an innocuous

10 document?

11      A.    Well, practice at criminal district court --

12 I don't know if you're a Louisiana barred attorney or

13 not.  But in our civil code, the idea of tradition as

14 a source of law is very much the rule at Tulane and

15 Broad.  There are practices and procedures at Tulane

16 and Broad that fly in direct contravention of the cord

17 of criminal procedure and that's just the way it's

18 always been.  This document was no different than any

19 of the other procedures that the judges at Criminal

20 District Court endorse, allow, main date, and it

21 frankly didn't dawn on me at the time that this was

22 any more or less egregious than the motion practice,

23 the first appearance practice, the discovery

24 practices, the way The courts were conducted over

25 there.  This was a document that I didn't really think

Rough Transcript

ROUGH DRAFT

1  beginning Bates stamped in the bottom right-hand

2  corner INDEF01288.  I'll put this up on the screen.

3          (EXHIBIT 23 WAS MARKED.

4           FOR IDENTIFICATION.)

5  BY MS. ARANDES:

6     Q.    This is a transcript from the State of

7  Louisiana versus James Cunningham, January 27th, 2017,

8  in front of Judge Laurie White.

9          Can you scroll to page -- actually why don't

10 we do this.  I need to take a short break.  Why don't

11 we just take a quick break and you can review the file

12 over the break, and then we can talk about when we get

13 back.  Is that okay?

14    A.    Sure.

15          MR. PAUL:  10 minutes; is that right?  Does

16 that work?

17          THE VIDEOGRAPHER:  Going off the record.

18 The time is 2:05.

19          (A RECESS WAS TAKEN.).)

20

21          THE VIDEOGRAPHER:  Media number 4, on the

22 record at 2:16.

23 BY MS. ARANDES:

24    Q.    Mr. Pipes, you mentioned that one of the

25 reasons why Mr. O'Hern was concerned with creating a

Rough Transcript

ROUGH DRAFT

1    form, DA subpoena, that looks professional was an

2    incident regarding professional I know percent nation

3    of an OPDA investigator.  Are you referencing a case

4    that was brought against Taryn Blume?

5        A.    No.

6        Q.    What you referencing?

7        A.    Mr. O'Hern didn't specifically say that at

8    that time.  I know that we had issues -- we con talent

9    would have issues where we would be talking to

10   witnesses who would say I already talked to the DA's

11   office about this, and we had not reached out to them

12   or anything like that.  And so the office had had

13   concerns both before and after the Taryn Blume case

14   about impersonation of DA office personnel.  But

15   again, that's not something that Mr. O'Hern

16   specifically stated at that point.  I know that is

17   something that had been an issue in the past and

18   continued to be so into the future.

19       Q.    Did you have a conversation with Mr. O'Hern

20   about that at some other time?

21       A.    I am sure I have had conversations -- or I

22   had conversations with Mr. O'Hern about people

23   impersonating DA office personnel.  I don't know if we

24   ever had one in reference to these particular

25   documents and their use.

Rough Transcript

ROUGH DRAFT

1    Q.    Did you think it was appropriate for Mr.  --

2    well, let me strike that.

3          Mr. O'Hern is not a lawyer; correct?

4    A.    Correct.

5    Q.    Do you think it was appropriate for

6    Mr. O'Hern to develop a form with legal language

7    despite not being an attorney?

8          MR. FREEMAN:  Object to the form of the

9    question.

10   A.    I don't know if "appropriate" is a judgment

11   that I can make.  He was not an attorney, but he was a

12   law enforcement officer who had served documents

13   before.  As far as what would have been appropriate, I

14   don't know.  I would say that in hindsight, looking at

15   the document, there are portions of it that could be

16   miss leading and it probably could have been he had

17   it's to be more clear.  But again, that was not

18   something I was concerned with.  I passed Mr. O'Hern

19   on to the First Assistant and really didn't give the

20   document a second thought until much later.

21   Q.    Did you assume that Mr. Martin would review

22   the form closely?  Is that why you -- sorry.

23   A.    I assumed that Mr. O'Hern would talk to

24   Graymond Martin about it and that he would have to

25   approve before it went into general use.  As far as

Rough Transcript

ROUGH DRAFT

1  what exactly Mr. Martin was going to do with T I

2  wouldn't be comfortable speculating.

3      Q.    I think you mentioned that because it was

4  going out as a form that would go out to the entire

5  office, that would fall within Mr. Martin's

6  responsibilities; is that correct?

