# EXHIBIT 9

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF LOUISIANA

 3   _____

 4   RENATA SINGLETON, MARC MITCHELL,
     LAZONIA BAHAM, JANE DOE,
 5   TIFFANY LACROIX, FAYONA BAILEY,
     JOHN ROE and
 6   SILENCE IS VIOLENCE,               Case No.

 7                                      2:17-cv-10721-JTM-JVM

 8        Plaintiffs,

 9   v.

10   LEON CANNIZZARO, et al.,

11        Defendants.

12   _____

13

14            VIDEOTAPED DEPOSITION OF
     ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
15            DAVID S. PIPES 30(b)(6)

16            New Orleans, Louisiana
                October 19, 2020
17            10:30 a.m. - 6:52 p.m.

18

19        Taken on behalf of the Plaintiffs

20        ********************************

21        Examination of the witness taken before:
          Michael J. D'Amato, Notary Public in and for the
22        State of Florida at Large, Registered Merit
          Reporter, Florida Professional Reporter

23

24

25   Job No. 183662
```

Page 218

1  are not congruent with each other.  An individual could

2  change a statement, recant a statement, have a memory

3  change that would not necessarily amount to a crime.

4        This is referring specifically to a very

5  narrow course of conduct and fact which is, I don't

6  want to give you the impression that the office policy

7  would be any recanting witness is getting prosecuted.

8  No.  But if a witness or victim commits a crime,

9  prosecution is something we would contemplate as we

10  would with any individual.

11      Q.    Turning to the second page of this document,

12  which is Bates stamped 67039, and I will turn to it on

13  the screen, too, it says "Is he entitled to a lawyer?"

14  And then it says, "No."

15        Can a victim or witness seek an attorney?

16      A.    I'm sorry, can they what?

17      Q.    Can they ask for an attorney?

18      A.    They can certainly ask.  This was a statement

19  of the law at the time that this document was prepared

20  in which they were not entitled to appointment of an

21  indigent defender or a public lawyer.  If they want to

22  have a lawyer or hire a lawyer, of course they can hire

23  a lawyer.

24      Q.    Okay.

25      A.    I would also point out that subsequent to this

1    presentation and these materials the statute has been

2    amended and I believe it does include the provision for

3    appointment of counsel for material witness now.

4         Q.   Has there been additional training for ADAs in

5    providing attorneys to witnesses or victims, especially

6    on material witness warrants?

7         A.   We have had additional training on the changes

8    to the material witness law.  We do not provide them

9    with attorneys.  The court does that.

10        Q.   I understand that.  That's not what I was

11   asking.  I was asking whether ADAs in the OPDA's office

12   have been trained on what to do when a witness asks for

13   an attorney given a change in the law that you just

14   described?

15        A.   Yes.

16        Q.   I'm going to turn to Topic 7 now.  Let me

17   screen share.  Topic 7 says, "Detailed information

18   about who designed the form of and implemented,

19   encouraged or advocated for the use of DA subpoenas."

20   Are you prepared to testify on Topic 7 today?

21        A.   Yes.

22        Q.   Let me pull up what I am going to mark as

23   Exhibit 11, OPDA 39340 through 39343.

24             (Exhibit 11 marked for identification)

25        Q.   Mr. Pipes, do you recognize this document?

Page 220

1      A.    I do.

2      Q.    Can you describe what it is, please?

3      A.    Pages 1, 2 and 3 are an email from Debbie Ford

4   who at the time was the first executive assistant to it

5   looks like all staff, but I could be mistaken, and I'm

6   not going to go through every name.  And the attachment

7   is one of the quote/unquote DA subpoena forms created

8   by Mr. O'Hearn.

9      Q.    You cut out a bit.  Who was created by who?

10     A.    Mr. Jim O'Hearn.

11     Q.    Do you know who might have approved this DA

12  subpoena template before it was circulated?

13     A.    The -- let me back up from the beginning.  In

14  late 2013/early 2014 I was approached by Jim O'Hearn,

15  who at the time was an investigator with our office.

16  He basically expressed concern over the documents that

17  we were using for both DA subpoenas and for grand jury

18  subpoenas.

19          He showed me two documents that he wanted to

20  use, identical except for the fact that the grand jury

21  subpoena had a spot for a court signature.  I told him

22  he would need to take that to the first assistant.  It

23  was shortly after that I believe he did so and this

24  email followed.

25     Q.    So the OPDA did authorize the use of the DA

 1    subpoena template, is that correct?

 2         A.    Yes.

 3         Q.    Do you know if DA subpoenas were used in

 4    previous administrations prior to Mr. Cannizzaro's

 5    administration?

 6               MR. FREEMAN:  Object to the form of the

 7         question, vague and ambiguous.

 8         A.    Yes, they were.

 9         Q.    Were they always called DA subpoenas?

10         A.    I can't say they were always called that.  I

11    know that they were ubiquitously referred to as that

12    going at least as far back as the 1990s.

13         Q.    Do you know if they were called anything, and

14    if so what they were called?

15         A.    I've heard them referred to as DA notices.

16    Those are pretty much the only terms I could think of.

17

18         Q.    Do you know if the word subpoena always

19    appeared on the DA notice or DA subpoena?

20         A.    I do not know that.

21         Q.    If you look at the actual DA subpoena template

22    on 39343, under the word subpoena it says "A fine and

23    imprisonment may be imposed for failure to obey this

24    notice."

25               Do you know whether this terminology was

Page 222

1   included on prior versions of the DA subpoena or DA

2   notice?

3      A.   I do not.  I do not know if it was included in

4   all prior forms.  I have seen forms that did not

5   include that language.

6      Q.   Was there any OPDA policy on when to use the

7   DA subpoena?

8      A.   A policy, no, I would not say there was a

9   policy on when to use it.  It was a tool that existed

10  for use, but there was never a policy that said you

11  should use this in this circumstance.

12     Q.   Did ADAs need supervisory approval before

13  sending out a DA subpoena?

14     A.   Not to my knowledge, no.

15     Q.   Do you know whether there was a policy of the

16  OPDA that a particular ADA should try to reach out by

17  telephone or otherwise to a victim or witness before

18  issuing a DA subpoena?

19     A.   As I said a moment ago there was not a

20  particular policy with regard to when this form should

21  or should not be used.  The office had a policy of

22  trying to reach out to victims as early as we could in

23  the process, and a phone call would likely be the first

24  step in reaching out to a victim.  Again, assuming it

25  wasn't a case where our staff was on scene of a crime.