# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

RENATA SINGLETON; MARC
MITCHELL; LAZONIA BAHAM; JANE
DOE; TIFFANY LACROIX; FAYONA
BAILEY; JOHN ROE; and SILENCE IS
VIOLENCE,

      *Plaintiffs*,

v.

LEON CANNIZZARO, in his official
capacity as District Attorney of Orleans
Parish and in his individual capacity;
GRAYMOND MARTIN; DAVID PIPES;
IAIN DOVER; JASON NAPOLI; ARTHUR
MITCHELL; TIFFANY TUCKER;
MICHAEL TRUMMEL; MATTHEW
HAMILTON; INGA PETROVICH; LAURA
RODRIGUE; SARAH DAWKINS; and
JOHN DOE, in their individual capacities,

      *Defendants*.

Civil Action No. 17-10721

Section H
Judge Jane Triche Milazzo

Division 1
Magistrate Judge Janis van Meerveld

## MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON LAZONIA BAHAM'S CLAIMS AGAINST INDIVIDUAL DEFENDANTS

In the week before the first trial date set for the murder of Orlando Rickmon, Assistant District Attorney Jason Napoli sent Lazonia Baham what looked like a subpoena. It said "SUBPOENA" at the top in bold letters. It was emblazoned with the official seal of the District Attorney's Office. And it threatened, in all capital letters, "A FINE AND IMPRISONMENT MAY BE IMPOSED FOR FAILURE TO OBEY THIS NOTICE."[1] The only difference between the "subpoena" that Ms. Baham received and a legitimate one was that the "subpoena" she received had no space for the signature of a judge or clerk. That is because no judge or clerk had authorized

---

[1] Ex. 11 (May 13, 2014 fake subpoena template) at OPDA39343.

1

it. It was a fraudulent subpoena, created by the District Attorney's Office. But Ms. Baham, a grandmother with a tenth-grade education and a history of special education, thought it was real. And so she did what it commanded her to do. She went to the DA's Office.

In sending Ms. Baham a fraudulent subpoena, Jason Napoli and First Assistant District Attorney Graymond Martin (collectively "Individual Defendants")—who sent Defendant Napoli the fake subpoena template and instructed him to use it—committed abuse of process under Louisiana law.[2] Individual Defendants now move for summary judgment, asserting that the Court should find that Ms. Baham's testimony is "so blatantly contradicted by the record . . . that no reasonable jury could believe it," that Ms. Baham is precluded from relief because of her purported failure to show injury, and that her claims are prescribed.[3] But even a cursory examination of the record makes clear that, contrary to Individual Defendants' contention, Ms. Baham's testimony is substantially more consistent with the record than that of Defendant Napoli. And, at any rate, "Credibility determinations have no place in summary judgment proceedings." *Richardson v. Oldham*, 12 F.3d 1373 (5th Cir. 1994). Similarly, Individual Defendants' claim that Ms. Baham's failure to show injury overlooks the evidence of injury that has emerged during discovery, and their prescription claim distorts the law and ignores unrebutted evidence in the record demonstrating that the prescriptive period did not commence until shortly before Ms. Baham filed the lawsuit. *See Singleton*, 372 F. Supp. 3d at 429 (quoting *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 246 (La. 2010)). The Court should deny Individual Plaintiffs' (premature)[4] Motion.

---

[2] Based on the deposition testimony of David Pipes in his individual capacity, Ms. Baham dismisses any claim she might have against him.

[3] Individual Defendants' Memorandum in Support of Mot'n for Summary Judgment on Lazonia Baham's Claims Against Individual Defendants (Dkt. No. 282-1) ("MSJ") at 2.

[4] Plaintiffs reserve the right to supplement the record to this Summary Judgment opposition, and note for the Court that OPDA is *continuing to produce* responsive documents directly relevant to their Motion.  For example, on Thursday, December 8, 2020, 1 week before the deadline for this

## FACTUAL BACKGROUND

Ms. Baham was a witness in *State v. Isaac Jones*, Case No 536-436.[5] Isaac Jones was accused of murdering Orlando Rickmon.[6] Just before she found out that Orlando had been murdered, she had seen Isaac Jones standing on Telemachus Street, around the corner from her home—Orlando was killed on Baudin Street.[7]

In August 2013, several months after the murder, Ms. Baham received at least one grand jury subpoena.[8] In late 2014, Defendant Jason Napoli was assigned as the prosecutor on the Isaac Jones case.[9] About two years passed after Ms. Baham received the grand jury subpoena before she heard from anyone about the Isaac Jones case.[10] In 2015, Ms. Baham received another document demanding she appear at the District Attorney's Office.[11] This document also had the seal of the Orleans Parish District Attorney's Office on it, and it was labeled as a "SUBPOENA."[12]

This "subpoena" was fake. It was created using a template form for fake subpoenas that First Assistant District Attorney Graymond Martin had instructed all OPDA staff to use on May

---

Response, OPDA produced almost 100 pages of communications about contacting Ms. Baham, case referral forms, and other relevant discovery. Defendants filed this motion for Summary Judgment and opposed an extension before producing these documents that have been in OPDA's possession and are responsive to discovery requests sent over a year ago.  Plaintiffs expect that additional documents relevant to this Motion will continue to be produced, as discovery continues. Furthermore, Defendant Martin has yet to be deposed and so a fulsome record of the nature and extent to which he was involved beyond distributing the fake subpoena template and directing Defendant Napoli to use it has yet to be developed.

[5] *See* Plaintiff's Counterstatement of Undisputed Material Facts ("CSUMF") ¶ 33.

[6] *See* CSUMF ¶ 63.

[7] *Id.* ¶ 33.

[8] *Id.* ¶¶ 54-55.

[9] *Id.* ¶ 66.

[10] *Id.* ¶ 64.

[11] *Id.* ¶ 80.

[12] *Id.*

13, 2014.[13] This was not the first fake subpoena to be "issued" in the Isaac Jones case. In May 2013, "subpoenas" were issued to two law enforcement witnesses demanding that they "report to ADA Craig Famularo" in Magistrate Court.[14] Neither of these documents was signed by a judge or clerk.[15] And of course, Louisiana law does not authorize prosecutors to compel any witness to "report to" them absent an order from a court. *See* La. Code Crim. P. art. 66.

