**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

RENATA SINGLETON; MARC
MITCHELL; LAZONIA BAHAM; JANE
DOE; TIFFANY LACROIX; FAYONA
BAILEY; JOHN ROE; and SILENCE IS
VIOLENCE,

      *Plaintiffs*,

v.

LEON CANNIZZARO, in his official
capacity as District Attorney of Orleans
Parish and in his individual capacity;
GRAYMOND MARTIN; DAVID PIPES;
IAIN DOVER; JASON NAPOLI; ARTHUR
MITCHELL; TIFFANY TUCKER;
MICHAEL TRUMMEL; MATTHEW
HAMILTON; INGA PETROVICH; LAURA
RODRIGUE; SARAH DAWKINS; and
JOHN DOE, in their individual capacities,

      *Defendants*.

Civil Action No. 17-10721

Section H
Judge Jane Triche Milazzo

Division 1
Magistrate Judge Janis van Meerveld

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNCONTESTED FACTS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON**
**LAZONIA BAHAM'S CLAIMS AGAINST INDIVIDUAL DEFENDANTS**

Defendants Jason Napoli, David Pipes[1] and Graymond Martin (collectively, the

"Individual Defendants") have filed a statement of purportedly uncontested facts as required by

Local Rule 56.01 As set forth further in this Response, Plaintiffs respond that Individual

Defendants' statement of facts contains numerous statements that are, in fact, contested and/or

objectionable on other grounds. This Response addresses each purportedly uncontested fact in

turn.

---

[1] As explained in Plaintiffs' Response to Motion for Summary Judgment on Lazonia Baham's
Claims, Plaintiff Lazonia Baham has now agreed to dismiss her claim against David Pipes.

1

1.     Ms. Baham has never produced copies of any document ordering her to appear at the Orleans Parish District Attorney's Office. However, Ms. Baham was able to locate "quite a few" other subpoenas in her possession concerning the same case, which she provided to her lawyers. *See* Exhibit 2, Baham Depo., at 20.

**RESPONSE:**

OBJECTION. This "fact" is inappropriately compound.

Plaintiff Baham further OBJECTS that neither statement is material to this dispute. *Merritt-Campbell, Inc. v. RxP Prod., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999) ("An issue is 'material' if it involves a fact that might affect the outcome of the suit under the governing law."). Ms. Baham testified repeatedly that she received a fake subpoena, and the record supports her account. Ex. 1 (Baham Dep.) at 36:17-38:22 (Q: When did you go to the Orleans Parish DA's office? A: When I had got the subpoena to go there."); *see also* Counterstatement of Undisputed Facts (Ex. C) ¶ 81; *infra* Resp. to "Fact" 12 (hereby incorporated by reference).

Without waiving these objections, Ms. Baham responds as follows:

Ms. Baham ADMITS that she has been unable to locate or produce the fraudulent "subpoena" directing her to appear at the District Attorney's Office without court authorization. Ms. Baham testified that she moved twice after she received the fake "subpoena." Ex. 1 (Baham Dep.) 242:11-13 ("I done moved twice since then. I done moved from Audubon to Mandeville, from Mandeville to Texas."); *see also id.* 24:15-18, 26:14-20 (describing two different residences in Austin, Texas); *id.* 27:6-9 (testifying that she moved to Mandeville Street in 2017). Since moving, Ms. Baham has been unable to locate numerous items, including paperwork that she previously possessed. *Id.* at 248:25-249:1-6 ("[A] lot of stuff when I left from off of Audubon Street, I – I – I know a baby bag, a brown purse and a black purse was missing that I had a whole

lot of papers and things too, and I been trying to figure out where is it at. Stuff just been all over, it just been not pleasant, let's say that."); *see also* Ex. 2 (Baham Decl.) ¶¶ 18-20; 24.

Ms. Baham ADMITS that in her search, she was able to locate certain other subpoenas from the case in which she received a fake subpoena, *State v. Isaac Jones* (517-255, 546-436). She further ADMITS that she produced these documents to her counsel.

However, Ms. Baham testified that she has not been able to find all of the documents she had from the Isaac Jones case, including subpoenas. *See* Ex. 1 (Baham Dep.) at 166:9-19 ("Q: And have you turned over all the documents that you have concerning the Isaac Jones case to your lawyers? A: All the ones that I could have found. . . . It—it was some that was misplaced and thing I couldn't find, but I tried to find as many as I could have got."); *see also id.* at 20:4-6 (referencing "probably a few [subpoenas] [she] couldn't find").

Specifically, Ms. Baham located six subpoenas from the following court dates: Ex. 3 (Baham Subpoenas Received) July 6, 2016 (PL20922); August 22, 2016 (PL20926); May 15, 2017 (PL20920); August 14, 2017 (PL20929); October 20, 2017 (PL20921); and November 13, 2017 (PL20927)). *See* Ex. 2 (Baham Decl.) ¶ 26. These subpoenas represent five of the fourteen trial dates that were ultimately set in *Jones*. *See* Ex. 4 (docket in *State v. Jones*, No. 517-255); Ex. 5 (docket in *State v. Jones*, No. 536-436). The subpoena from October 20, 2017 appears to be unrelated to any trial or other court date set in *Jones*. *See* Ex. 4.

Ms. Baham has been unable to locate any subpoenas in this case from 2015 (the year in when she received the fake subpoena), 2014, or 2013, including a grand jury subpoena for August 22, 2013, which she signed accepting service for herself and for her daughter, *see* Ex. 6 (Aug. 22, 2013 Grand Jury Subpoena) at OPDA10382; Ex. 7 (Aug. 29, 2013 Grand Jury Subpoena) OPDA10396. *See* Ex. 2 (Baham Decl.) ¶ 15. Ms. Baham has also been unable to locate subpoenas

related to at least two other court dates for which she was subpoenaed in *Jones*, including November 6, 2017 and March 5, 2018. *See* Ex. 8 (Hamilton Decl.) ¶ 4 (describing court appearance on November 6, 2017); Ex. 9 (Mar. 1, 2018 Motion Hearing in *State v. Isaac Jones*) (transcript discussing subpoena for Ms. Baham for March 5, 2018 trial date); *see also* Ex. 2 (Baham Decl.) ¶ 26.[2]

2.     Ms. Baham testified that she "keeps everything." *See* Exhibit 2, Baham Depo., at 248.

**RESPONSE:**

OBJECTION. This "fact" is not material. *Merritt-Campbell, Inc.*, 164 F.3d at 961.

Without waiving this objection, Ms. Baham responds as follows:

DISPUTE. The quoted statement is misleading because it is isolated from the sentences that follow it, in which Ms. Baham clarifies that she "tr[ies] to keep as much as [she] can" and describes paperwork she has lost. Ex. 1 (Baham Dep.) at 248:23-24.

Ms. Baham ADMITS that she testified: "I keeps [*sic*] everything. I got – I try to keep as much as I can keep. What's too full, I put to the side of that, but a lot of stuff when I left from off of Audobon Street, I—I—I know a baby bag, a brown purse and a black purse was missing that I had a whole lot of papers and things too, and I been trying to figure out where is it at. Stuff just been all over, it just been not pleasant, let's say that." *Id.* at 248:23-249:6.

Ms. Baham also testified that she has been unable to find other documents she once possessed, including subpoenas and other documents from the Isaac Jones case. *See id.* at 166:9-19 ("Q: And have you turned over all the documents that you have concerning the Isaac Jones case

---

[2] Any other subpoenas from *Jones* that Ms. Baham has produced in this litigation were obtained from court files by her counsel.

to your lawyers? A: All the ones that I could have found. . . . It—it was some that was misplaced and thing I couldn't find, but I tried to find as many as I could have got."); *id.* at 242:9-14 ("I got— have a lot of stuff I probably couldn't find from y'all and thing. I have a whole lot of paper I been—I done—I done moved twice since then. I done moved from Audobon to Mandeville, from Mandeville, from Mandeville to Texas. I had stuff all in the storage and thing."); *see also id.* at 20:4-6 (referencing "probably a few [subpoenas] [she] couldn't find").

3.       Ms. Baham has not conducted a thorough search for the alleged unlawful subpoenas that she claims to have received, and she has not even reviewed all of the papers at her house. *See* Exhibit 2, Baham Depo., at 248.

**RESPONSE:**

OBJECTION. This "fact" is not material. *Merritt-Campbell, Inc.*, 164 F.3d at 961.

Without waiving this objection, Ms. Baham responds as follows:

DISPUTE. This "fact" is contrary to Ms. Baham's testimony. Ms. Baham has completed a thorough search for the fake subpoena, including in her current and former homes. In her deposition, Ms. Baham testified, "I been looking and looking for it." Ex. 1 (Baham Dep.) 242:8-9. Defendants' counsel did not ask Ms. Baham where or how she had searched for the fake subpoena. *See id.* at 5:1-205:3; 227:18-17. Ms. Baham nevertheless volunteered information about her search. *See id.* at 247:24-248:4 ("I really went to try to find more and more. I backtrack from Audubon Street, looking at stuff on Mandeville."); *id.* at 249:4-5 ("Q: "I been trying to figure out where is it at. Stuff just been all over, it just been not pleasant, let's say that."); *see also id.* at 166:18-19 ("I tried to find as many [documents from the Isaac Jones case] as I could have got.").

Ms. Baham has reviewed all of the papers in her current home, her previous home on Mandeville Street, her home from before that on Audubon Street, and her storage unit, but she has been unable to locate the fake subpoena. *See* Ex. 2 (Baham Decl.) ¶¶ 18-20.

Ms. Baham did testify in her deposition, "I know it's at my house right now." Ex. 1 (Baham Dep.) at 248:10. However, Ms. Baham was not referring to her current home on North Tonti Street, where she had been living for about nine months. Ex. 2 (Baham Decl.) ¶ 22; *see* Ex. 1 (Baham Dep.) at 24:19-25:1 (testifying about her current home). She was referring instead to the home on Audubon Street, where she lived between 2008 and 2017. Ex. 2 (Baham Decl.) ¶ 22; *see* Ex. 1 (Baham Dep.) at 27:21-28:1 (testifying about her home on Audubon Street). Ms. Baham left many of her belongings, including paperwork, at the house on Audubon when she moved to Mandeville Street. Ex. 2 (Baham Decl.) ¶¶ 23-24. Relatives moved in and misplaced many of her things. *Id*. ¶ 20.

As Ms. Baham testified, she has gone back to the house on Audubon and searched all of the paperwork in that house that she can find. *See* Ex. 1 (Baham Dep.) at 247:24-248:4 ("I really went to try to find more and more. I backtrack from Audubon Street, looking at stuff on Mandeville."). However, because she is still missing a lot of documents and other items, she believes they must be somewhere she has not yet looked. Ex. 2 (Baham Decl.) ¶ 23-24.

