## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

RENATA SINGLETON; MARC
MITCHELL; LAZONIA BAHAM; JANE
DOE; TIFFANY LACROIX; FAYONA
BAILEY; JOHN ROE; and SILENCE IS
VIOLENCE,

     *Plaintiffs*,

v.

LEON CANNIZZARO, in his official
capacity as District Attorney of Orleans
Parish and in his individual capacity;
GRAYMOND MARTIN; DAVID PIPES;
IAIN DOVER; JASON NAPOLI; ARTHUR
MITCHELL; TIFFANY TUCKER;
MICHAEL TRUMMEL; MATTHEW
HAMILTON; INGA PETROVICH; LAURA
RODRIGUE; SARAH DAWKINS; and
JOHN DOE, in their individual capacities,

     *Defendants*.

Civil Action No. 17-10721

Section H
Judge Jane Triche Milazzo

Division 1
Magistrate Judge Janis van Meerveld

## PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Lazonia Baham offers this counterstatement of undisputed facts to demonstrate the significant amount of evidence that has been adduced to date in discovery that is relevant to her legal claim against Individual Defendants Jason Napoli and Graymond Martin—notwithstanding the fact that Defendants are continuing to produce highly-relevant evidence as recently as within the last week. The evidence cited here, as well as the evidence cited in Plaintiff's Response to Defendants' Statement of Uncontested Facts, establishes that Individual Defendants have failed to "show[] that there is no genuine dispute as to any material fact," and they are therefore not entitled to summary judgment. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).

1

**Orleans Parish District Attorney's Office Use of Fake Subpoenas**

1.       Prosecutors at the Orleans Parish District Attorney's Office ("OPDA") have long used fake subpoenas to compel witnesses' cooperation without court oversight. These documents purport to validly impose legal obligations to comply with them, but in fact, they were fabricated by OPDA without court oversight.[1]

2.       Between 2013 and 2017, OPDA attorneys used more than ten different versions of fake subpoenas (and counting)—an additional version came to light through discovery last week.[2]

3.       In early 2014, an OPDA investigator, James O'Hern, designed a fake subpoena template.[3]

4.       Mr. O'Hern was concerned that the DA subpoenas being used were "skewed," "blurry" and "multiple generation copies," and as such looked "unprofessional."[4]

5.       Defendant First Assistant Graymond Martin, as the individual in charge of setting office policies on such matters, approved Mr. O'Hern's template and had his executive assistant send the template to the entire OPDA office in May of 2014.[5]

6.       The fake subpoena template stated that the recipient was "notified pursuant to LSA-CCRP art. 66 to appear before the District Attorney for the Parish of New Orleans, to testify to the truth according to your knowledge in such matters as may be required of you."[6]

---

[1] Ex. 40 (Dep. of David Pipes (Rough Draft)) at 94:1-94:19; 157:9:11 ("Our office had been using some version of a DA notice, DA subpoena going back, as I said before, forever.").

[2] *Id.* at 129:7-155:22 (reviewing different fake subpoena forms with Chief of Trials David Pipes); Ex. 14 (compilation of first page of the eleven different fake subpoena forms discussed); Ex. 41 (six uses of a fake subpoena form produced for the first time by Defendants on Wednesday, Dec. 9, 2020).

[3] Ex. 46A (30(b)(6) Dep. of OPDA) at 220:11-24; Ex. 40 (Dep. of David Pipes (Rough Draft)) at 136:1-138:7.

[4] *See* Ex. 40 (Dep. of David Pipes (Rough Draft)) at 157:9-14 ("Our office had been using some version of a DA notice, DA subpoena going back, as I said before, forever. And a lot of times it was multiple generation copies, six the, generation copies of forms, they were skewed, they were blurry, they looked unprofessional.").

[5] Ex. 11 (May 13, 2014 Martin email) at OPDA 39340-39343 (email attaching template); Ex. 40 (Dep. of David Pipes (Rough Draft)) at 164:21-165:12) (agreeing that responsibility for review and approval of the form would be Mr. Martin's responsibility); *id.* at 35:3-8 (noting that issues related to the administration of the office would go to First Assistant Graymond Martin).

[6] Ex. 11 (May 13, 2014 Martin email) at OPDA039343.

7.      The template has blanks to fill in the date and time of the meeting, the name of the prosecutor, the prosecutor's phone number, and the criminal case information.[7]

8.      The template directs the recipient to a preprinted address: 619 South White Street, the address of the District Attorney's Office.[8]

9.      The template does not include space to obtain a signature or approval from a clerk or the Court.[9]

10.     The 2014 email sent at Martin's direction attaches a "revised DA Subpoena to be used from this date forward" and directs staff to "disregard any older forms of subpoenas. **Do not use any of the older subpoenas.**"[10]

11.     The 2014 email also directs staff to "save the attached in a folder on your computer" per "the First Assistant D.A. Graymond Martin."[11]

12.     At least 191 fake subpoenas based on this template were sent between October 2013 and April 2017.[12]

13.     Defendant Jason Napoli characterized Martin's email as an "order[] to use this document,"[13] although he also denies ever opening the e-mail.[14]

14.     Defendant Napoli testified unequivocally that he is required to follow Martin's instructions—including instructions given to the office as a whole.[15]

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.* at OPDA039341 (emphasis in original).

[11] *Id.*

[12] *See* Ex. 44 (191 fake subpoenas using this template) (introduced as Ex. 12 in Deposition of David Pipes).

[13] Ex. 34 (Napoli Dep.) at 186:12-15.

[14] *Id.* at 184:21-22.

[15] *Id.* at 30:18-31:1.

15.     On April 21, 2017, Mr. O'Hern sent  Martin an older version of a fake subpoena used in 2010, titled "Subpoena" at the top, but with a signature for the Assistant District Attorney where a Judge or clerk would sign a legitimate subpoena.[16]

16.     On April 26, 2017, a local news publication reported that OPDA prosecutors were using fake subpoenas to gain access to witnesses.[17]

17.     The article included a picture of a subpoena that had been created using the template disseminated by Martin.[18]

18.     On the same day, April 26, 2017, Martin sent a memorandum to Assistant District Attorneys in the Major Offense Trial (MOT), Trial, and Magistrate Divisions directing them to use yet another fake subpoena template form.[19]

19.     This new form was titled "NOTICE TO APPEAR," included "return on service" forms, referred to itself as "process of court," and stated that the witness was "notified" to appear at the District Attorney's Office "to discuss the truth according to your knowledge in such matters as may be required of you."[20]

20.     The "NOTICE TO APPEAR" form is virtually identical to the "Subpoena" form that Mr. O'Hern sent Martin on April 21, 2017, except for the changed title.[21]

21.     In  a memorandum that accompanied the new fake subpoena template, Martin wrote: "It has been brought to my attention that some ADA's [sic] may be using forms to be delivered to witnesses in cases that may not have been approved by me as appropriate."[22]

22.     Martin then directed OPDA staff to take a series of steps to access witnesses, starting with the following: "[F]irst resort to victim witness counselor assigned to the case, next a letter

---

[16] Ex. 46 (April 21, 2017 O'Hern email).

[17] Ex. 47 (*Lens* article from Apr. 26, 2017) at INDEF01068-73.

[18] *Id.* at INDEF01070.

[19] Ex. 48 (April 26, 2017 Martin email) at OPDA039344-OPDA039345 (directing Sherry Walker to send contents of memorandum and attachment to all Assistant District Attorneys); *see also* Ex. 49 (April 26, 2017 memorandum) at OPDA00653-54.

[20] Ex. 48 ("NOTICE TO APPEAR" template form) at OPDA039345.

[21] *Id.*; *see also* Ex. 46 (April 21, 2017 O'Hern email).

[22] Ex. 49 (April 26, 2017 memorandum) at OPDA00653.

to the last known address, next have your investigator locate the witness and deliver a notice to appear at our office."[23]

23.     Martin specified in the memorandum that the "Notice to Appear" "may be delivered to witnesses," but stated that "[a]ny other self-created or modified notice that may be floating around the office in your computer or on some network is expressly prohibited unless the form has been approved by me."[24]

24.     On April 28, 2017, Mr. Martin drafted a new memorandum that revoked the "NOTICE TO APPEAR" form.[25]

25.     The new memorandum removed the information about having an investigator provide a "notice to appear" to witnesses, and replaced it with instructions to have the investigator "deliver a letter to the witness requesting that the witness appear at our office."[26]

**The Murder of Orlando Rickmon and the Ensuing Police Investigation**

26.     In February of 2013, Orlando Rickmon was shot.[27]

27.     He identified Isaac Jones as the shooter.[28]

28.     On April 10, 2013, OPDA prosecutor Autumn Cheramie sent Mr. Rickmon a fake subpoena demanding he appear at the District Attorney's Office on April 15, 2013 "to testify to the truth according to your knowledge in such matters as may be required of you" in the State's case against Isaac Jones.[29]

29.     The letter accompanying the fake subpoena states: **"Attached to this letter is a Subpoena directing you to appear before me <u>April 15, 2013</u>."** [30]

---

[23] *Id.*

[24] *Id.*

[25] Ex. 50 (April 28, 2017 Memorandum re: Revised Witness Contact Policy) at OPDA00624.

