EXHIBIT 16

STATE OF LOUISIANA

VS

ISAAC JONES

ORLEANS PARISH GRAND JURY

POLICE ITEM NOS. I-08333-12,
B-03213-13
& D-31858-13

## PERPETUATION OF TESTIMONY

Transcript of testimony given by the following witnesses in the above captioned matters before the Orleans Parish Grand Jury on Thursday, August 15, 2013, Mr. Craig Famularo, Esq., Assistant District Attorney present on behalf of the State of Louisiana.

10 Jurors were present throughout the proceedings.

WITNESSES CALLED:   NOPD Sergeant Virgil Landry    Page 1
(As to Item No. B-03213-13.)

NOPD Detective Clinton Givens Page   7
(As to Item Nos. I-08333-12 & D-31858-13)

MAURICE W. BETTENCOURTT
Certified Court Reporter

CERTIFIED DA OFFICE COPY

OPDA10568

1  (After an opening statement in this matter, Mr. Famularo

2          places an easel with a white chart board next

3          to the foreperson and facing all the jurors.

4          On this chart board are five columns with case

5          numbers and names involved thereto.)

6                  --------------

7      NOPD DETECTIVE VIRGIL LANDRY, after having first

8  been duly sworn, did testify as follows:

9  EXAMINATION BY MR. FAMULARO:

10  Q.  Tell us your name, please.

11  A.  Detective Virgil Landry.

12  Q.  And where are you employed?

13  A.  Sixth  District.

14  Q.  What do you do in the Sixth District?

15      I'm a person's crimes      ctive   which is shootings

16          robberies, missing adults and stuff like that.

17  Q.  And did you handle an attempted murder on an Orlando

18          Rickmon on February 24th of this year?

19  A.  Yes, I did.

20  Q.  And that was the 3200  block of Toledano?

21  A.  Yes, sir.

22  Q.  Can you tell us what you learned from the initial

23          officers what happened?

24  A.  Around 1:04 P.M."shots fired" was called to the dis-

25          patcher.  An officer responded but there was

CERTIFIED DA OFFICE COPY

OPDA10569

```
 1              no houses struck by gunfire.  One of the
 2              witnesses said that a gold sedan fled the
 3              area.  Also, casings were discovered in the
 4              3200 block of Toledano, but no victim.
 5    Q.   And you secured those casings?
 6    A.   Yes.
 7    Q.   Under that item number?
 8    A.   Yes.  The Crime Lab came out and processed and
 9              collected  those casings.
10    Q.   All right.
11    A.   After that, approximately thirty minutes later a
12              call from University Hospital came in and
13              said that a gold sedan came to the hospital
14              and the victim, Orlando Rickmon came, and he
15              suffered gunshot wounds to the stomach, the
16              jaw and the arm.
17         After that, the officers relocated to University
18              Hospital where they took control of the car
19              and attempted to contact, or speak to Mr.
20              Rickmon, but was unable to because  he was
21              brought into surgery.
22    Q.   All right.    And  did  they  later speak to Mr.
23              Rickmon?
24    A.   Yes.  The next--that was the 24th. The 25th I was
25              assigned the case. The detective that was on
              the scene on the 24th when it all happened was
```

-2-

CERTIFIED DA OFFICE COPY

OPDA10570

1    Detective Ed Johnson. On the 25th we relocated
2    to University Hospital  and attempted to talk
3    to Mr. Rickmon to see if, you know, did he see
4    anything. But the first time we went in the
5    A.M. he had a stomach tube so he was unable
6    to talk.  He was in a lot of pain.  So I spoke
7    to the nurse and the nurse said they were plann-
8    ing on taking the tube out around  Noon, "come
9    back later in the day."
10   We came back later in the day and spoke to him.  Mr.
11   Rickmon said he was waiting for his friend
12   Rick--Milton in the 3200 block of Toledano.
13   While he was waiting a black Land Rover pulled
14   up next to him.  He said all he knows is "they
15   just started shooting."
16   Now, granted, Mr. Rickmon was still severely sedated,
17   he was still in a lot of pain, but he was able
18   to talk a little bit.
19   After that I could see that he was struggling with
20   talking so we said "we'll come back," and I
21   went and introduced myself to his family, gave
22   them my card,   said   "look,if you hear any-
23   thing give me a shout.  If I don't answer the
24   phone call the Sixth District and we'll go
25   from there."

