# EXHIBIT 1-2

```
 1      MR. SACHS:

 2          Bruce, maybe you can help Ms. Baham find

 3  No. 17 on that document, that line, please.

 4      THE WITNESS:

 5          Have you received -- they got none on

 6  there.

 7      MR. HAMILTON:

 8          He means over here.

 9      THE WITNESS:

10          Yes, on -- relationship die or family

11  member/close friend, job -- yes, I had done lost

12  someone.

13  BY MR. PAUL:

14      Q    What was -- what was the loss that was

15  being referred to in the form?

16      A    What was the loss?

17      Q    Yes, ma'am.

18      A    And when was this here?

19      Q    This is December 29, 2015.

20      A    December 19th?

21      Q    29th -- December 29th of 2015.

22      A    Who pass in the '15?  There was so many

23  deaths so I'm trying to see who was in '15.  I think

24  it was my sister-in-law died in '15.

25      MR. SACHS:
```

```
 1      MR. SACHS:

 2           Prior to being arrested, Ms. Baham.

 3      THE WITNESS:

 4           No.  I don't do none of this here thing.

 5  I -- I probably had -- and that was before like

 6  around the repass.  Now, I -- for the repass.

 7  BY MR. PAUL:

 8      Q    I'm sorry?  I didn't hear your answer.

 9      A    Someone passed that time.  Only person I

10  told that -- I had a few drinks, probably about two

11  or three beers at the repass, at the funeral, but

12  other than this here and thing, and I just drunk

13  them three beers around repass time and everything,

14  but I used to drink years ago, but I haven't drank

15  in years but that time at a repass.  And any kind of

16  drugs or anything, I never done drugs.

17      Q    So you didn't tell anyone at the jail that

18  you had used marijuana in the last 30 days?

19      MR. SACHS:

20           Objection, asked and answered.

21      THE WITNESS:

22           No.

23      MR. SACHS:

24           And, again, objection for relevancy to all

25  these medical questions.
```

LAZONIA BAHAM on 09/11/2020

```
 1  BY MR. PAUL:
 2      Q    So you talked a few minutes ago about when
 3  you appeared in front of the judge after you were
 4  arrested.  Do you recall that?
 5      A    And when I have to -- when they brought me
 6  to court?
 7      Q    Yes.
 8      A    Yes.
 9      Q    Do you recall the name of the judge?
10      A    But I never get a chance to talk with the
11  judge.
12      Q    Do you recall the name of the judge?
13      A    Laura White.
14      Q    Laurie White you said?
15           Do you recall that she appointed a lawyer
16  for you?
17      A    Yeah, she sent the lawyer to the back over
18  when Napoli asked to speak to me at the back.
19      Q    Do you recall the name of the lawyer?
20      A    No.
21      Q    How many times did you speak with him?
22      A    With the lawyer?
23      Q    Yes, ma'am.
24      A    Just that time when we went in the back
25  when I said where I seen Ike at, and when the lawyer
```

1 say what he said to Napoli and thing, that's when

2 Napoli put him out, put him out the room.

3     Q    So your testimony is that Mr. Napoli told

4 your lawyer to leave?

5     A    Yes.

6     Q    And your lawyer just left because

7 Mr. Napoli told him to?

8     A    The lawyer told him he was going to be in

9 big trouble if this ever gets out to the press.  He

10 told him for to shut up and get out.

11     Q    Did you tell your lawyer to leave the

12 room?

13     A    No, I didn't tell him to leave.  Napoli

14 told him to leave.

15     Q    So what did Mr. Napoli say to you when you

16 were back in the room with him?

17     A    After the lawyer left out, he close the

18 door back, and I telling him where I seen -- he had

19 the pen on the desk like this here (indicating).

20 Lazonia, look and listen at me, now I know what you

21 seen, you seen the red car there.  I said, a red

22 car, what red car?  Come on now, Lazonia, the red

23 truck.  You know, you know -- I said, what red truck

24 is you talking about?  What is you talking about?

25         He sit there, he looking at me thinking.

```
 1  All right, well, you -- you'll testify and say that
 2  you seen him?  I said, yeah, that's what I been
 3  trying to do all the while y'all arrested me.  I
 4  told -- told Kitchens I tell him where I seen the
 5  boy.  He said, right.
 6          Went back to the front, I sit in the seat
 7  up there where the judge was at, call it, and the
 8  security guard right there, and he went talking to
 9  the judge.  And after I got the subpoena and thing,
10  I looked at it, I said they saying I'm testifying
11  against him, I'm trying to tell them where he was.
12  I'm trying to raise my hand up --
13      Q    Let's just go back to your discussion with
14  Mr. Napoli.
15      A    -- to tell the judge.
16      Q    So he -- he was asking you about seeing a
17  red truck; is that what you said?
18      A    He said from a red car to a red truck.  I
19  ain't know what he was talking about.  I kept on
20  telling him I don't know what he talking about.
21      Q    And what did he say when you said you
22  didn't know what he was talking about?
23      A    Then he went to asking me do I -- is --
24  would I testify to what I said.  I said, yeah, I
25  tell them.  I just seen him right around in front my
```

1 house, ain't had nothing to do.  We went back to the

2 front and thing.  That's when they served me with

3 the subpoena.

4      Q    And what did he say after you told him

5 that?  You said that -- you said you told him you

6 would testify to what you saw, which is that you saw

7 Isaac Jones by your house, correct?

8      A    Yes.

9      Q    And what did he say after that?

10     A    He said, all right.  Brought me back to

11 the front, went talk to the judge, and then after I

12 got served with the subpoena, the judge was saying I

13 was going to be released, how long I was back there?

14 And I said about seven days.  He said six.  He in

15 the back of me, he said six.  So I said six.

16          We sit back down and thing.  After I got

17 the subpoena and realized they saying I'm testifying

18 against him.  I say, how I'm testifying against him

19 if I said where I seen him at?  I tried to raise my

20 hand and thing.  The deputy there, right there

21 told -- put my hand down.

22     Q    If we can just focus for a minute on your

23 meeting with Mr. Napoli.  About how long were you in

24 the meeting with him?

25     A    Not long after he put him from back there

1   and went to saying that and ask me would I testify

2   after he say what he said.  I told him yeah.  When

3   they gave me the subpoena, I seen that they said

4   testify against him.  I say, how I'm testifying

5   against him if I'm saying where he was?

6          I tried to raise my hand for to tell them

7   that.  The deputy that was right there told me put

8   my hand down.  It just was so much commotion,

9   everything going on in that court.  That's when they

10  done pulled me -- brought me to the back.  I ain't

11  get a chance to say nothing.  So I'm going all

12  around trying to find me a lawyer or something for

13  when I get back in there to try to represent me and

14  thing.

15     Q    If you had to estimate, about how long did

16  you meet with Mr. Napoli?

17     A    I say like about five to seven minutes

18  probably after back there.

19     Q    Did he threaten you in that meeting?

20     A    No.  The way he was doing, he hit the

21  table, still talking about the car and the truck and

22  thing.  I don't know nothing about and thing.

23     Q    Did you feel like he had done something

24  wrong to you in that meeting?

25     A    Yes, he had done me something wrong,

1  because he got me like I'm testifying against him

2  when I'm trying to tell him where he was.

3      Q    But you told him what you would testify

4  to, correct, you told him --

5      A    Yes.

6      Q    -- I'll testify that I saw Isaac Jones

7  around my house; is that correct?

8      A    (No response.)

9      Q    And Mr. Napoli didn't threaten you after

10  you said that, did he?

11    MR. SACHS:

12         Objection to form.

13    THE WITNESS:

14         No, he ain't threaten me went out there

15  for -- go out there and got that subpoena and thing.

16  When I seen the subpoena that I'm testifying against

17  him, I know that wasn't right, and I'm still trying

18  to find out what -- that's when I went -- I say,

19  man, what is these people in here trying to do?

20    MR. SACHS:

21         I want to object to the definition of

22  threat.  That's vague.

23    THE WITNESS:

24         I was trying to get a lawyer.

25  BY MR. PAUL:

1      Q    What do you mean when you said the

2  subpoena that you received said that you were

3  testifying against Isaac Jones?

4      A    Like I'm testifying against him when I'm

5  telling them where I seen him at.

6      Q    What did it say on the subpoena that said

7  you were testifying against Isaac Jones?

8      A    Yes.

9      Q    What did it say?  I mean, what did the

10  subpoena say that reflected that you were testifying

11  against Isaac Jones?

12      A    It had it on the subpoena, on the subpoena

13  that I'm testifying about -- I can't really explain

14  it, but I know I was -- they had it where I was

15  testifying against him.  I'm saying how I'm

16  testifying on him and I'm telling them where he at?

17      Q    Well, the subpoena said State of Louisiana

18  versus Isaac Jones, correct?

19      A    Yes.

20      Q    And it had your name on there as a

21  witness, correct?

22      A    Yes.

23      Q    Where on the subpoena did it say Lazonia

24  Baham is testifying against Isaac Jones?

25      MR. SACHS:

```
 1            Objection.  She was called as a State's
 2   witness.  I think she's asked and answered this.
 3            Go ahead, Ms. Baham.
 4        THE WITNESS:
 5            I specifically told them I was testifying
 6   to tell them where I seen Ike at.  I seen it on the
 7   subpoena.  It wasn't like I was testifying and
 8   saying that -- where I seen him at.  They had it
 9   like I'm testifying against him or something.
10   BY MR. PAUL:
11        Q   Do you feel like Mr. Napoli did anything
12   to retaliate against you?
13        A   Yes.
14        MR. SACHS:
15            Objection.  Go ahead and answer.
16   BY MR. PAUL:
17        Q   What did he do to retaliate against you?
18        A   After I done told him everything I know
19   and thing, he still harassing me, calling.  After
20   they gave me that subpoena, I couldn't talk to the
21   judge.  When I went back with the subpoena, I'm
22   sitting in the courtroom trying to get to the bottom
23   of it, he done called me out the courtroom for to go
24   sit on the benches, still talking about a red truck
25   and thing and then asked me if -- if is I'm on any
```

1  kind of medicine or anything.  Do I remember what we

2  talked about?  I said, I remember exactly what we

3  talk about, I told you where I seen the boy at.  I

4  say, I don't know nothing about no red car or no red

5  truck.  What is you talking about?

6       Q    So you mentioned before you talked to

7  Mr. Napoli twice, right?  Once after you first went

8  to court and, then again several weeks later; is

9  that correct?

