**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

RENATA SINGLETON; MARC
MITCHELL; LAZONIA BAHAM; JANE
DOE; TIFFANY LACROIX; FAYONA
BAILEY; JOHN ROE; and SILENCE IS
VIOLENCE,

     *Plaintiffs*,

v.

LEON CANNIZZARO, in his official
capacity as District Attorney of Orleans
Parish and in his individual capacity;
GRAYMOND MARTIN; DAVID PIPES;
IAIN DOVER; JASON NAPOLI; ARTHUR
MITCHELL; TIFFANY TUCKER;
MICHAEL TRUMMEL; MATTHEW
HAMILTON; INGA PETROVICH; LAURA
RODRIGUE; SARAH DAWKINS; and
JOHN DOE, in their individual capacities,

     *Defendants*.

Civil Action No. 17-10721

Section H
Judge Jane Triche Milazzo

Division 1
Magistrate Judge Janis van Meerveld

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
ON TIFFANY LACROIX'S CLAIMS AGAINST INDIVIDUAL DEFENDANTS**

Defendants Laura Rodrigue, David Pipes, and Graymond Martin (collectively, the "Individual Defendants"), through undersigned counsel, respectfully submit this memorandum in support of their motion seeking summary judgment dismissing Tiffany LaCroix's remaining claims against them—state-law tort claims for abuse of process and fraud.

The undisputed facts in this case show that Ms. Rodrigue sent a "DA subpoena" to Ms. LaCroix because she was a witness in an upcoming trial and Ms. Rodrigue wanted to meet with her to ascertain what her testimony would be and prepare for trial. Ms. LaCroix did not comply with the "DA subpoena," and to this day, she has never met with, or even spoken to, Ms. Rodrigue.

Ms. Rodrigue has never attempted to threaten or intimidate Ms. LaCroix into complying with the "DA subpoena" and has never attempted to have Ms. LaCroix punished for failing to comply with it.

Based on these facts, Ms. LaCroix's abuse-of-process claim fails as a matter of law for multiple reasons. The tort of abuse of process is premised on misuse of legally issued court process for an improper, malicious, collateral purpose. But the document sent to Ms. LaCroix was created by the District Attorney's Office and was not issued or authorized by any court or enforceable in any court. Thus, there was no "legal process" to abuse. Second, there is no evidence suggesting that Ms. Rodrigue had any malicious or collateral purpose of harming Ms. LaCroix or furthering some personal interest at Ms. LaCroix's expense. Rather, the evidence shows that Ms. Rodrigue merely sought to meet with a witness to prepare for trial, which is a legitimate goal that is directly within the scope of her proper role as a prosecutor. Third, Ms. LaCroix cannot prove that she suffered any legally cognizable injury as a result of receiving a "DA subpoena." Similarly, Ms. LaCroix's fraud claim fails because she cannot show any injury that was caused by reliance on allegedly false statements in the "DA subpoena." The Individual Defendants are therefore entitled to summary judgment in their favor.

## BACKGROUND

On April 9, 2016, Cardell Hayes was driving on Magazine Street with a friend when he made an abrupt stop near St. Andrew Street. *See State v. Hayes*, _ So. 3d _, 2019 WL 1386493, at *2 (La. App. 4th Cir. Mar. 27, 2019). New Orleans Saints hall-of-famer Will Smith was driving behind Mr. Hayes in a car with his wife (Raquel Smith) and two friends. *See id.* Mr. Hayes claims that his vehicle was bumped by Mr. Smith's vehicle, though the passengers in Mr. Smith's vehicle deny that there was any collision. *See id.* In any event, Mr. Smith drove away and Mr. Hayes began

to follow him. *See id.* A minute or two later, Mr. Hayes rammed into the back of Mr. Smith's vehicle, damaging the car and shattering the back windshield. *See id.*

Mr. Hayes got out of his vehicle armed with a loaded .45 caliber handgun. *See id.* at *11. Mr. Smith got out of his vehicle, unarmed, and began to argue with Mr. Hayes. *See id.* at *3, 11. Mrs. Smith tried to break up the argument, pleading with her husband and asking him to think about their children. *See id.* at *3. As Mr. Smith began to walk away with her, Mr. Hayes fired two shots. *See id.* Mrs. Smith was shot through both legs, severely injuring her, and Mr. Smith was shot in the side. *See id.* at *3, 5, 13 & n.20. Mr. Hayes then fired seven additional shots into Mr. Smith's back, killing him. *See id.* at *3.

Mr. Hayes was indicted for second-degree murder, attempted second-degree murder, and aggravated criminal damage to a vehicle. *See id.* at *1. The shooting and the subsequent criminal case attracted substantial attention from both local and national media. Even before the indictment was returned, Mr. Hayes's attorney made clear through public media statements that Mr. Hayes was claiming to have acted in justified self-defense.[1]

On October 1, 2016, two months before Mr. Hayes's trial was scheduled to begin, *GQ* published a lengthy article about the shooting that was predominately based on Mr. Hayes's

