```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF LOUISIANA

 3
      * * * * * * * * * * * *
 4
    RENATA SINGLETON,
 5  MARC MITCHELL,
    LAZONIA BAHAM,
 6  JANE DOE,
    TIFFANY LACROIX,
 7  FAYONA BAILEY,
    JOHN ROE, and
 8  SILENCE IS VIOLENCE,
                                         CASE NO.
 9           Plaintiffs,
                                         2:17-cv-10721-JTM-JVM
10  v.
                                      JUDGE JANE TRICHE MILAZZO
11  LEON CANNIZZARO, et al.,
                                      MAG. JANIS VAN MEERVELD
12           Defendant.

13  * * * * * * * * * * * *

14                    CONFIDENTIAL

15      VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF

16              LAURA CANNIZZARO RODRIGUE

17              Location of witness:

18                   law offices of

19     Stanley Reuter Ross Thornton & Alford, LLC

20          909 Poydras Street, Suite 2500

21              New Orleans LA  70112

22          Friday, September 25, 2020

23

24  Reported by:  DEBRA AMOS ISBELL, CCR,RDR,CRR

25  Job No: 183488
```

**EXHIBIT 6**

1  office and a licensed member of the bar, yes.

2     Q.   Is it accurate where it states on Exhibit 3,

3  the fake subpoena, that this is a process of the

4  court -- it is effectively a duplicate of process of

5  court?  If you look at where it states "Return of

6  Personal Service," in open quotes it states:

7          "I received the process of

8          court of which this is a

9          duplicate."  Close quote.

10         Is that an accurate statement?

11    A.   Not -- no, I would say no in terms of it's

12 not the court.

13    Q.   This Exhibit 3, this fake subpoena, requests

14 that Tiffany Lacroix appear at 619 South White Street;

15 is that correct?

16    A.   Yes.

17    Q.   What is 619 South White Street?

18    A.   The District Attorney's Office.

19    Q.   And why was Ms. Lacroix requested through

20 this fake subpoena to appear there at the District

21 Attorney's Office?

22    A.   To the best of my recollection, this would

23 have been days before the jury trial was set to begin.

24 Ms. Lacroix, along with at least two other

25 gentlemen -- I don't remember who else -- had done

1  interviews with Sports Illustrated and another media

2  outlet, I cannot recall who.  It might have been ESPN.

3  I can't recall.

4           Through her interview with Sports

5  Illustrated, we learned that the defendant in the

6  case, his first phone call was made to her on the

7  scene of the crime after he had shot the victim.  So

8  at that time we did not know whether she had

9  information relevant to the case.  She had never told

10 anybody that, the police or anybody else for that

11 matter.

12          So we were hoping to have her speak with us

13 the same way she had spoken with the media outlets

14 just to see what the information was.  Really just to

15 make sure that there was no -- no stone left unturned

16 in preparation for the trial.  And this would have

17 been days before.

18     Q.   And document 3 -- or Exhibit 3, excuse me --

19 this fake subpoena, how was this provided to

20 Ms. Lacroix, do you recall?

21     A.   I believe it was given to an investigator to

22 bring.  That's typically how it would have gone.  If

23 we had an address, the investigator would bring it to

24 the person's home.

25     Q.   And do you recall who that investigator was

1   It would have been extremely dangerous.

2       Q.   To the best of your recollection, did
3   Tiffany Lacroix ask for you to direct her to come to
4   the DA's office?

5       A.   Well, Tiffany Lacroix would never speak to
6   me.  I mean she refused to speak to us at all.

7       Q.   So is it an accurate statement to say that
8   she never asked to have Exhibit 3, this fake subpoena,
9   issued to her?

10      A.   No.  I've never had a witness or a victim
11  ever call me and ask me to issue them a DA subpoena to
12  come meet with me who is not cooperative.

13      Q.   So why was this DA subpoena, Exhibit 3,
14  issued to Tiffany Lacroix again?

15      A.   It was several days before trial.  She had
16  done an interview with Sports Illustrated informing, I
17  guess, the whole world at that point that the first
18  phone call he made after he murders the victim was to
19  her.  It seemed extremely relevant, especially since
20  we knew he was going self-defense.  Self-defense is a
21  very sort of different type of trial where every move
22  he makes after the crime will be very important
23  evidence in determining if he was acting out of fear
24  of death or great bodily harm or he was acting with
25  the intent to kill.

