```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3

 4   RENATA SINGLETON; MARC
     MITCHELL; LAZONIA BAHAM;
 5   JANE DOE; TIFFANY LACROIX;
     FAYONA BAILEY; JOHN ROE;    CIVIL ACTION NO. 17-10721
 6   AND SILENCE IS VIOLENCE

 7                              SECTION H
     VERSUS                     JUDGE JANE TRICHE MILAZZO
 8
     LEON CANNIZZARO, IN HIS     DIVISION I
 9   OFFICIAL CAPACITY AS        MAGISTRATE JUDGE
     DISTRICT ATTORNEY OF        JANIS VAN MEERVELD
10   ORLEANS PARISH AND IN
     HIS INDIVIDUAL CAPACITY;
11   GRAYMOND MARTIN; DAVID
     PIPES; IAIN DOVER;
12   JASON NAPOLI, ET AL

13

14

15

16

17

18          Video Conference Zoom Deposition of

19   TIFFANY LACROIX, taken on Saturday, September 12,

20   2020.

21

22

23

24                                          EXHIBIT
                                               7
25
```

1  the news stories that you were seeing around that

2  time?  Was it generally a favorable or unfavorable

3  portrayal of Mr. Hayes?

4      MS. MIKKILINENI:

5          Objection.  This is totally irrelevant.

6  BY MR. PAUL:

7      Q    You can answer.

8      A    It was unfavorable.

9      Q    Did you ever talk to people from the media

10 about Cardell Hayes?

11     MS. MIKKILINENI:

12          Object as to relevance.

13     THE WITNESS:

14          I --

15 BY MR. PAUL:

16     Q    You can answer.

17     A    I believe I did -- I believe I did two

18 interviews.

19     Q    Who did you give the interviews to?

20     A    I only remember the name of one.  I

21 believe it was, like, through ESPN, and I don't

22 remember the other one.

23     (Exhibit 2 was marked for identification.)

24     MR. PAUL:

25          I'm going to introduce Exhibit 2 here for

1  you.  This is C7.

2      MS. MIKKILINENI:

3          Can you share it on the screen, Matt.

4      THE WITNESS:

5          I've never seen this.

6      MS. MIKKILINENI:

7          Is there a question pending?

8      MR. PAUL:

9          No, there's not.

10     MS. MIKKILINENI:

11         Okay.

12 BY MR. PAUL:

13     Q    This is a Sports Illustrated article

14 published October 11, 2016, about the killing of

15 Will Smith.  I'm going to ask you to look on Page --

16 I'm sorry, Ms. LaCroix.  I can't find it.

17         Okay.  Can you look at Page 10.

18     A    Yes.

19     MS. MIKKILINENI:

20         Could you re-share the document, Matt, and

21 if you wouldn't mind zooming in, it's a little hard

22 to read.

23     MR. PAUL:

24         Can you read that, Tara, toward the top?

25     MS. MIKKILINENI:

```
 1              Yeah, sort of, if I squint.
 2   BY MR. PAUL:
 3      Q    Ms. LaCroix, toward the top of that page
 4   there --
 5      MS. MIKKILINENI:
 6              Yeah, actually, do you mind -- do you mind
 7   zooming in?  Sorry, Matt.  I actually really -- I'm
 8   having trouble reading it.
 9      MR. PAUL:
10              Can you read that now?
11      MS. MIKKILINENI:
12              No.  There should be a zoom, like a plus,
13   a little plus sign that would make it bigger.  Yeah,
14   that's a little bit better.  But now it's cut off.
15      MR. PAUL:
16              So I'm going to have to scroll over
17   manually.
18   BY MR. PAUL:
19      Q    Can you see it, Ms. LaCroix?
20      MS. MIKKILINENI:
21              Can you maximize -- can you maximize the
22   window.
23      MR. PAUL:
24              I can't.  This is as big as it goes, the
25   screen.
```

```
 1       MS. MIKKILINENI:

 2            Okay.

 3  BY MR. PAUL:

 4       Q    Ms. LaCroix, I want to ask you about the

 5  quote at the top of the page there.  It's in

 6  parentheses.  It says --

 7       A    Okay.

 8       Q    -- He was just in total shock, says

 9  LaCroix, regarding the conversation.  He was, like,

10  I shot somebody, they kept coming, they attacked us,

11  end quotes.  That -- does that quote --

12       A    Yes.

13       Q    -- reflect what you told the reporter?

14       A    Yeah, that sounds about -- along with

15  other stuff, yeah.

16       Q    Do you recall the name of that reporter?

17       A    No.

18       MS. MIKKILINENI:

19            Objection to relevance.

20  BY MR. PAUL:

21       Q    Was it Richard O'Brien?

22       A    I really don't remember his name.

23       Q    Did you talk to him over the phone or in

24  person?

25       MS. MIKKILINENI:
```

```
 1              Object as to relevance.

 2        THE WITNESS:

 3              I want to say both.

 4  BY MR. PAUL:

 5     Q    So you talked to him on more than one

 6  occasion?

 7        MS. MIKKILINENI:

 8              Object as to relevance.

 9        THE WITNESS:

10              Maybe.  I really don't remember.

11  BY MR. PAUL:

12     Q    How did you get in contact with him in the

13  first place?

14        MS. MIKKILINENI:

15              Object as to relevance.

16        THE WITNESS:

17              I don't -- I don't remember.

18  BY MR. PAUL:

19     Q    Did someone contact you, or did you seek

20  out someone to talk to?

21     A    No.  Somebody contacted me.

22        MS. MIKKILINENI:

23              Object as to relevance.

24  BY MR. PAUL:

25     Q    Why did you decide to talk to the reporter
```

1   about what Cardell Hayes told you?

2       MS. MIKKILINENI:

3           Object as to relevance.

4       THE WITNESS:

5           To -- to tell what happened, I guess.

6   BY MR. PAUL:

7       Q   You felt like you wanted to tell your side

8   of the story?

