```
 1  THE COURT:
 2              Record purposes only, accident report.
 3  MS. RODRIGUE:
 4              No problem for the record only.
 5              AFTER BEING DULY SWORN,
 6                   ANTHONY WILLIAMS
 7           TESTIFIED UNDER OATH AS FOLLOWS:
 8                  DIRECT EXAMINATION
 9  BY MR. FULLER:
10  Q.  Good after -- good evening.
11  A.  Good evening.
12  Q.  It's almost night.  State your name for the record.
13  A.  Anthony Michael Williams.
14  Q.  And Mr. Williams, where are you from?
15  A.  New Orleans, Louisiana.
16  Q.  And you don't have to give your exact address but what
17  part of the city do you live in?
18  A.  The Seventh Ward.
19  Q.  And do you work?
20  A.  Yes, I do.
21  Q.  And what type of job do you have or what type of work do
22  you engage in?
23  A.  Well, I'm a barber.
24  Q.  And do you cut out of your house, do you cut out of a
25  shop?
26  A.  No, I cut out of a shop, Lance's Barbershop.
27  Q.  And where is Lance's Barbershop?
28  A.  It's located in the Sixth Ward.
29  Q.  And how long have you been barbering?
30  A.  I've been cutting hair since I was 11 years old.  I got
31  my license in 2009.
32  Q.  And I know this is not the most polite question to ask
```

EXHIBIT 8

OPDA05792

1  somebody but how old are you now?
2  A.  I'm 39.
3  Q.  So you've been cutting for a while.
4  A.  Yes, sir.
5  Q.  Not gonna mess my head up.
6  A.  No, sir.
7  Q.  All right. Do you know -- do you know a gentleman by the
8  name of Cardell Hayes?
9  A.  Yes, I do.
10 Q.  And how do you know Mr. Hayes?
11 A.  I've known Mr. Hayes -- I met him through a friend, a
12 mutual friend of mine.
13 Q.  Okay. And how long have you known him?
14 A.  About a year, almost two years now.
15 Q.  And do you know where Mr. Hayes gets his hair cut?
16 A.  I do. I cut his hair.
17 Q.  All right. Now, did you -- do you remember April 9th of
18 this year?
19 A.  Yes, I do.
20 Q.  And did you see Mr. Hayes on April 9th of this year?
21 A.  Yes, I did.
22 Q.  Where did you see him?
23 A.  At the barbershop.
24 Q.  All right. And I know you don't -- well, if you can give
25 me an exact time, that's fine, but do you know about what
26 time you saw him?
27 A.  Well, I saw him twice that day, actually, because he
28 called -- he has a routine. He calls ahead of time when he
29 comes to see us and tells us order him a pizza, order us a
30 pizza. So he came and he did that earlier in the daytime. I
31 believe he came from practice he said. And he came back
32 later on that evening, right before going out to a house

```
 1  party.
 2  Q.  Now, I know you said that he was at the shop earlier and
 3  I think y'all ordered a pizza and then you saw him later on
 4  that same day, right?
 5  A.  Right.
 6  Q.  At any point when he came to the shop did you cut his
 7  hair or line him or anything like that?
 8  A.  Yeah.  He came and he ate the pizza.  I believe he
 9  stepped out for a minute and he came back and I gave him an
10  edge up.
11  Q.  Okay.  And if I were to show you a photograph or show you
12  a copy of his arrest photograph, would you be able to
13  identify for the members of the jury the lining that you gave
14  him?
15  A.  Yes, sir.
16  MR. FULLER:
17              May I approach, Judge?
18  THE COURT:
19              Yes.
20  BY MR. FULLER:
21  Q.  Now, just show the members of the jury --
22  THE COURT:
23              And just so we're -- if you could just --
24  MR. FULLER:
25              Oh, I'm sorry.
26  THE COURT:
27              -- reference the exhibit, thank-you.
28  MR. FULLER:
29              For the record, this is State's 5.
30  THE COURT:
31              State's 5.
32  BY MR. FULLER:
```

