**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

RENATA SINGLETON, *et al.*

*Plaintiffs*,

v.

LEON CANNIZZARO, *et al.*,

*Defendants*.

Civil Action No. 17-10721

Judge Jane Triche Milazzo

Magistrate Judge Janis van Meerveld

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON TIFFANY LACROIX'S CLAIMS AGAINST INDIVIDUAL DEFENDANTS**

Plaintiff Tiffany LaCroix ("Ms. LaCroix"), through her undersigned counsel, respectfully submits this Memorandum in Opposition to Defendant's Motion for Summary Judgment on Tiffany LaCroix's claims against individual Defendants. Based on the foregoing, Plaintiff respectfully asks this Court to deny Defendant's Motion for Summary Judgment.

## I. INTRODUCTION

There is no dispute over any of the material facts that establish that Laura Rodrigue, a longtime and experienced prosecutor in the Office of the Orleans Parish District Attorney, sent Tiffany LaCroix a fake subpoena that purported to be issued under the authority of Article 66 of the Louisiana Code of Criminal Procedure but was, in fact, generated by the DA's Office in order to evade court oversight. There is no dispute that Ms. Rodrigue signed and issued the subpoena to Ms. LaCroix, and did so to obtain information from Ms. LaCroix about the case against Cardell Hayes. There is no dispute that Ms. Rodrigue sent two *other* fake subpoenas in the same case for the same investigative purpose. It is additionally undisputed that the fake

subpoenas stated they were issued pursuant to Article 66, and threatened fines and imprisonment as penalties for noncompliance, and that such statements were misrepresentations made with the intent to deceive. And it is undisputed that Ms. Rodrigue did not obtain the subpoenas under Article 66, thus circumventing its procedural protections

The crux of Defendants' argument in their motion for summary judgment is that, contrary to this Court's prior order, Ms. LaCroix suffered no injury as a result of those undisputed facts, and therefore Ms. LaCroix's claims of fraud and abuse of process fail. But there is no dispute that Ms. LaCroix, believing she could be fined or jailed if she ignored the subpoena, borrowed money to pay for an attorney to accompany her to the meeting at the DA's office (money which she has since paid back). And the law of the case is clear -- this Court held that an individual who responded to receipt of a fake subpoena, including by hiring an attorney, demonstrates sufficient injury to maintain these causes of action (although, contrary to Defendants' assertions, it did not *limit* Ms. LaCroix's damages to the amount spent on an attorney). Order of Feb. 28, 2019 at 41-42 (Dkt. No. 116). Defendants attempt to relitigate this issue but provide no basis in law or fact for the Court to revisit its ruling. Thus, summary judgment to Ms. Rodrigue must be denied.

Given that the *only* issue raised by Ms. Rodrigue with respect to Plaintiff's fraud claim is the issue of damages, and that issue has been previously resolved by this court, it is clear that Ms. LaCroix, and not Defendants, are entitled to summary judgment on her fraud claim. Indeed, Ms. LaCroix filed a motion for summary judgment on her claim of fraud against Defendant Rodrigue the day before Defendant's motion for summary judgment.

With respect to Ms. LaCroix's abuse of process claim, Defendants also try to relitigate the question of whether a fake subpoena can be the basis for an abuse of process claim, and

whether attempting to avoid judicial oversight can establish the element of ulterior purpose. As above, this Court rejected these arguments in its ruling on the Defendants' Motion to Dismiss, finding that the irregular use of the lawful Article 66 investigative subpoena process to avoid judicial oversight is sufficient to allege an abuse of process claim, *id.* at 40-41, and Defendants offer no reason for the Court to revisit it.

In sum, because the evidence adduced in this case mirrors the evidence in the Complaint, there is no meaningful distinction between the Court's resolution of these issues at the motion-to-dismiss phase and the current record. Defendant's motion for summary judgment should be denied and Plaintiff's Motion for Summary Judgment should be granted.

