# EXHIBIT A

TIFFANY LACROIX on 09/12/2020

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
 2

 3

 4   RENATA SINGLETON; MARC
     MITCHELL; LAZONIA BAHAM;
 5   JANE DOE; TIFFANY LACROIX;
     FAYONA BAILEY; JOHN ROE;    CIVIL ACTION NO. 17-10721
 6   AND SILENCE IS VIOLENCE

 7                               SECTION H
     VERSUS                      JUDGE JANE TRICHE MILAZZO
 8
     LEON CANNIZZARO, IN HIS     DIVISION I
 9   OFFICIAL CAPACITY AS        MAGISTRATE JUDGE
     DISTRICT ATTORNEY OF        JANIS VAN MEERVELD
10   ORLEANS PARISH AND IN
     HIS INDIVIDUAL CAPACITY;
11   GRAYMOND MARTIN; DAVID
     PIPES; IAIN DOVER;
12   JASON NAPOLI, ET AL

13

14

15

16

17

18          Video Conference Zoom Deposition of

19   TIFFANY LACROIX, taken on Saturday, September 12,

20   2020.

21

22

23

24

25
```

```
 1                A P P E A R A N C E S

 2

    REPRESENTING RENATA SINGLETON; MARC MITCHELL;
 3  LAZONIA BAHAM; JANE DOE; TIFFANY LACROIX;
    FAYONA BAILEY; JOHN ROE; AND SILENCE IS VIOLENCE:
 4
            CIVIL RIGHTS CORPS
 5          (BY:  TARA MIKKILINENI, ESQ.)
            1601 CONNECTICUT AVENUE NW, SUITE 800
 6          WASHINGTON, D.C. 20009
            (202)894-6120
 7          tara@civilrightscorps.org

 8          ACLU FOUNDATION OF LOUISIANA
            (BY:  BRUCE HAMILTON, ESQ.)
 9          POST OFFICE BOX 56157
            NEW ORLEANS, LOUISIANA 70156
10          (504)522-0628
            bhamilton@laaclu.org
11

12  REPRESENTING LEON CANNIZZARO, IN HIS OFFICIAL
    CAPACITY AS DISTRICT ATTORNEY OF ORLEANS PARISH
13  AND IN HIS INDIVIDUAL CAPACITY; GRAYMOND MARTIN;
    DAVID PIPES; IAIN DOVER; JASON NAPOLI, ET AL:
14
            STANLEY, REUTER, ROSS, THORNTON & ALFORD, LLC
15          (BY:  MATTHEW J. PAUL, ESQ.)
            909 POYDRAS STREET, SUITE 2500
16          NEW ORLEANS, LOUISIANA 70112
            (504)523-1580
17          mjp@stanleyreuter.com

18          OFFICE OF THE DISTRICT ATTORNEY,
            PARISH OF ORLEANS
19          (BY:  ROBERT L. FREEMAN, JR., ESQ.)
            (BY:  DONNA R. ANDRIEU, ESQ.)
20          619 SOUTH WHITE STREET
            NEW ORLEANS, LOUISIANA 70019
21          (504)822-2424

22  ALSO PRESENT:

23          ALLISON GOTFRIED, LAURA ARANDES, MONICA CHOU,
            COLE LAUTERMILCH, PATRICK BOLLMAN,
24          AND JENNA FLORIO

