# EXHIBIT B

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF LOUISIANA

 3
       * * * * * * * * * * * * *
 4
      RENATA SINGLETON,
 5    MARC MITCHELL,
      LAZONIA BAHAM,
 6    JANE DOE,
      TIFFANY LACROIX,
 7    FAYONA BAILEY,
      JOHN ROE, and
 8    SILENCE IS VIOLENCE,
                                    CASE NO.
 9            Plaintiffs,
                                    2:17-cv-10721-JTM-JVM
10    v.
                              JUDGE JANE TRICHE MILAZZO
11    LEON CANNIZZARO, et al.,
                              MAG. JANIS VAN MEERVELD
12            Defendant.

13    * * * * * * * * * * * * *

14

15       VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF

16             LAURA CANNIZZARO RODRIGUE

17             Location of witness:

18                 law offices of

19      Stanley Reuter Ross Thornton & Alford, LLC

20          909 Poydras Street, Suite 2500

21            New Orleans LA  70112

22          Friday, September 25, 2020

23

24    Reported by:  DEBRA AMOS ISBELL, CCR,RDR,CRR

25    Job No: 183488
```

```
 1

 2

 3

 4              September 25, 2020

 5                 9:08 a.m.

 6

 7

 8

 9

10   Videotaped Video Conference Deposition of

11   LAURA CANNIZZARO RODRIGUE, with the

12   witness located at the law offices of

13   Stanley Reuter Ross Thornton & Alford, LLC,

14   909 Poydras Street, Suite 2500, New Orleans,

15   Louisiana, before Debra Amos Isbell,

16   a Registered Professional Reporter,

17   Registered Diplomate Reporter,

18   Certified Realtime Reporter, and

19   Louisiana Certified Court Reporter.

20

21

22

23

24

25
```

1           A P P E A R A N C E S

2        (ALL APPEARANCES BY VIDEO CONFERENCE)

3

4    Civil Rights Corps

5    Attorneys for Plaintiffs

6    1601 Connecticut Avenue NW

7    Washington, DC  20009

8

9        BY:  TARA MIKKILINENI, ESQUIRE

10            LAURA ARANDES, ESQUIRE

11            SAVANNAH BAKER, ESQUIRE

12            KATIE CHAMBLEE-RYAN, ESQUIRE

13

14

15

16   Venable

17   Attorneys for Plaintiffs

18   600 Massachusetts Avenue NW

19   Washington, DC  20001

20       BY:  GERALD SACHS, ESQUIRE

21

22

23

24

25

1   APPEARANCES (Continued)

2

3   Venable

4   Attorneys for Plaintiffs

5   750 East Pratt Street

6   Baltimore, MD  21202

7

8       BY:  D'SEAN L. WILLIAMS-BROWN, ESQUIRE

9

10

11   ACLU

12   Attorneys for Plaintiffs

13   125 Broad Street

14   New York, NY  10004

15

16       BY:  MARIANA KOVEL, ESQUIRE

17

18   ACLU of Louisiana

19   Attorneys for Plaintiffs

20   1340 Poydras Street

21   New Orleans, LA  70112

22

23       BY:  BRUCE HAMILTON, ESQUIRE

24

25

```
 1   APPEARANCES (Continued)

