# EXHIBIT A

1                UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF LOUISIANA

3

  * * * * * * * * * * * *

4

  RENATA SINGLETON,
5 MARC MITCHELL,
  LAZONIA BAHAM,
6 JANE DOE,
  TIFFANY LACROIX,
7 FAYONA BAILEY,
  JOHN ROE, and
8 SILENCE IS VIOLENCE,
                              CASE NO.
9          Plaintiffs,
                          2:17-cv-10721-JTM-JVM
10 v.
                        JUDGE JANE TRICHE MILAZZO
11 LEON CANNIZZARO, et al.,
                          MAG. JANIS VAN MEERVELD
12          Defendant.

13  * * * * * * * * * * * *

14

15      VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF

16             LAURA CANNIZZARO RODRIGUE

17              Location of witness:

18                 law offices of

19      Stanley Reuter Ross Thornton & Alford, LLC

20          909 Poydras Street, Suite 2500

21             New Orleans LA  70112

22          Friday, September 25, 2020

23

24  Reported by:  DEBRA AMOS ISBELL, CCR,RDR,CRR

25  Job No: 183488

1

2

3

4           September 25, 2020

5                9:08 a.m.

6

7

8

9

10   Videotaped Video Conference Deposition of

11   LAURA CANNIZZARO RODRIGUE, with the

12   witness located at the law offices of

13   Stanley Reuter Ross Thornton & Alford, LLC,

14   909 Poydras Street, Suite 2500, New Orleans,

15   Louisiana, before Debra Amos Isbell,

16   a Registered Professional Reporter,

17   Registered Diplomate Reporter,

18   Certified Realtime Reporter, and

19   Louisiana Certified Court Reporter.

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2         (ALL APPEARANCES BY VIDEO CONFERENCE)

 3

 4   Civil Rights Corps

 5   Attorneys for Plaintiffs

 6   1601 Connecticut Avenue NW

 7   Washington, DC  20009

 8

 9      BY:  TARA MIKKILINENI, ESQUIRE

10           LAURA ARANDES, ESQUIRE

11           SAVANNAH BAKER, ESQUIRE

12           KATIE CHAMBLEE-RYAN, ESQUIRE

13

14

15

16   Venable

17   Attorneys for Plaintiffs

18   600 Massachusetts Avenue NW

19   Washington, DC  20001

20      BY:  GERALD SACHS, ESQUIRE

21

22

23

24

25
```

```
 1    APPEARANCES (Continued)

 2

 3    Venable

 4    Attorneys for Plaintiffs

 5    750 East Pratt Street

 6    Baltimore, MD  21202

 7

 8         BY:  D'SEAN L. WILLIAMS-BROWN, ESQUIRE

 9

10

11    ACLU

12    Attorneys for Plaintiffs

13    125 Broad Street

14    New York, NY  10004

15

16         BY:  MARIANA KOVEL, ESQUIRE

17

18    ACLU of Louisiana

19    Attorneys for Plaintiffs

20    1340 Poydras Street

21    New Orleans, LA  70112

22

23         BY:  BRUCE HAMILTON, ESQUIRE

24

25
```

```
 1   APPEARANCES (Continued)