7      A.    Right.  Things that affect the office as a

8  whole is not something I would have made.  At that

9  point I was Chief over MOT, and I wasn't Chief over

10  the entire Trials Division solely.  So this would not

11  have been something that I would have had authority

12  over or input in really.

13      Q.    What is the basis for your statement that

14  fake subpoena forms of the type that we've looked at

15  would be unsuccessful if used to try to get a victim

16  or a witness to come in to meet with the DA?

17          MR. FREEMAN:  Object to the form of the

18  question.

19      A.    Part of my job, as I said earlier, was when

20  attorneys had issues or problems, they would come to

21  me and we would try to work them out.  A trial

22  attorney would come to me with a case that is set for

23  trial.  Usually they're going to come with me Thursday

24  or Friday with a trial set on Monday.  And it's going

25  to be a trial -- is it something that can be

Rough Transcript

ROUGH DRAFT

1  continued?  No, the judge is not going to grant a

2  continuance.  Is this something that can be worked

3  out?  We would talk to the DA.  Either he would or

4  would not be able to authorize a deal.  Let's assume

5  no.  So at that point we're preparing for a witness

6  where we don't have a witness.  At that point sending

7  a DA notice to the witness is a pointless exercise

8  because either their cooperative and they would have

9  either contacted us, they'd already be coming, or if

10  then uncooperative, I can't do anything with that.  If

11  I'm going to send an Interrogate to an uncooperative

12  witness with a piece of paper, it's going to be an

13  instanter subpoena from the court.  That way if they

14  ignore the instanter subpoena, I can then, if

15  necessary, ask for an alias capeas and then a

16  continuance of the trial based on their failure to

17  appear.  At that point if I'm going to need to seek a

18  Material Witness Warrant, while the fact that a DA

19  notice went to them is something I might include, that

20  is not going to be dispositive to the Court.  If my

21  goal or my need is to have that witness there in

22  court, I'm going to want a real subpoena in their hand

23  that they ignored so that I can ask the Court to issue

24  an alias capeas under their contempt of court powers

25  to bring that witness in or under their instanter

Rough Transcript

ROUGH
ROUGH DRAFT

1   that the use of the 2014 O'Hern version of the fake

2   subpoena, which was entered -- versions of which were

3   entered into the record today as Exhibit 12.  People

4   stopped using them after a memo went out telling them

5   to cease using that version; is that right?

6        A.    That's correct.

7        Q.    Did you ever check to make sure people had

8   stopped using it?

9        A.    I didn't follow behind them and go through

10  their files and computers, if that's what you're

11  asking.  We continue to check to see if there were

12  files that contain them as they came in.  And, you

13  know, as older files continued to close out, more of

14  them came in.  But as far as like a formalLized check

15  up to make sure they weren't still going out, I did

16  not take part in that if it existed.

17       Q.    To your knowledge, did anyone take any steps

18  to make sure that no versions of fake subpoenas were

19  going out after the policy was issued, that it stated

20  that those documents should not be used anymore?

21            MR. FREEMAN:  Object to the form.

22       A.    We issued the policy.  We had the CLEs on

23  it.  I do not know if there was anything in particular

24  told to the investigators about delivering them or

25  not.  The attorneys were instructed not to use it, and

Rough Transcript

ROUGH DRAFT

1    I've seen no indication that any of them have

2    continued to.

3         Q.    We talked earlier about giving someone a

4    version of that 2014 O'Hern subpoena as an excuse

5    note.  And I asked you, I believe, if you thought that

6    there was any issues of giving that to an excuse note

7    to somebody given that it says Subpoena on the top of

8    it.  What if that employer was a law enforcement

9    official or a judge?  Would you have any hesitation

10   about giving them that document as an excuse note?

11        A.    Generally most of the time the boss was a

12   law enforcement official because they were given to

13   NOPD officers who came to the office to meet with us.

14        Q.    So -- sorry.  Go ahead.

15        A.    So no.

16        Q.    Have you ever received any training, either

17   through CLEs or within NOPD or externally, about

18   heightened professional responsibility obligations for

19   legal supervisors?

20        A.    I'm required by state law to obtain certain

21   CLE supervisors as a supervisor, sexual harassment

22   training, things of that nature.  It's a topic that's

23   come up in the ethic professional CLEs that I've

24   taken.  I don't recall if I've taken a specific class

25   that expressly dealt with a heightened responsibility

Rough Transcript

ROUGH DRAFT

1  for supervisors.  Usually it's just a portion that

2  comes up in a standard CLE on ethics or

3  professionalism.