After Ms. Baham received the fake subpoena, she went to the courthouse, where she spoke with a woman who called the Orleans Parish District Attorney's Office for her, but was unable to reach anyone there.[16] Ms. Baham then went to the District Attorney's Office, but was not allowed in by the security guard.[17] Ms. Baham then returned to the courthouse, but the woman she had spoken to earlier was gone.[18] Ms. Baham missed work to do that.[19]

The Isaac Jones case was set for trial for October 13, 2015, but Ms. Baham was not subpoenaed for that date (nor did she even know about it).[20] That day, Defendant Napoli sought a material witness warrant for Ms. Baham, alleging that she would not meet with him, speak with the investigator on the case, or accept their phone calls.[21] That motion was granted, and Ms. Baham was arrested and jailed for eight days.[22]

---

[13] *Id.* ¶¶ 5, 80, 82 (testifying that document she received was similar in form to the template adopted by Martin in 2014); *see also* Ex. 11 (May 13, 2014 Martin email with fake subpoena template).
[14] CSUMF ¶¶ 92-93.
[15] Ex. 43.
[16] CSUMF ¶¶ 83-84.
[17] *Id.* ¶ 85.
[18] *Id.* ¶ 86.
[19] *Id.* ¶¶ 88-89.
[20] *Id.* ¶¶ 129-30.
[21] *See id.* ¶¶ 132-37.
[22] *Id.* ¶¶ 138-41.

In April of 2017, Ms. Baham became aware of the DA's office use of fake subpoenas, which was when she first became aware that the document she had received was fake.[23]

## STANDARD OF REVIEW

A motion for summary judgment should be granted if the record, taken as a whole, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980).  When ruling on a motion for summary judgment, the Court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 585 (1986); *Merritt-Campbell, Inc*., 164 F.3d at 961. The Court "must not resolve factual disputes by weighing conflicting evidence since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980) (citations omitted). *Id.* (citations omitted).  Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961. A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).

## ARGUMENT

Defendants' arguments for summary judgment turn on two questions of fact: whether Ms. Baham received a fake subpoena and who was responsible for sending it to her.[24] To prevail,

---

[23] *Id.* ¶¶ 173-76.

[24] Defendants' arguments concern only the second element of Ms. Baham's abuse-of-process claim: a "willful act in the use of the process not proper in the regular conduct of the

Defendants must show that, for at least one of these issues, there no genuine dispute of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). They cannot.

Defendants also seek summary judgment based on several meritless legal arguments—two of which this Court has already addressed. And throughout their brief, they suggest through mere emphasis that certain extraneous issues—such as whether Ms. Baham received one or more grand jury subpoenas two years before the events in question—are somehow central to summary judgment. As set forth in Plaintiff Baham's Response to Defendants' Proposed Statement of Undisputed Material Facts, these issues are each premised on misapprehension of the evidence and mischaracterization of Ms. Baham's testimony.[25] Summary judgment should be denied.

## I. Plaintiffs' Evidence Presents Disputes of Fact, and Defendants' Efforts To Discount This Evidence Fail

Ms. Baham's consistent testimony that she received a fake subpoena is supported by a robust evidentiary record.[26] Regardless, Defendants center their arguments on Ms. Baham's credibility. Their claims—based on out-of-context testimony that is primarily borne of Ms. Baham's confusion about legal terminology— are contrary to the record. Their efforts fail:

---

proceeding." *Taylor v. State*, 617 So. 2d 1198, 1205 (La. Ct. App.), *writ denied,* 620 So. 2d 875 (La. 1993); *see also Singleton v. Cannizzaro*, 372 F. Supp. 3d 389, 423 (E.D. La. 2019), *aff'd in part, appeal dismissed in part*, 956 F.3d 773 (5th Cir. 2020) (identifying these elements). Indeed, Defendants no not even appear to raise the "willfulness" of their conduct; instead, they seek a summary determination that they engaged in no such conduct at all. Defendants do not address the first element of abuse-of-process—an "ulterior purpose." *Id.*

[25] As Plaintiffs detail in their Response to Defendants' Proposed Statement of Material Facts, these issues are premised on misinterpretations of Ms. Baham's testimony and other evidence in the record. *See* Plaintiff's Response to Defendants' Statement of Facts ("RSUMF") Nos. 1-3 (detailing Ms. Baham's thorough search for the fake subpoena at issue, and explaining the misapprehensions that undergird Defendants' interpretation of the facts); *id.* at Nos. 4, 6 (addressing the alleged "inconsistencies" between the Second Amended Complaint and Ms. Baham's testimony—which simply amount to the further development of the factual record through the discovery process).

[26] RSUMF Resp. No. 9; *see also* CSUMF ¶¶ 80-85.

credibility determinations are inappropriate at summary judgment. *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) ("Any credibility determination made between the officers' and [Henry's] version of events is inappropriate for summary judgment."). And although Defendants suggest Ms. Baham's testimony is so extreme in its inconsistencies that this court should ignore this principle, Ms. Baham's testimony is consistent with itself and the record.

### A.   Ms. Baham's Deposition Testimony Was Consistent and Credible

In her deposition, Ms. Baham repeatedly testified that she received a subpoena to the District Attorney's Office that did *not* look like a grand jury subpoena. Each time, she provided the same account. She received two documents telling her to go to the District Attorney's Office: a letter and a "subpoena."[27] The letter came first.[28] The "subpoena" came "a month or so" later.[29] The "subpoena" had a seal on it, and it commanded her to report to the District Attorney's Office.[30]

In response, Ms. Baham went to the courthouse to ask about the "subpoena."[31] A woman there called the District Attorney's Office for her.[32] When no one answered, the woman told Ms. Baham to go to the District Attorneys' Office.[33] When Ms. Baham arrived, she was turned away by a security guard.[34] Ms. Baham testified to these facts at least five times during her deposition— each time describing these events the same way.[35]

Regardless, Defendants make several attempts to discredit Ms. Baham's testimony. The record rebuffs each of them. To start, Defendants emphasize that "Ms. Baham has never been able

---

[27] CSUMF ¶¶ 74-75, 80-81.
[28] *Id.* ¶ 74, 81.
[29] *Id.* ¶ 81.
[30] *Id.* ¶ 80.
[31] *Id.* ¶ 83.
[32] *Id.* ¶ 84.
[33] *Id.*
[34] *Id.* ¶ 85.
[35] *Id.* ¶¶ 80-86; *see* RSUMF n.7.

to produce any copy of any unlawful subpoena that was allegedly delivered to her." Doc. 282-1 at 12-3. However, this hardly constitutes evidence that no fake subpoena was sent.