When Ms. Baham testified that she "knows" the fake subpoena is at the house on Audubon, she meant that she feels it *must* be there in a place she missed, since that is the last place that she had it. *Id*.; *accord* Ex. 1 (Baham Dep.) at 247:19-21 ("Q. "When was the last time you can remember actually having it in your possession? A. On Audubon Street."). Ms. Baham keeps thinking that if she could go back and search again, she would find it. Ex. 2 (Baham Decl.) ¶ 23.

Accordingly, Ms. Baham corrected Defendants counsel when he interpreted her testimony to mean that she had not searched everywhere she can think to do so:

> "Q: You're saying you have papers stored somewhere that you haven't been able to search yet?
>
> A: No . . . ."

Ex. 1 (Baham Dep.) at 248:8-10.

In addition to the fake subpoena, Ms. Baham has been unable to find any subpoenas in this case from 2015 (the year in which she received the fake subpoena), 2014, or 2013, including a grand jury subpoena for August 22, 2013, which she signed accepting service for herself and for her daughter, *see* Ex. 6 (Aug. 22, 2013 Grand Jury Subpoena) at OPDA10382; Ex. 7 (Aug. 29, 2013 Grand Jury Subpoena) OPDA10396. *See* Ex. 2 (Baham Decl.) ¶ 15. Ms. Baham has also been unable to locate subpoenas related to at least two other court dates for which she was subpoenaed in *Jones*, including November 6, 2017 and March 5, 2018. *See* Ex. 8 (Hamilton Decl.) ¶ 4 (describing court appearance on November 6, 2017); Ex. 9 (Mar. 1, 2018 Motion Hearing in *State v. Isaac Jones*) (transcript discussing subpoena for Ms. Baham for March 5, 2018 trial date); *see also* Ex. 2 (Baham Decl.) ¶ 26.[3]

4.    The Second Amended Complaint alleges that Ms. Baham "received several unlawful subpoenas demanding that she appear at the District Attorney's Office." The Second Amended Complaint does not allege when Ms. Baham received such documents, when she was supposedly ordered to appear, what the documents looked like, whether the documents included the word "subpoena," or what other language was included on the documents. The Second Amended

---

[3] Any other subpoenas from *Jones* that Ms. Baham has produced in this litigation were obtained from court files by her counsel.

Complaint also does not allege that the documents received by Ms. Baham were in the form of the "DA subpoena" that was attached as Appendix A. *See* Doc. No. 52 at ¶ 270; *see also id.* at 83.

**RESPONSE:**

OBJECTION. The "fact" above is inappropriately compound. Ms. Baham further OBJECTS that none of these "facts" is material. *Merritt-Campbell, Inc.*, 164 F.3d at 961.

Without waiving these objections, Ms. Baham responds as follows:

With respect to the first sentence, Ms. Baham ADMITS that the quoted sentence fragment is included in paragraph 270 of the Second Amended Complaint. *See* Defs.' Mot. S.J. Ex. 3 (Sec. Am. Compl.) ¶ 270.

In further response to the first sentence, Ms. Baham notes that this sentence fragment was a good faith allegation based on the information available to counsel at the time the Second Amended Complaint was filed on January 25, 2018. *See* Defs.' Mot. S.J. Ex. 3 (Sec. Am. Compl.) (providing filing date).

At that time, Ms. Baham knew that she had received one fake subpoena that looked like the fake subpoenas she had seen on the news, with the word "SUBPOENA" at the top and a seal on it. Ex. 2 (Baham Decl.) ¶ 27. In her deposition, Ms. Baham confirmed that the "subpoena" she received matched the template for fake subpoenas that was distributed to the staff of the Orleans Parish District Attorney's Office by Defendant Graymond Martin. *See* Ex. 1 (Baham Dep.) at 213: 17-18 (testifying, in response to an image of the fake subpoena template, "That—that's the one. I seen that. That's the one from the DA."); Ex. 10 (fake subpoena template introduced as exhibit 1 in the Deposition of Ms. Baham); *see also* Ex. 11 (email from Defendant Martin attaching the fake subpoena template).

Ms. Baham described a second document to counsel that also had the seal of the District Attorney's Office on it and looked like a letter. *See* Ex. 1 (Baham Dep.) at 254:2 ("They got a little seal on the letter I got."). This matches the description of another type of fake subpoena that OPDA prosecutors used, which had a seal on them and resembled letters. *See, e.g.*, Ex. 12 (example of fake subpoena with accompanying letter). Fake subpoenas with this format were used dozens of times in 2014 and 2015 (the year in which Ms. Baham received a fake subpoena). *See* Ex. 13 (compilation of fake subpoenas of that type).

In addition, Ms. Baham described a number of subpoenas that had no seal on them and were printed on regular white paper. Ex. 2 (Baham Decl.) ¶ 13. Unlike the fake subpoena with the seal on it, these documents appeared to Ms. Baham to have come from the court, and she believed they demanded that she go there. *Accord* Ex. 1 (Baham Dep.) at 229:20-22 ("It was just one of them where I had to go to the DA office. That's the one I keep on telling you about with the seal on."). However, when she went to court in response, no one called her name, even when she waited until the court closed. *See* Ex. 1 (Baham Dep.) at 207:18-23 (describing various subpoenas she received); *see also id.* at 112:16-17 ("I went in the Court every time I got a subpoena to go. Never been called."); *id.* at 190:13-15 ("I had so many [subpoenas] . . . And every time I stayed until the courts closed."). In at least one case, an OPDA prosecutor has sent a fake subpoena matching the description Ms. Baham provided, with "Criminal District Court for the Parish of Orleans" written on the top. *See* Ex. 14 (compilation of fake subpoena types) at OPDA00029.

Based on this information, counsel believed in good faith that Ms. Baham had received other fake subpoenas, in addition to the fake subpoena she had identified from the picture on the news. To investigate this belief, counsel attempted to obtain the District Attorney's file in *State v. Isaac Jones* through Louisiana's public records act, but were barred from doing so by statute

because the *Jones* case was still pending. *See* La. R.S. 44:3 (barring access to prosecutors' files pending criminal cases); Ex. 4 (docket in *State v. Jones*, 517-255); Ex. 5 (docket in *State v. Jones*, 536-436). Accordingly, in paragraph 270 of the Second Amendment Complaint, counsel alleged that Ms. Baham had received "several fake subpoenas," since this was counsel's good-faith belief based on the information then available. *But see* Defs.' Mot. S.J. Ex. 3 (Sec. Am. Compl.) ¶ 7 (alleging that Ms. Baham received "a fraudulent subpoena").

Upon review of documents in investigation and through the discovery process, counsel found no evidence that Ms. Baham had unwittingly received additional fake subpoenas other than the one she originally identified because it matched the image on the news. Ms. Baham notes that none of her claims turn in any respect on whether she received one or multiple fake subpoenas from Defendant Napoli in the same case during the same time period.

With respect to the second sentence, Ms. Baham DISPUTES that the Second Amended Complaint does not specify "when" Ms. Baham received the fraudulent subpoena. The Second Amended Complaint establishes that Ms. Baham received the fraudulent subpoena between February 2013 and October 13, 2015.  Defs.' Mot. S.J. Ex. 3 (Sec. Am. Compl.) ¶¶ 261, 270, 273. Ms. Baham ADMITS that the Second Amended Complaint does not allege when Ms. Baham was "ordered" to appear at the District Attorney's Office. Ms. Baham DISPUTES that the Second Amended Complaint does not allege "what the documents looked like." The Second Amended Complaint provides general descriptions of the fraudulent subpoenas, including the one received by Ms. Baham. *Id.* ¶ 35 ("[D]ocuments, styled as 'subpoenas,' that command witnesses to appear at the District Attorney's Office for private interrogations. The documents take at least three forms: standardized pre-printed 'subpoena' forms, unauthorized forms from the electronic 'CourtNotify' system, and individualized 'subpoena' forms."). Ms. Baham ADMITS that the Second Amended

Complaint does not specify "whether the documents included the word 'subpoena,' or what other language was included on the documents."

With respect to the third sentence, Ms. Baham ADMITS that the Second Amended Complaint does not specify whether the fake subpoena Ms. Baham received was in the form of the "DA subpoena" that was attached thereto as "Appendix A."

Ms. Baham further notes that the Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim," and not "detailed factual allegations." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 552 (2007) (quoting Fed. Rule. Civ. Proc. 8(a)).


5.     Ms. Baham does not recall the date on which she received any alleged unlawful subpoena or the date on which she was allegedly ordered to appear at the DA's office. *See* Exhibit 15, Baham Response to Interrogatory No. 16 by Jason Napoli.

**RESPONSE:**

OBJECTION. This "fact" is not material. *Merritt-Campbell, Inc.*, 164 F.3d at 961.

Without waiving this objection, Ms. Baham responds as follows:

Ms. Baham ADMITS that Ms. Baham does not recall the particular date on which she received the fraudulent subpoena or the date on which it ordered her to appear at the District Attorney's Office.

In further response, Ms. Baham states that she repeatedly testified during her deposition that she received the fraudulent subpoena "probably like a month or so" after she received a letter from the District Attorney's Office.  Ex. 1 (Baham Dep.) at 211:13-24 ("Q: [D]id [the fake subpoena] come on the same day as the letter, a different day, do you know about how far apart? A: It came after the letter. Q: Do you know how soon after? A: No, not really sure, but I know it

came after. . . . probably like a month or so."); *id.* at 241:17-24 (testifying that she received the fake subpoena "probably like a month or so after" she received the letter); *accord* at 254:3-8 (testifying that she first saw the fake subpoena "[a] little after I got the letter").

The letter sent to Ms. Baham from the District Attorney's Office was dated September 22, 2015. Defs.' Mot. S.J. Ex. 4 (letter from victim-witness counselor Alison Morgado). Therefore, Ms. Baham would have received the fraudulent subpoena around October 13, 2015—the date of the first trial setting in *State v. Isaac Jones*. *See* Ex. 4.

6.      Contrary to her allegations in the Second Amended Complaint, Ms. Baham testified that she received only one subpoena directing her to appear at the Orleans Parish District Attorney's Office. *See* Exhibit 2, Baham Depo., at 12.

**RESPONSE:**

OBJECTION. This "fact" is not material. *Merritt-Campbell, Inc.*, 164 F.3d at 961.