[26] *Id.*

[27] Ex. 51 (NOPD Homicide Report) at OPDA10860.

[28] *Id.*; Ex. 1 (Baham Dep.) at 39:20-40:15.

[29] Ex. 42 (Rickmon fake subpoena).

[30] *Id.* at Plaintiffs-24493 (emphasis in original).

30.     On April 23, 2013, Mr. Rickmon was shot again and killed on Baudin Street.[31]

31.     Mr. Rickmon had been in a relationship with Plaintiff Lazonia Baham's daughter, Dinnika Baham,[32] since middle school.[33]

32.     Lazonia Baham (Ms. Baham) considered Mr. Rickmon like her own child, and he was the father of Ms. Baham's grandchild, who was three years old when Mr. Rickmon died.[34]

33.     Shortly before Ms. Baham found out that Mr. Rickmon had been killed, she saw Isaac Jones standing on Telemachus Street, around the corner from her home.[35]

34.     The next day, Detective Clinton Givens obtained security footage from the area where the murders took place, which showed two individuals exiting a "red or burgundy" Dodge minivan and then re-entering the van a short time later.[36]

35.     After the security footage ran on the news, Dinnika Baham contacted Detective Givens.[37]

36.     Dinnika explained that Isaac Jones had shot Orlando Rickmon a couple of months before the murder and had been threatening both of them ever since.[38]

---

[31] Ex. 52 (Homicide Screening Charge Conference Review) at OPDA10137.

[32] Throughout this Counterstatement, "Ms. Baham" refers to Plaintiff Lazonia Baham. Ms. Baham's children are identified by their first names.

[33] Ex. 1 (Baham Dep.) at 38:23-39:12.

[34] *Id.* at 226:7 (testifying that she was "real close" with Mr. Rickmon); *id.* at 226:7-10 ("That was my baby, just like a child. He was a good child. Everybody loved him. He wasn't no trouble child. He wouldn't get in no trouble or nothing.").

[35] Ex. 38 (Apr. 4, 2016 Baham testimony) at OPDA69060 ("Q: And did you ever indicate that you saw Isaac Jones in connection with this particular murder, in the area of the murder? A: No, he wasn't in the area of the murder. He was back where I stay in Gerttown."); *id.* at OPDA69065-76 (testifying about where she had seen Jones); *accord* Ex. 1 (Baham Dep.) at 45:1-7; 93:19-22.

[36] Ex. 51 (NOPD Homicide Report) at OPDA10861.

[37] *Id.* at OPDA10864.

[38] Ex. 53 (audiotape of Apr. 28, 2013 conversation between Dinnika Baham and Detective Givens) OPDA2085 at 1:48.

37.      Dinnika then identified Isaac Jones as one of the suspects in the security footage, repeatedly stating that she was "sure" that it was him.[39]

38.      Detective Givens asked Dinnika how she was so certain, since the video does not provide a clear shot of his face, and Dinnika said that she could identify Isaac Jones from his walk.[40] She did not describe anything about Isaac Jones's walk that was distinctive.[41]

39.      Dinnika also told Detective Givens that shortly before the murder, her mother—Lazonia Baham—had told Dinnika that she had seen Isaac Jones "and some boy . . . with the burgundy van like they plotting something."[42]

40.      Dinnika also told Detective Givens that her mother had told her that she had seen Jones on Telemachus Street.[43]

41.      At the time of Dinnika's interview with Detective Givens, she was regularly abusing pharmaceutical drugs.[44]

42.      The following day, Detective Givens received a call from a person who introduced herself as Lazonia Baham.[45]

---

[39] *Id.* at 13:47.

[40] *Id.* at 13:56.

[41] *Id.* at 13:50.

[42] *Id.* at 6:54.

[43] *Id.* at 17:39.

[44] Ex. 38 (Apr. 4, 2016 Baham testimony) at OPDA069067 (stating, about a different interview with law enforcement about the Jones case, "I don't know what [Dinnika] tell them, but she was so busy ducking she could have told them anything abusing the pills."); *id.* at OPDA069078 ("She was so busy ducking all the pills up and down, and I was trying to tell her to stay up . . . ."); *id.* at OPDA069082 (testifying that Dinnika was "abusing pills" including Xanax and Tramadol); Ex. 1 (Baham Dep.) at 60-61 ("Q: So six days after Orlando Rickmon was killed, why would your daughter be telling law enforcement all these things if they're not true? A: I don't know that. […] I know she was a – I don't know why, but I know she was abusing pills and things. . . . She was going through a worse—bad time, just like I am and still is. […] I don't know why would she do something like that. She was scared, what? I told you she was abusing pills."); *id.* at 65:17-19 (stating, while describing the same interview, "He came—the officer came to my house to interview my daughter. She full of the drugs, pills in there. I'm tapping her to get her up."); *id.* at 63-65 ( "My daughter in there with her head over the table full of pills, full of them. They know she full of them.").

[45] Ex. 51 (NOPD Homicide Report) at OPDA10865; Ex. 54 (Givens Dep.) at 111:21-24.

43.     Detective Givens had never met or spoken to Ms. Baham before, and he never did so afterwards.[46]

44.     He did not record the phone number from which the call came.[47]

45.     The numbers listed for Ms. Baham in Detective Givens' file do not match the number that OPDA used to successfully communicate with her in December of 2013.[48]

46.     In his report, Detective Givens wrote that, during the call, Ms. Baham told him that she was "positive" that she had seen Isaac Jones in the van from the surveillance video.[49]

47.     Detective Givens also wrote that Ms. Baham said she had seen Isaac Jones in the van "about 30 minutes prior to the murders on Baudin Street," and that "when she saw him in the vehicle, he was in the uptown area."[50]

48.     Ms. Baham has repeatedly testified that she never saw Isaac Jones in a red or burgundy van and that she never told Detective Givens or anyone else otherwise.[51]

---

[46] Ex. 54 (Givens Dep.) at 114:23-25-116:4.

[47] *Id.* at 111:6-18.

[48] *Compare* Ex. 51 (NOPD Homicide Division Report) at OPDA10846 *with* Ex. 55 (victim witness advocate notes) at OPDA39157.

[49] Ex. 51 (NOPD Homicide Division Report) at OPDA10865.

[50] *Id.* Accordingly, Ms. Baham testified that when she saw Isaac Jones on the day of the murder, "he wasn't in the area of the murder. He was back there where I stay at in Gerttown." Ex. 38 (Apr. 4, 2016 Baham Testimony) at OPDA069056.

[51] *See* Ex. 1 (Baham Dep.) at 57:11-22 (Q: So your daughter, she also said you told her on [the day of the murder] . . . don't come back here because Ike and another man are on the corner with the burgundy van like they're plotting something; is that correct? A: That is a lie. I never said that. Q: That's a lie, you said? A: Yes, I never said that."); *id.* at 59 ("I never seen a burgundy van."); Ex. 38 (Apr. 4, 2016 testimony in *State v. Isaac Jones*) at OPDA069062-069063 at 16:23-17:2 (Q: Where was Mr. Jones when you saw him? A: On Telemachus. Q: What was he doing? A: Talking to a friend of his named – they call him J-Ross, I don't know his real name. […] Q: And was he on foot or was he in a car or something? A: He was on foot, standing up talking.").

**The Grand Jury and Isaac Jones' Indictment**

49.     The Orleans Parish District Attorney's Office obtained a court-authorized subpoena for Ms. Baham to testify before the grand jury in the case against Isaac Jones on August 15, 2013.[52]

50.     The subpoena for August 15, 2013 was never served on Ms. Baham; indeed, there is no record that service was even attempted.[53]

51.     The day before, on August 14, 2013, an investigator from OPDA emailed Detective Givens to request "the specific address on the Bahams" so that she could "serve them this morning."[54]

52.     The address that Detective Givens provided later that morning, 9007 Forshey, was incorrect.[55]

53.     The case against Isaac Jones was presented to the grand jury on August 15, 2013.[56]

54.     A second grand jury subpoena for Ms. Baham was issued for August 22, 2013.[57]

55.     The second subpoena was served successfully, and Ms. Baham signed the subpoena to accept service.[58]

---

[52] Ex. 15 (Aug. 15, 2013 grand jury subpoena) at OPDA10458.