-3-

CERTIFIED DA OFFICE COPY

OPDA10571

1   But before that, in between the time that we waited
2       to speak to Mr. Rickmon the car that was used--
3       well, the car that he drove himself to the
4       hospital, his vehicle that was shot up, was
5       seized and brought to the cage at Headquarters.
6   We got it processed for potential evidence.  They
7       had six bullet holes to the door, the driver's
8       side door, and only five came in and out.  So
9       we figured there was a possibility of a
10      bullet lodged in the door.
11  We were able to locate a spent casing inside the
12      door, and also, the night of when we were
13      processing, the initial processing of the
14      vehicle at the hospital we was able to get
15      another projectile out of the driver's side
16      rubber inside the door.  So after that we then
17      went and spoke to him and that's when he told
18      us about the Land Rover.
19  Q.  All right.  And did he tell you who shot him?
20  A.  Not at that point, no.
21  Q.  When did he eventually tell you who shot him?
22  A.  After that I get a call, information regarding the
23      possible perpetrator by the name of Ike.
24      That's all I had was Ike.  Now, I passed the
25      name on to my superiors, to my lieutenant,

-4-

CERTIFIED DA OFFICE COPY

```
 1              and he came back and he said "look, we heard
 2              of a guy named Isaac Jones as possibly goes
 3              by the nickname of 'Ike.'"
 4         So we entered it into the motions data base, which
 5              is our computer.  Anybody that has any type
 6              of entry they can find it in the computer,
 7              and we found  a motion entry for Isaac Jones.
 8         So with that, I believed that the person called
 9              was credible so I elected to get a six photo-
10              graphic lineup.  I contacted the State Police
11              because at the time our computers were down
12              so we weren't able to create our own lineup.
13              So  the State Police actually created the
14              photographic lineup.  And myself and
15              Detective Timothy Sisson actually relocated
16              to University Hospital to present Mr. Rick-
17              with the lineup.
18   Q.  Is that the lineup you showed him (putting a six
19              photo lineup on a sheet in front of the wit-
20              ness)?
21   A.  Yes, it is.   This is the lineup Timothy Sisson
22              showed him.
23   Q.  You put that on the evidence books, right?
24   A.  Yes.
25   Q.  And did he sign the lineup?  (Mr. Famularo passed
              around the lineup to the jurors.)
```

CERTIFIED DA OFFICE COPY

OPDA10573

1   A.   Yes.

2   Q.   What did he say?

3   A.   He identified Mr. Jones  and he put "the one who shot

4        him on the side."

5   Q.   That's what he put down.  What did he tell you?  Do

6        you remember what he told you?

7   A.   Oh, yes.  He said, excuse my French, he said "this is

8        the dick ass nigger who shot me," or "this is

9        the dick ass nigger," And he said "fuck that

10        motherfucker ."

11   BY MR. FAMULARO:

12      All right.  Any questions?

13   EXAMINATION BY A JUROR:

14   Q.   What you all know it was about?

15   A.   We believe that in the beginning that it may have

16        had something to do with his girlfriend, but

17        nothing ever came out of that.  No, we don't.

18   EXAMINATION BY ANOTHER JUROR:

19   Q.   Who was that, whose girlfriend?

20   A.   That was Mr. Rickmon.  That was our initial belief,

21        but after and during the course of the investi-

22        gation it faded out.

23   BY MR. FAMULARO:

24      Any other questions?  (Nothing further forthcoming

25        from the jurors.)  Okay.  Thank you, detective.

-------------

-6-

CERTIFIED DA OFFICE COPY

OPDA10574

1    NOPD DETECTIVE CLINTON  GIVENS, after having first

2    been duly sworn, did testify as follows:

3    EXAMINATION BY MR. FAMULARO:

4    Q.  Tell us your name, please.

5    A.  Clinton Givens.

6    Q.  Where are you employed?

7    A.  NOPD Homicide.

8    Q.  I'm going to take you back to September 5th of

9         2012.  Did you investigate a homicide that

10         occurred in the  3000 block of Audubon Street?