10      A    When I went back to court, when I was

11  subpoenaed for to go back, that's when he called me

12  out the courtroom.

13      Q    Tell me about that second conversation.

14  What happened in that second conversation?

15      A    He asked do I remember what we talked

16  about.  I said, yeah.  He said, oh, okay.  So you

17  remember about the red -- I said, yeah, I remember

18  about the red truck, yeah, it was on the news, yeah,

19  I remembered it.  Then he asked me is I'm on any

20  kind of medicine.  I said, no, I'm not on no

21  medicine.

22      Q    And then what did he say?

23      A    He asked me to go sit back in there --

24      Q    Did he say anything else --

25      A    -- in the courtroom.

```
 1      Q    Did he say anything else to you other than
 2  what you just told me?
 3      A    No.
 4      Q    Did he make any threat to you on that
 5  occasion?
 6      A    No.  Just the things how he was doing --
 7      MR. SACHS:
 8           Objection to form.
 9      THE WITNESS:
10           -- in there -- in there.  What does he
11  keep on questioning me about something I don't know
12  and I'm telling him what I know.  You trying to put
13  words in my mouth.
14  BY MR. PAUL:
15      Q    So you feel like what he did wrong was
16  that he kept questioning you about something that
17  you didn't know about; is that correct?
18      A    Yes, it was wrong after I told him what I
19  knowed (sic).
20      Q    And how do you believe he retaliated
21  against you?
22      A    He done --
23      MR. SACHS:
24           Objection.  Calls for legal conclusion.
25      THE WITNESS:
```

1          Every time I come to the court -- every
2    time I come to court and thing.
3    BY MR. PAUL:
4        Q    I'm sorry?
5        A    That should have been resolved.  Every
6    time I go to the court, I'm -- I said all that
7    should have been resolved.  Every time I go to the
8    courtroom, they have me sitting in there.  They sit
9    me in there for the stuff that I don't know nothing
10   about, just sitting there.  Sitting there.
11          They have me in there all day until the
12   courts close and then just steady giving me
13   subpoenas to come back after y'all done put me on
14   the stand for pretrial and thing and I'm telling
15   y'all everything, and you still would not leave me
16   alone.  They still done have me coming to the court
17   for nothing.  You still done running me there for
18   nothing.  Still make sure he going to give me a
19   subpoena to come there.
20          They get me in there for -- they read all
21   this here charge and I ain't know nothing about
22   nothing with this here y'all doing out there in the
23   street and thing.  They would try to make me change
24   my testimony after they let me hear all these here
25   cruel thing that y'all have been doing.

1            I said this here would be -- what they try

2   to do, trying to close the case and don't know who

3   done it, just trying to give anybody a charge and

4   getting someone to try to help them to do it.

5       Q    So I think you're telling me after you

6   got --

7       A    They wasn't worrying about nothing but

8   theyself.

9       Q    After you got released from jail, you got

10  subpoenas to come back to court on multiple

11  occasions; is that correct?

12      A    Yes.

13      Q    And you feel like there was something

14  wrong with that?

15      A    No, nothing wasn't wrong.

16  MR. SACHS:

17           Objection.  Ms. Baham, hold on one second.

18  THE WITNESS:

19           What was wrong --

20  MR. SACHS:

21           Objection to vagueness.

22  THE WITNESS:

23           What was wrong with it, once I came and

24  y'all found out everything, why is y'all kept on

25  harassing me?  Why was they just keep on harassing

```
 1  me for no reason when I'm telling them everything
 2  and try to put words in my mouth?
 3  BY MR. PAUL:
 4      Q    What do you mean when you say harassment?
 5  What are you referring to?
 6      MR. SACHS:
 7          Asked and answered.
 8      THE WITNESS:
 9          Calling me to court.
10  BY MR. PAUL:
11      Q    I'm sorry?
12      A    They calling me to court, just sitting in
13  there, just sitting in there for nothing, wasting
14  time, wasting money when I could have been making
15  money.
16      Q    Was there anything other than --
17      A    My children going all out of control and
18  thing because I'm trying to deal with this and can't
19  focus on what my family and my business what I have
20  to do.  Just bringing me -- just a merry-go-round.
21      Q    Was there anything other than making you
22  come back --
23      A    Like a nightmare you can't wake up out of.
24      Q    Was there anything other than making you
25  come back to court that you believe was harassment
```

1  of you?

2      A     Yes, they was harassment and thing when

3  you -- you telling me -- I'm telling you what I seen

4  and y'all telling me about a red car, red truck and

5  thing, I don't know nothing about and thing.  What

6  is you keep harassing me about something I don't

7  know about?

8      Q     Other than asking you --

9      A     You just going to make me say something.

10     Q     Other than asking you questions on two

11  different occasions and calling you to come back to

12  court, is there anything that Jason Napoli did that

13  you consider retaliation?

14     MR. SACHS:

15          Objection.  Calls for a legal conclusion.

16          Go ahead and answer, Ms. Baham.

17     THE WITNESS:

18          Yes, I think what he done was pretty much

19  rude, not professional at all.

20  BY MR. PAUL:

21     Q     What are you referring to?

22     A     What he -- the way how he acted when he

23  had me at the back, call me to the back and putting

24  the attorney out there, and hitting on the table

25  with the pen like this here (indicating.)  Come on

1  now, Lazonia, come on, you know.  No.  Okay.  Well,

2  you seen the red car.  What is you doing all this

3  here for when I'm telling you I seen the boy around

4  there talking to another boy named Jay.

5      Q    So when you left that meeting, did you

6  feel like something wrong had been done to you?

7      A    Yes.

8      Q    Did you consider suing Mr. Napoli at that

9  point?

10     MR. SACHS:

11          Objection, relevancy.

12     THE WITNESS:

13          I was not thinking about trying to sue

14  him.  I was trying to let the people know what he

15  was doing was not right, and he don't need to be in

16  there for what he's doing.  That's not right.

17  BY MR. PAUL:

18     Q    Did you consider suing the DA's office at

19  that point?

20     A    I wasn't trying to think about suing

21  nothing.  All I wanted was peace and to get over all

22  of this.

23     Q    When did you start thinking about suing

24  Jason Napoli and the DA's office?

25     A    They kept on --

```
 1      MR. SACHS:
 2           Objection, relevance.
 3      THE WITNESS:
 4           Kept on.  I wasn't worrying about trying
 5  to sue them.  All I was trying to get to the bottom
 6  of it, get my life back together.  I wasn't -- none
 7  of that was on my mind.
 8  BY MR. PAUL:
 9      Q    I'm asking, when did it start being on
10  your mind?
11      MR. SACHS:
12           Objection.
13      THE WITNESS:
14           It never was on my mind.
15  BY MR. PAUL:
16      Q    You have sued Mr. Napoli, correct?
17      A    Yes, I'm trying to sue him now.
18      Q    When did -- when did it first get on your
19  mind the idea to sue him?
20      A    It was never on my mind.  I keep on
21  telling you, it was never on my mind.
22      Q    Then why did you do it then?
23      A    My mind was -- because he was harassing me
24  and doing things to me, locking me up and everything
25  for nothing, that's why.
```

1  says there's no response.  If the record reflects

2  that you and your daughter did not appear for court

3  on November 13, 2017, would you have any reason to

4  dispute that?

5       A    No, not -- I came to court.

6       Q    Let me know if you want me to read any --

7  if you want me to scroll through any other parts of

8  the transcript so you can read it.

9       A    I think we got the subpoena in the

10 courtroom.  I remember me and my daughter had went

11 to court.  I think this was served in court, yes.

12 They got her to sign it.  This is her signature, I

13 know that, and this is my signature right here.

14      MR. SACHS:

15           Would you mind, Matt, scrolling through

16 the -- Mr. Paul, would you mind scrolling through

17 the document?  I don't have a copy of it, so...

18      MR. PAUL:

19           Sure.  Let me know when you want me to

20 scroll.

21      MR. SACHS:

22           I just wanted to see that.  If you just

23 scroll through the document so I can -- if I can

24 look at it.  I may have looked at it before, I

25 just -- I don't know what Ms. Baham is talking about

1  because I don't have all the pages in front of me.

2      THE WITNESS:

3          I think we went to court that day.  I'm

4  not sure.  I know a date when they had us to sign

5  something when both of us was at court.

6  BY MR. PAUL:

7      Q   Would you agree that the transcript that's

8  on the screen here reflects that you did not appear

9  in court on that day?

10     MR. SACHS:

11         Objection.

12     THE WITNESS:

13         Yes, I'm not sure.

14     MR. SACHS:

15         Mr. Paul, would you mind scrolling through

16  the rest of this document so we can see it?  Thank

17  you.  Or if it's easier, you could e-mail it out to

18  all of us.

19     MR. PAUL:

20         It's only three pages.  I'll e-mail it if

21  you want, but I'm happy to scroll it for you.

22     MR. SACHS:

23         That would be great.  I'm just seeing

24  Page 9 -- oh, there we go.  Okay.

25  BY MR. PAUL:

1        Q     All right.  So all I'm asking, Ms. Baham,

2    the transcript seems to reflect that you didn't

3    appear in court on November 13, 2017.  I'm just

4    asking if you have any reason to dispute that?

5        MR. SACHS:

6              Objection.

7        THE WITNESS:

8              No, I -- I'm not sure at the time why I

9    didn't make it to court.

10   BY MR. PAUL:

11       Q     As far as you're aware, did you appear

12   every time in court that you had a subpoena to be

13   there?

14       MR. SACHS:

15             Objection to the term "subpoena."  Are you

16   including in that the fake subpoenas, the letters?

17       THE WITNESS:

18             Every subpoena I got, I tried to make sure

19   I made it down there to the courtroom, and I just

20   was sitting every time.  They never called me or

21   nothing.  I'm just sitting in there.

22   BY MR. PAUL:

23       Q     As far as you know, did you actually

24   appear every time you were subpoenaed?