---

[1] *See, e.g.*, Exhibit 1, Travers Mackel, *Attorney for accused killer in Will Smith death to stay on case*, WDSU NEWS, April 13, 2016 (also available at https://www.wdsu.com/article/attorney-for-accused-killer-in-will-smith-death-to-stay-on-case/3386405); Exhibit 2, Josh Peter, *How Cardell Hayes went from football prospect to murder suspect*, USA TODAY, April 13, 2016 (also available at https://www.usatoday.com/story/sports/nfl/saints/2016/04/13/cardell-hayes-new-orleans-will-smith-shooting/82976404/); Exhibit 3, Erik Ortiz, *Ex-New Orleans Saints star Will Smith was shot seven times in the back*, NBC NEWS, April 13, 2016 (also available at https://www.nbcnews.com/news/us-news/ex-new-orleans-saints-star-will-smith-was-shot-8-n555461).

version of the events.[2] The article was based in part on an interview with Ms. LaCroix—Mr. Hayes's long-time girlfriend, and the mother of his son—who provided information about Mr. Hayes's background and personality. More importantly, Ms. LaCroix revealed that Mr. Hayes had called her on the telephone and spoken with her immediately after the shooting. The article stated:

> He's on his phone, calling his ex-girlfriend, an English teacher he'd been with from the eighth grade until a few months ago. They're still close, raise their son together. His voice is panicky, cracking, like he's gulping for air. He's talking in fragments, not making sense, not to Tiffany, anyway. *I shot someone*, he tells her. *I don't know what happened*, he says. And both of those things, right then in the echoing wail of the approaching sirens, are absolutely true.[3]

The article provided further information about Mr. Hayes's phone call with Ms. LaCroix: "He waited for the police, and he called Tiffany. 'These white guys kept coming at us,' he told her in a raspy panic. 'He was going to get a gun . . . . I don't know what happened.'"[4] The article also revealed that, about one hour before the shooting, Mr. Hayes had been at Lance's barbershop, where Anthony Williams was cutting his hair.[5]

The following week, on October 11, 2016, another lengthy article about the shooting was published in the national media—this time in *Sports Illustrated*.[6] That article also included quotes from Ms. LaCroix describing her conversation with Mr. Hayes immediately after the shooting: "'He was just in total shock,' says LaCroix, recalling the conversation. 'He was like, "I shot

---

[2] *See* Exhibit 4, Sean Flynn, *The Shooter & The Saint*, GQ: GENTLEMEN'S QUARTERLY, October 1, 2016; *see also* https://www.gq.com/story/saint-will-and-the-man-who-shot-him (October 3, 2016 online version of article).

[3] *See* Exhibit 4, *The Shooter & The Saint*, at 2.

[4] *See* Exhibit 4, *The Shooter & The Saint*, at 8.

[5] *See* Exhibit 4, *The Shooter & The Saint*, at 3.

[6] *See* Exhibit 5, Richard O'Brien, *Complicated Truth Behind Will Smith's Killing*, SPORTS ILLUSTRATED, October 11, 2016 (also available at https://www.si.com/nfl/2016/10/11/will-smith-death-new-orleans).

somebody! They kept coming! They attacked us!'"[7] The *Sports Illustrated* article also included quotes from Lance Rouzan (the barbershop owner) and Anthony Williams (Mr. Hayes's barber) about Mr. Hayes, his nature and personality, and his actions on the day of the shooting.[8]

Before these articles were published, Ms. Rodrigue—one of the prosecutors working on the case against Mr. Hayes—was not aware that Mr. Hayes had called Ms. LaCroix immediately after the shooting or that he had been with Mr. Williams and Mr. Rouzon just before the shooting.[9] None of these witnesses had ever been interviewed by the police or prosecutors.[10] Recognizing that their testimony was relevant, and potentially very important, to Mr. Hayes's claim of self-defense, Ms. Rodrigue hoped to speak with them before trial to ascertain what their testimony would be.[11] Accordingly, in late November 2016, about one week before trial was to begin, Ms. Rodrigue sent "DA subpoenas" to the three witnesses directing them to appear at the DA's office.[12]

Mr. Williams and Mr. Rouzon appeared at the DA's office and spoke to Ms. Rodrigue about Mr. Hayes.[13] Ms. Rodrigue told them she had read about the interview they gave to *GQ* and wanted to know if they had relevant information about the night of the shooting.[14] Mr. Williams and Mr. Rouzon talked about Mr. Hayes generally but said that they had not spoken to Mr. Hayes about the events of the shooting and had no information about the shooting.[15] Mr. Williams later

---

[7] *See* Exhibit 5, *Complicated Truth Behind Will Smith's Killing*, at 10.

[8] *See* Exhibit 5, *Complicated Truth Behind Will Smith's Killing*, at 4.

[9] *See, e.g.*, Exhibit 6, Excerpts of Laura Rodrigue Deposition, at 71, 95.

[10] *See, e.g.*, Exhibit 7, Excerpts of Tiffany LaCroix Deposition, at 51.

[11] *See, e.g.*, Exhibit 6, Rodrigue Depo,. at 71, 79.

[12] *See, e.g.*, Exhibit 6, Rodrigue Depo., at 70–71, 80, 85–86.

[13] *See* Exhibit 8, Excerpts of Cardell Hayes Trial Testimony (December 9, 2016), at 194.

[14] *See* Exhibit 8, Hayes Trial Testimony at 194, 201.