1    So it was very crucial evidence, in our
2 opinion, that she shared with the world but would not
3 speak with us.  And we were making sure that we made
4 every effort to speak to every potential witness who
5 had evidence in the case out of our duty to our
6 victims, as I hope I have done in every case.
7    Q.   And so in order to speak with Ms. Lacroix,
8 you authorized the issuance and the service of this
9 fake subpoena on her; is that accurate?
10   A.   Right.  In order to make contact with her,
11 yes.  I sent an investigator to see if she'd be
12 willing to talk to us.
13   Q.   And did you issue a trial subpoena to
14 Ms. Lacroix?
15   A.   The judge did.  We went into court.  She had
16 an attorney file a motion to quash.  At that point it
17 was obvious she was never going to speak to us.  We
18 would just, I guess, find out at the moment she
19 testified what information she had if she became a
20 witness.  And her attorney came in.  Then we asked the
21 judge to issue a trial subpoena in the event that she
22 would be needed to testify.  Her attorney refused to
23 accept service for her, at which point, to the best of
24 my recollection, the judge asked him to provide an
25 address and --

1     Q.    Ms. Rodrigue --

2     A.    -- I believe he was on --

3     Q.    -- we can talk about -- we can talk about
4  what occurred in court in a little bit. Let me ask
5  you a different question.

6           So prior to issuing Exhibit 3, this fake
7  subpoena, to Ms. Lacroix, you knew that she did not
8  want to talk with you; is that correct?

9           MR. PAUL:  Object to the form.

10    A.    I had never made any effort to speak to her
11 at that point, not knowing that she held this crucial
12 piece of information.  So we had not -- we didn't know
13 this.  So we then, of course, tried to talk to her.

14          The only time I learned that -- or I guess I
15 assumed she would be not willing to talk to us was
16 when her attorney arrived to quash the subpoena.

17    Q.    Did your investigator working with you or
18 any of the investigators working with you in this case
19 attempt to reach out to Ms. Lacroix prior to the
20 issuance of this fake subpoena, which is Exhibit 3?

21    A.    I believe that an effort was made to call a
22 phone number that we had.  And I would assume that we
23 were not -- we did not receive a return call.

24    Q.    Let me just ask you some different questions
25 on a different topic here.

```
                                                              Page 85
 1                ANTHONY WILLIAMS, 11/28/2016 -
 2                PLAINTIFFS-111655, WAS MARKED FOR
 3                IDENTIFICATION.)
 4       Q.    Do you recognize this document,
 5   Ms. Rodrigue?
 6       A.    I recognize that to be my handwriting, yes.
 7       Q.    And Exhibit 4, is this what's known as a
 8   fake subpoena?
 9       A.    Yes.
10       Q.    And why is it your understanding that this
11   is referenced as a fake subpoena?
12       A.    I believe that the media gave it that title,
13   to the best of my knowledge.  But I would assume that
14   it's because -- the theory behind that being it's not
15   a court subpoena, so therefore it's fake.
16       Q.    Is it true that not responding to Exhibit 4
17   here, Mr. Williams would have been put in jail or
18   fined?
19       A.    Not responding to that document would not in
20   and of itself have resulted in that, no.
21       Q.    Is it accurate that this Exhibit Number 4
22   was issued pursuant to Louisiana State Code Article
23   66?
24       A.    I do not believe so, no.
25       Q.    And how was this Exhibit 4 served on
```