9       MS. MIKKILINENI:

10          Object as to rel -- object as to form,

11  relevance and characterization of that question.

12  BY MR. PAUL:

13      Q   You can answer.

14      A   Yes.

15      Q   Did you ever talk to a reporter from The

16  Lens newspaper?

17      MS. MIKKILINENI:

18          Object as to relevance.

19      THE WITNESS:

20          I don't remember.

21  BY MR. PAUL:

22      Q   Did you ever talk to a reporter named

23  Charles Maldonado?

24      A   I really don't remember.

25      Q   Do you recall when Cardell Hayes' trial

```
 1  began?
 2      A    Do I recall when his trial what?
 3      MS. MIKKILINENI:
 4           Could you repeat the question, Matt.  You
 5  kind of cut out there.
 6  BY MR. PAUL:
 7      Q    Do you recall when Cardell Hayes' trial
 8  began?
 9      A    Yes.
10      Q    When was that?
11      A    I believe -- I want to say 2017, 2016,
12  2017, I think.
13      Q    If the court records reflected it began on
14  December 5, 2016, does that sound right to you?
15      A    Yes.
16      Q    Do you recall how long the trial lasted?
17      A    A week, two maybe.
18      Q    Did you attend the trial?
19      A    I was subpoenaed to be there, but I was
20  not inside of the courtroom until the end.
21      Q    So you were not inside the courtroom at
22  any point during the trial?
23      A    Towards the end, maybe the last day; but
24  the majority of the time, no.
25      Q    Did you come to court every day the trial
```

1  was set?

2      A    Yes.

3      Q    Did you want to attend the trial?

4      A    Maybe a day but not the entire time, no.

5      Q    So you said that you were subpoenaed to

6  come to the trial?

7      A    Yes.

8      Q    Who gave you a subpoena to come to the

9  trial?

10     A    The person who signed it was Laura

11 Rodrigue.

12     Q    Do you believe it was improper for

13 Ms. Rodrigue to give you a subpoena to come to

14 trial?

15     MS. MIKKILINENI:

16          Objection.  This is ambiguous because

17 there are multiple documents that have been filed,

18 subpoenas, so it's a legal conclusion.

19     MR. PAUL:

20          Please stop the speaking --

21     MS. MIKKILINENI:

22          So it calls for --

23     MR. PAUL:

24          Please stop the speaking objections.

25 You're coaching the witness.

1      MS. MIKKILINENI:

2           No.  Your question is ambiguous.  I'm

3  objecting as to form.  It's ambiguous and it calls

4  for a legal conclusion.

5      MR. PAUL:

6           That's fine.

7      THE WITNESS:

8           Can you repeat the question?

9  BY MR. PAUL:

10     Q    Yes, ma'am.  Do you believe it was

11  improper for Ms. Rodrigue to give you a subpoena to

12  come to Cardell Hayes' trial?

13     MS. MIKKILINENI:

14          Calls for a legal conclusion.  Objection.

15     THE WITNESS:

16          The first subpoena was improper because it

17  was given to me illegally, I believe.  The second

18  one was, I guess, correct, because it was an

19  official actual subpoena.

20  BY MR. PAUL:

21     Q    So the first subpoena you're talking

22  about, was that a subpoena for you to come to trial?

23     A    I believe it was a subpoena to speak to

24  the district attorney, I believe.

25     Q    I'm just asking -- I'm just asking you

```
 1  about the subpoena you received to come to trial.

 2  Was there anything --

 3      A    Okay.

 4      Q    -- that was improper or illegal about you

 5  receiving a subpoena to come to trial?

 6      A    No, I believe it was given to me in a

 7  legal format.  So no, I guess -- sorry.

 8      Q    What was the outcome of the trial?

 9      A    Cardell Hayes was convicted.

10      Q    Do you recall what he was convicted of?

11      A    I don't know the specifics or what he got

12  that he received.  It was more than one thing, I

13  think, I believe.  I don't remember exactly.

14      Q    Were you there when the jury announced the

15  verdict?

16      MS. MIKKILINENI:

17           Object as to relevance.

18      THE WITNESS:

19           No.

20  BY MR. PAUL:

21      Q    When did you find out about the verdict?

22      A    On the news.

23      MS. MIKKILINENI:

24           Object as to relevance.

25  BY MR. PAUL:
```

1  C5.

2  BY MR. PAUL:

3      Q    Ms. LaCroix, this is a Motion to Quash

4  filed on your behalf in Orleans Parish Criminal

5  District Court, and I'm going to ask you to look at

6  the first page of the document, which is the third

7  page of the Memorandum in Support.  Let me know when

8  you're there, please.

9      A    I'm there.

10     Q    So towards the top of the page, "On

11  November 27, 2016, Ms. LaCroix was given what

12  appears to be an Article 66 subpoena"; is that

13  correct?

14     A    Yes.

15     Q    Do you believe that accurately reflects

16  the date that you received the document?

17     A    Yes.

18     Q    Do you recall what day of the week that

19  was?

20     A    No.

21     Q    Can you tell me everything that you

22  remember about receiving that document?

23     A    This document, I just -- I came home, and

24  it was in my door when I went to open my front door.

25     Q    It was stuck in your front door?

1    A    Uh-huh.

2    Q    So you never saw the person who delivered

3 it there?

4    A    No.

5    Q    Do you have any idea who delivered it

6 there?

7    MS. MIKKILINENI:

8         Objection.  Calls for speculation.

9    THE WITNESS:

10        I'm assuming someone from the District

11 Attorney's office, the prosecution of the case that

12 this is in reference to.

13 BY MR. PAUL:

14    Q    When did the document say that you should

15 appear at the DA's office?

16    A    The 29th of November.

17    Q    At what time?

18    A    It says 10:00 a.m., but then that's

19 crossed out, and then it says 12 noon.