OPDA05794

1   Q.   Show the members of the jury what you did.
2   A.   Okay. He didn't want too much done because he has dreads
3   and he -- anybody who grows a beard, they -- a lot of people
4   tend to take it down the distinctive lining of his beard
5   right up in here (indicating). So he didn't get too much --
6   he didn't want me to bring it down, he was trying to make it
7   fuller. So you can see the line, you definitely can see the
8   lining in this part (indicating), the precision in the lining
9   of the head area. You can't see it too much on the beard
10  except for when you get to the mustache because he didn't
11  want me to go deep into his beard. So anybody with a beard,
12  they can understand that.
13       But if you can tell, his lining is pretty exact all the
14  way around as far as his mustache goes and his forehead, his
15  hairline goes, it's blocked off and it's curved at the
16  curving edges on each side.
17  Q.   And when you line him, when you line Mr. Hayes, do you
18  utilize clippers alone or a clipper and a razor?
19  MR. NAPOLI:
20              Judge, I'm going to object --
21  THE WITNESS:
22              I'm old-fashioned --
23  MR. NAPOLI:
24              -- object to the relevancy --
25  THE WITNESS:
26              -- I use a clipper and a razor.
27  MR. NAPOLI:
28              -- of this question.
29  THE WITNESS:
30              Hot towel, hot lather.
31  THE COURT:
32              Overruled.

188

OPDA05795

1  BY MR. FULLER:
2  Q.  All right.  Now, I notice you said that he didn't want
3  you to push his beard down?
4  A.  Right.
5  Q.  All right, and I've got one too.
6  A.  Right.
7  Q.  So explain to the members of the jury when you say he
8  didn't want you to "push his beard down."
9  A.  Usually, when you -- when your beard grows, most men,
10 it's kind of jagged, like it doesn't grow full in all spots.
11 But the guys with a full beard, some guys tend to take it
12 down like into his mustache, into his goatee.  This would be
13 your goatee area (indicating), this would be a full beard,
14 this would be your mustache.  This could be considered a
15 goatee too, the top and bottom without disconnecting.
16     So he had a full beard and he was trying to make it as
17 full as possible so he wanted me to bring it all the way up.
18 He was trying to make it grow into the top part of the
19 mustache.  So that was the issue, he was just trying to get
20 that to come up fuller.
21 Q.  When he came to the barber shop for the haircut or the
22 lining earlier, was he angry or anything like that?
23 A.  Nah, he was -- he was joking.  He just -- like I said, I
24 think he just left practice, you know.  He called me and me
25 and Lance had just opened up that day.  So we were in there
26 just shooting the breeze and he happened to call so, like I
27 say, we ordered a pizza, he got there, you know, we shot the
28 breeze with him a little bit and then he asked me to line him
29 up.  He was asking what we were doing that night because it
30 was a weekend so we was wondering if we were gonna get out or
31 anything, you know.  We didn't have any plans or anything so
32 he said he was just gonna pass back later on that night.

OPDA05796

```
 1  Q.  Okay.
 2  A.  He was pretty much hap -- we was -- the whole day was
 3  pretty much a happy, calm type of day.
 4  Q.  Okay. And does Cardell pass back over later?
 5  A.  Yes. Yes, he does.
 6  Q.  Okay. And what happens after he passes back over later?
 7  A.  Well, when he comes back, it's a weekend so we're kinda
 8  busy. On a barbershop, Friday -- late night Thursday, Friday
 9  and Saturday are real busy. So we had a couple of heads in
10  there, me and the other barber, and we wanted to get out with
11  him but we really couldn't at that time. We were gonna catch
12  up with him later on.
13      But when he got in, he was, you know, pretty laid back,
14  you know what I'm saying? He sat in the shampoo chair and
15  leaned back in the chair and pretty much got on his phone and
16  that was it.
17  Q.  At some point after he comes back the second night -- the
18  second time rather, does he leave?
19  A.  After he comes back the second time?
20  Q.  Yes, sir.
21  A.  Yeah, he leaves. What happens, he sits back in the chair
22  and he cracks a smile. The other barber who owns the shop
23  asked him what he was smiling about and he said, "A house
24  party uptown," is what he said. So we was like okay. He's
25  like, "Are y'all coming with us, are y'all getting out?" We
26  was like, "We don't know," because I had two customers and I
27  think the other guy had about two customers, plus the one in
28  the chair, so we had to take care of those.
29      And he was like, "Okay, well, I'll leave and I'll give
30  y'all a call and let you know how it's looking, if it's worth
31  y'all coming up here or if we'll just meet up somewhere
32  else." So after that, he just -- he just pretty much shook
```