## II. FACTUAL BACKGROUND

Ms. LaCroix was a potential witness in a criminal case, *State v. Cardell Hayes*, Case No. 528-975. Counter-statement of Uncontested Facts at ¶1. Defendant Laura Rodrigue was an experienced prosecutor at the Orleans Parish District Attorney's Office, and the lead prosecutor on the *Hayes* case. Counter-statement of Uncontested Facts at ¶2. At time of the *Hayes* trial, Ms. Rodrigue had been at OPDA for ten years, and was part of the "Major Offense Trials" Division, a division which focused on serious cases where defendants were charged with crimes that could result in imprisonment as a sentence. Counter-statement of Uncontested Facts at ¶2.

In connection with the *Hayes* case, in November 2016, Ms. Rodrigue issued, and Ms. LaCroix received, a document titled "Subpoena," demanding a private meeting at the OPDA's office (the "Office"). *See* Counter-statement of Uncontested Facts at ¶¶3, 4; Exhibit C. Ms. Rodrigue issued the "Subpoena" requesting that Ms. LaCroix appear at the Office because Ms. Rodrigue wanted to speak to Ms. LaCroix about an interview that Ms. LaCroix had done in

which she discussed a phone call that she received on the day of the crime. Counter-statement of Uncontested Facts at ¶5.

The only legitimate subpoenas that direct an individual to appear at the Office in Orleans Parish are subpoenas issued by a Court under Article 66 of the Louisiana Code of Criminal Procedure and grand jury subpoenas. Counter-statement of Uncontested Facts at ¶10, n.2. This was neither. Thus, the document Ms. Rodrigue issued titled "Subpoena" was a fake subpoena ("Fake Subpoena"). Counter-statement of Uncontested Facts at ¶6.

The Fake Subpoena received by Ms. LaCroix inaccurately stated, "I received the process of court of which this is a duplicate[,]" even though it was "not a document that's filed into the court record," nor was it approved, reviewed, or signed by the court. Counter-statement of Uncontested Facts at ¶7. Similarly, the Fake Subpoena warned that "A fine and imprisonment may be imposed for failure to obey this notice." Counter-statement of Uncontested Facts at ¶8. However, this was also not an accurate statement. Counter-statement of Uncontested Facts at ¶9. The Fake Subpoena also stated that it was issued pursuant to Louisiana State Code Article 66. Counter-statement of Uncontested Facts at ¶10. As noted above, this, too was inaccurate. Counter-statement of Uncontested Facts at ¶11.

The Fake Subpoena received by Ms. LaCroix was not the only fake subpoena issued by Ms. Rodrigue while she was employed as a prosecutor for the New Orleans Parish District Attorney's Office. Counter-statement of Uncontested Facts at ¶13.[1] Indeed, in the same case, Ms. Rodrigue issued a Fake Subpoena to another potential witness, Anthony Williams, to

---

[1] Ms. Rodrigue testified that she also used Fake Subpoenas when she worked in the Jefferson Parish District Attorney's Office. Counter-statement of Uncontested Facts at ¶13, n.3.

investigate potential information Mr. Williams might have. Counter-statement of Uncontested Facts at ¶14; Exhibit D.

When issuing fake subpoenas, Ms. Rodrigue would print out the blank fake subpoena template and then would fill out the form by hand. Counter-statement of Uncontested Facts at ¶15. Fake subpoenas could be found on any desktop within the office. Counter-statement of Uncontested Facts at ¶16. Multiple versions of fake subpoenas were used at OPDA. If a prosecutor needed the most recent version, Ms. Rodrigue testified that she could just “scream[] across the hall” and say, “Joe, do you have a DA subpoena, have you got one of those subpoenas over there or the form” and someone would “just email[] it so that I would have had a copy on my computer.” Counter-statement of Uncontested Facts at ¶17. Ms. Rodrigue believed it was “important” that the fake subpoenas were issued to “look as if [they] came from the DA’s Office.” Counter-statement of Uncontested Facts at ¶18.

After receiving the Fake Subpoena, Ms. Lacroix became “very upset and nervous” and was “confused” because she believed it was an indication that she had done something wrong. Counter-statement of Uncontested Facts at ¶20. Ms. LaCroix was afraid that she could face jail time or be fined because of the Fake Subpoena. Counter-statement of Uncontested Facts at ¶21. She had never been jailed in her life. Counter-statement of Uncontested Facts at ¶21.