25
```

```
 1                        INDEX
 2                                                     PAGE
 3   STIPULATION..................................4
 4   EXAMINATION BY:
 5        MR. PAUL................................6
 6   CERTIFICATE................................122
 7
 8                       EXHIBITS
 9
10   EXHIBIT 1 (INTERROGATORY RESPONSES)..........19
11   EXHIBIT 2 (ARTICLE)..........................31
12   EXHIBIT 3 (MOTION TO QUASH)..................47
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1  Orleans, then they just made him out to be, like, a
 2  monster.  He wasn't.  He still isn't.
 3       THE WITNESS:
 4            Can we take a break?
 5       MR. HAMILTON:
 6            Can we take a break, Matt?
 7       MR. PAUL:
 8            Yeah, let's take a break.
 9                 (Brief recess.)
10  BY MR. PAUL:
11       Q    Ms. LaCroix, did you ever receive a
12  document --
13       A    Yes.
14       Q    -- asking you to come to Orleans Parish
15  DA's Office?
16       A    Yes.
17       Q    How many times?
18       A    Once.
19       Q    When was that?
20       A    November 2016, I believe, maybe.
21       Q    And do you recall what day it was?
22       A    No, not the date.
23       (Exhibit 3 was marked for identification.)
24       MR. PAUL:
25            I'm going to introduce Exhibit 3.  This is
```

```
 1      A    Yes.
 2      Q    So the night of the 27th, November 27th,
 3 you came home and discovered the document in your
 4 door, that's correct?
 5      A    Yes.
 6      Q    What did you do after you received that
 7 document?
 8      A    I called my mother.
 9      Q    And what did you tell her?
10      A    That I received the subpoena.
11      Q    And what did she say?
12      A    Told me -- I was very upset and nervous,
13 and I was confused because I believe that, like, it
14 was a sign that I did something wrong.  She told me
15 to calm down and that she would come with me to the
16 District Attorney's Office, but just in case, I may
17 need to bring a lawyer.
18           So then she proceeded to call around to --
19 if any one of my family members knew somebody who I
20 would be comfortable with talking about what's going
21 on and them representing me with this because I
22 wasn't sure on what was going to happen because I
23 never experienced anything like this before.
24      Q    So the first thing you said, did you say
25 your mother told you that you were upset by it?
```

```
 1  would -- she would come with me to the District
 2  Attorney's Office, but just in case, she was going
 3  to call some of -- some other people to see what I
 4  should do, or if I should get some other -- an
 5  attorney before I was to go down to the District
 6  Attorney's Office.
 7       Q    Did she refer you to an attorney?
 8       A    She -- my mother did not.  One of our
 9  family members did refer us to an attorney.
10       Q    And who was the attorney that they
11  referred you to?
12       A    I believe his name -- I don't remember his
13  whole name, but his name was -- I think first name
14  was, like, Lawrence.  He was in the same law firm
15  that A.J. Ibert worked at or he worked for them.  I
16  wasn't sure of the capacity of it, but he
17  recommended him to me.
18       Q    Did you hire a lawyer?
19       A    Did I what?
20       Q    Did you hire a lawyer?  Did you retain a
21  lawyer?
22       A    Yes.
23       Q    Who did you hire?
24       A    A.J. Ibert.
25       Q    And is it still true that you don't
```

 1  remember whether it was before or after you hired
 2  Mr. Ibert that you talked to Cardell Hayes' lawyers?
 3         MS. MIKKILINENI:
 4              Objection.  Asked and answered.
 5         THE WITNESS:
 6              I don't remember.
 7  BY MR. PAUL:
 8     Q    When you talked to Cardell Hayes' lawyers,
 9  did they encourage you not to cooperate with the
10  DA's office?
11         MS. MIKKILINENI:
12              Objection, irrelevant.
13         THE WITNESS:
14              No.
15  BY MR. PAUL:
16     Q    When did you hire Mr. Ibert?
17     A    It was in the day -- I guess, the
18  following day I received the subpoena.
19     Q    Did you sign a representation agreement
20  with them?
21     A    Yes.
22     Q    Do you have copy of that agreement?
23     A    Personally, no, but my lawyers, they do.
24     Q    Did you give a copy of that agreement to
25  your lawyers in this case?