 2

 3   Stanley, Reuter, Ross, Thornton & Alford

 4   Attorneys for LAURA CANNIZZARO RODRIGUE

 5   909 Poydras Street

 6   New Orleans, LA  70112

 7

 8        BY:  MATTHEW PAUL, ESQUIRE

 9

10

11   Office of the District Attorney, Parish of Orleans

12   Attorneys for OPDA

13   619 South White Street

14   New Orleans, LA  70119

15        BY:  ROBERT FREEMAN, ESQUIRE

16        BY:  DONNA ANDRIEU, ESQUIRE

17

18

19

20

21   Court Reporter:

22        DEBRA AMOS ISBELL, CCR,RDR,CRR

23

24   Videographer:

25        MARSHALL FOX
```

1                     I N D E X

2   DEPOSITION OF LAURA CANNIZZARO RODRIGUE, 9/25/2020

3

4                   EXAMINATION INDEX

5        BY MR. SACHS . . . . . . . . . . . . . . . . 11

6        BY MR. FREEMAN . . . . . . . . . . . . . . .228

7        BY MR. SACHS . . . . . . . . . . . . . . . .230

8

9

10                    EXHIBIT INDEX

11   Plaintiffs'

12   Exhibit 1   LETTER TO LOUISIANA ATTORNEY         24

13               DISCIPLINARY COUNSEL FROM THOMAS

14               BARBERA, 9/15/2017, WITH ATTACHMENTS

15               - INDEF01110-01169

16   Exhibit 2   ACKNOWLEDGMENT OF EMPLOYEE POLICY &   41

17               PROCEDURES MANUAL, 8/3/2009 -

18               OPDA38244

19   Exhibit 3   DA SUBPOENA TO TIFFANY LACROIX,       65

20               11/29/2016 - OPDA003509

21   Exhibit 4   DA SUBPOENA TO ANTHONY WILLIAMS,      84

22               11/28/2016 - PLAINTIFFS-111655

23   Exhibit 5   DA SUBPOENA TO JOSH HORN, 7/10/2014  103

24               - OPDA00206

25