 2

 3   Stanley, Reuter, Ross, Thornton & Alford

 4   Attorneys for LAURA CANNIZZARO RODRIGUE

 5   909 Poydras Street

 6   New Orleans, LA  70112

 7

 8        BY:   MATTHEW PAUL, ESQUIRE

 9

10

11   Office of the District Attorney, Parish of Orleans

12   Attorneys for OPDA

13   619 South White Street

14   New Orleans, LA  70119

15        BY:  ROBERT FREEMAN, ESQUIRE

16        BY:  DONNA ANDRIEU, ESQUIRE

17

18

19

20

21   Court Reporter:

22        DEBRA AMOS ISBELL, CCR,RDR,CRR

23

24   Videographer:

25        MARSHALL FOX
```

1                     I N D E X

2   DEPOSITION OF LAURA CANNIZZARO RODRIGUE, 9/25/2020

3

4                 EXAMINATION INDEX

5       BY MR. SACHS . . . . . . . . . . . . . . . 11

6       BY MR. FREEMAN . . . . . . . . . . . . . .228

7       BY MR. SACHS . . . . . . . . . . . . . . .230

8

9

10                 EXHIBIT INDEX

11  Plaintiffs'

12  Exhibit 1   LETTER TO LOUISIANA ATTORNEY          24

13              DISCIPLINARY COUNSEL FROM THOMAS

14              BARBERA, 9/15/2017, WITH ATTACHMENTS

15              - INDEF01110-01169

16  Exhibit 2   ACKNOWLEDGMENT OF EMPLOYEE POLICY &   41

17              PROCEDURES MANUAL, 8/3/2009 -

18              OPDA38244

19  Exhibit 3   DA SUBPOENA TO TIFFANY LACROIX,       65

20              11/29/2016 - OPDA003509

21  Exhibit 4   DA SUBPOENA TO ANTHONY WILLIAMS,      84

22              11/28/2016 - PLAINTIFFS-111655

23  Exhibit 5   DA SUBPOENA TO JOSH HORN, 7/10/2014   103

24              - OPDA00206

25