4      Q.    We talked a lot today about the case of

5  Renata Singleton.  Sitting here today, do you wish

6  that you would have done anything differently in that

7  case?

8      A.    Not that I can think of immediately.  May

9  involvement on the decision to get the Material

10  Witness Warrant and how it was executed -- not really,

11  no.  It's unfortunate that she had to be arrested.

12  But I can -- I am not permitted to just FLAUNT a Court

13  order ordering someone's arrest.  That has to go to a

14  judge.  There's a procedure and a process.  And it is

15  unfortunate that that she was not arrested the night

16  before, came into the office, and there was nothing we

17  could do at that point to help her.  Our position at

18  that time and, to my knowledge, our position still,

19  she did not want to take a part in these proceedings

20  and fought us every step of the way and was deducting

21  service.  It unfortunate that victims of crime do

22  that.  I do not relish putting a victim in jail.  I

23  don't relish putting a defendant in jail.  It is an

24  unfortunate necessity of our practice that sometimes

25  for the good of the State, for the good of society,

Rough Transcript

ROUGH DRAFT

1  that victims sometimes suffer.  And I hope to mitigate

2  that.  I encourage the people I supervise to mitigate

3  that.  But unfortunately there are cases where it is

4  necessary to protect them or to protect other people.

5  As I sit here looking back over Renata Singleton's

6  case, again, the things that stick out in my mind

7  most, that she was not cooperative with us until it

8  was too late.  She already had a warrant out for her

9  arrest when she came to the office.  You're telling me

10  she said:  No, I'm here, I'm going to cooperate.  I

11  don't know that.  I didn't speak with her.  But at

12  that point, from the moment the judge said that she

13  was granting that Material Witness Warrant, she was

14  going to jail until that judge said something

15  different.  And it's unfortunate that she came here,

16  giving her the benefit of the doubt from what you're

17  telling me, wanting to cooperate.  But at that point

18  it was beyond my ability to help her other than to try

19  to get her back in front of the judge.  In a perfect

20  world Section F would have been sitting on that Friday

21  or Judge Pittman would have been willing to hear it on

22  Monday or she would have been sitting on Monday.  In a

23  perfect world, honestly, she wouldn't have been a

24  victim of a crime from a man who abused her and did it

25  before and likely would do it again.  It's not

ROUGH
ROUGH DRAFT

 1  something I relish.  But to ask is there anything I

 2  would do differently, nothing particular comes to

 3  mind.

 4       Q.    So according to you, there was nothing that

 5  you could do to prevent her from being arrested, but

 6  you thought it was appropriate to stop and ask her

 7  about the case before you got her arrested; is that

 8  right?

 9       A.    I thought it was appropriate to find out --

10  she just showed up at the office, and we didn't know

11  why she was here.  I honestly didn't know how she had

12  gotten here.  I thought it was appropriate to find out

13  where her head was, what was she thinking was

14  happening and she knew she was going to be arrested.

15  Because I think it would be horrific if you came to

16  the DA's office thinking everything is good, yeah,

17  here's what's going on, okay, good, and as you turn to

18  leave, you're getting put in jail.  I believe she

19  needed to know:  Look, I appreciate you're here now,

20  but the judge has issued a warrant for your arrest.

21  This trial is going to happen and gauge what she

22  thinks about that.  Because part of the presentation

23  of that case is going to vary greatly depending on

24  whether she is going to refuse to come out from the

25  back and have to be dragged out kicking in screaming

Rough Transcript

ROUGH
ROUGH DRAFT

1   versus she would take the stand willingly and explain

2   truthfully what happened to her and when asked about

3   it, say:  I didn't want to go forward, but here I am.

4   That's all things that need to be known before the

5   trial begins because it's going to vastly change how

6   you present the case.

7        MS. ARANDES:  I have no further questions.

8   I have no further questions.  Per suspect.  Thank you

9   for this second session, Mr. Pipes.  I know it was

10  long.  And thank you also, everyone, for bearing with

11  me on some breaks today.

12       MR. PAUL:  Thank you very much.

13       THE VIDEOGRAPHER:  This concludes the

14  deposition.  This concludes the deposition.  Off the

15  record at 5:51?

16       COURT REPORTER:  Read and sign?

17       MR. PAUL:  Read and sign the deposition?

18  Yes, please.  (The deposition was concluded at

19  5:52 p.m.)

20

21

22

23

24

25