Defendants have not even been able to locate other fake subpoenas—known to have been used—within the Isaac Jones case; the victim and later decedent, Orlando Rickmon, was himself served a fake subpoena that OPDA failed to produce.[36] Similarly, prosecutor Laura Rodrigue admits sending a fake subpoena to witness Anthony Williams, which Defendants also failed to produce.[37] Evidently, fake subpoenas—which were created for use outside the confines of the law—were not consistently maintained.

Even so, Defendants claim it "notable" that Ms. Baham has not found the fake subpoena because she produced "quite a few" other subpoenas and testified in her deposition that she "keeps everything." Doc. 282-1 at 12 (quoting Ex. 1 (Baham Dep.) at 20, 248). This mischaracterizes Ms. Baham's testimony.[38] Ms. Baham testified that there were "probably a few [subpoenas] I couldn't find."[39] When asked what happened to the document, Ms. Baham explained that she had moved twice, which made it hard for her to keep track of paperwork, and that she was missing three bags where she had kept documents.[40] The fact that Ms. Baham, who had no legal duty to—or, until the lawsuit was filed approximately two years after receiving the fake subpoena, any reason to think she should—preserve the subpoena, does not impeach her credibility. And even if it did, would not merit removing that credibility determination from the trier of fact. *Richardson v. Oldham*, 12 F.3d 1373 (5th Cir. 1994).

---

[36] CSUMF ¶ 94.
[37] *Id.* ¶¶ 118-19.
[38] *See* RSUMF, Resps. Nos. 1-3.
[39] *Id.*
[40] *Id.*

8

Second, Individual Defendants use selectively excerpted testimony and Ms. Baham's confusion about legal terminology to claim misleadingly that she "clearly testified in her deposition that the only subpoena she ever received ordering her to come to the DA's office was a grand jury subpoena in 2013, long before Mr. Napoli began working on the Isaac Jones case." MSJ at 13-14. However, when read in context, Ms. Baham's testimony confirms that the only "subpoena" she understood to order her appearance at the District Attorney's office was *not* a grand jury subpoena, and that it could not have been a grand jury subpoena because she received it more than two years after the grand jury subpoenas were issued.[41]

Although Individual Defendants quote Ms. Baham's one-word "yes" in response to a leading question, they omit Ms. Baham's repeated and unequivocal testimony that the fraudulent subpoena she received was *not* a grand jury subpoena. Throughout her deposition, Ms. Baham described the fraudulent subpoena as "ha[ving] a seal."[42] Moreover, when actually shown copies of the grand jury subpoenas, Ms. Baham made clear that none of them were the fraudulent subpoena she received.[43]

The fact that Ms. Baham misunderstood or misspoke in response to a single leading question, without opposing counsel following up to confirm that she understood the question, particularly when considered alongside her consistent statements that the grand jury subpoenas looked nothing like the fraudulent subpoena to the District Attorney's Office, hardly constitutes "clea[r] testi[mony] that that the only subpoena she ever received ordering her to come to the DA's office was a grand jury subpoena in 2013." MSJ at 13-14.

---

[41] *See* RSUMF Resps. Nos. 7, 9.
[42] CSUMF ¶ 80.
[43] *See* RSUMF Resps. Nos. 7-9.

Defendants also try to mischaracterize another response by Ms. Baham: when asked whether she received any subpoenas to the District Attorney's Office other than the grand jury subpoenas, she replied, "No, not that I'm aware of. Just the letter and subpoena that I got when I stay over there to the DA office. All the rest I was going to court."[44]  Defendants seek to recast Ms. Baham's misunderstanding as an admission—entirely inconsistent with her other testimony throughout the deposition—that the fraudulent subpoena was actually a grand jury subpoena.  As explained above, Ms. Baham repeatedly distinguishes the grand jury subpoenas from the fraudulent subpoena. Moreover, it became apparent that Ms. Baham understood grand jury subpoenas to require her appearance in court—not the District Attorney's office.[45]

In fact, Ms. Baham later explains the very answer Individual Defendants quote, when Mr. Paul revisited the issue later in the deposition: "Yes, I probably didn't get the right -- how you was saying it, but I'm trying to explain it to the best of my knowledge the ones that I had, what I said, to go to the DA office. The one with the seal on it and the letter, that's the only two times I went to the DA office." Ex. 1 (Baham Dep.) at 232:8-14. Ms. Baham's incorrect belief[46] that the grand jury subpoenas required her appearance in court and not at the District Attorney's office confirm

---

[44] Even within the quoted text, Individual Defendants omit Ms. Sachs' objection to the ambiguity of the question. *Compare* MSJ at 15 n.5 with Ex. 1 (Baham Dep.) at 116:22-23 ("Objection for the same reasons previously stated.");  Throughout the deposition, Individual Defendants capitalize on the confusion created by Mr. Paul's refusal—despite multiple requests and objections by Mr. Sachs—to define what he meant by "subpoena" during the deposition. *See* RSUMF Resp. Nos. 7, 9.

[45] RSUMF Resp. Nos. 7, 9.

[46] Ms. Baham had only a tenth-grade education and had been placed in "slow learner" classes. CSUMF ¶ 58. As noted by counsel, and particularly given Ms. Baham's educational background, her mistaken belief that the Grand Jury subpoenas required her to appear in court was not unreasonable, given "The subpoenas clearly call for her to be present at the Grand Jury for the Orleans Parish Criminal District Court, which is located at the District Attorney's Office." Ex. 1 (Baham Dep.) at 107:21-24.

that when she described a "letter and subpoena" directing her to the District Attorney's office, she

was not referring to a grand jury subpoena.