Without waiving this objection, Ms. Baham responds as follows:

ADMITTED IN PART. Ms. Baham ADMITS that she testified in her deposition that she received one fake subpoena. *See, e.g.*, Ex. 1 (Baham Dep.) at 229:20-22 ("It was just one of them where I had to go to the DA office. That's the one I keep on telling you about with the seal on."). Ms. Baham also ADMITS that paragraph 270 of the Second Amended Complaint alleges that she received "several" fake subpoenas. *See* Defs.' Mot. S.J. Ex. 3 (Sec. Am. Compl.) ¶ 270. However, paragraph 7 of the Second Amended Complaint alleges that "received a [i.e. one] fraudulent subpoena from the District Attorney's Office." *Id.* ¶ 7. Ms. Baham DISPUTES that her testimony contradicts this allegations.

Ms. Baham further notes that, as described above, the allegation in paragraph 270 was made in good faith based on the information reasonably available at the time the Second Amended Complaint was filed. Ms. Baham hereby incorporates her response to the first sentence of Number 4, above, which addresses this issue.

7.      Ms. Baham testified that she received the subpoena to appear at the DA's office in 2013, several months after Orlando Rickmon was murdered. *See* Exhibit 2, Baham Depo., at 104.

**RESPONSE:**

OBJECTION. This "fact" is not material. *Merritt-Campbell, Inc.*, 164 F.3d at 961.

Without waiving this objection, Ms. Baham responds as follows:

DISPUTE. The statement mischaracterizes Ms. Baham's testimony and omits her repeated and consistent earlier statements and later clarifications about when she received the fraudulent subpoena. *See, e.g.*, Ex. 1 (Baham Dep.) at 102:12-15 ("Q: What was before the subpoena? When you appeared at the DA's office was before the subpoena? A: Before I had got a letter for to go there, before I got the subpoena."); *id.* at 211:13-24 ("Q: [D]id [the fake subpoena] come on the same day as the letter, a different day, do you know about how far apart? A: It came after the letter. Q: Do you know how soon after? A: No, not really sure, but I know it came after. . . . probably like a month or so."); *id.* at 241:17-24 (testifying that she received the fake subpoena "probably like a month or so after" she received the letter); *see also* Defs.' Mot. S.J. Ex. 4 (letter from victim-witness counselor dated September 22, 2015).

In addition, the cited testimony evidences only Ms. Baham's confusion about counsel's questions. That testimony was interwoven with questioning about grand jury subpoenas that were issued for Ms. Baham in August 2013, one of which she received. Ex. 1 (Baham Dep.) at 103:16-

25, 104:1-21; Ex. 15 (unserved grand jury subpoena for August 15, 2013); Ex. 6 (served grand jury subpoena for August 22, 2013); Ex. 7 (unserved grand jury subpoena for August 29, 2013). The grand jury subpoenas demanded that Ms. Baham report to the "GRAND JURY for Orleans Parish Criminal District Court located in the Orleans Parish District Attorney's Office." *See* Exs. 15, 6, and 7.

Ms. Baham—who did not graduate high school and has a history of special education, Ex. 1 (Baham Dep.) at 225:10-18—does not know what a "grand jury" or "grand jury subpoena" is. *Id.* at 208:1-5 ("Q: [D]o you know what a grand jury is? A: No, not—I think—I thought a Grand Jury was when you get up on the stand and they—and they had a judge in the thing talking to you."); *id.* at 208:9-10 ("Q: [D]o you know what a Grand Jury subpoena is? A: No. I just know the subpoena I got to appear in front of the jury."); *see also id.* at 225:10-18 ("Q: Did you actually finish tenth grade? A: Yes, but I ain't—I ain't went to the 11th or nothing."). And she did not understand that the "grand jury subpoenas" that defense counsel was referencing required her to go there. *Id.* at 230:19-21 (stating, in reference to a grand jury subpoena, "This here for to go in the courtroom."); *see also* Ex. 2 (Baham Decl.) ¶ 17. As a result, when defense counsel referred to a subpoena requiring her to go to the District Attorney's Office, Ms. Baham believed he was describing the fake subpoena—even though, in fact, counsel was referencing a grand jury subpoena. *See id.* Ms. Baham's confusion is evident from her testimony:

> Q: So I'm asking you about [grand jury] subpoenas to go to the DA's office right now. The one that you're holding in your hand is one of the ones for you to go to the DA's office; is that correct?
>
> A: This—I got one with a seal on it. This was not the one. I keep telling you.
>
> Q: Ma'am, I'm not asking you about the one with the seal. I'm asking you about the one in your hand.

A: This here—this here for to go in the courtroom. I got subpoenaed for the court and I got subpoenaed for the DA office.

Q: No, ma'am. This subpoena commands you to appear at the Orleans Parish DA's Office, 619 South White Street; is that not what the document says?

A: Yes, that's what it say.

Q: And I asked you this morning, aside from this document and the two others like it, did you receive any other documents telling you to appear at the DA's office; you recall me asking that? [. . .]

A: Yes, I probably didn't get that right—how you was saying it, but I'm trying to explain it to the best of my knowledge the ones that I had, what I said, to go to the DA office. The one with the seal on it and the letter, that's the only two times I went to the DA office. [. . .] All the other times I was going to the courtroom."

Ex. 1 (Baham Dep.) at 230:10-231:17.

Before this exchange, when defense counsel put an image of a 2013 grand jury subpoena on the screen, Ms. Baham explained that the fake subpoena she had received looked different from the grand jury she was being shown. *Id.* at 96:8-10 (It didn't have this on there. It was a subpoena like this here. It had a seal on the subpoena."). When counsel tried to discuss the grand jury subpoenas from 2013, Ms. Baham repeatedly responded by describing the fake subpoena, since— as far as she knew—that was the only subpoena that demanded she appear at the District Attorney's Office. *See id.* at 96:22-97:17 (describing how she responded to the fake subpoena in response to a question about whether she "appear[ed] at the DA's office" in response to a grand jury subpoena); *id.* at 98:15-99:13 (same); *see also id.* at 15:13-16:8 (providing the same account of her response to the fake subpoena); *id.* at 37:20-38:22 (same); *id.* at 215:1-25 (same). Ms. Baham also repeatedly attempted to clarify that the fake subpoena was different from the grand jury subpoena that was being shown on the screen. *See id.*

Ms. Baham gave the cited testimony during this confusing exchange. *Id.* at 207:1-4 (agreeing that she was confusing by defense counsel's question about which subpoenas she received at what times).[4] Ms. Baham, who struggles in general with remembering dates, confirms that she misspoke because she was confused. Ex. 2 (Baham Decl.) ¶¶ 11, 17; *accord* Ex. 1 (Baham Dep.) at 144:3-13 (struggling to remember what year her mother-in-law—who lived next door and for whom Ms. Baham cared for as a home health aide—died, and offering to check her obituary to find the date); *id.* at 29:11-23. She affirms the accuracy of her testimony before and after this statement: she received the fake subpoena shortly after she received the letter, which is dated September 22, 2015. *See, e.g.*, *id.* at 102:12-15; *id.* at 211:13-24; *id.* at 241:17-24; *see also* Defs.' Mot. S.J. Ex. 4 (letter from victim-witness counselor).

8.      Ms. Baham testified that she received three subpoenas ordering her "to appear before the GRAND JURY for the Orleans Parish Criminal District Court located in the Orleans Parish District Attorney's Office, 619 South White St. New Orleans, Louisiana," on three dates in August 2013. *See* Exhibit 2, Baham Dep., at 95–96, 103–106; *see also* Exhibit 16 (August 15, 2013 grand jury subpoena); Exhibit 17 (August 22, 2013 grand jury subpoena); Exhibit 18 (August 29 2013 grand jury subpoena).

---

[4] Throughout the deposition, there was additional confusion due to ambiguity about the definition of the term "subpoena" as used by Defendants' counsel, despite Mr. Sachs' repeated objections and requests for clarification. *See, e.g.*, Ex. 1 (Baham Dep.) at 235:23-236:1 ("MR. SACHS: I have continually throughout this entire deposition asked for clarity of a definition of subpoenas to make things more clear, and I've lodged that objection. I'm lodging the objection now."); *see also id.* at 171:15-16 ("MR. SACHS: Objection to the term 'subpoena.' Are you including in that the fake subpoenas, the letters?"); *id.* at 229:16-17 ("MR. SACHS: Objection to the term 'subpoena.' Can you please define that.").

**RESPONSE:**

OBJECTION. This "fact" is not material. *Merritt-Campbell, Inc.*, 164 F.3d at 961. Whether Ms.
Baham received (two years before the events at issue) all three grand jury subpoenas, or just one
or two, has no bearing on the question of whether she received a fraudulent subpoena.

Without waiving this objection, Ms. Baham responds as follows:

DISPUTE. Ms. Baham did not testify that she received three grand jury subpoenas. *See* Ex.
1 (Baham Dep.) at 106:5-8 ("Q: So you received three subpoenas in 2013 to appear at the DA's
office that I just showed you; is that correct? A: No.").

Specifically, Ms. Baham testified that she received the grand jury subpoena dated August
22, 2013, because her signature was on it accepting service. *Id.* at 103:16-22; *see also id.* 104:3-9
(guessing that she signed the subpoena at the court because "I know I signed a lot at the Court").
However, Ms. Baham notes that there is no evidence in the record that the grand jury convened on
that date. The only grand jury testimony in evidence is dated August 15, 2013. *See* Ex. 16 (Aug.
15, 2013 grand jury testimony).

With respect to the grand jury subpoena dated August 15, 2013, Ms. Baham was confused
by defense counsel's questions. Ex. 2 (Baham Decl.) ¶ 17. She therefore answered counsel's
questions about the grand jury subpoena by describing the fake subpoena. This is apparent, since
Ms. Baham repeatedly tried to correct defense counsel by explaining that the subpoena she was
talking about was different from the grand jury subpoena he was showing to her on the screen
(defense counsel plowed ahead):

Q: Did you receive this subpoena?

A: Yes . . . It wasn't no Section G.

Q: So was the subpoena delivered to you? [ . . .]

> A: It didn't have this on there. It was a subpoena like this here. It had a seal on the subpoena.
>
> Q: So I'm just asking if you received the subpoena.
>
> A: Yes, I received the subpoena.

Ex. 1 (Baham Dep.) at 95:20-96:10; *see* Ex. 15 (grand jury subpoena for August 15, 2013) (subpoena has no seal and says "SECTION G" at the top). Immediately after this exchange, Ms. Baham described her response to receiving the fake subpoena. *See* Ex. 1 (Baham Dep.) at 96:22-97:17; *see also id.* at 15:13-16:8 (providing the same account of her response to the fake subpoena); *id.* at 37:20-38:22 (same); *id.* at 215:1-25 (same).