[53] *See id.* (grand jury subpoena for Aug. 15, 2013 including no signature, no date of service, and no documentation on whether service was attempted or achieved); *see also* Ex. 18 at OPDA10370 (unserved grand jury subpoena for Blake Daniel, another *Jones* witness for the same date); *id.* at OPDA10427 (same for Judith Cassidy Geissler); *id.* at OPDA10459 (same for Dinnika Baham); *id.* at OPDA10485 (same for Rhonda Rickmon); Ex. 16 (Aug. 15, 2013 grand jury transcript) (including testimony on August 15, 2013 only from two law enforcement witnesses and no lay witnesses).

[54] Ex. 17 (Aug. 14, 2013 email) at OPDA10415.

[55] *Id.*; Ex. 1 (Baham Dep.) 28:11-15.

[56] Ex. 16 (Aug. 15, 2013 grand jury transcript) at OPDA10568-93.

[57] Ex. 6 (Aug. 22, 2013 grand jury subpoena).

[58] *Id.*; Ex. 1 (Baham Dep.) at 103:16-104:4.

56.    The subpoena read: "**YOU ARE HEREBY COMMANDED** to appear before the **GRAND JURY** for Orleans Parish Criminal District Court located in the Orleans Parish District Attorney's Office."[59]

57.    Ms. Baham did not understand what a grand jury was, and mistakenly believed that the grand jury subpoena required her to appear in court—not at the District Attorney's Office.[60]

58.    Ms. Baham has a tenth-grade education and was referred to classes for "slow learners" in school.[61]

59.    In response to the second subpoena, Ms. Baham went to the courthouse instead of to the District Attorney's Office.[62]

60.    There is no evidence in the record that a grand jury was convened with respect to the case against Isaac Jones on August 22, 2013, and no one called Ms. Baham to ask her where she was or otherwise communicate with her about the grand jury subpoena.[63]

61.    A third grand jury subpoena for Ms. Baham has been produced and is dated August 29, 2013.[64]

62.    The third grand jury subpoena does not appear to have been served (and it is not clear whether service was ever attempted).[65]

---

[59] Ex. 6 (August 22, 2013 grand jury subpoena) (emphasis in original); Ex. 7 (grand jury subpoena for August 29, 2013) (including the same statement); Ex. 15 (unserved grand jury subpoena for August 15, 2013) (including the same statement).

[60] *See* Ex. 1 (Baham Dep.) at 208:1-12 (Q: And do you know what a Grand Jury is? A: No, no—I think—I thought a Grand Jury was when you get up on the stand and they—and they had a judge in the thing talking to you. Q: Like when you testified in the case? A: Yes, when I—when they put me on the stand. Q: Oh, okay. And do you know what a Grand Jury subpoena is? A: No. I just know the subpoena that I got to appear in front of the jury."); *id.* at 230:19-20 ("This here [referring to grand jury subpoena]—this here is for to go in the courtroom.").

[61] *Id.* at 225:10-18.

[62] *Id.* at 231:16-232:23; *accord* Ex. 2 (Baham Decl.) ¶¶ 12-14.

[63] Ex. 16 (Aug. 15, 2013 Grand Jury Testimony) (the only evidence in the record of when the grand jury heard testimony in *State v. Isaac Jones*, dated August 15, 2013); *see* Ex. 2 (Baham Decl.) ¶ 16.

[64] Ex. 7 (August 29, 2013 grand jury subpoena).

[65] *Id.*; *id.* at OPDA10397 (subpoena return is signed by the process server, but the date of service was never entered, and Ms. Baham's signature does not appear on the subpoena).

63.     On August 29, 2013, the grand jury indicted Isaac Jones for second degree murder.[66]

**OPDA's Belated Efforts to Contact Ms. Baham**

64.     After Isaac Jones was indicted, more than two years passed before Ms. Baham heard from anyone about the case.[67]

65.     In December of 2013, Ms. Baham cooperated voluntarily with OPDA in another case and appeared in court as requested.[68]

66.      Defendant Napoli was assigned as the prosecutor in the Isaac Jones case by December 17, 2014.[69]

67.     Detective Mike Kitchens, who was detailed from New Orleans Police Department to the District Attorney's Office, was assigned to the case.[70]

68.     Detective Kitchens' responsibilities included locating witness and serving subpoenas.[71]

69.     Detective Kitchens testified that he would never deliver a document to a witness unless the Assistant District Attorney on the case had provided him with the document and specifically instructed him to do so.[72]

---

[66] Ex. 4 (Docket Master in *State v. Isaac Jones*, No. 517-255) at Plaintiffs-13072.

[67] Ex. 1 (Baham Dep.) 208:9-209:8.

[68] Ex   55 (victim witness counselor notes) at OPDA39157-58 (documenting that Ms. Baham "confirmed her contact number is her cell," agreed to pass along information to her boyfriend, and stated that she "w[ould] be in attendance" at an upcoming hearing, "as she is for every court date").

[69] Ex. 4 (Docket Master in *State v. Isaac Jones*, No. 517-255) at Plaintiffs-13073 (date Defendant Napoli first appears on the docket in *State v. Jones*); Ex. 34 (Napoli Dep.) at 53:20-54:10 (testifying that he began working on the case shortly before his first appearance on the docket); *id.* at 52:3-12 (testifying that no other prosecutors were responsible for the case from that point on other than him).

[70] Ex. 33 (Kitchens Dep.) at 141:25-142:5.

[71] *Id.* at 60:19-22.

[72] *Id.* at 218:12-15 ("[T]he only reason you would ever give a document to a witness is if the ADA had give it to you and told you to pass it on to a witness? A. Correct.").

70.     Detective Kitchens testified that when provided with a document to serve by an ADA, he would not review the entire document—only the appearance date—and so it is possible he served fraudulent subpoenas without even realizing it.[73]

71.     The first trial date in the Isaac Jones case was scheduled for October 13, 2015.[74]

72.     On September 2, 2015, OPDA victim-witness counselor Alison Morgado submitted a "locate request" for the Bahams to an OPDA investigator—but she listed them as "Cozoria" and "Dannita."[75]

73.     About three weeks before the trial date, Ms. Morgado reported to Napoli that she "submitted locate[s]" on "DINNIKA AND LOZONIA," and asked if "Corzoria and Dannita" were still needed.[76]

74.     On September 22, 2015, Ms. Morgado sent a letter instructing Ms. Baham to "contact the Victim Witness Division of the Orleans Parish District Attorney's Office as soon as possible."[77]

75.     Ms. Morgado's September 22, 2015 letter did not include the fact that there would be a trial date on October 13, 2015 in *State v. Isaac Jones* or even specify that it pertained to the Isaac Jones case.[78]

76.     Ms. Morgado memorialized a call with Ms. Baham two days after she sent the letter, but her notes do not indicate that Ms. Morgado provided any information to Ms. Baham, including the trial date.[79]

---

[73] *Id.* at 220:23-221:3 ("Q. [W]hen you were talking about that [fraudulent subpoena template] document that I was sharing with you with "Subpoena" written on it, it's possible that you had served that document on witnesses without even realizing it; is that fair? A. That's fair to say; correct.").

[74] Ex. 4 (Docket Master in *State v. Isaac Jones*, No. 517-255) at Plaintiffs-10374.

[75] Ex. 56 (Sept. 2, 2015 Email from A. Morgado to J. Lorenzo and A. Mattix) at OPDA68941-42.

[76] Ex. 57 (Sept. 21, 2015 Email from A. Morgado to J. Napoli) at OPDA068947.

[77] Ex. 58 (Sept. 22, 2015 A. Morgado Letter) at OPDA12713.

[78] *Id.*

[79] Ex. 55 (victim-witness counselor notes).

77.     In response to Ms. Morgado's September 2015 letter, Ms. Baham went to the Orleans Parish District Attorney's Office, but she was not allowed past security.[80]

78.     At this point, Ms. Baham had gone through the first two steps of the witness contact process that Defendant Graymond Martin later documented: "first resort to victim witness counselor assigned to the case"; (2) "next a letter to the last known address."[81]

79.     The next step in Defendant Martin's process is to send a fake subpoena.[82]

**The Fake Subpoena**

80.     After Ms. Baham received the September 22 letter, she received another document demanding she appear at the District Attorney's Office, which was labeled as a "subpoena" and had the seal of the Orleans Parish District Attorney's Office on it.[83]

81.     Although Ms. Baham cannot remember the date on which she received the fake subpoena, she consistently testified that it came about a month after the letter.[84]

---

[80] Ex. 1 (Baham Dep.) at 37-38, 101, 102-03, 119; *cf.* Ex. 59 (OPDA Office Visitor Policy, updated July 20, 2015) at OPDA067305 (requiring that all visitors sign in, present a "valid form of picture ID," pass through a security screening checkpoint, and then again "submit identification" in order to enter); *id.* at ODPA067246 (showing date updated).