11   A.  Yes.

12   Q.  Tell us what you--did you go to the scene?

13   A.  Yes.

14   Q.  Tell us what you observed when you arrived on the

15         scene.

16   A.  A black male later identified as Theron Crawford

17         suffered several--I  Think it was five gunshot

18         wounds, was laying in the street several feet

19         in front of his vehicle, which was still runn-

20         ing in the block, maybe 4, 5 0'clock

21         in the afternoon.

22   Q.  And did you obtain sureillance video of the shooting?

23   A.  We did.

24   Q.  Tell us what was  on  there.

25   A.  We obtained video from a house on the block.

-7-

CERTIFIED DA OFFICE COPY

OPDA10575

1   The video showed the victim arrived--the video
2       doesn't have that to correspond with the
3       actual time so it just shows the one time.
4   But the video shows that the victim arrived.  In
5       fact he gets dropped off by a friend, he gets
6       out of the friend's vehicle, walks over to
7       his vehicle, gets in it, starts it up.  The
8       friend that dropped him off pulls off.
9   Maybe ten seconds later another vehicle pulls up,
10      a dark colored, appeared to be a Chevy Silve-
11      rado pickup and three subjects exit the
12      vehicle.  The driver never did.  The subjects
13      all were armed with weapons, handguns.  One
14      possibly looked like an assault rifle from
15      the video.
16  The subjects approached the victim's car.  Initially
17      one of the subjects went to the passenger side
18      of the car, which was parked--which was on the
19      street.  The driver's side would have been
20      parked against the curb where it was parked
21      at.  He opened the passenger door with the
22      door handle.  It was locked.  Went around to
23      the driver's side.  He got the victim out at
24      gunpoint.  Two other armed subjects joined
25      him.  They shut the door, I guess to prevent

-8-

CERTIFIED DA OFFICE COPY

OPDA10576

1    the driver from getting back into his car.

2  He walked the victim back to the black Chevy

3    Silverado.  A struggle happened.  The victim

4    didn't readily get in the truck. There was a

5    kind of physical stuggle that erupted several

6    times.  When that was going on, one of the

7    three armed subjects returned to the victim's

8    vehicle, entered the driver's side compart-

9    ment.  You can't see what he's doing in there

10   but you can see him in there for maybe a

11   minute.

12  As  he's exiting the driver's compartment the victim

13   is still in front of the vehicle in an alter-

14   cation with the other two armed subjects who

15   are still trying to drag him into the truck

16   that they were in.  And as  this third guy

17   who's in the car looks, while still standing

18   in the doorway of the car, you hear five gun-

19   shots. The victim falls to the ground.  All

20   three subjects enter back into the truck and

21   flee the scene.

22  Q.  And you processed the scene and the vehicle, the

23    Crime Lab processed those?

24  A.  Yes.

25  Q.  And there were multiple casings found on the scene?

-9-

CERTIFIED DA OFFICE COPY

OPDA10577

1    A.   Yes, there were. I believe five.

2    Q.   And they processed the car for DNA, correct?

3    A.   And prints.

4    Q.   Now the prints came back to who?

5    A.   Christopher Peterson.

6    Q.   And that was on the victim's car?

7    A.   That was on the driver's door of the victim's car,

8         and it appeared as per the video that would

9         have been when they first got the victim out

10        of his car you could see one subject push the

11        door closed to prevent the victim from getting

12        bgack into his car.