25       A     Just about every time.  I think one -- one

```
 1   time.  I think I probably was on the verge of moving
 2   or something.  That's when they issue another one, I
 3   think, where we had to go.
 4        Q    So you feel like you might have missed one
 5   date that you were subpoenaed for?
 6        A    Probably.  I'm not sure though.
 7        MR. SACHS:
 8             Objection to the form of that question.
 9   BY MR. PAUL:
10        Q    Do you recall Judge Laurie White ever
11   calling and leaving a message on your voice mail
12   about you not coming to court?
13        A    No.
14        Q    Ma'am, have you ever gone by the name
15   Zakia Banks?
16        A    Zakia?  That's my daughter's name.
17        Q    Have you ever used that name yourself?
18        MR. SACHS:
19             Objection, foundation.
20        THE WITNESS:
21             Don't remember.
22   BY MR. PAUL:
23        Q    You don't remember you said?
24        A    Using -- I probably -- Zakia Banks?  Not
25   that I know of.
```

```
 1      Q    Have you ever gone by the name Kim McCoy?
 2      MR. SACHS:
 3           Objection.
 4      THE WITNESS:
 5           I don't know.  I'm not -- I don't know.
 6   BY MR. PAUL:
 7      Q    Have you ever gone by the name Kim Green?
 8      A    Okay.  I -- okay.  I think Kim Green -- I
 9   done used Kim Green before when I got arrested years
10   ago or something.  I probably used a alias.
11      Q    You got arrested and you gave them the
12   name Kim Green?
13      A    I know they was going to find it out once
14   they fingerprint me.
15      Q    Have you ever gone by the name Pamela
16   Williams?
17      A    Yes, alias.  When I go to jail, yeah, I
18   done gave that.
19      Q    So you've given the police that name when
20   you got arrested and went to jail you're saying?
21      A    Huh?
22      Q    You're saying that you used that name as
23   an alias when you were arrested and went to jail?
24      A    No, not now and thing when they brought
25   me.  They had my name and thing.  That was years ago
```

 1   what you talking about.

 2       Q    Right.  I just want to be sure I'm

 3   understanding what you're saying.  You said you

 4   have -- you have used the name Pamela Williams in

 5   the past?

 6       A    Yes.

 7       Q    In what context did you use it?

 8       MR. SACHS:

 9            Objection to the relevancy.

10       THE WITNESS:

11            Probably disturbing the peace, the

12   shoplifting charge probably one.  I don't -- I don't

13   know.  I know years ago I done used alias when I

14   went to jail, and I know they was going to find it

15   out once they fingerprint me.

16   BY MR. PAUL:

17       Q    Have you ever gone by the name Paula

18   Williams?

19       A    I don't know.  I come up with names and

20   things.  I done came up with names for when I went

21   to jail, but I know they going to catch it once I go

22   to jail.  I give them -- done gave them alias

23   before, yes.

24       Q    Have you gone by the name Brittany

25   Williams?

```
 1              And, Mr. Paul, I'm just -- the line you
 2   read was the line dated 3/8/2010, correct?
 3         MR. PAUL:
 4              Correct.
 5         MR. SACHS:
 6              This is three years before Mr. Jones'
 7   murder just for time -- three or five years before,
 8   somewhere along those lines.
 9         MR. PAUL:
10              Three years.
11         MR. SACHS:
12              Three years.  Right.  I'm going to object
13   to the use of this.
14   BY MR. PAUL:
15      Q    I'm sorry, ma'am, I couldn't hear you.
16         MR. SACHS:
17              And while you're reading that, Ms. Baham,
18   just so that I was clear, this is three years before
19   Mr. Jones' murder and five years before you were
20   arrested on the material witness warrant.
21         THE WITNESS:
22              I'm not aware.  Could have been.
23   BY MR. PAUL:
24      Q    Do you have any reason to dispute that
25   what's reflected in this document, docket master, is
```

```
 1  correct?

 2      MR. SACHS:

 3          Objection to the form of the question.

 4      THE WITNESS:

 5          Yes, I'm not sure what this for.  I can't

 6  answer, but it's here, it have to be.

 7      MR. SACHS:

 8          Objection.  Again, Ms. Baham didn't create

 9  this document.

10  BY MR. PAUL:

11      Q    Ms. Baham, have you paid any money to any

12  lawyers in connection with anything that happened in

13  the Isaac Jones case?

14      A    No.

15      Q    Have you paid any money to any lawyers as

16  a result of being arrested as a material witness in

17  the Isaac Jones case?

18      A    No.

19      Q    Have you paid any money to any lawyers as

20  a result of receiving any subpoenas?

21      A    You want me to answer the question?

22      Q    Yes, ma'am.  I said, have you paid any

23  money to any lawyers as a result of receiving any

24  subpoenas?

25      A    No.
```

LAZONIA BAHAM on 09/11/2020

1      Q    Have you lost any money as a result of

2   receiving any subpoenas?

3      MR. SACHS:

4           Objection.  Could you define -- could you

5   define "lost"?

6      THE WITNESS:

7           Loss work.

8   BY MR. PAUL:

9      Q    I'm sorry, Ms. Baham, I couldn't hear you.

10     A    Yes, losing days of work and thing.

11     Q    And which subpoenas caused you to lose

12  days of work?

13     A    I don't know.  I had so many of them.

14     Q    Do you mean trial subpoenas?

15     A    And every time I stayed until the courts

16  closed.

17     Q    So you -- you're talking about subpoenas

18  to come to court?

19     A    Yes.

20     Q    Have you lost any money as a result of

21  being arrested as a material witness in the Isaac

22  Jones case?

23     A    Yes, being -- being locked up.  I'm losing

24  out on money at work.

25     Q    How much money did you lose out on as a

```
 1  result of that?
 2       A    I don't know.
 3       MR. SACHS:
 4             Objection.  Calls for speculation.
 5             Go ahead and answer, Ms. Baham, to the
 6  best of your ability.
 7       THE WITNESS:
 8             I -- I don't know.  I really can't tell
 9  you.
10  BY MR. PAUL:
11       Q    Do you have any idea at all?
12       A    No.
13       Q    Ms. Baham, what do you want as a result of
14  this lawsuit?
15       MR. SACHS:
16             Objection.
17       THE WITNESS:
18             I want them to be accountable for what
19  they done.
20  BY MR. PAUL:
21       Q    Who?
22       A    And what they was trying to do.  They need
23  to have a strike against they license or something.
24  Kitchens and Napoli, both of them.  They sent me
25  through pure hell and still is sending me through
```

1    it.

2        Q    Is there something other than money that

3    you're seeking through this lawsuit?

4        A    I'm seeking for them -- to get some kind

5    of justice for them.  They need to get a strike

6    against they law license or anything for they won't

7    do that to anyone else.

8        MR. SACHS:

9            And object to the question as relevancy,

10   vague, confusing.

11           Go ahead and answer, Ms. Baham.

12   BY MR. PAUL:

13       Q    You think Mr. Napoli and Mr. Kitchens

14   should be punished somehow?  Is that what you're

15   saying?

16       A    Yes.

17       MR. SACHS:

18           Objection.

19       THE WITNESS:

20           They -- they need to be accountable for

21   what they doing is not right.

22   BY MR. PAUL:

23       Q    Is there anything else that you're trying

24   to achieve as a result of this lawsuit?

25       A    Yes, I -- I need peace and closure.  I

 1  speculation.

 2      THE WITNESS:

 3          It will give me some kind of closure just

 4  to know they cannot do it to anyone else.

 5  BY MR. PAUL:

 6      Q    Do you think you'll have closure when this

 7  lawsuit is over?

 8      A    I have closure when they can't do it to

 9  anyone else, that's when I have closure.

10      Q    And when you say "they," you're talking

11  specifically about Jason Napoli and Mike Kitchens?

12      A    Yes.

13      Q    When was the first time you ever talked to

14  anyone about suing the DA's office?

15      MR. SACHS:

16          Objection, relevancy.

17      THE WITNESS:

18          I didn't talk to anyone about suing them

19  until my son seen on TV what they was doing.

20      MR. SACHS:

21          Ms. Baham, I just want to caution you,

22  you don't have to disclose any conversations that

23  you've had with any potential attorneys or actual --

24  or attorneys that are working with you.  That is a

25  privilege.

```
 1       THE WITNESS:

 2             I said my son.  So I say my son.

 3   BY MR. PAUL:

 4       Q    Can you finish what you're saying about

 5   your son?

 6       A    I say my son called and told me on the

 7   phone what they was doing, and that's when I --

 8       Q    What were they doing?

 9       A    That they was handing out fake subpoenas

10   and thing, and that's when I kept on telling them.

11   I been telling them the truth.  I been trying to

12   tell everyone, wouldn't listen.

13       Q    When did your son call you and tell you

14   this?

15       A    When he seen it on the news.

16       Q    Which son?

17       A    My oldest child, Michael.

18       Q    Michael.  So after he told you that, did

19   you talk to someone about getting a lawyer?

20       A    I -- I've been -- was been trying to get a

21   lawyer from day one before my son even told me

22   anything.  I been trying to get a lawyer for to try

23   to defend me in the courtroom.

24       Q    I'm not talking about defending you in the

25   courtroom.  I'm talking about to sue the DA's office
```

 1  and Jason Napoli.  Did -- after your son told you

 2  about what he saw on TV, did you talk to anyone

 3  about getting a lawyer to sue the DA's office and

 4  Jason Napoli?

 5       MR. SACHS:

 6             Objection, form.

 7             You can go ahead and answer, Ms. Baham, as

 8  best you can.

 9       THE WITNESS:

10             No.  I was just trying to get a lawyer to

11  get this all behind me.

12  BY MR. PAUL:

13       Q    So how did you become -- how did you

14  become involved in this lawsuit?

15       A    When my son gave me the -- told me who to

16  reach out to and thing.