[15] *See* Exhibit 8, Hayes Trial Testimony at 194–197, 201–202.

testified at trial and confirmed that there was no "strong-arming" by Ms. Rodrigue and that he had no problem coming to talk with Ms. Rodrigue about Mr. Hayes.[16] Similarly, Mr. Rouzon testified that he "had a good conversation at the D.A.'s office" with Ms. Rodrigue and told her "exactly basically what [he] just told the ladies and gentlemen of the jury."[17]

By contrast, Ms. LaCroix did not want to speak with anyone at the DA's office because she was concerned that they may be able to use what she said against Mr. Hayes.[18] Ms. LaCroix came home after dark on Sunday, November 27, 2016, and discovered the "DA subpoena" stuck in her front door.[19] The document directed Ms. LaCroix to contact Ms. Rodrigue and to appear at the District Attorney's Office at noon on November 29, 2016. Ms. LaCroix called her mother, who told her that she should get an attorney and proceeded to contact other relatives looking for a recommendation.[20] The following day, Ms. LaCroix met with and retained an attorney, Anthony Ibert.[21] Mr. Ibert told Ms. LaCroix "that [she] didn't have to go or participate, . . . because the document was fake, basically."[22] Thus, after speaking to Mr. Ibert, Ms. LaCroix believed that the document she had received was not a valid subpoena and that she was not required to appear at the District Attorney's Office on November 29.[23]

Ms. LaCroix did not appear at the District Attorney's Office on November 29, 2016 (or any other date) to speak with Ms. Rodrigue. She did, however, talk to Mr. Hayes on the phone on

---

[16] *See* Exhibit 8, Hayes Trial Testimony, at 195.

[17] *See* Exhibit 8, Hayes Trial Testimony, at 201; *see also* Exhibit 6, Rodrigue Depo., at 96.

[18] *See* Exhibit 7, LaCroix Depo., at 71, 76–77.

[19] *See* Exhibit 7, LaCroix Depo., at 48.

[20] *See* Exhibit 7, LaCroix Depo., at 50, 61.

[21] *See* Exhibit 7, LaCroix Depo., at 62.

[22] *See* Exhibit 7, LaCroix Depo., at 54.

[23] *See* Exhibit 7, LaCroix Depo., at 67.

November 29 about the "DA subpoena" she had received. Ms. LaCroix explained that she had

spoken with Mr. Hayes's lawyer and gotten her own lawyer, and that the situation was "very good.

Very very good for you."[24] Ms. LaCroix stated: "You're lucky I'm so smart. . . . It's good. It's a

good thing. Yeah. Yes. Very good. . . . [T]hey tried to play with me, and they getting', they about

to get played. Big time. Come knockin' at this door. I'm a show you. . . . Good thing I know how

to read. That's for sure."[25]

Also on November 29, 2016, Mr. Ibert filed a "Motion to Quash" in Orleans Parish

Criminal District Court.[26] Among other things, the motion explained that "the subpoena does not

appear on its face to be issued by the clerk of court."[27] A hearing on Mr. Ibert's motion was set for

the following day, November 30, and Mr. Ibert appeared without Ms. LaCroix. At the beginning

of the hearing, Ms. Rodrigue stated: "[T]he State can withdraw the 'DA' subpoena at this time.

We don't need the hearing. We just need her served for trial."[28] As Ms. Rodrigue explained in her

deposition: "At that point it was obvious she was not going to speak to us. So I said to withdraw,

---

[24] *See* Exhibit 9, Audio recording of November 29, 2016 phone call, at 0:22–1:45; *see also* Exhibit 7, LaCroix Depo., at 52–58.

[25] *See* Exhibit 9, Audio recording, at 0:22–1:45. The Complaint alleges that Ms. LaCroix's unwillingness to meet with prosecutors was based in part on a scheduling conflict: "She works as a schoolteacher, and she was one of the few teachers certified to administer statewide standardized testing to students with special needs. The appointment demanded by the fraudulent subpoena would have required her to miss one of the testing days." Doc. No. 52 at ¶ 321. However, Ms. LaCroix's deposition testimony reveals that this allegation is completely false. She testified that she believed that November 29, 2016, would have been a teacher training day, not a testing day. *See* Exhibit 6, LaCroix Depo., at 82–84. She also testified that she, "along with other teachers," was required to undergo specific training to administer standardized testing to "504 accommodated student[s]." *See id.* at 83. She further admitted that she did not know whether November 29, 2016, was a training day. *See id.* at 84–85.

[26] *See* Exhibit 10, Motion to Quash filed in *State v. Cardell Hayes* (November 29, 2016).

[27] *See* Exhibit 10, Motion to Quash, at page 1 of "Memorandum in Support."

[28] *See* Exhibit 11, Transcript of November 30, 2016 hearing, at 1.

that we didn't need to speak with her, and that to just serve her for trial so at least she can't basically flee if something that she said becomes relevant, I guess in connection with her Sports Illustrated interview . . . ."[29]

Judge Camille Buras asked Mr. Ibert: "As an officer of the Court will you accept service for her?"[30] Mr. Ibert stated that he was not authorized to accept service for Ms. LaCroix and suggested that the State attempt to serve her at her home.[31] At the same time, Mr. Ibert was reluctant to provide Ms. LaCroix's address on the record.[32] Judge Buras issued an instanter subpoena for Ms. LaCroix to appear at trial and instructed Mr. Ibert:

> [P]lease put her address on the—if you don't want to put it on the record, I understand, but it has to be on the subpoena or I'll just go instruct the sheriff's office to pick her up at her job and bring her here to get in court service. . . . So we can do it the paperwork way or we can do it the, come to take a ride to Section 'H' way.[33]

Mr. Hayes was ultimately convicted of manslaughter and attempted manslaughter after a seven-day trial. As foreshadowed in Ms. LaCroix's November 29 phone call with Mr. Hayes (stating that it was "very very good" for him), Mr. Hayes's lawyers attempted to exploit the "DA subpoena" issue in his criminal case, both at trial and on appeal.[34] Ms. LaCroix appeared at Mr.