1   Mr. Williams, to the best of your knowledge?
2       A.   It would have -- I mean not that I have
3   independent recollection of this particular one, but I
4   would assume it was the same.  This would all have
5   been -- I believe the other one would have been the
6   same day or so.  So I would assume it's the same
7   manner because, to the best of my recollection, this
8   was another gentleman who had participated in an
9   interview with one of the national media outlets.  And
10  that's when we learned of him, and that's why we made
11  an attempt to speak with him.
12      Q.   And so your attempt to speak with
13  Mr. Williams was to gain information from him related
14  to the investigation; is that accurate?
15      A.   Correct.  I mean he -- I do not recall
16  exactly.  I believe he may have been a barber.  I
17  believe that was one of the people -- and I'm
18  recalling this from the testimony from trial, but it's
19  been quite a while.  My understanding is he had -- I
20  don't want to misstate.  It mentions something that
21  was relevant to the character of the defendant, and I
22  can't recall if he mentioned also that he actually had
23  direct knowledge to some extent of the actual
24  incident.  And I don't remember who he said he had
25  spoken to or something of that nature.

1  people.

2      Q.    I've asked you about two DA subpoenas, fake

3  subpoenas, in the Hayes case, Exhibits 3 and 4.  Did

4  you issue any other fake subpoenas in the Hayes case?

5      A.    Not -- I don't recall anything other than

6  that time.  In other words, those newspaper articles

7  hit the press, and that was the first time we had seen

8  this statement from Ms. Lacroix and we had known of

9  Mr. Williams, and I believe there was another man who

10 gave an interview with Mr. Williams, and I don't

11 recall if he got the subpoena or not.  But I just

12 remember there were two males who gave the interviews,

13 one was a barber, and honestly I can't right now

14 remember which one was which.  They might have both

15 been barbers.  I can't remember.

16     Q.    Did anyone raise concern about the use of

17 the fake subpoenas with regard to either Mr. Williams

18 or Ms. Lacroix after they were issued?

19     A.    So Ms. Lacroix's attorney came in, which I

20 think we've discussed, when he came in to file the

21 motion to quash.  Mr. -- I don't recall -- again, one

22 of the gentlemen was called to testify by the defense

23 in their case in chief.  And the defense attorney was

24 John Fuller.  He presented the document, what you're

25 calling the fake subpoena, to the witness on the stand

1  and sort of said:  Didn't they give you this fake
2  document type of thing?
3         And the witness on cross-examination did
4  admit that he was not under any duress, that we had
5  actually had a very nice conversation and sort of
6  shared details about our lives, our personal lives
7  with each other, and that's sort of how the meeting
8  ended.  Nobody was threatened, pressured, nothing of
9  that nature.  And after that I believe Mr. Fuller
10 didn't ask another question about it.
11    Q.    And what happened with -- my understanding
12 is there was a motion to quash in the Tiffany Lacroix
13 case, to quash the fake subpoena; is that accurate?
14    A.    Correct.
15    Q.    And what happened with that motion?  Is my
16 understanding accurate that you withdrew the subpoena?
17 Is that accurate?
18    A.    So what happened is an attorney came in,
19 filed a motion to quash.  I believe that I was -- I
20 think I was in the office when that happened and
21 somebody, whoever -- it was probably the ADA assigned
22 to the section -- called me over, said there's an
23 attorney here who filed a motion to quash in the
24 Cardell Hayes case.
25         I don't even know if I was available at the

1  time, but eventually went over there.  And he filed
2  the motion to quash.  At that point it was obvious she
3  was not going to speak to us.  So I said to withdraw,
4  that we didn't need to speak with her, and that to
5  just serve her for trial so at least she can't
6  basically flee if something that she said becomes
7  relevant, I guess in connection with her Sports
8  Illustrated interview, because that's at that point
9  the only statement I had that she had made.
10            So that was fine.  The judge asked that
11 Mr. Ibert accept service or asked if he would.  He
12 said he would not accept service for her.  The judge
13 asked him to provide her address.  He refused to do
14 that.  And the judge said that she would send a deputy
15 to pick her up from work or something along the
16 lines of:  We can do this the easy way or the hard
17 way.  And then the attorney agreed to provide an
18 address, I believe.
19     Q.    My apologies.  Just give me one moment.
20     A.    Sure.
21     Q.    I believe you testified earlier that you had
22 an obligation to meet or speak with witnesses or
23 victims to ascertain if they had inculpatory or
24 exculpatory evidence; is that accurate?
25     A.    In my practice, yes, I believe.