20    Q    What time of the day was it when you

21 discovered that document in your door?

22    A    Night.

23    Q    Night?

24    A    At night, uh-huh.

25    Q    It was dark?

TIFFANY LACROIX on 09/12/2020

1      A     Yes.

2      Q     So the night of the 27th, November 27th,

3  you came home and discovered the document in your

4  door, that's correct?

5      A     Yes.

6      Q     What did you do after you received that

7  document?

8      A     I called my mother.

9      Q     And what did you tell her?

10      A     That I received the subpoena.

11      Q     And what did she say?

12      A     Told me -- I was very upset and nervous,

13  and I was confused because I believe that, like, it

14  was a sign that I did something wrong.  She told me

15  to calm down and that she would come with me to the

16  District Attorney's Office, but just in case, I may

17  need to bring a lawyer.

18           So then she proceeded to call around to --

19  if any one of my family members knew somebody who I

20  would be comfortable with talking about what's going

21  on and them representing me with this because I

22  wasn't sure on what was going to happen because I

23  never experienced anything like this before.

24      Q     So the first thing you said, did you say

25  your mother told you that you were upset by it?

TIFFANY LACROIX on 09/12/2020

1      A    No, I was upset.  She was just telling me

2  to calm down and it was okay.

3      Q    At the time you received that document,

4  had you ever talked to anyone at the police

5  department about Cardell Hayes?

6      A    No.

7      Q    At that time, had you ever talked to

8  anyone from the DA's office about Cardell Hayes?

9      A    No.

10      Q    Had anyone from the DA's office tried to

11  contact you before about Cardell Hayes?

12      A    No.

13      Q    To this day, have you ever talked to

14  anyone from the DA's office about Cardell Hayes?

15      A    No.

16      Q    To this day, have you ever been to the

17  Orleans Parish DA's Office?

18      A    No.

19      Q    Do you recall getting a call from Cardell

20  Hayes on November 29, 2016?

21      A    Yeah, probably.  I don't know the date.

22  He would call.

23      Q    I'm going to play an excerpt of a

24  recording for you and ask you a few questions about

25  it.

```
 1        A     Okay.

 2        MR. PAUL:

 3              This is -- give me one second.  I'm sorry.

 4   This was produced in discovery as INDEF02047.

 5                    (Recording played)

 6   BY MR. PAUL:

 7        Q     Ms. LaCroix, do you recognize your voice

 8   in the recording I just played?

 9        A     Yes.

10        Q     Do you recognize Cardell Hayes' voice in

11   the recording I just played?

12        A     Yes.

13        Q     Does that recording accurately reflect

14   what both of you said when you talked on the phone

15   on November 29th?

16        A     Yes.

17        Q     You told him, "You're lucky I'm so smart";

18   is that correct?

19        A     Yes.

20        Q     Why was Mr. Hayes lucky that you're so

21   smart?

22        A     Because I read the document.

23        MS. MIKKILINENI:

24              Objection.

25   BY MR. PAUL:
```

1      Q     Because you read the document?

2      A     Because --

3      MS. MIKKILINENI:

4            Objecting to the question, vague.

5 BY MR. PAUL:

6      Q     I'm sorry, Ms. LaCroix, I didn't hear --

7      A     Because I talked to my mother and my

8 mother advised me that I needed to get a lawyer.

9      Q     You told me you read the document,

10 correct?

11      A     Uh-huh.

12      Q     What did you find out when you read the

13 document?

14      A     That I was being asked to appear at the

15 District Attorney's Office to speak to Laura

16 Rodrigue, according to this, in reference to the

17 case of Cardell Hayes.

18      Q     What did you mean by saying he's lucky

19 that you're smart?  How was he lucky that you're

20 smart?

21      A     Because I got a lawyer to represent me.

22      Q     You also told Mr. Hayes, "It's a good

23 thing.  It's very, very good for you."  Is that

24 correct?

25      A     Yep.

54

```
1       Q    What did you mean that it was very, very
2   good for him?
3       A    Meant that I was -- I guess, after
4   speaking to my attorney, after the advice that I
5   received and that's why I made that comment, I'm
6   assuming.
7       Q    So how did you believe it was very good
8   for Cardell Hayes?
9       MS. MIKKILINENI:
10           Object as to relevance.
11  BY MR. PAUL:
12      Q    You can answer.
13      A    Because of what I was told by my attorney.
14      Q    All right.  I'm not asking you to tell me
15  what your attorney told you, but I am asking you why
16  you believed -- what you meant when you said, "This
17  is very good for you"?
18      A    Because I -- I was already told that the
19  things -- like someone else had received the same
20  document in this manner, and they went -- they went
21  to the District Attorney's Office, it was told to
22  me, with an attorney and that they were going to ask
23  me some outrageous questions and that I didn't have
24  to go or participate, according to my attorney,
25  because the document was fake, basically.
```

1     Q     And how was that very good for Cardell --

2     MS. MIKKILINENI:

3          I'm just going to remind -- I'm just going

4     to object and remind Ms. LaCroix not to testify as

5     to any conversations that she had with her attorney.

6     BY MR. PAUL:

7     Q     That's correct.  I'm not asking you about

8     what your lawyer told you.  I'm just asking you

9     about what you meant and believed when you said

10    this.

11    A     Because after what my attorney informed me

12    and the information that was given to me, I meant

13    that I asked the right, I guess, person to the right

14    people in order to make sure that I wasn't trying to

15    be used as a ploy to make him out to be a bad

16    person.

17    Q     You believed it was going to be -- it was

18    going to help his case that you had received this

19    document?

20    A     I --

21    MS. MIKKILINENI:

22          Object to characterizing her answer.

23    THE WITNESS:

24          I believed it was going to help his case?

25    No, but I believed that it wasn't going to hurt him

1   in any way, due to what I was told about the

2   questioning that may occur if -- when I was supposed

3   to go.