OPDA05797

```
 1  everybody's hand and left.
 2  Q.  Did you see him leave with anybody?
 3  A.  No.  I didn't see him.  He was in the shop by his self.
 4  Q.  Okay.  Now, did you ever get that call from him?
 5  A.  No, we didn't.  We never -- we never got the call from
 6  him but we never thought about it either.  You know, we just
 7  figured maybe he got into something, went somewhere else
 8  or -- you know.
 9  Q.  Now, I know you're a barber now but do you have any
10  convictions?
11  A.  Yes, I do.
12  Q.  All right.  And what convictions?  Do you remember your
13  convictions?
14  A.  Yeah, just marijuana possession.  That's it.
15  Q.  Okay.  And do you have any possession with intent to
16  distribute marijuana or gun charges or anything like that?
17  A.  No, sir.
18  Q.  At some point did you speak with members from the
19  District Attorney's Office?
20  A.  Yes, I did.
21  Q.  All right.  And the folks that you spoke with from the
22  District Attorney's Office, do you see them in here?
23  A.  Yes, I do.
24  Q.  Now, how did you -- and let me ask you this.  Did you
25  testify in front of a grand jury?
26  A.  No, I didn't.
27  Q.  Okay.  How was it brought to your attention to come to
28  the District Attorney's Office?
29  A.  I got a knock on the door of the barbershop one day and
30  it was -- I guess the guy was a sheriff.  He had a -- I think
31  a greenish-colored shirt on and he had a badge and he was
32  holding a subpoena paper -- well, what seemed to be a
```

OPDA05798

```
 1  subpoena paper -- with "Assistant District Attorney" and his
 2  name on it, something with the City of New Orleans on the
 3  top.
 4  Q.  All right.  And did you go to the address that was
 5  indicated on --
 6  A.  Yes, I did.
 7  Q.  -- what you thought was a subpoena?
 8  A.  Right.  Yes, I did.
 9  Q.  All right.  Now, is there a gentleman at the barber
10  shop -- well, let me ask you this.  Do you know somebody
11  named "Whitey"?
12  A.  Yeah, that's a good friend of mine.  He's also a business
13  partner of mine.
14  Q.  Okay.  I want to show you what I'm going to mark as D-5
15  and ask you if you can recognize that.
16  A.  Yes, I can.  This is the paper that the deputy or officer
17  came with that -- the particular day that he knocked on the
18  door that I'm speaking of.
19  Q.  All right.  Now, that is what you thought was a subpoena,
20  right?
21  A.  Yes, sir.
22  Q.  All right.  Does it say anything on there about
23  testifying to a grand jury?
24  A.  No.
25  Q.  All right.  And you see on there where it says -- it
26  doesn't just say Leon Cannizzaro's office, it says Criminal
27  District Court on there, right?
28  A.  Right.
29  Q.  Do you know who the only folks are that can issue
30  subpoenas for Criminal District Court?
31  A.  I didn't know.  That's why I accepted it.
32  Q.  Do you see a signature line on there for a judge or a
```

OPDA05799

1  minute clerk?
2  A.  No, I do not.
3  Q.  And at the top what does it say if you don't show up for
4  what they call a subpoena?
5  A.  "A fine and imprisonment may be imposed for failure to
6  obey this notice."
7  Q.  And based on that, you go and you speak with the district
8  attorneys, right?
9  A.  Yes, sir.
10 Q.  And Lance goes with you also?
11 A.  Yes, sir.
12 Q.  And you would agree that at the top of that form it
13 states that "failure to appear can result in a fine or
14 imprisonment"?
15 A.  Yes, sir.
16 Q.  Even though that has no legal value whatsoever.
17 A.  It appears that way.
18 Q.  And it has Leon Cannizzaro's seal on it.
19 A.  Yep.
20 Q.  Were you the only one that received a piece of paper that
21 looked like this that you know of?
22 A.  No.  From my understanding, it was more than three people
23 that got summons or whatever you want to call it.  It was one
24 paper that I saw besides mine and that was Lance's because we
25 work together.
26 Q.  Okay.
27 MR. FULLER:
28          Thank-you for coming and the State may have
29      some questions for you, all right?
30 THE WITNESS:
31          Yes, sir.
32                    **CROSS EXAMINATION**