The designated time that the Fake Subpoena directed Ms. LaCroix to appear at the Office was problematic. Ms. LaCroix worked as a schoolteacher, and “had to do a specific training, along with other teachers, in order to be able to give the … standardized test to [] 504 accommodated student[s]” with special needs. Counter-statement of Uncontested Facts at ¶22. The Fake Subpoena’s appointment time would have required Ms. LaCroix to miss one of the scheduled trainings for the testing. Counter-statement of Uncontested Facts at ¶23. Ms. LaCroix

also did not feel at liberty to travel or to leave the state until the Fake Subpoena was quashed, since she was apprehensive of the language used in the Fake Subpoena and the prosecutor's threats. Counter-statement of Uncontested Facts at ¶24.

After receiving the Fake Subpoena, Ms. LaCroix spoke to her mother, who told Ms. LaCroix that she would accompany her to the Office but that just in case, Ms. LaCroix "may need to bring a lawyer." Counter-statement of Uncontested Facts at ¶25. Ms. LaCroix testified that her mother then proceeded to "call around" to family members to see if anyone knew somebody that Ms. LaCroix could talk to or represent her, because Ms. LaCroix "wasn't sure on what was going to happen because [she] never experienced anything like this before." Counter-statement of Uncontested Facts at ¶26.

The day after receiving the Fake Subpoena, Ms. LaCroix hired a lawyer, A.J. Ibert, to represent her. Counter-statement of Uncontested Facts at ¶27. Ms. LaCroix had to miss work in order to hire and meet with Mr. Ibert to discuss the Fake Subpoena she received. Counter-statement of Uncontested Facts at ¶28. Mr. Ibert was paid $500 to represent Ms. LaCroix. Counter-statement of Uncontested Facts at ¶30. He was hired to assist Ms. LaCroix in going to speak to the district attorney because she believed the fake subpoena she had received required her to go to such a meeting and she intended to comply with it. *See* Counter-statement of Uncontested Facts at ¶29.

Ms. Rodrigue now admits, in hindsight, that the fake subpoenas she used "should not have had the word 'Subpoena' on the top [of the document]." Counter-statement of Uncontested Facts at ¶32. Ms. Rodrigue also admitted that the fake subpoenas should not have had statements about consequences of being fined or imprisoned. Counter-statement of Uncontested Facts at ¶33. Ms. Rodrigue also testified that the fake subpoena should not have included a

statement that it was issued pursuant to Article 66. Counter-statement of Uncontested Facts at ¶34.

## III. ARGUMENT

### A. The Undisputed Facts Establish That, By Sending Ms. LaCroix a Fake Subpoena, Ms. Rodrigue Committed the Tort of Abuse of Process.

Abuse of process involves the "malicious perversion of a legally issued process whereby a result not lawfully or properly obtainable under it is attempted to be secured." *Succession of Cutrer v. Curtis*, 341 So. 2d 1209, 1214 (La. App. 1976) (quotations omitted). The tort of abuse of process requires two elements: "(1) the existence of an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular prosecution of the proceeding." *Mills v. City of Bogalusa*, No. CV 13-5477, 2016 WL 2992502, at *14 (E.D. La. May 24, 2016) (citing *Waguespack, Seago & Carmichael (A PLC) v. Lincoln*, 768 So. 2d 287, 290-91 (La. App. 2000)). *See also Taylor v. State*, 617 So. 2d 1198, 1205 (La. Ct. App.), *writ denied,* 620 So. 2d 875 (La. 1993) ("there are only two essential elements of abuse of process. . . First, an ulterior purpose, and second, a willful act in the use of the process not proper in the regular conduct of the proceeding.")

#### 1. The Use of Fake Subpoenas Is A Legal Process That Has No Legal Effect And Satisfies The First Element Of The Abuse of Process Claim

Defendants argue that Plaintiff's abuse of process claim fails because the Fake Subpoenas were not a misuse of a legally issued process as they were not issued by a court nor enforceable in a court of law. (Dkt. 327-1 at 11-13). Defendants claim that Louisiana courts have never considered the "process" of an abuse of process claim anything other than a court process or a legal process. (Dkt. 327-1 at 12). In other words, Defendants maintain that it is not an abuse of process under Louisiana law to issue fake documents titled "subpoena" that purport to be issued