```
 1      A    I believe they received one from my
 2  attorney.  They requested it.
 3      Q    Which attorney are you talking about?
 4      A    Ibert, my attorney in the case in
 5  reference to the fake subpoena.
 6      Q    You believe that -- you believe that A.J.
 7  Ibert gave a copy of the representation agreement to
 8  your lawyers in this current case?
 9      A    I believe so.  I think they requested
10  because I don't remember giving it to them.
11      MS. MIKKILINENI:
12           Objection to -- objection to -- I mean,
13  she can only testify as to what she knows.
14  BY MR. PAUL:
15      Q    Did you have a copy yourself in your
16  possession at one point?
17      A    Yeah.
18      Q    Do you know what happened to it?
19      A    No.
20      Q    When was the last time you can remember
21  having a copy of it?
22      A    I don't know.  I really don't remember.
23      Q    What did you hire Mr. Ibert to do?
24      A    To represent me --
25      MS. MIKKILINENI:
```

```
 1              Objection -- objection -- sorry, just
 2   really quickly, object to the extent that this
 3   requires any conversations that would be privileged.
 4   BY MR. PAUL:
 5        Q    You can answer.
 6        A    I hired him to -- I hired him to come, I
 7   guess, to represent me when I had to go speak to the
 8   district attorney.
 9        Q    Did he come with you to speak to the
10   district attorney?
11        A    No, because I never had to speak to them.
12        Q    So did you hire him to do anything else
13   for you?
14        MS. MIKKILINENI:
15             Objection to the extent that this calls
16   for anything that was privileged.
17        THE WITNESS:
18             No, I -- I hired him to assist me in going
19   to speak to the district attorney when I received
20   the false subpoena.  At the time, I did not know
21   that was the case.  And I hired him to come with me
22   because I believed this document said I needed to
23   go, so I was going to comply with the law, and I
24   just wanted representation to come with me so I can
25   comply with whatever was being requested of me at
```

```
 1   the time.
 2   BY MR. PAUL:
 3       Q    Is it your understanding that the full
 4   scope of the representation that you hired Mr. Ibert
 5   for was to accompany you to the DA's office for a
 6   meeting?
 7       A    Yeah, that was the original reason that I
 8   hired him, yep.
 9       Q    You say "the original."  I'm asking you
10   was there another reason that -- that you hired him
11   for?
12       A    No, I didn't -- I didn't realize he was
13   going to -- well, that's attorney privilege.  No,
14   that's why I hired him to accompany with me --
15   accompany me to go speak to the district attorney.
16   That's why I hired him because I was going to go
17   speak to them because I was told I needed to do so,
18   and I was going to comply, because I thought that's
19   what I had to do.
20       Q    Did you agree on the fee for the
21   representation?
22       MS. MIKKILINENI:
23            Objection.  Again, objecting to anything
24   that requires disclosure of conversations with her
25   attorney that were privileged.
```

```
 1      MR. PAUL:
 2           I think asking about the fee that they --
 3   to negotiate the pay is not privileged.
 4      MS. MIKKILINENI:
 5           Can you reask the question?
 6   BY MR. PAUL:
 7      Q    Did you agree on the fee for the
 8   representation?
 9      A    Yes.
10      Q    What was the fee that you agreed on?
11      A    I believe it -- I believe it was $500.
12      Q    Was that a flat fee for the whole
13   representation?
14      A    It was a -- I think it -- I believe it was
15   the fee, yeah, I believe so.
16      Q    Did you have to pay the whole amount
17   upfront?
18      A    Yes.
19      Q    Did you pay any money to Mr. Ibert?
20      A    No, I believe my mother did.
21      Q    How much did your mother pay him?
22      A    I believe it was $500.
23      Q    Do you know when she paid him?
24      A    The day that I hired him, I believe, the
25   next day or --
```