```
 1   Exhibit 6   MOTION AND ORDER FOR MATERIAL      112

 2               WITNESS BOND FOR ROY MAYER

 3               - OPDA00563-00564

 4   Exhibit 7   MOTION AND ORDER FOR MATERIAL      117

 5               WITNESS BOND FOR CHAMPAGNE SUTTON

 6               - OPDA00581-00582

 7   Exhibit 8   MOTION AND ORDER FOR MATERIAL      127

 8               WITNESS BOND FOR RUSSELL HARRIS

 9               - OPDA00579-580

10   Exhibit 9   MOTION AND ORDER FOR MATERIAL      133

11               WITNESS BOND FOR RHONDA GAIL KIRK

12               - OPDA00576-578

13   Exhibit 10  TRANSCRIPT IN STATE OF LOUISIANA   171

14               VS. ALIREZA SADEGHI, 3/17/2017

15               - PLAINTIFFS-11157-11224

16   Exhibit 11  TRANSCRIPT EXCERPT IN STATE OF     173

17               LOUISIANA VS. ALIREZA SADEGHI,

18               3/21/2017 - PLAINTIFFS-10997-11062

19   Exhibit 12  TRANSCRIPT IN STATE OF LOUISIANA   175

20               VERSUS ALIREZA SADEGHI, 3/21/2017

21               - OPDA-INT004743-004765

22

23

24

25
```

1    okay with you.  Can you hold out for a little bit?

2              MR. PAUL:  Okay.

3        Q.    So I'm not trying to confuse you.  But for

4    purposes of this deposition, when I reference "fake

5    subpoenas," is it acceptable -- or can you agree that

6    that refers to what's known as DA subpoenas or

7    DA notices?

8        A.    Sure.

9        Q.    Did you ever issue any fake subpoenas?

10             MR. PAUL:  Object to the form of the

11   question.

12       A.    Yes.  The ones -- the notices that you're

13   talking about, yes.

14       Q.    Do you recall how many fake subpoenas you

15   may have issued?

16       A.    I don't know.  I don't recall because -- I

17   guess when you say "issued," some of them would have

18   been given to my investigator to bring to a witness to

19   speak to them.  But the form was also used to give to

20   victims or witnesses who came to meet with us.

21             Like, for instance, typically we would -- my

22   practice typically would be when I first got a file, I

23   would try to call the person, reach out to them, if

24   you had a phone number.  You know, a lot of times the

25   witnesses were not willing to give a phone number to

1  the police officers, so you may not have a number.

2          We would ask them to come meet, if they

3  would be interested in meeting with us.

4          If they did, a lot of times they would say:

5  Can I have documentation to show to work that I have

6  been here?

7          So that form was used for that on many

8  occasions as well.  I would print one out, give it to

9  the witness, sign my name, and say:  Please have your

10  office call if they don't believe that you were here.

11  In other words, just to verify to their workplace.

12          Sometimes we even used them as a trial

13  notice to the witness.  In other words, the witness

14  might say:  When is the trial date?

15          I would print one out, write the date on it

16  so that they would know what day to come to trial as

17  sort of a reminder.

18     Q.   And you would print these documents out, the

19  fake subpoenas, from a computer.  Was this your

20  computer or the general office computer?  What

21  computer was this that you were getting the fake

22  subpoenas from?

23     A.   It would be in the office.  I can't say that

24  it was one specific office because we would switch

25  offices.  Typically we would switch offices depending

1    on sections because all the files, which would have

2    been hundreds of them, were usually -- it was too much

3    of a pain to move the files from office to office, so

4    you would just move your body to a different office.

5           So whatever computer was there, typically I

6    would be able to find the form on that computer?

7        Q.    Was this fake subpoena stored on desktop

8    computers or was it stored sort of on an internal

9    shared drive where everyone had access to it?

10       A.    I'm not aware of an internal shared drive.

11   But in full disclosure, I'm not very savvy with that.

12   So even defining that would be difficult for me.

13          But for me personally, I'm a desktop person.

14   I would just save my icons that I needed on a desktop

15   computer, and then I would just click the icon for the

16   subpoena and print it up.

17       Q.    So is it accurate to state that you could

18   find this DA's notice, fake subpoena, on any desktop

19   you went to within the office, generally speaking?

20       A.    If I was at that desktop, yes.  I can't

21   speak for other people.  In other words, some people

22   were much -- you know, would maybe have their own USB

23   drive with forms on it that they would carry from

24   computer to computer, something like that.  But for me

25   personally, I was able to find it on a computer, a

Page 61

1    desktop.

2         Q.    You said that you printed out this fake

3    subpoena and then would fill it out handwritten; is

4    that correct?

5         A.    Correct, yes.  I would fill in the blanks,

6    yes.

7         Q.    Where did this template or document that you

8    would print from, where did that come from, do you

9    know?

10        A.    The actual form?

11        Q.    Exactly.

12        A.    Okay.  I don't recall how it was

13   distributed.  I would assume at some point it had to

14   have been emailed.  I don't know.  I can't recall

15   that.

16        Q.    Do you know who created this DA notice/fake

17   subpoena?

18              MR. PAUL:  Object to the form.

19        A.    I do not.

20        Q.    Do you have any understanding or knowledge

21   of who created the fake subpoena?

22              MR. PAUL:  Object to the form of the

23   question.

24        A.    You mean like since the litigation, what

25   have I been told?  Or at that time period?

Page 62

1      Q.     Either.

2      A.     I would have had no knowledge during the

3   time because it would not have been sort of on my

4   radar as odd.  It was the same type of form we used in

5   Jefferson Parish, it was the same type of form when I

6   got to the DA's office in New Orleans.  It was just

7   like where-is-that-form-that-we-use type of thing.

8          So I don't even recall people -- or anybody

9   saying:  Oh, here's this new form we created.  It

10  doesn't register in my memory in that way.  I clearly

11  was using the new form.  I mean I've seen that.  But I

12  don't have any recollection of any creation of a form

13  or announcement of a new form or anything.

14     Q.     You mentioned that you may have come into

15  new information since this litigation.  What would

16  that have been, the new information that indicates who

17  created this form?

18     A.     I cannot recall when -- I really don't even

19  know if I recall who, who we talked about.  But

20  somebody had said that Jim O'Hern, who was an

21  investigator at the office, may have been the one who

22  typed it up or something of that nature.

23     Q.     I'm sorry.  Who was that again?

24     A.     Jim O'Hern.

25     Q.     And who is Jim O'Hern?

Page 63

1      A.    He was an investigator.

2      Q.    And you believe that it was Jim O'Hern who

3   made this document?

4      A.    No.  I don't believe that -- I believe, in

5   all the talk and the rumblings of all this since then,

6   during the litigation, since it's been pending --

7   that's what I recall.  I don't know if that's correct

8   or not.  I have no idea.

9      Q.    If this fake subpoena was saved on a

10  desktop, is it possible that there are different

11  versions of it?

12     A.    I don't know.  I don't even know if it can

13  be amended or -- I don't know what the word is.  I

14  have no idea.  All I have seen is what I used.

15     Q.    And you mentioned that in Jefferson Parish

16  you used something similar; is that correct?

17     A.    Correct.

18     Q.    Was it a fake subpoena as well?

19           MR. FREEMAN:  Object to the form.

20     A.    It was a form issued by the DA's office to

21  request witnesses to come in and meet with us at the

22  DA's office.  I don't know what the title of it was.

23  I don't have recollection of that.

24           MR. SACHS:  Let me just do one quick

25  exhibit, and then we can take a break, Mr. Paul.  I

```
1   that correct, Ms. Isbell?