```
 1   Exhibit 6    MOTION AND ORDER FOR MATERIAL        112
 2                WITNESS BOND FOR ROY MAYER
 3                - OPDA00563-00564
 4   Exhibit 7    MOTION AND ORDER FOR MATERIAL        117
 5                WITNESS BOND FOR CHAMPAGNE SUTTON
 6                - OPDA00581-00582
 7   Exhibit 8    MOTION AND ORDER FOR MATERIAL        127
 8                WITNESS BOND FOR RUSSELL HARRIS
 9                - OPDA00579-580
10   Exhibit 9    MOTION AND ORDER FOR MATERIAL        133
11                WITNESS BOND FOR RHONDA GAIL KIRK
12                - OPDA00576-578
13   Exhibit 10   TRANSCRIPT IN STATE OF LOUISIANA     171
14                VS. ALIREZA SADEGHI, 3/17/2017
15                - PLAINTIFFS-11157-11224
16   Exhibit 11   TRANSCRIPT EXCERPT IN STATE OF       173
17                LOUISIANA VS. ALIREZA SADEGHI,
18                3/21/2017 - PLAINTIFFS-10997-11062
19   Exhibit 12   TRANSCRIPT IN STATE OF LOUISIANA     175
20                VERSUS ALIREZA SADEGHI, 3/21/2017
21                - OPDA-INT004743-004765
22
23
24
25
```

1           S T I P U L A T I O N

2

3           It is stipulated and agreed by and between

4    counsel for the parties that the Videotaped Video

5    Conference Deposition of LAURA CANNIZZARO RODRIGUE is

6    hereby taken under the Federal Rules of Civil

7    Procedure, in accordance with law, pursuant to notice;

8

9           That reading and signing by the witness is

10   reserved.

11

12          That all objections, save those as to the

13   form of the questions, are hereby reserved until such

14   time as this deposition, or any part thereof, may be

15   used or sought to be used in evidence.

16

17          That the court reporter may swear in the

18   witness remotely.  The court reporter was DEBRA AMOS

19   ISBELL, Certified Court Reporter in and for the State

20   of Louisiana.

21

22

23

24

25

1    have with Orleans Parish court, but it's paper still.

2    So despite the fact that CourtNotify became

3    electronic, the Clerk's Office there still operates

4    with big paper files where they would just stick a

5    smaller piece of paper for service, they would just

6    tuck it into the file.  So I mean more often than not

7    we never had any idea really what was the outcome.

8         Q.    As an Assistant District Attorney in OPDA,

9    did you have an obligation to inform defense counsel

10   that you had issued a subpoena or requested the

11   issuance of a subpoena through CourtNotify?

12        A.    They could access that system themselves.

13   So they always knew who we requested to be served.

14   And most likely -- we were usually working in unison

15   with them.  They would call to make sure we had served

16   the police officer.  For instance, if it was their

17   motion to suppress evidence, it was their duty to

18   properly serve the police officer to come to court.

19   But more often than not, we would do that for them and

20   put the police officers in the system at the screening

21   process.  But they would sometimes call us just to

22   make sure that we did it for them.

23        Q.    My understanding from your testimony is that

24   the CourtNotify system was essentially public, that

25   defense attorneys and maybe the Court could see it; is

Page 52

1   that accurate?

2      A.   I don't believe it was public.  I mean I

3   know that I had to have a password.  So I'm not sure

4   who from court could access it.  I would assume,

5   because they would be responsible.  Or the Clerk's

6   Office to some extent.

7      Q.   If you wanted to redact or keep a name out

8   of CourtNotify, how would you go about doing that?

9      A.   What I recall was that you would click a

10  button and you would select whether the person was law

11  enforcement or a victim or a witness, if I recall

12  correctly.  And then I think if you listed the

13  person -- if the person was the victim, then they

14  would not appear -- you could not see their address.

15  And I know we're prohibited from identifying rape

16  victims by full name in a Bill of Indictment or

17  Information, depending on what the charge was.  So we

18  tried to ensure that that was not happening.

19     Q.   Would you ever obtain a protective order to

20  ensure the privacy of a victim or witness' name?

21     A.   I guess I'm not sure what you mean.

22  Basically when we indicted -- let's say we indicted an

23  aggravated rape and I was the victim.  The Bill of

24  Indictment would read, you know, who committed the

25  crime of aggravated rape upon L.R.  So that's how we

1  would ensure that the name wasn't released or made

2  public.  And for the most part -- I believe that the

3  press even followed that when they reported on the

4  cases, to the best of my recollection.

5     Q.    You had mentioned something before about

6  conviction rates and sometimes people don't get the

7  convictions they want, and maybe that's because of

8  unfavorable juries or the judges.  Would the lack of

9  obtaining convictions cause you any type of concern

10  about the evidence or the case that you had brought?

11     A.    Well, I guess, you know, certain cases

12  certainly are stronger evidentiarily than other cases.