Third, Defendants suggest that Ms. Baham described her receipt of the fake subpoena "only

in response to leading questions by her own lawyer." *See* 282-1 at 16.[47] In particular, Defendants

deem suspect that Ms. Baham did not previously describe any details about the fake subpoena

prior to the redirect. *See id.* But Defendants' counsel did not ask Ms. Baham to describe the fake

subpoena prior to the redirect. *See* Ex. 1 (Baham Dep.) at 5:1-205:3. Even so, Ms. Baham

volunteered that the subpoena she had received demanding she go to the District Attorney's Office

"had a seal on the subpoena."[48] Likewise, and still prior to any questioning by her attorney, Ms.

Baham confirmed to Mr. Paul that the grand jury subpoena he was showing her did not resemble

the fraudulent subpoena she received. *Id.* at 96:8 (adding, "It didn't have this on there,"

differentiating another element of the grand jury subpoena format from that of the fraudulent

subpoena). And after the redirect, when Defendants' counsel did ask her to describe the document

(both times by asking her to recite "everything [she] remember[ed]" about it), she described it

consistently.[49]

Fourth, in addition to the differences in appearance between the fraudulent and grand jury

subpoenas, the timing of the fraudulent subpoena confirms that it was not one of the grand jury

subpoenas. Ms. Baham has been unwavering in her insistence that she only received two

documents that she understood to direct her to the District Attorney's office: (1) a letter (from

---

[47] To the extent Defendants suggest that Ms. Baham did not describe her receipt of the fake
subpoena at all before redirect, this mischaracterizes her testimony; she repeatedly did so. *See, e.g.*
Ex. 1 (Baham Dep.) at 13:10-12; *id.* at 15:13-16:8; *id.* at 36:17-38:22; *id.* at 96:24-97:17; *id.* at
106:10-13; *id.* at 117:1-4.
[48] *See* Ex. 1 (Baham Dep.) at 96:8-10 (stating, to explain how the fake subpoena was different
from one she was being shown: "It had a seal on the subpoena.").
[49] RSUMF Resp. No. 9.

victim-witness counselor Alison Morgado), and (2) the fraudulent "subpoena," distinguished by a "seal" and directing her to the District Attorney's Office, which she received "like a month or so" after she received the aforementioned letter.[50] The "letter" was dated September 22, 2015.[51] The grand jury subpoenas were issued in August of 2013—more than two years *before* the letter.[52] On the other hand, Ms. Baham's testimony that she received the subpoena roughly one month after the letter suggests she would have received the fraudulent subpoena in October 2015, around the time of Isaac Jones' trial date on October 13, 2015—three weeks after September 22,[53] exactly when one would expect a prosecutor to be ramping up pre-trial investigation.

When read in context, Ms. Baham's deposition testimony establishes that she received a fraudulent subpoena—not a grand jury subpoena—two years after the grand jury occurred, while Defendant Napoli was the assigned prosecutor on the case, and the trial date was just days away. Ms. Baham's account is credible and consistent. At a minimum, it precludes a finding that there is no genuine dispute as to any material fact.

### B.       The Record Supports Ms. Baham's Testimony

Individual Defendants have not proven that Ms. Baham's testimony "is blatantly contradicted by the record, so that no reasonable jury could believe it." MSJ at 9 (quoting *Koerner v. CMR Construction & Roofing, LLC*, 910 F.3d 227-28 (5th Cir. 2018)).

### 1.       *The Record Shows that Defendant Napoli's Denial Carries No Weight.*

Individual Defendants' Motion hinges on the purported credibility of Defendant Napoli's testimony "that he surely did not" send a "DA Subpoena" to Ms. Baham,[54] —effectively arguing

---

[50] CSUMF ¶¶ 74-75, 80-81.
[51] Defs.' MSJ Ex. 4; CSUMF ¶ 74.
[52] CSUMF ¶¶ 49-63, 74.
[53] *Id.* ¶ 81; Ex. 4 at 4 (Docket Master in *State v. Isaac Jones*, No. 517-255) at Plaintiffs-13075.
[54] MSJ at 2.

that he is so much more credible than Ms. Baham that the case should not even proceed to a trier of fact. Ms. Baham stated that she received the fake subpoena "a month or so" after she received the letter from the District Attorney's Office.[55] Defendant Napoli denies sending her a fake subpoena,[56] just as he denies "that he [has] issued any document that was 'not issued pursuant to governing law.'"[57] Yet in example after example, the record rebuts Defendant Napoli's claims.

First, in an application to the court seeking Ms. Baham's arrest on a material witness warrant, Defendant Napoli wrote, "Lazonia Baham was notified by Orleans Parish District Attorney's Office Investigator Mike Kitchens that she was an *essential witness* in the above stated case and would be needed to testify."[58] However, Kitchens testified he never made any such representation.[59]

Likewise, Defendant Napoli also denied directing Det. Kitchens to send "District Attorney Office Subpoenas" to a shooting victim[60] named Steven Smith or to Mr. Smith's relatives.[61] Yet in an application for a material witness warrant that Defendant Napoli submitted to the court, he relied on a memorandum by Detective Kitchens, which stated that Detective Kitchens had delivered *multiple* "District Attorney Office Subpoena[s]" to Mr. Smith's family members.[62] Defendant Napoli testified he did not know what kind of document Detective Kitchens would have used and suggested that Detective Kitchens selected and delivered the documents on his own initiative.[63] However, Det. Kitchens testified that he received the "subpoena" he served "[f]rom

---

[55] CSUMF ¶ 81.
[56] *Id.* ¶ 96.
[57] *Id.*
[58] Ex. 36.
[59] Ex. 33 (Kitchens Dep.) at 157:5-9; CSUMF ¶ 133.
[60] CSUMF ¶ 98.
[61] *Id.* ¶ 97.
[62] *Id.* ¶ 99.
[63] *Id.* ¶ 100.