Moreover, on its face, it appears that the grand jury subpoena for August 15, 2013 appears never to have been served. *See* Ex. 15 (grand jury subpoena for August 15, 2013) (subpoena including no signature, no date of service, and no documentation on whether service was attempted or achieved). This makes sense; at 10:02 am on August 14, 2013—the day before the date on the grand jury subpoena—an investigator from the District Attorney's Office emailed Detective Givens to request "the specific address on the Bahams" so that she could "serve them th[at] morning." Ex. 17 (Aug. 14, 2013 email). Detective Givens then supplied the wrong address. *Id.* (providing address on Forshey Street); *see* Ex. 1 (Baham Dep.) at 28:12-13 (testifying that she lived on Forshey Street "years ago . . . way before [Hurricane Katrina]"). The grand jury subpoenas for that date for other witnesses also appear to be unserved. *See, e.g.*, Ex. 18 (subpoenas for other witnesses). Ms. Baham also has no recollection of receiving this document. Ex. 2 (Baham Decl.) ¶ 15.

With respect to the grand jury subpoena for August 29, 2013, Ms. Baham responded that her signature does not appear on the subpoena. Ex. 1 (Baham Dep.) at 105:17-106:3. She then answered "yes" to the question, "Do you believe you received this?" *Id.* at 106:3-4. From the

question, it is not clear precisely what counsel was asking (e.g. this question could mean, "Would you believe it if I told you that you received this?"). The question also did not address when she had "received" it, in what context, or whether she actually remembered receiving it. Immediately after this exchange, when asked if she received all three subpoenas, Ms. Baham answered "no." *Id.* at 106:5-8.

On its face, it does not appear that the grand jury subpoena for August 29, 2013 was ever served. Ex. 7 (Aug. 29, 2013 grand jury subpoena) (including a process server's signature, but no service date, and no signature from Ms. Baham or anyone accepting service on her behalf). Ms. Baham also has no recollection of receiving this document. Ex. 2 (Baham Decl.) ¶ 15.


9.      Ms. Baham testified that, aside from the grand jury subpoenas that were shown to her and discussed during her deposition, she had not received any other subpoenas (or other documents) directing her to appear at the Orleans Parish District Attorney's Office. *See* Exhibit 2, Baham Depo., at 116–117, 165–166.

**RESPONSE:**

OBJECTION. This "fact" is not material in light of Ms. Baham's consistent testimony to the contrary. *Merritt-Campbell, Inc.*, 164 F.3d at 961.

Without waiving this objection, Ms. Baham responds as follows:

DISPUTE. This "fact" is contrary to Ms. Baham's testimony. Ms. Baham repeatedly and consistently described her receipt of a fake subpoena throughout her deposition.

Specifically, Ms. Baham testified that she received two documents telling her to go to the District Attorney's Office: a letter and a "subpoena." Ex. 1 (Baham Dep.) at 106:10-13 ("A: I got two—two telling me go to the DA office. There was a subpoena and a letter. All the rest of them

was to go at the courtroom.").[5] The "subpoena" had a seal on it. *Id.* at 211:10-11 ("[T]hat's the one with the seal there where they told me to go to the DA office.").[6] And it matched the fake subpoena template that First Assistant District Attorney Graymond Martin had distributed to all Orleans Parish District Attorney's Office staff in May, 2014. *See* Ex. 11 (May 13, 2014 fake subpoena template email); Ex. 1 (Baham Dep.) at 213:17-18 (testifying, in response to an image of the fake subpoena template, "That—that's the one. I seen that. That's the one from the DA."); *see also* Ex. 10 (fake subpoena template).

Each time Ms. Baham described the fake subpoena, she provided the same account of what she did in response: she went to the District Attorney's Office, but she was turned away at

---

[5] *Accord, e.g.*, Ex. 1 (Baham Dep.) at 13:10-12 ("That's the one they talking about where they told me to go to sit over there to the DA's office"); *id.* at 36:17-38:22 (Q: When did you go to the Orleans Parish DA's office? A: When I had got the subpoena to go there."); *id.* at 117:1-4 ("A: Just the letter and subpoena that I got when I stay over there to the DA office. All the rest I was going to Court."); *id.* at 230:7-9 ("I just had two ones for to go to the DA office. That's the one with the seal on and the letter."); *id.* at 231:11-13 ("The one with the seal on it and the letter, that's the only two times I went to the DA office."); *id.* at 237:7-11 ("The two what I'm telling you that I know from the DA office, it was the letter and the one with the seal on it. All the rest, I'm going to the courtroom with them, as what I could recall.").

[6] *Accord, e.g.*, Ex 1 (Baham Dep.) at 96:8-10 (stating, to explain how the fake subpoena was different from one she was being shown: "It had a seal on the subpoena."); *id.* at 228:19-24 ("It's the one with the seal on it . . . to go to the DA office. The one with the seal on it, that's—that's the one where they sent me to the DA office with."); *id.* at 229: 20-22 ("It was just one of [the subpoenas] where I had to go to the DA office. That's the one I keep on telling you about with the seal on."); *id.* at 230:7-9 ("I just had two ones for to go to the DA office. That's the one with the seal on and the letter."); *id.* at 231:25 ("The [subpoena] I had when I went to the DA office is the one . . . with the seal on it."); *id.* at 239:1-4 ("Q: Can you tell me everything that you remember about [the fake subpoena?] A: Telling me for to go to the DA, like this here, what—and they had a seal."); *id.* at 241:24-242:9 ("Q: Can you tell me everything you remember about the document that you actually received? A: Telling me to go to the DA office. Q: What else did it say? A: They had to—yeah, the address and thing on there. Q: The address— A: Just like what you have—like the one with the seal on it. That—that is the one I went to the DA office with. That's the best to my knowledge of what I could understand it.").

security.[7] *See* Ex. 1 (Baham Dep.) at 97:8-10 ("I goes over there to the DA office, the security guard at the front wouldn't let me get no further.").[8] And although Ms. Baham cannot remember the date on which she received the fake subpoena, she consistently testified that it came about a month after the letter, which is dated September 22, 2015.[9] *See* Defs.' Mot. S.J. Ex. 4 (letter from counselor).

---

[7] Ms. Baham's full account of how she responded—which she provided at least five times during her deposition—is detailed. Each time, Ms. Baham she explains that she went first to the courthouse to ask about the "subpoena" and where she should go; that a woman there called the District Attorney's Office and got no response; that she then went to the District Attorney's Office, but was turned away at security; and that she returned to the courtroom, but that the woman she had spoken with was gone. *See* Ex. 1 (Baham Dep.) at 15:13-16:8 (providing this account); *id.* at 37:20-38:22 (same); *id.* at 96:24-97:17 (same); *id.* at 100:2 (same); *id.* at 215:1-25 (same).

[8] *Accord, e.g.*, Ex. 1 (Baham Dep.) at 36:17-22 ("Q: Have you ever been to the Orleans Parish DA's office? A: Yes. They wouldn't let me in. Q: When did you go to the Orleans Parish DA's office? A: When I had got the subpoena to go there."); *id.* at 37:7-25 ("Q: And so how many times have you been to the Orleans Parish DA's Office? A: I been there twice, once with the subpoena and one time with the letter. I couldn't get in, so I wind up just going back to the courthouse. Q: And when you say you couldn't get in, you're saying that no one there would answer the front door? A: Yeah. They had—they have security but they wouldn't let you through. Q: So you're saying that you talked to something in security, told them why you were there, they would not let you come in? A: They wouldn't—they wouldn't let me—they had a lady one time was there and said that they was gone for the day. That's when I went with the subpoena, and standing there, he—the security guard stop the lady who works in there. Someone was asking, said they was gone for the day."); *id.* at 233:19-25 ("[T]he one . . . with the seal, that's what I brought over to the DA office, and I went over there with the letter. That's the only two times I went to the DA office with. All the other times I went to the courtroom with them, and they just tell me to take a seat."); *see also id.* at 253:12-17 ("Why y'all didn't pull the footage and thing when I went over there to the DA office . . . Y'all ought to have all that footage.").

[9] Ex. 1 (Baham Dep.) at 211:13-24 ("Q: [D]id [the fake subpoena] come on the same day as the letter, a different day, do you know about how far apart? A: It came after the letter. Q: Do you know how soon after? A: No, not really sure, but I know it came after. . . . probably like a month or so."); *id.* at 241:17-24 (testifying that she received the fake subpoena "probably like a month or so after" she received the letter); *accord id.* at 102:12-15 ("Q: What was before the subpoena? When you appeared at the DA's office was before the subpoena? A: Before I had got a letter for to go there, before I got the subpoena."); *id.* at 103:8-10 (A: "I know I went to the DA twice. I went with the subpoena, and I went with the letter. I'm not exactly sure the dates."); *id.* at 209:9-17 ("Q: And around the same time you got the letter in the mail, did you get another document that had the label 'subpoena' on it and had the seal of the DA's office on it? A: I got—I got that

The portion of Ms. Baham's testimony cited for the "fact" above evidences only that Ms. Baham was confused by defense counsel's questions. At that time, defense counsel was attempting to question Ms. Baham about three grand jury subpoenas (only one of which she received); *see supra* Resp. to "fact" 8, which Ms. Baham incorporates into this response); *see also* Ex. 15 (unserved grand jury subpoena for August 15, 2013); Ex. 6 (served grand jury subpoena for August 22, 2013); Ex. 7 (unserved grand jury subpoena for August 29, 2013).

Ms. Baham—who did not graduate high school and has a history of special education—does not know what a "grand jury" or "grand jury" subpoena is. Ex. 1 (Baham Dep.) at 208:1-5 ("Q: [D]o you know what a grand jury is? A: No, not—I think—I thought a Grand Jury was when you get up on the stand and they—and they had a judge in the thing talking to you."); *id.* at 208:9-10 ("Q: [D]o you know what a Grand Jury subpoena is? A: No. I just know the subpoena I got to appear in front of the jury."); *see also id.* at 225:10-18 ("Q: Did you actually finish tenth grade? A: Yes, but I ain't—I ain't went to the 11th or nothing.").

Nor did she understand that the grand jury is located in the District Attorney's Office and that grand jury subpoenas she was being shown commanded her to appear there rather than in court.  *See* Ex. 15 (grand jury subpoena commanding the witness to report to the "GRAND JURY for Orleans Parish Criminal District Court located in the Orleans Parish District Attorney's Office."); Ex. 6 (same); Ex. 7 (same); Ex. 1 (Baham Dep.) at 112:10-17 ("Q. Did you ever appear

---

subpoena after the letter, yes, I got the subpoena."); *id.* at 212:16-213:1 ("I got the letter first . . . And a while after that, that's when I got the subpoena. . . . I know it was after the letter."); *id.* at 239:6-8 ("I went [to the District Attorney's Office] with the letter first and I went with the subpoena with the seal on it."); *id.* at 254:3-8 (Q: When was the first time you ever saw that blank DA subpoena form that your lawyer showed you earlier today? A: Which one? The one with the seal? Q: Yes, ma'am. A: A little after I got the letter."); *id.* at 255:4-5 ("The subpoena, I got that after I got the letter.").

before the Grand Jury? A. I went in the Court every time I got a subpoena to go.") (objections omitted); *id.* at 230:19-21 (stating, in reference to a grand jury subpoena, "This here for to go in the courtroom."); *see also* Ex. 2 (Baham Decl.) ¶ 17.