[81] Ex. 49 (Apr. 26, 2017 Memorandum from G. Martin to OPDA Attorneys re: Witnesses with Notice to Appear Template).

[82] *Id.*

[83] Ex. 1 (Baham Dep.) at 38, 102, 103, 211-213, 211; *Accord, e.g.*, *id.* at 96:8-10 (stating, to explain how the fake subpoena was different from one she was being shown: "It had a seal on the subpoena."); *id.* 228:19-24 ("It's the one with the seal on it . . . to go to the DA office. The one with the seal on it, that's—that's the one where they sent me to the DA office with."); *id.* at 229: *id.* at 20-22 ("It was just one of [the subpoenas] where I had to go to the DA office. That's the one I keep on telling you about with the seal on."); *id.* at 230:7-9 ("I just had two ones for to go to the DA office. That's the one with the seal on and the letter."); *id.* at 231:25 ("The [subpoena] I had when I went to the DA office is the one . . . with the seal on it."); *id.* at 239:1-4 ("Q: Can you tell me everything that you remember about [the fake subpoena?] A: Telling me for to go to the DA, like this here, what—and they had a seal."); *id.* at 241:24-242:9 ("Q: Can you tell me everything you remember about the document that you actually received? A: Telling me to go to the DA office. Q: What else did it say? A: They had to—yeah, the address and thing on there. Q: The address— A: Just like what you have—like the one with the seal on it. That—that is the one I went to the DA office with. That's the best to my knowledge of what I could understand it.").

[84] *Id.* at 211:13-24 (Q: [D]id [the fake subpoena] come on the same day as the letter, a different day, do you know about how far apart? A: It came after the letter. Q: Do you know how soon after? A: No, not really sure, but I know it came after. . . . probably like a month or so."); *id.* at 241:17-

82.     The fake subpoena looked identical to the template form for fake subpoenas Graymond Martin had instructed all OPDA staff to use in his email sent on May 13, 2014.[85]

83.     After Ms. Baham received the fake subpoena, she went to the courthouse to ask about it, since in the past, she had gone to court for subpoenas.[86]

84.     At the courthouse, Ms. Baham spoke with a woman who called the Orleans Parish District Attorney's Office for her, but was unable to reach anyone there, and the woman told her to go to the District Attorney's Office.[87]

85.     Ms. Baham then went to the District Attorney's Office, but was not allowed in by the security guard.[88]

---

[24] (testifying that she received the fake subpoena "probably like a month or so after" she received the letter); *accord id.* at 102:12-15 ("Q: What was before the subpoena? When you appeared at the DA's office was before the subpoena? A: Before I had got a letter for to go there, before I got the subpoena."); *id.* at 103:8-10 (A: "I know I went to the DA twice. I went with the subpoena, and I went with the letter. I'm not exactly sure the dates."); *id.* at 209:9-17 ("Q: And around the same time you got the letter in the mail, did you get another document that had the label 'subpoena' on it and had the seal of the DA's office on it? A: I got—I got that subpoena after the letter, yes, I got the subpoena."); *id.* at 212:16-213:1 ("I got the letter first . . . And a while after that, that's when I got the subpoena. . . . I know it was after the letter."); *id.* at 239:6-8 ("I went [to the District Attorney's Office] with the letter first and I went with the subpoena with the seal on it."); *id.* at 254:3-8 (Q: When was the first time you ever saw that blank DA subpoena form that your lawyer showed you earlier today? A: Which one? The one with the seal? Q: Yes, ma'am. A: A little after I got the letter."); *id.* at 255:4-5 ("The subpoena, I got that after I got the letter.").

[85] Ex. 11 (May 13, 2014 Martin email with template); Ex. 1 (Baham Dep.) at 213 (testifying, while viewing the fake subpoena template, "That—that's the one. I seen that. That's the one from the DA."); *id.* at 213-14 (confirming that the fake subpoena she received matched the template).

[86] Ex. 1 (Baham Dep.) at 99:24-100:2; *id.* at 215:1-5.

[87] *Id.* at 97:1-7; 215:6-10.

[88] *Id.* at 97 ("I goes over there to the DA office, the security guard at the front wouldn't let me get no further."); *cf.* Ex. 59 (OPDA Office Visitor Policy, updated July 20, 2015) at OPDA067305 (requiring that all visitors sign in, present a "valid form of picture ID," pass through a security screening checkpoint, and then again "submit identification" in order to enter); *id.* at 067246 (showing date updated).

86.     Ms. Baham then returned to the courthouse, but the woman she had spoken to earlier was gone.[89]

87.     Although Ms. Baham felt that there was something not "right" about the fake subpoena, she believed that it was real.[90]

88.     Travelling to the District Attorney's Office in response to the fake subpoena caused Ms. Baham to miss her work as a home health aide, typically earning around $300 per week.[91]

89.     When Ms. Baham missed work, she lost money.[92]

90.     Responding to the fake subpoena also disrupted Ms. Baham's life and emotional well-being.[93]

91.     In response to every other subpoena Ms. Baham received, she went to court or an attorney representing her went in her place.[94]

92.     In addition to Ms. Baham, at least three other witnesses were sent fake subpoenas in *State v. Isaac Jones.*[95]

93.     The District Attorney's file in *State v. Isaac Jones* contains two "subpoenas" that were "issued" to law enforcement witnesses demanding that on May 22, 2013 they "report to ADA

---

[89] Ex. 1 (Baham Dep.) at 97:6 ("So I left from other there, went back to the courtroom to try to catch the lady in the courtroom. By the time I made it back over there, she was gone."). Ms. Baham's full account of how she responded—which she provided at least five times during her deposition—is detailed. Each time, Ms. Baham she explains that she went first to the courthouse to ask about the "subpoena" and where she should go; that a woman there called the District Attorney's Office and got no response; that she then went to the District Attorney's Office, but was turned away at security; and that she returned to the courtroom, but that the woman she had spoken with was gone. *see also id.* at 15:13-16:8 (providing this account); *id.* at 37:20-38:22; *id.* at 96:24-97:17 (same); *id.* at 100:2; *id.* at 215:1-25 (same).

[90] *Id.* at 214:3-5, 247.

[91] *Id.* at 216:1-3; *id.* at 202:2-24; *id.* at 204:4-25; *see also* Ex. 45 (excerpt from case file with information about L. Baham).

[92] Ex. 1 (Baham Dep.) at 190:2-10.

[93] *Id*. at 161:3-9.

[94] *Id.*; *see* Ex. 8 (Hamilton Decl.) ¶¶ 5-7; Ex. 60 (Oct. 13, 2015 transcript).

[95] *See infra* ¶¶ 93-94.

Craig Famularo" in Magistrate Court (neither was signed by a Judge or a clerk, and a prosecutor has no authority to require that a witness "report to" him absent a court's approval).[96]

94.    Another fake subpoena orders Orlando Rickmon, the deceased victim in *State v. Isaac Jones*, "to appear before the District Attorney of the Parish of New Orleans" to "testify" in the Jones case.[97]

95.    Like the fake subpoena Ms. Baham received, the fake subpoena sent to Mr. Rickmon is missing from the District Attorney's file.[98]

**Defendant Napoli's Denials**

96.    Defendant Napoli denied sending Ms. Baham a fraudulent subpoena and "denie[d] that he [has] issued any document that was 'not issued pursuant to governing law.'"[99]

97.    Napoli also denied directing Detective Kitchens to send "District Attorney Office Subpoenas" to a victim named Steven Smith or to his relatives.[100]

98.    Steven Smith was the victim of a shooting.[101]

99.    In a material witness warrant that Napoli submitted to the court, he relied as the basis for Mr. Smith's arrest on a memorandum by Kitchens; the memorandum stated that Kitchens had delivered multiple "District Attorney Office Subpoena[s]" to Mr. Smith's family members.[102]

---

[96] *See* Ex. 43 (grand jury subpoenas for *State v. Isaac Jones*) at OPDA10249, OPDA10252. In a letter accompanying them, the prosecutor, Autumn Cheramie, stated, "Attached to this letter is a subpoena directing you to appear before me April 15, 2013." Ex. 42.

[97] *See* Ex. 42.

[98] The entire DA file for the *State v. Isaac Jones* case is approximately 1,000 pages. In the interest of space, Plaintiff will not attach the entirety of that file to show the absence of a document which should be undisputed. Should Defendants disagree, they should identify where in that record it was produced.