13   Q.   That was on the driver's side.

14   A.   Window.   Yes.

15   Q.   And then you got the DNA results on Christopher

16        Peterson also, correct?

17   A.   Yes.

18   Q.   That was a CODIS hit.

19   A.   Yes.

20   Q.   Now, let's fast forward to April 23rd of 2013.  Did

21        you investigate  the homicide  of Armond (sic)

22        Rickmon?

23   A.   Yes.

24   Q.   Orlando Rickmon.

25   A,   Orlando Rickmon and--

-10-

CERTIFIED DA OFFICE COPY

OPDA10578

```
 1   Q.  Desmond Bell.

 2   A.  --Desmond Bell.

 3   Q.  And the baby that was shot--

 4   A.  Seven year  old that shot.

 5   Q.  Seven years old?

 6   A.  Yes,  he was  seven, making eight. Damon--

 7   Q.  Demond  Harris?

 8   A.  Yes.

 9   Q.  Tell us what you observed on that scene.

10   A.  That would have been about, maybe about 6 in the

11             evening.  When I got there the juvenile had

12             already been taken to the hospital via EMS.

13             When I got there the two subjects, Rickmon

14             and Bell, were both laying on the front porch

15             of ████████       They both suffered multiple

16             gunshot wounds.   They were pronounced  dead

17             on the scene.

18   BY  MR. FAMULARO:

19       Any questions (to the jurors) about the September

20             homicide?  If you want to look at ther video

21             I'll show it to you all on the screen (in this

22             room).  Any questons?

23   BY A  JUROR:

24       Was there a motive on that one?

25
```

-11-

CERTIFIED DA OFFICE COPY

OPDA10579

1   BY MR. FAMULARO:

2       The first homicide we're talking about.

3   BY THE WITNESS:

4       Yes, the first one. I believe the motive may have

5           been robbery.

6   BY MR. FAMULARO:

7       Yes.

8   BY THE WITNESS:

9       Their victim was known to sell cars from auctions and

10          was kind of known to have money on him. So I

11          believe that it was.

12  BY MR. FAMULARO:

13      Okay. So April 23rd, Rickmon and Desmond Bell are

14          shot and killed and the child was wounded?

15  BY THE WITNESS:

16      Yes.

17  EXAMINATION BY MR. FAMULARO:

18  Q.  Do you discover that Rickmon had been shot at and

19          wounded previously?

20  A.  Yes. Once we cleared up the scene I went back to

21          the office and checked the names, you know,

22          of the victims, or ex-victims as it would be,

23          and I discovered that--and I had been told on

24          the scene but I hadn't confirmed it yet, that

25          Rickmon had been shot back in February, I want

-12-

CERTIFIED DA OFFICE COPY

OPDA10580

```
 1            to say February 24th or 28th, went back and
 2            pulled up the case and found that Rickmon was
 3            in fact shot multiple times back in February.
 4            He subsequently identified the perpetrator as
 5            Isaac  Jones.
 6   Q.  And did you speak to his girlfriend?
 7   A.  I did.  Several--maybe a day or so later I spoke
 8            with the girlfriend, Miss Baham.
 9   Q.  Damika Baham?
10   A.  Yes, Damika Baham.
11   Q.  And you also spoke to his--her mother?
12   A.  Yes.
13   Q.  And what was her  name, do you remember?
14   A.  Lazonya  (phonetically).
15   Q.  Okay.  Go ahead.
16   A.  I spoke to Damika first and she advised me that--of
17            the shooting that happened in February and
18            she went on to tell me that they had  been
19            receiving threats once they identified Isaac.
20            Isaac made it clear via  other people and via
21            phone that they  weren't going to make it to
22            court, he was going to kill her, Orlando and
23            the baby and, you know, basically they weren't
24            going to make it to court.  And this was known
25            apparently because I later talked to Orlando's
```

-13-

CERTIFIED DA OFFICE COPY

OPDA10581

```
 1              mom who was aware of it and I talked to her
 2              mom, Lazonya Baham, later and she was aware
 3              of it also.
 4      But when I was talking to Damika Baham she tells me
 5              that on that same date, maybe about a half an
 6              hour before the murder she got a call from her
 7              mom, because her mom was aware of the threats
 8              that were being made, warning her that they
 9              had seen Jones, Isaac Jones, in a red van in
10              the uptown area and he looked like he was up
11              to something.  She was kind of  giving them
12              a heads up.
13  Q.   They called it a red/maroon?
14  A.   Yes, a reddish maroon  van.
15  Q.   All right.  Lazonya told Damika that.  You spoke
16              to Lazonya eventually, huh?
17  A.   Yes.
18  Q.   And she told you the same thing.
19  A.   Yes, she did. She also spoke with Orlando's mother,
20              Kathy Rickmon, and she told her the same thing.
21  Q.   And Damika told you that she had spoke to Jones
22              personally  and received threats, correct?
23  A.   Yes.  They had been receiving them via phone and
24              from other people, but yes.
25  Q.   Now, did you obtain a video of the maroon van around
```

-14-

CERTIFIED DA OFFICE COPY

OPDA10582

1           the corner from the shooting on Baudin Street?