17       Q    What number did your son give you?

18       MR. SACHS:

19             Objection to relevancy.

20             Go ahead and answer, Ms. Baham.

21       THE WITNESS:

22             He gave me the number to the ACLU.

23  BY MR. PAUL:

24       Q    And how did your son have the number for

25  the ACLU?

```
 1      MR. SACHS:

 2           Objection.

 3      THE WITNESS:

 4           I don't know.

 5 BY MR. PAUL:

 6      Q    So your son called you on the phone, told

 7 you about something with subpoenas; is that correct?

 8      MR. SACHS:

 9           Objection.

10      THE WITNESS:

11           Yes.

12      MR. SACHS:

13           That's not what she said.  She said fake

14 subpoenas.

15 BY MR. PAUL:

16      Q    Did he tell you that you should call the

17 ACLU?

18      A    Yes, he said -- I asked him what the

19 number is.  He said he was going to call -- call me

20 back and give me some numbers to call.

21      Q    So he gave you a number to call and you

22 called it?

23      MR. SACHS:

24           Objection, relevancy.

25           You can go ahead and answer, Ms. Baham.
```

```
 1      THE WITNESS:

 2            Yes.  I -- I -- I got in touch with

 3  them -- after I got in touch with them.  I have a

 4  friend and cousins who work with lawyers and all,

 5  and I asked her would it be good for me to go to

 6  talk with them and thing, and she told me I couldn't

 7  get a better -- better place than them people help

 8  you, and that's what -- I result to them.

 9  BY MR. PAUL:

10      Q   Who did you talk to at the ACLU?

11      MR. SACHS:

12            Objection.

13            You can go ahead and answer, Ms. Baham, if

14  you recall.

15      THE WITNESS:

16            I think it was Mr. Bruce and Ms. --

17            Your name is Bruce, huh?  Yeah, and I

18  talked to Ms. Katie.

19  BY MR. PAUL:

20      Q   As a result of talking to them, did you --

21      MR. SACHS:

22            Objection.  This is -- we're getting right

23  into attorney/client privilege here.

24      MR. PAUL:

25            Let me ask the question.
```

```
 1  BY MR. PAUL:

 2      Q    As a result of talking to them, did they

 3  become your lawyers in this -- in this lawsuit?

 4      A    Excuse me?  Say the question again.

 5      Q    Sure.  As a result of you calling them and

 6  talking to them, did they become your lawyers in

 7  this lawsuit?

 8      MR. SACHS:

 9           Objection.  How they -- how Ms. Baham

10  obtained her representation is entirely irrelevant

11  to this litigation.  I think it's bordering on

12  attorney/client privilege, and I'm going to advise

13  her not to answer.

14  BY MR. PAUL:

15      Q    Ms. Baham, are you going to follow that

16  advice?

17      A    I'm not going to answer.

18      Q    Did you ever sign a written representation

19  agreement with any of the lawyers that are

20  representing you in this lawsuit?

21      A    Excuse me?  Could you say that again.

22      Q    Did you ever sign a written representation

23  agreement with any of the lawyers that are

24  representing you in this lawsuit?

25      MR. SACHS:
```

LAZONIA BAHAM on 09/11/2020

202

```
 1            Objection.  Again, her -- her engagement
 2   with her lawyers, her agreement with her lawyers is
 3   all privileged material.  I'm going to instruct her
 4   again not to answer.
 5   BY MR. PAUL:
 6       Q    Are you going to follow that advice,
 7   Ms. Baham?
 8       A    Yes, I'm not going to answer.
 9       Q    Has anyone offered you money to be a
10   plaintiff in this lawsuit?
11       A    No.
12       Q    Has anyone offered you anything else of
13   value to be a plaintiff in this lawsuit?
14       A    No.
15       MR. PAUL:
16            Let's take a break for about ten minutes.
17   I might be done here.
18       MR. SACHS:
19            Okay.  That's fine.
20                 (Brief recess.)
21   BY MR. PAUL:
22       Q    Ms. Baham, you mentioned before that your
23   only employment between 2013 and 2016 was doing home
24   health; is that correct?  I can't hear you.
25       MR. PAUL:
```

LAZONIA BAHAM on 09/11/2020

```
 1              We have no sound, Bruce.
 2         THE WITNESS:
 3              I been doing that before -- I was doing
 4    home healthcare before the storm came, before 2005.
 5    BY MR. PAUL:
 6         Q    So let me -- let me ask the question
 7    again.  I'm only asking now about the time period
 8    between 2013 to 2016.
 9              So during that time, I think you told me
10    before, the only employment you had was doing home
11    health; is that correct?
12         A    Yes.
13         Q    You told me you were caring for two
14    different people, your mother-in-law and someone
15    else?
16         A    Yes, both of them deceased.
17         Q    Were -- did they hire you directly, or
18    were you working for some kind of agency?
19         A    No, they hired me directly.
20         Q    So they were just paying you --
21         A    I was -- yes, I was getting paid with
22    my -- before she became my mother-in-law, I had got
23    the job sitting with her from her daughter, which
24    she is deceased now, too.
25         Q    I forgot to ask you --
```

```
 1        A     I got the job.

 2        Q     When did you marry Mr. Heart?

 3        A     '17.

 4        Q     Of '17.  So you were -- you said your

 5   mother-in-law was paying you directly to be her --

 6        A     That was before -- that was before.  Yes,

 7   that was before.  I was -- got with her through her

 8   daughter.

 9        Q     How much were you making for those two

10   clients combined?

11        A     I was getting paid every week.

12        Q     And how much were you making every week?

13        A     I was getting three to four -- three a

14   week.  All depends on the hours I was staying there.

15        Q     I didn't hear the first thing you said.

16   How much per week?

17        A     Three or -- 300 or a little more,

18   depending on my hours I was there.

19        Q     And that was for both clients or just --

20   or each client?

21        A     No, that's for one, for each.

22        Q     Would you say you made on average $300 a

23   week for each client during the period 2013 through

24   2016?

25        A     Yes.
```

```
1       MR. PAUL:

2               All right.  Ms Baham, I have no further

3   questions for you.

4       MR. SACHS:

5               We have some redirect.  We have some

6   redirect we'd like to do.  Ms. Chamblee-Ryan is

7   going to --

8       MR. PAUL:

9               Is there anything from the DA's office?

10      MR. FREEMAN:

11              Thank you, Matt, for reminding that I'm

12  still there.  Yeah.  I'm not -- I don't have any

13  questions at this point.  I think you covered it

14  all, so I'm going to pass it over to Mr. Sachs.

15      MR. SACHS:

16              Thank you.  I'm sorry, who is speaking

17  because there was no -- it just said OPDA.

18      MR. PAUL:

19              That was Bobby.

20      MR. SACHS:

21              Okay.  Thank you.

22              Go ahead, Ms. Chamblee-Ryan.

23  EXAMINATION BY MS. CHAMBLEE-RYAN:

24      Q    All right.  Ms. Baham, we're almost done.

25              Okay.  I'm just going to ask you a few
```

LAZONIA BAHAM on 09/11/2020

```
 1  questions.  I want to start just by talking about

 2  all the documents you got that were labeled --

 3      MR. SACHS:

 4          Katie, hold on.  Katie, hold on one

 5  second.  They're reconnecting to the audio, it looks

 6  like.

 7      MS. CHAMBLEE-RYAN:

 8          Oh.  Okay.

 9              (Off the record.)

10  BY MS. CHAMBLEE-RYAN:

11      Q    Hi, Ms. Baham.

12      A    Hi.

13      Q    Hi.  We're almost done.  I'm just going to

14  ask you some questions now, okay?

15      A    Okay.

16      Q    All right.  Or do you need a break or do

17  you -- you ready to get started?

18      A    I'm fine.  Let's get started.

19      Q    Great.

20          So I want to just talk about the documents

21  that you got, all the documents you got that were

22  labeled subpoena, and I know you talked about some

23  of them with Mr. Paul just now.  I just want to walk

24  through the time line of those to make sure it's

25  clear.
```

```
 1              First, was it -- was it confusing when
 2   Mr. Paul was asking you questions about which
 3   subpoena you got when?
 4        A    Yes.
 5        Q    Okay.  And is it easier for you to
 6   remember when things happened based on what was
 7   going on at the time, like your arrest or
 8   Mr. Rickmon's murder instead of just remembering
 9   exact dates out of thin air?
10        A    Yes.
11        Q    Okay.  I can do it by events just to get
12   this time line cleaner.
13              So in general, just generally speaking, is
14   it true that in the years after Orlando Rickmon was
15   killed, you got lots of documents that said subpoena
16   on them, and they looked a lot of different ways?
17        A    Yes.
18        Q    What were some of the different ways they
19   looked?
20        A    Some of them, like, the cream color --
21   like, it wasn't the thin paper, like, and then I got
22   the white subpoenas.  It was different.  It wasn't
23   the same.  They was different.
24        Q    Were some of them yellow?
25        A    Yes.
```

1      Q     Okay.  And do you know what a Grand Jury

2  is?

3      A     No, not -- I think -- I thought a Grand

4  Jury was when you get up on the stand and they --

5  and they had a judge in the thing talking to you.

6      Q     Like when you testified in the case?

7      A     Yes, when I -- when they put me on the

8  stand.

9      Q     Oh, okay.  And do you know what a Grand

10  Jury subpoena is?

11      A     No.  I just know the subpoena that I got

12  to appear in front of the jury.

13      Q     Right.  And so I want to start by talking

14  about those.  Is it true in just -- in the few

15  months -- so right after Mr. Rickmon was killed, a

16  few months after that, you got some subpoenas?

17      A     Yes.

18      Q     And is it true that after you got those

19  there was a long time where you didn't get anything

20  having to do with the case?

21      A     Yes, and then they started back up.

22      Q     And is -- and when they started back up,

23  is it true that you got a letter from the DA's

24  office in the mail?

25      A     Yes.

1      Q    Okay.  And was that about -- would you --

2   would you think that was fair to say it was about,

3   maybe, two years after Mr. Rickmon was murdered,

4   like quite a while?

5      A    It was a while after, yes.

6      Q    And if I told you that that letter was

7   dated September 2015, would that sound right to you?

8      A    Yes.

9      Q    Okay.  And around the same time you got

10  the letter in the mail, did you get another document

11  that had the label "subpoena" on it and had the seal

12  of the DA's office on it?

13     MR. FREEMAN:

14          Object at this time --

15     THE WITNESS:

16          I got -- I got that subpoena after the

17  letter, yes, I got the subpoena.

18     MS. CHAMBLEE-RYAN:

19          Okay.

20     MR. PAUL:

21          Can you repeat your answer?  I didn't

22  hear.