---

[29] *See* Exhibit 6, Rodrigue Depo., at 97.

[30] *See* Exhibit 11, Transcript of November 30, 2016 hearing, at 2.

[31] *See* Exhibit 11, Transcript of November 30, 2016 hearing, at 2.

[32] *See* Exhibit 11, Transcript of November 30, 2016 hearing, at 3.

[33] *See* Exhibit 11, Transcript of November 30, 2016 hearing, at 4–5.

[34] *See, e.g.*, Exhibit 8, Hayes Trial Testimony, at 191–193 (questioning Anthony Williams); Exhibit 12, Charles Maldonado, *Fake subpoena could factor into Cardell Hayes' appeal of manslaughter conviction*, THE LENS, July 24, 2017 (also available at https://thelensnola.org/2017/07/24/fake-subpoena-used-in-cardell-hayes-case-could-factor-into-his-appeal-of-manslaughter-conviction/); Exhibit 13, Ken Daley, *Cardell Hayes' appeal in Will Smith killing seeks probe of fake 'DA's subpoena,'* NOLA.COM, July 24, 2017 (also available at https://www.nola.com/news/crime_police/article_9adaae8c-a678-5e46-8f25-486e159af058.html).

Hayes's sentencing on April 20, 2017, and testified on his behalf, describing him as "one of the best men that I know" who "always avoided any type of altercation" and "never ever ran to or looked for any type of trouble."[35] Ms. LaCroix also included a detailed account of her phone call with Mr. Hayes immediately after the shooting, which supported his claim of self-defense:

> And I know he's so sorry. He's just so—he didn't mean to do that. He was—and that I know him he was in fear for his life. He was afraid because I talked to him. He called me right after it happened and I answered the phone and he was screaming on the phone and I've never heard him like that. And I said, "Cardell, Cardell, calm down. What's wrong?" He said, he said, "I shot somebody." I said, "What?" He said, "I don't know. They were attacking me. I didn't know what to—they were attacking me. They were attacking me." . . . . He sounded just so afraid and just— he was so scared.[36]

In her deposition, Ms. LaCroix testified that the first time she spoke with anyone about suing the Orleans Parish District Attorney's Office was when someone "reached out to [her] in regards to it."[37] Specifically, Ms. LaCroix testified that a woman from the ACLU whom she had not previously spoken to contacted her by phone to offer legal representation.[38] As a result of this solicitation, Ms. LaCroix became a plaintiff in the present lawsuit.

## PROCEDURAL HISTORY

Ms. LaCroix initially asserted claims against OPDA, Mr. Martin, Mr. Pipes, and Ms. LaCroix under the First, Fourth, and Fourteenth Amendments, alleging unlawful seizure, compelled speech, and retaliation, along with vague allegations of substantive-due-process violations. Ms. LaCroix also asserted Louisiana state-law claims for fraud and abuse of process.

---

[35] *See* Exhibit 14, Excerpts of Cardell Hayes sentencing, at 34–35.

[36] *See* Exhibit 14, Excerpts of Cardell Hayes sentencing, at 37–38.

[37] *See* Exhibit 7, LaCroix Depo., at 116.

[38] *See* Exhibit 7, LaCroix Depo., at 116–120.

On the Defendants' Rule 12(b)(6) motion, the Court dismissed Ms. LaCroix's Fourth Amendment claim, concluding that she was never "seized"—rather than comply with the allegedly unlawful subpoena, she disputed it and refused to appear at the DA's office. *See* Doc. No. 116 at 19–21. The Court also dismissed Ms. LaCroix's First Amendment compelled-speech claim, concluding that Ms. LaCroix never "met with prosecutors" or "spoke" in response to an allegedly unlawful subpoena. *See id.* at 37. The Court also held that all Individual Defendants are shielded by absolute prosecutorial immunity with respect to all alleged conduct other than creating or issuing unlawful subpoenas (and failure to supervise or intervene in relation to such conduct). *See id.* at 17 The Court also held that the Individual Defendants are entitled to qualified immunity with respect to any remaining federal claims. *See id.* at 18–26.[39] Finally, the Court later granted partial summary judgment dismissing all claims for injunctive relief against the Individual Defendants for lack of standing. *See* Doc. No. 200.

As a result of the rulings described above, Ms. LaCroix has only two remaining claims against the Individual Defendants—state-law claims for abuse of process and fraud. Moreover, based on the Court's immunity rulings, those claims are limited to seeking damages for whatever injury Ms. LaCroix may have suffered due to receiving allegedly unlawful subpoenas directing her to appear at the DA's office. With respect to the fraud claim, the Court has construed that claim as limited to seeking damages based on the cost of hiring an attorney in response to receiving an allegedly unlawful subpoena. *See* Doc. No. 116 at 41–42.

---

[39] *See also* Doc. No. 179 (granting qualified immunity on supervisory claims against Mr. Cannizzaro, Mr. Martin, and Mr. Pipes).