4   BY MR. PAUL:

5       Q    You also said, "They tried to play with

6   me.  They're about to get played big time."  Is that

7   correct?

8       A    Yes.

9       Q    Who were you referring to?

10      A    The District Attorney's Office,

11  prosecution, I'm assuming.

12      Q    What did you mean that they had tried to

13  play with you?

14      A    Because they gave me a fake subpoena, and

15  I was, like, extremely upset, panicking.  I thought

16  I did something wrong, but when I spoke to my

17  attorney, he informed me the situation.  They were

18  expecting me, I guess, to just comply in an illegal

19  manner, that they were asking me to do so.

20          So -- and then not only was it an illegal

21  way, but like I said before, the questions that I

22  had told they might ask me to be, like, insulting

23  and to make me upset with what was going on, so I

24  was smart because I got a lawyer and I was told that

25  I didn't have to comply with an -- according to this

1  document, the illegal subpoena being given to me.

2      Q    Did you mean that they had tried to trick

3  you?

4      A    Yes.

5      Q    Were you tricked?

6      A    With the -- my first reaction, yes, I was.

7      Q    What did you mean when you said they were

8  about to get played big time?

9      A    Meaning I wasn't -- I was told I didn't

10 have to cooperate until I was given --

11     MS. MIKKILINENI:

12         Objection.  Sorry.  I just want to, again,

13 just interject to the extent that this asks for her

14 to testify about the comments -- contents of any

15 conversation with her attorney.

16 BY MR. PAUL:

17     Q    And that's not what I'm asking.  I'm

18 asking what you meant when you said, "They're about

19 to get played big time"?

20     A    Meaning that my lawyer was going to go

21 through the process of -- this is the first

22 document, order to quash, that's what I was

23 referencing to.

24     Q    You believed that him quashing the

25 subpoena would be them getting played big time?

1    A    Yes, because they thought I was going to

2  come willingly to get harassed illegally.

3    Q    You said, "It's a good thing I know how to

4  read, that's for sure."  Is that correct?

5    A    Yes.

6    Q    Why was it a good thing that you knew how

7  to read?

8    A    Because when I saw that it was a subpoena,

9  I knew that it had to do with something with the

10  Court, so I possibly needed someone there with me to

11  go to speak to anybody in reference to anything.

12    Q    It's a good thing you knew how to read

13  things that involved the Court, that's what you're

14  saying?

15    A    Yes, yes.

16    Q    Did you talk to Cardell Hayes' lawyers

17  about the documents that you received?

18    MS. MIKKILINENI:

19       Objection to relevance.

20    THE WITNESS:

21       Yes, I told them that I received a

22  subpoena.

23  BY MR. PAUL:

24    Q    Who did you talk to?

25    MS. MIKKILINENI:

TIFFANY LACROIX on 09/12/2020

 1  would -- she would come with me to the District

 2  Attorney's Office, but just in case, she was going

 3  to call some of -- some other people to see what I

 4  should do, or if I should get some other -- an

 5  attorney before I was to go down to the District

 6  Attorney's Office.

 7      Q    Did she refer you to an attorney?

 8      A    She -- my mother did not.  One of our

 9  family members did refer us to an attorney.

10      Q    And who was the attorney that they

11  referred you to?

12      A    I believe his name -- I don't remember his

13  whole name, but his name was -- I think first name

14  was, like, Lawrence.  He was in the same law firm

15  that A.J. Ibert worked at or he worked for them.  I

16  wasn't sure of the capacity of it, but he

17  recommended him to me.

18      Q    Did you hire a lawyer?

19      A    Did I what?

20      Q    Did you hire a lawyer?  Did you retain a

21  lawyer?

22      A    Yes.

23      Q    Who did you hire?

24      A    A.J. Ibert.

25      Q    And is it still true that you don't

 1  remember whether it was before or after you hired

 2  Mr. Ibert that you talked to Cardell Hayes' lawyers?

 3      MS. MIKKILINENI:

 4          Objection.  Asked and answered.

 5      THE WITNESS:

 6          I don't remember.

 7  BY MR. PAUL:

 8      Q    When you talked to Cardell Hayes' lawyers,

 9  did they encourage you not to cooperate with the

10  DA's office?

11      MS. MIKKILINENI:

12          Objection, irrelevant.

13      THE WITNESS:

14          No.

15  BY MR. PAUL:

16      Q    When did you hire Mr. Ibert?

17      A    It was in the day -- I guess, the

18  following day I received the subpoena.

19      Q    Did you sign a representation agreement

20  with them?

21      A    Yes.

22      Q    Do you have copy of that agreement?

23      A    Personally, no, but my lawyers, they do.

24      Q    Did you give a copy of that agreement to

25  your lawyers in this case?

1      MR. PAUL:

2           I think asking about the fee that they --

3  to negotiate the pay is not privileged.

4      MS. MIKKILINENI:

5           Can you reask the question?

6  BY MR. PAUL:

7      Q    Did you agree on the fee for the

8  representation?

9      A    Yes.

10     Q    What was the fee that you agreed on?

11     A    I believe it -- I believe it was $500.

12     Q    Was that a flat fee for the whole

13  representation?

14     A    It was a -- I think it -- I believe it was

15  the fee, yeah, I believe so.

16     Q    Did you have to pay the whole amount

17  upfront?