OPDA05800

1  **BY MS. RODRIGUE:**
2  Q.  Good afternoon, Mr. Williams.  How are you?
3  A.  Good afternoon.  I'm good, I'm good.
4  Q.  So Mr. Fuller talked about the day that you came to the
5  District Attorney's Office, right?
6  A.  Yes, ma'am.
7  Q.  And you had a lawyer with you?
8  A.  Yes, I did.
9  Q.  Okay.  So he was aware -- I mean, he knew about the
10 subpoena that you and Lance had gotten.
11 A.  Right.
12 Q.  And actually, you guys came in and said you wanted to
13 give information about Cardell to us, correct?
14 A.  Well, yeah, because we were summoned so -- I mean, had we
15 not been summoned, I don't know if it would have been
16 appropriate just to go to the D.A.'s office and give
17 information --
18 Q.  Right.
19 A.  -- being that --
20 Q.  No, I --
21 A.  -- the situation is what it is.
22 Q.  -- I agree, I don't think anybody expected you guys to
23 just, you know, walk into the D.A.'s office.
24 A.  Right.
25 Q.  Do you remember when you sat down and I said, "Look, we
26 read about the interview that you guys gave in GQ" --
27 A.  Right.
28 Q.  -- "and we were eager to meet with you and see if you had
29 any evidence of the actual facts of the night."  Do you
30 remember me telling you that?
31 A.  Right, uh-huh (affirmative response).
32 Q.  And I let you tell me about Cardell for a while.

1  A.  Right.
2  Q.  I think we talked back and forth for a while about your
3  experience in the entertainment industry, we talked about
4  many celebrities --
5  A.  Yes.
6  Q.  -- that you have worked with and that sort of stuff?
7  A.  Right.
8  Q.  So we had a very good conversation back and forth.
9  A.  Yes.
10 Q.  Okay. So in no way, shape or form did you come in and I
11 said, "Sit down and" -- and it was nothing like that.
12 A.  No, ma'am.
13 Q.  Okay. We talked back and forth, you told me a little bit
14 about yourself.
15 A.  Right.
16 Q.  I told you about myself. I asked if you knew anything
17 about the actual accident or the shooting or anything like
18 that. Correct?
19 A.  Correct.
20 Q.  You told me you didn't have any information about that.
21 A.  Correct.
22 Q.  And you basically told me the exact same thing you just
23 told the ladies and gentlemen of the jury.
24 A.  Exactly.
25 Q.  Okay. And you had no problem doing that for your friend.
26 A.  Right.
27 Q.  Okay. So it wasn't any strong-arming, you just came
28 because you got the notice.
29 A.  Right.
30 Q.  And you had no problem coming in.
31 A.  Right.
32 Q.  Okay. And you said you were friends with him for about

OPDA05802

```
 1  two years and I remember when we met, you said it was about
 2  six months.  So is that --
 3  A.  Well --
 4  Q.  -- the time now that he's been in jail you mean?
 5  A.  Well, yeah, I was about to say, the time that -- you're
 6  speaking of the time that I first met him until the incident
 7  and then from the time he's been in jail to now.
 8  Q.  Right.
 9  A.  So that's about -- almost two years.
10  Q.  Yeah, that's what I thought.  I just remembered you
11  telling me six -- so it was about six months or so is what
12  you said of actually interacting with him --
13  A.  Right, right.  Well --
14  Q.  -- prior to this incident.
15  A.  -- that was, you know, all the times that we interacted.
16  As far as -- the question was is how long -- how long did we
17  ever interact.  That was your questioning.
18  Q.  Right.
19  A.  So I was like giving an actual number to the amount of
20  times we've been out, those type of things, been to business
21  events.  Like, we went on a tour with -- like I say, with
22  Kevin Gates, who's an artist, which was about like six dates,
23  you know, six or seven dates.  So that was an accumulation of
24  time that we had spent as friends but that wasn't the total
25  time that I have known him or known of him.
26  Q.  Okay.
27  A.  Right.
28  Q.  I understand.  And you never spoke to him immediately
29  after the incident or anything like that.
30  A.  No, no, I didn't.
31  Q.  Okay.  And I don't know if you remember but we talked
32  about -- I said, "Has he ever given you his version of what
```