*under a court's authority*, because the process used to generate those subpoenas—the DA's office creating them—is so obviously extralegal. This position is ridiculous on its face. The issuance of the Fake Subpoena at issue here is a court process or a legal process – it is just a fake one. The process abused here is Article 66, which states that, "[u]pon written motion of the attorney general or district attorney setting forth reasonable grounds therefor, the court may order the clerk to issue subpoenas directed to the persons named in the motion, ordering them to appear at a time and place designated in the order for questioning by the attorney general or district attorney respectively, concerning any offense under investigation by him." La. Stat. Ann. C. Cr. P. art. 66, sec. A. Indeed, the commentary to Article 66 recognizes that court oversight is necessary to prevent abuse of the investigative subpoena process by the district attorney: "[t]he requirement of court approval before the subpoena is actually issued answers the only real objection to the device, *i.e.*, the possible abuse of it by the district attorney." 1966 Official Revision Comm. (b). Thus, the Comment explicitly defines what Ms. Rodrigue did here—order witnesses to appear at the DA's office for questioning by prosecutors concerning an offense under investigation, *without court oversight*—as an abuse of the process.

Defendants cite to *Ioppolo v. Rumana* to underline this idea that Louisiana courts have never considered the "process" element of a cause of action for abuse of process anything other than "legal process, or court process." 581 F. App'x 321, 326 (5th Cir. 2014). However, the "process" that was at issue in *Ioppolo* was not a legal or court process, but involved a process for how a *private* professional organization for surgeons dealt with complaints regarding ethical and professional misconduct. Subpoenas (or fake subpoenas) issued by prosecutors are tools that are exclusive to legal or court proceedings—as reinforced by the fact that the fake subpoena sent to Ms. LaCroix states clearly in the header: "Criminal District Court for the Parish of New

Orleans," threatens that a "fine or imprisonment may be imposed for failure to obey this notice," and states the recipient is receiving the notice pursuant to Article 66. *See* Brooks Decl. Exhibit C. *Ioppolo* offers no support for Defendants' position that fake court documents that have no legal effect *because they were faked* are not an improper use of process.

And the fact that the Fake Subpoena had no independent legal effect is irrelevant; Louisiana courts *have* considered documents with no legal effect to support an abuse of process claim. In *Alden v. Lorning*, 904 So.2d 24, 28 (La. App. 4th Cir. 2005), "the principal action filed by Dr. Alden had no legal basis, [and] such filing gave rise to an irregularity in the process itself. With the establishing of an irregularity in the process itself, ulterior motive, the second requisite element to establish abuse of process, is presumed." In *Alden*, the appellate court affirmed the trial court's finding of abuse of process when there was an "irregularity in the law." The *Alden* court distinguished between an abuse of process claim in which ulterior motive must be proven because a legal process is used, and where ulterior motive is presumed because an improper or "irregular" process is used. Here, as in *Alden*, an "irregular" process was used. The issuing of Fake Subpoenas when they should have been issued pursuant to Article 66 establishes an irregular use of process; thus, even if Ms. Rodrigue did not have an ulterior purpose (which the evidence shows she did), the ulterior motive element is presumed to be met, and Ms. LaCroix's abuse of process claim has been established.

Importantly, this Court has already held that allegations identical to the evidence adduced in this case are sufficient to both state a claim and put that claim outside of the protection of absolute immunity, and the undisputed facts bear out these allegations. *See* Feb. 28, 2019, Order and Reasons (ECF No. 116) at 40-41.

**2. Ms. Rodrigue Did Have Ulterior Purpose In Sending Fake Subpoenas**

Defendants also argue that Ms. LaCroix's claim for abuse of process fails because she cannot prove the existence of an "ulterior purpose." (Dkt. 371-1 at 14).

As noted above, because the use of process here was "irregular" under *Alden*, this Court should presume the other element of abuse of process, "ulterior motive" has been met. *See* 904 So.2d at 28; *Weldon v. Republic Bank*, 414 So. 2d 1361, 1365 (La. Ct. App. 1982) ("[t]he existence of an ulterior motive may, perhaps, be inferred from the fact that the process has been misused or misapplied[.]")(quoting 1 Am.Jur.2d Abuse of Process §4).