```
 1  to.
 2         THE WITNESS:
 3             My lawyer.
 4  BY MR. PAUL:
 5     Q    Is it true that you did not want to talk
 6  to the DA's office about your phone call with
 7  Cardell Hayes that night?
 8         MS. MIKKILINENI:
 9             Objection.
10         THE WITNESS:
11             I was not -- I was never asked to.
12  BY MR. PAUL:
13     Q    Would you have been willing to if you had
14  been asked?
15         MS. MIKKILINENI:
16             Objection.
17         THE WITNESS:
18             With a subpoena, yes.
19  BY MR. PAUL:
20     Q    Was there some sort of standardized
21  testing going on at your school on November 29,
22  2016?
23     A    There was training for standardized
24  testing, I believe, yes.
25     Q    What sort of standardizing testing?
```

```
 1      A     It could have been two different tests,
 2   the end of course test or the LEAP test.
 3      Q     Were you scheduled to be in training for
 4   those tests on November 26th -- sorry,
 5   November 29th, 2016?
 6      A     I -- I believe so because that's usually
 7   around the time of the year where we -- we get
 8   training for testing to get prepared to give the
 9   test later on in the school year.
10      Q     Were there actually any standardized tests
11   being given that day, November 29, 2016?
12      A     I don't remember.  It was a possibility it
13   could have been being given in the -- the building
14   because, again depending on which test it is,
15   standardized test is given different times of the
16   year, but I really don't remember, like, what test
17   it was.
18      Q     At that time in November 2016, did you
19   have some sort of specialized certification to give
20   standardized tests to special needs students?
21      A     I was -- I was trained -- I had to do a
22   specific training, along with other teachers, in
23   order to be able to give the standard -- any
24   standardized test to a 504 accommodated student.
25      Q     Did you do that training?
```

```
 1      Q    Do you have any documents reflecting when
 2  the training was?
 3      A    No, I don't.
 4      Q    Did you take any time off work when you
 5  got the document from the DA's Office?
 6      A    Yes, I did.
 7      Q    When did you take off work?
 8      A    When I had to go hire -- go meet my
 9  attorney.
10      Q    When was that?
11      A    The date I went to talk to my lawyer, the
12  day -- I guess the 29th -- 28th -- I don't know the
13  date.
14      Q    So you received the document on the 27th;
15  is that correct?
16      A    It's the 28th then.  I'm assuming.  Yeah,
17  it's within that timeline.  I had to take off in
18  order to talk to him.
19      Q    You took off of work on November 28th?
20      A    Is that a Monday?  I don't know the date,
21  like the day.
22      Q    I'll tell you it is a Monday.
23  November 27, 2016 was a Sunday.
24      A    Okay.  So I believe I talked to him the
25  following day, the 28th, because I remember I had to
```

```
 1      MS. MIKKILINENI:
 2           Objection.
 3      THE WITNESS:
 4           Well, yeah --
 5      MS. MIKKILINENI:
 6           There's an assumption built into that
 7  question that she did not -- that she -- she did not
 8  say.
 9      THE WITNESS:
10           I mean, no, I wouldn't.  And it was a
11  short span time -- a period of time, so I wouldn't
12  make plans to leave, I don't think.  I wouldn't make
13  plans to leave.  Not at my -- yeah.
14  BY MR. PAUL:
15      Q    You had no plans to leave anyways?
16      A    Yeah, yeah.  No, so I wouldn't have
17  left -- I wouldn't have left until it was resolved.
18  Even if I did have plans, I wouldn't have.
19      Q    Was there something about the document
20  that made you feel like you were not free to travel
21  or leave the state before the date --
22      MS. MIKKILINENI:
23           Objection.  You haven't -- you haven't
24  built a foundation for the question.
25      MR. PAUL:
```