2          COURT REPORTER:  (Nodding head

3   affirmatively.)

4          (PLAINTIFFS' EXHIBIT 3, DA SUBPOENA TO

5           TIFFANY LACROIX, 11/29/2016 - OPDA003509,

6           WAS MARKED FOR IDENTIFICATION.)

7      Q.   Do you recognize this document,

8   Ms. Rodrigue?

9      A.   Yes, I do.

10     Q.   And is that your handwriting on this

11  exhibit, Exhibit 3?

12     A.   Yes, it is.

13     Q.   What would you describe Exhibit 3 as?

14     A.   A DA subpoena.

15     Q.   And you would describe it as a DA subpoena

16  because at the very top of it, it says "Subpoena."  Is

17  that correct?

18         MR. PAUL:  Object to the form.

19     A.   I don't know if it's because of the top of

20  it.  But that's, I guess, what I would refer to it as.

21  I can't say whether subconscious it's because that's

22  what's written there or not.  But yes, that's what I

23  would refer to it as.

24     Q.   Does Exhibit 3 state "Subpoena" at the top?

25     A.   Yes, it does.
```

```
 1      Q.    Does Exhibit 3 also state that:

 2            "A fine and imprisonment may

 3             be imposed for failure to obey

 4             this notice"?

 5      A.    Yes, it does.

 6      Q.    Does Exhibit 3 on the left-hand side also

 7   state:

 8            "You are hereby notified

 9             pursuant to LSA-CCRP, Article

10             66, to appear before the

11             District Attorney for the

12             Parish of Orleans to testify to

13             the truth according to your

14             knowledge in such matters as

15             may be required of you"?

16      A.    Yes, it does.

17      Q.    Do you know what Article 66 is?

18      A.    I did not at the time, no.

19      Q.    At the time you issued what is Exhibit 3,

20   you did not know what Article 66 was?

21      A.    No.

22      Q.    Just for clarity, no, you did not know --

23   yes, you did not know what it is?