13  So you went into court knowing -- for instance, if I

14  had a murder trial and the defendant had committed the

15  crime on video and had confessed, you would feel

16  pretty confident in the facts that you were able to

17  present.  If you present a murder trial and there's

18  simply one eyewitness, no physical evidence, then you

19  know it's going to be difficult.  It's going to be

20  difficult to convince a jury to send a man -- in

21  Louisiana it's mandatory life sentences.  So we know

22  the defense attorneys are going to, you know, be

23  extremely -- putting a lot of pressure on those juries

24  to say on the testimony of one witness you're going to

25  send a man to jail for life.  And unfortunately, in

Page 56

1    A.    Yes.

2    Q.    And would they be kept in the case file?

3    A.    They should be, along with all notes that

4    were taken during the actual trial.  We would usually

5    have big legal pads and tear everything out at the end

6    of trial and place it into the case file to be sent to

7    closed files.

8    Q.    Did you have any obligations to disclose any

9    of those conversations to defense attorneys?

10   A.    If the information that the witness gave me

11   contradicted something that the witness had previously

12   said or presented what we call exculpatory evidence,

13   then yes, we would do a disclosure and we would file

14   it into the court record and serve a copy on the

15   defense counsel.

16   Q.    You mentioned that part of what's difficult

17   if you can't get a conviction is looking at the

18   victim's family and telling them you weren't able to

19   get a conviction for them; is that a fair statement?

20   A.    Well, we usually don't have to tell them.

21   They usually will hear the verdict read.

22   Q.    Fair enough.  What happens if the Orleans

23   Parish District Attorney's Office charges the wrong

24   person?  How does that impact the victim?

25         MR. FREEMAN:  Object to the form.

1       Q.    Go ahead and answer.

2       A.    I guess that's two-fold.  You said what

3  happens first.  Well, the case would be dismissed.  I

4  would hope we would then charge the appropriate person

5  if we know who that is.  And if not, that's simply the

6  reality of what will happen.  I mean the case could

7  just end there.  And it does.  I mean that has

8  happened before.  And those are very difficult

9  conversations to have.  But they happen.

10        There are times when murder cases come in to

11  the Screening Division, and we simply don't have

12  enough to indict, and we have to tell the family

13  there's just no case -- we don't have enough to

14  present here.

15       Q.    I'd like to talk a little bit more about

16  some of the issues in the current litigation for which

17  you're being deposed.  As you're aware, this case --

18  one of the issues in this litigation is the use of

19  what's known as fake subpoenas; is that correct?

20       A.    That's how it's been -- that's the catch

21  phrase for them, yes.

22       Q.    And I --

23            MR. PAUL:  Can we take a break?

24            MR. SACHS:  No.  I'd like to ask a couple of

25  questions, and then we can take a break, if that's

Confidential

Page 58

1   okay with you.  Can you hold out for a little bit?

2          MR. PAUL:  Okay.

3      Q.   So I'm not trying to confuse you.  But for

4   purposes of this deposition, when I reference "fake

5   subpoenas," is it acceptable -- or can you agree that

6   that refers to what's known as DA subpoenas or

7   DA notices?

8      A.   Sure.

9      Q.   Did you ever issue any fake subpoenas?

10         MR. PAUL:  Object to the form of the

11  question.

12     A.   Yes.  The ones -- the notices that you're

13  talking about, yes.

14     Q.   Do you recall how many fake subpoenas you

15  may have issued?

16     A.   I don't know.  I don't recall because -- I

17  guess when you say "issued," some of them would have

18  been given to my investigator to bring to a witness to

19  speak to them.  But the form was also used to give to

20  victims or witnesses who came to meet with us.

21         Like, for instance, typically we would -- my

22  practice typically would be when I first got a file, I

23  would try to call the person, reach out to them, if

24  you had a phone number.  You know, a lot of times the

25  witnesses were not willing to give a phone number to

1           When you were at the DA's office, did you

2    ever issue any letters on DA letterhead?  And by

3    "issue" -- let me rephrase that.  Did you ever send

4    any correspondence on DA -- with your signature and

5    the DA insignia on the top?

6       A.    I would think maybe that had occurred.  I

7    can't think of a specific example.  I'm trying to

8    think of any reason -- you know, I think maybe -- I

9    think the Screening Division would probably do that

10   more.  And the reason that's coming to mind is -- the

11   only thing I can think of, for instance, if you had a

12   case maybe involving restitution to a business or

13   something like that, we might send a letter.  I can't

14   think of another example.

15      Q.    And when you sent these letters, was there a