ADA Napoli."[64] Det. Kitchens testified further that he would never have delivered a document to Steven Smith or his relatives unless Defendant Napoli gave it to him.[65]

Defendant Napoli further denied that the "District Attorney Subpoenas" that Det. Kitchens delivered would have had the word "subpoena" on them.[66] But Det. Kitchens testified that the only reason he would have used the term "subpoena" in his memorandum is if it appeared at the top of the document.[67]

In a different case, Defendant Napoli denied that he had anything to do with a fake subpoena that had been created for a witness named Sidney Frazier. Defendant Napoli testified that he had no knowledge of it.[68] But the prosecutor listed on the fake subpoena is Defendant Napoli.[69] Defendant Napoli testified that he "was the attorney [on the case involving Mr. Frazier] from the beginning of January."[70] The subpoena directed Mr. Frazier to appear at the District Attorney's Office on January 22, 2013.[71] Sidney Frazier testified that he met with Defendant Napoli and Mike Kitchens at the jail where Mr. Frazier was being held—on or about the day the fake subpoena demanded.[72]

Defendant Napoli testified that he was not aware of other prosecutors using the fake subpoena template form.[73] But in February 2014, Defendant Napoli texted a witness's mother and told her that if her son did not "show up" pursuant to two subpoenas, "we are going to ask the

---

[64] *Id.* ¶ 101.
[65] *Id.* ¶ 102
[66] *Id.* ¶ 103.
[67] *Id.* ¶ 104.
[68] *Id.* ¶ 110
[69] *Id.* ¶ 107
[70] *Id.* ¶ 108
[71] *Id.* ¶ 106.
[72] *Id.* ¶ 109.
[73] *Id.* ¶ 117.

judge to issue a warrant for his arrest."[74]  One of those subpoenas was a fake subpoena signed by ADA Rob Moore.[75] On the day following the date listed on the fake subpoena—but before the court date had arrived—ADA Moore filed a material witness warrant application.[76]

In still another case, Defendant Napoli interviewed a witness, Anthony Williams, with ADA Laura Rodrigue.[77] In that case, the witness had submitted to the interview pursuant to a fake subpoena matching the fake subpoena template distributed by Defendant Martin.[78] In April 2017, Defendant Napoli used a fake subpoena signed by prosecutor Sarah Dawkins to secure access to a shooting victim whose father was murdered during the same crime.[79] When the victim's counsel contacted Defendant Napoli to ask about the fake subpoena, Defendant Napoli told him: "'He's coming to our office, or he's going to jail.'"[80]

Shortly before the first trial setting in the Isaac Jones case on October 13, 2015—Defendant Napoli gave Detective Kitchens a "subpoena" to deliver to Ms. Baham.[81] Detective Kitchens testified that he does not know whether the "subpoena" commanded Ms. Baham to appear in court or at the District Attorney's Office.[82] Indeed, he testified that in another case, at Defendant Napoli's direction, he had served "District Attorney Subpoenas" that he received from Defendant Napoli.[83]Moreover, the record indicates that, at the time that Defendant Napoli gave this "subpoena" to Detective Kitchens, the court had not issued any subpoenas for Ms. Baham). In

---

[74] *Id.* ¶ 111.
[75] *Id.* ¶ 112.
[76] *Id.* ¶ 113
[77] *Id.* ¶ 118
[78] *Id.* ¶ 119.
[79] *Id.* ¶ 120.
[80] *Id.* ¶ 121
[81] *See* RSUMF Resp. No. 12 (outlining evidence and argument in detail).
[82] *See* CSUMF ¶ 70.
[83] *Id.* ¶¶ 99-104.

contrast, for subsequent trial dates, the record does include evidence that witness subpoenas were issued.[84] And Louisiana law requires that returns from all service attempts (whether or not successful) be filed into the record.[85] Thus, if a subpoena was issued and service attempted, such records should exist. None does. Therefore, the record confirms that whatever "subpoena" for Ms. Baham that Defendant Napoli had given Detective Kitchens was not legitimate.

In his deposition, Defendant Napoli first testified that he did not remember whether or not he had requested a subpoena for Ms. Baham for the October 13, 2015 trial date.[86] Later, he appeared to admit that he had not sought a subpoena for Ms. Baham for that date.[87] In another case, a fake subpoena was "issued" for a witness named Sidney Frazier, directing him to appear at the District Attorney's Office on January 22, 2013.[88] The prosecutor listed on the "subpoena" is Defendant Napoli.[89] Defendant Napoli testified that he "was the attorney [on this case] from the beginning of January on."[90] However, Defendant Napoli disclaims responsibility for this "subpoena" as well. Indeed, Defendant Napoli testified that he believed he had never seen it before.[91] At trial, however, Sidney Frazier testified that he met with Defendant Napoli and Mike Kitchens at the jail where Mr. Frazier was being held—at precisely the time the fake subpoena demanded.[92]

---

[84] RSUMF at Resp. No. 10.
[85] *See* La. Code Crim. Proc. art. 736(a); *see also* art. 734 (stating that these requirements apply to District Attorney's Investigators who serve subpoenas).
[86] CSUMF ¶ 129 & n.131.
[87] *Id.*
[88] *Id.* ¶ 106.
[89] *Id.* ¶ 107.
[90] *Id.* ¶ 108.
[91] *Id.* ¶ 110.
[92] *Id.* ¶ 109.

In addition to the fake subpoenas he sent himself, Defendant Napoli also used fake subpoenas that other prosecutors had signed to make witnesses and victims believe they are required to meet with prosecutors (and that if they do not, they could be jailed). In February 2014, Defendant Napoli texted a witness's mother and told her that if her son did not "show up" pursuant to two subpoenas, "we are going to ask to ask the judge to issue a warrant for his arrest."[93] Ex. 34 (Napoli Dep.) at 382:5-6 (admitting that he sent the texts). One of the "subpoenas" was a fake subpoena signed by prosecutor Rob Moore.[94] The day the date listed on the fake subpoena—but before the court date had arrived—Moore filed a material witness warrant application.[95]

### 2. *Ms. Baham's Testimony About the Fake Subpoena Is Consistent with OPDA Policies—And Other Prosecutors' Actions In the Same Case*

Ms. Baham's testimony is also consistent with the policies and practices of the Orleans Parish District Attorney's Office at the time. On May 13, 2014, Defendant First Assistant District Attorney Graymond Martin emailed a template of the fake subpoena that Ms. Baham received to all OPDA staff—including Defendant Napoli—and instructed them to use this template exclusively.[96] Defendant Napoli characterized this email as an "order[] to use this document."[97] And he testified unequivocally that he is required to follow Defendant Martin's instructions— including instructions given to prosecutors as a whole.[98]

In just the autumn of 2015—when Ms. Baham received the fake subpoena in State v. Jones[99]—OPDA prosecutors sent fake subpoenas using Defendant Martin's template at least