As a result, when defense counsel referred to a subpoena requiring her to go to the District Attorney's Office, Ms. Baham believed he was describing the fake subpoena—even though, in fact, counsel was referencing a grand jury subpoena. *See id.* ¶ 17. As such, Ms. Baham tried to correct defense counsel by repeating her earlier descriptions of the fake subpoena that she received:

> Q: So you received three [grand jury] subpoenas in 2013 to appear at the DA's office that I just showed you; is that correct?
>
> A: No. I—I—I—the only—I had one of these here, one of—one of these here that I could remember from the DA office and a letter. I got two—two telling me to go to the DA office. There was a subpoena and a letter. All the rest of them was to go to the courtroom."

Ex. 1 (Baham Dep.) at 106:5-13.

Moreover, when Ms. Baham was shown copies of the grand jury subpoenas on the screen, she made clear that none of them were the fake subpoena she received:

> Q. So I'm asking you about subpoenas to go to the DA's office right now. The one that you're holding in your hand [a Grand Jury subpoena] is one of the ones for you to go to the DA's office; is that correct?
>
> A. This -- I got the one with a seal on it. This [grand jury subpoena in my hand] was not the one. I keep on telling you.

*Id.* at 230:10-15.[10]

---

[10] *See also id.* at 228:15-24 ("Q. And this document commands you to appear before the Grand Jury at the Orleans Parish DA's Office on October 22, 2013; is that correct? A. This is not the one where I had to go there for. It's the one with the seal on it – Q. I'm sorry, what was that? A -- to go to the DA office. The one with the seal on it [not this grand jury subpoena], that's – that's the one where they sent me to the DA office with."); *id.* at 229:20-22 ("A. It was just one of them where I had to go to the DA office. That's the one I keep on telling you about with the seal on.").

And Ms. Baham repeatedly responded to questions about the grand jury subpoenas by describing the fake subpoena, since—as far as she knew—that was the only subpoena that demanded she appear at the District Attorney's Office. *See id.* at 96:22-97:17 (describing how she responded to the fake subpoena in response to a question about whether she "appear[ed] at the DA's office" in response to a grand jury subpoena); *id.* at 98:15-99:13 (same); *see also id.* at 15:13-16:8 (providing the same account of her response to the fake subpoena); *id.* at 37:20-38:22 (same); *id.* at 215:1-25 (same).

Throughout this line of questioning, defense counsel refused—despite multiple requests and objections by Mr. Sachs—to define what he meant by "subpoena" during the deposition.[11] Even in response to the answer cited by Individual Defendants in this fact, Mr. Sachs renewed his objection to Mr. Paul's ambiguous references to "subpoenas" in a case involving numerous iterations of subpoenas, documents purporting to be subpoenas, and other documents. *See* Ex. 1 (Baham Dep.) at 114:6-12 ("MR. SACHS: Objection to vagueness and the definition of subpoena. Are we talking about the fake subpoena, the real subpoenas, the Grand Jury subpoenas? MR. PAUL: Thank you. BY MR. PAUL: You can answer, Ms. Baham."); *id.* at 116:21-23 (renewing objection stated at 114:6-12).

The portion of the transcript Defendants rely on for this "fact" evidences each of these issues. Counsel asked, "[A]side from the subpoenas that we just discussed, did you ever receive any other subpoenas telling you to go to the DA's office?" *Id.* at 114:20-23. Before Ms. Baham answered this, Ms. Baham's counsel objected, defense counsel repeated the question, and the computer lost connection. *Id.* at 115:10-11 (MR. PAUL: Is she trying to speak? Is the sound cutting out?"). This sequence—the objection, the repeat of the question, and the connection issues—then

---

[11] *See supra* n.4, incorporated by reference herein.

24

repeated twice more. *Id.* at 115:13-116:25. When Ms. Baham finally responded, as she had done

before, she described the fake subpoena she had received, and not the grand jury subpoenas: "No,

not that I'm aware of. Just the letter and subpoena that I got when I stay over there to the DA

office. All the rest I was going to Court." *Id.* at 117:1-4.

In the second portion of the transcript Defendants cite for this "fact," defense counsel

restated the same question about the grand jury subpoenas—this time immediately after covering

different topics and taking a recess, without showing any images of them on the screen, and without

referencing the year in which the grand jury subpoenas were issued. *Id.* at 165:1-25. Ms. Baham

repeated the same answer—again appearing to reference the fake subpoena, and not the grand jury

subpoenas. *Id.* at 165:23-25.

Later in her testimony, Ms. Baham expressly clarified that the only fake subpoena that she

had received was the fake subpoena with a seal on it, and not the grand jury subpoenas:

> Yes, I probably didn't get the right -- how you was saying it, but I'm
> trying to explain it to the best of my knowledge the ones that I had,
> what I said, to go to the DA office. The one with the seal on it and
> the letter, that's the only two times I went to the DA office."

*Id.* at 231:8-14; *see also id.* at 233:19-23 ("I went—the one what y'all showed up there on the

screen with the seal, that's what I brought over to the DA's office . . . ."); *id.* at 240:20-23 ("[Y]es,

that was the document that I went to the DA office with, the one that y'all put up on screen, what

I keep telling you.").

Ms. Baham also incorporates by reference her response to "fact" number 7, above.


10.     On January 6, 2016, when Ms. Baham appeared before Judge Laurie White, Ms. Baham

stated: "I never got a subpoena." *See* Exhibit 9, Transcript of January 6, 2016 hearing, at 3.

**RESPONSE:**

25

OBJECTION. This "fact" is not material because Ms. Baham was plainly referring to a trial

subpoena, not the fake subpoena she received to go to the District Attorney's Office. *Merritt-*

*Campbell, Inc.*, 164 F.3d at 961.

Without waiving this objection, Ms. Baham responds as follows:

ADMIT. Ms. Baham admits that she made the quoted statement. However, Ms. Baham

would dispute any implication that this statement somehow implies she did not receive the fake

subpoena at issue in this case.

Ms. Baham made this statement during a brief hearing on January 6, 2016 after Ms.

Baham's arrest as a material witness. *See* Ex. 19 (Jan. 6, 2016 Transcript) at PL10964. During that

hearing, apparently to explain to Ms. Baham why she had been jailed, Judge White stated to Ms.

Baham that subpoenas that had been sent to her "through [the] court." *Id.* at PL10965. Judge White

then admonished: "I want you to understand, ma'am, when you are a witness in a criminal

prosecution, if you ignore a subpoena—." *Id.* Ms. Baham then replied "I never got a subpoena."

*Id.* In context, Ms. Baham is clearly stating that she did not receive any subpoena to come to court

that she had ignored. (In response to Ms. Baham's statement, Judge White instructed her to speak

with a public defender). *Id.* at PL10965-66.

As the record reflects, Ms. Baham's statement was accurate: she had never received a

subpoena to come to court in the Isaac Jones case. There is no evidence that Ms. Baham was served

with a subpoena for the October 13, 2015, trial date about which Judge White was questioning her.

Indeed, the record includes no evidence that a subpoena for Ms. Baham was even issued. In

contrast, for subsequent trial dates, the record does include evidence that witness subpoenas were

issued.[12] Moreover, although Louisiana law requires that returns from all service attempts (whether or not successful) be filed into the record, there is none associated with the October 13, 2015 trial date.[13]

The court had issued subpoenas associated with the separate case opened against Ms. Baham as a material witness. *See* Ex. 31 (Baham CourtNotify service history) showing subpoenas issued in Case No. 526-742); Ex. 32 (OPDA12724-25 (docket in *State v. Baham*, No. 526-742, the material witness case against Ms. Baham). However, none of them had been served. *See* Ex. 31.

11.    Mr. Napoli has testified that he is sure he never sent any unlawful subpoena to Ms. Baham. *See* Exhibit 6, Napoli Depo., at 312–313.

**RESPONSE:**

OBJECTION. This "fact" is not material because Defendant Napoli's denials are contrary to the weight of the evidence.

---

[12]  *See, e.g.* Ex. 20 (records from CourtNotify, the Court's electronic subpoena system, documenting witness subpoenas issued for the May 15, 2017 trial date); Ex. 21 (return of service for Ms. Baham for May 15, 2017); Ex. 22 (CourtNotify records documenting witness subpoenas issued for the August 14, 2017 trial date); Ex. 23 (instanter subpoena for Dinnika Baham for August 14, 2017 from clerk's file); Ex. 24 (instanter subpoena for Lazonia Baham for August 14, 2017 from clerk's file); Ex. 25 (instanter subpoena for Dr. Erin O'Sullivan for August 14, 2017 from clerk's file); Ex. 26 (instanter subpoena for Dr. Samantha Huber for August 14, 2017 from clerk's file); Ex. 27 (minute entry from clerk's file for March 1, 2018 documenting service of a subpoena for Ms. Baham for March 5, 2018); Ex. 28 (minute entry from clerk's file for Feb. 20, 2018 documenting that court granted State's motion for an instanter subpoena for Ms. Baham); Ex. 29 (minute entry from clerk's file for Oct. 19, 2017 documenting that court granted State's motion for an instanter subpoena); Ex. 30 (minute entry from clerk's file for Oct. 16, 2017 documenting that court ordered the State to file a motion for an instanter subpoena).

[13]  *See* La. Code Crim. Proc. art. 736(a) (requiring that both returns from all unsuccessful attempts to serve subpoenas and copies of subpoenas that were served be "return[ed] . . . to the court that issued the subpoena" and that such returns "shall form part of the record"); *see also* art. 734 (stating that these requirements apply to District Attorney's Investigators who serve subpoenas).

Without waiving this objection, Plaintiffs respond as follows:

ADMIT IN PART. Plaintiffs ADMIT that the above statement accurately paraphrases Mr. Napoli's deposition testimony. However, Plaintiffs DISPUTE the veracity of Mr. Napoli's self-serving testimony.

In addition to the evidence controverting Defendant Napoli's claim, *see* CSUMF ¶¶ 96-121, Defendant Napoli's credibility is weak; indeed, he appears to have lied to the court in the same case in which Ms. Baham alleges he sent a fake subpoena.