[99] Ex. 61 (Def. Napoli Resp. to Pls.' Req. for Adm.) Resps. to Nos. 17-20.

[100] Ex. 34 (Napoli Dep.) at 301:13.

[101] Ex. 33 (Kitchens Dep.) at 106:18-19.

[102] *Id.* at 113:11-116:7 ("On several occasions the detective met with Mr. Smith's mother and grandmother . . . but Mr. Smith was never at the location. Detective Kitchens would leave an Orleans Parish District Attorney's office subpoena along with his card in the hands of Mr. Smith's mother or grandmother after each visit to no avail. Mr. Smith never appeared in the District Attorney's Office on the dates listed in the subpoenas nor did he ever call the detective.").

100.    Napoli testified that he does not know what kind of document Kitchens would have used and suggested that Kitchens selected and delivered the documents on his own initiative.[103]

101.    Kitchens testified that he received the "subpoena" he served "[f]rom ADA Napoli."[104]

102.    Kitchens testified that he would never have delivered a document to Steven Smith or his relatives unless Napoli gave it to him.[105]

103.    Napoli also denied that the "District Attorney Subpoenas" that Kitchens delivered would have had the word "subpoena" on them.[106]

104.    Kitchens testified that the only reason he would have used the term "subpoena" in his memorandum is if it appeared at the top of the document.[107]

105.    [Deleted]

106.    In a different case, a fake subpoena was created for a witness named "Sidney Frazier," directing him to appear at the District Attorney's Office on January 22, 2013.[108]

107.    The prosecutor listed on the fake subpoena is Napoli.[109]

---

[103] Ex. 34 (Napoli Dep.) at 301:14-20 ("Q: So Mr. Kitchens just did that completely on his own? A: Well, I understand those forms are sent to everyone within the office. So everyone in the office has access to those forms. I don't even know what it was that was contained on the document that Mr. Kitchens give [sic] to the person.").

[104] Ex. 33 (Kitchens Dep.) at 110:16-19.

[105] *Id.* at 118:8-20. ("Q: And to be clear, there's no way that you would have, without Jason Napoli's knowledge, gone ahead and printed off some of these District Attorney's Office subpoenas and just started leaving the with Mr. Smith's family? A: No, no way, no how. Q: It would only be if Jason Napoli has physically given you a document that said Orleans Parish District Attorney's Office subpoena and told you to give it to Steve Smith or his family members? A: Yes. I'm not capable—I don't even know where you would get a subpoena to print out to give someone unless it was coming from an ADA.").

[106] Ex. 34 (Napoli Dep.) at 299:22-24.

[107] Ex. 33 (Kitchens Dep.) at 115:2-3 ("If I wrote that in there, then that was on top of the subpoena.").

[108] Ex. 63 (fake subpoena to S. Frazier) (introduced as Ex. 14 in deposition of J. Napoli).

[109] *Id.*

108.    Napoli testified that he "was the attorney [on the case involving Mr. Frazier] from the beginning of January on."[110]

109.    Mr. Frazier testified that he met with Napoli and Kitchens at the jail where Mr. Frazier was being held—on or about the day the fake subpoena demanded.[111]

110.    Yet Napoli disclaimed responsibility for this "subpoena" as well, testifying that he believed he had never seen it before.[112]

111.    In yet another case, in February 2014, Napoli texted a witness's mother and told her that if her son did not "show up" pursuant to two subpoenas, "we are going to ask to ask the judge to issue a warrant for his arrest."[113]

112.    One of those subpoenas was a fake subpoena signed by Assistant District Attorney Rob Moore.[114]

---

[110] Ex. 34 (Napoli Dep.) at 200:11-13.

[111] Frazier testified that he met with Defendant Napoli and Detective Kitchens "about a week prior to his testimony," which he gave on January 29, 2013. *See* Ex. 64 (Jan. 29, 2013 Woolridge Tr.) at Plaintiffs-16218. Exactly one week prior to Frazier's testimony was January 22, 2013: the date that appears on the fake subpoena. Ex. 63.

[112] Ex. 34 (Napoli Dep.) at 203:11-14; *see id.* at 195:9-12 ("Q: Did someone send this form without your knowledge? A: I have—I don't know. If it's without my knowledge, I would not know.").

[113] Ex. 65 (texts to K. Baker, introduced as Ex. 22 in deposition of J. Napoli) at 3; Ex. 34 (Napoli Dep.) at 382:5-6 (admitting that he sent the texts); *see* Ex. 66 (Baker Decl.) ¶¶ 17-19 (describing her receipt of and authenticating the same texts from Defendant Napoli); *see also id.* ¶ 19 (estimating that the texts arrived approximately one month before Bernard Baker was arrested as a material witness); Ex. 67 (Docket Master in *State v. Bernard Baker,* material witness case, documenting his arrest on March 21, 2014).

[114] In a text message to Bernard Baker's mother, Defendant Napoli stated, "Ms. Baker you can let Bernard know that we know he was served for the 24th and for today and if he doesn't show up we are going to ask the judge to issue a warrant for his arrest." Ex. 65 at 3. Defendant Napoli sent these texts in mid-to-late February, 2014. *See* Ex. 66 (Baker Decl.) ¶ 19 (estimating that the texts arrived approximately one month before Bernard Baker was arrested as a material witness); Ex. 67 (documenting arrest on March 21, 2014). At that time, the only court date scheduled in the case at issue was on February 24, 2014. *See* Ex. 68 (Docket Master in *State v. Shelley Davis*) at Plaintiffs-04377-78; *see* Ex. 66 (Baker Decl.) ¶¶ 7-13 (identifying this case). The fake subpoena for Mr. Baker demanded he appear on February 19, 2014. Ex. 69 (Baker fake subpoena).

113.    On the day following the date listed on the fake subpoena—but before the court date had arrived—Moore filed a material witness warrant application.[115]

114.    Napoli testified that he was not really aware of other prosecutors using Martin's fake subpoena template.[116]

115.    In a case Napoli prosecuted with Laura Rodrigue, a witness moved through counsel to quash a fake subpoena that Rodrigue had "issued" using Martin's fake subpoena template.[117]

116.    Rodrigue testified that Napoli "would have been aware of the fact that [the witness] subsequently filed a motion to quash [for the fake subpoenas]. He would have been aware at that point."[118]

117.    Napoli testified that he was not aware of other prosecutors using the fake subpoena template form.[119]

118.    In the same case, Napoli interviewed a witness, Anthony Williams, with Rodrigue.[120]

119.    The witness had submitted to the interview pursuant to a fake subpoena "issued" by Rodrigue matching the fake subpoena template distributed by Martin.[121]

---

[115] Ex. 70 (material witness warrant for Baker issued on February 20, 2014); Ex. 71 (screening action form for Baker material witness case in relation to *State v. Shelly Davis*, with "offense date" listed as February 20, 2014); *see also* Ex. 69; *but see* Ex. 68 (docket in *State v. Shelley Davis*) at Plaintiffs-04377-78 (documenting that closest trial date was February 24, 2014).

[116] *See* Ex. 34 (Napoli Dep.) at 185:17-20 ("Q: Were you aware of other prosecutors using [the fake subpoena template form]? A. I wasn't -- I mean, I can't specifically say that I was. I wasn't really aware of other prosecutor's practices that much.").

[117] Ex. 72 (Motion to Quash in *State v. Cardell Hayes*).

[118] Ex. 73 (Rodrigue Dep.) at 208:13-15.

[119] Ex. 34 (Napoli Dep.) at 185:17-20 ("Q: Were you aware of other prosecutors using [the fake subpoena template form]? A. I wasn't -- I mean, I can't specifically say that I was. I wasn't really aware of other prosecutor's practices that much.").

[120] Ex. 74 (Williams Decl.) ¶¶ 5-6; Ex. 73 (Rodrigue Dep.) at 84:25-88:12 (describing the fake subpoena and interview).

[121] Ex. 74 (Williams Decl.) ¶¶ 1-6; Ex. 75 (Williams fake subpoena).

120.    In April 2017, Napoli used a fake subpoena signed by Assistant District Attorney Sarah Dawkins and matching Martin's template fake subpoena to secure access to a shooting victim whose father was murdered during the same crime.[122]

121.    When the victim's counsel contacted Napoli to ask about the fake subpoena, Napoli told him: "'He's coming to our office, or he's going to jail.'"[123]

**Ms. Baham's Phone Conversation with Jason Napoli**

122.    Around the same time that the fake subpoena arrived, Ms. Baham spoke on the phone with Napoli.[124]

123.    Ms. Baham testified that Napoli asked her to meet with him.[125]

124.    Ms. Baham did not want to meet with him and did not see any need for her to do so.[126]

125.    Ms. Baham informed Napoli[127] that she would be willing to come to court to testify. Ms. Baham grew frustrated during the call with Napoli's efforts to get her to meet with him, and

---

[122] Ex. 76 (Carpasso Decl.) ¶¶ 3, 4-9; *see* Ex. 77 (Carpasso fake subpoena).