2   A.  I did.  I got a video from a  house in the 400  block

3           of South Pierce.  The video showed, and again,

4           the video doesn't correlate with the actual

5           time.  It's kind of a one time thing.  It

6           shows the van pulling up; it's actually going

7           the wrong way on Pierce.  Pierce runs in an

8           uptown direction.  The van was heading down

9           Pierce in a downtown direction.

10        The van pulled up, two subjects exited the van out

11          of the passenger compartment.  Again, the

12          driver didn't exit.  The two subjects had

13          hoods on or hooded sweatshirts, and long pants

14          on and you could see they appeared to be con-

15          cealing something beneath their sweatshirts.

16          They walked up South Pierce to Baudin, which

17          is right at the corner, maybe a half a block

18          from where the van parked at, just out of

19          view, and then the next part of the video

20          shows the same subjects, you know, I guess

21          maybe fifteen, twenty minutes later, running

22          back to the van.  They jumped in. The van fled

23          the wrong way  up Pierce towards Canal and

24          then unknown.

25   Q.  All right.  Now, did you bring Damika Eaham to

            the Homicide Office and take a statement from

-15-

CERTIFIED DA OFFICE COPY

OPDA10583

```
 1          her?
 2   A.  I did.
 3   Q.  And while you were interviewing her did she tell you
 4          anything about the homicide that occurred on
 5          September 5th of 2012?
 6   A.  She didn't know anything about the homicide prior--
 7          well, what she told me, she didn't know any-
 8          thing about the homicide prior to  but when
 9          I was talking to Miss Baham she mentioned the
10          threats.  So she relayed a couple of things in
11          that interview, that she had spoken with her
12          mom and her mom verified that the same van--
13          because I released the video to the media just
14          to get Crime Stoppers help from Crime Stoppers'
15          tips.  And she said that when her mom saw the
16          video on the news that night her mom recognized
17          that same van as the van that she had seen Isaac
18          in earlier that day.
19   She mentioned that she and Isaac weren't friends of
20          anything like that, but they had grown up in
21          the same neighborhood and they knew each other
22          from just growing up together but not ever like
23          close friends or anything, or even associates.
24   I showed her initially the video from the South
25          Pierce video from Baudin Street, from the
```

-16-

CERTIFIED DA OFFICE COPY

OPDA10584

1        Baudin Street case.  She looked at the video

2        and she identified one of the subjects, she

3        was pretty sure that he was Mr. Jones.

4   Recalling that I had that other case where Jones

5        had already been a suspect, because I had--

6        actually I know that he's an associate of

7        Christopher Peterson, who was identified as

8        the perpetrator in the case from Audubon.

9        I was able to show that Jones was an associate

10       of Mr. Peterson.  He was a suspect but I had

11       never had  anything directly linking him to

12       the scene.

13      I let Miss Baham view that video and she was a

14       hundred percent positive that--well, the

15       subject that I had mentioned that had returned

16       to the victim's car while--just before he got

17       shot by the other two armed subjects, was Ike-

18       Isaac Jones as well.  She  referred to him as

19       "Ike."  That's what they know him as.

20  Q.  And he's at the driver's side on the College Court

21       entrance by himself going to the car, correct?

22  A.  As the other two subjects are having that physical

23       altercation trying to force that victim into

24       their car,  he went back to the driver's side

25       and he went inside  the vehicle.  You couldn't

          see what he was doing, but  yes.

-17-

CERTIFIED DA OFFICE COPY

OPDA10585

1   Q.  And then you had taken buffer swabs, what we call

2         "buffer swabs" from him, swabs from his mouth,

3         Isaac Jones and that was sent to the State

4         Police Crime Lab, correct?

5   A.  That's correct.

6   Q.  And you requested that the casings  from Baudin

7         Street--do you remember how many casings

8         there was at Baudin Street?