23     MR. FREEMAN:

24          I'm sorry, did you get my objection as to

25  leading?

```
 1       MS. CHAMBLEE-RYAN:

 2            I'm sorry, is that -- is that Mr. Freeman?

 3   I don't believe that there's any rule against

 4   leading in a redirect.  And also, Mr. Freeman, I

 5   think we continue to object to your participation

 6   since you're a witness in the case and you entered

 7   appearances in the Isaac Jones case that we're

 8   talking about.  So I think that it's improper for

 9   you to participate.  It might be more appropriate

10   for Mr. Paul or Ms. Andrieu to make the objection.

11       MR. PAUL:

12            There's been no ruling excluding

13   Mr. Freeman for the deposition, so he will continue

14   to participate.

15       MR. FREEMAN:

16            That's correct.

17       MS. CHAMBLEE-RYAN:

18            Okay.  I think -- I think we'll lodge our

19   objection.  I think that's -- that's inappropriate

20   given his status as a witness in the case, but okay.

21   In interest of moving forward, we'll move on.

22   That's fine.

23       MR. FREEMAN:

24            Perfect.

25       MR. PAUL:
```

```
 1          I'm sorry, I didn't catch the answer to
 2   that question.  Could you -- there was -- there was
 3   some talking back and forth.
 4          MS. CHAMBLEE-RYAN:
 5          Yes.
 6   BY MS. CHAMBLEE-RYAN:
 7      Q    Ms. Baham, I'll ask it again.  So after
 8   you got the letter or around the same time you got
 9   the letter, did you also get a document that was
10   labeled "subpoena" and had the DA's seal on it?
11      A    Yes, that's the one with the seal there
12   where they told me go to the DA office.
13      Q    Right.  And did that come on the same day
14   as the letter, a different day, do you know about
15   how far apart?
16      A    It came after the letter.
17      Q    Do you know how soon after?
18      A    No, not really sure, but I know it came
19   after.
20      Q    Okay.  And is it closer to say it came,
21   you know, a year after or maybe a week after or a
22   month after, something like that, or a day, just to
23   estimate?
24      A    Yeah, probably like about month or so.
25      Q    Okay.
```

LAZONIA BAHAM on 09/11/2020

```
 1      A    Okay.  I got that in '15.
 2      Q    You know what, Ms. Baham, you said -- I'm
 3  making a mistake here.  You said that it was easier
 4  to do things by things that happened, so was that
 5  maybe a month or so before you were -- or how long
 6  before you were arrested do you think?  A few months
 7  or a month or a week?  Few months?
 8      A    Yes.  Yes, it -- yeah, about a couple of
 9  months after I got arrested.
10      Q    Before you got arrested?
11      A    Arrested, yes.
12      Q    I'm sorry, Ms. Baham, just to -- I think I
13  asked it in a confusing way.  Before you got
14  arrested?
15      A    No, no, no, no, no, not before I got
16  arrested.  I got the letter first.
17      Q    Yes.
18      A    And a while after that, that's when I got
19  the subpoena.
20      Q    Okay.  You got -- so you got the letter,
21  then you got the subpoena with the DA's seal on it,
22  and I just want to show you a picture of that, and
23  you don't know exactly how far after you got the
24  letter that you got that document?
25      A    No, I'm not sure, but I know it was after
```

 1  the letter.

 2   (Plaintiff Baham's Deposition Exhibit 1 was marked

 3                  for identification.)

 4  BY MS. CHAMBLEE-RYAN:

 5      Q    Okay.  Let me -- let me just show you -- I

 6  want to show you something that I've marked as

 7  Plaintiff -- Plaintiff Baham's Deposition Exhibit 1.

 8  I'm just going to share my screen if I can figure

 9  out how.

10      MS. CHAMBLEE-RYAN:

11          Actually, I don't think I have the option.

12  Perhaps the host can enable screen sharing?

13          (Off-the-record discussion.)

14  BY MS. CHAMBLEE-RYAN:

15      Q    Ms. Baham, let me zoom out so you can see

16  this.

17      A    That -- that's the one.  I seen that.

18  That's the one from the DA.

19      Q    That's the one you got at some -- you

20  know, after -- after the letter?

21      A    Uh-huh.

22      Q    Okay.  And so it had -- it had a seal on

23  it like this?

24      A    Yes.

25      Q    And it said DA's office on it like this at

1  the top?

2      A    Uh-huh.

3      Q    Okay.  And when you got this document, did

4  you think it was real?

5      A    Yes, I -- I'm thinking all of them real,

6  but I was trying to find out why they never was

7  calling me.  I'm just sitting in there for nothing.

8  They sent me to the DA office and everything.  I was

9  just on a merry-go-round.

10     Q    Yes, ma'am.  And you testified earlier

11  today about how after you got the subpoena that said

12  go to the DA's office -- and we're not talking about

13  the ones that said to go to the Grand Jury room,

14  we're talking about just the one we just looked

15  at -- was it -- you said -- I believe you said, but

16  correct me if I'm wrong, that after that you went to

17  the courtroom -- you went to the courthouse to ask

18  how to get to the DA's office?

19     MR. PAUL:

20         Object to the form.  That's not what she

21  said.

22     THE WITNESS:

23         Yes.

24  BY MS. CHAMBLEE-RYAN:

25     Q    Well, Ms. Baham, is that what you said?

```
 1      A    I -- I -- I -- I went to the courtroom to
 2   find -- find out.  I know I -- they was sending me
 3   to that courtroom with the other subpoena, so I went
 4   there to see for to find out where -- where I go and
 5   asked the lady because the court was closed.
 6           So she told -- she called over there, and
 7   she couldn't get no answer and thing.  The courts
 8   had closed that early.  So she told me I might could
 9   catch them where to go walk, where the DA office
10   was.  I walked around there to the DA office.  Go in
11   there, the security guard wouldn't let me go all the
12   way.  They just let me by the door at the front how
13   far you go at.  He asked another lady, and she said
14   they was -- say they probably gone for the day but
15   come back and check with her.
16           So I'm trying to get back over there to
17   the courtroom and see what I have to do because she
18   wouldn't let me in there to talk to them.  And they
19   had another one stopping saying that must be the new
20   thing what they doing.
21      Q    Okay.
22      A    So I went back over there.  By the time I
23   made it back over there, the lady was gone too.  She
24   was gone from out the court office, in the hall
25   where you first go into court where she worked at.
```

```
 1      Q    Okay.  And, Ms. Baham, is it -- is it true
 2   you had to miss work to do that?
 3      A    Yes.
 4      Q    And is it true the next day, just to make
 5   sure you were doing the right thing, you came and
 6   sat in the courtroom anyway but nobody ever called
 7   your name?
 8      A    Yes.
 9      Q    Okay.  And about a month after that, is
10   it -- is it true you started getting more subpoenas
11   that looked different from that and said to come to
12   court?
13      A    Yes.
14      Q    Okay.  And you got those subpoenas -- just
15   to be clear, I'm trying to kind of get the time line
16   because I know it's confusing when you got so many.
17   So first you got the letter; is that right?
18      A    Yes.
19      Q    Then you got the document that said
20   subpoena and had the seal on it, the one we just
21   looked at together, Exhibit 1?
22      A    Right.
23      Q    Then you got a bunch of other subpoenas
24   that said to come to court?
25      A    Yes.
```

1      Q     And about two years before any of that,

2   you got a few subpoenas, and then there was a long

3   time where you didn't get anything?  I'm just making

4   sure we're all -- we got the time line.  Is that --

5      A     Yes.

6      Q     -- is that right?

7            Okay.  And the subpoena that you got, you

8   know, after you got the subpoena with the DA's seal

9   on it, the subpoenas you got after that, do you

10  remember if somebody put those in your hand or if

11  you got them some other way?

12     A     No.  Someone put it in my brother hand, my

13  niece hand, I found one on the porch, and the rest

14  of them will be in the mailbox.

15     Q     Okay.  And even though nobody put it in

16  your hand, when you got one of those, did you still

17  go to the courtroom?

18     A     Yes, because my name and thing was on it

19  to go to court.

20     Q     Okay.  What happened when you went to the

21  courtroom?  And this is before you were arrested.

22  This is all before you were arrested.

23     A     I just go in there and sit and wait on

24  them to call my name and thing.  I get up and ask

25  the guard again, and he just tell me to take a seat.

```
1    I just sit there and sit.  My name don't get call, I
2    just go back and try to wait until another subpoena
3    come and see if I have to be in court that day.
4         Q    In all the times you went to court before
5    you were arrested as a material witness, did anybody
6    ever call your name when you went?
7         A    No.
8         Q    Okay.  Did you ever wait around all day in
9    court?
10        A    Yes, yes.
11        Q    And you missed work when you do that?
12   Okay.
13        A    Yes.
14        Q    Yes.  Okay.
15             I want to just change the subject a little
16   bit and talk about something else.  I know it's
17   difficult when we're jumping around.  We talked
18   about when you talked to Mike Kitchens on the phone.
19   Is it true that Mike Kitchens called you a lot of
20   times?
21        A    Yes.
22        Q    And some of those times were right after
23   the murder?
24        A    Yes.
25        Q    But is it also true after you got that
```

 1  document that we looked at together with the seal on

 2  it, did Mike Kitchens call you after that too?

 3      A    Yes.

 4      Q    Okay.  And how did you know it was Mike

 5  Kitchens when he called you on the phone?  Did he

 6  say so?

 7      A    Yes.

 8      Q    What did he say?

 9      A    He said his name, and then he go to asking

10  could he come pick me up or could I meet him

11  somewhere and what I have to do, I could speak in

12  the microphone and thing, nobody have to see me and

13  thing.  I say, why I have to speak in a microphone,

14  nobody see me and thing when I can just go in the

15  courtroom and say it?

16      Q    Okay.  So I want to just make sure we

17  understanding the timing because I know, you know,

18  at least one time you said he asked you to go on

19  tape so no one would have to see you; is that right?

20  Is that what you said?

21      A    (No response.)

22      Q    Were there multiple times he asked you to

23  go somewhere with him?

24      A    Yes, every time he call he was trying to

25  get me to come and meet him somewhere for to go

1   where I can talk about -- talk on the -- on the tape

2   and thing, nobody won't see my face and thing.  I

3   said, talk on the tape and thing for what?  For to

4   say where I seen the boy at?  What I have to talk on

5   the tape to say that?  I can just go into court and

6   say that.

7        Q    And did -- did you ever -- did he ever say

8   that he wanted you to meet with someone else too?

9        A    Yes, he had -- he -- he mentioned about

10  someone else will be there and thing and he just --

11       Q    Do you know who that was?

12       A    -- finishing up paperwork.

13            No.

14       Q    Okay.  But just to be clear, he asked --

15  he wanted you to come meet with him and someone

16  else?

17       A    Yes, and -- and he -- he agree to come

18  pick me up or I meet him somewhere and thing.

19       Q    Okay.  Was he -- did he say that he was

20  picking you up to take you to court?

21       A    No.

22       Q    Okay.

23       A    He was just picking me up to, trying to

24  take me somewhere for to speak into something and

25  thing.

1      Q     Okay.

2      A     Where nobody could see me, he say.

3      Q     Okay.  But is it true you told him that

4  you didn't need to do that because you were

5  comfortable testifying in court?

6      A     Yes.

7      Q     Okay.  And is it true that Mike Kitchens

8  told you that you would be arrested if you didn't

9  come talk to him or didn't go with him?