**LEGAL STANDARD**

Summary judgment must be granted as to all or part of any claim or defense "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A).

**DISCUSSION**

I.   **Ms. LaCroix's claim for abuse of process fails because there was no "legal process," because there was no malicious purpose to achieve an improper collateral objective, and because Ms. LaCroix cannot prove any resulting damages.**

"An abuse of process claim originates from the common law and is recognized under [Louisiana] jurisprudence as a compensable tort under LSA-C.C. art. 2315." *No Drama, LLC v. Caluda*, 177 So. 3d 747, 751 (La. App. 5th Cir. 2015) (quotation omitted). "[A]buse of process is the misuse of *legal process* for an ulterior purpose. It consists in the malicious misuse or misapplication of that process after issuance to accomplish some purpose not warranted or commanded by the writ. It is malicious perversion of a *legally issued process* whereby a result not lawfully or properly obtainable under it is attempted to be secured." *Ioppolo v. Rumana*, 581 F. App'x 321, 326 (5th Cir. 2014) (quotation omitted). *See also Delcambre v. Mancuso*, 268 So. 3d 325, 331 (La. App. 3rd Cir. 2019) ("An abuse of process occurs when the actor employs legal process in a manner technically correct, but for a wrongful and malicious purpose to obtain an unjustifiable end or an object which it was not the purpose of the particular process employed to effect.") (quotation omitted). "The essential elements of a cause of action for abuse of process are (1) the existence of an ulterior purpose; and (2) a willful act in the use of the process not in the regular prosecution of the proceeding." *Duboue v. City of New Orleans*, 909 F.2d 129, 132 (5th Cir. 1990). "The plaintiff must also prove damage resulting from the abuse." *Orrill v. Mortgage*

*Electronic Registration Systems, Inc.*, No. 06-cv-10012, 2008 WL 1867706, at *2 (E.D. La. Apr. 24, 2008).[40]

Ms. LaCroix alleges that Ms. Rodrigue committed the tort of abuse of process by sending a document that purported to be an Article 66 subpoena directing Ms. LaCroix to appear at the District Attorney's Office, but was not in fact issued by a court pursuant to the procedure set forth in Article 66. Ms. LaCroix alleges that "[b]y circumventing the requirements of Article 66, Defendants avoided court oversight of investigative subpoenas, and they used them not to investigate crimes pre-indictment, but to intimidate, coerce, and threaten witnesses after criminal proceedings have already been initiated." *See* Doc. No. 52 at ¶ 442. She further contends that "[t]he conduct at issue in this claim is not the *creation* of fraudulent subpoenas, but rather the use of these documents to gain private interrogations free of judicial oversight in which they could, among other things, improperly coerce witnesses to change their testimony." *See* Doc. No. 67 at 52. However, Ms. LaCroix cannot prove that there was any misuse of "legal process," that there was any malicious, collateral purpose, or that she suffered any injury as a result.

A.    **The "DA subpoena" sent to Ms. LaCroix cannot give rise to a claim for abuse of process because it was not "legal process"—it was not issued by any court or enforceable in any court.**

"Louisiana courts have never considered the 'process' element of a cause of action for abuse of process anything other than legal process, or court process." *Ioppolo*, 581 F. App'x at 326 (quotation omitted). More than one hundred years ago, when the Fifth Circuit first recognized the common-law tort of abuse of process under Louisiana law, the Fifth Circuit described it as

---

[40] *See also Owl Constr. Co. v. Ronald Adams Contractor, Inc.*, 642 F. Supp. 475, 478 (E.D. La. 1986) ("Further, the abuse must have damaged the plaintiff in some manner."); *Mini-Togs. Inc. v. Young*, 354 So. 2d 1389, 1391 (La. App. 2nd Cir. 1978) ("To make out its case, the plaintiff must prove irregular steps taken under cover of the process after its issuance, and damage to the plaintiff resulting therefrom.") (quotation omitted).

"applicable to all kinds of abuses *in the service of lawful process*." *See Gonsouland v. Rosomano*, 176 F. 481, 486 (5th Cir. 1910) (emphasis added). Eighty years later, the Fifth Circuit explained again that "[t]he precise inquiry" in a claim for abuse of process "involves a misuse of a process already *legally issued* whereby a party attempts to obtain some result not proper under law." *Duboue v. City of New Orleans*, 909 F.2d 129, 132 (5th Cir. 1990) (emphasis added). Louisiana courts have similarly held that an abuse-of-process claim necessarily involves misuse of *lawful* process. *See, e.g.*, *Almerico v. Dale*, 927 So. 2d 586 (La. App. 5th Cir. 2006) ("In reviewing Louisiana cases on abuse of process, we find none in which the 'process' part of the cause of action has been considered anything other than *legal* process, or *court* process.") (emphasis added); *Delcambre v. Mancuso*, 268 So. 3d 325, 331 (La. App. 3rd Cir. 2019) ("An abuse of process occurs when the actor employs *legal process* in a manner *technically correct*, but for a wrongful and malicious purpose to obtain an unjustifiable end or an object which it was not the purpose of the particular process employed to effect.") (quotation omitted, emphasis added).