18     A    Yes.

19     Q    Did you pay any money to Mr. Ibert?

20     A    No, I believe my mother did.

21     Q    How much did your mother pay him?

22     A    I believe it was $500.

23     Q    Do you know when she paid him?

24     A    The day that I hired him, I believe, the

25  next day or --

67

```
 1      Q     Did she ever ask you to pay her back?

 2      A     No.

 3      Q     I think you already told me you did not

 4  actually appear at the DA's office on November 29th

 5  at noon; is that correct?

 6      A     Correct.

 7      Q     Why not?

 8      A     Because my attorney said I didn't have to

 9  after we had our conversation.

10      MS. MIKKILINENI:

11           Yeah.  Again, objection to the degree that

12  this requires any disclosure of attorney/client

13  conversation.

14  BY MR. PAUL:

15      Q     So on November 29th, it was your

16  understanding that you did not have to appear at the

17  DA's office at noon; is that -- is that fair to say?

18      A     After my conversation with my lawyer, yes,

19  but before I hired my lawyer, it was my

20  understanding that I was to go and speak to the

21  District Attorney's Office.

22      Q     Understood.  Did Mr. Ibert file something

23  for you in court on November 29th?

24      A     Yes, he did.  Motion to Quash, I believe,

25  yep.
```

1      A     I was told to ask questions about Cardell

2  Hayes.

3      Q     Would you agree that you didn't want to

4  speak with anyone from the DA's office if there was

5  any way to avoid it?

6      MS. MIKKILINENI:

7            Objection.  Calls for speculation.  The

8  form of the question was inappropriate.

9      THE WITNESS:

10            Any way, meaning without receiving an

11  official subpoena?  That's the question?

12  BY MR. PAUL:

13      Q     I mean, if there was any way that you

14  could avoid it, if you could -- that you didn't want

15  to do it unless you had to?

16      A     Yeah, I didn't want to do it.

17      MS. MIKKILINENI:

18            Objection as to form.  It's an ambiguous

19  question.

20      MR. HAMILTON:

21            Are you all right?

22      THE WITNESS:

23            Yeah, I'm good.

24  BY MR. PAUL:

25      Q     Is it true that you did not want to talk

1  to anyone at the DA's office unless you were forced

2  to?

3      MS. MIKKILINENI:

4          Objection.  The question is ambiguous.

5  BY MR. PAUL:

6      Q    You can answer.

7      A    No.  In my eyes, I believed that if I had

8  to talk to anybody at the District Attorney's

9  Office, I thought I -- it was because I did

10 something wrong, and I did not.  So that's why I

11 didn't want to talk to them.

12     Q    Did you think they were going to ask you

13 what you knew about Cardell Hayes?

14     A    Yes.

15     MS. MIKKILINENI:

16         Objection as to knowledge.

17 BY MR. PAUL:

18     Q    Why did -- why did you believe it was --

19 that them wanting to talk to you had something to do

20 with you doing something wrong?

21     A    Because I had never experienced anything

22 like this, so I just assumed that when you have to

23 go speak to the DA, it was because you were in some

24 form of trouble because I never experienced anything

25 like this, so I just made the assumption that's what

1  it was.

2       Q    Do you feel the same way about someone

3  being called as a witness at trial, that it means

4  that they've done something wrong?

5       MS. MIKKILINENI:

6            Objection, speculation.

7       THE WITNESS:

8            No, I guess not.  I was just thinking

9  about myself, and in my case, I wouldn't know about

10  anything else, a broad statement.

11  BY MR. PAUL:

12       Q    I guess I'm just asking you, if you had

13  got a subpoena instead telling you to come to trial

14  to testify about Cardell Hayes, would you have also

15  felt like it was because you did something wrong?

16       MS. MIKKILINENI:

17            Objection, irrelevant.

18       THE WITNESS:

19            Yeah, I guess so, being punished by

20  affiliation.  I don't know.

21  BY MR. PAUL:

22       Q    Would you agree that you didn't want to

23  cooperate in the DA's office in any way while it was

24  prosecuting Cardell Hayes?

25       MS. MIKKILINENI:

```
 1      Q     So someone named Anthony told Cardell
 2 Hayes' mom about his experience in going to talk to
 3 prosecutors and she told you about his story; is
 4 that -- is that correct?
 5      A     Yeah.  She just told me the line of
 6 questioning, like some of the questions that maybe
 7 were going to be asked of me.
 8      Q     What were some of the questions he thought
 9 were going to be asked of you?
10      A     He said that he was asked things like, was
11 Cardell, like, a violent person?  Did he like
12 violent video games, things like that, violent
13 movies.
14      Q     Did you feel like if you talked to the
15 DA's office, they might be able to use that
16 information against Cardell Hayes?
17      MS. MIKKILINENI:
18           Can we -- objection.  Calls for
19 speculation.
20      THE WITNESS:
21           Can you repeat that?  I didn't -- it kind
22 of cut off.
23 BY MR. PAUL:
24      Q     Sure.  Did you feel like if you talked to
25 the people from the DA's office, they might be able
```

1   to use that -- to use what you said against Cardell

2   Hayes?

3       MS. MIKKILINENI:

4           Objection.

5       THE WITNESS:

6           I mean, I really -- if they -- I guess if

7   they tried to word things, like, twist my words

8   around, possibly.

9   BY MR. PAUL:

10      Q    Is that something that you were concerned

11  about?

12      A    Yes.

13      MS. MIKKILINENI:

14          Can we take a minute -- can we take a few

15  minutes?  It's 1:00.  We've been going for an hour.

16      MR. PAUL:

17          Yeah.

18      MS. MIKKILINENI:

19          We can -- we can just do five -- five

20  minutes.

21      MR. PAUL:

22          Okay.

23                  (Brief recess.)

24  BY MR. PAUL:

25      Q    Ms. LaCroix, you mentioned earlier you

```
 1  to.
 2        THE WITNESS:
 3            My lawyer.
 4  BY MR. PAUL:
 5        Q    Is it true that you did not want to talk
 6  to the DA's office about your phone call with
 7  Cardell Hayes that night?
 8        MS. MIKKILINENI:
 9            Objection.
10        THE WITNESS:
11            I was not -- I was never asked to.
12  BY MR. PAUL:
13        Q    Would you have been willing to if you had
14  been asked?
15        MS. MIKKILINENI:
16            Objection.
17        THE WITNESS:
18            With a subpoena, yes.
19  BY MR. PAUL:
20        Q    Was there some sort of standardized
21  testing going on at your school on November 29,
22  2016?
23        A    There was training for standardized
24  testing, I believe, yes.
25        Q    What sort of standardizing testing?
```

1       A    It could have been two different tests,

2   the end of course test or the LEAP test.