OPDA05803

```
 1  happened out there" --
 2  A.   Yeah, I --
 3  Q.   -- and you said no.
 4  A.   No; I haven't spoken to him since.
 5  Q.   Okay, so you don't have any idea what happened on the
 6  scene that night.
 7  A.   No, I can't say anything about the scene that night.
 8  MS. RODRIGUE:
 9            Okay.  Thank-you, Mr. Williams.
10  THE WITNESS:
11            You're welcome.
12  MS. RODRIGUE:
13            Wait, I'm sorry.  One moment.
14            Nothing further.  Thank-you, Mr. Williams.
15  THE WITNESS:
16            Okay, thank-you.
17  THE COURT:
18            Any further questions of Mr. Williams,
19       Mr. Fuller?
20  MR. FULLER:
21            No other questions for Mr. Williams.
22  THE COURT:
23            Thank-you, Mr. Williams.  You may step down.
24  THE WITNESS:
25            Thank-you.
26  MR. FULLER:
27            Mr. Lance Rouzan, Judge.
28  THE COURT:
29            Lance Rouzan.
30            Thank-you, Mr. Rouzan.  You may step forward.
31                 AFTER BEING DULY SWORN,
32                      **LANCE ROUZAN**
```

OPDA05804

```
1                TESTIFIED UNDER OATH AS FOLLOWS:
2  THE COURT:
3            Good evening.
4  THE WITNESS:
5            Good evening.
6  THE COURT:
7            Thank-you.  If you could spell your first and
8       last names for us.
9  THE WITNESS:
10           Lance, L-A-N-C-E; Rouzan, R-O-U-Z-A-N.
11 THE COURT:
12           Thank-you, Mr. Rouzan.
13                      DIRECT EXAMINATION
14 BY MR. FULLER:
15 Q.  Mr. Rouzan, good evening to you.
16 A.  Good evening.
17 Q.  Where are you originally from?
18 A.  From New Orleans, from here.
19 Q.  Okay.  And without giving your exact address, what part
20 of the city do you live in?
21 A.  Gentilly.
22 Q.  Now, are you employed?
23 A.  Yes.
24 Q.  And what's your line of employment?
25 A.  I'm a barber and a barbershop owner.
26 Q.  And what's the name of your shop?
27 A.  Lance's Barbershop - The Barber D.
28 Q.  And do you know a Mr. Anthony Williams?
29 A.  Yes, sir.
30 Q.  And how do you know him?
31 A.  I know him from barber school.
32 Q.  Now, you know Cardell Hayes?
```

198

1  A.  Yes, sir.
2  Q.  How do you know Mr. Hayes?
3  A.  He's a client at my barbershop.
4  Q.  And who cuts his hair?
5  A.  Anthony Williams.
6  Q.  Do you remember April 9th of this year?
7  A.  Yes, sir.
8  Q.  And do you recall whether or not Cardell came into the
9  barbershop on that day?
10 A.  Definitely.
11 Q.  And do you know how many times he came that day?
12 A.  I believe it was either two or three times.
13 Q.  When Mr. Hayes was in the barbershop the times that you
14 saw him, was he ever angry or had a bad disposition about him
15 or anything like that?
16 A.  Not at all.  Not at all.
17 Q.  And, you know, was he joking around?
18 A.  He actually -- he always jokes around so yeah, yeah.
19 Q.  Okay.  Now, I want to take you back to later on that
20 night.  You stated that he was at the shop two or three
21 times, right?
22 A.  Sure.
23 Q.  And do you recall when he was there later that night?
24 A.  Yes.
25 Q.  All right.  And what was he doing?
26 A.  He arrived at the barbershop with Kevin O'Neal.  They
27 both were wearing -- well, Cardell had on a blue dashiki and
28 I believe Kevin had on a red dashiki.  And as soon as they
29 walked in, they actually came in smiling, laughing and
30 everybody clowning, saying, you know, how nice they looked in
31 their dashikis and was wondering, you know, what's the
32 occasion.

OPDA05806

1  Q.   Now, do you know what plans, if any, Cardell had for
2  after he left the shop?
3  A.   Yeah.  He told me that he was going to a house party.
4  Q.   What kind of car did Cardell drive?
5  A.   An orange Hummer H2.
6  Q.   Did Kevin have a car also?
7  A.   I believe Kevin drove a little Tahoe to the shop, a blue
8  Tahoe, or something like that.
9  Q.   And when you left the shop, was Kevin's Tahoe still
10 there?
11 A.   Yeah.
12 Q.   And after Cardell left the shop, him and Kevin,
13 mentioning the house party to you, did you hear from him
14 again that night?
15 A.   No.
16 Q.   And I think one last question, I think, Lance, is do you
17 have any convictions?
18 A.   Yes.
19 Q.   And what convictions do you have that you recall?
20 A.   Possession of marijuana with the intent.
21 Q.   And any other convictions?
22 A.   No, sir.
23 Q.   And do you recall the year that you got that conviction?
24 A.   Yeah; it was October 2004.
25 MR. FULLER:
26           The State might have a few questions for you.
27      Thank-you.
28 THE WITNESS:
29           Sure thing.
30                    **CROSS EXAMINATION**
31 **BY MS. RODRIGUE:**
32 Q.   Good afternoon, Mr. Lance.  How are you?