Even if not inferred, the evidence demonstrates that Defendant Rodrigue issued the Fake Article 66 Subpoena to Ms. LaCroix to deceive her into coming to the Office to speak with her so that Ms. Rodrigue could discover what information she had—in other words, for investigative purposes—with the ulterior purpose of avoiding the safeguards put in place by Article 66, including court oversight and public accountability. Counter-statement of Uncontested Facts at ¶5.[2] Defendants have explained that prosecutors used the *real* Article 66 subpoena process infrequently for this very reason—prosecutors' aversion to disclosing the identity of a witness. Counter-statement of Uncontested Facts ¶12. Filing an Article 66 subpoena through the correct, court-supervised process requires public disclosure of the potential value of a witness; the use of Fake Subpoenas thus confers obvious benefits to a prosecutor who wants to compel a witness to talk to her but does not want to reveal that she is talking to that witness. This ulterior purpose is

[2] As noted above, Ms. Rodrigue also acknowledged that she sent the same Fake Subpoena to Anthony Williams, also a potential witness in the Cardell Hayes case, for the same investigative purpose. Counter-statement of Uncontested Facts at ¶14, n. 4 ("Q: And so your attempt to speak with Mr. Williams was to gain information from him related to the investigation; is that accurate? A: Correct.").

clearly illustrated by the *other* fake subpoenas that Ms. Rodrigue sent in the same case to Anthony Williams and Lance Rouzon. On her own admission, Ms. Rodrigue purported to compel them to meet with her in order to discover what information they had, did not find their information useful, and ultimately did not call them as witnesses at trial. Counter-statement of Uncontested Facts at ¶1 n.1. But because she issued Fake Subpoenas rather than seeking real ones through the Article 66 process, she could avoid having to convince a court of the importance of talking to them and potentially signaling their potential importance as witnesses.

Ms. Rodrigue sent a Fake Article 66 Subpoena to Tiffany LaCroix, instead of seeking an actual Article 66 Subpoena, to obtain an investigative interview without having to publicly request it and successfully prove the need for such a meeting to the Court—safeguards enacted specifically to avoid abuse. Even if ulterior purpose couldn't be assumed because of Ms. Rodrigue's use of irregular purpose, this clearly constitutes acting "for a specific purpose not authorized by law" and satisfies the element of "ulterior purpose." *Taylor v. State*, 617 So. 2d 1198, 1205–06 (La.App. 3 Cir 1993) (finding ulterior motive where police officer initiated investigation not for purpose authorized by law but to shield himself from possible civil liability in another lawsuit); *see also Mini-Togs, Inc. v. Young*, 354 So. 2d 1389 (La. App. 2d Cir. 1978) (finding ulterior purpose where defendant filed suit not to protect city bonds but to protect jobs of union members); *Ratcliff v. Boydell*, 674 So.2d 272 (La. App. 4th Cir. 1996) (finding ulterior purpose where defendants filed suit not to defend themselves but for the purpose of intimidating and punishing plaintiff).

Ms. Rodrigue issued a document purporting to be an Article 66 subpoena that was not. Counter-statement of Uncontested Facts at ¶¶10-11. She admits now that she should not have included the statement saying that it was issued pursuant to Article 66. *Id.* at ¶34. And Ms.

Rodrigue knew at the time she issued the Fake Subpoena that it was not a real subpoena obtained pursuant to the prescribed statutory process and did not carry the force and effect of "fine and imprisonment," yet she issued it so that Ms. LaCroix would come and speak to her in the Office. Counter-statement of Uncontested Facts at ¶¶6-11. Ms. Rodrigue's knowing issuance of Fake Subpoenas not authorized by law satisfies the element of ulterior purpose.

**3. Ms. LaCroix Was Injured By The Fake Subpoenas**

Defendants argue that Ms. LaCroix did not suffer an injury because she did not personally hire an attorney, but rather, asked her mother to loan her the money to hire an attorney. (Dkt. 371-1 at 15). As this Court held in denying Defendants' Motion to Dismiss, Ms. LaCroix "suffered an injury—the cost of a private attorney—because [she] reasonably relied on the threats of fines and imprisonments that appeared as intentionally deceptive material misrepresentations within the 'subpoenas.'" Dkt 116 at 42. Ms. LaCroix's mother loaned her the money for the attorney (and Ms. LaCroix has since paid her mother back). Counter-statement of Uncontested Facts at ¶31. Even if she hadn't paid her back, incurring that debt would still be sufficient.