```
 1            Thank you.
 2       MS. MIKKILINENI:
 3            And, also, object to the extent that this
 4  calls for testifying about any privileged
 5  conversations that Ms. LaCroix had.
 6       THE WITNESS:
 7            So when I received the first document, did
 8  I feel that I could leave the state if I wanted to?
 9  No, because I received it, like, on the 20 -- like
10  within -- everything happened within, I guess,
11  three-day span, so of course when something like
12  that was given to me, I -- I wouldn't have left, and
13  I don't think I would have permission if I was
14  supposed to comply and was going to comply with the
15  request to go talk to the district attorney.  So I
16  wouldn't have left out of -- I wouldn't have.
17  BY MR. PAUL:
18       Q    So you're saying --
19       A    And I --
20       Q    -- you believe -- you believe when you
21  received that document, that you had to come to the
22  DA's office on November 29th at noon, correct?
23       A    Yes.
24       Q    Anything in that document that made you
25  feel like you were not at liberty to travel or leave
```

```
 1  before that time?
 2       MS. MIKKILINENI:
 3            Objection.  That's ambiguous.
 4       THE WITNESS:
 5            Yeah, because it said it was from the
 6  district attorney, that I had to -- when I think of
 7  a subpoena, my assumption is that you have to comply
 8  because that's the law.  So, of course, I wouldn't
 9  have.  If I thought I could have the ability to
10  travel, I couldn't, not with this document that I
11  needed to go speak to the district attorney.
12  BY MR. PAUL:
13       Q    Why could you not have traveled at some
14  time before your appearance at the DA's office?
15       A    Well, for one, there wasn't enough time
16  to, I guess, go out of town, which I didn't have
17  plans to do anyway, but anything, I guess, would put
18  me at risk of missing this requirement, I wouldn't
19  have taken that risk because I would want to comply
20  with the law.  I wouldn't have, like, purposely
21  tried to, like, miss it because I thought that --
22       MS. MIKKILINENI:
23            Your audio went out.  Bruce?
24       MR. PAUL:
25            Ms. LaCroix, I think your audio is out.
```

```
 1   BY MR. PAUL:
 2       Q    So you didn't say that he was a plaintiff?
 3       A    No.  I don't think so, no.
 4       Q    Ms. LaCroix, what do you want as a result
 5   of this lawsuit?
 6       A    Just want some form of, like, change,
 7   first of all, because I don't want anybody to feel
 8   the way I felt when I received this document.  Just
 9   at first knowing that it was -- I didn't know it was
10   illegal at the time that I did receive the subpoena.
11   I was nervous, I was anxious, I was afraid.
12            I didn't really know what was going on, I
13   just -- like, I had no real control over it.  But
14   then to find out that it wasn't, I guess, real, I
15   don't want -- it was, like, the feeling that I had
16   was unlike -- it wasn't necessary, like it really
17   wasn't necessary.  Like, it just made me really
18   upset, nervous, anxious.  Like, I was scared because
19   of, like, what could happen at my job, what could
20   happen in front of my son.
21            So I don't want anybody else to ever feel
22   that way, and I want some form of change to occur on
23   how people are given -- like witnesses are treated,
24   and how, I guess, they are -- I guess how they're
25   being asked or requested to, I guess, participate
```

```
 1              Objection.  I'm sorry.  I'm going to
 2   object to this because it calls for a legal
 3   conclusion.
 4        THE WITNESS:
 5              How?  Like they -- the individuals who
 6   participated and knew that it was wrong, that it was
 7   illegal to do what they were doing, so they need to
 8   be -- there needs to be some type of, I guess,
 9   result in that because when people -- when people --
10   when we do wrong things and when it comes to the
11   law, like the subpoena says, like I was afraid I
12   could face, like, jail time or be fined from a false
13   document that I was given, and that's not right.
14              And the people who would give out these
15   fake subpoenas, they knowingly knew that it wasn't
16   real, so they should have to answer for that because
17   not -- it wasn't -- not just in this case, over
18   time, because I'm going to assume that this
19   wasn't -- I'm not the first person to receive
20   something like this.
21   BY MR. PAUL:
22        Q    Do you think they should have to pay you
23   money?
24        MS. MIKKILINENI:
25              Objection.
```