24      A.    I did not know what it was at the time I

25   issued that.
```

1    Q.    At the time you issued this, was it your
2    understanding that a fine or imprisonment could be
3    imposed for lack of obeying specifically just this
4    fake subpoena?
5    A.    I would say it was not my understanding that
6    that would have happened.  I guess to clarify -- I
7    don't know if it's the way you phrased the question or
8    me trying to answer it.  To the best of -- what I
9    believe you're asking is -- I don't know that I would
10   have even read the fine print for the Article 66 or
11   just seen the form and knew what the form was in terms
12   of how we utilized it -- or how I utilized it at the
13   office.  So I would not have believed that this form
14   would have resulted in imprisonment in and of itself
15   or could have.
16   Q.    So to be clear, on the top of document
17   Plaintiffs' Exhibit 3 where it states "A fine and
18   imprisonment may be imposed for failure to obey this
19   notice," that's not an accurate statement?
20   A.    Correct.
21   Q.    And to the best of your knowledge, this
22   document is not providing notice pursuant to Article
23   66; is that correct?
24   A.    To the best of my knowledge now, that's what
25   I understand, correct.

1    through the Sheriff's Office or through CourtNotify.

2    And I have also used this form to give to a victim or

3    witness who was in my office to sort of remind them of

4    the upcoming trial date.

5        Q.    When you sought the issuance of a trial

6    subpoena, you did that as an officer of the court; is

7    that correct?

8        A.    When I used this form to remind them or the

9    official like through CourtNotify?

10       Q.    When you sought the issuance of a

11   CourtNotify subpoena, you did that as an officer of

12   the court; is that correct?

13       A.    Correct.

14       Q.    As a member of the Louisiana Bar, you are

15   deemed an officer of the court; is that correct?

16       A.    Correct.

17       Q.    When you provided this subpoena to the

18   investigator, this subpoena being Exhibit 3, to an

19   investigator to provide to a victim or a witness of

20   crime, you did that as an officer of the court; is

21   that correct?

22            MR. FREEMAN:  Object to the form.

23       A.    Correct.  Well, I mean, I guess, it's not a

24   document that's filed into the court record.  I guess

25   I would say I did it as a representative of the DA's

1    office and a licensed member of the bar, yes.

2        Q.    Is it accurate where it states on Exhibit 3,

3    the fake subpoena, that this is a process of the

4    court -- it is effectively a duplicate of process of

5    court?  If you look at where it states "Return of

6    Personal Service," in open quotes it states:

7              "I received the process of

8               court of which this is a

9               duplicate."  Close quote.

10             Is that an accurate statement?

11       A.    Not -- no, I would say no in terms of it's

12   not the court.

13       Q.    This Exhibit 3, this fake subpoena, requests

14   that Tiffany Lacroix appear at 619 South White Street;

15   is that correct?

16       A.    Yes.

17       Q.    What is 619 South White Street?

18       A.    The District Attorney's Office.

19       Q.    And why was Ms. Lacroix requested through

20   this fake subpoena to appear there at the District

21   Attorney's Office?

22       A.    To the best of my recollection, this would

23   have been days before the jury trial was set to begin.

24   Ms. Lacroix, along with at least two other

25   gentlemen -- I don't remember who else -- had done

1   interviews with Sports Illustrated and another media

2   outlet, I cannot recall who.  It might have been ESPN.

3   I can't recall.

4            Through her interview with Sports

5   Illustrated, we learned that the defendant in the

6   case, his first phone call was made to her on the

7   scene of the crime after he had shot the victim.  So

8   at that time we did not know whether she had

9   information relevant to the case.  She had never told

10  anybody that, the police or anybody else for that

11  matter.

12           So we were hoping to have her speak with us

13  the same way she had spoken with the media outlets

14  just to see what the information was.  Really just to

15  make sure that there was no -- no stone left unturned

16  in preparation for the trial.  And this would have

17  been days before.

18       Q.    And document 3 -- or Exhibit 3, excuse me --

19  this fake subpoena, how was this provided to

20  Ms. Lacroix, do you recall?

21       A.    I believe it was given to an investigator to

22  bring.  That's typically how it would have gone.  If

23  we had an address, the investigator would bring it to

24  the person's home.

25       Q.    And do you recall who that investigator was

1              So it was very crucial evidence, in our

2    opinion, that she shared with the world but would not

3    speak with us.  And we were making sure that we made

4    every effort to speak to every potential witness who

5    had evidence in the case out of our duty to our

6    victims, as I hope I have done in every case.

7        Q.    And so in order to speak with Ms. Lacroix,

8    you authorized the issuance and the service of this

9    fake subpoena on her; is that accurate?

10       A.    Right.  In order to make contact with her,

11   yes.  I sent an investigator to see if she'd be

12   willing to talk to us.

13       Q.    And did you issue a trial subpoena to

14   Ms. Lacroix?

15       A.    The judge did.  We went into court.  She had

16   an attorney file a motion to quash.  At that point it

17   was obvious she was never going to speak to us.  We

18   would just, I guess, find out at the moment she