16   template that you used for letters?  I know in my

17   office we have a standard correspondence template that

18   just prepopulates and it's easy to use.  I'm sure

19   Mr. Paul has one as well.  Is that what would occur in

20   your office?

21           MR. FREEMAN:  Objection, vague and ambiguous

22   as to time.

23      A.    I think that the one thing I've sort of, I

24   guess, learned moving from criminal law into civil law

25   is that there is a lot more paperwork going on in

1    civil court.  In criminal court there's not a lot of

2    that.  There's not a lot of letters, correspondence.

3    I mean we don't get the luxury of depositions,

4    obviously -- which is why all we can do is just hope

5    that somebody will come in and talk to us.

6              I don't recall a template.  I do recall that

7    there was like a letterhead.  But I don't recall a

8    template for any particular letter.  Because I can't

9    even remember an instance where I would have sent a

10   letter.  I'm not saying it didn't happen, but I can't

11   recall a time.

12       Q.    Is there a reason why in Ms. Lacroix's case

13   you didn't simply send her a letter on DA letterhead

14   versus a fictitious, made-up document?

15       A.    Well, this was days before trial.  I mean

16   good luck if the mail is coming on a regular cycle.

17   I mean there was no way we would have just sent a

18   letter and hoped it got there in a few days, crossed

19   our fingers, and then headed into a murder trial, you

20   know.  I mean we have certain obligations, in my

21   opinion, to make sure that we have all the evidence

22   that's relevant.  And we also have an obligation to

23   make sure that she doesn't have any exculpatory

24   evidence we need to disclose.  So we have to make

25   these efforts.

1    Q.    Is there a reason why you didn't ask or

2  authorize or instruct your investigator to merely go

3  speak with Ms. Lacroix instead of giving her a

4  fictitious document?

5    A.    Well, every time the investigator would go

6  out, it would be -- certainly, the best case scenario,

7  is if he actually made contact with the person and was

8  able to speak with them.  I mean nine times out of ten

9  that was the best outcome, essentially.  And then he

10  would just report back to us:  So and so -- look,

11  they're not going to cooperate, they cursed me out,

12  whatever with that.  And then we sort of knew at that

13  point this witness is not cooperative.

14           I believe the defense attorney, if I recall

15  the transcript correctly, said that she was at work at

16  the time that this notice was left at her home.  So he

17  certainly would have made an effort to speak to her.

18    Q.    I'd like to show you a different exhibit and

19  talk about -- I believe it's in the same case, the

20  Hayes case.  It's Mr. Williams.  Let me share my

21  screen with you.

22           MR. SACHS:  We'll mark this as Plaintiffs'

23  Exhibit 4.  And it's Bates labeled at the bottom

24  Plaintiffs-11655.

25           (PLAINTIFFS' EXHIBIT 4, DA SUBPOENA TO

1                  ANTHONY WILLIAMS, 11/28/2016 -

2                  PLAINTIFFS-111655, WAS MARKED FOR

3                  IDENTIFICATION.)

4        Q.    Do you recognize this document,

5    Ms. Rodrigue?

6        A.    I recognize that to be my handwriting, yes.

7        Q.    And Exhibit 4, is this what's known as a

8    fake subpoena?

9        A.    Yes.

10       Q.    And why is it your understanding that this

11   is referenced as a fake subpoena?

12       A.    I believe that the media gave it that title,

13   to the best of my knowledge.  But I would assume that

14   it's because -- the theory behind that being it's not

15   a court subpoena, so therefore it's fake.

16       Q.    Is it true that not responding to Exhibit 4

17   here, Mr. Williams would have been put in jail or

18   fined?

19       A.    Not responding to that document would not in

20   and of itself have resulted in that, no.

21       Q.    Is it accurate that this Exhibit Number 4

22   was issued pursuant to Louisiana State Code Article

23   66?

24       A.    I do not believe so, no.

25       Q.    And how was this Exhibit 4 served on

1    this form or the most recent version when you were

2    there?

3        A.    Probably whoever I was -- either my junior,

4    my senior, or just another trial ADA who would have

5    been in the office next to me at the time.  I probably

6    would have screamed across the hall and said, you

7    know:  Joe, do you have a DA subpoena, have you

8    got one of those subpoenas over there or the form -- I

9    don't know what we were calling them -- and they would

10   have just emailed it so that I would have had a copy

11   on my computer.

12       Q.    So is it accurate to state that the use of

13   these fake subpoenas was pretty widespread in OPDA?

14       A.    I don't know if it was widespread.  I just

15   think that everybody knew it was a tool you had in

16   your toolbox in order to try to speak to somebody.  I

17   mean I don't think that anybody thought this was

18   waving a magic wand that was going to get people to

19   come in and cooperate.  That just didn't happen no