---

[93] *Id.* ¶ 111.
[94] *Id.* ¶ 112.
[95] *Id.* ¶ 113.
[96] *Id.* ¶¶ 5-11.
[97] *Id.* ¶ 13.
[98] *Id.* ¶ 14.
[99] *Id.* ¶¶ 80-81.

twenty-five times.[100] Ms. Baham was not even the only witness who received a fake subpoena in the Isaac Jones case; prosecutors used at least three more.[101]

### C.     Defendant Martin Is Liable

Individual Defendants allege in passing that Ms. Baham's claims against Mr. Martin fail because he did not personally send her a fraudulent subpoena or direct that such a document be sent to her. Mot. at 9.[102] However, a defendant is liable for the reasonably foreseeable consequences of his tortious conduct. Restatement 2d Torts § 435 (actor is liable for harm resulting from its conduct unless it appears to a court "highly extraordinary" that conduct would result in harm).[103]   A defendant need not be able to foresee the specific individual his conduct will harm; "[t]he duty of any person is the obligation of due care to refrain from any act which would cause foreseeable harm to others even though the nature of that harm or the identity of the harmed person or harmed interest is unknown at the time of the act." *Gresham v. Davenport*, 524 So.2d 48, 54 (La. Ct. App. 1988), *rev'd on other grounds*, 537 So.2d 1144 (La. 1989); *see also Istre*, 628 So.2d at 1232; Restatement 2d Torts § 435.

---

[100] RSUMF Resp. No. 12. The true number is almost certainly greater. As described above, fake subpoenas were not consistently maintained at OPDA, and Plaintiffs have located fake subpoenas that were not maintained in the District Attorney's files. *See, e.g.*, CSUMF ¶ 95.

[101] One of the fake subpoenas was addressed to Orlando Rickmon—the victim, CSUMF ¶¶ 28-29, 94. The subpoena addressed to him was not included in the District Attorney's file. Two other fake subpoenas direct witnesses to "appear before the District Attorney" in magistrate court, and demand that the witnesses "report to ADA Craig Famularo." *Id.* ¶ 93.

[102] They make this same argument with respect to Mr. Pipes, but, as noted above, Plaintiff Baham is dismissing her claim against Mr. Pipes. *See supra* n. 2.

[103] *See, e.g.*, *Istre v. Fidelity Fire & Cas. Ins. Co.*, 628 So.2d 1229, 1232 (La. Ct. Ap. 1993) (concluding automobile accident caused by an intersection lacking working traffic signal was a "reasonably foreseeable" result of backhoe operator's negligent cutting of power line even though construction site was four miles away from intersection and backhoe operator cut power lines an hour before accident occurred), *writ denied*, 634 So.2d 852 (La. 1994); *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 467 F. Supp. 1257, 1288 (E.D. La. 1978) (relying on Restatement 2d Torts for proposition that party was liable for foreseeable conduct) (subsequent history omitted).

It is undisputed that Defendant Martin emailed the entire staff at the District Attorney's Office, including Defendant Napoli, and explicitly instructed them to use a fake subpoena.[104] Indeed, it is what Defendant Martin demanded of his staff.[105] Ms. Baham is one of the victims of Defendant Martin's conduct. The fact that Defendant Martin engaged in tortious conduct broadly and indiscriminately does not shield him from liability for how his actions harmed her. A reasonable factfinder could conclude that his actions, and instructions, contributed to the abuse of process she suffered.[106]

## II.    Defendants' Legal Arguments Are Meritless

### A.    Ms. Baham Has Sufficiently Alleged Damage

Defendants contend that Ms. Baham's abuse-of-process claims must fail because she has not shown "damage resulting from the abuse." Doc. 282-1 at 20 (quoting *Orrill v. Mortgage Electronic Registration Systems, Inc.*, No. 06-cv-10012, 2008 WL 1867706, at *2 (E.D. La. Apr. 24, 2008)). But Ms. Baham has shown damage, and regardless, Defendants misunderstand the law.

Ms. Baham testified that when she received the fake subpoena, she went first to the courthouse to ask about it, then to the District Attorney's Office, where she was turned away by security, and then back to the courthouse, which had closed.[107] To do this, Ms. Baham missed

---

[104] CSUMF ¶¶ 50-11.

[105] *Id.* ¶¶ 10, 13.

[106] Moreover, even if not independently liable, he is arguably liable as a conspirator who assisted and encouraged in the commission of the tort. *See Nat'l Union Fire Ins. Co. of Pennsylvania v. Spillars*, 552 So. 2d 627, 633–34 (La. Ct. App. 1989) (explaining that, under Louisiana law, a person who "assists and encourages" in the commission of a tort pursuant to a conspiracy to commit the wrongdoing is liable for the harm that results).

[107] CSUMF ¶¶ 83-86.

work (she served as a home health aide, making about $300 per week).[108] And when Ms. Baham missed work, she lost money.[109]

Ms. Baham also described the disruption caused to her life and emotional wellbeing.[110] Defendants do not argue that these harms do not amount to "damage." *See generally* Doc. 282-1 at 20. Instead, they ignore this evidence and focus instead on the allegations in the Complaint, where Ms. Baham alleged that she did not attend a private meeting at the District Attorney's Office pursuant to the fake subpoena. *Id.*

However, even if Ms. Baham had not shown damages (and she has), Defendants' legal argument fails. Abuse-of-process includes "only two essential elements": (1) an "ulterior purpose" and (2) a "willful act in the use of the process not proper in the regular conduct of the proceeding." *Taylor v. State*, 617 So. 2d 1198, 1205 (La. Ct. App.), *writ denied,* 620 So. 2d 875 (La. 1993); *see also Singleton v. Cannizzaro,* 372 F. Supp. 3d 389, 423 (E.D. La. 2019), *aff'd in part, appeal dismissed in part*, 956 F.3d 773 (5th Cir. 2020) (identifying these elements).