Specifically, Defendant Napoli made representations about Ms. Baham to the Court—as a basis for seeking her arrest—that have been directly contradicted by the sworn testimony of Detective Mike Kitchens. *Compare* Defs.' Mot. S.J. Ex. 10 (Oct. 13, 2015 Motion and Order for Material Witness Bond) ("Lazonia Baham was notified by Orleans Parish District Attorney's Office Investigator Mike Kitchens that she was an essential witness in the above stated case and would be needed to testify") *with* Ex. 33 (Kitchens Dep.) at 157:5-9 ("[D]id you ever have a conversation with Ms. Baham about how she was an essential witness and needed to be in court? A. Never. Q. Did you ever send any sort of communication to Ms. Baham explaining that she was an essential witness and needed to appear in court? A. Never. Q. Did you ever have any sort of conversation, communication, or give any other indication to Ms. Baham that you were looking for her and that she needed to come to court, come to the DA's office, or otherwise participate in the case against Isaac Jones? A. Never. Q. Did you ever tell Ms. Baham a court date? A. Never. Q. Other than leaving that business card, did you ever provide any information to Ms. Baham, Lazonia Baham, about the need for her to be in court or take any other action related to the Isaac Jones case? A. Never"); *see also id.* at 152:19-153:4 ("Q. How did you get that subpoena that you were asked to serve on [Ms. Baham]? A. From Mr. Napoli. Q. Was that subpoena signed by a

judge? A. I assumed it was. Q. Did you look or no? A. No. Q. Did that subpoena command Ms. Baham to appear in court or at the District Attorney's Office, or do you not know? A. I do not know.").

Likewise, Mr. Napoli denied instructing Det. Kitchens to send a witness in a separate case a District Attorney subpoena,[14] even though Detective Kitchens' contemporaneous memorandum specifically references delivering several "District Attorney subpoenas" in the case. *See* Ex. 34 (Napoli Dep.) at 298:19-301:20. Contrary to Jason Napoli's testimony, Detective Kitchens testified, "Q. And so all the subpoenas that you would have given to either Steve Smith or someone – one of his family members who was there you got from Jason Napoli? A. Yes." Ex. 33 (Kitchens Dep.) at 11:14-18. Based on Ms. Baham's testimony that she received a fraudulent subpoena, Ex. 1 (Baham Dep.) at 213:17-18, and Detective Kitchens' testimony agreeing that "the only reason [he] would ever give a document to a witness is if the ADA had given it to [him] and told [him] to pass it on to a witness," Ex. 33 (Kitchens Dep.) at 218:12-15, there is ample basis to dispute Mr. Napoli's claim.

12.    Ms. Baham has never produced any evidence showing that Mr. Napoli sent her any unlawful subpoena.

**RESPONSE**:

DISPUTE. The statement above is inaccurate. Ms. Baham testified that she received a fake subpoena, and the evidence in the record supports her account.

---

[14] Ex. 34 (Napoli Dep.) at 301:10-13 (Q. Did you direct Mr. Kitchens to send district attorney subpoenas to Mr. Smith or his relatives? A. Not that I recall, no.").

Ms. Baham testified that she received two documents telling her to go to the District Attorney's Office: a letter and a "subpoena." Ex. 1 (Baham Dep.) at 106:10-13 ("A: I got two— two telling me go to the DA office. There was a subpoena and a letter. All the rest of them was to go at the courtroom.").[15] The "subpoena" had a seal on it. *Id.* at 211:11-12 ("[T]hat's the one with the seal there where they told me to go to the DA office.").[16] And it matched the fake subpoena template that First Assistant District Attorney Graymond Martin had distributed to all Orleans Parish District Attorney's Office staff in May, 2014. *See* Ex. 11 at OPDA039343; Ex. 1 (Baham Dep.) at 213:17-18 (testifying, in response to an image of the fake subpoena template, "That— that's the one. I seen that. That's the one from the DA."); *see also* Ex. 10 (fake subpoena template).

---

[15] *Accord, e.g.*, Ex. 1 (Baham Dep.) at 13:10-12 ("That's the one they talking about where they told me to go to sit over there to the DA's office"); *id.* at 36:17-38:22 (Q: When did you go to the Orleans Parish DA's office? A: When I had got the subpoena to go there."); *id.* at 117:1-4 ("A: Just the letter and subpoena that I got when I stay over there to the DA office. All the rest I was going to Court."); *id.* at 230:7-9 ("I just had two ones for to go to the DA office. That's the one with the seal on and the letter."); *id.* at 231:11-13 ("The one with the seal on it and the letter, that's the only two times I went to the DA office."); *id.* at 237:7-11 ("The two what I'm telling you that I know from the DA office, it was the letter and the one with the seal on it. All the rest, I'm going to the courtroom with them, as what I could recall.").

[16] *Accord, e.g.*, Ex. 1 (Baham Dep.) at 96:8-10 (stating, to explain how the fake subpoena was different from one she was being shown: "It had a seal on the subpoena."); *id.* at 228:19-24 ("It's the one with the seal on it . . . to go to the DA office. The one with the seal on it, that's—that's the one where they sent me to the DA office with."); *id.* at 229: 20-22 ("It was just one of [the subpoenas] where I had to go to the DA office. That's the one I keep on telling you about with the seal on."); *id.* at 230:7-9 ("I just had two ones for to go to the DA office. That's the one with the seal on and the letter."); *id.* at 231:25 ("The [subpoena] I had when I went to the DA office is the one . . . with the seal on it."); *id.* at 239:1-4 ("Q: Can you tell me everything that you remember about [the fake subpoena?] A: Telling me for to go to the DA, like this here, what—and they had a seal."); *id.* at 241:24-242:9 ("Q: Can you tell me everything you remember about the document that you actually received? A: Telling me to go to the DA office. Q: What else did it say? A: They had to—yeah, the address and thing on there. Q: The address— A: Just like what you have—like the one with the seal on it. That—that is the one I went to the DA office with. That's the best to my knowledge of what I could understand it.").

Each time Ms. Baham described the fake subpoena, she provided the same account of what she did in response: she went to the District Attorney's Office, but she was turned away at security.[17] *See* Ex. 1 (Baham Dep.) at 97:8-10 ("I goes over there to the DA office, the security guard at the front wouldn't let me get no further.").[18] And although Ms. Baham cannot remember the date on which she received the fake subpoena, she consistently testified that came about a month after the letter, which is dated September 22, 2015.[19] *See* Defs.' Mot. S.J. Ex. 4 (letter from counselor).

---

[17] Ms. Baham's full account of how she responded—which she provided at least five times during her deposition—is detailed. Each time, Ms. Baham she explains that she went first to the courthouse to ask about the "subpoena" and where she should go; that a woman there called the District Attorney's Office and got no response; that she then went to the District Attorney's Office, but was turned away at security; and that she returned to the courtroom, but that the woman she had spoken with was gone. *See* Ex. 1 (Baham Dep.) at 15:13-16:8 (providing this account); *id.* at 37:20-38:22 (same); *id.* at 96:24-97:17 (same); *id.* at 100:2; *id.* at 215:1-25 (same).

[18] *Accord, e.g.*, Ex. 1 (Baham Dep.) at 36:17-22 ("Q: Have you ever been to the Orleans Parish DA's office? A: Yes. They wouldn't let me in. Q: When did you go to the Orleans Parish DA's office? A: When I had got the subpoena to go there."); *id.* at 37:7-25 ("Q: And so how many times have you been to the Orleans Parish DA's Office? A: I been there twice, once with the subpoena and one time with the letter. I couldn't get in, so I wind up just going back to the courthouse. Q: And when you say you couldn't get in, you're saying that no one there would answer the front door? A: Yeah. They had—they have security but they wouldn't let you through. Q: So you're saying that you talked to something in security, told them why you were there, they would not let you come in? A: They wouldn't—they wouldn't let me—they had a lady one time was there and said that they was gone for the day. That's when I went with the subpoena, and standing there, he—the security guard stop the lady who works in there. Someone was asking, said they was gone for the day."); *id.* 233:19-25 ("[T]he one . . . with the seal, that's what I brought over to the DA office, and I went over there with the letter. That's the only two times I went to the DA office with. All the other times I went to the courtroom with them, and they just tell me to take a seat."); *see also id.* at 253:12-17 ("Why y'all didn't pull the footage and thing when I went over there to the DA office . . . Y'all ought to have all that footage.").

[19] Ex. 1 (Baham Dep.) at 211:13-24 (Q: [D]id [the fake subpoena] come on the same day as the letter, a different day, do you know about how far apart? A: It came after the letter. Q: Do you know how soon after? A: No, not really sure, but I know it came after. . . . probably like a month or so."); *id.* at 241:17-24 (testifying that she received the fake subpoena "probably like a month or so after" she received the letter); *accord id.* at 102:12-15 ("Q: What was before the subpoena? When you appeared at the DA's office was before the subpoena? A: Before I had got a letter for

During that same time period—shortly before the first trial setting in the Isaac Jones case on October 13, 2015—Defendant Napoli gave Investigator Kitchens a "subpoena" to deliver to Ms. Baham. *See* Ex. 33 (Kitchens Dep.) at 152:19-21. There is no evidence in the record that a trial subpoena had even been issued for Ms. Baham. In contrast, for subsequent trial dates, the record does include evidence that witness subpoenas were issued.[20] Moreover, although Louisiana law requires that returns from all service attempts (whether or not successful) be filed into the record, there is none associated with the October 13, 2015 trial date.[21] Further still, Defendant Napoli testified that he did not remember whether or not he had requested a subpoena for Ms. Baham for the October 13, 2015 trial date. Ex. 34 (Napoli Dep.) at 125:23-16 ("I don't recall if I specifically [requested a subpoena] for Ms. Baham or not."); *id.* at 174:2-25 (same). Later, he appeared to admit that he had not sought a subpoena for Ms. Baham for that date. *Id.* at 174:17-25 ("Q: Why didn't you get a trial subpoena? A: Because she said—I mean, based on my conversation

---

to go there, before I got the subpoena."); *id.* at 103:8-10 (A: "I know I went to the DA twice. I went with the subpoena, and I went with the letter. I'm not exactly sure the dates."); *id.* at 209:9-17 ("Q: And around the same time you got the letter in the mail, did you get another document that had the label 'subpoena' on it and had the seal of the DA's office on it? A: I got—I got that subpoena after the letter, yes, I got the subpoena."); *id.* at 212:16-213:1 ("I got the letter first . . . And a while after that, that's when I got the subpoena. . . . I know it was after the letter."); *id.* at 239:6-8 ("I went [to the District Attorney's Office] with the letter first and I went with the subpoena with the seal on it."); *id.* 254:3-8 (Q: When was the first time you ever saw that blank DA subpoena form that your lawyer showed you earlier today? A: Which one? The one with the seal? Q: Yes, ma'am. A: A little after I got the letter."); *id.* 255:4-5 ("The subpoena, I got that after I got the letter.").