[123] *Id.* ¶ 9. At a subsequent hearing, Defendant Napoli sought the victim's arrest as a material witness. Ex. 78 (Apr. 25, 2017 Transcript in *State v. Travis Leonard*) at Plaintiffs-21812. The victim's counsel repeatedly raised concerns that the victim may have received a DA Subpoena and not a court subpoena. *Id.* at Plaintiffs-21813-14. Defendant Napoli did not respond. *See generally id.* at Plaintiffs-21812-18; *see also* Ex. 79 (reporting on *Leonard* fake subpoena and hearing); Ex. 77 (fake subpoena).

[124] Ex. 2 (Baham Decl.) ¶ 33 (stating that call with Defendant Napoli occurred after she got the fake subpoena but before she was arrested). Ms. Baham previously believed that the person she spoke to on the phone was Detective Kitchens, and that she did not meet Defendant Napoli until after her arrest. *Id.* ¶ 30; Ex. 1 (Baham Dep.) at 75, 75-78 (describing "several" calls from Detective Kitchens). However, after reviewing Defendant Napoli's deposition testimony describing his phone call with her, Ms. Baham believes that she did in fact speak with Defendant Napoli because she remembers the call he describes. Ex. 2 (Baham Decl.) ¶¶ 30-33; Ex. 34 (Napoli Dep.) at 99:15-20). Ms. Baham assumed that the call was from Detective Kitchens because she had never met Defendant Napoli, and the only business card that she had received from OPDA had Detective Kitchens's name on it. Ex. 2 (Baham Decl.) ¶ 30; *accord* Ex. 33 (Kitchens Dep.) (testimony re: Kitchens leaving his card) at 156:22.

[125] Ex. 1 (Baham Dep.) at 219-21; Ex. 2 (Baham Decl.) ¶ 31.

[126] Ex. 2 (Baham Decl.) ¶ 31.

[127] During the phone conversation, Ms. Baham believed him to be Mike Kitchens *see supra* n. 55.

remembers responding, "Why the hell I got to go down there when I can just say that in the courtroom? Why would I go hiding like I'm doing something wrong?"[128]

126.   Ms. Baham never said she would not respond to a court subpoena to come to court and testify truthfully.[129]

**Napoli's Pursuit of a Material Witness Warrant and Ms. Baham's Arrest**

127.   At the time that Napoli provided the "subpoena" to Kitchens, the court had not authorized any trial subpoenas for Ms. Baham (or, it appears, any other witness) in the Isaac Jones case at all.[130]

128.   Prior to the August 14, 2017 court date, no lawful subpoenas were issued for Ms. Baham to testify in court.[131]

129.   Ms. Baham was not subpoenaed for the October 13, 2015, trial date.[132]

130.   Ms. Baham did not know about the October 13, 2015, trial date.[133]

---

[128] Ex. 2 (Baham Decl.) ¶ 31.

[129] Ex. 1 (Baham Dep.) at 77:23-78:15.

[130] Ex. 34 (Napoli Dep.) at 174:17-25 ("Q: Why didn't you get a trial subpoena [for Ms. Baham]? A: Because she said—I mean, based on my conversation with her—well, first, she was clearly evading Mike Kitchens. . . . I'm not going to waste resources when clearly a witness is trying to evade service."); Ex. 31 (Court Notify Service History) at NOLA-00029 (showing that the first subpoena issued for Ms. Baham in *State v. Isaac Jones*, Case No. 517-255, was for the August 14, 2017 court date); *See generally* Jones DA File and Clerk File (no evidence of any subpoena prior to August 14, 2017). Such records exist even for subpoenas that were issued, but not served. *See, e.g.*, Ex. 80 (CourtNotify History for Case No. 517-255 for Apr. 11, 2017) at 2 (showing subpoenas issued for Clinton Givens and Timothy Sison).

[131] *Id.*

[132] *See, e.g.*, *supra* n. 131; *see also* Ex. 36 (Motion and Order for Material Witness Bond for L. Baham) at OPDA12744 (material witness warrant application, which does not allege that Ms. Baham had been subpoenaed for the October 13, 2015 court date). Both Defendant Napoli and Detective Kitchens initially suggested that a subpoena had been issued for Ms. Baham for October 13, 2015, at their depositions, but both admitted that they did not know whether or not this was actually the case. Ex. 34 (Napoli Dep.) at 351:11-22; Ex. 33 (Kitchens Dep.) at 179:22-180:7..

[133] Ex. 2 (Baham Decl.) ¶ 34. Defendant Napoli initially claimed that Ms. Baham knew about the October 13, 2015 trial date. Ex. 34 (Napoli Dep.) at 135:7-8. However, he admitted that he had no specific recollection of having told her the date. *Id.* at 171:16-172:15. He surmised that victim-witness counselor, Alison Morgado, included the date in the letter that she sent to Ms. Baham. *Id.*

131.     When the October 13, 2015 trial date arrived, Napoli and defense counsel jointly moved for a continuance.[134]

132.     On October 13, 2015, Napoli filed a motion for a material witness warrant for Ms. Baham.[135]

133.     In that application, Napoli made representations about Ms. Baham to the Court—as a basis for seeking her arrest—that have been directly contradicted by the sworn testimony of Kitchens.[136]

134.     While testifying under oath in his deposition, Napoli made the same representation Kitchens contradicted under oath—that Kitchens informed Ms. Baham that she was an essential witness in the case and would be needed to testify.[137]

---

at 172:13-22. She did not: as noted above, the letter does not include any trial date or even reference the Isaac Jones case. *See supra* n. 77. Defendant Napoli speculated that Ms. Morgado told her the trial date over the phone, but admitted he did not know whether she had done so. Ex. 34 (Napoli Dep.) at 344:19-25. In contrast to other notes made by Ms. Morgado, Ms. Morgado's notes do not state that she informed Ms. Baham of the trial date. *Compare* Ex. 81 at X (notes showing that she documented informing a victim or witness of a trial date) *with* Ex. 55 at X (notes regarding Ms. Baham).

[134] Ex. 60 (Transcript in *State v. Isaac Jones*, No. 517-255 (Oct. 13, 2015)) at Plaintiffs00250).

[135] Ex. 36 (Motion and Order for Material Witness Bond for L. Baham) at OPDA12744.

[136] *Compare* Ex. 36 (Motion and Order for Material Witness Bond for L. Baham) ("Lazonia Baham was notified by Orleans Parish District Attorney's Office Investigator Mike Kitchens that she was an essential witness in the above stated case and would be needed to testify") *with* Ex. 33 (Kitchens Dep.) at 157:5-9 ("[D]id you ever have a conversation with Ms. Baham about how she was an essential witness and needed to be in court? A. Never. Q. Did you ever send any sort of communication to Ms. Baham explaining that she was an essential witness and needed to appear in court? A. Never. Q. Did you ever have any sort of conversation, communication, or give any other indication to Ms. Baham that you were looking for her and that she needed to come to court, come to the DA's office, or otherwise participate in the case against Isaac Jones? A. Never. Q. Did you ever tell Ms. Baham a court date? A. Never. Q. Other than leaving that business card, did you ever provide any information to Ms. Baham, Lazonia Baham, about the need for her to be in court or take any other action related to the Isaac Jones case? A. Never"); *see also id.* at 152:19-153:4 ("Q. How did you get that subpoena that you were asked to serve on [Ms. Baham]? A. From Mr. Napoli. Q. Was that subpoena signed by a judge? A. I assumed it was. Q. Did you look or no? A. No. Q. Did that subpoena command Ms. Baham to appear in court or at the District Attorney's Office, or do you not know? A. I do not know.").

[137] Ex. 34 (Napoli Dep.) at 95:25-96:14.

135.    Aside from that representation, the basis that Napoli provided for Ms. Baham's arrest in the warrant application was that Ms. Baham refused to meet with Napoli, speak with Kitchens, or accept their phone calls.[138]

136.    The record for October 13, 2015 reflects no discussion of Napoli's motion for a material witness warrant.[139]

137.    Napoli asked that Ms. Baham be held without bond.[140]

138.    The Court granted the motion on October 13, 2015 and ordered that a capias be issued for Ms. Baham's arrest.[141]

139.    On December 29, 2015, Ms. Baham was arrested at her home, while she was sick and her children were at home.[142]

140.    While she was in jail, Ms. Baham was very worried about who was taking care of her children.[143]

141.    Ms. Baham spent eight days—including New Year's Eve and New Year's Day—in Orleans Parish Prison.[144]

---

[138] Ex. 36 (Motion and Order for Material Witness Bond for L. Baham) at OPDA12744 ("Lazonia Baham was notified by Orleans Parish District Attorney's Office Investigator Mike Kitchens that she was an essential witness in the above stated case and would be needed to testify. Ms. Baham refused to meet with ADA Jason Napoli and cut off all communication with the District Attorney's Office. Despite multiple visits to her home, Ms. Baham refuses to speak with Detective Kitchens and has refused to return multiple phone calls. The actions of Ms. Baham indicate that she is intentionally avoiding service.").