9   A.  There was maybe like forty-four, forty-five.

10  Q.  Forty-five casings?

11  A.  Yes.

12  Q.  Single casings.  All right.  And you requested that

13        that be compared to--did you submit the strrmpt-

14        ed murder item number  sd pg mpe?

15  A.  I requested that it be compared to the Audubon

16        Street case and the case--the February case

17        where Orlando Rickmon had been shot.

18  Q.  And  you also requested it be compared to the College

19        Court case?

20  A.  What, the College Court case?

21  Q.  That's the "I" (alphabet letter indicating September,

22        preceding the numerical item number.)

23  A.  That's the Audubon.

24  Q.  Audubon. Yes.   All right.  That's off College Court?

25

-18-

CERTIFIED DA OFFICE COPY

OPDA10586

1    A.   No.  The address is on College Court is the address

2         across the street from there.

3    Q.   Oh, all right.  I got you.

4    A.   Around the corner from College Court.  It's actually

5         right  around the corner.

6    Q.   All right.    That's the wrong address up there on

7         the (chart) board.

8    A.   It should be ████████████

9    Q.   Audubon.  Right.

10   A.   And I requested that it be compared to--I requested

11        that it be compared to the Audubon case, the

12        case involving--there's another case involving

13        him, Mr. Jones shooting at his uncle.

14   Q.   Yes.  That's in  May.  That's on Castiglione.

15   A.   I requested that the Baudin case be compared to the

16        Audubon case, the case involving Mr. Rickmon

17        from February.

18   Q.   That was on Toledano Street.   Okay.

19   A.   The case involving Isaac shooting at his uncle.

20   Q.   All right.

21   A.   And the case involving, was it Curry?

22   Q.   Jeremy Curry.

23   A.   Jeremy Curry.

24   Q.   That's on Gervais.  That's Detective Johnson's case.

25   A.   So I requested that.  I sent that request to

-19-

CERTIFIED DA OFFICE COPY

OPDA10587

```
1              Meredith Acosta in Ballistics that it be com-
2              pared to those.  I actually spoke with her on
3              yesterday and she advised that she was going
4              to kind of see what was going on with it
5              because I requested it a while ago.
6   Q.  All right.  You don't have that result?
7   A.  I don't.
8   Q.  Is there a possibility that you have a DNA hit on
9              the Rickmon case on Baudin?  We know we might
10             get one on the Crawford case, but is there
11             anything that came back on the--
12  A.  There's nothing.
13  Q.  You don't think there's going to be anything that
14             would show his DNA on the Baudin Street case?
15  A.  I don't.  There was--there was one live round that
16             was spent, but it was inadvertently handled
17             by Ballistics before I could get it up to
18             Baton Rouge to have it swabbed for DNA.
19  Q.  All right.
20  A.  That would have been this one.
21  BY MR. FAMULARO:
22      All right.  Questions?
23  EXAMINATION BY A JUROR:
24  Q.  They had no eye-witnesses  on Baudin at all?
25  A.  I can't hear you.  (Juror at far end of table.)
```

-20-

CERTIFIED DA OFFICE COPY

OPDA10588

Q.   They had no eye-witness out on Baudin at all?

A.   They did.  They had--they had a witness; well, two
     witnesses across the street.

EXAMINATION BY MR. FAMULARO:

Q.   They couldn't really make an I. D., right?

A.   They couldn't, and  they had a newspaper article
     that came out and it kind of messed up the
     interview.  Before I could get either one of
     those witnesses in--well, I showed one lineup,
     but the picture I got was Mr. Jones looking
     down at the camera. And they were giving me--
     initially I took a little statement from them
     on the scene that night while I was canvassing
     the neighborhood and they were focusing on his
     eyes and facial pictures.  The  picture I had
     was with Mr. Jones looking like he's looking
     at the floor.  That was the only picture I had.
I  showed them a lineup and they were like "I don't
     know," but they were just focusing on the eyes.
So  I requested a second lineup from the State Police
     where they had a picture of him looking head on.
     I got that lineup back.  I scheduled to show
     them that lineup,  both of them, separately,
     that lineup on a Monday.  That Sunday an
     article came out in the paper insinuating that