10      A     Yes, he told me, I'm warning now, you will

11  be arrested.  I said, arrested for what?  Saying I

12  seen the boy?  What is y'all arresting me for?

13      Q     Okay.

14      A     Because I told y'all I seen him?

15      Q     Now, you testified earlier about your

16  calls with Kitchens, and we just talked about that,

17  and about the conversation you had with Jason Napoli

18  right after you were jailed as a material witness.

19            Is it true that you had the impression

20  based on the way they were talking to you that they

21  wanted you to testify about things that weren't what

22  you actually saw?

23      A     Yes, yes.

24      Q     And put more simply, did you feel like

25  they wanted you to lie?

```
 1      A    Yes.

 2      Q    How did you know?

 3      A    The way that I -- they was talking and

 4  saying about the red car, and he talking about

 5  arresting me if I don't come in.  He warning me and

 6  thing.  I say why is they warn me?  I'm just telling

 7  them what I seen and thing.  He still telling me to

 8  come in and do this or I'm going to get arrested and

 9  thing.  For what?  What is I'm getting arrested for?

10      Q    You didn't understand what you were doing

11  wrong?

12      A    I know I wasn't doing nothing wrong.

13      Q    And did Jason Napoli ever ask you if you

14  knew what perjury was?  Do you remember that?

15      A    Yes.

16      Q    When was that?

17      A    At the -- in the courtroom.

18      Q    Were you standing in the courtroom or were

19  you in another room?

20      A    No, I was in the courtroom when he put me

21  on the stand.

22      Q    Was that when you were actually testifying

23  or a different time?

24      A    When I was testifying.  When I was

25  testifying.
```

1      Q      When you were testifying.

2             And is it true you were always willing to

3   testify truthfully in open court about what you saw?

4      A      Yes.

5      Q      And how many times do you think you came

6   to court overall and were never called up that you

7   just waited there?  Do you -- do you have a guess of

8   how many it was that you believe?

9      A      Oh, too many.  I can't tell you.

10     Q      Okay.  And is it true -- sorry.  Did you

11  want to say something else, Ms. Baham?  I don't want

12  to cut you off.

13     A      No.

14     Q      Okay.  And is it true you came to court on

15  April 4, 2016 -- well, I shouldn't say the date.

16  When you came in and you testified, were you being

17  honest when you were on the stand?

18     A      Yes.

19     Q      Okay.  And, Ms. Baham, I know you gave us

20  the names of your children earlier.  Do you mind

21  telling me how many are under 18 right now?

22     A      Five -- four, I think.  Three of them and

23  my grandbaby, four.

24     Q      And how old is your youngest?

25     A      11.

1     Q    Were they living with you when you were
2   arrested as a material witness?
3     A    Yes.  I -- they didn't go to school that
4   day because I was sick and I kept them home.  I was
5   just praying they stayed in there sleep for they
6   wouldn't see me out there handcuffed.
7     Q    And who took care of the children when you
8   were in jail?
9     A    My brother came up from the other side and
10  got them.
11    Q    Were any of them -- did any of them see
12  you get arrested?
13    A    No.  I told my brother hurry up in there
14  and close the door.
15    Q    Ms. Baham, just speaking generally, did
16  anyone from the police or district attorney's office
17  ever ask you for your phone or your phone records?
18    A    No.
19    Q    Okay.  And so that's correct, they didn't
20  ask you?
21    A    No.
22    Q    Okay.  And in the months before Orlando
23  Rickmon was murdered, were you talking to your
24  daughter Dinnika Baham a lot?
25    A    No, she was -- that's when she was staying

 1   with them and her sister-in-law.  Her, Orlando and

 2   her sister-in-law and them, they were staying in Mid

 3   City.

 4        Q    And is it true on the day of the murder

 5   your daughter, Dinnika Baham, was in the east?

 6        A    Yes.

 7        Q    Okay.  I want to just talk a little bit

 8   about your background just because some questions

 9   were asked about that.

10             Is it -- is it true the highest education

11   level you went -- you completed was tenth grade?

12        A    Yes.

13        Q    Did you actually finish tenth grade?

14        A    Yes, but I ain't -- I ain't went to the

15   11th or nothing.

16        Q    Okay.  And when you were in school, were

17   you ever referred for classes for slow learners?

18        A    Yes.

19        Q    Okay.  I'll just wrap up.

20             Ms. Baham, how -- how did you feel -- I'm

21   sorry to have to ask you this, but I just want to

22   explain where you were coming from or let you

23   explain where you were coming from.  How do you

24   feel -- how did you feel when Orlando Rickmon was

25   murdered?

```
1      A    Hurt, hurt, hurt.

2      Q    Were you close with Mr. Rickmon?

3      A    Yes.

4      Q    I'm sorry, Ms. Baham.  I'm sorry to ask

5  you these questions.  I'm just going to pause in

6  case you want to say anything else about that.

7      A    Yes, real close.  That was my baby, just

8  like a child.  He was a good child.  Everybody loved

9  him.  He wasn't no trouble child.  He wouldn't get

10 in no trouble or nothing.

11     Q    Do you know who killed Orlando Rickmon?

12     A    No.

13     Q    If you did, would you do everything you

14 could to bring that person to justice?

15     A    Yes.

16     Q    I'm sorry, Ms. Baham.  Do you want me

17 to -- do you want to say anything else about that?

18 I don't want to step on you.

19     A    No.

20     Q    This is my last question and then we'll

21 get you out of here.  Mr. Paul asked you what you

22 wanted from -- from this case, and you said -- I

23 believe what you testified was -- you know, one

24 thing you said was that you didn't want it -- what

25 happened to you to happen to anyone else.  Can you
```

LAZONIA BAHAM on 09/11/2020

1  explain why that's important to you?

2      A    I don't think nobody needs to be going

3  through that if they doing right, trying to help

4  make a difference.  I don't think that's a place for

5  them to be working because that's not right.  They

6  supposed to be helping people, and they ain't doing

7  nothing but destroying people.  They not trying to

8  help.  Nothing but destroying people.

9      Q    Who -- who do you mean by "them"?

10      A    Napoli and Kitchens.

11     MS. CHAMBLEE-RYAN:

12         All right.  Thank you, Ms. Baham.  That's

13  all I've got.  Thank you.

14     MR. PAUL:

15         I have some more questions.  We need about

16  15 minutes.

17                 (Brief recess.)

18  RE-EXAMINATION BY MR. PAUL:

19      Q    Ms. Baham, I'm going to ask you to look at

20  Exhibit 4 again that we talked about earlier this

21  morning.

22     MR. HAMILTON:

23         Do you remember what number that is, Matt?

24     MR. PAUL:

25         That was B16.

```
 1        MR. SACHS:
 2             Mr. Paul, would you mind putting it on the
 3   screen for the rest of us, please?
 4        MR. PAUL:
 5             Going right now.
 6        MR. SACHS:
 7             Thank you.
 8   BY MR. PAUL:
 9        Q    Ms. Baham, do you recall looking at this
10   document earlier this morning?
11        A    Yes.
12        Q    And I believe you told me at the time you
13   received this document; is that correct?
14        A    Yes, I received this document.
15        Q    And this document commands you to appear
16   before the Grand Jury at the Orleans Parish DA's
17   Office on October 22, 2013; is that correct?
18        A    This is not the one where I had to go
19   there for.  It's the one with the seal on it --
20        Q    I'm sorry, what was that?
21        A    -- to go to the DA office.
22             The one with the seal on it, that's --
23   that's the one where they sent me to the DA office
24   with.
25        Q    Yes, ma'am.  Could you read the document
```

LAZONIA BAHAM on 09/11/2020

```
 1   that you have in your hand.  This document --
 2        A    Criminal District Court -- huh?
 3        Q    The document reads, you are hereby -- "You
 4   are hereby commanded to appear before the Grand Jury
 5   for Orleans Parish Criminal District Court located
 6   in the Orleans Parish District Attorney's Office,
 7   619 South White Street"; is that correct?
 8        A    Yes.
 9        Q    And I showed you this and two others very
10   much like it this morning; do you recall that?
11        A    Yes.
12        Q    And I asked you, other than those
13   documents, did you ever receive any subpoena telling
14   you to come to the DA's office; do you recall that?
15        MR. SACHS:
16             Objection to the term "subpoena."  Can you
17   please define that.
18   BY MR. PAUL:
19        Q    Do you remember telling --
20        A    It was just one of them where I had to go
21   to the DA office.  That's the one I keep on telling
22   you about with the seal on.
23        Q    Yes, ma'am.  I'm asking you about the
24   document in your hand which you just told me that
25   you got, that you received; is that correct?
```

1      A     Rephrase the question.  What you said?

2      Q     So I showed you this Exhibit 4 this

3   morning and I showed you two other subpoenas that

4   were like it.  These command you to appear at the

5   DA's office for the Grand Jury; is that correct?

6      A     I'm not -- to the DA office.  I had

7   subpoenas to go to court.  I just had two ones for

8   to go to the DA office.  That's the one with the

9   seal on and the letter.

10     Q     So I'm asking you about subpoenas to go to

11  the DA's office right now.  The one that you're

12  holding in your hand is one of the ones for you to

13  go to the DA's office; is that correct?

14     A     This -- I got the one with a seal on it.

15  This was not the one.  I keep on telling you.

16     Q     Ma'am, I'm not asking you about the one

17  with the seal.  I'm asking you about the one in your

18  hand.

19     A     This here -- this here for to go in the

20  courtroom.  I got subpoenaed for the court and I got

21  subpoenaed for the DA office.

22     Q     No, ma'am.  This subpoena commands you to

23  appear at the Orleans Parish DA's Office, 619 South

24  White Street; is that not what the document says?

25     A     Yes, that's what it say.

```
 1      Q    And I asked you this morning, aside from
 2  this document and the two others like it, did you
 3  receive any other documents telling you to appear at
 4  the DA's office; you recall me asking that?
 5      MR. SACHS:
 6           Objection.
 7      THE WITNESS:
 8           Yes, I probably didn't get the right --
 9  how you was saying it, but I'm trying to explain it
10  to the best of my knowledge the ones that I had,
11  what I said, to go to the DA office.  The one with
12  the seal on it and the letter, that's the only two
13  times I went to the DA office.
14  BY MR. PAUL:
15      Q    So you're saying --
16      A    All the other time I was going to the
17  courtroom.
18      Q    So you're saying you did not comply with
19  the subpoena holding in your hand -- that you're
20  holding in your hand right now?
21      MR. SACHS:
22           Objection.
23      THE WITNESS:
24           All I'm saying, what I -- I know, this was
25  not the one I -- I -- I went.  The one I had when I
```

 1  went to the DA office is the one that y'all showed

 2  on the screen with the seal on it.