Ms. LaCroix alleges that the "DA subpoenas" given to her and another plaintiff "were not legal documents." *See* Doc. No. 52 at ¶ 324.[41] The Individual Defendants agree that the "DA subpoena" given to Ms. LaCroix was not issued by any court or enforceable in any court, and that it had no legal effect or authority at all. Accordingly, the "DA subpoena" given to Ms. LaCroix was not "legal process" in any sense. Her abuse-of-process claim therefore fails as a matter of law.

**B.    Ms. Rodrigue did not act with a wrongful, malicious purpose to seek an improper collateral objective—she was attempting to prepare for trial by meeting with a witness who possessed important, relevant information.**

In addition to proving a misuse of "legal process," a plaintiff alleging abuse of process must also prove that the legal process was used "for a wrongful and malicious purpose to obtain

---

[41] Thus, as Ms. LaCroix alleges, "there was nothing to quash." *See* Doc. No. 52 at ¶ 324.

an unjustifiable end or an object which it was not the purpose of the particular process employed to effect." *Hebert v. La. Licensed Prof'l Vocational Rehab. Counselors*, 4 So. 3d 1002, 1009 (La. App. 3rd Cir. 2009) (quotation omitted). Stated differently, the "process" must be used "to attain some collateral objective, outside the scope of the operation of the process employed." *Id.* (quotation omitted). "It is the 'hidden' or ulterior motive that drives this claim and the improper end its [sic] seeks to achieve." *Id.* at 1010. Without this showing of a wrongful and malicious purpose, an irregular or improper use of legal process does not satisfy the elements of the tort.

For example, in *Owl Construction Co. v. Ronald Adams Contractor, Inc.*, 642 F. Supp. 475, 478 (E.D. La. 1986), the district court found that, although the defendant's filing of a lien was "improper," there was no "ulterior purpose or motive" because the defendant's purpose was legitimate—"to protect their interests in the collection of the money admittedly owed to them by plaintiff OWL for materials supplied." *See also Harvey v. Caesars Entm't Operating Co.*, 790 F. App'x 582, 591 (5th Cir. 2019) (allegation that "Harrah's reported [plaintiff] to the District Attorney so that Harrah's could collect a civil debt" did not state a claim for abuse of process because "Louisiana law does not consider the desire to collect a civil debt to be an ulterior motive for prosecution").

Ms. LaCroix cannot prove "the existence of an ulterior purpose" on Ms. Rodrigue's part. As Ms. Rodrigue explained in her deposition, her purpose in sending the document to Ms. LaCroix was to prepare for an imminent trial by meeting with a potentially important witness to ascertain what her testimony might be:

> Through her interview with Sports Illustrated, we learned that the defendant in the case, his first phone call was made to her on the scene of the crime after he had shot the victim. So at that time we did not know whether she had information relevant to the case. She had never told anybody that, the police or anybody else for that matter. So we were hoping to have her speak with us the same way she had spoken

with the media outlets just to see what the information was. Really just to make sure that there was no—no stone left unturned in preparation for the trial.[42]

Ms. Rodrigue further explained:

It seemed extremely relevant, especially since we knew he was going self-defense. Self-defense is a very sort of different type of trial where every move he makes after the crime will be very important evidence in determining if he was acting out of fear of death or great bodily harm or he was acting with the intent to kill.[43]

There is simply no evidence suggesting that Ms. Rodrigue had any other purpose in attempting to arrange a meeting with Ms. LaCroix. In particular, there is no evidence supporting the allegation that Ms. Rodrigue sought to "improperly coerce [Ms. LaCroix] to change [her] testimony." *See* Doc. No. 67 at 52. Nor is there any evidence suggesting that Ms. Rodrigue had malice toward Ms. LaCroix or some desire to cause her harm. Before sending the "DA subpoena" to Ms. LaCroix, Ms. Rodrigue had never met her or spoken with her and had never been informed that Ms. LaCroix did not wish to speak with her.[44] Nor has Ms. Rodrigue taken any action since that time from which malice could be inferred. To this day, Ms. Rodrigue has never met or spoken with Ms. LaCroix and has never attempted to have any punishment imposed on her for failure to comply with the "DA subpoena."

### C. Ms. LaCroix cannot prove that she was injured by the mere receipt of a "DA subpoena" that she did not comply with.

Ms. LaCroix previously alleged that she "hired an attorney at personal expense" after receiving the "DA subpoena." *See* Doc. No. 67 at 38. However, in her deposition, Ms. LaCroix testified to the contrary, explaining that she never paid any money to Mr. Ibert.[45] Rather, Ms.

---

[42] *See* Exhibit 6, Rodrigue Depo., at 71.

[43] *See* Exhibit 6, Rodrigue Depo., at 79.

[44] *See* Exhibit 6, Rodrigue Depo., at 81.

[45] *See* Exhibit 7, LaCroix Depo., at 66.

LaCroix testified that her mother paid Mr. Ibert's $500 flat fee and never requested any reimbursement from her.[46] Ms. LaCroix cannot show any personal financial loss as a result of hiring counsel.

Ms. LaCroix also explained in her deposition that she is seeking damages based on the time she had to take off work to appear for Cardell Hayes's trial pursuant to a court subpoena.[47] As noted above, Judge Buras issued a subpoena ordering Ms. LaCroix to appear for the trial as a potential witness.[48] Ms. LaCroix testified in her deposition that she appeared for every day of the trial, which lasted "a week, two maybe."[49] However, the trial subpoena was not even arguably illegal or improper, which Ms. LaCroix conceded in her deposition.[50] Thus, there is no basis for Ms. LaCroix to recover damages for any alleged harm or loss resulting from her attendance at the trial.