3       Q    Were you scheduled to be in training for

4   those tests on November 26th -- sorry,

5   November 29th, 2016?

6       A    I -- I believe so because that's usually

7   around the time of the year where we -- we get

8   training for testing to get prepared to give the

9   test later on in the school year.

10      Q    Were there actually any standardized tests

11  being given that day, November 29, 2016?

12      A    I don't remember.  It was a possibility it

13  could have been being given in the -- the building

14  because, again depending on which test it is,

15  standardized test is given different times of the

16  year, but I really don't remember, like, what test

17  it was.

18      Q    At that time in November 2016, did you

19  have some sort of specialized certification to give

20  standardized tests to special needs students?

21      A    I was -- I was trained -- I had to do a

22  specific training, along with other teachers, in

23  order to be able to give the standard -- any

24  standardized test to a 504 accommodated student.

25      Q    Did you do that training?

84

```
 1      A    Yes, I did.

 2      Q    When was it?

 3      A    I don't remember.  I know I had to do it

 4  because I gave the test.

 5      Q    You're saying you gave the test.  When did

 6  you give the test?

 7      A    It was towards -- between -- I want to say

 8  March and May, end of the year, I believe.

 9      Q    What year, I'm asking?

10      A    It would have had to be the same -- I do

11  this training mostly every year, so 20 -- 2016, I'm

12  assuming, the dates.  I don't really remember.

13      Q    So I'm asking about --

14      A    So, like, when I received the -- like when

15  I received the subpoena, that about was after, I

16  believe, Thanksgiving, and usually that's the time

17  period when we get our training to comply with the

18  State mandate so that we are able to test the

19  students.  So that's usually how that works.  So it

20  was within that year, the same year I got the

21  subpoenas which would be the, what, the 2016 school

22  year, 20 -- yeah, the 2016 school -- yeah.

23      Q    So you don't remember what days the

24  training was on?

25      A    No, I don't.
```

1      Q    Do you have any documents reflecting when

2  the training was?

3      A    No, I don't.

4      Q    Did you take any time off work when you

5  got the document from the DA's Office?

6      A    Yes, I did.

7      Q    When did you take off work?

8      A    When I had to go hire -- go meet my

9  attorney.

10     Q    When was that?

11     A    The date I went to talk to my lawyer, the

12  day -- I guess the 29th -- 28th -- I don't know the

13  date.

14     Q    So you received the document on the 27th;

15  is that correct?

16     A    It's the 28th then.  I'm assuming.  Yeah,

17  it's within that timeline.  I had to take off in

18  order to talk to him.

19     Q    You took off of work on November 28th?

20     A    Is that a Monday?  I don't know the date,

21  like the day.

22     Q    I'll tell you it is a Monday.

23  November 27, 2016 was a Sunday.

24     A    Okay.  So I believe I talked to him the

25  following day, the 28th, because I remember I had to

```
 1  just say I wasn't coming in, yeah, 28th.

 2      Q    Did you take off the entire day,

 3  November 28th?

 4      A    I don't really remember.  I don't remember

 5  if it was the entire day, but I believe so because

 6  the time period that I met with him, I think

 7  requirements like at my job, once you miss a certain

 8  amount of, like, time, it's considered a full day.

 9  I can't really remember.  I don't -- the memory of

10  my -- of that day, I don't remember going to work,

11  so I just remember the -- the office visit.  I don't

12  remember anything else.

13      Q    Did you take any time off for other than

14  that day?

15      A    Yes, I did, when I had to comply with the

16  subpoena.

17      Q    When you went to Cardell Hayes' trial?

18      A    Yeah.

19      Q    So between November 27th and November 29th

20  of 2016, did you have any travel plans?

21      A    No.

22      Q    Did you have any plans to leave the state?

23      A    Oh, I'm sorry, no.

24      MS. MIKKILINENI:

25           Objection to relevance.
```

```
 1  BY MR. PAUL:

 2      Q    No?  You said, no, you did not have any

 3  plans to leave the state?

 4      A    No, I don't -- no, I don't remember.  No.

 5      Q    Is it true that you did not feel at

 6  liberty to leave -- strike that.

 7           Is it true that you did not feel at

 8  liberty to travel or leave the state until the

 9  document was quashed?

10      MS. MIKKILINENI:

11           Objection, relevance.

12      THE WITNESS:

13           I -- I didn't --

14      MS. MIKKILINENI:

15           It's also ambiguous.

16      THE WITNESS:

17           I don't know.  I -- to -- did I think --

18  basically, you're asking me, do you think -- do you

19  think I had -- I think that I had the right to leave

20  being given the fake subpoena?

21  BY MR. PAUL:

22      Q    I'm just asking, is it a true statement,

23  you did not feel at liberty to travel or leave the

24  state until your lawyer had gone to court and got

25  that document quashed?
```

1  that correct?

2      A    Well, I don't know if I could -- in the

3  time that I had to -- I guess that was under the

4  legal subpoena, so -- but the fact that -- yeah, I

5  had to sit there for nothing anyway.  I wasn't asked

6  or even called on.

7      Q    So you believe, in this case, you should

8  be compensated for the time you had to take off from

9  work to go to Cardell Hayes' trial?

10     A    Because I was given -- yeah, I believe so.

11  I mean, I believe I shouldn't have had to be forced

12  to comply with something that I thought I had to,

13  which was illegal in the first place.  So the time

14  that I missed, the -- if you want to say, I guess,

15  the wear and tear on my car, the feeling that I felt

16  when I received it, the anxiety it caused me, like,

17  when I was at work, yes, but I don't have a monetary

18  amount that would be, like, attached to that, like

19  off the top of my head.