OPDA05807

1  A. Good evening. Good, and yourself?
2  Q. Good. Thank-you for coming. The last thing you said
3  was, Mr. Fuller asked you about a conviction and you said
4  possession with the intent. That's possession with the
5  intent to distribute, correct?
6  A. Yes, ma'am.
7  Q. Okay. Now, we've met before, right?
8  A. Yes, ma'am.
9  Q. Okay, we met at the D.A.'s office. I see you smiling.
10 A. Yeah.
11 Q. We had a good conversation at the D.A.'s office for a
12 while, correct?
13 A. Yes.
14 Q. And you came in and you talked about -- exactly basically
15 what you just told the ladies and gentlemen of the jury,
16 correct?
17 A. Yes. Yes, ma'am.
18 Q. All right. And you told us that you had known Cardell
19 for about six months or so prior to this happening.
20 A. Yeah, six to eight months.
21 Q. Okay. And I asked you -- I said I had read about you in
22 GQ.
23 A. Yes, but I -- actually, you probably read the
24 barbershop's name. I didn't actually interview with GQ or
25 Sports Illustrated.
26 Q. Oh, okay, I apologize. And I had reached out -- I had
27 read your name somewhere. It might have been one of the
28 local articles.
29 A. Yes.
30 Q. And we had reached out --
31 A. Yes.
32 Q. -- to see what information you might have.

OPDA05808

```
1   A.   Sure.
2   Q.   And I asked you if you actually spoke to him after the
3   incident, right?
4   A.   Yes.
5   Q.   And you said no, you had no information, you had never
6   spoken to him or gotten his version.
7   A.   No, I didn't speak to him about his version of anything
8   but I did speak with him over the phone once.
9   Q.   Right, but -- and just that's casual conversation.
10  A.   Yeah.  He was -- his mother was actually at the shop with
11  her grandson, his son, and he actually called while she was
12  there and we briefly spoke with him, maybe -- everyone in the
13  shop maybe had about 10, 20 seconds to speak with him.
14  Q.   And -- but you never talked to him -- like, he never told
15  you what happened or anything.
16  A.   Oh, no, no.
17  Q.   All right.  And you didn't -- you weren't anywhere around
18  the scene or at the events leading up, any of the accidents
19  that happened --
20  A.   No no.
21  Q.   -- or anything like that.
22  A.   No.
23  Q.   So you don't have any information about what actually
24  happened that night.
25  A.   No, ma'am.
26  MS. RODRIGUE:
27             All right.  Thank-you, Mr. Lance.
28  THE WITNESS:
29             Thank-you.
30  MR. FULLER:
31             No questions, Judge.
32  THE COURT:
```

OPDA05809

```
1                Thank-you, Mr. Rouzan.  You may step down.
2   THE WITNESS:
3                All right, thank-you guys.
4   THE COURT:
5                Next witness?
6   MR. FULLER:
7                Mr -- oh, I'm sorry.
8                Mr. Dwight Harris, Judge.
9   THE COURT:
10               Dwight Harris.
11               Do you all want to come on up for a minute.
12                    (BENCH CONFERENCE)
13  THE COURT:
14               (To the jury) Rather than making you all go up,
15          if you don't mind sitting there one second.
16                    (BENCH CONFERENCE)
17  THE COURT:
18               All right, Mr. Harris.  You can step forward to
19          get sworn in.  Thank-you.
20                    AFTER BEING DULY SWORN,
21                         DWIGHT HARRIS
22               TESTIFIED UNDER OATH AS FOLLOWS:
23                       DIRECT EXAMINATION
24  BY MR. FULLER:
25  Q.   Good evening, Mr. Harris.
26  A.   How are you doing?
27  Q.   Pull the microphone a little closer to you.
28  THE COURT:
29               Could you spell your first and last names for
30          us.
31  THE WITNESS:
32               D-W-I-G-H-T, H-A-R-R-I-S.
```

OPDA05810