It is also undisputed that Ms. LaCroix had to miss work in order to hire an attorney for the purposes of attending the meeting at the DA's office. Missed work is clearly a cognizable injury under Louisiana law. *See, e.g., In re Rushing*, 424 B.R. 747, 752 (Bankr. M.D. La. 2010); *see also Coffel v. Stryker Corp.*, 284 F.3d 625 (5th Cir. 2002) (finding that the plaintiff's loss of salary or bonuses upon reliance of the fraud were not speculative, because they were proven by evidence to establish lost bonuses with reasonable certainty). And Ms. LaCroix suffered an additional injury, discussed in more depth *infra*—as a teacher who had never before run into any trouble with the law, she experienced the mental anguish of receiving a subpoena commanding

her to meet privately with the prosecutor in the case against the father of her child, threatening her with fines and imprisonment if she did not comply. Such distress is sufficient to establish general damages for an abuse of process violation under Louisiana law. *See Alden*, *supra*, 904 So.2d at 8 (finding, as a result of the Defendant's "liability for abuse of process. . .[plaintiff] is entitled to general damages, which include mental pain and suffering.")

In sum, the undisputed record establishes that Ms. Rodrigue committed the tort of abuse of process. Thus, Defendants' motion for summary judgment on this claim should be denied and Plaintiff's Motion for Summary Judgment should be granted.

**B. Plaintiff's Claim of Fraud Is Met By The Undisputed Facts**

The elements of the tort of fraud are (1) a misrepresentation of material fact; (2) made with the intent to deceive; (3) reasonable or justifiable reliance by the plaintiff; and (4) resulting injury. *Schaumburg v. State Farm Mut. Auto. Ins. Co.*, 421 F. App'x 434, 442 (5th Cir. 2011) (citing *Wooley v. Lucksinger*, 14 So. 3d 311, 378–79 (La. App. 1 Cir. 2008)). "Fraud ... may be established by circumstantial evidence." La. Civ. Code art. 1957; *accord Lafayette Ins. Co. v. Pennington*, 966 So.2d 136, 137-38 (La. App. 2d Cir.2007) ("[F]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other … Fraud is proved by a preponderance of evidence and may be established by circumstantial evidence.").

Defendants apparently admit that the first two elements are met by Ms. LaCroix's claims, because they only address Ms. LaCroix's injury in their motion for summary judgment. (Dkt. 371-1 at 19). And Defendants' only argument is to disagree with this court's prior conclusion that Ms. LaCroix suffered an injury in hiring a private attorney. (Dkt 371-1 at 20). For the

reasons set forth below (as well as those above), this is clearly insufficient to justify summary judgment.

**1. Ms. LaCroix Reasonably Relied On The Fake Subpoena**

Defendants take issue with the Court's previous ruling allowing Ms. LaCroix's fraud claim to proceed, arguing that this Court erred in holding that the alleged injury of retaining a lawyer in response to the Fake Subpoena is sufficient to establish that she "relied on the truthfulness of any statement" in the Fake Subpoena. Dkt. 327-1 at 20. This Court's ruling was correct, and the facts borne out in discovery establish that Ms. LaCroix adversely relied on the misrepresentations in the subpoena so as to be defrauded.

Ms. LaCroix reasonably relied on the misrepresentations in the Fake Subpoena because on the day after receiving the Fake Subpoena, Ms. LaCroix hired an attorney for the purpose of accompanying her to the DA's office, not, as Defendants' suggest, to fight the fake subpoena. Counter-statement of Uncontested Facts at ¶¶27, 29; Defs.' Mot. at 20. Ms. LaCroix testified that she hired the attorney to "assist [her] in going to speak to the district attorney when I received the false subpoena" (which she did not know was fake at the time). Counter-statement of Uncontested Facts at ¶29. She testified that she "hired him to come with me because I believed this document said I needed to go, so I was going to comply with the law, and I just wanted representation to come with me so I can comply with whatever was being requested of me at the time." *Id.*