19   testified what information she had if she became a

20   witness.  And her attorney came in.  Then we asked the

21   judge to issue a trial subpoena in the event that she

22   would be needed to testify.  Her attorney refused to

23   accept service for her, at which point, to the best of

24   my recollection, the judge asked him to provide an

25   address and --

1   Mr. Williams, to the best of your knowledge?

2       A.    It would have -- I mean not that I have

3   independent recollection of this particular one, but I

4   would assume it was the same.  This would all have

5   been -- I believe the other one would have been the

6   same day or so.  So I would assume it's the same

7   manner because, to the best of my recollection, this

8   was another gentleman who had participated in an

9   interview with one of the national media outlets.  And

10  that's when we learned of him, and that's why we made

11  an attempt to speak with him.

12      Q.    And so your attempt to speak with

13  Mr. Williams was to gain information from him related

14  to the investigation; is that accurate?

15      A.    Correct.  I mean he -- I do not recall

16  exactly.  I believe he may have been a barber.  I

17  believe that was one of the people -- and I'm

18  recalling this from the testimony from trial, but it's

19  been quite a while.  My understanding is he had -- I

20  don't want to misstate.  It mentions something that

21  was relevant to the character of the defendant, and I

22  can't recall if he mentioned also that he actually had

23  direct knowledge to some extent of the actual

24  incident.  And I don't remember who he said he had

25  spoken to or something of that nature.

1    really did not have any information, direct

2    information of what happened out there, that it was

3    all sort of word of mouth.  He told me that basically

4    he had done the interview to try to help a friend.

5           And I explained to him that that certainly

6    made sense and I certainly understood his perspective

7    and that I understood what a difficult position he was

8    in and that I knew that it was tough for him to see

9    his friend go through this.  We actually talked a

10   little bit about each of our backgrounds, where we

11   came from, those sorts of things.  And it was a very

12   pleasant conversation.

13       Q.    How did you come about knowing to issue

14   these fake subpoenas, Exhibits 3 and 4, to victims or

15   witnesses?

16       A.    In Jefferson Parish it was pretty routine,

17   you know, when I started there at the DA's office.  I

18   had clerked there every summer in law school.  And I

19   then was hired there after being admitted to the bar.

20   And that's sort of -- let me say this:  You were

21   required to speak to your victims and witnesses.  And

22   you had to really show that you made an effort to do

23   that in preparation for trial, you know.  We were

24   not -- you couldn't just throw somebody on the stand

25   and hope for the best, you know.  You really had to

1  put in the work and try to learn more about the case

2  and in other instances turn over evidence that was

3  exculpatory before trial.  You're moving so fast in

4  the DA's office and your caseload is so big, that

5  often you're calling "ready for trial" and you're

6  hoping that you're as prepared as possible.  But

7  really it was not -- you did not want to put a witness

8  on the stand without having made any effort to speak

9  to them at all.  And you certainly want to make sure

10  you have them.

11      Q.    And so I understand you used similar fake

12  subpoenas in Jefferson Parish.  Specifically in OPDA,

13  this is not -- Exhibits 3 and 4 are not replicas of

14  anything from Jefferson Parish, are they?

15      A.    I don't recall what the form looked like

16  there.  I really don't.  I mean it was a long time

17  ago.  I just know that that was the form that we would

18  use to go meet or to speak with witnesses, to have

19  them come meet with us.  And when I got to New

20  Orleans, it wasn't like:  Oh, we have this special

21  form here.  It was just like:  Oh, that's the form we

22  used, the same one I used in the other office when we

23  tried to meet with people.  And it was the same

24  procedure in Jefferson Parish, too.  We'd have an

25  investigator go deliver the form and have the witness

1  or victim come meet with us.

2      Q.   Well, let's be clear about a few things as

3  we talk about this.  You did not use the Jefferson

4  Parish form in Orleans Parish; is that correct?

5      A.   Well, no.  I don't believe Jefferson Parish

6  would have allowed me to do that.

7      Q.   So let's talk about the Orleans Parish form,

8  documents 3 and 4.

9      A.   Okay.

10      Q.   Where did you first get these forms from,

11  documents 3 and 4, the template for the fake

12  subpoenas?  Where did you first get these forms from?

13      A.   When I started, I don't believe the form

14  looked like this in New Orleans.  I believe there were

15  different versions of the form.  I don't know at what

16  point the form was revised or amended.  I don't

17  recall.  And I don't know when this form was

18  circulated.  I can't recall that.

19      Q.   How many versions --

20      A.   I'm sure somebody if I asked --

21      Q.   Oh, go ahead.  I'm sorry.

22      A.   I said I'm sure if I asked somebody can

23  someone email me a copy of whatever we're using,

24  that's likely how it happened.

25      Q.   Who in OPDA would you have emailed to get

1  this form or the most recent version when you were

2  there?

3      A.    Probably whoever I was -- either my junior,

4  my senior, or just another trial ADA who would have

5  been in the office next to me at the time.  I probably

6  would have screamed across the hall and said, you