20   matter what.  I mean many witnesses ignored official

21   court subpoenas.  They ignored court orders.  I mean I

22   don't think anybody thought that this had the weight

23   to do anything.  It was just another tool in an effort

24   to do our job basically.

25       Q.    So is it an accurate statement to say that

1  it was not secretive within the office, within OPDA,

2  that you were using these fake subpoenas as a tool to

3  obtain witnesses?

4      A.    No, no.  Nobody ever thought it needed to be

5  a secret.  There was no reason to make it a secret.

6      Q.    And so this was fully authorized to use

7  within OPDA, this being Exhibits 3 and 4, this

8  template for a fake subpoena?

9          MR. FREEMAN:  Objection to the form.

10         MR. PAUL:  Object to the form.

11     A.    I can't speak to what was authorized or

12  unauthorized.  But I know this is the form that we

13  had.

14     Q.    You as an attorney, an Assistant District

15  Attorney at the time, would you have ever used

16  something or done something that was not authorized?

17         MR. FREEMAN:  Objection, calls for

18  speculation.

19     Q.    Go ahead and answer.

20     A.    I don't -- you know, you don't go as you're

21  handling God knows how many cases -- it's not like a

22  process where you go:  Am I authorized to do this?  Am

23  I authorized to do this?  I think everybody acts on,

24  you know, doing what they believe is taking the best

25  course of action in each and every case.  And every

1   case is going to call for a different tool that you

2   use.  Every single case presents a different fact

3   scenario.

4       Q.    Let me ask it one more time.  Would you ever

5   issue a subpoena that you were not authorized to

6   issue?

7           MR. FREEMAN:  Objection.  Asked and

8   answered.

9       Q.    Go ahead and answer.

10      A.    No.  I wouldn't have even had -- that would

11  require me to sort of create my own subpoena.  So I

12  would not have done something that I was not

13  authorized to do, to my knowledge.

14      Q.    And I understand you do things to the best

15  of your belief, as you just testified; is that

16  accurate?

17      A.    Well, I think -- I guess we all act in good

18  faith.  And that's how I would describe it, I guess.

19      Q.    Do you have any independent obligation to

20  verify what you're doing is lawful?

21      A.    Well, I think we do that all day every day

22  as attorneys.  I mean I think that you don't sit down

23  and look for some -- you don't get -- a green light

24  doesn't go off with every action.  You ask yourself

25  every day that you conduct yourself am I doing -- is

1  this the right thing?  Am I following the laws, the

2  rules, the procedures, and doing everything to the

3  best of my ability?  Am I representing the victims as

4  I've been sworn to do?  Have I prepared for trial to

5  the best of my abilities?  You know, am I representing

6  the State in an ethical and professional way?

7           You ask yourself those questions all day

8  every day.

9     Q.    And under what authority were these

10 subpoenas, the fake subpoenas, issued?

11    A.    I don't believe there is any official

12 authority.  Like I said, it's a piece of paper that we

13 would have an investigator bring to a person's house

14 in an effort to try to speak to them.  Or that we

15 would use to have them bring to work to verify that

16 they had been in the office or a piece of paper that

17 we would use so that they could remember the trial

18 date, mark it on their calendar, and have sort of

19 something to take home.

20    Q.    Did you ever believe that there was any

21 official authority that specifically gave you

22 authorization to issue these fake subpoenas?

23    A.    No.  I believed it was the same tool that I

24 had been using since I was in Jefferson, Orleans,

25 everywhere.  It was just a tool we used to speak to

1  people.

2      Q.    I've asked you about two DA subpoenas, fake

3  subpoenas, in the Hayes case, Exhibits 3 and 4.  Did

4  you issue any other fake subpoenas in the Hayes case?

5      A.    Not -- I don't recall anything other than

6  that time.  In other words, those newspaper articles

7  hit the press, and that was the first time we had seen

8  this statement from Ms. Lacroix and we had known of

9  Mr. Williams, and I believe there was another man who

10  gave an interview with Mr. Williams, and I don't

11  recall if he got the subpoena or not.  But I just

12  remember there were two males who gave the interviews,

13  one was a barber, and honestly I can't right now

14  remember which one was which.  They might have both

15  been barbers.  I can't remember.

16      Q.    Did anyone raise concern about the use of

17  the fake subpoenas with regard to either Mr. Williams

18  or Ms. Lacroix after they were issued?

19      A.    So Ms. Lacroix's attorney came in, which I

20  think we've discussed, when he came in to file the

21  motion to quash.  Mr. -- I don't recall -- again, one

22  of the gentlemen was called to testify by the defense

23  in their case in chief.  And the defense attorney was

24  John Fuller.  He presented the document, what you're

25  calling the fake subpoena, to the witness on the stand