Defendants cite *Orrill v. Mortgage Electronic Registration Systems, Inc*. (an unpublished opinion) for the proposition that "A plaintiff alleging abuse of process 'must also prove damage resulting from the abuse.'" Doc. 282-1 at 20 (quoting *Orrill*, No. 06-cv-10012, 2008 WL 1867706, at *2 (E.D. La. Apr. 24, 2008). But Defendants take this sentence from *Orrill* out of context. By "damage," the court simply meant that the plaintiff must satisfy the second element of abuse of process—and indeed, the court found that that "damage" element was not met because the plaintiff

---

[108] *Id.* ¶ 88.
[109] *Id.* ¶ 89.
[110] *Id.* ¶ 90.

could not establish any "irregularity in the process." *Id.*[111] The court did not—as Defendants suggest—graft a new detrimental reliance element onto a tort that does not include one.[112]

### B.    Ms. Baham's Claims Are Not Prescribed

Louisiana abuse-of-process claims are subject to a one-year prescriptive period.[113] However, the doctrine of *contra non valentum* "provides some grace for those plaintiffs who are unaware that their injury was caused by a tort."[114] This Court previously held, based on Plaintiffs' allegations, that their state law claims had not prescribed. *See Singleton v. Cannizzaro*, 372 F. Supp. 3d 389, 428-30 (E.D. La. 2019) (Doc. 116 at 48-49). The evidence confirms this conclusion.

As this Court previously explained, "the ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." *Singleton*, 372 F. Supp. 3d at 429 (quoting *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 246 (La. 2010)). In light of Plaintiffs' "relatively limited education and experience in

---

[111] *See Orrill*, No. CIV.A. 06-10012, 2008 WL 1867706, at *2 (E.D. La. Apr. 24, 2008) ("Allegations that a party had an ulterior purpose for filing a claim are insufficient to plead a claim for abuse of process. The plaintiff must also prove damage resulting from the abuse. Here, plaintiff has not pleaded any irregularity in the process of defendants' reconventional demand.").

[112] Notably, Defendants cite no case where the two elements of abuse-of-process were satisfied but the claim was nevertheless dismissed for lack of "damages." Instead, Defendants then rely on this Court's conclusions with respect to Plaintiff Baham's *fraud* claims (on the basis that she did not attend a private meeting at the District Attorney's Office or hire a lawyer to quash the subpoena) to argue that her abuse-of-process claim must be dismissed. *Id.* Of course, Defendants omit the critical point: although this Court dismissed Ms. Baham's fraud claims on that basis, it allowed her abuse-of-process claims to proceed. *Id.* at 424.

[113] *See No Drama, LLC v. Caluda*, 177 So. 3d 747, 751–52 (La. App. 5 Cir. 2015) (holding that abuse-of-process claims are subject to a one-year prescriptive period). Plaintiff Baham does not dispute that—as this Court previously recognized—her abuse-of-process claim is facially prescribed. *See Singleton*, 372 F. Supp. 3d at 428-29. Thus, Ms. Baham "has the burden of showing why [her] claim has not prescribed." *Id.* at 429.

[114] *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. 16-17039, 2020 WL 1815854, at *2 (E.D. La. Apr. 7, 2020), *reconsideration denied*, No. 16-CV-17039, 2020 WL 2473772 (E.D. La. May 13, 2020) (quotations omitted).

criminal law and Defendants' allegedly fraudulent behavior," this Court then found that that prescription of Plaintiffs' fake-subpoena-based claims was suspended until prosecutors use of those documents became widely known in April 2017. *Id.* at 429-30.

Ms. Baham now pairs this Court's reasoning with evidence. Ms. Baham did not graduate from high school.[115] When she was in school, she was referred to classes for slow learners.[116] At the time of the events in question, Ms. Baham worked as a home health aide making about $300 per week.[117] During her deposition, Ms. Baham was demonstrably confused by legal concepts and terminology.[118]

On the other hand, the fake subpoena at the center of this case is plainly crafted look like an official document: it is titled "SUBPOENA," it has the District Attorney's seal, and it includes a "return of service" like a real subpoena would.[119] Multiple witnesses—including a local attorney and a prosecutor at the District Attorney's Office—attest that they believed it was a valid legal document.[120] Prosecutors' use of fake subpoenas was not widely known until it was documented in a local news story in April of 2017.[121] Ms. Baham repeatedly testified that—like those witnesses—she also believed that the fake subpoena she received was real. Ex. 1 (Baham Dep.) at

---

[115] CSUMF ¶ 58. *See Singleton*, 372 F. Supp. 3d at 429 (reasoning that "Plaintiffs' inaction was reasonable considering their relatively limited education and experience in criminal law").
[116] CSUMF ¶ 58.
[117] *Id.* ¶ 88.
[118] *Id.* ¶ 57; *see also* RSUMF Resps. Nos. 7, 9, 10. Relevant to the reasonableness inquiry is whether the plaintiff had education and experience in the subject matter that gave rise to the cause of action. *See, e.g.*, *Bayou Fleet, Inc. v. Bollinger Shipyards, Inc.*, 197 So. 3d 797, 807 (La. App. 4th Cir. 2016) (holding that Plaintiffs' inaction in dispute involving a shipyard was unreasonable where the plaintiffs were "well educated, sophisticated businessmen with nearly 40 years of experience each in managing and owning marine businesses").
[119] *See* Ex. 11 (fake subpoena template) at OPDA39343.
[120] CSUMF ¶ 175.
[121] *Id.*

214:3-5.[122] Despite this, Defendants contend that this Court should alter its previous conclusion based on Baham's testimony that she thought "something ain't right about the subpoena." Doc. 282-1 (quoting Ex. 1 (Baham Dep.) at 241:1-2). But just prior to the excerpts Defendants cite, Ms. Baham testified that she believed that the fake subpoena was real.[123] Ms. Baham also testified that she did not consider taking legal action until her oldest son saw a story about fake subpoenas on the news.[124] Thus, the evidence contradicts Defendants' suggestion that Ms. Baham—who did not graduate high school and has no legal knowledge—made some assessment of the subpoena's legal validity before it was publicly exposed.

Defendants nevertheless contend that because Ms. Baham felt that something was "not right" about the fake subpoena, she had constructive notice of her claim. The law forecloses this argument. A plaintiff's "mere apprehension that something may be wrong is insufficient to commence the running of prescription." *Campo v. Correa*, 828 So.2d 502, 511 (La. 2002).[125] At summary judgment, the question for this Court is whether Plaintiffs have raised a dispute of fact as to whether Ms. Baham's actions were reasonable in light of the "particular circumstances." *Terrebonne Par. Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F. 3d 303, 322 (5th Cir. 2002). As described above, she has.[126]

_____

[122] CSUMF ¶ 87.