[20] *See, e.g.*, Exs. 23-30.

[21] *See* La. Code Crim. Proc. art. 736(a) (requiring that both returns from all unsuccessful attempts to serve subpoenas and copies of subpoenas that were served be "return[ed] . . . to the court that issued the subpoena" and that such returns "shall form part of the record"); *see also* art. 734 (stating that these requirements apply to District Attorney's Investigators who serve subpoenas).

with her—well, first, she was clearly evading Mike Kitchens. . . . I'm not going to waste resources when clearly a witness is trying to evade service.").[22]

In light of this evidence, it appears that the "subpoena" Defendant Napoli gave to Detective Kitchens was not issued by the court. The implication is plain: it was "issued" by Defendant Napoli instead.

Plaintiff Baham has also presented evidence that shortly after she received the fake subpoena, Defendant Napoli used other means to achieve the same purpose: securing an out-of-court interview with Ms. Baham.

For example, when Defendant Napoli sought a material witness warrant for Ms. Baham on October 13, 2015, he provided the following basis for the warrant: "Ms. Baham *refused to meet with ADA Jason Napoli* and cut off all communication with the District Attorney's Office." Ex. 36 (Motion for Material Witness Bond for L. Baham) at OPDA12744 (emphasis added).

When Ms. Baham was brought to court from jail, *see* Ex. 32 (docket master for *State v. Baham*, No. 526-742), Defendant Napoli sought to interview her outside of court about the facts of the case. *See* Ex. 34 (Napoli Dep.) at 219:17-18 ("I wanted to get details regarding what it was

---

[22] *Accord* Ex. 34 (Napoli Dep.) at 126:10-19 (testifying that he may have decided not to seek a subpoena for Ms. Baham because "it was pretty clear that a subpoena was not going to be received well"). When confronted with records from CourtNotify, the Court's electronic subpoena system, showing that the first court date for which Ms. Baham was subpoenaed was August 14, 2017, Defendant Napoli suggested he rarely uses CourtNotify. *Id.* at 124:13-15. But a printout from the system under his name appears in the case file. Ex. 35. Defendant Napoli also testified that he might have sought an "instanter" subpoena for Ms. Baham. Ex. 34 (Napoli Dep.) at 125:22-24. However, he was positive that if he had done so, it would not be reflected in the record because instanter subpoenas are not "documented in the record in any way, in almost all cases." *Id.* at 127:10-12; *id.* 127:2-19. But "instanter" subpoenas are documented in the record. *See, e.g.*, Exs. 23-30; Ex. 5 (docket master in *State v. Isaac Jones*, No. 536-436) at Plaintiffs-15645-46 (reflecting requests and court orders for instanter subpoenas on October 16, 2017; October 19, 2017; and February 20, 2018); *but see* Ex. 34 (Napoli Dep.) at 127:13-15 ("Q: You're sure a court doesn't order an instanter subpoena? A: I am certain.").

she saw that day."); *id. at* 228:7-9 ("I needed information from her regarding what she said in the police report."); *accord id.* at 220:6-12; *see also* Ex. 19 (Jan. 6, 2016 transcript) at PL10966 (reflecting Defendant Napoli's request to speak privately with Ms. Baham).

Once outside the courtroom, Defendant Napoli interrupted the public defender as he advised Ms. Baham of her right not to speak with Defendant Napoli. *See* Ex. 39 (Reingold Decl.) ¶ 8; Ex. 40 (Apr. 4, 2016 testimony given by L. Baham in *State v. Isaac Jones*) at INDEF00938 ("He was telling me—advising me of my rights. You was telling him to shut up."). After the public defender had left, Defendant Napoli questioned Ms. Baham about the facts. *See* Ex. 1 (Baham Dep.) at 150:17-24.

Although trial had been set for January 19, 2016, Defendant Napoli did not seek a subpoena for Ms. Baham for that date.[23] Instead, Ms. Baham was subpoenaed for two days later, when no court date was set in *Jones* at all. *See* Ex. 4 (docket master in *State v. Jones*, No. 517-255); Ex. 34 (Napoli Dep.) at 239:8-16. When Ms. Baham came to court, Defendant Napoli questioned her outside of court again. *Id.* at 240:6-11 ("I had the opportunity to review the police report and maybe ask her like a few more specific questions."); Ex. 1 (Baham Dep.) at 156:21-157:5.

Further still, Ms. Baham has presented evidence that her account is consistent with the practices of prosecutors at the Orleans Parish District Attorney's Office ("OPDA") at the time that it occurred. Prosecutors at OPDA have long used fake subpoenas to compel witnesses' cooperation without court oversight; such documents purport to validly impose legal obligations to comply with them, but in fact, they were fabricated by the District Attorney's Office without court

---

[23] *See* Ex. 19 (Jan. 6, 2016 transcript) at Plaintiffs-10966 (Court issuing a new subpoena for two days after the trial date, without comment from Defendant Napoli); Ex. 41 (subpoena for Ms. Baham for January 21, 2016).

oversight. Ex. 40 (Dep. of David Pipes (Rough Draft)) at 94:1-94:19; 157:9:11 ("Our office had

been using some version of a DA notice, Da subpoena going back, as I said before, forever.").

Between 2013 and 2017, OPDA attorneys used more than ten different versions of fake subpoenas

(and counting)—an additional version came to light through discovery last week. *Id.* at 129:7-

155:22 (reviewing different fake subpoena forms with Chief of Trials David Pipes); Ex. 14

(compilation of first page of the eleven different fake subpoena forms discussed); Ex. 41 (six uses

of a fake subpoena form produced for the first time by Defendants on Wednesday, Dec. 9, 2020).

Indeed, Ms. Baham was not the only witness who received a fake subpoena in the Isaac Jones case;

prosecutors used at least three more, all of which are in evidence.[24] One of the fake subpoenas—

addressed to the victim, Orlando Rickmon—was not included in the District Attorney's file.

In May of 2014, Defendant First Assistant Graymond Martin, as the individual in charge

of setting office policies on such matters, sent a fake subpoena template to the entire OPDA office.

Ex. 11 (May 13, 2014 Martin email) at OPDA 39340-39343 (email attaching template); Ex. 40

(Dep. of David Pipes (Rough Draft)) at 164:21-165:12) (agreeing that responsibility for review

and approval of the form would be Mr. Martin's responsibility); *id.* at 35:3-6 (noting that issues

related to the administration of the office would go to First Assistant Graymond Martin). The fake

subpoena template stated that the recipient was "notified pursuant to LSA-SSRP art. 66 to appear

before the District Attorney for the Parish of New Orleans, to testify to the truth according to your

knowledge in such matters as may be required of you."  Ex. 11 (May 13, 2014 Martin email) at

---

[24] One of the fake subpoenas orders the victim, Orlando Rickmon, "to appear before the District
Attorney of the Parish of New Orleans" to "testify" in the Jones case. *See* Ex. 42 (fake subpoenas).
In a letter accompanying them, the prosecutor, Autumn Cheramie, stated, "Attached to this letter
is a subpoena directing you to appear before me April 15, 2013." *Id.* Two of the fake subpoenas
direct witnesses to "appear before the District Attorney" in magistrate court, and demand that the
witnesses "report to ADA Craig Famularo." Ex. 43.

OPDA039343.The template has blanks to fill in the date and time of the meeting, the name of the prosecutor, the prosecutor's phone number, and the criminal case information. *Id.* The template directs the recipient to a preprinted address: 619 South White Street, the address of the District Attorney's Office. *Id.* The template does not include space to obtain a signature or approval from a clerk or the Court. *Id.*

The 2014 email sent at Martin's direction attaches a "revised DA Subpoena to be used from this date forward" and directs staff to "disregard any older forms of subpoenas. **<u>Do not use any of the older subpoenas.</u>**" *Id.* at OPDA039341 (emphasis in original).The 2014 email also directs staff to "save the attached in a folder on your computer" per "the First Assistant D.A. Graymond Martin." *Id.* At least 191 fake subpoenas based on this template were sent between October 2013 and April 2017. *See* Ex. 44 (191 fake subpoenas using this template) (introduced as Ex. 12 in Deposition of David Pipes).

Defendant Napoli characterized this email as an "order[] to use this document." Ex. 34 (Napoli Dep.) at 186:12. And he testified unequivocally that he is required to follow Defendant Martin's instructions—including instructions given to prosecutors as a whole:

> Q: If [Graymond Martin] gives you an instruction, are you required to do what he says? [. . .]
>
> A: If he gives—yes. I mean, he's my boss.
>
> Q: So if he says—if he says, Mr. Napoli, do X, your understanding is that you have to do X?
>
> A: Yes. If I was uncomfortable with that I may speak to him and be like, you now, let's talk about this further, but he is my boss.
>
> Q: And if he said every prosecutor in the office has to do X, your understanding would be that you need to do that same thing? [. . .]
>
> A: Yes, because I'm a prosecutor at the office.

*Id.* at 30:18-31:13.[25]

In just the autumn of 2015—when Ms. Baham received the fake subpoena—OPDA prosecutors sent fake subpoenas using Defendant Martin's template at least twenty-five times.[26]

13.    Ms. Baham has not alleged that Mr. Pipes or Mr. Martin personally sent any fraudulent "DA subpoena" to her or personally directed that such a document be sent to her. *See* Doc. No. 52. Ms. Baham also has not produced or identified any evidence showing that Mr. Pipes or Mr. Martin took such actions.

**RESPONSE:**

OBJECTION as to Defendant Pipes because Plaintiffs' Response to Motion for Summary Judgment concedes dismissal of Ms. Baham's claim against him. *See* Opp'n n.2.

Without waiving this objection, Ms. Baham states as follows:

Ms. Baham ADMITS that, at this point in the litigation, there is no evidence that Defendant Martin personally directed the fraudulent subpoena be sent to Ms. Baham (Plaintiffs have not yet taken the deposition of Mr. Martin to confirm this fact). However, that is not dispositive. By way of further response, Ms. Baham alleges that Mr. Martin provided Defendant Napoli with the fraudulent subpoena template, and instructed him and all other prosecutors in the office to use it. Ex. 11 (email containing fraudulent subpoena template sent to staff, including Defendant Napoli,

---

[25] When specifically presented with the email from Defendant Martin that attached the fake subpoena template, Defendant Napoli testified that he "[does]n't believe that [he] ever opened that e-mail." Ex. 34 (Napoli Dep.) at 184:21-22.