[139] Ex. 60 (Oct. 13, 2015 Tr.) at Plaintiffs00250.

[140] Ex. 36.

[141] Ex. 36.

[142] Ex. 1 (Baham Dep.) at 224:3-4; *see also id.* at 141:21-23 ("I do know I was sick when they took my out my house throwing up."); *id.* at 224:4-6 ("I was just praying they stayed in there sleep for they wouldn't see me out there handcuffed.").

[143] *Id.* at 127 ("My babies wondering about me when I'm coming home and everything, making me stressed out even much more.").

[144] Ex. 82 (Orleans Parish Central Lockup Inmate Release Form.

**Meetings with Defendant Napoli in January 2016**

142.    On January 6, 2016, Ms. Baham was brought to court in shackles and an orange jumpsuit to appear in the new case that had been opened against her as a material witness.[145]

143.    At the hearing on January 6, 2016, Judge White instructed Ms. Baham that she needed to comply with court-ordered subpoenas.[146]

144.    Ms. Baham understood Judge White to be suggesting she had been issued a subpoena to appear in court for at a date that she had then missed. Ms. Baham responded that she had never gotten such a subpoena.[147]

145.    At the hearing on January 6, 2016, Napoli asked to speak with Ms. Baham outside of court.[148]

146.    Napoli and Ms. Baham then went to a room outside of the courtroom to talk, accompanied by a public defender, Colin Reingold, whom the court had appointed to represent Ms. Baham (over Napoli's protest).[149]

147.    When Reingold began advising Ms. Baham of her rights—including her right not to speak to Napoli—Napoli interrupted him and instructed him to cease speaking.[150]

148.    Although Napoli "does not recall" interrupting Mr. Reingold as Mr. Reingold advised Ms. Baham of her rights, Napoli testified that he "advocated for [Ms. Baham] to speak to [him]"

---

[145] Ex. 19 (Jan. 6, 2016 Tr.) at Plaintiffs-10964.

[146] *Id.* at Plaintiffs-10965-10966

[147] *Id.* at Plaintiffs-10965 ("[Judge White]: Ms. Baham, the State has been sending you, through this court, witness subpoenas. […] I want you to understand, ma'am, when you are a witness in a criminal prosecution, if you ignore a subpoena-- [Ms. Baham:] I never got a subpoena.").

[148] *Id.* at Plaintiffs-10966.

[149] *See id.* at Plaintiffs-10964-65.

[150] *See* Ex. 37 (Reingold Decl.) ¶ 8 ("I explained to Ms. Baham that she did not have to talk to ADA Napoli if she did not wish to do so. As I did this, ADA Napoli interrupted me. I cannot remember his exact words, but his message was that I should stop talking to Ms. Baham and stop potentially discouraging her from speaking with him. His demeanor as he interrupted me was annoyance and exasperation."); *see also* Ex. 38 (Ms. Baham's Apr. 4, 2016 testimony in *State v. Jones*) at OPDA069060 ("[The public defender] was telling me—advising me of my rights. You was telling him to shut up.").

by telling her that Mr. Reingold represents violent criminals and intimating that Mr. Reingold may have ulterior motives for advising her against speaking with Mr. Napoli.[151]

149.    After advising Ms. Baham, Mr. Reingold left the room and Napoli met with Ms. Baham alone.[152]

150.    During that meeting, Ms. Baham told Napoli that she would testify in court about where she had seen Isaac Jones: near her house.[153]

151.    Ms. Baham testified that Napoli told her he "knew" she had seen Jones in a red car.[154]

152.    Ms. Baham testified that she did not understand what Napoli was talking about and she told him she did not know anything about a red car.[155]

153.    Ms. Baham had the distinct impression that Napoli was pressuring her to say something that was not true.[156]

---

[151] *See* Ex. 34 (Napoli Dep.) at 228 (Q: And you said you argued for her to speak to you. What did you say? A: I said—well, first, I informed her that Mr. Reingold was a defense attorney who often advocated on behalf of violent criminal charged with the same stuff that Isaac Jones was charged with and he may not want you to speak with me for different reasons.").

[152] Ex. 37 (Reingold Decl.) ¶ 9 ("I do not remember Ms. Baham's exact words in response, but she conveyed that she had nothing to hide and that she no longer wanted me to stay in the room. I then left Ms. Baham and ADA Napoli in the room alone."); Ex. 1 (Baham Dep.) at 133:15 ("[T]he lawyer that was in there was telling—was advising me I ain't had to say nothing. I said, it's all right."). *See* Ex. 34 (Napoli Dep.) at 231.

[153] Ex. 1 (Baham Dep.) at 151:23-152:1 ("Then he went to ask me do I –is—would I testify to what I said. I said, yeah, I tell them. I just seem him right around in front my house, ain't had nothing to do.").

[154] *Id.* at 150:17-23 ("[Defendant Napoli] had the pen on the desk like this here (indicating). Lazonia, look and listed at me, now I know what you seen, you seen the red car there. . . . Come on now, Lazonia, the red truck."); *accord id.* at 162:22 ("[T]he way how [Defendant Napoli] acted when he had me at the back, call me to the back . . . Come on now, Lazonia, come on, you know. No. Okay. Well, you seen the red car.").

[155] *Id.* at 150:21 ("I said, a red car, what red car? . . . I said, what red truck is you talking about? What is your talking about?"); *id.* at 151:18 ("He said from a red car to a red truck. I ain't know what he was talking about. I kept on telling him I don't know what he talking about.").

[156] *Id.* at 158:12-13 (testifying, about her conversations with Defendant Napoli, "You trying to put words in my mouth."); *see also id.* at 160:1 ("[W]hat they try to do, trying to close the case and don't know who done it, just trying to give anybody a charge and getting someone to try to help them do it.").

154.    After the meeting with Napoli, Ms. Baham tried to get the judge's attention by raising her hand so that she could express her concerns, but a courtroom deputy told her to put her hand down.[157]

155.    Although trial had been set for January 19, 2016, Napoli did not seek a subpoena for Ms. Baham for that date to testify at trial.[158]

156.    Instead, Ms. Baham was subpoenaed for two days later, when no court date was set in *Jones* at all (the case was set instead on a separate docket for the material witness case against Ms. Baham).[159]

157.    [deleted]

158.    Napoli again asked Ms. Baham to speak with him outside of the courtroom and she agreed.[160]

159.    Ms. Baham testified that Napoli continued to question her about the red car, and she repeated that she had not seen Isaac Jones in one.[161]

160.    Napoli subsequently filed a "Notice of Disclosure" with the Court claiming that during that conversation on January 6, 2016, "Ms. Baham stated that she saw the defendant in the area of the murder just moments prior to the murder."[162]

---

[157] *Id.* at 134:22-135:1; *accord id.* at 151:12-15; *id.* at 153:6:11.

[158] *See* Ex. 19 (Jan. 6, 2016 Tr.) at Plaintiffs-10966 (Court issuing a new subpoena for two days after the trial date, without comment from Defendant Napoli); Ex. 39 (subpoena for Ms. Baham for January 21, 2016).

[159] *See* Ex. 4 (Docket Master in *State v. Isaac Jones*, No. 517-255) at Plaintiffs-13072-77; Ex. 32 (Docket Master for *State v. Baham*); Ex. 34 (Napoli Dep.) at 239:8-16.

[160] Ex. 1 (Baham Dep.) at 156.

[161] Ex. 1 (Baham Dep.) at 157:6-21; *id.* at 221:24-222:9. *Accord id.* at 156:21-157:5 ("When I went back with the subpoena . . . he called me out the courtroom for to go sit on the benches, still talking about a red truck and thing and then asked me if—if is I'm on any kind of medicine or anything. Do I remember what we talked about? I said, I remember exactly what we talk about, I told you where I seen the boy at. I say. I don't know nothing about no red car or no red truck. What is you talking about?").

[162] Ex. 160 (Notice of Disclosure).