-21-

CERTIFIED DA OFFICE COPY

OPDA10589

```
 1          Jones was involved in the case on Baudin Street
 2          and that it was in retaliation for one of those
 3          subjects supposedly killing his dad, and so my
 4          witnesses were more or less, once they had saw
 5          it, they were like "I don't know. I don't want
 6          to pick this guy because I saw him in the paper."
 7     And I don't know if--and there's one, we spoke in a
 8          conversation after the interview and she was
 9          like "that could be him, but I'm not sure if
10          I'm saying that because I saw him in the paper
11          and they said it was him and I don't want to
12          pick him just because I saw him." So it's like
13          they kind of went out of their way not to pick
14          him because the paper put him in there without
15          having--on an open case.  Yes (to a juror)?
16  EXAMINATION BY A JUROR:
17  Q.  Did the girlfriend and the mom tell you anything
18          about the boyfriend, Orlando, being shot? Were
19          they being protected?  Do you believe that?
20  A.  I don't know much about that case other than the
21          basics. That was handled by another detective. I
22          did talk to a Kathy Rickmon, that she had made
23          notification--she notified the detective, or
24          tried to. I'm not sure she got in touch with him,
25          but she said she made some noticiation to the
```

-22-

CERTIFIED DA OFFICE COPY

OPDA10590

```
 1              D. A.'s Office. Now  I don't know if they--I
 2              can't show if they ever made any reports on it,
 3              but when I talked to her, the first interview I
 4              did with her, she was very upset and the biggest
 5              thing was that she felt like there wasn't enough
 6              protection after the shooting being that he
 7              identified the guy as the perpetrator.
 8        So I guess I'd have to say if there was, there wasn't
 9              enough.
10   Q.   Why wasn't he arrested after Rickmon identified him
11              as the shooter?  Why wasn't he in jail?
12   A.   He was arrested.
13   BY MR. FAMULARO:
14        He bonded out.
15   BY THE WITNESS:
16        He made bond.
17   ESAMINATION BY ANOTHER JUROR:
18   Q.   What was it that said it was retaliation?
19   A.   There was an article.
20   Q.   There was an article about that?
21   A.   And the thing about that is I can't, again, I didn't
22              know the guys before the case, you know, that's
23              the thing with this job, you don't get to know
24              people until  afterwards.  But they're wanted,
25              and their records,  I mean I can't say a
                hundred percent either way, but they're wanted
                and, you  know,  and their  records  and back-
```

-23-

CERTIFIED DA OFFICE COPY

OPDA10591

```
 1          ground,   They don't have anything to suggest
 2          that they were--because I mean even in the
 3          paper they  insinuated there were in a gang.
 4          But I  mean I didn't have anything in their
 5          background or their records that they had
 6          been arrested for more than a traffic ticket.
 7          And that was each one of them. And there was
 8          never anything else to suggest that there was
 9          anything going on, you know, at their age.
10     They're what, twenty-five, twenty-six, something
11          like that?  There  was nothing more than a
12          traffic ticket on each one of their records.
13     So I don't even know what--and the paper, that
14          information they got, even now, I don't know
15          where that came from because that s not some-
16          thing that I found.
17 BY MR. FAMULARO:
18     Anything else?  (Nothing further forthcoming from
19          the jurors.)  Thank you, Detective.
20               -------------
21
22
23
24
25
```

-24-

CERTIFIED DA OFFICE COPY

OPDA10592

C-E-R-T-I-F-I-C-A-T-E

I, the undersigned court reporter, do hereby certify that the foregoing twenty-four pages of transcription of the testimony given by the witnesses, NOPD Detectives Virgil Landry and Clinton Givens, before the Orleans Parish Grand Jury on August 15, 2013, in the matter of State v. Isaac Jones, under Police Item Numbers I-08333-12, B-03213-13 and D-31858-13, are true and correct, according to the best of my ability and understanding.

MAURICE W. BETTENCOURT
Certified Court Reporter

CERTIFIED DA OFFICE COPY

OPDA10593