 3  BY MR. PAUL:

 4      Q    So you did not go to the DA --

 5      A    That's the one I had for to appear and the

 6  letter.

 7      Q    So you did not go to the DA's office in

 8  response to the subpoena that you're holding in your

 9  hand right now; is that correct?

10      A    I told you two times I went to the DA

11  office.  All the rest of the time I went to the

12  courtroom.  Two times I went to the DA office.  All

13  the rest of the time it was in the courtroom.

14      Q    So is it correct that you did not appear

15  at the DA's office in response to the subpoena that

16  you're holding in your hand?

17      MR. SACHS:

18          Objection.

19      THE WITNESS:

20          I'm not -- I'm not sure, so I can't answer

21  that, but I can tell you the times that I went when

22  I told you I went.  There was two times I went to

23  the DA office.  All the rest of the time I went to

24  court.

25  BY MR. PAUL:

```
 1      Q    You're sure that you only went to the DA's
 2  office twice; that's correct?
 3      A    Yes, yes.
 4      Q    Once in response to a subpoena?
 5      A    And a letter.
 6      Q    And once in response to a letter?
 7      A    Yes.
 8  MR. SACHS:
 9           Objection.
10  BY MR. PAUL:
11      Q    And you're saying this is not the
12  subpoena --
13      A    All the other times I was --
14      Q    Are you saying this is not the one that
15  you went in response to a subpoena for?
16      MR. SACHS:
17           Objection.
18      THE WITNESS:
19           No.  I -- I went -- I went -- the one what
20  y'all showed up there on the screen with the seal,
21  that's what I brought over to the DA office, and I
22  went over there with the letter.  That's the only
23  two times I went to the DA office with.  All the
24  other times I went to the courtroom with them, and
25  they just tell me to take a seat.
```

 1  BY MR. PAUL:

 2      Q    So when I showed you this document that

 3  you're holding in your hand this morning and the two

 4  others like it and asked you, are those the only

 5  times that you received a document telling you to go

 6  to the DA's office, and you said, yes, was that true

 7  testimony?

 8      A    I probably just didn't understand the

 9  question how you was saying it right, but I'm making

10  it clear as I can what I told you the two times what

11  I went.  One of them, the one when I had the seal on

12  it and the letter.  That's the two times I went to

13  the DA office.  All the other times I was going to

14  the courtroom.

15      Q    And then after lunch I came back and asked

16  you again about the same topic; do you recall?  I

17  asked you about those same Grand Jury subpoenas.

18      MR. SACHS:

19          Objection.

20  BY MR. PAUL:

21      Q    Do you recall that?

22      MR. SACHS:

23          Subpoena has been used --

24      THE WITNESS:

25          When you saying Grand Jury and thing, I be

LAZONIA BAHAM on 09/11/2020

```
 1   thinking you talking about when I'm going on the
 2   stand.  I -- I'm trying to answer as best to my
 3   knowledge.
 4   BY MR. PAUL:
 5       Q    So I asked you again after lunch, I said,
 6   those subpoenas I showed you earlier this morning,
 7   those three similar subpoenas, other than those, did
 8   you ever receive any document --
 9       A    And I told you --
10       Q    Please let me finish the question.
11       MR. SACHS:
12            Let him finish, Ms. Baham.
13   BY MR. PAUL:
14       Q    We came back after lunch and I confirmed
15   once again, other than that subpoena holding in your
16   hand -- that you're holding in your hand and the two
17   like it, did you receive any document telling you to
18   go to the DA's office, and you again said, no, I
19   cannot recall any; do you recall that?
20       MR. SACHS:
21            Objection.  Ms. Baham, let me just lodge
22   my objection here.
23            I have continually throughout this entire
24   deposition asked for clarity of a definition of
25   subpoenas to make things more clear, and I've lodged
```

1  that objection.  I'm lodging the objection now.

2          Ms. Baham, you can now go ahead and

3  answer.  And I'm also going to lodge an objection

4  for potentially mischaracterizing previous

5  testimony.  If you'd like to have the court reporter

6  read it back, we can do that.

7          You can go ahead and answer, Ms. Baham.

8      THE WITNESS:

9          I only went to the DA office twice for the

10  letter and the subpoena with the seal on it.  All

11  the other subpoenas I got and thing, I went to the

12  courtroom.

13  BY MR. PAUL:

14      Q    And, ma'am, I'm not asking you about when

15  you actually went to the DA's office.  I'm asking

16  you about documents that you received.  I'm just

17  asking --

18      MR. SACHS:

19          Objection.  Can we clarify "received"?  As

20  she testified previously, things were put in

21  mailboxes, handed to relatives, left at her

22  doorstep.  What -- what do you mean by "received"?

23      MR. PAUL:

24          I mean received in any fashion at all.

25  BY MR. PAUL:

1      Q    When I asked you before -- after lunch to

2  confirm that aside from the subpoena that you're

3  holding in your hand right now and the two others

4  like it, you did not receive any other document

5  telling you to come to the DA's office, and, again,

6  you said, I don't recall any; is that correct?

7      A    I don't recall any.  The two what I'm

8  telling you that I know from the DA office, it was

9  the letter and the one with the seal on it.  All the

10  rest, I'm going to the courtroom with them, as what

11  I could recall.

12      Q    The document that you're holding in your

13  hand does not tell you to go to the courtroom; is

14  that -- is that correct?

15      A    Yes.

16      Q    Correct.  That's why I asked you, other

17  than that document and the two like it, did you

18  receive any other document telling you to go to the

19  DA's office?

20      MR. SACHS:

21          Objection.  Asked and answered.  She's

22  very clearly said that she received the letter and

23  the notice with the seal on it.

24      MR. PAUL:

25          Right.

```
 1  BY MR. PAUL:

 2      Q    What's changed between now and this

 3  morning?

 4      A    What you mean, what changed?

 5      Q    Well, you testified to one thing this

 6  morning and you testified to something when your --

 7  when your lawyer put a document in front of you and

 8  asked you leading questions about it.

 9      MR. SACHS:

10          Objection, mischaracterization --

11  objection mischaracterization of testimony.  She's

12  already testified that she had a lack of

13  understanding of your question, and she's clarifying

14  it to the best of her ability.  I think that is what

15  has changed since this morning.

16          Go ahead and testify, Ms. Baham.

17      THE WITNESS:

18          Like I said, I got a letter and I got the

19  subpoena.  That's the only two times I went to the

20  DA office.  All the other time I went to the

21  courtroom.

22  BY MR. PAUL:

23      Q    So you're saying now that you received a

24  subpoena with the seal on it; is that correct?

25      A    Yes.
```

LAZONIA BAHAM on 09/11/2020

1      Q     Can you tell me everything that you

2  remember about that document?

3      A     Telling me for to go to the DA, like this

4  here, what -- and they had a seal.  The one that

5  y'all showed me earlier, that's the one I went to

6  the DA office with.  I went there with the letter

7  first and I went with the subpoena with the seal on

8  it.

9      Q     And that document that your lawyer showed

10  you earlier had your name on it?

11      A     Yes.

12      Q     It did?

13      A     You talking about the subpoena?

14      Q     Yes, ma'am.  The subpoena with the seal

15  that your lawyer showed you, did that have your name

16  on it?

17      MR. SACHS:

18          Objection.  Which subpoena are you talking

19  about, Mr. Paul?

20      MR. PAUL:

21          The only subpoena that her lawyer showed

22  her with the seal on it.

23      MR. SACHS:

24          Can we put that back up on the screen for

25  her so she can see it to make things clearer.

 1      MR. PAUL:

 2           No.

 3      MR. SACHS:

 4           I'm going to object.  Why don't we show

 5  her what you're talking about as an exhibit?

 6      MR. PAUL:

 7           Because I'm asking about her memory now.

 8      MR. SACHS:

 9           Okay.  Objection.

10  BY MR. PAUL:

11      Q    Do you know whether the subpoena that your

12  lawyer put up on the screen and showed you half an

13  hour ago had your name on it?

14      MR. SACHS:

15           Objection.  Ms. Chamblee-Ryan specifically

16  asked her if that example looks like what she had

17  received before?

18  BY MR. PAUL:

19      Q    Ms. Baham, you can answer.

20      A    Yes, that's what she had -- yes, that was

21  the document that I went to the DA office with, the

22  one that y'all put up on screen, what I keep on

23  telling you.

24      Q    Can you tell me everything you remember

25  about the document that you actually received?

LAZONIA BAHAM on 09/11/2020

1    A    Telling me to go to the DA office.

2    Q    What else did it say?

3    A    They had to -- yeah, the address and thing

4  on there.

5    Q    The address --

6    A    Just like what you have -- like the one

7  with the seal on it.  That -- that is the one I went

8  to the DA office with.  That's the best to my

9  knowledge of what I could understand it.

10   Q    How did you receive that document?

11   A    Through the mail.

12   Q    Through the mail?

13   A    Yes.

14   Q    So you found it in your mailbox one day?

15   A    It was in the mailbox.

16   Q    When did you find it in your mailbox?

17   A    I got the letter first --

18   Q    Okay.

19   A    -- from them.  I was going check with the

20  letter.  I got that probably like a month or so

21  after.

22   Q    About a month or so after you received a

23  letter from the DA's office?