Ms. LaCroix also seeks damages based on the time she allegedly took off from work to meet with her lawyer. Ms. LaCroix testified that, the day after she received the "DA subpoena," she missed work when she went to meet with Mr. Ibert.[51] Ms. LaCroix could not recall whether she missed that entire day of work or only part of the day.[52] She also could not give even a rough estimate of how much money might have been deducted from her paycheck based on the time she took off to meet with her lawyer on one day.[53] Ms. LaCroix also explained that she did not have

---

[46] *See* Exhibit 7, LaCroix Depo., at 66–67.

[47] *See* Exhibit 7, LaCroix Depo., at 104–105.

[48] *See* Exhibit 11, Transcript of November 30, 2016 hearing, at 1–5.

[49] *See* Exhibit 7, LaCroix Depo., at 37–38.

[50] *See* Exhibit 7, LaCroix Depo., at 39–40.

[51] *See* Exhibit 7, LaCroix Depo., at 85–86.

[52] *See* Exhibit 7, LaCroix Depo., at 86.

[53] *See* Exhibit 7, LaCroix Depo., at 105–107.

any documentation that would establish the amount of her allegedly lost income.[54] Accordingly, Ms. LaCroix cannot prove any damages in the form of lost income.

Ms. LaCroix also apparently seeks damages for alleged emotional distress. The Complaint alleges: "Because Ms. LaCroix was apprehensive, given the language used in the subpoenas and the threats from prosecutors, she did not feel at liberty to travel or to leave the state until the purported subpoena was quashed." Doc. No. 52 at ¶ 323.[55] But Ms. LaCroix testified that she had no plans to travel or leave the state between November 27 (when she received the "DA subpoena") and November 29 (when her appearance was requested).[56]

Ms. LaCroix testified that when she received the "DA subpoena," she assumed that "it was because [she] did something wrong" and that she was "in some form of trouble."[57] But she also testified that she would have felt the same way if she had received a subpoena to testify at Cardell Hayes's trial.[58] And, strikingly, Ms. LaCroix's description of her alleged trauma focused on her anxiety around the possibility of being *properly served* with *a real, court-issued subpoena*:

> [A]fter the fake subpoena, it was told to me I was going to get a real one, that—what was like—I asked like what could happen, like, if they were to give it to me at school. And then when I was told that they could come into my—it was a possibility they could walk into my classroom in the middle where I was teaching, the trauma—like, the idea—the trauma that it would cause, not only to myself, but to like all of my students who could see that, that could trigger—the thought of that

---

[54] *See* Exhibit 7, LaCroix Depo., at 106.

[55] Contrary to her allegation, Ms. LaCroix has never come forward with any evidence that she received "threats from prosecutors."

[56] *See* Exhibit 7, LaCroix Depo., at 86–87.

[57] *See* Exhibit 7, LaCroix Depo., at 72–73.

[58] *See* Exhibit 7, LaCroix Depo., at 73 ("Q: [I]f you had got a subpoena instead telling you to come to trial to testify about Cardell Hayes, would you have also felt like it was because you did something wrong? A: Yeah, I guess so, being punished by affiliation. I don't know.").

triggering so many ripple effects would, like, overwhelm me. Thinking about it now, its . . .[59]

[T]he thought of them coming in . . . to serve me an actual—like give me a subpoena that they have to, I guess, someone have to give to me in my hand, I guess, if that's how the law—how you're supposed to do it, and the possibility of them coming to my school or, like doing that in front of my students and other people was traumatizing, like, within itself. That was partially a reason why I left the school that—that's why I left 35 because of, like, the possibility of all kind of things, and I wanted to get a fresh start.[60]

There is no basis for a rational fact-finder to conclude that Ms. LaCroix suffered compensable emotional distress based on the mere receipt of a "DA subpoena," which was sent to her privately and not at her place of employment. Ms. LaCroix was never personally served with the document; rather, she found it stuck in her door when she came home on the night of November 27, 2016.[61] The following day, she spoke with a lawyer and was informed that she did not have to comply "because the document was fake, basically."[62] The day after that, Ms. LaCroix gleefully informed Mr. Hayes that her receipt of the document was "a good thing" that was "very very good" for Mr. Hayes.[63]

It appears that any distress Ms. LaCroix suffered was caused not by her uneventful receipt of a document with no legal effect, but by the prospect of being legally compelled to testify as a witness against the father of her child. Yet Ms. LaCroix was in possession of information that was clearly relevant to Mr. Hayes's claim of self-defense—which was the central issue in his case—and was willing to exploit that information for his benefit in the news media and at sentencing. It

---

[59] *See* Exhibit 7, LaCroix Depo., at 108–109.

[60] *See* Exhibit 7, LaCroix Depo., at 110–111.

[61] *See* Exhibit 7, LaCroix Depo., at 48.

[62] *See* Exhibit 7, LaCroix Depo., at 54, 67.

[63] *See* Exhibit 9, Audio recording of November 29, 2016 phone call, at 0:22–1:45; *see also* Exhibit 7, LaCroix Depo., at 52–58.

was perfectly legitimate for the State to seek out the information known to Ms. LaCroix and to compel her attendance at trial, and any distress that she may have suffered as a result cannot legally give rise to damages in this case.