20     Q    I'm trying to get a little more specific

21  and ask you about lost vacation time at work, so --

22  and I'm not sure I understood your answer just now.

23  The time that you had to take off of work to go to

24  Cardell Hayes' trial, do you believe that's

25  something you should be compensated for in this

1   lawsuit?

2       A     Yes, because I was forced to go, and even

3   if I would go, I wouldn't have gone that entire time

4   because I'm a teacher, and it's hard for me to miss

5   those many days.  So I would have went maybe one or

6   two, but I wouldn't have voluntarily went the entire

7   time.  I wouldn't have done that.  With my

8   profession, that wouldn't be in my best interest to

9   lose -- to lose time like that.

10      Q     How much less was your paycheck as a

11  result of you taking off to go to your lawyer's

12  office and to go to court?

13      A     I don't remember how less.  I just know

14  that -- I remember towards the end of the year, I

15  didn't get my full salary pay because I -- I had ran

16  out of my awarded ten days, my time, I believe, and

17  it was -- I want to say maybe one of those days was

18  like a blackout day, so I didn't get paid for that

19  day at all.

20      Q     What's a blackout day?

21      A     Certain days of the year, we are -- it's

22  part of our contract, that you can't take off days

23  right before, like, a holiday and the day -- the

24  first day before -- the first day we get back from a

25  holiday, like it's required of me to be there, and

1  if you -- if you're not there, then it's a blackout

2  day, like you won't get paid for that day.

3      Q    So how much --

4      A    And even necessarily not for holidays.

5  It's like certain days.  You're given a calendar and

6  I don't -- yeah, it's called a blackout day.

7      Q    Okay.  How much money was taken out of

8  your paycheck as a result of you not being able to

9  come to work on those days?

10     A    I don't -- I don't remember.  I don't

11 remember.

12     Q    Do you have your pay stubs for that time

13 period?

14     A    No, I don't.

15     Q    Do you have any documentation at all that

16 would reflect how much money was taken out of your

17 paycheck as a result of you missing work on those

18 days?

19     A    No, but if I had to get a copy of my

20 paycheck, I guess I would have to, but I don't have

21 anything on me.  I don't have anything, no, in my

22 possession.

23     Q    Can you give me even a rough estimate of

24 how much money it is that --

25     MS. MIKKILINENI:

```
 1                 Objection, asked and answered.
 2  BY MR. PAUL:
 3      Q    -- that you lost?
 4      A    It's been a few years, so I don't
 5  remember.  I really don't remember.  That would
 6  require me to remember my pay and do the math, and I
 7  really couldn't give you -- I don't know.  I can't
 8  give you an exact amount.  I wouldn't want to lie
 9  because I really don't know.
10      Q    Is there anything about the way you were
11  treated by law enforcement that is traumatic?
12      MS. MIKKILINENI:
13                 Objection, ambiguous.
14      THE WITNESS:
15                 Yeah.  I'm assuming -- I'm assuming you
16  speaking about, like, being given the fake subpoena
17  or --
18  BY MR. PAUL:
19      Q    I mean, anything at all involving how you
20  were treated by law enforcement?
21      A    Yes, being given this --
22      MS. MIKKILINENI:
23                 Objection.  That's ambiguous.
24      THE WITNESS:
25                 Like, I'm going to talk -- speak about the
```

 1  fake -- being given a fake document, a subpoena, and

 2  then pressure to comply with this, knowing that it

 3  was illegal, or I didn't have to, yes, because there

 4  was a lot of -- the idea of me having to, first,

 5  having to get a lawyer, having to comply, the

 6  embarrassment that I had to go to work and show them

 7  this document, and ask what were the rules and

 8  regulations toward having to comply with subpoenas,

 9  period.

10          I mean, just to get into detail further, I

11  was told that I had -- of course, I had to comply,

12  but it still was -- even though I was being required

13  by the State, I still had to use my days to do so,

14  and just having to speak to the security officer who

15  was over our district at the time on what can happen

16  if I was -- I needed to be -- because after the fake

17  subpoena, it was told to me I was going to get a

18  real one, that -- what was like -- I asked like what

19  could happen, like, if they were to give it to me at

20  school.

21          And then when I was told that they could

22  come into my -- it was a possibility they could walk

23  into my classroom in the middle where I was

24  teaching, the trauma -- like, the idea -- the trauma

25  that it would cause, not only to myself, but to like

1  all of my students who could see that, that could

2  trigger -- the thought of that triggering so many

3  ripple effects would, like, overwhelm me, to me.

4  Thinking about it now, it's...

5  BY MR. PAUL:

6      Q    You feel also like being subpoenaed and

7  having to come to trial all five days and sit there,

8  was that also traumatic for you?

9      MR. HAMILTON:

10          I'm sorry.  She just asked if we could

11  take a break.

12      MR. PAUL:

13          I'm sorry.  I didn't hear you.  Yeah.

14              (Brief recess.)

15  BY MR. PAUL:

16      Q    Ms. LaCroix, you were just talking

17  about -- I think you were saying you were thinking

18  about what could happen if you didn't comply with

19  the subpoena and someone would have to come to your

20  school and arrest you or something like that; is

21  that -- is that what you were saying?

22      A    No, I was -- I mean, if that was what the

23  subpoena required, but the thought of -- I was

24  saying, like, the thought of putting other children,

25  like, exposing them to that type of trauma would

```
 1  have multiple ripple effects, so that was one of
 2  the, like, things that I was thinking about when I
 3  was given that document, and the possibility of that
 4  happening and all the people that it would affect.
 5       Q    You're saying --
 6       A    Because of --
 7       Q    -- the possibility of you getting arrested
 8  at school for not complying with the subpoena; is
 9  that what you're saying?
10       MS. MIKKILINENI:
11            Objection.  That's not what she said.
12       THE WITNESS:
13            I'm saying -- I'm saying, like, the
14  thought of them coming in, I don't know if I
15  would -- I don't know why I would get arrested, but
16  them coming in to serve me an actual -- like, give
17  me a subpoena that they have to, I guess, someone
18  have to give to me in my hand, I guess, if that's
19  how the law -- how you're supposed to do it, and the
20  possibility of them coming to my school or, like,
21  doing that in front of my students and other people
22  was traumatizing, like, within itself.
23            That was partially a reason why I left the
24  school that -- that's why I left 35 because of,
25  like, the possibility of all kind of things, and I
```

1  wanted to get a fresh start.