Ms. LaCroix believed that she was obligated to attend a meeting at the Office as a result of the fake subpoena issued to her. As a result, she hired an attorney, and incurred the stress and expense of preparing to respond to this document, a document that had no legal force. Ms. LaCroix thus relied on the false representations in the Fake Subpoena that she was compelled to go to the

Office. As a result of Ms. Rodrigue's fraud, Ms. LaCroix suffered, at a minimum, economic injury: the cost of hiring counsel to confront it. This constitutes reliance.[3]

**2. Ms. LaCroix Suffered An Injury Because Of The Fake Subpoenas**

Ms. LaCroix was injured because, as described above, she agreed to pay an attorney to accompany her to the meeting and, eventually, to quash the Fake Subpoena. As this Court held in denying Defendants' Motion to Dismiss, Ms. LaCroix "suffered an injury—the cost of a private attorney—because [she] reasonably relied on the threats of fines and imprisonments that appeared as intentionally deceptive material misrepresentations within the 'subpoenas.'" Dkt. 116 at 42. Ms. LaCroix had to ask her mother to provide the money at the time, but has since paid her mother back the $500 loaned to her for the attorney. Counter-statement of Uncontested Facts at ¶31.

Although the Court recognized that such an injury was *sufficient* to establish reasonable reliance and injury, it did not, as Defendants' suggest, limit Plaintiffs' recovery to solely those damages. Defs.' Mot. at 10, 19. And Ms. LaCroix was damaged in other ways. First, Ms. LaCroix was injured because she had to take time off work to meet with her attorney (again, before she realized the document she had received was, in fact, fake)

Q. Did you take any time off work when you got the document from the DA's Office?
A. Yes, I did.
Q. When did you take off work?
A. When I had to go hire -- go meet my attorney.

(Counter-statement of Uncontested Facts at ¶28).

Q. Did you agree on the fee for the representation?
A. Yes.

[3] The fact that, once retained, her attorney informed her that he believed the subpoena was fake, does not mitigate the fact that she had already retained him. Moreover, Ms. LaCroix still needed her attorney to take this argument to the Court and ensure she did not need to appear.

Q· What was the fee that you agreed on?
A· I believe it -- I believe it was $500.

(Counter-statement of Uncontested Facts at ¶30). Fifth Circuit precedent and Louisiana law allow plaintiffs to recover for lost salary as an element of damages for fraud. *In re Rushing*, 424 B.R. 747, 752 (Bankr. M.D. La. 2010); *see Coffel v. Stryker Corp.*, 284 F.3d 625 (5th Cir. 2002) (finding that the plaintiff's loss of salary or bonuses upon reliance of the fraud were not speculative, because they were proven by evidence to establish lost bonuses with reasonable certainty). Defendants suggest that Ms. LaCroix's testimony was too vague and was unsupported by documentation, Defs.' Mot. at 16-17, but Ms. LaCroix's testimony that she missed work is undisputed. To the extent they want to challenge the strength of that testimony, that is not the appropriate standard at this stage, and cannot justify summary judgment.

In addition to the economic harms she suffered, Ms. LaCroix suffered the inherent harm of having received a fake, deceptive document from an office of law enforcement—from the very people she had relied on to protect her. Defendants are not just ordinary agents of the state; they are prosecutors entrusted with the impartial execution of our laws. *See United States v. Smith*, 814 F.3d 268, 277 (5th Cir. 2016) ("A prosecutor's role is not that it shall win a case, but that justice shall be done." (citations omitted)); *United States v. Calhoun*, 478 F. App'x 193, 196 (5th Cir. 2012) (Haynes, J., concurring) ("Prosecutors are held to a higher standard than even the high professional standards applicable to all attorneys."). Ms. Rodrigue violated that trust by deliberately deceiving victims and witnesses, including Ms. LaCroix. As Ms. LaCroix testified, about receiving a fraudulent document that threatened fines and imprisonment if she did not comply:

> "[ ] I don't want anybody to feel the way I felt when I received this document. I didn't know it was illegal at the time that I did receive the subpoena. I was nervous, I was anxious, I was afraid. I didn't really know what was going on, I just -- like, I had no real control over it. But then to find out that it wasn't, I guess, real, I don't want -- it was, like,

> the feeling that I had was unlike -- it wasn't necessary, like it really wasn't necessary. Like, it just made me really upset, nervous, anxious. Like, I was scared because of, like, what could happen at my job, what could happen in front of my son." LaCroix Testimony 93:8-20.