7  know:  Joe, do you have a DA subpoena, have you

8  got one of those subpoenas over there or the form -- I

9  don't know what we were calling them -- and they would

10 have just emailed it so that I would have had a copy

11 on my computer.

12     Q.    So is it accurate to state that the use of

13 these fake subpoenas was pretty widespread in OPDA?

14     A.    I don't know if it was widespread.  I just

15 think that everybody knew it was a tool you had in

16 your toolbox in order to try to speak to somebody.  I

17 mean I don't think that anybody thought this was

18 waving a magic wand that was going to get people to

19 come in and cooperate.  That just didn't happen no

20 matter what.  I mean many witnesses ignored official

21 court subpoenas.  They ignored court orders.  I mean I

22 don't think anybody thought that this had the weight

23 to do anything.  It was just another tool in an effort

24 to do our job basically.

25     Q.    So is it an accurate statement to say that

1  community is you want to talk to victims and witnesses

2  before trial; is that accurate?

3      A.    Correct.

4      Q.    And many times you've done this through

5  issuing the DA notice or subpoena, fake subpoena; is

6  that accurate?

7            MR. PAUL:  Object to the form.

8      A.    Correct.

9      Q.    And part of issuing these DA notices and

10  subpoenas is so that you can speak to a witness or a

11  victim ahead of trial; is that a fair statement?

12      A.    That along with -- like I have given

13  examples in the past.  It's a form we've used to

14  document for work or for a future trial date.

15      Q.    Let me just ask you:  As an attorney, what

16  you write and what you say has consequences; is that

17  correct?

18      A.    Sure, yes.

19      Q.    And when you submit things into court, you

20  take time and effort to review them and make sure

21  they're accurate and not misleading; is that correct?

22      A.    Correct.

23      Q.    And when you issued these fake subpoenas to

24  individuals in the community, how would they know that

25  these documents that said they could be jailed carried

1  no consequences and that was just there?

2          MR. FREEMAN:  Objection to the form.  It

3  calls for speculation.

4     A.    Now, I can't speak to what any individual

5  member of the community thought about the form.  I can

6  say that it was important, in my opinion, for the form

7  at least to look as if it came from the DA's office.

8  And that went back to issues we had had for many

9  years -- and I don't even know if they still exist --

10  where we had members of the defense bar, and mostly

11  from the public defender's office, going to a victim's

12  or witness' house if they could get a hold of an

13  unredacted police report -- which they were doing

14  sometimes -- presenting themselves as representing the

15  State under the guise that technically the Public

16  Defender's Office is funded by the State, writing

17  written statements from the victims or witnesses, and

18  then having that person sign it, and then bringing

19  those statements to court to cross-examine the witness

20  or victim with.  Many times on the stand the victim or

21  witness would say:  I thought you were the DA's

22  office.

23          So that was an issue we were having trying

24  to navigate when victims -- who they believed was

25  coming to speak to them.  And in some cases they were

1  afraid to speak to members of the defense bar if it

2  involved possible retaliation or even them knowing

3  where they lived.

4         So, you know, there were reasons that the

5  form -- in my opinion, we wanted to be sure they knew

6  where it was coming.  As I said before, in hindsight,

7  it should not have had the word "subpoena" on the top

8  of it.

9     Q.    Probably shouldn't have had the statement

10  about consequences of being fined or imprisoned as

11  well; correct?

12    A.    Correct.

13    Q.    Probably shouldn't have had the statement

14  that it was issued pursuant to Article 66; correct?

15    A.    Correct, to the extent anybody was looking

16  that up.  But yes.

17    Q.    You mentioned the Public Defender and some

18  of this activity of tricking witnesses or victims.  Do

19  you have any specific examples of that occurring?

20    A.    I mean I don't have the cases now, but I'm

21  sure I could get them.  I mean it's testimony from the

22  stand.  It was exhibits introduced in trial.  I can

23  specifically remember being in Section G for one where

24  the woman testified that it was actually her sister

25  who they had sign the statement, it wasn't even her,

1   issues and that sort of stuff or how to get guidance

2   on it.  And that would usually come from, like I said,

3   any of the supervisors.  There was really -- you had

4   your Deputy Chief, your Chief of Trials, your chiefs

5   of any major divisions in the office, the First

6   Assistant, and then the DA.  And I have to say most of

7   them were there all day every day.

8        Q.   To your knowledge, was Graymond Martin aware

9   of OPDA's use of the fake subpoenas?

10       A.   I would assume so.  I mean I can't speak for

11  him, but I would assume so.  He's very hands-on in

12  terms of he's there, he's present.  He was always

13  there if we needed him.

14       Q.   Did you ever speak with Mr. Martin about

15  fake subpoenas?

16       A.   No, no.

17       Q.   To your knowledge --

18       A.   Like I said -- I apologize.  There was

19  nothing else.

20       Q.   To your knowledge, was David Pipes aware of

21  OPDA's use of fake subpoenas?

22       A.   I would assume so, yes.

23       Q.   To your knowledge, was Jason Napoli aware of

24  OPDA's use of fake subpoenas?

25       A.   You know, he wasn't a supervisor, to my