1    and sort of said:  Didn't they give you this fake

2    document type of thing?

3              And the witness on cross-examination did

4    admit that he was not under any duress, that we had

5    actually had a very nice conversation and sort of

6    shared details about our lives, our personal lives

7    with each other, and that's sort of how the meeting

8    ended.  Nobody was threatened, pressured, nothing of

9    that nature.  And after that I believe Mr. Fuller

10   didn't ask another question about it.

11        Q.    And what happened with -- my understanding

12   is there was a motion to quash in the Tiffany Lacroix

13   case, to quash the fake subpoena; is that accurate?

14        A.    Correct.

15        Q.    And what happened with that motion?  Is my

16   understanding accurate that you withdrew the subpoena?

17   Is that accurate?

18        A.    So what happened is an attorney came in,

19   filed a motion to quash.  I believe that I was -- I

20   think I was in the office when that happened and

21   somebody, whoever -- it was probably the ADA assigned

22   to the section -- called me over, said there's an

23   attorney here who filed a motion to quash in the

24   Cardell Hayes case.

25              I don't even know if I was available at the

1  time, but eventually went over there.  And he filed

2  the motion to quash.  At that point it was obvious she

3  was not going to speak to us.  So I said to withdraw,

4  that we didn't need to speak with her, and that to

5  just serve her for trial so at least she can't

6  basically flee if something that she said becomes

7  relevant, I guess in connection with her Sports

8  Illustrated interview, because that's at that point

9  the only statement I had that she had made.

10          So that was fine.  The judge asked that

11  Mr. Ibert accept service or asked if he would.  He

12  said he would not accept service for her.  The judge

13  asked him to provide her address.  He refused to do

14  that.  And the judge said that she would send a deputy

15  to pick her up from work or something along the

16  lines of:  We can do this the easy way or the hard

17  way.  And then the attorney agreed to provide an

18  address, I believe.

19      Q.    My apologies.  Just give me one moment.

20      A.    Sure.

21      Q.    I believe you testified earlier that you had

22  an obligation to meet or speak with witnesses or

23  victims to ascertain if they had inculpatory or

24  exculpatory evidence; is that accurate?

25      A.    In my practice, yes, I believe.

1      Q.     Why then did you withdraw this DA notice

2    fake subpoena and not meet with Ms. Lacroix?

3      A.     Because I can't force a person to speak to

4    me.  I mean I have no ability to force her to talk to

5    me.  In my practice I should make that effort -- and

6    that's my obligation, in my opinion -- so at least I

7    can go in there and say that I have given my best, I

8    have done everything in my power to go in there as

9    prepared as possible.  But I can't force a victim to

10   meet with me.

11              I mean that's not uncommon.  I have actually

12   tried two rape cases where the victim would not meet

13   with me and recanted on the stand in trial.

14              So it happens.  They don't have to talk to

15   me.  And they can testify however they want.

16     Q.     In your opinion and understanding, would it

17   be acceptable for a lawyer to lie or trick a witness

18   to get them to talk with you if you're an ADA?

19     A.     I would hope that you would not have to lie

20   or trick them.  I think that that would be difficult

21   to do.  You know, in Orleans Parish it's very

22   difficult to tell a little white lie and trick an

23   Orleans Parish witness.  They don't -- it doesn't

24   bother them if you -- in other words, they will get a

25   court order to appear in court and disregard it and

1   not think twice.  It's not -- it doesn't -- they don't

2   have that fear in them as you might expect or think.

3           So it would be difficult to say if I tell a

4   lie to them, they'll come in and just tell me

5   everything about a case.

6       Q.    And if someone doesn't want to talk to you

7   or they don't want to -- let's just assume someone

8   doesn't want to talk to you and they ignore a court

9   subpoena, as you mentioned just now.  What would

10  happen if someone ignored a court subpoena?

11      A.    Well, it depends, you know.  A court

12  subpoena to testify in trial you mean?

13      Q.    Sure.  Let's start with that one.

14      A.    So it's really a case-by-case basis.  You

15  know, the best case scenario, in my opinion, would be:

16  Can we reach a resolution to the case where this

17  doesn't matter?  You know, the witness doesn't ever

18  have to come in or the victim doesn't have to come in.

19  Can we resolve the case?

20          If that doesn't happen, then I would

21  evaluate:  Is the testimony essential in order to

22  present the case?  Do I need this testimony or do I

23  have enough evidence without it to present the case?

24  And if I could present the case without that witness

25  and I feel like I can explain that to the victim, then