[123] CSUMF ¶ 87. Unsatisfied, Defense counsel then asked Ms. Baham if and when she believed the fake subpoena she received seemed "unlawful," "illegal," or "not right" five more times over objections. RSUMF Resp. No. 18.

[124] Ex. 1 (Baham Dep.) at 196:18-19 ("I didn't talk to anyone about suing them until my son seen on TV what they was doing); *accord id.* at 197:6-17.

[125] *See also In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. 16-17039, 2020 WL 1815854, at *3 (E.D. La. Apr. 7, 2020), *reconsideration denied*, No. 16-CV-17039, 2020 WL 2473772 (E.D. La. May 13, 2020).

[126] With respect to Defendant Martin, Ms. Baham's claims are not prescribed for an additional reason. Even where a plaintiff is aware of her injury, "prescription d[oes] not begin to run until [the plaintiff] ha[s] a reasonable basis to pursue a claim *against a specific defendant.*" *Jordan v. Employee Transfer Corp.*, 509 So. 2d 420, 424 (La. 1987) (emphasis added). Defendants make no

The same evidence also supports suspension of the prescriptive period based on fraudulent concealment.[127] Defendants' argument otherwise amounts to a conclusory statement that Ms. Baham has presented no evidence that any Individual Defendant engaged in "concealment, misrepresentation, fraud or ill practice." Doc. 282-1 at 24 (quoting *Prevo v. State ex rel. Dep't of Pub. Safety & Corr. Div. of Prob. & Parole*, 187 So. 3d 395, 398 (La. 2015)). But that is precisely what the evidence shows—indeed, it is the very premise underlying the concept of a fake subpoena.[128]

## C.    Defendants Misunderstand Abuse-of-Process

Defendants contend, as they did in their motion to dismiss, that they did not commit abuse-of-process by sending fake subpoenas because those documents were not "lawfully issued" process. *See* Doc. 282-1 at 24-25.[129] This Court has already rejected that argument.[130] Defendants provide no reason this Court should reverse that conclusion.[131] Regardless, Defendants misunderstand the law. The term "legally issued" in the cases Defendants cite refers to the requirement that the process at issue is normally associated with legal proceedings or courts. *See,*

---

attempt to explain how Ms. Baham could have known that Defendant Martin had directed his employees to use the fake subpoena she received.

[127] Tolling based on concealment is appropriate where the defendant has engaged in misrepresentation, fraud or ill practice; these actions effectively prevented the Plaintiff from pursuant her case; and the Plaintiff's action was reasonable in light of her education, intelligence, and the nature of the defendant's conduct. *Prevo v. Louisiana ex rel. Dep't of Pub. Safety & Corr. Div. of Prob. & Parole*, 187 So.3d 395, 399 (La. 2015). This Court previously found that the fraudulent concealment rule would suspend prescription of Plaintiffs' claims as well. *Singleton*, 372 F. Supp. 3d at 430 n. 196. Once again, the evidence confirms this Court's prior conclusion.

[128] CSUMF ¶¶ 173-75.

[129] *See* Defs.' Mem. in Supp. of Mot. to Dismiss (Doc. 63-1) at 38, 37-38. Defendants do not argue that the record evidence somehow warrants this Court's reversal of what it has already decided. Doc. 282-1 at 24-25.

[130] *See Singleton*, 372 F. Supp. 3d at 424.

[131] For example, Defendants do not argue that the record evidence somehow warrants this Court's reversal of what it has already decided. Doc. 282-1 at 24-25.

*e.g.*, *Ioppolo v. Rumana*, 581 F. App'x 321, 326 (5th Cir. 2014) (rejecting claim because the process at issue—an organization's internal disciplinary proceeding—was not "legal process, or court process").[132] Courts have never limited this tort to process that was *validly* issued. Indeed, the Louisiana Court of Appeals specified that abuse of process occurs when a government officer "fail[s] to comply with the proper procedures or rules set out by law for conducting official actions." *Taylor v. State*, 617 So. 2d 1198, 1205–06 (La. Ct. App. 1993).

Defendants "flouted the investigative subpoena process provided by Article 66 of the Louisiana Code of Criminal Procedure by serving [a] 'subpoena'" on Ms. Baham in an effort to question her outside of court. *Singleton*, 372 F. Supp. 3d at 424. Further still, Defendants used the existence of the Article 66 process to cloak their actions with legitimacy, even as they circumvented its requirements: the fake subpoena that Ms. Baham received (and the template form from which it was created) explicitly stated that compliance was required "pursuant to LSA CCRP art. 66." As this Court previously held, this "amount[s] to an abuse of process." *Singleton*, 372 F. Supp. 3d at 424.

Dated:  December 15, 2020                                   Respectfully Submitted,

                                                          *s/ Katie Chamblee-Ryan*

---

[132] *See Almerico v. Dale,* 927 So. 2d 586, 594 (La. Ct. App. 2006) (explaining that "the 'process' part of the cause of action" must refer to "legal process, or court process"); *see also*

Mariana Kovel (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (646) 905-8870
mkovel@aclu.org


Somil Trivedi (*pro hac vice*)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 715-0802


Gerald S. Sachs (*pro hac vice*)
Venable LLP DC
600 Massachusetts Ave. NW
Washington, DC 20001
Tel: (202) 344-4269


Allison B. Gotfried (*pro hac vice*)
Venable LLP
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Tel: (212) 370-6227

Katherine Chamblee-Ryan (*pro hac vice*)
Tara Mikkilineni (*pro hac vice*)
Ryan C. Downer (*pro hac vice*)
Laura Gaztambide Arandes (*pro hac vice*)
Jeffrey Stein (*pro hac vice*)
Civil Rights Corps
1601 Connecticut Avenue NW, Suite 800
Washington, D.C. 20009
Tel: (202) 844-4975


Bruce Hamilton
La. Bar No. 33170
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70156
Tel: (504) 522-0628


Sarah S. Brooks (*pro hac vice*)
Venable LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Tel: (310) 229-0408


Michael S. Blume (*pro hac vice*)
Venable LLP
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Tel: (212) 370-5500


*Attorneys for Plaintiffs*