[26] *See* Ex. 44 pp. 49-73 (twenty-five fake subpoenas using this template used between September 2, 2015 and November 18, 2015).

on behalf of Defendant Martin) Defendant Napoli characterized this email as an "order[] to use this document." Ex. 34 (Napoli Dep.) at 186:12. And he testified unequivocally that he is required to follow Defendant Martin's instructions—including instructions given to prosecutors as a whole:

> Q: If [Graymond Martin] gives you an instruction, are you required to do what he says? [. . .]
>
> A: If he gives—yes. I mean, he's my boss.
>
> Q: So if he says—if he says, Mr. Napoli, do X, your understanding is that you have to do X?
>
> A: Yes. If I was uncomfortable with that I may speak to him and be like, you now, let's talk about this further, but he is my boss.
>
> Q: And if he said every prosecutor in the office has to do X, your understanding would be that you need to do that same thing? [. . .]
>
> A: Yes, because I'm a prosecutor at the office.

*Id.* at 30:18-31:13.[27]

Plaintiff notes that Defendant Martin has not yet been deposed and thus information regarding his involvement remains incomplete.

14.     Ms. Baham admitted in the Second Amended Complaint that she "did not go to the private meetings at the District Attorney's Office," as allegedly directed by the "unlawful subpoenas" that she claims to have received. *See* Doc. No. 52 at ¶ 272.

**RESPONSE:**

OBJECTION. This "fact" is not material. *Merritt-Campbell, Inc.*, 164 F.3d at 961. Where Ms. Baham complied with the fake subpoena has no bearing on whether she received it.

---

[27] *See supra* n. 25 (incorporated herein).

Without waiving this objection, Ms. Baham responds as follows:

ADMIT IN PART. Although Ms. Baham ADMITS that the quoted language appears in the Second Amended Complaint, Ms. Baham DISPUTES any implication that she did not attempt to comply with the fake subpoena. To the extent it does so imply, this "fact" is misleading and ignores Ms. Baham's deposition testimony.

Although Ms. Baham never attended "private meetings at the District Attorney's Office," as alleged in the complaint, she did travel to the District Attorney's Office in an attempt to comply with the fraudulent subpoena. Ex. 1 (Baham Dep.) at 37:7-11 ("I been there [the District Attorney's Office] twice, once with the subpoena and one time with the letter. I couldn't get in, so I wind up just going back to the courthouse."); *see also id.* at 228:15-24 (stating that Ms. Baham appeared in response to the fraudulent subpoena—which she refers to as "the one with the seal on it" and not the grand jury subpoenas, which she understood to require her presence in court).

15.     The Court previously relied on Ms. Baham's allegations to dismiss her fraud claims, explaining: "She also chose not to respond to the 'subpoenas' sent to her. Any harm alleged by her was not because of misrepresentations in the 'subpoenas.'" *See* Doc. No. 116 at 42 (footnote omitted).

**RESPONSE:**

OBJECTION. This "fact" is improperly compound.

Ms. Baham further OBJECTS that this "fact" is not material. *Merritt-Campbell, Inc.*, 164 F.3d at 961.

Without waiving these objections, Ms. Baham responds as follows:

With respect to the first sentence, Ms. Baham ADMITS that the above statement accurately reflects the Court's ruling on her fraud claim.

With respect to the second sentence, DISPUTE. Ms. Baham was harmed because of the misrepresentations in the fake subpoena.

Ms. Baham testified that when she received the fake subpoena, she went first to the courthouse to ask about it, then to the District Attorney's Office, where she was turned away by security, and then back to the courthouse, which had closed.[28] Unsure what to do, Ms. Baham returned to courthouse and waited, but no one ever called her name. Ex. 1 (Baham Dep.) at 216:4-8. To do this, Ms. Baham missed work (she served as a home health aide, making about $300 per week). *Id.* at 216:1-3, 202:2-24, 204:4-25; *see also* Ex. 46 (INDEF901). And when Ms. Baham missed work, she lost money. Ex. 1 (Baham Dep.) at 190:2-10. None of these facts are controverted.

Ms. Baham also described the disruption caused to her life and emotional wellbeing:

> Q. And when you got [the fake subpoena], did you think it was real?
>
> A. Yes, I – I'm thinking all of them real, but I was trying to find out why they never was calling me. I'm just sitting in there for nothing. They sent me to the DA office and everything. I was just on a merry-go-round.

---

[28] Ex. 1 (Baham Dep.) at 215:1-10 ("I went to the courtroom to find -- find out . . . . where I go and asked the lady because the court was closed. So she told—she called over there, and she couldn't get no answer and thing. The courts had closed that early. So she told me I might could catch them where to go walk, where the DA office was."); *id.* at 215:10-13 ("I walked around there to the DA office. Go in there, the security guard wouldn't let me go all the way. They just let me by the door at the front how far you go at."); *id.* at 215:22-23 ("So I went back over there [to the courthouse]. By the time I made it back over there, the lady was gone too.").

Ex. 1 (Baham Dep.) at 214:3-9; *see also id.* 244:11-17 ("I'm making a blank trip, a blank trip for nothing. They sending me on a merry-go-round, and that's what I done, make a blank trip, still couldn't get no answer.").

16.     The date or dates on which Ms. Baham alleges that she received unlawful subpoenas are more than one year before the filing of the present lawsuit on October 17, 2017. *See* Doc. No. 1.

**RESPONSE:**

ADMIT.

17.      Ms. Baham testified that when she received the allegedly unlawful subpoena to appear at the DA's office, something seemed "not right about it" because it was "different from the other subpoenas" she had received. *See* Exhibit 2, Baham Depo., at 243.

**RESPONSE:**

OBJECTION. This "fact" is not material. *Merritt-Campbell, Inc.*, 164 F.3d at 961.

Without waiving this objection, Ms. Baham responds as follows:

Ms. Baham ADMITS that she testified to those statements. However, Ms. Baham DISPUTES this "fact" to this extent it implies she knew or reasonably could have known that the fake subpoena she received was not a legally valid document. This "fact" is also misleading because it omits Ms. Baham's testimony that she believed that the fake subpoena was in fact a valid legal document. *See* Ex. 1 (Baham Dep.) at 214:3-5 ("Q: And when you got [the fake subpoena], did you think it was real? A: Yes, I—I'm thinking all of [the subpoenas were] real.").

18.   Ms. Baham testified that she believed that the alleged subpoena to appear at the DA's office was illegal when she went to the court and the DA's office and spoke to someone about it, before her arrest in December 2015. *See* Exhibit 2, Baham Depo., at 245. Ms. Baham also testified that, at the same time, she told someone that "something ain't right about the subpoena." *See id.* at 247.

**RESPONSE:**

OBJECTION. This "fact" is inappropriately compound.

Without waiving with objection, Ms. Baham responds as follows:

With respect to the first sentence, DISPUTE. When questioned about when she first believed the subpoena was "illegal," Ms. Baham described how she suspected that "something ain't right about the subpoena" in 2015. Ex. 1 (Baham Dep.) at 246:25-247:2. However, Ms. Baham did not understand Mr. Paul to be asking when she actually believed that the subpoena violated the law. Ex. 2 (Baham Decl.) ¶ 29. At no point in her answer does she ever use the terms "illegal," "unlawful," or any other synonym indicating anything more than a hunch that there was something not "right" about the subpoena. Ex. 1 (Baham Dep.) at 243:5-247:2.

With respect to the second sentence, DISPUTE. Ms. Baham testified that although she believed that something was not "right" about the fraudulent subpoena, she still believed it to be a valid subpoena. *Id.* at 214:3-5 ("Q. And when you got this document, did you think it was real? A Yes, I – I'm thinking all of them real . . . .").

Ms. Baham further notes that she only attended school through the tenth grade and was "referred for classes for slow learners." *Id.* at 225:10-17.

19.     Ms. Baham has not alleged, or produced any evidence showing, that any of the Individual Defendants engaged in "concealment, misrepresentation, fraud, or ill practice" that prevented her from timely filing her claims in this lawsuit.

**RESPONSE:**

DISPUTE. The statement above is inaccurate. Ms. Baham has, in fact, alleged that Jason Napoli—in concert with, under the supervision of, and pursuant to policies set by Defendant Martin—sent Ms. Baham a fraudulent subpoena designed to look like a lawful, court-issued subpoena. *See* Defs.' Mot. S.J. Ex. 3 (Sec. Am. Compl.) ¶ 2 ("These fraudulent documents create the false impression that meeting with the District Attorney is required by law, and they threaten crime victims and witnesses with fines, arrest, and imprisonment if they do not obey."). Moreover, Ms. Baham has produced evidence that the fraudulent subpoena's deceptive design, including its misrepresentative heading of "SUBPOENA," prevented Ms. Baham from understanding that the fraudulent subpoena was illegal and thereby prevented her from timely filing a lawsuit. *See* Ex. 11 (May 13, 2014 fake subpoena template ) at OPDA039343.

Dated:  December 15, 2020                    Respectfully Submitted,

                                             s/ Katie Chamblee-Ryan_____

Katherine Chamblee-Ryan (*pro hac vice*)     Mariana Kovel (*pro hac vice*)
Tara Mikkilineni (*pro hac vice*)            American Civil Liberties Union Foundation
Ryan C. Downer (*pro hac vice*)              125 Broad Street, 18th Floor
Laura Gaztambide Arandes (*pro hac vice*)    New York, NY 10004
Jeffrey Stein (*pro hac vice*)               Tel: (646) 905-8870
Civil Rights Corps                           mkovel@aclu.org
1601 Connecticut Avenue NW, Suite 800
Washington, D.C. 20009
Tel: (202) 844-4975

Somil Trivedi (*pro hac vice*)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 715-0802

Bruce Hamilton
La. Bar No. 33170
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70156
Tel: (504) 522-0628

Gerald S. Sachs (*pro hac vice*)
Venable LLP DC
600 Massachusetts Ave. NW
Washington, DC 20001
Tel: (202) 344-4269

Sarah S. Brooks (*pro hac vice*)
Venable LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Tel: (310) 229-0408

Allison B. Gotfried (*pro hac vice*)
Venable LLP
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Tel: (212) 370-6227

Michael S. Blume (*pro hac vice*)
Venable LLP
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Tel: (212) 370-5500

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 15, 2020, I electronically filed the foregoing Plaintiff's Response to Statement of Uncontested Facts in Support of Motion for Summary Judgment on Lazonia Baham's Claims Against Individual Defendants using the CM-ECF System, which caused notice to be sent to via email to all counsel of record.

*s/ Katie Chamblee-Ryan*