161.    Ms. Baham has never claimed she saw Jones "in the area of the murder just moments prior to the murder."[163]

### Ms. Baham's Testimony

162.    After her arrest and her meetings with Napoli, Ms. Baham contacted the defense attorney for Isaac Jones and told him that she wanted to testify in court.[164]

163.    At the next trial date on April 4, 2016, Ms. Baham came to court.[165]

164.    The parties moved to continue the trial again, but the defense attorney for Isaac Jones moved to admit Ms. Baham's testimony.[166]

165.    Over Napoli's objection, the court allowed Ms. Baham to testify.[167]

166.    Ms. Baham testified on April 4, 2016, that she had seen Jones around the corner from her home.[168]

167.    Ms. Baham further testified on April 4, 2016, that when she saw Isaac Jones on the day of the murder he was on foot.[169]

168.    That same day, Napoli asked to keep the material witness case against Ms. Baham pending, stating that Ms. Baham had "failed to appear two separate times."[170]

169.    [deleted]

---

[163] Ex. 38 (Apr. 4, 2016 Baham testimony) at OPDA069055-57 (testifying that she told Defendant Napoli she had seen Jones near her home in Gerttown, and not in the area of the murder).

[164] Ex. 2 (Baham Decl.) ¶ 35; *accord* Ex. 38 (Apr. 4, 2016 Baham testimony) at OPDA069048 (showing defense lawyer arguing to allow Ms. Baham testify).

[165] Ex. 38 at OPDA069047-87.

[166] *Id.* at OPDA69047, OPDA69051.

[167] *Id.* at Plaintiffs00062.

[168] *Id.* at OPDA069055-56 (testifying that she saw Jones on Telemachus Street).

[169] *Id.* at OPDA069086.

[170] *Id.* at OPDA69049-50.

170.    The court expressed serious concerns about keeping the material witness warrant pending until trial given that Ms. Baham had appeared and the parties were not ready to proceed with trial.[171]

**The Remainder of the Isaac Jones Case, Ms. Baham's Participation in this Lawsuit, and Defendant Napoli's Subsequent Retaliation**

171.    [deleted]

172.    Meanwhile, trial in *State v. Isaac Jones* was continued eight more times.[172]

173.    In April 2017, an investigative piece about the use of fake subpoenas by the Orleans Parish District Attorney's Office was published in *The Lens*, a local newspaper.[173]

174.    [deleted]

175.    Before the *Lens* story broke, even many attorneys did not realize that the fake subpoenas were not lawfully issued documents.[174]

176.    In April 2017, Ms. Baham's oldest son Michael called her and told her that he seen on the television news that OPDA was using fake subpoenas.[175]

177.    Ms. Baham has since searched her home and storage unit for the fake subpoena she had received, but she had already moved twice and was unable to locate it.[176]

---

[171] Ex. 38 (Apr. 4, 2016 Baham testimony) at OPDA69050 ("The Court: I want to dismiss a material witness. I'm not going to be part of your conspiracy. . . . Mr. Napoli: We just want to keep it pending until the murder is tried. The Court: But it was today, and you're not ready to go today, lawyers? Mr. Napoli: Correct.").

[172] Ex. 34 (Docket Master in *State v. Isaac Jones*, No. 517-255) at Plaintiffs-13075-13077.

[173] *See* Ex. 47.

[174] *See, e.g.*, Ex. 76 (Carpasso Decl.) ¶ 5 (local attorney stating of a fake subpoena, "At the time that I received the 'subpoena,' I thought that the 'subpoena' was a valid legal document."); Ex. 84 (Trummel Dep.) at 197:14-17 (Q: At any time during your employment at OPDA did you believe that [a fake subpoena] was a valid subpoena? A: When I first started, it's likely, honestly."); Ex. 74 (Williams Decl.) ¶ 4 ("I went to the District Attorney's Office [after receiving a fake subpoena] because I believed that I could be sent to jail if I did not comply. That is the only reason that I went.").

[175] Ex. 1 (Baham Dep.) at 197.

[176] Ex. 1 (Baham Dep.) at 242:11-14 ("I done moved twice since then. I done moved from Audobon to Mandeville, from Mandeville to Texas. I had stuff in the storage and thing."); *id.* at 249:4-6

178.    After Ms. Baham's son gave her the number for the American Civil Liberties Union, Ms. Baham called the organization and spoke with undersigned counsel.[177]

179.    Ms. Baham was subpoenaed to appear in the Isaac Jones case twice more in the summer of 2017.[178]

180.    She came to court, waited, and was not called to present testimony.[179]

181.    Ms. Baham filed this lawsuit against OPDA and Defendants Graymond Martin and Jason Napoli on October 17, 2017.[180]

182.    Ms. Baham was subpoenaed to appear in the Isaac Jones case on November 6, 2017; she appeared with counsel but the case was not called.[181]

183.    On November 6, 2017, Ms. Baham signed another subpoena to appear in the Isaac Jones case on November 13, 2017.[182]

184.    On November 9, 2017, the State and defense jointly moved for a continuance of the November 13, 2017 trial date.[183]

185.    Napoli contends that Ms. Baham failed to appear on November 13, 2017, repeatedly referencing this "missed" court date in his deposition.[184]

---

("Stuff just been all over, it just been not pleasant, let's say that."); *id.* at 249:1-4 ("I know a baby bag, a brown purse and a black purse was missing that I had a whole lot of papers and things too, and I been trying to figure out where it is at."); *see also* Ex. 46 (Pipes 30(b)(6) Dep.) at 157:21-158:11 (describing public outcry regarding fake subpoenas); *id.* at 224:5-14; Ex. 85 (Tucker Dep.) at 97:5-11; 107:14-108:4; 109:11-16 (describing certain results of the *Lens* article reporting on fake subpoenas).

[177] Ex. 1 (Baham Dep.) at 198-200.

[178] Ex. 2 (Baham Decl.) ¶ 26.

[179] Ex. 1 (Baham Dep.) at16:10-14.

[180] Dkt. No. 1 (Complaint).

[181] Ex. 8 (Hamilton Decl.) ¶ 4.

[182] Ex. 86 (November 13, 2017 subpoena).

[183] Ex. 4 (Docket Master in *State v. Isaac Jones*, No. 517-255).

[184] Ex. 8 (Hamilton Decl.) ¶ 3.

186.    Ms. Baham did not fail to appear for court on November 13, 2017; her counsel in this litigation was present in court on her behalf and left only after the clerk confirmed that the case was not being called and the court was preparing for a trial in another matter.[185]

187.    Neither Napoli nor anyone else from OPDA called Ms. Baham or her counsel on November 13, 2017.[186]

188.    Later that same day, Napoli asked the court for a warrant to arrest Ms. Baham for failing to appear for the November 13, 2017 trial date.[187]

189.    The court denied his request.[188]

Dated:  December 16, 2020                                   Respectfully Submitted,


                                                          _s/ Katie Chamblee-Ryan_____


Katherine Chamblee-Ryan (*pro hac vice*)          Mariana Kovel (*pro hac vice*)
Tara Mikkilineni (*pro hac vice*)                 American Civil Liberties Union Foundation
Ryan C. Downer (*pro hac vice*)                   125 Broad Street, 18th Floor
Laura Gaztambide Arandes (*pro hac vice*)         New York, NY 10004
Jeffrey Stein (*pro hac vice*)                    Tel: (646) 905-8870
Civil Rights Corps                                mkovel@aclu.org
1601 Connecticut Avenue NW, Suite 800
Washington, D.C. 20009
Tel: (202) 844-4975


Somil Trivedi (*pro hac vice*)                    Bruce Hamilton
American Civil Liberties Union Foundation         La. Bar No. 33170
915 15th Street NW                                ACLU Foundation of Louisiana
Washington, DC 20005                              1340 Poydras St., Suite 2160
Tel: (202) 715-0802                               New Orleans, LA 70156
                                                  Tel: (504) 522-0628

---

[185] *Id.* at ¶¶ 7-12.

[186] Ex. 34, (Napoli Dep.) at 279:10-12.; Ex. 8 (Hamilton Decl.) ¶ 14.

[187] Ex. 87 (Hr'g. Tr. Nov. 13, 2017) at INDEF00968-70.

[188] Ex. 87 (Hr'g. Tr. Nov. 13, 2017) at INDEF00968-70.

Gerald S. Sachs (*pro hac vice*)
Venable LLP DC
600 Massachusetts Ave. NW
Washington, DC 20001
Tel: (202) 344-4269

Allison B. Gotfried (*pro hac vice*)
Venable LLP
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Tel: (212) 370-6227

Sarah S. Brooks (*pro hac vice*)
Venable LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Tel: (310) 229-0408

Michael S. Blume (*pro hac vice*)
Venable LLP
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Tel: (212) 370-5500

*Attorneys for Plaintiffs*