24   A    Yes.

25   Q    And what day did it tell you to come to

```
 1   the DA's office?

 2        MR. SACHS:

 3             Objection.

 4        THE WITNESS:

 5             I don't remember.

 6   BY MR. PAUL:

 7        Q    What happened to that document?

 8        A    I don't remember.  I been looking and

 9   looking for it.  I got -- have a lot of stuff I

10   probably couldn't find from y'all and thing.  I have

11   a whole lot of paper I been -- I done -- I done

12   moved twice since then.  I done moved from Audubon

13   to Mandeville, from Mandeville to Texas.  I had

14   stuff all in the storage and thing.

15        Q    When you received that -- that subpoena,

16   did you think it was unlawful in any way?

17        MR. SACHS:

18             Objection.  Calls for legal conclusion,

19   and objection based on foundation and vagueness and

20   speculation.

21   BY MR. PAUL:

22        Q    You can answer.

23        MR. SACHS:

24             Go ahead and answer, Ms. Baham.

25        THE WITNESS:
```

```
 1              I was -- I -- I -- I think all of them was
 2   subpoenas for to get there.  I was just trying to
 3   get to the bottom of it.
 4   BY MR. PAUL:
 5       Q   Did something seem not right about it to
 6   you when you got it?
 7       MR. SACHS:
 8              Objection.
 9       THE WITNESS:
10              Yes, when I -- I say -- I say it's
11   different from the other subpoenas.
12   BY MR. PAUL:
13       Q   So did that seem not right?
14       MR. SACHS:
15              Objection.  Go ahead and answer.
16       THE WITNESS:
17              Yeah, for when they say they was doing
18   something new and thing in the office thing, so
19   I'm -- it was right.  I didn't know.
20   BY MR. PAUL:
21       Q   Did you talk to anyone about it?
22       MR. SACHS:
23              Objection.  Are we referring to the --
24   BY MR. PAUL:
25       Q   At the time you received it?
```

1       MR. SACHS:

2            Objection.  Just for clarity, we're

3    talking about the fake subpoena, the one with the DA

4    seal on it?

5       MR. PAUL:

6            We're talking about the document with the

7    seal that she said she received.

8       MR. SACHS:

9            Go ahead and answer, Ms. Baham.

10      THE WITNESS:

11           Yes, I got -- I showed it to my brother

12   and him and thing.  I say, now, look at these

13   subpoenas, look at this here one and thing.  I said,

14   watch.  I kept on -- I say, watch, I'm making a

15   blank trip, a blank trip for nothing.  They sending

16   me on a merry-go-round, and that's what I done made

17   a blank trip, still couldn't get no answer.

18   BY MR. PAUL:

19      Q    Do you believe that that was somehow

20   illegal --

21      MR. SACHS:

22           Objection, calls for legal conclusion.

23   BY MR. PAUL:

24      Q    -- subpoena that you received?

25      MR. SACHS:

```
 1              Objection.  Objection.  Also asked and

 2    answered.

 3              Go ahead and answer it again if you'd

 4    like, Ms. Baham.

 5        THE WITNESS:

 6              I'm not going to answer the same thing.

 7    BY MR. PAUL:

 8        Q    When did you believe it was illegal?

 9        MR. SACHS:

10              Objection.

11        THE WITNESS:

12              You know, when everybody in the

13    courtroom -- when I go there and the deputies, none

14    of them don't know what it is -- really is, and when

15    the -- when the lady saying that must be the new

16    thing they doing.

17    BY MR. PAUL:

18        Q    What day was that?

19        A    When I went over there to the DA office.

20        Q    Was this before you got arrested?

21        A    Yes.

22        Q    And you showed somebody the subpoena you

23    say?

24        A    I went -- to the lady in the courtroom and

25    over there I showed the deputy at the DA office.
```

LAZONIA BAHAM on 09/11/2020

1      Q    And after that, you started believing it

2  was unlawful?

3      MR. SACHS:

4          Objection.  Mischaracterizes her

5  testimony.  She said earlier --

6      THE WITNESS:

7          I went --

8      MR. SACHS:

9          Ms. Baham, hold on.  Let me finish,

10  please.  Ms. Baham, let me finish.

11          Objection.  Mischaracterizes her

12  testimony.  She testified earlier that she believed

13  they were fake after her son saw it in the -- and

14  called her and told her.

15      MR. PAUL:

16          I don't believe that's true.

17  BY MR. PAUL:

18      Q    Ms. Baham, I just asked you when did you

19  start to believe they were unlawful --

20      MR. SACHS:

21          Objection.

22  BY MR. PAUL:

23      Q    -- and you said when you went to the DA's

24  office; is that correct?

25      A    I went to the DA.  I had done been telling

```
1  them when I'm showing them the subpoena something
2  ain't right about the subpoena.  I went to -- when I
3  went there with them saying, I don't know what
4  this -- what this about and thing.  It must be that
5  new thing what they doing, Cannizzaro and them
6  doing.
7       Q    And that was before you got arrested,
8  correct?
9       A    Yes.
10      Q    When was the last time you could remember
11 having a copy of that subpoena?
12      MR. SACHS:
13           Objection.  And just for clarity, we're
14 talking about the fake subpoena, the one with the DA
15 seal on it?
16      THE WITNESS:
17           When did I get it you say?
18 BY MR. PAUL:
19      Q    No, ma'am.  When was the last time you can
20 remember actually having it in your possession?
21      A    On Audubon Street.
22      Q    So that was before you moved in late 2017?
23 Am I remembering correctly?
24      A    Yeah, before I moved to Mandeville.
25 That's when I really went to try to find more and
```

1   first paragraph, Judge White says, "Ms. Baham, the

2   State has been sending you through this court

3   witness subpoenas.  We have not been able to get

4   those to you."  Correct?

5        A    (No response.)

6        Q    Further down the page you say, "I never

7   got a subpoena."  Was that a true statement?

8        MR. SACHS:

9             Objection.

10       THE WITNESS:

11            You talking about before I got arrested?

12   This here is when I got arrested.

13   BY MR. PAUL:

14       Q    This is after you got arrested, correct.

15   Judge White --

16       A    I had -- yes, I ain't got -- I ain't had

17   none subpoenas.  I ain't been in her courtroom when

18   I go -- just going in there sitting.

19       Q    But you didn't say to Judge White, I got

20   lots of subpoenas and I been in the courtroom

21   sitting, did you?

22       A    Rephrase your question again.

23       Q    You didn't say to Judge White, I got lots

24   of subpoenas, and I've been coming into the

25   courtroom sitting there.  You said, "I never got a

```
 1   subpoena"; isn't that true?
 2        A    Probably was for that day I probably did
 3   tell her that, but I got a lot of subpoenas, and I
 4   showed them the subpoenas.  I done even went in the
 5   court and sit.  Y'all have all this here and thing,
 6   why y'all don't have the records when he was in
 7   the -- brought me to the back with the lawyer, why
 8   y'all don't have records each time or get the
 9   footage and thing when I was sitting there in the
10   courtroom?  Y'all got it for everything else, but
11   y'all don't got it for the right thing.
12             And they got all this here.  Why y'all
13   didn't pull the footage up and thing when I went
14   over there to the DA office, from the courtroom when
15   she told me where to go at to the DA office and
16   thing, too?  Y'all ought to have all that footage
17   and everything else, too.
18        Q    Ms. Baham, we talked earlier about a
19   letter that you received from the DA's office,
20   correct?
21        A    Yes.
22        Q    Did that letter have the DA's seal on it?
23        A    On the letter?
24        Q    Yes, ma'am.
25        A    Yeah, I think they had a little seal up
```

1  there at the top of that thing too on the letter.

2  They got a little seal on the letter that I got.

3      Q    When was the first time you ever saw that

4  blank DA subpoena form that your lawyer showed you

5  earlier today?

6      A    Which one?  The one with the seal?

7      Q    Yes, ma'am.

8      A    A little after I got the letter.

9      MR. SACHS:

10          Objection.  Can you clarify whether you're

11  talking about the template with -- that's blank and

12  as an example or the one that she actually received?

13  BY MR. PAUL:

14      Q    Yes.  I'm not asking you about the one

15  that you received that you say had your name on it.

16  I'm asking you about the blank form that your lawyer

17  showed you earlier today.  When is the first time

18  you saw that blank form?

19      MR. SACHS:

20          Objection, relevancy.

21          Go ahead and answer, Ms. Baham.

22      THE WITNESS:

23          Okay.  You talking about the subpoena?

24  That subpoena with the seal on it?  When's the first

25  time that I see that?  That's what you asking?

255

```
 1   BY MR. PAUL:
 2       Q    The blank form that your lawyer showed you
 3   earlier?
 4       A    That subpoena, I got that after I got the
 5   letter.
 6       Q    That was not a blank form that you got,
 7   though, was it?
 8       A    Sir?
 9       Q    That was not a blank form that you got
10   after the letter, was it?
11       A    No, it wasn't blank.  It -- that was --
12   that was the subpoena with the seal on it what y'all
13   showed me on screen.
14       Q    The one that your -- the one that your
15   lawyer just showed you on screen was a blank form,
16   correct?
17       A    Yes.
18       Q    I'm just asking you, when is the first
19   time you saw that blank subpoena form?
20       A    I seen the -- I -- I seen the subpoena
21   like that what was mailed to me for to go to the DA
22   office.  That was right after the letter.
23       Q    Not the one that was mailed to you.  I'm
24   talking about the blank form.  When's the first time
25   you saw the blank form?
```

LAZONIA BAHAM on 09/11/2020

```
 1      A    You talking about the subpoena?

 2      Q    Yes, ma'am.

 3      MR. SACHS:

 4           Objection to the form.  Asked and

 5  answered.  She's answering the questions to the best

 6  of her abilities.

 7      THE WITNESS:

 8           Yes.

 9  BY MR. PAUL:

10      Q    Have your lawyers ever showed you that

11  blank form before today?

12      MR. SACHS:

13           Objection.

14      THE WITNESS:

15           Showed me what?

16      MR. SACHS:

17           Objection.

18  BY MR. PAUL:

19      Q    That blank subpoena form?

20      MR. SACHS:

21           This will be well within attorney/client

22  privilege material, whatever we've provided to at

23  different times or spoken by Ms. Baham, or is there

24  a reason why this is relevant?

25      MR. PAUL:
```

LAZONIA BAHAM on 09/11/2020

```
 1            I don't believe showing her documents
 2   would be privileged.
 3        MR. SACHS:
 4            I disagree.  I believe showing her
 5   documents outside of preparation or any other time.
 6   If you would like to ask her if she saw this in
 7   preparation for the deposition, please.
 8   BY MR. PAUL:
 9        Q    Did you see that blank -- Ms. Baham, did
10   you see that blank form in preparation for this
11   deposition?
12        A    Y'all showed it up on the screen.
13        Q    No, ma'am.  In preparation before this
14   deposition?
15        A    The one I had, yes, I seen.
16        Q    Not the one you had.  The blank form, did
17   you see that blank form in preparation for this
18   deposition?
19        A    Seen it?  What you saying?  Seen it on the
20   screen?
21        Q    No, ma'am.
22        A    Or did I have one like that?
23        Q    Did you review a copy of that blank form
24   in preparation for this deposition?
25        A    No, nobody ain't gave me no form.
```