**II.      Ms. LaCroix's fraud claim fails because she cannot prove any injury sustained in reliance on the truthfulness of allegedly false statements.**

"Fraud under Louisiana law entails a 'misrepresentation or suppression of the truth made with the intention to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.'" *First Am. Bankcard, Inc. v. Smart Business Tech., Inc.*, 178 F. Supp. 3d 390, 401 (E.D. La. 2016) (quoting La. Civ. Code art. 1953). "The Fifth Circuit has stated the requisite elements of a fraud claims are: '(1) a misstatement or omission; (2) of material fact; (3) made with the intent to defraud; (4) on which the plaintiff relied; and (5) which proximately caused the plaintiff's injury.'" *Id.* (quoting *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997)). "The intent to deceive is a specific intent." *Schaumburg v. State Farm Mut. Auto. Ins. Co.*, 421 F. App'x 434, 442 (5th Cir. 2011). "Pleading fraud with particularity in this circuit requires time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Williams*, 112 F.3d at 177 (quotation omitted).

The Defendants previously sought dismissal of Ms. LaCroix's fraud claim on the ground that she had not adequately alleged any injury that was sustained in reliance on allegedly false statements. *See* Doc. No. 63-1 at 42–43. In allowing Ms. LaCroix's fraud claim to survive dismissal under Rule 12(b)(6), the Court found only one alleged injury that was sufficient to sustain the claim: that Ms. LaCroix hired a private attorney after being served with a "DA subpoena." *See* Doc. No. 116 at 42. The Court held that Ms. LaCroix had allegedly "suffered an injury—the cost of a private attorney" in reliance on threatening language in the document. *See id.*

The Individual Defendants respectfully disagree with the Court's earlier conclusion and submit that Ms. LaCroix did not rely on the truthfulness of any statement in the "DA subpoena" in retaining Mr. Ibert. Ms. LaCroix admits in her Complaint that she "retained Anthony J. Ibert to challenge the fraudulent subpoena," Doc. No. 52 at ¶ 322, and the grounds for the challenge were, of course, that the "DA subpoena" was not actually a subpoena.[64] Ms. LaCroix testified that in her first meeting with Mr. Ibert, before he filed anything or appeared in court on her behalf, he informed her that she did not have to appear at the District Attorney's Office "because the document was fake, basically."[65]

Additionally, the Court's analysis dismissing Ms. LaCroix's Fourth Amendment claim is relevant here and calls for dismissal of her fraud claim for the same reasons. *See* Doc. No. 116 at 20. The Court explained that Ms. LaCroix was never "seized" because she did not submit to the show of authority contained in the "DA subpoena":

> [D]isputing a show of authority does not involve submission. Plaintiffs' challenge to the 'subpoena' represented a show of defiance, the antithesis of submission. Accordingly, because neither Baham nor LaCroix was ever physically confined, nor did they ever submit to prosecutors' show of authority, their Fourth Amendment rights were not violated.

Doc. No. 116 at 21. The Individual Defendants respectfully submit that reliance on the truthfulness of the statements contained in an apparent subpoena cannot be meaningfully distinguished from "submission" to the authority it claims. Because Ms. LaCroix and her lawyer were aware that the "DA subpoena" was not a valid subpoena at the time when he was retained, and because Ms. LaCroix did not comply with the "DA subpoena," her fraud claim must be dismissed.

---

[64] *See* Exhibit 10, Motion to Quash; *see also id.* at page 1 of "Memorandum in Support" (asserting that "the subpoena does not appear on its face to be issued by the clerk of court").

[65] *See* Exhibit 7, LaCroix Depo., at 54, 67.

Furthermore, even if the Court adheres to its earlier reasoning, Ms. LaCroix's fraud claim fails for the simple reason that she did not in fact incur "the cost of a private attorney" in response to the "DA subpoena." *See* Doc. No. 116. As discussed above, Ms. LaCroix admitted that she never paid any money to Mr. Ibert, and that his $500 flat fee was paid by her mother and never reimbursed by her.[66]

### III.     Ms. LaCroix cannot prove that either Mr. Pipes or Mr. Martin personally committed the torts of abuse of process or fraud against her.

Ms. LaCroix has not even alleged that Mr. Pipes or Mr. Martin personally sent a "DA subpoena" to her, directed that such a document be sent to her, or knew that such a document was being sent to her. Nor can Ms. LaCroix produce any evidence proving that Mr. Pipes or Mr. Martin did any of these things, because no such evidence exists. Mr. Pipes and Mr. Martin are therefore entitled to summary judgment.

### CONCLUSION

For the reasons explained above, Laura Rodrigue, David Pipes, and Graymond Martin are entitled to summary judgment in their favor on the abuse-of-process and fraud claims asserted by Tiffany LaCroix. Additionally, because there are no other claims pending against Ms. Rodrigue, she should be dismissed as a party to the case.

---

[66] *See* Exhibit 7, LaCroix Depo., at 66–67.

Respectfully submitted,

 */s/ Matthew J. Paul*
Richard C. Stanley, 8487
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
STANLEY, REUTER, ROSS, THORNTON
 & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile:  (504) 524-0069

*Counsel for Graymond Martin, David Pipes, and Laura Rodrigue*