2  BY MR. PAUL:

3      Q    So you think if a law enforcement officer

4  had come to school to serve you with a subpoena,

5  that could have been traumatic; is that what you're

6  saying?

7      A    It would have been.

8      Q    Would have been?

9      A    Not only to me, but to other children

10  within the classroom, who possibly have already

11  experienced things like that -- so and even if they

12  haven't, it would have been a memory, a long-lasting

13  memory that I don't think they should have deserved

14  to have, if it were to happen, or if it was going to

15  happen.

16      Q    Was it traumatic for you to be subpoenaed

17  and forced to go to the entire length of Cardell

18  Hayes' trial?

19      MS. MIKKILINENI:

20          Objection, irrelevant.

21      THE WITNESS:

22          Yeah.  I mean, it was because I thought I

23  was going to be, like, questioned -- or I don't want

24  to say harassed, but harassed about his character as

25  a person, like, trying to ask me -- if they were

```
 1      Q    Ms. LaCroix, when is the first time you

 2   talked to anyone about suing the DA's office?

 3      MS. MIKKILINENI:

 4           Objection.

 5      THE WITNESS:

 6           I don't remember specifically the exact

 7   time or date.

 8   BY MR. PAUL:

 9      Q    Was it very close to the time when you

10   received the document from the DA's office?

11      A    I believe so.

12      Q    Who did you first talk to about suing the

13   DA's office?

14      MS. MIKKILINENI:

15           Objection to the extent that this calls

16   for any privileged conversation.

17      THE WITNESS:

18           I don't remember the name of the person,

19   but somebody had reached out to me in regards to it.

20   I don't really remember specifically, like, the

21   name.

22   BY MR. PAUL:

23      Q    Was it a man or woman?

24      A    A woman.

25      Q    How did she reach out to you?
```

```
1       A     I believe by phone.

2       Q     So she called you on the phone, and what

3  did she say to you?

4       MS. MIKKILINENI:

5             Object to the extent this is potentially

6  attorney/client privileged.

7       THE WITNESS:

8             I really don't remember, like, exactly

9  what was said, but, like, I was just told --

10      MS. MIKKILINENI:

11            Yeah.  Objection, actually, this is very

12 likely to be privileged, so I'm going to actually

13 instruct Ms. LaCroix not to answer.

14      MR. PAUL:

15            What's the basis for the privilege?

16      MS. MIKKILINENI:

17            That this is -- that this is likely a

18 conversation with her attorney or an agent of the

19 attorney --

20      MR. PAUL:

21            Who was the agent?

22      MS. MIKKILINENI:

23            -- attorney/client communication.

24      MR. PAUL:

25            Who was the agent?
```

1      MS. MIKKILINENI:

2           I don't know.  I'm saying that this is

3  very likely a conversation that is privileged

4  because it falls within attorney/client

5  communication.  It was -- it was either an attorney

6  or investigator working under the attorney's

7  direction.

8      MR. PAUL:

9           That has not been established.

10     MS. MIKKILINENI:

11          But to the extent -- to the extent that

12  the question is directing her to give you the

13  contents of a conversation that may be privileged,

14  I'm instructing her not to answer.

15  BY MR. PAUL:

16     Q    You told me everything you remember about

17  the person that called you, not including what she

18  said to you?  Did she say what organization she was

19  with?

20     A    Yes, yes, I do remember that she was the

21  same person that I remained in contact with.  Over,

22  I want to say, the summer break, I had meetings, and

23  I believe she was the one who gave me a contract to

24  sign saying that she was going to represent me,

25  their organization.  So, yes, it occurred -- like,

```
 1   the conversation, I guess I remember happened over

 2   time.

 3        Q    Was she a lawyer?

 4        MS. MIKKILINENI:

 5             This is attorney/client privilege.

 6   BY MR. PAUL:

 7        Q    Was she a lawyer?

 8        A    Yes, yes, she was.

 9        Q    Had you ever talked to her before she

10   called you that day?

11        A    No, I hadn't.

12        Q    And was the purpose of her calling you

13   that day to secure legal representation for you?

14        A    I believe so.

15        MS. MIKKILINENI:

16             Objection, privileged.  Objection.  You're

17   asking her to testify as to what the contents of

18   that conversation.

19        MR. PAUL:

20             It's necessary to establish the privilege.

21   If it's not the purpose of securing legal

22   representation, it cannot possibly be privileged.

23   I'm asking her to confirm.

24        THE WITNESS:

25             Well, yes, it was --
```

```
 1      MS. MIKKILINENI:

 2           She can't testify as to the purpose.

 3      THE WITNESS:

 4           It was --

 5  BY MR. PAUL:

 6      Q    Was the apparent purpose of the call that

 7  day to seek legal representation for you?

 8      A    Yes, to let me know -- yes, uh-huh.

 9      Q    And you said that person, she ended up

10  serving as your lawyer?

11      A    Yes, multiple people, yeah.

12      Q    When did you sign that representation

13  agreement?

14      A    I really don't remember, like, the date.

15  I don't remember.

16      Q    What year was it?

17      A    I don't remember.

18      Q    Was she with the ACLU?

19      A    Yes.

20      Q    Was her name Anna Arsenault?

21      A    Maybe.  I really don't remember.

22      Q    But you're sure that she was a lawyer?

23      A    Yes, I do because I saw her multiple times

24  after that.

25      MR. PAUL:
```