Defendants ignore this testimony entirely, focusing on a different portion of Ms. LaCroix's testimony to argue that in fact, Ms. LaCroix's distress stemmed from her fear of being subpoenaed to testify at Mr. Hayes's trial. But Ms. LaCroix's testimony cited above is unequivocal—when she received the Fake Subpoena, she was "nervous. . . anxious. . . afraid." The subpoena demanded her appearance at the DA's office and threatened fines and imprisonment for her failure to comply; Ms. LaCroix had never before been in trouble with the law, and she was scared of "what could happen at my job, what could happen in front of my son." Counter-statement of Uncontested Facts at ¶¶20, 21. She talked to her mother and spent time researching lawyers; she took time off work to meet with that lawyer only to discovery that the document she had received was utterly fraudulent; she paid that lawyer to appear in court to "quash" the fake subpoena to ensure that there would be no adverse consequences for her not having gone to the DA's office. Ms. LaCroix was plainly injured by receiving the fake subpoena and Defendant's motion for summary judgment should be denied.

## IV. Defendant Martin Is Also Liable

In passing, Defendants argue that Ms. LaCroix's claims of fraud and abuse of process against Mr. Pipes and Mr. Martin should also be dismissed. Defs.' Mot. at 21. It is undisputed that Mr. Martin created the template form that was used for the Fake Subpoena that Ms. Rodrigue sent to Ms. LaCroix, and that Mr. Martin directed the entire office, including Ms. Rodrigue, to use such documents. Counter-statement of Uncontested Facts at ¶19. Moreover, as First Assistant District Attorney and supervisor of cases in the Major Trials division, Mr. Martin was responsible for the actions taken by the prosecutors on those cases, including the sending of

the Fake Subpoena to Ms. LaCroix. However, Plaintiffs have not yet deposed Mr. Martin. There is nothing in the record that establishes what Mr. Martin's participation and/or supervision of the Cardell Hayes case entailed, and thus, a genuine issue of material fact exists as to whether Mr. Martin participated in and/or approved the Fake Subpoena sent to Ms. LaCroix.[4]

## V. CONCLUSION

The record here shows that Defendants have not shown that they are entitled to summary judgment. The crux of their argument is that Ms. LaCroix suffered no injury, an argument that this Court has already rejected. Indeed, Ms. LaCroix filed a motion for summary judgment herself, arguing that there is no genuine issues of material fact with respect to Ms. LaCroix's claims of Fraud and Abuse of Process against Ms. Rodrigue. Ms. LaCroix respectfully asks that the Court deny Defendant's motion for summary judgment and grant her Motion for Summary Judgment.

Respectfully submitted this 26th day of January, 2021,

*/s/ Sarah S. Brooks*

Sarah S. Brooks
VENABLE LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
ssbrooks@venable.com
(310) 229-0408
*Counsel for Plaintiff Tiffany LaCroix*

[4] With respect to Mr. Pipes, given that he testified recently that he did not have any involvement in the *Cardell Hayes* case or with this fake subpoena, Plaintiff has agreed to dismiss her causes of action against Mr. Pipes as an individual.

Katherine Chamblee-Ryan (*pro hac vice*)
Tara Mikkilineni (*pro hac vice*)
Ryan C. Downer (*pro hac vice*)
Laura Gaztambide Arandes (*pro hac vice*)
Civil Rights Corps
1601 Connecticut Avenue NW, Suite 800
Washington, D.C. 20009
Tel: (202) 844-4975

Mariana Kovel (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (646) 905-8870
mkovel@aclu.org

Somil Trivedi (*pro hac vice*)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 715-0802

Bruce Hamilton
La. Bar No. 33170
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70156
Tel: (504) 522-0628

Sarah S. Brooks (*pro hac vice*)
Venable LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Tel: (310) 229-9900

*Counsel for Plaintiff Tiffany LaCroix*